**Objection Deadline: September 24, 2012 at 5:00 p.m. (prevailing Eastern Time)**
**Hearing Date: TBD**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue
New York, NY 10017
Telephone:  (212) 450-4000
Facsimile:  (212) 607-7984
Marshall S. Huebner
Benjamin S. Kaminetzky
Damian S. Schaible
Paul S. Mishkin

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PINNACLE AIRLINES CORP.,** *et al.*, | **Case No. 12-11343 (REG)** |
| | **(Jointly Administered)** |
| **Debtors.** | |

**MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO REJECT
COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF
FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

# TABLE OF CONTENTS

PAGE

**PRELIMINARY STATEMENT** ................................................................ 1

**BACKGROUND** ................................................................ 6

    A.    Regional Airline Industry Overview ................................................ 6

    B.    Shift Toward Larger Regional Aircraft .......................................... 8

    C.    Overview of Pinnacle ................................................................ 10

    D.    Pre-Filing Events ...................................................................... 12

    E.    Business Plan and Initial Labor Ask .......................................... 14

        1.    Business Plan Overview ...................................................... 15

        2.    May 8, 2012 Labor Ask ...................................................... 18

    F.    Revised Labor Ask .................................................................. 20

        1.    Industry "Game-Changer" .................................................. 20

        2.    Pinnacle's Validation of the Delta Calculation .................... 21

            (a)    Seabury Analysis .................................................. 23

            (b)    Compass Lexecon Analysis .................................... 24

        3.    Delta Contractual Rights .................................................... 25

        4.    Renegotiation of MFN Provisions ...................................... 27

        5.    Terms of Revised Proposal ................................................ 27

            (a)    Pilots .................................................................... 28

            (b)    Flight Attendants .................................................. 30

            (c)    Dispatchers .......................................................... 30

            (d)    Non-union ............................................................ 30

    G.    Union Negotiations .................................................................. 31

**ARGUMENT** ................................................................ 34

    I.    PINNACLE'S PROPOSAL IS NECESSARY TO ITS RESTRUCTURING .... 35

        A.    Necessity Legal Standard ...................................................... 35

        B.    Pinnacle's Proposal Is Necessary to Its Long-Term Competitiveness .... 37

        C.    Pinnacle's Proposal Is Necessary to Avoid Various Short-Term Risks .. 42

    II.    PINNACLE HAS SUPPLIED THE REQUIRED INFORMATION AND BARGAINED IN GOOD FAITH ................................................ 43

A.    Complete and Reliable Information..........................................................43

B.    Provision of Necessary Information .......................................................44

C.    Reasonable Meeting Times and Conferring in Good Faith ....................46

III.    PINNACLE'S PROPOSAL COMPLIES WITH SECTION 1113'S EQUITABLE
FACTORS.......................................................................................................47

A.    Fair and Equitable .................................................................................47

B.    Lack of Good Cause Refusal .................................................................49

C.    Balance of the Equities .........................................................................50

**CONCLUSION** ......................................................................................................52

# TABLE OF AUTHORITIES

### CASES

PAGE

*In re AMR Corp.*, No. 11-15463 (SHL),
   2012 Bankr. LEXIS 3756 (Bankr. S.D.N.Y. Aug. 15, 2012) ......................................... *passim*

*In re Allied Delivery Sys. Co.*,
   49 B.R. 700 (Bankr. N.D. Ohio 1985) ...................................................................50

*In re Bowen Enters., Inc.*,
   196 B.R. 734 (W.D. Pa. 1996 ..................................................................................49

*In re Delta Air Lines, Inc.*,
   359 B.R. 468 (Bankr. S.D.N.Y. 2006) .......................................................... *passim*

*In re Horsehead Indus., Inc.*,
   300 B.R. 573 (Bankr. S.D.N.Y. 2003) ...................................................................36

*In re Maxwell Newspapers, Inc.*,
   981 F.2d 85 (2d Cir. 1992) ..............................................................................49, 50

*In re Mesaba Aviation, Inc.*,
   341 B.R. 693 (Bankr. D. Minn. 2006) ....................................................................41

*New York Typographical Union No. 6 v. Royal Composing Room, Inc.*
   *(In re Royal Composing Room, Inc.)*,
   848 F.2d 345 (2d Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989) .................................. *passim*

*In re Northwest Airlines Corp.*,
   346 B.R. 307 (Bankr. S.D.N.Y. 2006) .................................................34, 35, 36, 37

*In re Royal Composing Room*,
   62 B.R. 403 (Bankr. S.D.N.Y. Jun. 16, 1986), *aff'd*, 848 F.2d 345 (2d Cir. 1988) ................45

*In re Tex. Sheet Metals, Inc.*,
   90 B.R. 260 (Bankr. S.D. Tex. 1988) ...............................................................46, 47

*Truck Drivers Local 807 v. Carey Transp., Inc.*,
   816 F.2d 82 (2d Cir. 1987) ...........................................................35, 36, 37, 50

*In re Walway Co.*,
   69 B.R. 967 (Bankr. E.D. Mich. 1987) ...................................................................50

## Statutes

11 U.S.C. § 1113.................................................................................................................. *passim*

## Other Authorities

7 Collier on Bankruptcy ¶ 1113.06 (15th ed. 2001) .......................................................................35

Pinnacle Airlines Corp. ("Pinnacle" or the "Company") and its affiliated debtors (the "Debtors") respectfully move, pursuant to 11 U.S.C. § 1113(c), for an Order (1) authorizing rejection of collective bargaining agreements with (a) the Air Line Pilots Association, International ("ALPA") and (b) the Association of Flight Attendants-CWA ("AFA"); and (2) implementing the terms of Pinnacle's Section 1113 proposal.

## PRELIMINARY STATEMENT

The regional airline industry is in crisis, and Pinnacle must adapt immediately or it will liquidate. Regional carriers are experiencing relentless pressure to reduce costs, leaving them with the painful, but unavoidable, choice of reducing the compensation of their workforce or shutting down. Demand for regional air service is shrinking, most notably for 50-seat regional jets of the type predominantly flown by Pinnacle. Numerous regional airlines have failed in the last ten years, and many others have undergone – or are currently undergoing – significant restructurings. Older airlines like Pinnacle are particularly exposed because of the relative seniority of their workforces, contributing to substantially higher labor costs. Just this past month, Delta Air Lines ("Delta") announced that it is shutting down its 35-year-old regional airline subsidiary, Comair, due to – in the words of Comair's president – "the economic limitations of our aging aircraft, cost structure, the long-term outlook for 50-seat aircraft, and our challenging industry and economy."[1] Pinnacle will imminently become this trend's next casualty absent substantial labor savings.

As the Court has previously heard, Pinnacle's bankruptcy was caused by a confluence of factors, including delayed integration of its subsidiaries, difficulties arising from its collective

---

[1] Glass Decl. Ex.53, Press Release, Ryan Gumm, President, Comair, Inc., Delta Air Lines, Comair to Cease Operations (July 27, 2012), http://news.delta.com/index.php?s=43&item=1676 (hereinafter "Comair Ceases Operations Press Release").

bargaining agreement with its pilots, increased operational expenses, and increasingly unprofitable contracts, all of which contributed to an acute liquidity crisis. Pinnacle has undertaken exhaustive efforts to address these issues and continues to do so. Among other steps, Pinnacle has streamlined its organization by shrinking its management team, consolidating its operations, and winding down unprofitable contracts, and has sought cost savings from every aspect of its business.

Despite these efforts, Pinnacle finds itself on the brink of extinction because of its above-market labor costs. This stark reality stems from the following facts:

- Pinnacle's sole continuing source of revenue is as a regional carrier for Delta, pursuant to assumed agreements for 50-seat and 76-seat regional jets. These agreements are currently *money-losing* for Pinnacle, contributing to losses that will leave Pinnacle with *close to zero liquidity by* ███████████ under its current cost structure.

- Delta, Pinnacle's DIP lender and sole continuing customer, has informed Pinnacle that even the money-losing rates it currently receives from Delta are ██████ *higher per 76-seat aircraft than the average rates charged by other Delta Connection carriers.* Independent analysis confirms this cost gap based on Pinnacle's above-market labor costs, which are exacerbated by a substantial seniority disadvantage. Delta also informed Pinnacle that its rates for 50-seat aircraft are above the Delta Connection average by ██████ per aircraft.

- Absent closing the ██████ cost gap, Pinnacle cannot compete for future 76-seat flying. This would be a death sentence for Pinnacle, because Delta (and likely other majors) are significantly reducing or phasing out 50-seat flying – which is what Pinnacle predominantly supplies – and replacing it with a smaller number of 76-seat aircraft.

- Pinnacle faces not only longer-term inevitable shut down, but also substantial short-term risk, if it fails to achieve competitive rates for future 76-seat flying. Pinnacle likely cannot raise necessary capital for exiting bankruptcy without long-term business prospects. Even if Pinnacle could emerge from bankruptcy, it enjoys little protection under its existing Delta contracts because they are not subject to any "minimum utilization" or other usage requirements and include a rate reset in 2018 to ██████████████████████ ████████████████████████.

Based on these and other facts, and having extracted all other feasible savings from its business, Pinnacle has computed necessary annual labor cost savings of approximately $76.5 million. This amount is required to cover the ▮▮▮▮▮ cost gap identified by Delta and independently validated by Pinnacle as necessary to allow Pinnacle to bid competitively for future flying.

To achieve these necessary aggregate savings, Pinnacle has proposed wage, benefit, and work rule modifications to its collective bargaining agreement with its pilots, flight attendants, and dispatchers that would result in savings of approximately $60 million, $6.4 million, and $288,000 from these groups, respectively, plus proposed savings of approximately $10 million from non-unionized labor. Pinnacle has also proposed a profit sharing program that would be among the industry's most generous, returning 10% of profits up to 4% of the Company's pre-tax margin and 15% of profits above 4% of the Company's pre-tax margin starting in 2013, contingent upon reaching a consensual resolution with the respective unions. Pinnacle has made these proposals in full compliance with Section 1113 of the Bankruptcy Code.

First, the proposed collective bargaining agreement modifications are necessary for Pinnacle's successful reorganization. There is nothing more fundamental to Section 1113 relief than emerging from bankruptcy with the ability to compete for and win new business. Delta, Pinnacle's sole customer and DIP lender, and one of the largest consumers of regional flying among a shrinking group of mainline carriers, has notified Pinnacle that, absent the savings it seeks, it is not cost-competitive for future flying – not with respect to increasingly obsolete 50-seat flying, and not with respect to replacement 76-seat flying. Independent analysis of Pinnacle's cost disadvantage confirms this assessment. Pinnacle thus has two choices: become competitive so that it has a future; or attempt to emerge from bankruptcy as an outdated carrier with no hope of winning replacement business after the expiration of its current contracts, which

3

– in any event – do not contain any "minimum utilization" or other usage requirements and are subject to various other risks.  The latter choice is not only highly unadvisable and contrary to the purpose of Section 1113, but likely impossible, because Pinnacle would be substantially inhibited in trying to attract third-party capital required for emergence if it could not demonstrate any long-term growth potential.  Pinnacle also risks breaching various minimum cash, maximum expense, and other DIP covenants if it does not immediately obtain substantial labor cost savings.  For all these reasons, Pinnacle's requested savings are overwhelmingly necessary to a successful restructuring.

Second, Pinnacle's proposal is based on the most complete and reliable information available.  All available information – including information received from Pinnacle's sole continuing customer, labor cost market comparisons, internal data, and analyses by industry experts based on the most recent market developments and trends – supports the cost savings figure Pinnacle has proposed.

Third, Pinnacle has bargained with its unions in good faith and has supplied all data necessary to evaluate the proposal.  It commenced negotiations on May 8, 2012.  In mid-June, Pinnacle received new information from Delta about its competitive position and immediately stopped negotiations to reassess its business plan, to engage in negotiations with Delta regarding its capacity purchase agreements with Delta, and to re-compute its required savings.  Pinnacle resumed negotiations on August 16 based on a revised savings proposal and has negotiated in good faith through the filing of this motion, and continues to do so.  Among other evidence of Pinnacle's good faith, senior Company representatives have made themselves available to the unions on virtually a 24/7 basis to meet, answer questions, and supply requested information.  To date, Pinnacle has provided more than 7,000 pages of information supporting its proposal, via a

4

continually-accessible electronic "Data Room," constantly updating the Data Room in response to the unions' queries. Pinnacle has considered every proposal offered by the unions and, at every turn, has demonstrated its openness to alternative methods for achieving the aggregate required cost savings.

