UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| **PINNACLE AIRLINES CORP.**, *et al.*, | Case No. 12-11343(REG) |
| | (Jointly Administered) |
| **Debtors.** | |

**DECLARATION OF JOHN SPANJERS IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

John Spanjers declares and says:

1. I am the President and Chief Executive Officer of Pinnacle Airlines Corp. ("Pinnacle" or "the Company"). I am also a member of the board of directors of the Company. I joined Pinnacle in July 2010, when it acquired Mesaba Aviation, Inc., where I was President and Chief Operating Officer. I became Pinnacle's Chief Operating Officer in October 2011, and in June 2012, I became the Company's Chief Executive Officer. I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2. I offer this declaration in support of Debtors' motion pursuant to 11 U.S.C. § 1113(c) for an Order (1) authorizing it to reject its collective bargaining agreements with (a) the Air Line Pilots Association, International ("ALPA") and the Association of Flight Attendants-CWA ("AFA"); and (2) implementing the terms of Pinnacle's Section 1113 proposals.

3. I previously submitted a declaration in this case as part of the Debtors' "First-Day Filings," in which I described Pinnacle's business, explained the circumstances giving rise to

Pinnacle's Chapter 11 filing, and provided an overview of Pinnacle's plan to restore profitability. (Declaration of John Spanjers Pursuant to Local Bankruptcy Rule 1007-2 dated Apr. 1, 2012, Dkt. No. 3 ("First-Day Declaration").)  This current declaration updates and supplements my First-Day Declaration with additional facts relevant to the Debtors' Section 1113 motion.

4.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the airline industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

**I.      Industry Background**

5.      In my First-Day Declaration, I described the relentless cost pressure faced by regional airlines and the commoditization of the industry, as mainline carriers demand increasingly lower rates from their regional partners.  (First-Day Decl. ¶¶ 11-13.)  This trend has only continued to intensify since the Debtors' Chapter 11 filing on April 1.

6.      Several recent developments in particular are of critical relevance to Pinnacle. First, it has become increasingly clear that any future growth in regional flying will be concentrated in larger, more cost-efficient 70- and 76-seat "dual class" aircraft (with advantages such as lower operating costs per seat and more efficient fuel burn), as opposed to smaller "single class" 50-seat aircraft of the type predominantly flown by Pinnacle.  In May, Pinnacle's only customer and DIP lender, Delta Air Lines ("Delta"), announced that it had reached an agreement with its pilot union permitting it to add 70 dual class regional aircraft, on the condition that Delta substantially decrease the number of 50-seat aircraft flown by its regional

2

partners, resulting in a net decrease in Delta's regional flying capacity. Based on the new agreement, Delta has announced that it plans to remove at least 200 50-seat aircraft from its fleet over the next two to three years, reducing its total number of 50-seat aircraft to 125 or fewer. Based on the numbers of 50-seat aircraft flown by Delta's other regional airline partners (known as "Delta Connection" carriers), it is clear that at least some – and likely a substantial portion – of the reduction must come from Pinnacle's fleet of 140 50-seat aircraft. (Hughes Decl. ¶ 32-36 & Ex. 12, Delta Connection Regional Jet Fleet and Future Delta Connection Regional Fleet.)

7. Second, in the wake of its announcement, Delta informed Pinnacle that its rates for 76-seat flying are substantially above the average rates charged by other Delta Connection carriers. As discussed below, this information fundamentally changed Pinnacle's assessment of its financial viability, requiring it to temporarily suspend its negotiations with its unions and ultimately deliver a revised Section 1113 proposal on August 16, 2012.

8. Third, Delta announced in July that it is shutting down its 35-year-old regional airline subsidiary Comair, because its costs are no longer competitive. Pinnacle currently shares many of the same cost and fleet disadvantages faced by Comair, including high relative seniority of its pilots and an above-market collective bargaining agreement, contributing to substantially uncompetitive costs.

## II. Updated Pinnacle Overview

9. Since filing for Chapter 11, Pinnacle has nearly completed the various wind-down initiatives discussed in my First-Day Declaration, including terminating turboprop flying for United Airlines, all "essential air service" flying, and shuttering its ground operations division. (First-Day Decl. ¶ 8.) Pinnacle's only remaining flying – and sole source of revenue – is 50-seat CRJ-200 and 76-seat CRJ-900 flying for Delta. Specifically, Pinnacle is flying 140 CRJ-200s and 41 CRJ-900s for Delta, pursuant to two separate capacity purchase agreements assumed with

3

court approval in connection with the Delta DIP facility, plus 16 additional CRJ-900s pursuant to a separate agreement scheduled to be wound-down in the first half of 2013. The continuing agreements extend through 2022, with termination of 78 of the CRJ-200s scheduled to begin in 2019, but are subject to "rate resets" in 2018, ███████████████████████████████ ███████████████████████████████████████. As discussed below, Pinnacle's current rates are significantly higher than the average rates charged by Delta Connection carriers, including ████████ higher per 76-seat aircraft.

