UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PINNACLE AIRLINES CORP., *et al.*, | Case No. 12-12-11343 (REG) |
| | (Jointly Administered) |
| Debtors. | |

### DECLARATION OF VIRGINIA L. HUGHES IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIRLINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113

Virginia L. Hughes declares and says:

## I.    Qualifications

1.      I am an Executive Director and Co-Head of the Airline Corporate Advisory Group of Seabury Advisors LLC ("Seabury"), which was retained in November 2011 by Pinnacle Airlines Corp. ("Pinnacle" or the "Company") and its four subsidiaries (collectively, the "Debtors") as their financial advisor.

2.      Seabury and its professionals have extensive experience working with financially troubled companies in complex financial restructurings both out of court and in Chapter 11 cases. Seabury and/or its professionals have served as advisors with respect to financial restructurings, finance operations, fleet optimization, new and used aircraft advisory services, cost reduction and operations optimization work, among other things, for numerous airline clients including those involved in Chapter 11 cases.[1]

---

[1] For a more detailed description of Seabury's qualifications, experience and role in these Chapter 11 cases, please refer to the Application of the Debtors for Authority to Employ and Retain Seabury Advisors LLC as Financial Advisor to the Debtors *Nunc Pro Tunc* to the Petition Date, [Dkt. # 111], filed on April 11, 2012.

3.      I joined Seabury in 2002 as a Vice President, and have been assigned by Seabury to advise numerous airline clients including US Airways, Air Canada, Northwest Airlines, South African Airways, and Frontier Airlines on a variety of projects, including airline treasury, corporate finance, airline restructuring, and airline operating economics.  From 2002-03 and in my capacity as a Seabury consultant, I served as the acting Chief Financial Officer of Midway Airlines – a U.S. regional airline – during its bankruptcy reorganization process.

4.      I have 19 years of global airline experience covering a wide range of matters, including several successful airline restructurings, crisis management, cash conservation, due diligence, strategic sourcing negotiations, cost reduction programs, and mergers and acquisitions. I have a senior role in assisting Seabury's airline clients in liquidity management, partner negotiation, fleet and vendor negotiation, and other restructuring issues.

5.      Prior to joining Seabury, I was a Senior Manager and leader in Ernst & Young's global airline group from 1993 to 2001.  During that time, I served numerous clients, including Southwest Airlines, British Airways, American Airlines, and Hilton International.  I led execution teams for various completed and proposed transactions, including the proposed American Airlines/British Airways alliance, the British Airways/Qantas Airlines joint services agreement, the proposed privatization of LOT Polish Airlines and Iberia Airlines, and Hilton International's acquisition of Stakis Hotels.

6.      I received my Bachelors in Business Administration in Accounting from the University of Texas at Austin and am a FINRA registered representative with the Series 7, 79 and 63 designations.

7.      I am the designated project leader from Seabury for advising the Debtors and have been performing a wide variety of financial advisory and managerial capacities since March

2

26, 2012. In addition to my financial advisory responsibilities, I have served as the Company's *de facto* CFO since the Company's CFO resigned in March 2012. In these capacities, I am familiar with Pinnacle's business and financial affairs, and I offer this declaration in support of Pinnacle's motion pursuant to 11 U.S.C. § 1113 to reject the collective bargaining agreements ("CBAs") between Pinnacle and the Air Line Pilots Association, International ("ALPA") and the Association of Flight Attendants-CWA ("AFA").

8.      I am not being compensated for this testimony other than through payments received by Seabury as a professional retained by the Debtors. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the airline industry as a whole. I am authorized to submit this declaration on behalf of Seabury, and if called upon to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

## II.     **Current Liquidity Crisis**

9.      Pinnacle is facing an acute liquidity crisis. Without immediate significant cost savings, Pinnacle will have insufficient cash to operate by                              .

10.     There are two basic benchmarks defining critical cash levels for the Company: (i) covenants under the Company's loan agreements requiring minimum month-end cash balances of $25 million,[2] and (ii) basic operational needs of the airline requiring a minimum cash

---

[2] Each loan agreement has a provision to measure the covenant on the first of the following month when month-end falls on a weekend.