Fourth, Pinnacle's proposal is fair and equitable. Union and non-union employees alike have been asked to contribute to the required cost savings, and these requested savings were made only after an exhaustive effort to identify savings from other sources. Pinnacle's pilots have been asked to contribute the most, given that they represent Pinnacle's largest controllable cost item and that their wages, benefits, and work rules are furthest from the market average compared to any other Pinnacle labor group. Pinnacle's proposed profit-sharing program – which would provide significant upside to Pinnacle employees, contingent upon reaching a consensual deal – further underscores the fairness of Pinnacle's proposal.

Fifth, Pinnacle's unions have refused Pinnacle's proposal without good cause. Given the necessity of the proposed cuts and Pinnacle's compliance with the other elements of Section 1113, there is no reasonable basis for the unions to have rejected Pinnacle's proposal.

Sixth, the balance of the equities favors implementation of the proposed modifications. There is no denying the significance of the requested cuts and the hardship they will impose on all employees. Section 1113, however, mandates consideration of the alternative – certain liquidation and the loss of every job at Pinnacle. Against the grave market reality in which Pinnacle must operate, there is no path to long-term sustainability absent the proposed cost savings.

5

For all these reasons, and for the additional reasons explained below and in the accompanying declarations, Pinnacle's Section 1113 motion should be granted, and the terms of its proposal should be implemented.

## BACKGROUND

A.    **Regional Airline Industry Overview**

Regional airlines such as Pinnacle partner with major (or "mainline") carriers to provide transportation between larger hub cities and smaller outlying destinations.  This service allows mainline carriers to offer expanded travel options for consumers, without needing to maintain and operate their own fleets of smaller aircraft suited for shorter regional flights.  Although not operated by the mainline partner, regional planes display the mainline brand name and logo, and regional flights are designated with the mainline marketing code.  Thus, from the perspective of the consumer, regional flying is intended to appear as a seamless extension of services provided by a single mainline carrier.  (Declaration of Daniel M. Kasper, dated September 13, 2012 ("Kasper Decl.") ¶ 32.)

The current troubles in the regional airline industry result from the transformation of the mainline airline industry that has been underway for over a decade.  Events such as the September 11, 2001 terrorist attacks, resulting increased security requirements and decreased demand for air travel, the growth of low-cost carriers, rising fuel prices, and the recent financial crisis have all contributed to a sustained contraction and loss of profits in the mainline airline industry.  With the Chapter 11 filing of American Airlines last November, every so-called "legacy" carrier has now been required to seek the protection of bankruptcy court.  (*Id.* ¶ 15.)  As observed by Judge Lane in his recent Section 1113 opinion in that case, airline bankruptcies have followed a consistent pattern:  "the airline enters bankruptcy with labor costs that are at or near

6

the top of the industry and then emerges with costs at or near the low end of the group." *In re AMR Corp.*, No. 11-15463 (SHL), 2012 Bankr. LEXIS 3756, at *82 (Bankr. S.D.N.Y. Aug. 15, 2012). The inevitable result has been steep and sustained cost cuts by major carriers, which have looked to tap every possible source of savings from their operations. (Kasper Decl. ¶ 15.)

For a time, regional airlines were largely immune to the mounting cost pressure and market downturns impacting their mainline partners. Regional airlines have historically enjoyed favorable "capacity purchase" contracts, requiring mainline carriers to pay them a fixed fee based on each departure, regardless of ticket sales or the number of passengers, and to cover various "pass-through costs" such as maintenance and fuel, with labor as the primary non-reimbursable (or "controllable") cost for regional carriers.[2] These contracts often afforded healthy profit margins, and allowed regional airlines to avoid applying the same degree of pressure on their own controllable costs as was becoming vital to the survival of their mainline partners. (*Id.* ¶ 16.)

That era is definitively over. As part of their drive to reduce costs, mainline carriers have fully turned their attention to regional contracts and have sought to reduce the cost of regional flying to significantly lower levels. Regional flying has become a nearly commoditized business, with relative cost as the primary determinant of who wins and who loses bids for new flying. This trend has been exacerbated by shrinking demand for regional flying from a decreasing number of mainline carriers, which have continually merged themselves into fewer and fewer potential consumers of regional flying (*e.g.*, American/TWA, US Airways/America West, Delta/Northwest, United/Continental). (*Id.* ¶¶ 17-18, 50.)

---

[2] An alternative type of contract, a pro-rate agreement, exposes regional airlines to fluctuations in fuel prices and airfares because regional airlines' compensation varies depending on ticket sales.

The impact of this trend is seen in several regional airline bankruptcies besides Pinnacle's (*e.g.*, Mesaba in 2005, Mesa Air Group in 2010, American Eagle in 2011), and most recently, in the announcement that Delta's 35-year-old regional airline subsidiary, Comair, will cease operations this September because its costs are no longer competitive.  In a memo reporting this news, Comair's president said to the company's employees:  "The discontinuation of Comair's operations is in no way a failure or a reflection of your work – it is an unfortunate necessity due to the economic limitations of our aging aircraft, cost structure, the long-term outlook for 50-seat aircraft, and our challenging industry and economy."[3]  The demise of Comair serves as a warning to all regional carriers, and particularly to Pinnacle given its similar characteristics and circumstances – including an above-market pilot collective bargaining agreement, high seniority of its workforce, and concentration in increasingly obsolete 50-seat aircraft, as discussed in the next section.  (*See generally* Kasper Decl. ¶¶ 20-21, 55-86; Declaration of John Spanjers, dated September 13, 2012 ("Spanjers Decl.") ¶ 8; Declaration of Virginia L. Hughes, dated September 13, 2012, ("Hughes Decl.") ¶¶ 33-38, & Ex. 11; Declaration of Jerrold A. Glass, dated September 13, 2012 ("Glass Decl.") ¶ 52.)

**B.**     **Shift Toward Larger Regional Aircraft**

In addition to the general trend of decline in the regional airline industry, there is an additional specific trend of critical importance to Pinnacle:  a move away from smaller 50-seat regional aircraft toward larger 70- and 76-seat aircraft.  Major carriers prefer the larger regional aircraft primarily because of their greater fuel efficiency and lower per-seat costs, and thus future growth in regional flying is expected to be concentrated in those larger aircraft, rather than 50-seat regional jets of the type predominantly flown by Pinnacle.  (Spanjers Decl. ¶ 6; Hughes

---

[3] Glass Decl. Ex.53, Comair Ceases Operations Press Release.

8

Decl. ¶¶ 33-34;  Kasper Decl. ¶¶ 19-20, 49-51.)  In May, Delta reached a watershed tentative

agreement with its pilots union, ratified in June, to modify their existing collective bargaining

agreement, including a change permitting Delta to add 70 of the larger 70- and 76-seat regional

jets to its fleet, on the condition that it remove from its fleet over 200 50-seat regional aircraft,

resulting in a net decrease in Delta's regional flying capacity.  (Spanjers Decl. ¶ 6.)

Since reaching the agreement with its pilots, Delta has repeatedly announced its intention

to reduce significantly its 50-seat fleet, stating that it plans to reduce the fleet "to less than 125

aircraft over the next two years," and has a "clear path" for doing so.[4]  Delta has explained that

this strategy is motivated by "significant changes in the economic and competitive conditions in

the airline industry," and that "the 50-seat reduction is probably the single biggest contributor"

toward an overall "$1 billion structural cost reduction . . . over the next two to three years."[5]  The

cost savings resulting from reduction of 50-seat aircraft is attributable to the relatively high

operating costs of 50-seat aircraft and, according to Delta, "even more importantly [to] the

upcoming fairly significant maintenance costs" that will soon arise given the age of these

aircraft, which Delta has estimated "will run into the hundreds of millions of dollars."[6]  ALPA

has estimated that the 50-seat aircraft reduction will save Delta "approximately $184 million in

---

[4] Hughes Decl. Ex. 9, Delta Air Lines' CEO Discusses Q2 2012 Results - Earnings Call Transcript, Seeking Alpha (July 25, 2012), http://seekingalpha.com/article/749071-delta-air-lines-ceo-discusses-q2-2012-results-earnings-call-transcript (hereinafter "Delta Q2 2012 Earnings Call").

[5] Glass Decl. Ex. 53, Comair Ceases Operations Press Release, http://news.delta.com/index.php?s=43&item=1676 ("Delta recently announced its intent to reduce the overall number of 50-seat regional jets in its network from nearly 350 to 125 or fewer in light of the significant changes in the economic and competitive conditions in the airline industry."); Hughes Decl. Ex. 9, Delta Q2 2012 Earnings Call.

[6] Hughes Decl. Ex. 9, Delta Q2 2012 Earnings Call.

above normal run rate CRJ-200 engine maintenance costs" as well as "approximately $289

million in DCI [Delta Connection] contract and CRJ-200 ownership costs."[7]

Given the distribution of 50-seat aircraft among Delta's regional partners, at least some –

and likely a substantial portion – of the reduction needed to achieve Delta's target of 125 or

fewer 50-seat aircraft must come from Pinnacle.  Based on expiring contracts and other

arrangements already negotiated, Delta will soon have reduced its 50-seat fleet to 225, of which

140 are flown by Pinnacle and 85 are flown by SkyWest/ExpressJet.  (Hughes Decl. ¶ 11.)  To

reach its stated goal of 125 50-seat aircraft or fewer, Delta must therefore remove at least 100

more 50-seat aircraft.  Thus, even assuming removal of many or all of the SkyWest/ExpressJet

remaining 50-seat aircraft, Delta would need to reduce Pinnacle's 50-seat flying to some extent,

and likely substantially, particularly if its true targeted number of 50-seaters is significantly less

than 125.  (Hughes Decl. ¶¶ 35-36, Ex. 11.)  As discussed below, this fact exposes Pinnacle to

significant risk if it cannot achieve a competitive rate for the 76-seat flying that Delta wishes to

substitute for 50-seat flying.

C.   **Overview of Pinnacle**

Pinnacle is a regional airline headquartered in Memphis, Tennessee.  Pinnacle was

founded in 1985 and for many years provided regional air service to Republic Airlines, and later,

after Republic merged into Northwest Airlines, for Northwest Airlines.  Northwest subsequently

acquired Pinnacle, and Pinnacle flew as a Northwest subsidiary until it was spun-off in 2003.  As

an independent regional airline, Pinnacle grew as it became a "Delta Connection" carrier in 2007

after the merger of Northwest and Delta, and through the acquisition of two subsidiary airlines –

---

[7] Hughes Decl. Ex. 2, Negotiators' Notepad 12-13, Delta MEC, Contract 2012 – Rumor, Innuendo and
Misrepresentations (June 21, 2012), http://alpawatch.org/C2012/Negotiators%27%20Notepad%2012-13%20--
%20Contract%202012%20%E2%80%93%20Rumor,%20Innuendo%20and%20Misrepresentations.pdf.

Colgan Air, Inc. ("Colgan") in 2007 and Mesaba Aviation, Inc. ("Mesaba") in 2010 – ultimately becoming the fourth-largest U.S. regional carrier after SkyWest, American Eagle, and Republic in terms of "available seat miles." (Kasper Decl. ¶ 57.) In 2011, Pinnacle experienced a $31.5 million loss, its worst annual loss in history. Following extensive out-of-court restructuring efforts, Pinnacle filed for Chapter 11 bankruptcy on April 1, 2012. (Declaration of John Spanjers Pursuant to Local Bankruptcy Rule 1007-2, dated April 1, 2012, Dkt. No. 3 ("Spanjers First-Day Decl.") ¶¶ 29-42.) The events leading to this filing are described in greater detail below.