10.     Despite the extensive cost-savings and profit-increasing initiatives undertaken (as described in my First-Day Declaration and summarized below), Pinnacle's continuing contracts are substantially unprofitable. Pinnacle is projecting a net loss of approximately $44 million for the second half of 2012 and is approaching unsustainably low cash levels.

11.     As of August 2012, Pinnacle had approximately 5,800 active employees, including pilots, flight attendants, flight dispatchers, mechanics, aviation maintenance support personnel, crew resource personnel, managers, and administrative support staff. More than 75% of Pinnacle's workforce is unionized, consisting as of August 2012 of approximately 2,400 pilots represented by the Air Line Pilots Association ("ALPA"); nearly 1,500 flight attendants represented by the Association of Flight Attendants ("AFA"); and approximately 80 flight dispatchers represented by the Transport Workers Union, International ("TWU"). Pinnacle's labor costs are by far its single largest "controllable" (*i.e.*, non-reimbursable) cost item representing more than 70% of its total controllable costs. Pinnacle faces certain liquidation absent substantial reduction of these costs.

### III.    Cost Savings and Initial Section 1113 Proposal

12.     Over the past many months, Pinnacle and its advisers have sought to cut costs and seek a path toward long-term financial viability. As discussed in my First-Day Declaration,

4

Pinnacle undertook numerous cost-cutting initiatives beginning in the fall of 2011, including significant down-sizing of its management team, elimination of 2012 merit increases and discretionary bonuses, consolidation of operations, seeking of lender and other creditor concessions, and unwinding of unprofitable contracts. (First-Day Decl. ¶¶ 29-37.) As noted above, the Company's wind-down initiatives are substantially completed.

13.     Pinnacle also has worked with its financial advisor Seabury to consider every cost item in its business plan and to identify any additional potential savings beyond those already realized. To date, Pinnacle has identified approximately $25.7 million worth of potential savings associated with its material costs, headquarters, non-union wages and headcount, and other items, and has factored these into its business plan. (Hughes Decl. ¶ 20.)

14.     Pinnacle initially attempted to obtain labor cost savings before its Chapter 11 filing. In the fall of 2011, Pinnacle approached its unions to seek a 5% wage cut, as well as relief from various pilot work rules that were imposing crippling training costs and loss of productivity in connection with the integration of Pinnacle's Mesaba and Colgan subsidiaries. (First-Day Decl. ¶¶ 17-25, 28.) Pinnacle explained to its unions that these concessions might allow the Company to retain its flying for United and help the Company avoid a Chapter 11 filing. Pinnacle also explained that without the requested concessions, and under a Chapter 11 restructuring scenario, the amount of labor savings ultimately needed could be substantially higher. The Company was unable to reach any labor deal pre-filing and was not able to retain its flying for United.

15.     Pinnacle made its initial Section 1113 proposal to its unions on May 8, 2012. In computing its initial ask, the Company had three primary goals: (1) attaining a cost structure that would avoid losing money on its only existing contracts; (2) achieving a sufficient profit margin

5

to attract an investor to allow Pinnacle to emerge from bankruptcy and to generate excess cash for future growth and protection against unforeseen fluctuations; and (3) achieving an overall competitive cost structure allowing the company to win future new business. Based on these considerations, Pinnacle proposed a package of wage, benefit, and work rule concessions achieving a combined average annual savings of approximately $43 million.

16. In formulating the initial $43 million ask, Pinnacle used its recently agreed upon contracts with Delta as the key benchmark of future competitiveness, calibrating the ask so that its labor cost reductions would permit it to bid for additional business offered at similar rates to those provided by the Delta contracts. Because the business terms of regional airline contracts – including pricing terms in particular – are highly-guarded, commercially sensitive information, Pinnacle was not able to benchmark its rates against the rates charged by Pinnacle's competitors in developing its Section 1113 proposal.

17. On May 8, 2012, members of Pinnacle's senior management team and its advisers presented the unions with Pinnacle's initial proposal, starting with an overview to all unions, followed by more detailed sessions with each union individually. Starting on that day and continuing thereafter, Pinnacle engaged in extensive, good faith negotiations with its unions and supplied all relevant information necessary to evaluate the initial proposal. The Pinnacle team made itself available on virtually a 24/7 basis to meet, answer questions, and otherwise do everything within its power to seek a consensual agreement. The Company's efforts included the launch and continual updating of an electronic "Data Room," which provided the unions with continual access to relevant information, as well as arrangements for the unions to access and manipulate a "live" version of the model underlying Pinnacle's business plan.