3

balance of $20 million[3] at all times.  The relevant minimum cash covenants are found in the

Senior Secured Super-Priority Debtor in Possession Agreement among the Debtors, Delta

Airlines Corp. and Delta Air Lines Inc. dated May 18, 2012 (as amended on July 13, 2012 and

August 15, 2012, the "DIP Agreement"),[4] and the Debtors' Amended and Restated Credit

Agreement with CIT Bank (the "Spare Parts Facility").[5]  The operational need for at least $20

million in cash has been previously presented in detail and accepted by the Court.[6]  In brief,

Pinnacle's monthly cash levels fluctuate significantly within each month as a result of, among

other things, variances in the amount and timing of payments due to and from Pinnacle under its

operating agreements, under its aircraft leases and for employee payroll, as well as numerous

unpredictable events potentially affecting Pinnacle's operations, including unanticipated

maintenance issues, aircraft damage, regulatory action, bad weather, and others.  To preserve the

integrity of Pinnacle's operations in the face of large and unpredictable fluctuations in intra-

month cash levels, Pinnacle must keep its cash balance above $20 million at all times.

  11.  Falling below either the $25 million or the $20 million cash thresholds would

subject Pinnacle to substantial risk of having to shut down its operations, causing the loss of

thousands of jobs and irreparable harm to the Company and its stakeholders.  With cash below

$25 million at any month-end, Pinnacle would be in default of the DIP Agreement and Spare

Parts Facility, resulting in acceleration and other remedies available to Pinnacle's lenders that

---

[3] Inclusive of available borrowings.

[4] The DIP Agreement, approved by the Court on May 17, 2012, provides up to $74,285,000 in financing. The DIP Agreement is attached as Exhibit 1 to the Declaration of Mark Shapiro.  For additional discussion of the DIP Agreement and covenants thereunder at risk for violation, see the Shapiro declaration.

[5] The Spare Parts Facility, approved by the Court on May 11, 2012, is in the amount of $32.6 million.  (Ex. 1, Amended and Restated Credit Agreement among Pinnacle Airlines, Inc., Colgan Air, Inc., Mesaba Aviation, Inc., CIT Bank, and C.I.T. Leasing Corporation, dated May 15, 2012.)

[6] Ex. 2, Transcript of Hearing on Debtors' Motion to Authorizing Debtors to Obtain Post-Petition Financing (May 16, 2012), at 154-57, 175.

would likely lead to the Company's liquidation if exercised. With cash below $20 million,

Pinnacle's operational integrity would be jeopardized severely for the reasons noted above.

12.    Pinnacle's cash balances are on a steady downward trajectory because Pinnacle's

revenue under its only contracts (CRJ-200 and CRJ-900 flying for Delta) is insufficient to cover

Pinnacle's monthly expenses. Pinnacle's current cash forecast shows dangerously low cash

balances by ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ absent the

concessions requested.



13.    Thus, Pinnacle faces imminent and substantial risk of liquidation without the cost

savings requested.

## III.    Need For Labor Savings

14.    Based on my knowledge of Pinnacle's cost structure, my extensive involvement

in Pinnacle's cost-cutting initiatives since Seabury's retention in late 2011, and my years of

airline industry experience, it is my professional opinion that Pinnacle has identified and factored

into its baseline business plan all feasible non-labor cost savings that could materially improve

Pinnacle's financial condition, leaving labor savings as the only remaining alternative to restore

Pinnacle's viability. (*See* Ex. 3, Pinnacle Airlines Corp. – Consolidated Business Plan, 2013-2018.)

15.    Pinnacle, like many regional airlines who operate flights on behalf of mainline partners, has few places to look other than labor for cost savings impacting its bottom line. This is because many categories of costs required to operate regional aircraft (landing fees, engine overhauls, aviation insurance, airframe overhauls, etc.) are reimbursed dollar-for-dollar by the mainline partner (so called "pass-through" costs), and thus reductions in those costs do not directly impact the regional airline's ultimate profitability. Costs that are *not* reimbursable dollar-for-dollar, known as "controllable costs," are the main drivers of a regional airline's bottom line. Rates received from the mainline partner are sustainable when they are sufficient to cover controllable costs and provide a sufficient profit margin. When rates are insufficient to cover controllable costs – as is the case now for Pinnacle based on its current Delta contracts – controllable costs must be reduced to restore profitability.