As part of Pinnacle's restructuring, all former Mesaba flying has been transferred to Pinnacle Airlines, Inc., and Pinnacle surrendered Mesaba's operating certificate to the FAA. Colgan's revenue flight operations ceased on September 5, 2012. Pinnacle's sole continuing source of operating revenue is as a Delta Connection carrier. Pinnacle flies two types of regional jets for Delta – 140 50-seat CRJ-200s and 41 76-seat CRJ-900s. Each aircraft type is covered by a separate capacity purchase agreement with Delta (the "Delta Connection Agreements"), both of which Pinnacle assumed with Court approval in mid-May as part of the Court's broader approval of the Delta-provided DIP facility.[8] (Hughes Decl. Ex. 2, Tr. of Hr'g on Debtors' Mot. to Authorizing Debtors to Obtain Post-Petition Financing (May 16, 2012) ("DIP Hearing Tr.").) The agreements are set to expire in 2022, but are subject to a "rate reset" in 2018, ███████████

████████████████████████████████████████

████████████████████████████ " (Dkt. Nos. 23, Ex. D; 289.)

Pinnacle has approximately 5,800 active employees, including pilots, flight attendants, flight dispatchers, mechanics, aviation maintenance support personnel, crew resource personnel,

---

[8] Pinnacle also flies 16 CRJ-900 aircraft for Delta pursuant to a separate assumed contract, which are scheduled to be wound down in the first half of 2013. (Spanjers Decl. ¶ 9.)

managers, and administrative support staff.  More than 75% of Pinnacle's workforce is

unionized, consisting of approximately 2,400 pilots represented by ALPA; nearly 1,500 flight

attendants represented by AFA; and approximately 80 flight dispatchers represented by the

Transport Workers Union of America ("TWU").  Pinnacle's labor costs are by far its single

largest "controllable" (i.e., non-reimbursable) cost item, representing more than 70% of its total

controllable costs.  (Hughes Decl. ¶ 16.)  As explained below, Pinnacle cannot sustain these

labor costs based on its current and projected future revenue, and will imminently run out of

money if forced to continue paying them.

D.    **Pre-Filing Events**

Pinnacle came under new management in the second half of 2011.[9]  Upon its arrival,

Pinnacle's new management team undertook a thorough assessment of Pinnacle's business.

With the assistance of outside advisors, management identified various problems that

collectively threatened the Company's viability, including delayed integration of its airline

subsidiaries, difficulties stemming from its joint collective bargaining agreement ("JCBA") with

its pilots (ratified in February 2011), poor operational performance, and unprofitable contracts

with airline customers.  (*See generally* Spanjers First-Day Decl. ¶¶ 29-37.)  As explained in prior

filings, and as found by the Court as part of its ruling approving Pinnacle's DIP financing, these

and other factors resulted in an acute liquidity crisis and forced Pinnacle into bankruptcy.

(Hughes Decl. Ex. 2, DIP Hearing Tr., at 175-79.)

---

[9] There have been subsequent management changes since that time and since the Company's Chapter 11
filing.  Sean Menke, Pinnacle's former CEO, resigned from the Company effective June 1, 2012.  John Spanjers, the
COO has succeeded him as CEO and continues to serve in both roles.  Ginger Hughes, Executive Director and Co-
Head of the Airline Corporate Advisory Group of Seabury Group ("Seabury"), has been the Company's *de facto*
CFO since the former CFO resigned in March 2012.  Steven A. Rossum, a former senior legal and finance executive
at several airlines, was appointed Chief Restructuring Officer in June 2012.  Dkt No.447, Order Authorizing
Employment and Retention of NSB Aviation, LLC and (ii) Designating Steven A. Rossum as Chief Restructuring
Officer (June 25, 2012).

Pinnacle made substantial progress in addressing these issues before its Chapter 11 filing on April 1, 2012, and has continued to do so post-filing. One of new management's first steps was to downsize the company's leadership by consolidating separate management teams that had existed across its subsidiaries into a single team, and by otherwise eliminating unnecessary management positions. These reductions decreased officer- and director-level headcount by about 40%, with accompanying dismissals of support staff and other employees. The Company also eliminated merit increases and discretionary bonuses scheduled for 2012. (Spanjers First-Day Decl. ¶ 30.)

In addition to reconfiguring its management team, Pinnacle embarked on an aggressive project of re-negotiating and exiting unprofitable contracts. For example, Pinnacle exited unprofitable turboprop flying for US Airways, which ceased in December 2011, except for certain "essential air service" flying, which Pinnacle has been able to exit post-filing. (Spanjers Decl. ¶ 9.) In February 2011, Pinnacle obtained temporary relief on unprofitable turboprop flying for United Airlines, bargaining for a short-term increase in its compensation from United, and ultimately negotiating a longer-term termination of that flying. Pinnacle also negotiated a substantial payment deferral with Export Development Canada ("EDC"), Pinnacle's lender in connection with various aircraft. (Spanjers First-Day Decl. ¶ 38.)

Moreover, Pinnacle identified and began implementing a variety of operational cost-saving measures, as further described below, and it undertook an extensive search for investors willing to provide badly needed liquidity. Despite substantial challenges, including the lack of unencumbered assets to offer as collateral, Pinnacle was able to obtain an approximately $74 million DIP facility from Delta, on terms that the Court found acceptable given Pinnacle's precarious financial condition and lack of identified financing alternatives. (Dkt. No. 316 at 6-7;

Shapiro Decl. Ex. 1.)  The DIP provides Pinnacle with the liquidity it needs to operate in

bankruptcy, conditioned on various financial and other covenants, as discussed below.

In addition to the efforts described above, Pinnacle approached its labor unions in the fall

of 2011 to see if it could obtain labor cost reductions that might reduce the chances of a

Chapter 11 filing.  The Company requested a 5% wage cut, as well as relief from ALPA

regarding provisions of the JCBA that were imposing substantial inefficiencies and crippling

costs in connection with the integration of Pinnacle's subsidiaries.  (Spanjers Decl. ¶ 14.)  The

Company believed and explained to its labor groups that these concessions, if obtained promptly,

might have allowed Pinnacle to retain its flying for United Airlines, potentially allowing the

Company to avoid bankruptcy altogether.  (*Id.*)  Pinnacle also made clear, however, that if it

could not obtain the requested concessions quickly, there would be a strong likelihood of a

Chapter 11 filing, and the labor concessions ultimately required to restructure successfully could

be substantially greater.  (*Id.*)  In the end, no labor deal was reached, and Pinnacle was not able

to retain the United flying.  (Spanjers Decl. ¶ 14.)

Although ultimately insufficient to avoid a Chapter 11 filing, Pinnacle's pre-filing efforts

have placed the Company on a path toward viability.  The missing piece is Pinnacle's critical

need for labor concessions.  Pinnacle was unable to address this issue pre-filing, and, as

described below, has not been able to address it post-filing through a consensual deal, despite

extended efforts to do so.

**E.**     **Business Plan and Initial Labor Ask**

Pinnacle and its advisors have worked diligently to build and refine a viable business plan

and to analyze the extent of labor savings needed for the Company's successful reorganization.

Seabury, based on its extensive airline finance experience, has advised on a wide range of areas,

14

focused on developing and testing every aspect of the Company's business model for robustness and long-term sustainability. (Hughes Decl. ¶¶ 14-21.) Barclays, based on its extensive investment banking experience in transportation and restructuring, has also advised in various areas, including the economic profile the Company would need to obtain to attract an outside investor to facilitate the Company's emergence from bankruptcy and help provide a platform for future growth. (Declaration of Mark Shapiro, dated September 13, 2012 ("Shapiro Decl.") ¶¶ 3-4.) Jerry Glass, President of F&H Solutions Group and one of the country's foremost airline labor experts based on over 30 years of industry experience, serves as the Company's lead labor negotiator and has advised on all aspects of the labor ask, including assistance with detailed market comparisons of the wage, benefit, and complex work rule terms of the Company's existing collective bargaining agreements. (Glass Decl. ¶ 14.)

The subsections immediately below discuss Pinnacle's business plan and initial labor ask, which Pinnacle presented to the unions on May 8, 2012. The sections that follow further below describe Pinnacle's revised ask based on new information obtained from Delta, which it presented to the unions on August 16.

### 1.    *Business Plan Overview*

Like any business plan, Pinnacle's business plan focuses on two basic components: revenue and cost. Because Pinnacle's sole continuing business is as a Delta Connection carrier, the revenue line of Pinnacle's business plan is simply the expected amounts to be received under its assumed contracts for CRJ-200 and CRJ-900 flying for Delta. On average, Pinnacle expects

to earn approximately ███████████ from Delta annually, above and beyond amounts paid by

Delta to cover "pass-through" costs (i.e., costs reimbursed by Delta).  (Hughes Decl. Ex. 3.)[10]

The cost items in the business plan are, primarily, the costs expected to be incurred by

Pinnacle in providing regional flying to Delta.  The key costs in this category are so-called

"controllable" costs, which are not subject to dollar-for-dollar reimbursement by Delta, and thus

are the main determinants of whether Pinnacle makes or loses money under its contracts.  As

noted above, labor is Pinnacle's single largest controllable cost, representing 70% of total

controllable costs, followed by maintenance and materials costs, which represent 13% of the

total.  (Hughes Decl. ¶ 16.)[11]

Certain other cost categories also have a material impact on Pinnacle's business plan.

Starting in 2013, Pinnacle will need to begin repaying the Delta DIP facility, at a cost of

approximately $7.9 million per year.  Pinnacle will also need to pay off various claims to exit

from bankruptcy.  These claims cannot currently be calculated with certainty, but are expected to

be approximately in the range of $15 to $22 million.  (Shapiro Decl. ¶ 24.)  Pinnacle also has real

estate and other basic overhead costs, amounting to approximately $30 million per year.

(Hughes Decl. ¶ 3.)

In an attempt to create the most robust business plan possible, Pinnacle has sought cost

reductions and opportunities to increase profitability wherever possible.  Key to this effort were

---

[10] These revenue amounts are not contractually fixed because Delta is not committed under the agreements to any particular amount of flying.

[11] Although ultimately reimbursable, certain controllable costs are paid in the first instance by Pinnacle and reimbursed later by Delta.  Given Pinnacle's depleted cash level, the Company must pay particularly careful attention not only to its controllable costs, but also to the timing of reimbursement for its non-controllable costs as well.  As previously presented to the Court and found as fact as part of the Court's approval of the DIP facility, the stability of Pinnacle's operations and ability to weather unpredictable liquidity fluctuations depends on the Company's always maintaining a minimum cash cushion of at least $20 million, including at monthly cash "low points" where Pinnacle is expecting later reimbursement for costs it has incurred.  (*See* Hughes Decl. Ex. 2, DIP Hearing Tr. at 175.)

the management down-sizing and pay freezes discussed above – which collectively saved the

Company approximately $17 million per year, as well as the unwinding of unprofitable contracts

– which helped avoid continuing losses exceeding $66 million per year.  (Hughes Decl. ¶ 17.)

Moreover, through an exhaustive process undertaken by Seabury and Pinnacle that began in the

fall of 2011 and continues to this day, every cost item of Pinnacle's business plan has been

analyzed for potential efficiencies and cost cuts.  This effort has identified the potential for $8.9

million in further savings as follows:

- $1.9 million in cuts for facilities, primarily related to headquarters leases;

- $4.1 in cuts for maintenance and materials, primarily related to repair and logistics costs; and

- $2.9 in cuts from various other expenses including, but not limited to, renegotiation of various executory contracts such as crew hotels and transportation, flight simulators, software, information technology support, and communications.

(Hughes Decl. ¶ 19.)

Notwithstanding these cost savings, with labor costs at their current level, Pinnacle

operates at a significant loss.  For example, Pinnacle's projected non-pass-through revenue for

the second half of 2012 is projected to be ███████, compared to non-pass-through contract

costs and non-contract costs totaling ███████.  Pinnacle's cash reserves were only $49

million as of July 31.  At the current pace, those reserves will drop to dangerously low levels by

███████ and risk total depletion by ███████.[12]  Otherwise stated, Pinnacle will

imminently run out of money absent substantial labor cuts.  (Hughes Decl. ¶¶ 12-13.)

---

[12]As noted above, and as found as a fact by the Court in the context of the DIP facility approval, Pinnacle must maintain a cash balance of $20 million.  *See supra* note 11.