18. Despite these and other efforts, the parties made little progress with respect to the initial May 8 ask. Pinnacle ultimately suspended negotiations regarding its initial ask based on the developments discussed below.

## IV. Revised August 16, 2012 Proposal

19. On June 15, Virginia Hughes of Seabury, Steven Rossum (Pinnacle's restructuring officer), and I participated in a meeting with Delta Connection representatives in Minneapolis. At that meeting, Delta informed the Pinnacle team that Delta had analyzed the rates it pays regional partners for 70- and 76-seat regional flying and had determined that Pinnacle's rates under its existing CRJ-900 contract – which is currently significantly money-losing for Pinnacle – are ▇ per aircraft higher than the average rate Delta pays Pinnacle's competitors for similar-gauge aircraft. Based on this cost discrepancy, Pinnacle management understood that it would not be able to win new flying from Delta or any other major carrier unless it could achieve cost savings sufficient for it to reduce its rates for 76-seat flying by ▇ per aircraft.

20. Based on confidentiality obligations to its other regional partners, Delta was not able to turn over the details of its analysis, although it agreed to memorialize its conclusion and the methodology it employed in a letter dated August 1, 2012. This letter has been shared with the unions and the UCC and is attached to the accompanying declaration of Mr. Cude. (Cude Decl., Ex. A). As explained in the letter, Delta adjusted for different types of "pass-through" costs under its various agreements so as to ensure an "apples-to-apples" comparison, and calculated an effective cost difference of approximately ▇ per aircraft between Pinnacle and other flyers of larger, two-class regional jets. The letter also reported a cost disadvantage associated with Pinnacle's smaller 50-seat regional jets of approximately ▇ per aircraft. Given that Delta is replacing 50-seat flying with 70- and 76-seat flying, consistent with an

7

overall industry shift toward dual-class regional aircraft, Pinnacle must achieve competitive rates for the larger regional aircraft, and has accordingly focused its analysis on the ▉ cost differential.

21.   In addition to interfacing with Delta and its representatives and obtaining the August 1 letter, Pinnacle undertook to corroborate the ▉ calculation through its own independent analysis. Because there is virtually no publicly available information about the rates that other regional carriers charge their mainline partners, the Company instead sought to validate the ▉ cost gap through a comparison of Pinnacle's costs to those of its competitors.

22.   Pinnacle and its advisors believed that the most relevant comparison for ensuring cost competitiveness was to newer, low-cost regional carriers (*e.g.*, Compass Airlines and GoJet Airlines) that have been the recent winners of new regional business, rather than older airlines with higher cost structures that have either proven untenable (*e.g.*, Comair) or are based on business platforms fundamentally distinguishable from Pinnacle's (*e.g.*, SkyWest) because of more favorable economies of scale, cash position, aircraft ownership (justifying higher margin payments from mainline carriers), or other advantages or characteristics inapplicable to Pinnacle.

23.   In examining the ▉ cost gap identified by Delta, we asked Seabury to focus in particular on Compass Airlines and GoJet Airlines, low-cost Delta Connection carriers that compete with Pinnacle. In addition to lower pilot wages, Compass and GoJet have substantially lower overall employee seniority compared to Pinnacle, given that they have only been in operation over the last five to seven years, leading to significantly lower pilot-related costs. Based on reasonable assumptions regarding the seniority distribution of Compass and GoJet, and confining its analysis to certain wage, work rule, and 401(k) costs, Seabury estimated

8

a Pinnacle cost disadvantage per 76-seat aircraft of approximately $263,000 compared to Compass 76-seat aircraft, and $332,000 compared to GoJet 70-seat aircraft.[1] (Hughes Decl. ¶¶ 26-28.)

24. Pinnacle also asked Daniel Kasper, a noted airline industry expert of the consulting group Compass Lexecon, to analyze Pinnacle's cost disadvantage. Based on publicly available "Form 41" cost data reported by airlines for 2011, Mr. Kasper estimated a cost differential between Pinnacle and Compass Airlines of over $300,000 per 76-seat aircraft based on pilot costs alone. (Kasper Decl. ¶ 82.)

25. These analyses corroborated Delta's calculation showing that Pinnacle would be priced out of the market if it could not eliminate the identified ▮▮▮ cost differential. Pinnacle and its advisors calculated that eliminating this differential would require obtaining approximately $76.5 million in aggregate labor savings per year, and that its Section 1113 proposal would have to be revised accordingly.