16.    Pinnacle's largest controllable cost by far is labor, representing approximately 70% of total controllable costs, followed by maintenance and materials, which account for approximately 13% of controllable costs. Various miscellaneous categories individually account for no more than 3% of the total.[7] Maintenance and materials, although a significant component of controllable costs, are considerably lower in cost than labor and are generally a very limited source of savings, because their price in the market is relatively fixed and their consumption is driven by minimum thresholds required for safe and reliable operation of the airline.

---

[7] Cost percentages represent forecasted 2013 controllable costs excluding any of the relief sought herein. Maintenance and materials controllable costs exclude heavy airframe and engine overhauls which are a pass-through cost to Pinnacle.

17.    Notwithstanding these constraints imposed by Pinnacle's cost structure, the

Company has implemented significant cost savings since late 2011.  The most substantial

initiatives have been as follows:

- Pinnacle substantially reduced its management and non-contract headcount, resulting in approximately $13.5 million in annual savings.

- Pinnacle eliminated merit increases and cost of living increases in 2012 for non-contract employees, resulting in approximately $3.3 million in annual savings.

- Pinnacle has exited unprofitable flying contracts.  Most significantly, it negotiated the termination of flying for the following aircraft:

  - 30 Q400 aircraft flown for United Airlines (formerly Continental Airlines)

  - 58 Saab 340 aircraft flown for Delta, United, and US Airways

  - 16 CRJ-900 aircraft flown for Delta (scheduled to be decommissioned in the first half of 2013).

18.    Taken together, these decommissioned (and soon-to-be decommissioned)

operations reflected more than 37% of Pinnacle's operating fleet at its peak, and contributed

more than $575 million in annual controllable costs.   By eliminating these operations, Pinnacle

has avoided continuing losses exceeding $66 million per year.

19.    Pinnacle has also identified the following additional categories of potential

savings, which have been factored into Pinnacle's business plan – i.e., the Company's

projections and calculations of overall required cost savings assume that these savings items will

in fact be accomplished:

- $1.9 million in cuts for facilities, primarily related to headquarters leases;

- $4.1 million in cuts for maintenance and materials, primarily related to repair and logistics costs; and

- $2.9 million in cuts from various other expenses including, but not limited to, renegotiation of various executory contracts such as crew hotels and transportation, flight simulators, software, information technology support, and communications.

20.    All together, and putting aside the very significant losses avoided through the
operational wind-downs discussed, the Company has implemented and/or factored into its
business plan non-contract labor cost savings totaling approximately $25.7 million per year on a
going-forward basis. These savings, however, are not nearly sufficient for Pinnacle to achieve
profitability, let alone provide a platform for future viability and potential growth. To
accomplish these goals, the Company has no alternative other than to seek the requested savings
from its labor groups.

**IV.    Initial May 8, 2012 Labor Ask**

21.    On May 8, 2012, Pinnacle's senior management and advisors delivered to
Pinnacle's unions an initial labor ask totaling $42.6 million in average annual savings from
collectively bargained and non-collectively bargained employees. Pinnacle formulated the initial
labor ask by calculating the amount of savings needed to achieve an 8% rate-based margin under
its existing contracts with Delta. The Company's ask was premised on the belief that the rates in
the Delta contracts were at market levels. Pinnacle and its advisors determined that such a
margin was required to generate minimal cash flows to attract third-party investment needed for
emergence from Chapter 11, assuming that such a cost structure would enable it to successfully
compete for additional profitable business.

**V.    Revised August 16, 2012 Ask**

22.    On June 15, 2012, I attended a meeting in Minneapolis with John Spanjers,
Pinnacle's President and CEO, Steven Rossum, and Delta Connection ("DCI") representatives.
At that meeting the DCI representatives informed Mr. Spanjers, Mr. Rossum, and me that the
rates DCI pays Pinnacle to fly 50-seat and 76-seat aircraft significantly exceed the average rates
for similar gauge aircraft charged by other DCI carriers – specifically, that Pinnacle's rates for
such flying are above-market by          and          per 50-seat and 76-seat aircraft per

8

year, respectively. DCI's conclusion to this effect is memorialized in a letter dated August 1,
2012 from DCI to Mr. Spanjers. (Cude Decl., Ex. A.)