2.    *May 8, 2012 Labor Ask*

Pinnacle's initial labor ask was predicated on three key facts.  First, Pinnacle's labor costs are significantly above market.  On a per-seniority year basis (i.e., comparing employees of the same longevity across regional airlines), the wages of Pinnacle's pilots are approximately 6% above the industry average.  (Glass Decl. ¶ 73, Ex. 17.)  But because of Pinnacle's high relative pilot seniority, and because compensation generally increases as seniority increases, Pinnacle's true wage-related cost disadvantage for its pilots is substantially larger.  (The full extent of this seniority disadvantage was not known until Pinnacle received additional information later in the process, as discussed below.)  (Spanjers Decl. ¶¶ 19-25.)  Moreover, the pilot "work rules" specified in the JCBA – which determine when, for how long, and under what circumstances pilots can work, and the extent to which the Company must compensate pilots for "soft" time not spent flying aircraft – are among the most costly and least productive in the industry.  (Glass Decl.§ VI.B.)  Other labor cost disadvantages were found with respect to flight attendant wages and work rules and certain benefits for all labor work groups, including the Company's 401(k) match, which is among the industry's highest.  (Glass Decl. § VII.B.)

Second, any labor ask would obviously have to generate sufficient savings to ensure that the Company did not lose money under its only contracts – i.e., its recently assumed contracts with Delta for CRJ-200 and CRJ-900 flying.  These agreements are currently money-losing. (Hughes Decl. ¶ 12.)  Without access to the price terms of other regional airline contracts – which are tightly guarded and highly confidential within the industry – Pinnacle looked to the rates of its assumed Delta contracts as reflective of the existing market, and as indicative of the cost structure Pinnacle would need to achieve to compete generally in the marketplace without losing money.  (Spanjers Decl. ¶¶ 21-22.)

Third, the Company could not survive by simply achieving break-even costs. It needed to earn a sufficient profit margin to begin generating a cash surplus to guard against unpredictable revenue fluctuations, attract an investor for assistance in emerging from bankruptcy, and achieve competitive rates allowing for future growth. (Spanjers Decl. ¶ 15.)

Based on these considerations, the Company computed an initial labor ask of approximately $43 million per year, spread across all labor groups and consisting of reduced wages and benefits and various work rule modifications. Consistent with the substantially larger market disadvantage associated with the pilots' compensation as compared to Pinnacle's other work groups, Pinnacle's proposal asked for proportionately more from the pilots. However, after accounting for the varying market differentials and "marking-to-market" each labor group's compensation on a per-seniority year basis, the remaining cuts needed to reach the $43 million total were spread roughly equivalently in percentage terms across all three unionized groups (ranging from 9.0-9.6%), with somewhat larger percentage cuts for non-unionized salaried and hourly employees. Given the overall disproportionate contribution of pilot costs to total costs, and given the more significant market deviation associated with pilot compensation, the pilots' total requested contribution was approximately 78% of the aggregate $43 million ask, or approximately $33 million. (Glass Decl. ¶ 31.)

On May 8, 2012, the Company presented its initial proposal in separate presentations to each of its unions and began good faith negotiations to reach a consensual deal. The parties made little progress toward a consensual resolution before the temporary suspension of negotiations in mid-June.

19

**F.    Revised Labor Ask**

    *1.    Industry "Game-Changer"*

In June, Pinnacle received information from Delta that required it to suspend negotiations and reformulate its proposal.  As discussed above, Delta reached a tentative agreement with its pilots in May to permit it to add 70- and 76-seat regional aircraft to its fleet while substantially reducing 50-seat regional aircraft, which are generally less fuel efficient and have higher unit costs than larger regional aircraft and are increasingly disfavored by mainline carriers.  This was an industry "game-changer," and it substantially impacted Pinnacle's assessment of its future.  (Spanjers Decl. ¶ 6.)  As an initial matter, Delta's announcement signaled an overall reduction in demand for regional flying, because the number of larger aircraft announced to be added to Delta's fleet would not offset the capacity reduction resulting from the contemplated reduction of 50-seat aircraft.  Moreover, Delta's announcement signaled a trend directly at odds with Pinnacle's own fleet composition, which is concentrated in 50-seat aircraft.  Of Pinnacle's 181 planes extending past next year, 140 of them are 50-seat CRJ-200s, and only 41 are 76-seat CRJ-900s.  As explained above based on more recent announcements, Delta's goal of reducing its 50-seat aircraft inevitably requires a reduction in Pinnacle's 50-seat flying.  (*See supra* pp. 8-10.)

In mid-June, Pinnacle learned from Delta that the rates under Pinnacle's existing Delta Connection Agreements are not cost-competitive compared to other Delta Connection carriers.  Delta conducted a cost comparison analysis of Delta Connection carriers "to determine whether Pinnacle would be a candidate for future lift awards from Delta."  (Declaration of Jason Cude, dated September 13, 2012 ("Cude Decl.") ¶ 5.)  After accounting for differences in compensation structure across contracts (including different categories of pass-through costs), Delta determined that Pinnacle's rates are higher than Delta Connection average rates by approximately ███████

per 76-seat aircraft and ███████ per 50-seat aircraft.  (Cude Decl. ¶ 8; *id.*, Ex. A).  Based on this

analysis, Delta concluded that "Pinnacle is not cost-competitive when compared to the DC

average."  (Cude Decl. ¶ 10.)  Pinnacle management understood this information to mean that,

unless Pinnacle could reduce its rates on its existing, and *already money-losing*, CRJ-900 flying

by ███████ per aircraft, it would never win any new business from Delta or any other mainline

carrier.  (Spanjers Decl. ¶ 19.)

On June 22, Pinnacle suspended its labor negotiations so that it could assess and react to

the new information obtained.  Pinnacle requested that Delta provide a written statement of its

conclusion regarding Pinnacle's costs, which it did by letter dated August 1, 2012.  (Cude Decl.,

Ex. A).  As explained in the letter, the rates charged by other Delta Connection carriers

underlying Delta's calculation are highly confidential and commercially sensitive, and thus Delta

was constrained in supplying additional details about its calculation beyond the information

contained in the letter.  (*Id.*)

### 2.    *Pinnacle's Validation of the Delta Calculation*

Although not able to access the data underlying Delta's calculation, Pinnacle analyzed

the likely reasons for the identified ███████ cost gap and reached the following conclusion:

Pinnacle's seniority disadvantage was more acute than had been previously appreciated and – in

a world rapidly moving toward 76-seat flying – was pricing Pinnacle out of the market to an

extent not adequately captured by the original ask.  (Hughes Decl. ¶¶ 23-32.)  Moreover, it

appeared that the "average" Delta Connection rate was being driven by the very lowest – and

youngest – cost providers in the industry, including Compass Airlines ("Compass") and GoJet

Airlines ("GoJet"), based on overall industry cost pressure and contractual obligations of certain

Delta Connection carriers to be at or near the lowest cost provider for Delta.  (Hughes Decl.
¶¶ 26-32.)

Based on these revelations, Pinnacle undertook an analysis to quantify, on a seniority-
adjusted basis, Pinnacle's cost differential compared to its Delta Connection competitors, and to
replicate Delta's calculation as closely as possible.  In comparing itself to the industry, Pinnacle
and its advisors concluded that the most appropriate comparison was to the cost structure of the
industry's more recent entrants that are winning new business (*e.g.*, Compass and GoJet), rather
than to older regional carriers with cost structures that have proven unsustainable (*e.g.*, Comair)
or are based on structural or other advantages not shared by Pinnacle (*e.g.*, SkyWest).  (Spanjers
Decl. ¶ 22; Hughes Decl. ¶ 31.)  SkyWest and its subsidiary ExpressJet/ASA, for example, enjoy
large economies of scale, substantial cash reserves, and the ability to raise financing for
purchasing aircraft.  (Spanjers Decl. ¶ 22; Hughes Decl. ¶ 31.)  Pinnacle lacks these advantages
and can only market its services through a low cost structure.  (Hughes Decl. ¶ 31; Kasper Decl.
¶ 81 n.126.)  It cannot do so without being competitive with the lowest-cost regional carriers,
which are invariably among the industry's newest entrants.  (Spanjers Decl. ¶ 22; Kasper Decl.
¶ 86-89.)

The Company and its advisors used two different cost comparison methodologies, as
discussed below.  Both analyses focused on the cost gap that exists with respect to Pinnacle's
existing, money-losing Delta contracts, which would only have become sustainable after
implementation of the cost savings contemplated by the original May 8 proposal.  In other
words, both analyses were aimed at identifying cost gaps that exist above and beyond those
addressed by the initial May 2012 labor ask.  (Kasper Decl. ¶¶ 80-83; Hughes Decl. ¶¶ 32-33.)

(a)    Seabury Analysis

Seabury identified several key cost categories as to which it could reasonably estimate amounts paid by Compass and GoJet and compared those amounts to the analogous amounts paid by Pinnacle. These cost categories consisted of pilot and flight attendant wages, certain work rules, and 401(k) match. (Hughes Decl. ¶¶ 27-30 & Exs. 4-5.)

*Compass* – To compute a seniority adjustment for Compass pilot wages, Seabury estimated Compass's weighted average Captain/First Officer seniority at 3.6 years, as compared to ▮▮▮ for Pinnacle. (Restricted to Captains alone, the seniority differential is more stark – ▮▮▮ for Pinnacle versus 4.8 for Compass.) (*Id*. ¶ 27 & Ex. 4.) Based on the comparative seniority estimates, Seabury computed a cost gap between Pinnacle and Compass attributable *only* to pilot wages of approximately $210,000 per 76-seat aircraft. (*Id*. at Ex. 4.) After accounting for flight attendant, work rule, and 401(k) disadvantages, this gap increased to approximately $263,000. (*Id*. ¶ 27 & Ex. 4.)

*GoJet* – Seabury performed an analogous calculation for GoJet. Seabury estimated GoJet's weighted average Captain/First Officer seniority at 3.3 years. (*Id*. ¶ 30 & Ex. 5.) Based on pilot longevity and wages alone, Seabury computed a cost gap between Pinnacle 76-seat jets and GoJet 70-seat jets of approximately $257,00 per aircraft. (*Id*. ¶ 30 & Ex. 5.)[13] After accounting for flight attendant, work rule, and 401(k) disadvantages, this gap increased to approximately $332,000. (*Id*. ¶ 30 & Ex. 5.)

---

[13] Although GoJet flies 70-seat CRJ-700 regional jets, as opposed to 76-seat regional jets of the size flown by Pinnacle, GoJet is properly viewed as a Pinnacle competitor. (Hughes Decl. ¶ 24 & n.8.)

(b)    Compass Lexecon Analysis

Pinnacle also turned to Daniel Kasper of Compass Lexecon, an airline industry expert

and former member of the United States National Airline Commission with over 30 years of

industry experience, for assistance in analyzing the cost gap identified by Delta.  In addition to

assessing Pinnacle's overall competitive position and cataloging the substantial disadvantages

faced by Pinnacle (including seniority and pilot work rule productivity issues), Mr. Kasper

performed a quantitative comparison of "pilot cost per block hour" data publicly reported by

Delta Connection carriers for 2011.  (Kasper Decl. ¶ 71; Ex. 23, Pilot Costs per Pilot Block Hour

for RJs with More than 50 Seats, 2011; ¶¶ 81-82; Ex. 29, Delta Connection 76-Seat RJ Cost per

Pilot Block Hour, 2011.)  This data showed Pinnacle's pilot-related costs as significantly higher

than those of several other Delta Connection carriers, including Shuttle America and Compass,

which reported the two lowest pilot costs among Delta Connection Carriers flying 76-seat

aircraft.  (*Id.*)  Mr. Kasper estimated that Pinnacle's annual cost disadvantage per 76-seat aircraft,

solely attributable to pilot costs (and assuming the proposed May 8 savings), is approximately

$309,000 compared to Compass, and $143,000 compared to Shuttle America.  (*Id.* ¶ 82.)[14]  Mr.

Kasper further estimated a flight attendant cost disadvantage of approximately $36,000 and

$34,000 per large regional jet compared to Compass and GoJet Airlines, respectively.  (*Id.* ¶ 83.)

Based on his analysis, Mr. Kasper concluded that Pinnacle is at a significant cost disadvantage in

competing for additional flying from Delta or any other mainline carrier, particularly for larger

aircraft.  (*Id.* ¶¶ 80-86.)