26. In formulating its revised Section 1113 proposal, Pinnacle carefully considered whether it could successfully complete its Chapter 11 reorganization based on in its initial May 8, 2012 ask, which would have accomplished minimal profitability on its existing contracts with Delta, while leaving the ▮▮▮ cost gap unaddressed. Pinnacle and its advisers concluded that this was not a feasible route for the Company for various reasons.

27. First, Pinnacle has no realistic chance of long-term survival with significantly uncompetitive rates for 76-seat flying. Given the industry shift away from 50-seat aircraft, an inability to compete for new 76-seat flying is a death sentence for Pinnacle, or at a minimum, a guarantee that Pinnacle will soon find itself again in Chapter 11.

---

[1] GoJet does not currently fly any 76-seat aircraft.

28.     Second, there is a significant risk that Pinnacle can never emerge from bankruptcy without becoming cost competitive on 76-seat flying. Particularly given the difficulties Pinnacle encountered in trying to obtain DIP financing, the Company and its advisors did not see any likelihood of raising new capital unless an investor could be shown a realistic prospect of long-term business potential, not simply expiring contracts that could never be replaced or renewed. (Shapiro Decl. ¶¶ 22-30.)

29.     Third, there are significant short-term risks even under Pinnacle's existing contracts with Delta. For example, the contracts contain no "minimum utilization" or other usage requirements, and thus Delta is contractually permitted to substantially reduce aircraft that it does not wish to fly. Moreover, the contracts are subject to "rate resets" in 2018, ███████████████████████████████████████████████████████████. Pinnacle also faces various default risks under its DIP agreement if it does not immediately achieve substantial labor savings. (Shapiro Decl. ¶¶ 7-21.)

30.     Before finalizing and presenting its revised labor proposals, Pinnacle entered negotiations with Delta regarding the "most-favored-nation" ("MFN") clauses in Pinnacle's contracts with Delta. Under the prior version of those provisions, in the event that Pinnacle offered regional flying to another customer at lower rates than it was charging Delta, Pinnacle was obligated to charge Delta those same lower rates across all aircraft flown for Delta, regardless of the number of aircraft flown for the other customer. This provision essentially precluded Pinnacle from seeking non-Delta growth opportunities, because – even with a reduction in its rates to competitive levels allowing it to win new business – any such business at reduced rates would have been dilutive of Pinnacle's current revenue under its Delta contracts.

10

Over the course of several weeks in July and August, Pinnacle was able to renegotiate the MFN provisions with Delta to substantially lessen their dilutive impact on Pinnacle's revenue and permit Pinnacle to seek future growth opportunities. As amended, Pinnacle is able to fly ▌ aircraft per non-Delta customer at lower rates than those charged to Delta without any offsetting rate reduction obligation, and then incurs only partial rate reduction obligations to Delta for additional aircraft beyond the first ▌ per non-Delta customer.

31.     On August 16, 2012, the Company presented a revised labor ask to its unions, consisting of various wage, benefit, and work rule modifications totaling the $76.5 million needed to close the ▟▟▟▟▟ cost gap. Pinnacle's pilots would contribute the most to the overall required savings, based on the fact that pilot costs constitute the largest component of Pinnacle's labor costs, and based on the substantial market disparity between Pinnacle's pilot costs and those of the industry – particularly when factoring in Pinnacle's significant seniority disadvantage. To help address this disadvantage, Pinnacle's proposal contains certain structural modifications to the seniority accrual of its pilots. Specifically, Pinnacle has sought to impose a seniority cap of 12 years for Captains, a cap of 4 years for First Officers, and a rule that would place newly promoted First Officers at the first Captain seniority step, rather than crediting newly promoted First Officers with Captain longevity equivalent to the years previously spent as a First Officer. Pinnacle has also identified numerous pilot work rules that are significantly more onerous to the Company than those of its competitors and has proposed changes to better align them with the industry.

## V.     Labor Union Negotiations

32.     Since resuming labor negotiations on August 16, Pinnacle has once again made itself available on virtually a 24/7 basis to meet, answer questions, supply information, and explore any opportunities for a consensual resolution.

11

33. On August 30, 2012, Pinnacle reached a tentative agreement with TWU on behalf of the Company's flight dispatchers, which was ratified on September 11, 2012.

34. Pinnacle continues to negotiate in good faith with ALPA and AFA. I have instructed our labor negotiations team to make themselves continually available to meet with ALPA and AFA, and to make every possible effort to reach consensual deals.

I, John Spanjers, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee
Dated: September 13, 2012

*[signature]*

John Spanjers
President and Chief Executive
Officer -- Pinnacle Airlines Corp.