23.    Following the June 15 meeting, Pinnacle asked me and my team to attempt to
validate the cost gap identified by DCI, with particular focus on the ▇▇▇▇ gap for 76-seat
aircraft, given an overall industry shift toward larger dual-class aircraft (as discussed below). I
attempted to gather information from DCI regarding the methodology and underlying data used
to arrive at the ▇▇▇▇ figure, but as described in the August 1, 2012 letter, Delta was
significantly limited in what it could supply due to confidentiality obligations to the DCI carriers
whose rates DCI included in its analysis.

24.    Without access to the rates charged by other regional airlines, we sought to
validate the ▇▇▇▇ figure by comparing Pinnacle's labor costs to those of its competitors, in
particular, to low-cost competitors such as Compass Airlines ("Compass") and GoJet Airlines
("GoJet").[8] In my professional judgment, these comparisons are the most appropriate because
the regional airline industry is increasingly commoditized, and Pinnacle lacks any meaningful
ability to compete for additional business if it cannot offer rates that are among the industry's
lowest. Given the extent of the cost pressure in the regional airline industry, plus contractual
obligations that have required certain DCI carriers to match lower rates of their DCI
competitors,[9] I reached the view that the cost differential reported by DCI based on the average
DCI rates was likely being driven by the lowest cost regional airlines.

---

[8] Although GoJet flies 70-seat aircraft, not 76-seat aircraft, the distinction is not material for purposes of
this cost comparison analysis. GoJet's significantly lower cost structure for its 55-80 seat aircraft compared to
Pinnacle would allow it -- following a reasonable transition period – to operate 76-seat aircraft at labor cost levels
similar to GoJet's 70-seat aircraft.

[9] SkyWest, for example, has a provision in its Delta Connection agreements that requires that certain rates
charged to Delta be no more than the second-lowest in the Delta Connection network. We understand that during the
fourth quarter of 2010, SkyWest reached an agreement with Delta on rates through December 31, 2015 satisfying

9

25.     We conducted cost comparisons of Pinnacle to both Compass and GoJet based largely on two categories of information: (i) the pay "scale" of these airlines compared to Pinnacle (i.e., the hourly rate paid to Captains, First Officers and flight attendants at each level of the seniority scale); and (ii) the airline's "seniority" distribution (i.e., the number of Captains, First Officers, and flight attendants at each level of the seniority scale). The latter category of information is typically not publicly available but is critical to understanding the cost differential. Even if two airlines have comparable pay scales for each level of seniority, the airline with relatively higher seniority will incur greater costs because pay rates generally increase with seniority.

26.     Pinnacle has a substantial seniority disadvantage due to the airline's longevity. Pinnacle's predecessor airline was founded in 1985, and Mesaba and Colgan were founded even earlier. This seniority disadvantage is exacerbated by the integration of the pilots of all three airlines into one integrated seniority list ("ISL") as well as the significant reductions in flying. Those actual and planned reductions will disproportionately displace more junior pilots, leading to the most senior pilots from all three airlines flying the remaining aircraft. Compass and GoJet are relatively new airlines, having introduced service in 2007 and 2005, respectively. I am not aware of any publicly available information showing the seniority distribution for these airlines. However, given that they are relatively new industry entrants, my team and I were able to make reasonable assumptions about their seniority distributions, as discussed below.

A.     **Compass Analysis**

27.     We estimated the seniority distribution of Compass's pilot and flight attendant workforce based on the date on which its 76-seat aircraft were delivered. Because Compass

---

both a contractual rate reset and the second-lowest rate provision. At the same time, Delta waived its right to the second-lowest provision through December 31, 2015.

started operations in 2007, its pilot seniority on 76-seat aircraft cannot exceed 5 years. Our

analysis concluded that the average Compass pilot's seniority is likely approximately 3.6 years

versus ▮▮▮▮▮ for Pinnacle pilots.[10]  The average Compass flight attendant's seniority is likely

approximately 3.0 years versus ▮▮▮▮ for Pinnacle flight attendants.  With a seniority-based

pay system, this differential drives a significant cost disadvantage for Pinnacle. We applied this

estimated seniority disadvantage in comparing Pinnacle's proposed pay rates (under its May

2012 labor ask) to Compass's pay rates.  In addition, we estimated the effect of Pinnacle's 401(k)

disadvantage against Compass by applying the seniority comparison and pay rates to each

airline's 401(k) match rates.  The estimated value of Pinnacle's cost disadvantage against

Compass due to seniority, pay rate, and 401(k) for pilots totals $219,526 per CRJ-900 per year.