---

[14]Although Delta Connection carriers Skywest and ExpressJet/ASA reported higher pilot-related costs for 2011 than Shuttle America and Compass, they are contractually obligated to Delta to keep certain contractual rates (including those covering pilot costs) at or below the second-lowest rates charged by all Delta Connection carriers, and thus are constrained in their pricing by the lowest-cost Delta Connection carriers.  (Kasper Decl. ¶ 82; Hughes Decl. ¶ 24, n.9.)

*    *    *

Thus, both analyses validated at least a substantial portion of the Delta-identified

██████ gap, or indeed, suggested that the gap might be even larger.  With the Seabury and

Compass Lexecon calculations as support for the ██████ cost gap reported by Delta, Pinnacle

determined that its future viability depended on achieving sufficient additional labor savings

beyond its initial ask in an amount of ██████ per 76-seat aircraft.  (Spanjers Decl. ¶¶ 25-31;

Hughes Decl. ¶¶ 32-33.)

3.    _Delta Contractual Rights_

In addition to the Company's inability to compete for future business, Pinnacle and its

advisors considered various immediate and short-term risks jeopardizing its existence if it does

not close the ██████ cost gap.

As an initial matter, it is unclear how Pinnacle could emerge from bankruptcy without

obtaining cost cuts necessary to achieve competitive rates.  Pinnacle will almost certainly need

third-party capital investment to pay off administrative claims and provide sufficient liquidity to

emerge from bankruptcy.  (Shapiro Decl. ¶¶ 22-30.)  Unsurprisingly, Pinnacle's investment

banking advisor, Barclays, does not see a significant likelihood of attracting an investor or lender

if Pinnacle's cost structure is preclusive of future business.  (Shapiro Decl. ¶ 30.)  Moreover,

absent immediate and substantial labor cost savings, Pinnacle is at risk of violating various

covenants under its DIP agreement with Delta, including minimum permitted liquidity needed to

avoid default and to convert the DIP into an exit facility, as well as maximum operating expense

and material budget deviation covenants.  (_Id._ ¶¶ 9-15.)  Delta must also reasonably approve the

Section 1113 relief obtained and the plan of reorganization proposed by Pinnacle, or else there is

an event of default under the DIP agreement.  (_Id._ ¶¶ 16-18.)

Even if Pinnacle could exit bankruptcy without closing the ██████ per aircraft cost gap, it would face significant risks under its existing Delta contracts. Pinnacle's agreements with Delta contain no "minimum utilization" or other usage requirements, and thus Delta could substantially reduce Pinnacle's flying, including Pinnacle's 50-seat aircraft that Delta must reduce to reach its reduction goal. (Spanjers Decl. ¶ 6; Hughes Decl. ¶¶ 36-37 & Ex. 11.) Without competitive rates for potential 76-seat flying, Pinnacle would have no prospect of replacing its eliminated 50-seat flying, and thus no prospect of avoiding the substantial job loss that would otherwise accompany its elimination. Pinnacle also faces "rate reset" provisions in 2018, ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

Pinnacle also considered the possibility that Delta could once again emerge as the only interested investor in Pinnacle. As the Court previously heard and found in this case, Pinnacle encountered substantial difficulties in attracting investor interest when it sought DIP financing, owing in large part to Pinnacle's lack of unencumbered assets, and ultimately only Delta was willing to offer financing. (Hughes Decl. Ex. 2, DIP Hearing Tr., at 176.) This same dynamic exists now, but even more starkly. Pinnacle still has no significant unencumbered assets, its current cost structure precludes future business, and Delta has change-in-control veto rights under its agreements with Pinnacle for transactions transferring control of 25% or more of the Company. (Shapiro Decl. ¶ 29.) Thus, even if a third party were willing to make a substantial investment in Pinnacle (which appears unlikely for the reasons noted), Delta could condition its

consent to such investment on changes to the agreements, such as changes in rate, duration,

numbers of aircraft to be operated, substitution rights, and payment terms.

All these risks further underscored the need to close the ▆▆▆▆ cost gap identified by

Delta.

### 4.    *Renegotiation of MFN Provisions*

Before presenting its revised proposal, Pinnacle negotiated with Delta for several weeks

in July and August to obtain certain key modifications to the "most-favored-nation" ("MFN")

clauses in Pinnacle's contracts.  (Spanjers Decl. ¶ 30.)  As previously drafted, those provisions

effectively precluded Pinnacle from seeking flying opportunities from customers other than

Delta, because the provisions obligated Pinnacle to give Delta the benefit of any lower rates

charged to another customer on every aircraft flown for Delta.  (*Id.*)  Thus, for example, if

Pinnacle flew one CRJ-200 regional jet for United Airlines at rates lower than those charged to

Delta, Pinnacle would have had to match those lower rates for all 140 CRJ-200s flown for Delta.

The result would have been substantially dilutive of Pinnacle's revenue, likely rendering new

flying opportunities uneconomical.  Pinnacle sought and obtained amendments to the MFN

clauses significantly decreasing their dilutive impact on Pinnacle's revenue, including complete

relief from any rate reduction obligation to Delta for the first ▆ aircraft flown per non-Delta

customer.  (*Id.*)

### 5.    *Terms of Revised Proposal*

Pinnacle calculated a revised, total labor ask of $76.5 million as required to reduce costs

by ▆▆▆▆ per 76-seat aircraft.  In spreading this amount among the various labor groups,

Pinnacle has used the same percentage contributions underlying the May 8 ask, including a pilot

contribution of 78% of the total required savings – i.e., approximately $60 million of the total

$76.5 million.  As before, the larger contribution from pilots is based on the disproportionate

extent to which pilots contribute to overall labor costs, as well as the substantially greater market

disparity of Pinnacle pilot compensation compared to other labor groups, particularly given the

severity of Pinnacle's seniority disadvantage.

Certain proposals are common to all labor groups.  For example:

- Pinnacle proposes to decrease its 401(k) retirement plan match for all employees. Currently, Pinnacle's 401(k) contribution rates are among the most generous in the industry.  Pinnacle's proposal would move those rates toward the lower end of the industry average, producing an estimated savings of approximately $3.1 million per year.  (Glass Decl. ¶¶ 223-25; Declaration of Stephen Hunyor, dated September 13, 2012, ("Hunyor Decl.") Ex. 1.)

- Pinnacle proposes to eliminate its extended sick leave benefit and offer short-term disability benefits on a voluntary basis at 100% employee cost.  Pinnacle would also modify its long-term disability benefits by requiring employees to contribute 25% towards the cost of the benefits and modifying its current 90-day elimination period to a 120-day elimination period.  These changes would align Pinnacle with the industry average and are estimated to save the Company approximately $939,000 per year.  (Glass Decl. ¶¶ 217-19.)

- Pinnacle proposes to eliminate its PPO health plan and replace it with a consumer-driven health reimbursement plan.  This change is estimated to save the Company approximately $8.8 million per year.  (Glass Decl. ¶ 207; Hunyor Decl. Ex. 1.)

- Pinnacle proposes a profit-sharing program that would pay employees 10% of profits up to 4% of the Company's pre-tax margin and 15% of profits above 4% of the Company's pre-tax margin starting in 2013.  This proposal is projected to result in approximately $7 million in annual payments to employees.  This plan provides guaranteed sharing starting with the first dollar of profits earned. (Glass Decl. ¶¶ 226-29.)

Beyond the above proposals, Pinnacle has proposed a series of labor group-specific

modifications as follows:

(a)     Pilots

As discussed above, one of the key drivers of Pinnacle's labor cost disadvantage is the

wages of its pilots.  On a per-seniority year basis, Pinnacle's pilot wages are significantly higher

28

than the industry average.  Accounting for Pinnacle's seniority disadvantage, that gap becomes

substantially larger.  To address the gap, Pinnacle has proposed the following wage-related

changes for pilots:

- Captain pay cuts of 7-13% at each seniority level through year 12, with no seniority step-up after year 12, applied retroactively, resulting in a 21-25% wage reduction for current top-of-scale Captains;

- First Officer pay cuts of 10-16% at seniority levels 2 through 4, with no seniority step-up after year 4, applied retroactively, resulting in a 19-24% wage reduction for current top-of-scale First Officers; first-year First Officers to receive 8% pay raise; and

- First Officers promoted to Captain would start as first-year Captains for wage purposes, rather than being credited with years spent as First Officer (*e.g.*, fourth-year First Officer promoted to Captain would become first-year, not fourth-year, Captain).

(*See* Glass Decl., Ex. 65.)  Collectively, these changes would produce approximately $31.5

million in annual savings.

In addition to wages, Pinnacle's cost disadvantage is largely attributable to its pilot work

rules, which are among the most costly and least efficient in the industry.  As explained in detail

and depicted in chart form in the declaration of Mr. Glass, Pinnacle's work rules taken as a

whole are overwhelmingly less favorable to the Company when examined alongside comparable

rules at Pinnacle's competitors.  Among numerous other examples:

- Pinnacle's guaranteed monthly and daily minimum credit hours for its pilots, awarded regardless of hours actually flown, are substantially above market (Glass Decl. ¶¶ 94-97);

- Pinnacle is significantly constrained in its ability to assign open flying time to its Reserve pilots, who are under-utilized and are often paid minimum guarantees for time not actually flown (*id*. ¶¶ 111-13);

- In various situations, Pinnacle is required to release from duty pilots who may be needed for flying the next day, but for whom no assignment has been identified as of 10:00 AM the day before, contrary to standard industry practice allowing airlines to make assignment decisions on shorter notice (*id*. ¶¶ 105-10);

- Under certain circumstances, pilots are able to select on-duty times when it is virtually impossible for them to be assigned any flying, thereby virtually guaranteeing credit time for hours not spent flying (*e.g.*, *id.* ¶ 24); and

- Few restrictions currently exist on pilots' abilities to switch aircraft types voluntarily, contrary to the industry norm, imposing substantial required training costs on the Company (*id.* ¶¶ 143-46).

Modifying these and the other work rules discussed in Mr. Glass's declaration would save the Company approximately $21 million per year.  (Hunyor Decl. Ex. 1.)

(b)    Flight Attendants

Pinnacle has proposed a combination of wage, benefits, and work rule modifications that result in annual savings of approximately $6.5 million.  (Hunyor Decl. Ex. 1.)

(c)    Dispatchers

Pinnacle proposed an across-the-board salary cut of 5% for dispatchers, producing estimated annual savings of approximately $158,000.  Pinnacle also proposed dispatcher work rule modifications that would contribute approximately an additional $31,000 in annual savings.  (Hunyor Decl., Ex. 1.)  TWU tentatively agreed to this proposal with certain modifications on August 30, 2012, and its members ratified the agreement on September 11, 2012.  (Declaration of W. Chris Harrison, dated September 13, 2012 ("Harrison Decl.") ¶ 24.)

(d)    Non-union

Pinnacle has proposed salary cuts, benefit reductions, and work rule modifications for non-unionized employees, producing aggregate annual savings of approximately $10.1 million.  (Hunyor Decl., Ex. 1.)

*      *      *

The proposed modifications have a combined estimated value of approximately $76.5 million per year, as required to close the identified ██████ gap per 76-seat aircraft and to allow Pinnacle to compete for future regional flying.

**G.    <u>Union Negotiations</u>**

Pinnacle has negotiated diligently and in good faith with its unions since delivery of its initial May proposal (and, indeed, starting even earlier as part of its out-of-court restructuring efforts).  Pinnacle continued with these efforts after the resumption of discussions this past August, and continues to seek a consensual resolution to this day.  Throughout the negotiations process, Pinnacle has overwhelmingly demonstrated a good faith commitment to reaching a consensual resolution.

On May 8, 2012, Pinnacle met with its unions to explain the reasons that the Company was forced to seek Chapter 11 bankruptcy protection, share its business plan, discuss Pinnacle's ongoing efforts to reduce costs, and present its initial labor ask.  (Ryan Decl. ¶ 4; Harrison Decl. ¶ 4.)  Pinnacle's senior management team and external advisors were in attendance and available to answer questions.  (Ryan Decl. ¶ 4; Harrison Decl. ¶ 4.)  Following an opening presentation to all unions, Pinnacle met individually with each of the unions to provide additional detail and begin discussing the specific concessions sought from each union.  (Ryan Decl. ¶¶ 5-6; Harrison Decl. ¶¶ 5-6.)