The estimated value of Pinnacle's cost disadvantage against Compass due to seniority, pay rate,

and 401(k) for flight attendants totals $38,227 per CRJ-900 per year.

       28.     We also assessed Pinnacle's pilot work rule advantages and disadvantages by

comparing Compass's pilot work rules to Pinnacle's pilot work rules under the May 2012 labor

ask.  Pinnacle's estimated cost disadvantage against Compass due to pilot work rules is $5,398

per CRJ-900 per year.

       29.     Pinnacle's total estimated cost disadvantage compared to Compass for the

categories listed above was $263,151 per CRJ-900 per year.  Thus, on the basis of these costs

alone, my team and I were able to substantiate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  (Ex. 4, Build-up of Pinnacle Estimated Cost Disadvantage Versus Compass

(Average Per Year).)

---

[10] For purposes of this calculation, we adjusted Pinnacle's seniority to account for the wind-down of the 16
CRJ-900s under the 2007 DCA with Delta, scheduled to occur in the first half of 2013.

## B.    GoJet Analysis

30.     Because GoJet started operations in 2005, its average pilot seniority for 70-seat aircraft cannot exceed 7 years. Our analysis concluded that the average GoJet pilot's seniority is likely approximately 3.3 years versus ████ years for Pinnacle pilots. The average GoJet flight attendant's seniority is likely approximately 2.7 years versus ████████ for Pinnacle flight attendants. Applying the same methodology used for Compass and examining the same cost categories, we estimated a total cost disadvantage of $332,343 – ████████████████

████████████████. (Ex. 5, Build-up of Pinnacle Estimated Cost Disadvantage Versus GoJet (Average Per Year).)

*      *      *

31.     There are three other regional airlines that provide 76-seat flying to DCI, other than those identified by Delta as excluded from its calculations, that may have seniority distributions more similar to Pinnacle's. Even compared to these competitors, however, Pinnacle's pilots and flight attendants likely have a higher seniority due to Pinnacle's ISL and additional increases to overall seniority resulting from significant reduction in flying. In addition, these other regional airlines have advantages or circumstances not applicable to Pinnacle:

- SkyWest Airlines and ExpressJet Airlines (collectively, "SkyWest") operated thirty-one 76-seat aircraft for DCI as of July 2012. SkyWest has over $600 million in unrestricted cash and marketable securities as well as creditworthiness to finance new aircraft.

- Shuttle America (a wholly owned subsidiary of Republic Airlines Holdings, "RAH") operates sixteen 76-seat aircraft for DCI as of July 2012. RAH has over $180 million in unrestricted cash as well as creditworthiness to finance aircraft.

Pinnacle, by contrast, is in bankruptcy and has no ability to finance aircraft, due to money-losing operations, depleted cash reserves, no mortgageable assets, and an uncompetitive cost structure.

12

32.     Based on the analysis above, and as further confirmed by the Compass Lexecon analysis presented in the Declaration of Daniel Kasper submitted concurrently with the Debtors' Section 1113 motion, my professional opinion is that Pinnacle faces cost disadvantages against its competitors in a sufficient amount to allow those competitors to charge rates that are approximately $      lower than Pinnacle's rates per 76-seat aircraft. Without bridging this cost gap, I do not believe that Pinnacle has any realistic chance of long-term viability, because it would be unable to compete for future business.

33.     In order to bridge the $      cost gap, my team and I calculated that Pinnacle would need to obtain additional savings of approximately $33.9 million above and beyond the savings initially requested on May 8, 2012, bringing the total annual required savings to approximately $76.5 million.