At that time, Pinnacle also launched an electronic "Data Room," which provided the unions with 24/7 internet-based access to all documents made available in support of the proposals.  (Ryan Decl. ¶¶ 6, 9; Harrison Decl. ¶¶ 6, 8.)  Documents initially loaded to the Data Room included Pinnacle's budgets, DIP materials, summaries of Pinnacle's contracts,

31

information concerning other carriers' CBAs, labor cost savings summaries related to the proposed modifications, a summary of Pinnacle's monthly flight profitability, among various others.  (Ryan Decl. ¶9; Harrison Decl. ¶ 8.)  Based on continual additions to the Data Room – both at the initiation of Pinnacle and in response to union requests – the Data Room currently contains more than 7,000 pages of information related to Pinnacle's proposals and continues to be supplemented on an ongoing basis.  (Ryan Decl. ¶ 9; Harrison Decl. ¶ 8.)

In the days and weeks following the initial May 8 meetings, Pinnacle representatives participated in numerous additional formal and informal meetings, calls, presentations, working sessions, sub-group conferences, email exchanges, and other communications with the unions regarding the proposed modifications.  (Ryan Decl. ¶ 7; Harrison Decl. ¶ 7.)  Pinnacle walked the unions through every item of its proposals; explained its methodology and rationale; arranged for sessions with the Company's consultants; provided access in a private room to a "live" version of the Company's model for the unions to manipulate and re-run with varying assumptions; answered questions; gathered and provided information in response to dozens of information requests; listened to and engaged with the unions on every cost-savings idea proposed; and otherwise did everything within its power to facilitate discussions.  (Ryan Decl. ¶¶ 7, 9-11; Harrison Decl. ¶¶ 7-10.)  Pinnacle responded promptly and accommodated all requests for meetings, information, or any other assistance or input whenever it reasonably could.  (Ryan Decl. ¶¶ 7-11; Harrison Decl. ¶¶ 7-10.)  All of these efforts are explained in greater detail in the declarations of Messrs. Ryan and Harrison.  (Ryan Decl.; Harrison Decl.)

With respect to its flight attendants, Pinnacle engaged in a dual-track communications approach, including both the United Steelworkers ("USW") when it was the authorized representative of the flight attendants, and also AFA when it appeared that it might become the

flight attendants' authorized representative, which ultimately occurred in July. (Harrison Decl. ¶ 11.) So as to provide AFA with as much lead time as possible in understanding the Company's business plan and labor asks, Pinnacle sought and obtained the Court's approval to provide AFA with the same type of confidential information it had been providing USW, and began to do so in June. (*Id.* ¶¶ 11-12.)

As explained in detail above, Pinnacle received new information from Delta leading it to suspended negotiations in late June while it revised its business plan and reformulated its labor proposals. (*Id.* ¶ 13.) On August 16, Pinnacle presented its revised proposal to the unions and re-launched negotiations using the same approach applied previously – comprehensive presentation of the proposal, provision of supporting materials, willingness to meet virtually whenever requested, prompt responsiveness to all reasonable data requests, and otherwise total commitment to good faith negotiations. (Ryan Decl. ¶¶ 12-17; Harrison Decl. ¶¶ 14-17.)

On August 30, 2012, Pinnacle and TWU reached a tentative agreement on modifications to the flight dispatcher CBA, which was ratified on September 11, 2012. (Harrison Decl. ¶ 24.)

Negotiations to date have not resulted in any agreement with AFA or ALPA. Pinnacle and AFA have exchanged various counter-proposals and have found potential common ground on certain issues; but AFA's latest counter-proposal still falls substantially short of the savings amount required under Pinnacle's proposal. (*Id.* ¶¶ 19-23.)

Negotiations with ALPA have produced less progress toward a consensual resolution. The parties have been able to agree on certain limited items, including modifications regarding hotel costs, resulting in modest cost savings of approximately $30,000 to $41,000 per year, and modifications of certain pilot training rules, which provide a potential one-time savings of less than $2 million. (Ryan Decl. ¶¶ 20-25.) ALPA has claimed that its latest counter-proposal

would achieve $25.6 million in savings, as compared to the approximately $60 million in savings required under Pinnacle's proposal. (*Id.* ¶ 30.) However, based on the Company's preliminary analysis, as well as the apparent similarity of ALPA's latest counter-proposal to a prior counter-proposal analyzed by the Company, it appears that actual savings associated with the counter-proposal are significantly less than $25.6 million. (*Id.*)

The Company remains committed to achieving a consensual resolution with both AFA and ALPA, and will continue to bargain in good faith during the pendency of this motion. (Ryan Decl. ¶ 31.; Harrison Decl. ¶ 23.)

## **ARGUMENT**

A debtor is permitted to reject its collective bargaining agreements if its proposed modifications comply with Section 1113 of the Bankruptcy Code. Most fundamentally, the proposal must be "necessary to permit the reorganization of the debtor." 11 U.S.C. § 1113(b)(1)(A) (2006); *In re Northwest Airlines Corp.*, 346 B.R. 307, 320-21 (Bankr. S.D.N.Y. 2006). Moreover, the debtor must have supplied an adequate and reliable basis for evaluating the proposal, and must have genuinely tried to reach a consensual resolution with its unions. Specifically, the proposal must be "based on the most complete and reliable information available," 11 U.S.C. § 1113(b)(1)(A); the debtor must have supplied the unions with "such relevant information as is necessary to evaluate the proposal," 11 U.S.C. § 1113(b)(1)(B); and the debtor must have met with the unions "at reasonable times" and "confer[red] in good faith" in an attempt to agree on modifications to the collective bargaining agreements, 11 U.S.C. § 1113(b)(2). Finally, the proposal must satisfy certain equitable requirements. The proposal must treat all parties "fairly and equitably," 11 U.S.C. § 1113(b)(1)(A); the unions must have rejected the proposal "without good cause," 11 U.S.C. § 1113(c)(2); and the "balance of the

equities" must clearly favor rejection, 11 U.S.C. § 1113(c)(2).  For the reasons discussed below,

Pinnacle's proposal satisfies these requirements.

## I.   PINNACLE'S PROPOSAL IS NECESSARY TO ITS RESTRUCTURING

### A.   Necessity Legal Standard

Necessity is the touchstone of the Section 1113 inquiry.  *See New York Typographical*

*Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345,

348-49 (2d Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989); *Northwest Airlines*, 346 B.R. at 321

("The most fundamental requirement for rejection of a collective bargaining agreement is that

the rejection must be 'necessary.'").  In determining whether proposed modifications are

necessary, courts in the Second Circuit are guided by several key principles.

First, the proposal must contain "necessary, *but not absolutely minimal*, changes that will

enable the debtor to complete the reorganization process successfully."  *Truck Drivers Local 807*

*v. Carey Transp., Inc.*, 816 F.2d 82, 89-90 (2d Cir. 1987) (emphasis added).  Otherwise stated,

the debtor's proposal "need not be limited to the bare bones relief that will keep it going."  *Royal*

*Composing Room*, 848 F.2d at 350; *In re Delta Air Lines, Inc.*, 359 B.R. 468, 477 (Bankr.

S.D.N.Y. 2006).[15]

Second, the necessity inquiry is inherently long-term.  Courts must "look[] into the

debtor's *ultimate future* and estimat[e] what the debtor needs to attain financial health."  *Carey*

*Transp.*, 816 F.2d at 90 (emphasis added).  "[C]ourts have repeatedly recognized that in judging

the 'necessity' criterion the focus should be on the long-term economic viability of the

---

[15]*See also* 7 <u>Collier on Bankruptcy</u> ¶ 1113.06[2][b] (15th ed. 2001) ("Congress did not codify a standard
that modifications should be authorized only where it clearly appears that unless the agreement is rejected, the
debtor will collapse[.]  [T]he debtor should not have to show that absent modification, liquidation will occur.").

reorganized debtor, as opposed to the debtor's short-term economics as they may have evolved during the course of the bankruptcy." *Delta Air Lines*, 359 B.R. at 477.

Third, a debtor's competitiveness is fundamental to its long-term financial health. *See Delta Air Lines*, 359 B.R. at 477 ("ability to compete in the marketplace" within which the debtor operates is "essential for the viability of any reorganization"); *Northwest Airlines*, 346 B.R. at 321 (modifications that enable the debtor to "compete in the marketplace" are necessary). Proposed modifications to a collective bargaining agreement are necessary "when a debtor's labor costs are higher than those of its competitors and where the debtors faces 'enormous competitive pressure.'" *Delta Air Lines*, 359 B.R. at 477-78 (quoting *Royal Composing Room*, 848 F.2d at 350).

Fourth, the proposal must be "viewed as a whole, and not by its specific elements." *In re Horsehead Indus., Inc.*, 300 B.R. 573, 584 (Bankr. S.D.N.Y. 2003) (citation omitted); *see also Royal Composing Room*, 848 F.2d at 348. Thus, the debtor "need only make a showing as to the overall necessity of the proposal, rather than provide that each element of the proposal is necessary to reorganization." *Northwest Airlines*, 346 B.R. at 321 (citing *Royal Composing Room*, 848 F.2d at 348). As the Second Circuit has explained, if the debtor were required to show the necessity of each element of its proposal, "no proposal could ever truly be 'necessary,' since any single vital element of a proposal can hardly be 'necessary' if it can be replaced by some alternative not included in the package which would achieve the same dollar savings for the debtor." *Royal Composing Room*, 848 F.2d at 348.

Fifth, modifications to the non-economic terms and provisions of a collective bargaining agreement, such as work rules, seniority, furlough, and the like, are often necessary for a successful reorganization where they provide the debtor with long-term flexibility. *See, e.g.*,

*Carey Transp.*, 816 F.2d at 86 (modifications to health and pension benefits, overtime, workers'

compensation and disability, and scheduling and assignment rules were "necessary"); *see also*

*Royal Composing Room*, 848 F.2d at 350 ("long-term flexibility" for the debtor through the

elimination of "priority" – the requirement to retain the company's most senior employees – was

necessary to a successful reorganization in the rapidly changing printing industry); *Northwest*

*Airlines*, 346 B.R. at 322 (noting that a proposal "may be deemed necessary for purposes of

§ 1113(b) even if it includes non-economic modifications").

Application of these principles here compels a finding of necessity.

### B.       Pinnacle's Proposal Is Necessary to Its Long-Term Competitiveness

It cannot reasonably be contested that Pinnacle needs immediate, significant labor

savings.  As explained above and in the declaration of Ms. Hughes, Pinnacle's *de facto* CFO for

the past several months, Pinnacle is sustaining substantial losses and will reach critically low

liquidity levels within a matter of months or less.  (Hughes Decl. ¶ 7.)  Pinnacle's mounting

losses are due to the simple fact that the rates paid by Delta under its only continuing contracts

are substantially less than Pinnacle's expenses.  (*Id.* ¶ 12.)  Under any understanding of Section

1113's necessity requirement, Pinnacle is entitled to labor savings required to remedy this

situation.

The analysis, however, does not end there because Section 1113 requires the Court to

consider more than the bare minimum Pinnacle needs to survive.  The Court must instead

consider Pinnacle's long-term prospects – in particular, its long-term ability to compete in the

market for regional airline services.  *See Carey Transp.*, 816 F.2d at 90; *Delta Air Lines*, 359

B.R. at 477-78.  The evidence is clear that Pinnacle has no such ability absent the $76.5 million

in annual labor savings it seeks.

37

As an initial matter, Pinnacle's only customer, and one of the largest of only a handful of potential consumers of Pinnacle's services, has told Pinnacle that it is not cost-competitive for future flying, including 76-seat flying of the type that Delta and other mainline carriers view as the future of regional flying. Specifically, Pinnacle's rates under its existing Delta Connection Agreements are ▮▮▮▮▮ per 76-seat aircraft *higher* than the average rates charged by other Delta Connection carriers. (Cude Decl. ¶ 8.) As long as this substantial gap persists, there is no rational reason Delta or any other mainline carrier would want to offer any future flying to Pinnacle, and thus, Pinnacle's viability depends on closing the cost gap. (Spanjers Decl. ¶ 31.) Having extracted all other feasible savings from its business, Pinnacle has calculated that it requires $76.5 million in annual labor cost savings to close the ▮▮▮▮▮ gap. (Hughes Decl. ¶ 33.) These facts bring Pinnacle's labor ask squarely within the necessity law of the Second Circuit, which deems necessary proposed CBA modifications required to ensure a debtor's future competitive viability. *See, e.g.*, *Delta Air Lines*, 359 B.R. at 477-78. It is difficult to imagine a more negative indicator of a debtor's future competitive viability, or a clearer indicator of the necessity of particular labor cuts, than a report from the debtor's only customer that its current cost structure is not cost-competitive.