## VI.     Threat to 50-Seat Regional Jets

34.     Based on my knowledge of the industry, recent announcements by Delta, and the differing characteristics of 50-seat aircraft versus 70- and 76-seat aircraft (the former carrying higher costs per available seat mile, which costs are driven partially by spreading high fuel costs over fewer seats), my professional opinion is that future growth in the regional airline industry will be concentrated in larger, dual-class aircraft, not smaller 50-seat aircraft. Otherwise stated, the 50-seat seat regional jet market, comprising the large majority of Pinnacle's remaining fleet, has reached maturity. Major carriers utilizing 50-seat jets have been actively reducing their reliance on them, consistent with the increase in unit costs to operate the aircraft. This reduction has been driven partially by the spike in fuel prices since the introduction of 50-seat aircraft in the late 1990s and early 2000s. Market maturity is evidenced by effective cessation of orders for new 50-seat aircraft from manufacturers, as well as fleet retirement announcements from mainline carriers. (*See* Ex. 6, 50 Versus 70+ Seat Historical Orders from 2000-2012.)

13

Moreover, it is increasingly common for manufacturers to disassemble 50-seat aircraft to harvest value in their underlying parts, rather than to attempt to remarket them for active flying.

35.    Furthermore, it is estimated that three of every four engines powering the CRJ-200 50-seat regional jets in the United States will need to be overhauled within the next three years, at an expected aggregate cost exceeding $1 billion.[11] In many capacity purchase agreements, including Pinnacle's agreements with Delta, this type of engine overhaul is a pass-through cost to the major airline. Such a significant one-time cost, coupled with ongoing unfavorable operating economics, combine to create strong incentives for major airlines to reduce or eliminate reliance on 50-seat aircraft.

36.    This trend is epitomized by a recent agreement reached between Delta and its pilot union permitting Delta to add seventy 76-seat regional aircraft, on the condition that Delta reduce the number of 50-seat aircraft flown by its regional partners to no more than 125. Since the agreement was reached, Delta's CEO has stated publicly that Delta does indeed intend to reduce its fleet of 50-seat aircraft to 125 or less, and to do so within the next two to three years.[12] Furthermore, Delta's President has stated publicly that Delta intends to reduce its overall regional jet fleet to 425 by 2015 via reductions of 200 or more 50-seat aircraft. This would leave a total DCI fleet of no more than 100 50-seat aircraft.[13] Based on known transactions and removals, Delta has already secured reductions of 50-seat aircraft sufficient to reduce the number

---

[11] Ex. 7, Andrew Compart, "Vast Majority of 50-seat CRJ Engines Due for Overhaul in Next Three Years", aviationweek.com, http://www.aviationweek.com/article.aspx?id=/article-xml/avd_06_27_2012_p01-02-471422.xml, June 27, 2012; Ex. 8, Negotiators' Notepad 12-13, Delta MEC, Contract 2012 – Rumor, Innuendo and Misrepresentations (June 21, 2012), http://alpawatch.org/C2012/Negotiators%27%20Notepad%2012-13%20--%20Contract%202012%20%E2%80%93%20Rumor,%20Innuendo%20and%20Misrepresentations.pdf.

[12] Ex. 9, Delta Air Lines' CEO Discusses Q2 2012 Results - Earnings Call Transcript, Seeking Alpha (July 25, 2012), http://seekingalpha.com/article/749071-delta-air-lines-ceo-discusses-q2-2012-results-earnings-call-transcript.

[13] Ex. 10, Delta Air Lines, Inc. Form 8-K (Sept. 7, 2012), Ex. 99.1, Delta Air Lines, Delta: Keep Climbing, Presentation to Deutsche Bank 2012 Aviation and Transportation Conference (Sept. 6, 2012) at 13.

to 249 by December 2015, leaving at least 124 more to be eliminated. Of the remaining 124, 85 are flown by SkyWest, 24 are flown by Shuttle America, and 140 are flown by Pinnacle. Thus, it would be impossible for Delta to accomplish its stated goal without eliminating some – and likely a substantial portion – of Pinnacle's 50-seat aircraft.

37.    Starting from the DCI fleet in service on July 2, 2012 by carrier, the chart below reflects the known additions and reductions to that fleet by aircraft seat size and the resultant fleet by December 2015 assuming the goals stated by Delta senior management materialize.