Pinnacle did not, of course, simply take this information from Delta at face value. Pinnacle obtained as much detail about the ▮▮▮▮▮ calculation as it could, consistent with Delta's confidentiality obligations to its other regional partners, and conducted its own analyses to validate Delta's calculation. (Spanjers Decl. ¶ 20; Hughes Decl. ¶¶ 23-33.) What Pinnacle found is that all, or significantly all, of the ▮▮▮▮▮ cost gap can be explained solely by the differential between its pilot costs and those of the lowest-cost regional airlines with which it competes. (Hughes Decl. ¶¶ 27-30 & Exs. 4-5; Kasper Decl. ¶ 82.) Part of the advantage that

38

these low-cost regional carriers have over Pinnacle is that their pilots are paid less than Pinnacle's pilots on a per-seniority year basis.  But more fundamentally, the lowest-cost regional carriers are among the newest in the industry, and they therefore enjoy a substantial seniority and corresponding cost advantage.  (Hughes Decl. ¶ 26.)  Because most airline employees are paid on an hourly rate based on their years of service, carriers with high average seniority can have substantially higher labor costs even if they have comparable hourly rates.  (Kasper Decl. ¶ 75.)  This creates a fundamental problem for Pinnacle.  Delta Connection carriers Compass and GoJet, for example, started operations in 2007 and 2005, respectively.  These carriers therefore cannot have pilots more senior than five or seven years, respectively.  Pinnacle and its predecessors-in-interest, by contrast, have flown for predecessors of Delta since 1985, and many of Pinnacle's pilots have been with the airline for 20 years or more.  (Hughes Decl. ¶ 26.)  Inherent in this discrepancy is a substantial cost difference, one that has only been exacerbated by the flying reductions and associated pilot lay-offs required by Pinnacle's restructuring, which affect junior pilots first and therefore effectively exacerbate Pinnacle's seniority disadvantage.  (*Id.*)

Faced with such a significant seniority disadvantage, Pinnacle cannot compete with the newest industry entrants by simply "marking to market" its pilot wages on a per-seniority year basis.  Regrettably, it must impose deeper cuts and fundamentally change its pilots' seniority structure, as it has proposed to do.  Beyond the proposed percentage reductions across seniority levels, Pinnacle has proposed to cap seniority step-ups at 12 years for Captain and 4 years for First Officers, and to treat First Officers promoted to Captain as first-year Captains, rather than to credit them with automatic Captain longevity equivalent to years previously spent as a First Officer.  (*See supra* pp. 28-29.)  These are difficult, painful changes for Pinnacle's pilots – particularly those who have been with the Company for years.  But there is simply no other way

for Pinnacle to compete with new competitors and avoid the worst possible scenario – company liquidation and loss of every employee job at Pinnacle.

To the extent Pinnacle could have been satisfied with "middle-of-the-pack" costs in prior, better years for the regional airline industry – whether based on its size, reputation, relationships with mainline carriers, or some other perceived advantage other than cost – that era is over.  (*See generally* Kasper Decl. ¶¶ 40-56.)  Pinnacle's management and its financial, labor, and general industry advisors have all reached the same unmistakable conclusion, based on their substantial expertise and intimate industry knowledge:  the regional airline industry is contracting, opportunities for flying are diminishing, and those diminishing opportunities are going to the lowest bidders.  Otherwise stated, regional flying has become essentially a commoditized business in which only the leanest, lowest-cost providers can survive.  (Hughes Decl. ¶ 24; Kasper Decl. ¶¶ 65, 88.)  Indications of this trend are everywhere, and are perhaps nowhere more apparent than in the recent failure of Comair, which – as explained by Pinnacle's experts – illustrates the consequences of seniority- and cost-related disadvantages of the exact type facing Pinnacle.  (Spanjers Decl. ¶ 8; Glass Decl. ¶¶ 51-53; Kasper Decl. ¶ 27.)

Against this backdrop, and focused on Pinnacle's prospects for *long-term* success as mandated by Section 1113, Pinnacle must emerge from bankruptcy at the lower end of the industry cost curve.  That result is the standard, appropriate outcome of a Section 1113 proposal for a Chapter 11 debtor operating in a relentlessly competitive industry.  As the court explained in its Section 1113 ruling in the 2006 bankruptcy of Pinnacle's now-defunct Mesaba subsidiary before its acquisition by Pinnacle:

> [I]n emerging from Chapter 11 into an intensely competitive
> market, a debtor should come forward *close to the top of the heap
> in strength, rather than at the bottom.*  Otherwise, it will not have

> the flexibility to remain competitive, or present the general
> attraction of future stability to prospective . . . partners.  And a lack
> of those qualities may well lead to a second financial failure.

*In re Mesaba*, 341 B.R. at 738-79 (emphasis added).  And as Judge Lane observed this past

August in his Section 1113 decision in American Airlines's bankruptcy, the pattern in airline

bankruptcies has been for the airline to "enter[] bankruptcy with labor costs that are at or near the

top of the industry and then emerge[] with costs *at or near the low end of the group*."  *In re AMR*

*Corp.*, No. 11-15463 (SHL), 2012 Bankr. LEXIS 3756, at *82 (Bankr. S.D.N.Y. Aug. 15, 2012)

(emphasis added).

Indeed, airlines that have failed to follow this approach have completed the Section 1113

process only to find themselves unable to compete effectively and right back in the same dire

financial straits in which they started.  For example, US Airways was forced to seek concessions

through four separate rounds of negotiations over the course of two bankruptcies from 2002-

2005.  Having failed the first three times to obtain adequate, permanent cost reductions necessary

to its long-term survival, US Airways was forced into its second bankruptcy to seek expedited

relief under Section 1113(e) to avoid an imminent shut-down.  (Glass Decl. ¶ 59.)  United

Airlines had to file Section 1113 motions twice over the course of 2003-2004 because it did not

obtain what it truly needed the first time around.  (*Id.* ¶¶ 61-64.)  Delta, Northwest, and

Continental followed similar patterns in their bankruptcies, requiring at least two rounds each of

union negotiations before obtaining necessary savings.  (*Id.* ¶¶ 65-69.)

Pinnacle seeks to avoid the waste and futility of a restructuring process that ultimately

leaves it unfit to compete in an intensely competitive industry.  By producing an aggregate

savings of $76.5 million per year, Pinnacle's proposed wage, benefit, and work rule

modifications will allow it to achieve long-term competitive viability.  For this reason,

Pinnacle's proposal is necessary under Section 1113.

### C.    Pinnacle's Proposal Is Necessary to Avoid Various Short-Term Risks

Pinnacle not only lacks any chance of long-term survival without competitive rates.  It

also faces imminent, short-term risk of extinction if it does not obtain its requested savings.

First, Pinnacle likely cannot even emerge from bankruptcy if it fails to obtain $76.5

million in annual labor cost reductions.  Barclays – based on its investment banking expertise

and specific experience with Pinnacle (including an extensive search for DIP financing that

resulted in no offers other than from Delta) – has concluded that Pinnacle is highly unlikely to

obtain any third-party equity financing if it cannot achieve long-term competitive rates.  (Shapiro

Decl. ¶¶ 22, 30.)  Simply stated, it is unlikely anyone would want to invest in Pinnacle based on

expiring contracts that have no hope of ever being replaced.  (*Id.* ¶¶ 25-27, 30.)  Barclays has

also concluded that there are numerous severe obstacles to raising the required capital as debt.

(*Id.* ¶¶ 28-30.)

Second, and even more imminently, Pinnacle stands at the verge of breaching numerous

DIP covenants if it does not obtain immediate, significant labor savings.  Pinnacle is perilously

close, for example, to breaching minimum liquidity and maximum operating expense covenants,

which would result in events of default.  (*Id.* ¶¶ 13-15.)  Pinnacle will also be in default if it does

not obtain Section 1113 savings and propose a plan of reorganization both of which are

reasonably acceptable to Delta.  (*Id.* ¶ 17.)  Given Delta's view, as corroborated by Pinnacle, that

Pinnacle is not cost-competitive for future flying absent a reduction in 76-seat rates by ██████

per aircraft, Delta could assert an event of default if Pinnacle does not obtain cost savings

sufficient to achieve that reduction.  Pinnacle's survival depends on continued access to DIP

financing and its ultimate conversion to an exit facility.  Absent achieving the proposed savings,

Pinnacle risks forfeiting the right to this critical support.

Third, even if Pinnacle could emerge from bankruptcy with above-market costs,

Pinnacle's survival would be jeopardized from the outset because it enjoys only limited

protection under its existing, above-market service agreements with Delta.  Critically, these

agreements have no "minimum utilization" or other usage requirements, and thus Delta may be

expected to substantially reduce any flying by Pinnacle that it longer wishes to use.  (*Id.* ¶ 27.)

Pinnacle also faces "rate reset" provisions in 2018, █████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

███████████      In short, it is not plausible that Pinnacle's contracts would survive their full term

as currently structured, and upon any renegotiation or alteration of the terms, Pinnacle would

likely have no ability to secure future flying from Delta or others absent competitive rates.

For all these reasons as well, Pinnacle's requested savings of $76.5 million per year are

necessary to its successful restructuring.

## II.    PINNACLE HAS SUPPLIED THE REQUIRED INFORMATION AND BARGAINED IN GOOD FAITH

### A.    Complete and Reliable Information

Pinnacle's proposal is "based on the most complete and reliable information available" as

required by 11 U.S.C. § 1113(b)(1)(A).  In broad terms, there are three information categories

supporting Pinnacle's proposal:  information relating to Pinnacle's revenue, Pinnacle's costs, and

market compensation comparisons, including information supporting the ██████ cost gap.

(Hughes Decl. ¶¶ 14-39.)  All three information categories are as complete, reliable, and current

as possible.  Pinnacle has continually updated its cash forecasts and cost and revenue projections,

43

and the most current versions of these projections continue to show that savings of $76.5 million

are required to close the ▮▮▮▮▮ gap.  (*Id.* ¶ 33.)  In performing market comparisons, Pinnacle

has always utilized and supplied the fullest and most up-to-date data available.  (Ryan Decl.

¶¶ 9-10, 17; Harrison Decl. ¶¶ 8-9, 18.)  Pinnacle's suspension of negotiations in mid-June and

reformulation of its ask is a testament to this fact.  When existing information changed and no

longer supported Pinnacle's ask, it changed its proposal accordingly.  For all these reasons,

Pinnacle has based its proposal on "the most complete and reliable information available."

### B.    Provision of Necessary Information

Pinnacle has supplied the unions with "such relevant information as is necessary to

evaluate the proposal," as required by 11 U.S.C. § 1113(b)(1)(B).  As discussed above, Pinnacle

launched an electronic "Data Room" at the outset of the Section 1113 process, which has

provided the unions with 24/7 access to all relevant documents, including detailed

documentation of Pinnacle's revenue and costs, and all market comparison data supporting

Pinnacle's proposal. (Ryan Decl. ¶¶ 6, 9; Harrison Decl. ¶¶ 6, 8.)  To date, the Data Room

contains over 7,000 pages of information.  (Ryan Decl. ¶ 9; Harrison Decl. ¶ 8.)  Pinnacle has

been continually updating the Data Room since the outset of the process.  (Ryan Decl. ¶ 6;

Harrison Decl. ¶ 6.)  Pinnacle has proactively supplied its business plan, periodic financial

reports, detailed descriptions of its proposals, costing backup, provision-by-provision

comparisons of Pinnacle and competitor work rules, and numerous other documents justifying its

proposal and consisting of the same information Pinnacle itself used to formulate its labor asks.