**Exhibit 11**

| DELTA CONNECTION REGIONAL JET FLEET | | | | | | | | | | |
| | 50 Seats | | | 65-69 Seats | | | 76 Seats | | | |
| | E145 | CRJ | Total | CR7 | E170 | Total | CR9 | E175 | Total | Grand Total |
| **July 1, 2012 DCI Fleet** | | | | | | | | | | |
| Chautauqua | 24 | - | 24 | - | - | - | - | - | - | 24 |
| Comair | - | 23 | 23 | 15 | - | 15 | 13 | - | 13 | 51 |
| Compass | - | - | - | - | 6 | 6 | - | 36 | 36 | 42 |
| GoJet | - | - | - | 12 | - | 12 | - | - | - | 12 |
| Pinnacle | - | 140 | 140 | - | - | - | 57 | - | 57 | 197 |
| Shuttle America | - | - | - | - | 14 | 14 | - | 16 | 16 | 30 |
| SkyWest | - | 152 | 152 | 55 | - | 55 | 31 | - | 31 | 238 |
| **Total** | 24 | 315 | 339 | 82 | 20 | 102 | 101 | 52 | 153 | 594 |
| | | | | | | | | | | |
| **Additions and reductions** | | | | | | | | | | |
| Comair | | (23) | (23) | (15) | | (15) | (13) | | (13) | (51) |
| GoJet | | - | - | 10 | | 10 | | | - | 10 |
| Pinnacle | | - | - | | | - | (16) | | (16) | (16) |
| SkyWest | | (67) | (67) | 5 | | 5 | 29 | | 29 | (33) |
| Potential new assignments | - | - | - | - | - | - | - | - | - | - |
| Planned reductions | - | - | - | - | - | - | - | - | - | - |
| | - | (90) | (90) | - | - | - | - | - | - | (90) |
| **Net DCI Fleet** | 24 | 225 | 249 | 82 | 20 | 102 | 101 | 52 | 153 | 504 |

| FUTURE DELTA CONNECTION REGIONAL JET FLEET | | | | | | | | | | |
| | E145 | CRJ | Total | CR7 | E170 | Total | CR9 | E175 | Total | Grand Total |
| Chautauqua | 24 | - | 24 | - | - | - | - | - | - | 24 |
| Compass | - | - | - | - | 6 | 6 | - | 36 | 36 | 42 |
| Go Jet | - | - | - | 22 | - | 22 | - | - | - | 22 |
| Pinnacle | - | 140 | 140 | - | - | - | 41 | - | 41 | 181 |
| Shuttle America | - | - | - | - | 14 | 14 | - | 16 | 16 | 30 |
| SkyWest | - | 85 | 85 | 60 | - | 60 | 60 | - | 60 | 205 |
| **Total** | 24 | 225 | 249 | 82 | 20 | 102 | 101 | 52 | 153 | 504 |
| **Net Actions to Goal** | | | (149) | | | | | | 70 | (79) |
| **Delta Goal** | | | 100 | | | 102 | | | 223 | 425 |

38.    Key to Pinnacle's revenue production is the amount of flying it will provide to Delta. The business plan uses an estimate of future flying under the Delta commercial agreements based on historical utilization of the two aircraft types Pinnacle operates for Delta. However, as Pinnacle's commercial agreements with Delta do not contain any "minimum utilization" or other usage requirements, Pinnacle's revenue forecasts are susceptible to variations in utilization. While decreased utilization decreases revenue, reductions in revenue and shedding of corresponding costs are not linear, at least not in the near-term.

16

39.     Pinnacle faces substantial risk given Delta's stated goal for reduction of 50-seat regional jets. If Delta were to rely partially or fully on its contractual right to reduce Pinnacle's utilization as a means of reducing Pinnacle's 50-seat flying, the impact could be detrimental for Pinnacle. Indeed, the effect of this provision has already materialized, resulting in significant revenue loss. In May 2012, Pinnacle was forecasting a pre-tax loss from its CRJ-200 and CRJ-900 flying with Delta (before consideration of the relief contemplated herein) of $8.2 million for the second half of 2012, based on estimated flying of approximately 290,000 block hours. As a result of reduced utilization for the second half of 2012, Pinnacle revised its forecast to reflect a pre-tax loss of $22.8 million over that same period. Pinnacle now estimates a 7% reduction in block hours from its May 2012 forecast – to approximately 268,000 block hours – resulting in a $14.8 million increase to operating loss.

I, Virginia L. Hughes, declare under penalty of perjury that the foregoing is true and

correct.

Memphis, Shelby County, Tennessee
Dated:  September 13, 2012

Virginia L. Hughes
Executive Director and Co-Head of
Airline Corporate Advisory
Seabury Advisors LLC