(Ryan Decl. ¶¶ 9-11, 13, 17; Harrison Decl. ¶¶ 8-9, 16, 18.)  Pinnacle has also made it a priority

to respond as fully and as quickly as possible to every reasonable request for information,

responding over the past several months to dozens upon dozens of union data requests.  (Ryan

Decl. ¶¶10, 17; Harrison Decl. ¶¶ 9, 18.)  Where these requests called for documentary responses, Pinnacle made responsive documents available in the Data Room.  (Ryan Decl. ¶¶10, 17; Harrison Decl. ¶¶ 9, 18.)  Where the requests called for oral explanations or information sessions, Pinnacle arranged for these as quickly as possible with the most knowledgeable people available to supply the requested information.  (Ryan Decl. ¶¶7-8, 15; Harrison Decl. ¶¶ 7, 17.)  Pinnacle also repeatedly made its professionals available to the unions to explain relevant analyses they had performed and answer questions.  (Ryan Decl. ¶¶7-8, 15; Harrison Decl. ¶¶ 7, 17.)  Among other examples, Pinnacle arranged for numerous presentations and information sessions with Seabury, Barclays, Compass Lexecon, healthcare experts, and others.  (Ryan Decl. ¶¶7-8, 15; Harrison Decl. ¶¶ 7, 15, 17.)

Pinnacle has also given the unions extensive access to a "live" version of the financial model underlying Pinnacle's business plan.  Pinnacle made secure rooms in its offices available to the unions for them to sit down with the models and re-run them with varying assumptions or otherwise manipulate them in any way they liked.  (Ryan Decl. ¶ 11; Harrison Decl. ¶ 10.)  Pinnacle also offered to provide tutorial sessions explaining how the model works and its underlying assumptions.  (Ryan Decl. ¶ 11.)  These sessions were kept private, meaning that the unions were given as much time as they wanted alone with the model, with a company representative present only when requested by the unions to assist with the model.  (Ryan Decl. ¶ 11; Harrison Decl. ¶ 10.)

These efforts go substantially beyond the level of information sharing required under Section 1113.  *See, e.g.*, *In re Royal Composing Room*, 62 B.R. 403, 412-13 (Bankr. S.D.N.Y. 1986), *aff'd*, 848 F.2d 345 (2d Cir. 1988) (finding that a single sheet of paper "was reliable and

relevant information and complete enough to form a basis for reasoned consideration of [the

debtor's] proposal").  Pinnacle has thus overwhelmingly satisfied its information-sharing burden.

### C.    Reasonable Meeting Times and Conferring in Good Faith

Pinnacle has also met with the unions "at reasonable times" and has "confer[red] in good

faith," as required by 11 U.S.C. § 1113(b)(2).  Since delivering its initial proposal on May 8,

2012, Pinnacle and its advisors have done everything reasonably within their power to reach a

consensual deal.  The negotiations process started with meetings and detailed presentations to

introduce the unions to Pinnacle's proposal on May 8, following which the Company made itself

available day in and day out, until temporarily suspending negotiations on June 22 to reformulate

its proposal in light of the new information received from Delta.  (Ryan Decl. ¶¶ 4-7; Harrison

Decl. ¶¶ 4-7, 13.)  Regrettably, the parties made little progress during that time.  (Ryan Decl. ¶ 7;

Harrison Decl. ¶ 7.)

On August 16, 2012, senior managers of the Company and its advisors presented its new

proposal through another series of initial meetings and presentations, further explaining the

changed circumstances since June, the resulting required modifications to Pinnacle's proposal,

and the bases for the revisions.  (Ryan Decl. ¶¶ 12-14; Harrison Decl. ¶¶ 14-16.)  Since then,

Pinnacle has actively engaged in negotiations with the unions.  Negotiation sessions to date have

consisted of formal and informal meetings, presentations, sub-group discussions, working

sessions, phone calls, email exchanges, and other nearly daily communications.  (Ryan Decl.

¶ 15; Harrison Decl. ¶ 17.)  Pinnacle has always agreed to meeting requests, and – when the

unions did not request meetings – repeatedly communicated that it stood ready to meet again at

any time.  (Ryan Decl. ¶¶ 6, 12, 14; Harrison Decl. ¶¶ 7, 15.)  Pinnacle's constant willingness to

meet and negotiate demonstrates its good faith.  *See, e.g.*, *In re Tex. Sheet Metals, Inc.*, 90 B.R.

260, 270 (Bankr. S.D. Tex. 1988) (debtor negotiated in good faith by making "every attempt" to

meet with union).  As noted above, these efforts led to a tentative agreement with Pinnacle's

flight dispatcher union, TWU, on August 30, 2012, ratified on September 11, 2012.

Pinnacle has not been able to reach consensual agreements with AFA or ALPA, but not

for lack of trying.  From the outset of the process, the Company has been willing to consider

every reasonable alternative paths to its required savings.  For example, ALPA and the Company

have entered into several letters of agreement, and the Company has included in its counter-

proposals various items contained in or adapted from the unions' counter-proposals.  (Ryan Decl.

¶¶ 20-25, 29; Harrison Decl. ¶ 21.)  The fundamental issue is that, to date, ALPA and AFA have

been unwilling to accept the necessity of Pinnacle's aggregate savings amount, and thus have

simply not put forward alternative proposed savings sufficient to achieve the required savings.

(Ryan Decl. ¶ 30; Harrison Decl. ¶ 22.)  By remaining open, however, to any alternative savings

opportunities, if or when presented, Pinnacle has fulfilled its obligation to negotiate in good

faith.  *See, e.g.*, *AMR Corp.*, 2012 Bankr. LEXIS 3756 at *161-62 (good faith test satisfied by

remaining open to alternative savings approaches while "adher[ing] to a necessary cost-saving

target").

### III.    PINNACLE'S PROPOSAL COMPLIES WITH SECTION 1113'S EQUITABLE FACTORS

#### A.    Fair and Equitable

Pinnacle's proposal treats all affected parties fairly and equitably as required by 11

U.S.C. § 1113(b)(1)(A).  There are no bright-line rules indicating whether a proposal is fair and

equitable.  Instead, courts apply a general, flexible standard requiring that cost-cutting burdens

be shared among affected parties and that, to the extent some groups are asked to contribute

more than others, those different contribution levels are justified under the circumstances.  *See,*

47

*e.g.*, *AMR Corp.*, 2012 Bankr. LEXIS 3756, at *49 ("Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest."). Pinnacle's proposal satisfies this standard.

As an initial matter, Pinnacle has undertaken an exhaustive process to reduce costs and cut its losses, both before and after its Chapter 11 filing, so as to ensure that its labor ask would be as small as possible. As described in more detail above, Pinnacle down-sized its management team, consolidated its operations, wound-down unprofitable contracts, and examined every cost item of its budget for potential savings. (*See supra* pp.12-13.) The Company's efforts to seek all feasible non-labor savings supports the fairness of the savings it must now seek from its employees. *See, e.g.*, *Royal Composing Room*, 848 F.2d at 349.

The Company's distribution of its ask among its labor groups is also fair under the circumstances. Currently, Pinnacle's labor groups account for the following approximate percentages of total labor costs: pilots - 60%, flight attendants - 13%, dispatchers - 1%, and non-union salary and hourly employees - 27%. (Glass Ex. 17.) Pinnacle's proposal asks for the following relative contribution levels from these groups toward the total required labor savings: pilots - 78%, flight attendants - 8%, dispatchers - less than 1%, and non-unionized salaried and hourly employees - 13%. (Glass Decl. Ex. 17.) The Company has thus asked all of its labor groups to participate. The fact that it has asked proportionately more from its pilots is justified for two key reasons.

First, Section 1113 does not require identical participation by all groups. To the contrary, the case law recognizes that different groups may need to contribute differing amounts depending on the circumstances. *See, e.g.*, *Delta Air Lines*, 351 B.R. at 77 ("'[F]airly and equitably' surely admits of differences in treatment where justified by particular facts of the

48

case."); *In re Bowen Enters., Inc.*, 196 B.R. 734, 743 (W.D. Pa. 1996) ("Fairness and equity do not require that the proposed treatment of employees belonging to the bargaining unit be identical to the anticipated treatment of other affected parties.").

Second, there are compelling and unavoidable reasons that the Company must ask the most from its pilots. While of course not the personal fault of any pilot, the unfortunate reality is that Pinnacle's competitive disadvantage is overwhelmingly attributable to its above-market pilot costs. As discussed above, comparative cost analyses shows that the Company's ▮▮▮▮▮▮ cost disadvantage per 76-seat aircraft identified by Delta is largely, if not completely explainable, by pilot costs alone. This is the unavoidable result of above-market pilot wages on a per-seniority year basis, above-market benefits and work rules, and – most fundamentally – a substantial seniority disadvantage, all impacting Pinnacle's largest cost item within its largest category of controllable costs. In short, Pinnacle's pilot costs completely undermine its ability to compete with newer competitors. By contrast, the costs of its other labor groups represent significantly smaller percentages of Pinnacle's total costs and are significantly closer to market. (Glass Decl. ¶ 27 & Ex. 53.) Under these circumstances, a larger ask from Pinnacle's pilots is fair and equitable. *See, e.g.*, *AMR Corp.*, 2012 Bankr. LEXIS 3756, at *49 ("The affected parties need not receive identical modifications, and the concessions asked of the unions can reflect the differences in the individual unions' wage and benefit levels.").

### B.    Lack of Good Cause Refusal

Based on the necessity of Pinnacle's proposal to its successful restructuring and its compliance with the other requirements of Section 1113, the unions' failure to accept Pinnacle's proposal is without good cause. *See, e.g.*, *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90 (2d Cir. 1992) ("[A] union will not have good cause to reject an employer's proposal that contains

only those modifications essential for the debtor's reorganization, that is, the union's refusal to accept it will be held to be without good cause."); *In re Walway Co.*, 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987) ("The legislative history of § 1113 indicates that 'good cause' is not a barrier to rejection if the proposal contains the specified 'necessary' modifications."); *In re Allied Delivery Sys. Co.*, 49 B.R. 700, 704 (Bankr. N.D. Ohio 1985) ("If the proposal is necessary and is fair and equitable, . . . then the union's refusal to accept it on the basis that the proposal is unjust . . . is not for good cause.").  Limited proposals made by the unions to date that would achieve only a fraction of Pinnacle's required savings do not constitute "good cause" for rejecting Pinnacle's proposal.  *See, e.g.*, *Maxwell Newspapers*, 981 F.2d at 90; *Royal Composing Room*, 848 F.2d at 349.

C.    <u>**Balance of the Equities**</u>

Finally, the balance of the equities favors rejection of Pinnacle's CBAs.  The Second Circuit has identified a range of potentially relevant considerations in this final analysis, including the consequences to creditors, employees, and other constituencies of the CBAs remaining in force; the distribution of the labor ask across groups, including in light of how each group's compensation compares to the industry; and the parties' demonstration of good or bad faith throughout the negotiations process.  *See generally Carey Transp., Inc.*, 816 F.2d at 92-93. Consideration of these factors is grounded in the ultimate goal of Chapter 11 of ensuring the successful reorganization of the debtor, and in the reality that employee hardship alone cannot be a basis for denying Section 1113 relief.  *Id.*; *AMR Corp.*, 2012 Bankr. LEXIS 3756, at *49.

For the reasons discussed above, the equities weigh in favor of Pinnacle's proposal.  The alternative to the requested CBA modifications is inevitably worse for all constituencies. Pinnacle will imminently run out of cash if it does not achieve substantial cost savings, and if it

50

does not achieve the full extent of its ask, it will have no long-term ability to compete as a regional carrier.  The ultimate consequence would be another Chapter 11 filing and/or liquidation, to the detriment of all.  Moreover, Pinnacle has acted in good faith and has asked only for those savings it truly needs, with the burden of those savings spread equitably under the circumstances.

## CONCLUSION

For all of these reasons, Pinnacle respectfully requests that the Court grant its Motion for an order authorizing it to reject its CBAs with ALPA, AFA, and TWU pursuant to Section 1113 of the Bankruptcy Code.

Dated: New York, New York
September 13, 2012

By: _____
Marshall S. Huebner
Benjamin S. Kaminetzky
Damian S. Schaible
Paul S. Mishkin

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7984

*Counsel to the Debtors
and Debtors in Possession*