Exhibit 2

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-11343-reg

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


PINNACLE AIRLINES CORP, et al.,


       Debtors.


- - - - - - - - - - - - - - - - - - - - -x


       United States Bankruptcy Court

       One Bowling Green

       New York, New York


       May 16, 2012

       10:28 AM


B E F O R E:

HON. ROBERT E. GERBER

U.S. BANKRUPTCY JUDGE

1

2   Doc# 23 Motion to Authorizing Debtors to Obtain Post-Petition

3   Financing, (II) Granting Liens and Providing Super-Priority

4   Administrative Expense Status, (III) Granting Adequate

5   Protection to Prepetition Secured Parties, (IV) Authorizing

6   Debtors to Assume Connection Agreements with Delta Air Lines,

7   Inc., and (V) Allowing General Unsecured Claim.

8

9   Doc #217 Motion for Relief from Stay As to Standard Aero Ltd.

10  for the Purposes of Terminating CF34-3B1 Engine Hourly Rate

11  Program Repair and Services Agreement, By and Between Standard

12  Aero Ltd. and Northwest Airlines, Inc., n/k/a/ Delta Air Lines,

13  Inc. and Related Assignment Agreements, and for Related Relief.

14

15

16

17

18

19  Transcribed by:  Penina Wolicki

20

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

1

2  A P P E A R A N C E S :

3  DAVIS POLK & WARDWELL LLP

4       Attorneys for Debtors

5       450 Lexington Avenue

6       New York, NY 10017

7

8  BY:   MARSHALL S. HUEBNER, ESQ.

9

10

11  AKIN GUMP STRAUSS HAUER & FELD LLP

12       Conflicts Counsel to Debtors

13       One Bryant Park

14       New York, NY 10036

15

16  BY:   LISA G. BECKERMAN, ESQ.

17       ABID QURESHI, ESQ.

18

19

20

21

22

23

24

25

1

2    MORRISON & FOERSTER LLP

3          Attorneys for Official Committee of Creditors

4          1290 Avenue of the Americas

5          New York, NY 10104

6

7    BY:   BRETT H. MILLER, ESQ.

8          ERICA J. RICHARDS, ESQ.

9

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12         Office of the United States Trustee

13         33 Whitehall Street

14         21st Floor

15         New York, NY 10004

16

17   BY:   ELISABETTA G. GASPARINI, ESQ.

18

19

20   COHEN, WEISS AND SIMON LLP

21         Attorneys for Air Line Pilots' Association

22         330 West 42nd Street

23         New York, NY 10036

24

25   BY:   RICHARD M. SELTZER, ESQ.

5

1

2  BROWN RUDNICK LLP

3       Attorneys for Shareholder Group

4       One Financial Center

5       Boston, MA 02111

6

7  BY:   JEFFREY L. JONAS, ESQ.

8        JESSICA L. CONTE, ESQ.

9        JAMES W. STOLL, ESQ.

10

11

12  KIRKLAND & ELLIS LLP

13       Attorneys for Delta

14       300 North LaSalle

15       Chicago, IL 60654

16

17  BY:   DAVID R. SELIGMAN, ESQ.

18

19

20

21

22

23

24

25

6

FROST BROWN TODD LLC

     Attorneys for Standard Aero

     3300 Great American Tower

     301 East Fourth Street

     Cincinnati, OH 45202


BY:   RONALD E. GOLD, ESQ.

     PAIGE L. ELLERMAN, ESQ.



MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

     Attorneys for United Steel Workers' Union

     1350 Broadway

     Suite 501

     New York, NY 10018


BY:   HANAN B. KOLKO, ESQ.


ALSO PRESENT:  (TELEPHONICALLY)

     RODNEY D. MCFADDEN, Pro Se

     RYAN MORRIS, Pro Se

     MARK TAUB, Mohawk Capital

     MICHAEL TIAN, Interested Party

P R O C E E D I N G S

1

2      THE COURT:  All right.  We're going to go right into

3  Pinnacle without a recess.  Come on up, please.  Is Ms.

4  Beckerman here?

5      MS. BECKERMAN:  I'm here.

6      THE COURT:  Oh, okay.

7      MS. BECKERMAN:  I'm just in the back.

8      THE COURT:  Yes, I see you're in deep right field.

9  Okay.  Come on up, please.

10      (Pause)

11      THE COURT:  Ms. Beckerman, I would like to get your

12  recommendation as to whether I should deal with DIP financing

13  or Standard Aero first.  I think you might want to deal with

14  DIP financing first, because you have more people in the

15  courtroom who might be interested in that.

16      MS. BECKERMAN:  Yes, Your Honor, that is correct.

17  We'd like to proceed in that order.  And also because we have a

18  deadline for our closing, which would have to occur potentially

19  tomorrow, at the latest Friday; so we'd like to make sure we

20  get the order entered, if you are going to approve it.

21      THE COURT:  All right.  I want to get appearances, and

22  then I want everybody to sit down.  I have some preliminary

23  comments.

24      Ms. Beckerman, I see you and your partner, Mr.

25  Qureshi.

**PINNACLE AIRLINES CORP, ET AL.**                                    8

1       MS. BECKERMAN:  Yes, Your Honor.  Lisa Beckerman and

2   Abid Qureshi from Akin Gump on behalf of the debtors.

3       THE COURT:  Okay.  From the creditors' committee?

4       MR. MILLER:  You have Brett Miller and Erica Richards

5   from Morrison & Foerster on behalf of the creditors' committee.

6       THE COURT:  All right.  Mr. Miller, you might or might

7   not know, but this morning we docketed the order making you

8   official.

9       MR. MILLER:  Thank you very much, Your Honor.

10      THE COURT:  Okay.  Next?

11      MR. JONAS:  Good morning, Your Honor.  Jeff Jonas from

12  Brown Rudnick.  With me are Jim Stoll and Jessica Conte, on

13  behalf of a number of shareholders.  And we filed the

14  objection, Your Honor.

15      THE COURT:  Yes.  And I saw your 2019.

16      MR. JONAS:  Thank you, Your Honor.

17      THE COURT:  Fine.  Anybody else appearing today?

18      MS. GASPARINI:  Elisabetta Gasparini, Office of the

19  United States Trustee.

20      THE COURT:  Right.

21      MR. KOLKO:  Your Honor, Hanan Kolko of Meyer, Suozzi,

22  English & Klein, on behalf of the United Steel Workers' Union.

23      THE COURT:  Right.

24      MS. ELLERMAN:  Your Honor, Paige Ellerman on behalf of

25  Standard Aero.

**PINNACLE AIRLINES CORP, ET AL.** 9

1    THE COURT:  Good morning.

2    MR. SELTZER:  Good morning, Your Honor.  Richard

3 Seltzer of Cohen, Weiss and Simon for the Air Line Pilots

4 Association.

5    THE COURT:  Okay.  Mr. Seltzer, good morning.

6    MR. SELIGMAN:  Good morning, Your Honor.  David

7 Seligman on behalf of Delta Airlines.

8    THE COURT:  Say that slower, please.

9    MR. SELIGMAN:  I apologize, David Seligman on behalf

10 of Delta Airlines.

11    THE COURT:  Oh, okay.  You've got Delta, Mr. Seligman.

12    MR. MORRIS:  And this is Ryan Morris, an equity holder

13 who filed a pro se objection.

14    THE COURT:  Yes, Mr. Morris.  I have some questions

15 for you, if you want to be heard more than just listen in.

16    MR. MORRIS:  Yes.

17    THE COURT:  Let me ask you right now.  I was surprised

18 when I read your papers that you didn't say what your role was

19 in this case, and I was also surprised that you didn't say what

20 equity you hold.  Would you tell me now, please, if, in fact,

21 that's so.

22    MR. MORRIS:  Oh, yes.  I'm an equity holder in this

23 case.  And I own approximately 900,000 shares personally and

24 through an LLC.  And I was a pre-petition holder for the

25 majority of those shares.  And also I filed a 13(d) along with

1 Wayne King in February.

2 THE COURT: Now, when I was encouraged the bankruptcy

3 rules committee to make individual holders trying to influence

4 the Court, subject to Rule 2019, the rules committee didn't

5 agree with me. Do you have any other disclosable interest,

6 like short positions or interests in any securities or debt of

7 the debtor other than the shares you just told me about?

8 MR. MORRIS: No, just the shares. I don't believe any

9 other debt is publicly traded. It's just held by secured

10 creditors.

11 THE COURT: No, I understand that. But I also assume

12 there might be, for instance, trade debt out there.

13 MR. MORRIS: Oh, no. I don't believe any trade debt

14 is actually traded. I've been asking, actually, but I don't

15 believe any has traded yet.

16 THE COURT: Okay.

17 MR. MORRIS: And I certainly don't own any.

18 THE COURT: All right. I'll give you your opportunity

19 to be heard when it's your turn.

20 MR. MORRIS: Thank you.

21 THE COURT: I'll hear first from you, Ms. Beckerman,

22 but here's where I want everybody to focus their discussion.

23 Obviously, I've read the papers.

24 It appears to me that this is simply another case in

25 which I'm going to be making the call under the Farmland

1  factors.  And I think many of us, at least in my side of the

2  bench, believe that Jerry Venters' analysis of those factors

3  and the applicable considerations is the best that's out there.

4      He identified, I think, five factors.  And Ms.

5  Beckerman, you tended to talk about the business judgment of

6  the debtor more than once, as if business judgment's the only

7  factor.  I think I have to make at least two other important

8  inquiries; one is the best interests of the estate analysis, as

9  to which, based on the papers, the estate seems to be way

10  ahead; but also to determine whether each of the terms that's

11  in there are appropriate.  And on one or two of them, I have

12  some reservations.

13      I do want to hear from the equity objectors as to what

14  they think I should be doing for an alternate source of

15  financing if I were to disapprove this.  Because I think the

16  record, at least insofar as I'm aware, is undisputed at this

17  juncture, that Delta is the only game in town, and that the

18  debtor desperately needs this money; and that whether Delta did

19  anything bad or not in the past, the fact is that the debtor

20  has a very serious liquidity need, especially after June 1st.

21      Now, what I will want to hear from the objectors, not

22  so much from the steel workers, but from the equity holders, is

23  what I'm supposed to do without a source of DIP financing.  I'm

24  sure this got the attention of the creditors' committee too.  I

25  mean, every creditors' committee in the world likes to get a

 1  better deal, but they're also realists in many instances.

 2        Now, the main thing that I want to talk about is the

 3  reasonableness of the terms, which is another one of Judge

 4  Venters' Farmland factors.  My principal concern, to tell you

 5  the truth, isn't so much on the control over the case, because

 6  it appears to me that's an amalgam of things that DIP lenders

 7  always ask for, and also is affected by the fact that -- I

 8  think, but I need both sides to confirm or help me understand

 9  better -- that there are reasonableness considerations attached

10  to most of them.  But the main concern I have, folks, not so

11  much from the ALPA reservation of rights, but from the steel

12  workers, who I understand represent ground workers, principally

13  mechanics and some of the flight attendants, is obviously we're

14  going to have labor relations issues coming down the road, and

15  I want these to proceed on a constructive basis until and

16  unless our backs are against the wall.  I want people

17  negotiating until and unless our backs are against the wall,

18  and I want to hold a contested 1113 hearing only if I must and

19  only if I have no alternative.

20        I want to have the flexibility in the case to help

21  labor and management get to a consensual deal if at all

22  possible.  And I want both sides to address the extent to which

23  anybody's taking away my discretion or my flexibility in

24  achieving that goal.  Now, I take no position on the merits of

25  any possible future difference in perspective between

1  management, on the one hand, and the unions on the other.  But

2  I want an environment in which I can help people come to their

3  own deal if I possibly can.

4         Ms. Beckerman, I'll hear from you first.  Those are

5  the things that I need you to address.  Then I'll hear from

6  your opponents.  I'll want to hear from the creditors'

7  committee, Mr. Miller, after I hear from Ms. Beckerman, if as I

8  sense, you're generally supportive of what she has to say.  And

9  then I'll hear from the objectors.

10        MS. BECKERMAN:  Good morning, Your Honor.  Lisa

11  Beckerman on behalf of the debtors.  Your Honor, I guess we'll

12  start with the best interests of the estates, because I think

13  that was what you flagged first.  You've already highlighted

14  that the testimony that we put in by declaration, our motion

15  and our supplemental declarations, all indicate that we are in

16  a situation where we need this financing, and if we don't

17  receive it in connection with -- by early June, we will start

18  having problems and running out of money.  So it is not a

19  situation where this is an optional situation for the debtors,

20  as you've already noted.

21        So the debtors had to go out and search for financing.

22  Mr. Shapiro's declaration, which is also in front of Your

23  Honor, as well, as a supplemental declaration, indicates that

24  we shopped it extensively.  There were several periods of

25  shopping it.  It was shopped in January; it was shopped in

1  March; and then shopped after the filing, so that there really

2  isn't another party that is prepared to lend.  And some of the

3  reasons for that are also set forth in Mr. Shapiro's

4  declaration, including the fact that the collateral that we

5  have available to pledge parties and the value of that is less

6  than the amount of DIP financing that we need to seek.

7          And that made this loan fairly unattractive to many

8  parties, because if there were to be a liquidation, they

9  couldn't be assured that they were going to have any kind of

10  value that would enable them to cover their loan.  And it's

11  only because, obviously, there are a lot of interests that

12  Delta has in connection with Pinnacle's survival, as its

13  largest customer, that it was willing to step up to the plate

14  and propose a DIP even though it has risks to Delta that if, at

15  the end of the day, there's meltdown, they won't be covered on

16  their collateral.

17          And the reasons that you see that type of structure --

18  in this case Delta but if you look at the cases we've cited in

19  our pleadings, United as well as Delta's own Chapter 11 --

20  where the DIP financing was from a more unusual source than one

21  would typically think, someone who had an interest in the

22  company surviving, in those cases, credit card companies, but

23  in our case, our largest customer; and because it had an

24  interest in surviving, we obviously then went and negotiated

25  terms with Delta, and we also pursued other options.  We did,

12-12349-reg Doc 375-2 Filed 09/21/12 Entered 09/21/12 16:38:01 Exhibit 2
Pg 16 of 191

1  obviously, have one party that submitted a term sheet to us,

2  but then pulled out.  Post-petition we continued.  And this is

3  our option that we have on the table.

4       Now, why is that in the best interests of the estates?

5  Well, I think we put in our papers the analysis that the board

6  considered in connection with this.  And it's not just a

7  business judgment analysis; it's the best interest of

8  stakeholders' analysis, Your Honor.

9       So on one hand, we had negotiated for a month with

10  Delta.  We had a DIP facility that on its face, on the

11  economics, is very compelling, because obviously we have

12  undersecured -- someone who's not getting sufficient

13  collateral, but is not charging us fees, and charging us twelve

14  and a half percent interest, which as you know, in this market

15  for a DIP, is not bad.  And the other person who had put down a

16  term sheet initially and then pulled out, was going to charge

17  twenty-five percent.  So from the perspective of what's

18  available for the estate, on a terms basis, this obviously,

19  economically, was the best choice.

20       The board obviously was not that excited, not

21  surprisingly, as I think comes out in Mr. Menke's declaration,

22  about being in a situation where we would have to renegotiate

23  terms of our contracts as part of the deal to get a DIP.  And

24  that was part of what was considered, of course.  But the board

25  determined that we should pursue the Delta alternative while we

PINNACLE AIRLINES CORP, ET AL.                                    16

1   looked at other things -- which we did, including this other

2   DIP lender that pulled out -- and we then, at the end of the

3   day, after we'd spent a month negotiating the best terms we

4   could possibly get under the contract -- as I think Mr. Menke's

5   declaration makes clear, and if it gets to testimony, I'm sure

6   it'll come out further, and it was very heated, serious

7   negotiations.

8          We certainly didn't end up where we got everything or

9   where Delta got everything.  I think the testimony would show,

10  Your Honor, that for example, Delta gave us a number of things

11  they didn't want to give us.  We ended up with exit financing,

12  because Mr. Shapiro, myself, the board and management was not

13  comfortable going into this process where we were taking on

14  this debt, operating the business, and not being sure how we

15  were going to ultimately get out.  And we also had change-of-

16  control issues that are in our existing contracts, which would

17  sort of limit our ability to go outside and get equity.  So

18  that was one consideration that we had.

19         Delta also did not want to -- we had a very serious

20  negotiation about rates.  Not surprisingly, Delta wanted to

21  have lower rates; we wanted higher rates.  We ended up

22  somewhere in the middle.  We had an issue about the length of

23  the term of the CRJ-200 contract, which is the contract that

24  governs 140 of our aircraft.  So the vast majority --

25         THE COURT:  Those are made by Bombardier?

1    MS. BECKERMAN: Yes. And so what happened with that

2    negotiation, Your Honor, is we would otherwise have had a

3    contract that was going to expire in 2017. We're sitting here

4    in 2012 trying to consider a reorganization that will probably

5    confirm in 2013. As you know, in our business, when you're

6    looking at trying to reorganize a business, you need to have

7    some kind of fairly long-term ability to have a business. If

8    140 out of your 181 aircraft are going to go away at the end of

9    2017, that is a very difficult business to reorganize. So one

10   of the things we got was an extension on the contract.

11        On our side, we obvious --

12        THE COURT: On the CRJ-200s?

13        MS. BECKERMAN: Yes, the CRJ-200s. We obviously

14   wanted other things that we didn't get. Not surprisingly, we

15   negotiated for numerous things. We negotiated to try to get

16   minimum utilization. Our contract did not have that pre-

17   petition before we modified it. It doesn't have it now. We

18   did get fixed margin, which is an improvement on that, because

19   we have to be paid so much per aircraft, so it's a sort of

20   compro -- somewhat of a compromise. Not as much as we wanted

21   on minimum utilization, but it's something that we negotiated.

22        We did not get our change of control waived. We

23   obviously wanted that. That was part of the tradeoff on the

24   exit financing. We did not get our change in our timing of

25   cash flows. One of our contracts, our CRJ-200 contract that

1    we've been talking about, Your Honor, we get paid in arrears.

2    And obviously from -- and it's been historically like that.

3    That's not new.  But our other contracts we get paid in

4    advance.  So we wanted to move our CRJ-200 contract to be paid

5    in advance like our other contracts, because it improves our

6    working capital.  But unfortunately, we weren't able to get

7    that either.  So we had a lot of back and forth, Your Honor.

8           Then we got to the issue of our outstanding disputes

9    under our Connection agreements, because as Your Honor can

10   imagine, if we're about to assume contracts, we have to be

11   comfortable that we're going to have no outstanding disputes or

12   we've resolved them, because otherwise we're going to have

13   arguments about cure costs that would come up at the time we

14   assume a contract, or we'd have just ongoing disputes with our

15   largest customer that we're trying to operate in a Chapter 11.

16   Not very easy to make our way through that either.

17          And Delta was, pre-petition, eighty percent of

18   Pinnacle's flying.  And with the wind-down of United and the US

19   Air flying that we talked about on the first day, and

20   subsequently with Your Honor in court, Delta will wind up,

21   ultimately when the wind-downs are completed, being a hundred

22   percent of Pinnacle's operations.

23          We also looked at the issue of our unprofitable

24   contract.  We had three contracts, one of which was

25   historically very unprofitable.  That's our 2007 CRJ-900

**PINNACLE AIRLINES CORP, ET AL.**                    19

1   contract that governs sixteen aircraft that we own.  We tried

2   to renegotiate that.  We just couldn't possibly work out a

3   situation on the economics that was workable from Delta and our

4   perspective; and we couldn't continue to assume that contract

5   and fund those losses forever, so we negotiated an orderly

6   wind-down.

7           And as part of that orderly wind-down, we had a

8   dispute about a claim, because Delta understandably said,

9   you're modifying this agreement; we're going to have to go out

10  and find a replacement; we're going to have some argument about

11  our damages.  And we had a broad range of dispute on that

12  claim, Your Honor.  They started out at 200 million; we were at

13  30.  We couldn't close the gap.  So what we ended up

14  negotiating is that they have an allowed claim, because even we

15  believe they have an allowed claim of some dollar, but the

16  amount won't be determined until a subsequent time with Your

17  Honor, therefore allowing the creditors' committee and other

18  parties to come in and weigh in about the claims process, and

19  that at the end of the day, you'll determine what claim they

20  have for damages.

21          THE COURT:  Pause, please, Ms. Beckerman.  To what

22  extent, if any, is there a thumb on the scales or any pressure

23  on me to reach a particular result as to the amount of the

24  allowed claim?

25          MS. BECKERMAN:  No thumb on the scales, Your Honor.

1  That's why we kicked it to you.

2           THE COURT:  All right.

3           MS. BECKERMAN:  We just really couldn't agree on it.

4  We had a lot of back-and-forth; we narrowed our gap,

5  ultimately; we got to where we were probably about ninety

6  million dollars apart.  But ninety million dollars, in the

7  scheme of this case, is an awfully big claim.  And we could --

8  and just the dispute.  And so we obviously couldn't agree to

9  that.

10          Then we were in the situation of trying to resolve

11 those outstanding disputes I mentioned.  And there'll be a --

12 there's a lot of arguments about those.  So I do think I need

13 to address that.

14          The first thing is that we had, just like any other

15 business where you have three contracts, where you have a

16 billion dollars of revenue for a business, in aggregate, of

17 which Delta's eighty percent of, you have commercial disputes

18 that arise under these contracts.  Very normal.  So what

19 happens under the terms of the contracts is that -- leaving

20 aside the pilot reimbursement and the rate reset, which I will

21 come back to in a minute and talk about -- if one party says I

22 don't think that the amount you charged me for this -- because

23 we have charges that go back and forth under the terms of our

24 agreement; they have to reimburse us for pass-through amounts;

25 we have amounts that we pay them for certain services they

1  provide to us.  So money goes back and forth all the time

2  between ourselves under the contract, and that's been

3  historically true ever since these contracts existed.  That's

4  not a new thing about any amendments to this contract.

5        So where we were is that we had a number of disputes

6  that had arisen, because they see a bill for our maintenance

7  and they think that maybe our maintenance amount included

8  something like beyond what heavy maintenance has covered, or we

9  had other services provided.  So there's a dispute.  And the

10  parties agree there's a dispute.  And then what happens under

11  the contract is until the parties reach a resolution or we have

12  to go to court and get ultimately a litigated resolution, there

13  is no amount that gets paid or set off for that amount.  It's a

14  dispute that's sitting there, in essence, in abeyance.

15        And we had disputes like that that went back and forth

16  on both sides.  And they were not insignificant, Your Honor.  I

17  think the testimony will explain that from our perspective and

18  Delta's perspective, these were in the tens of millions of

19  dollars.  So we had -- on each side.  And so then we had the --

20  so that was our disputes outstanding.

21        And we also had disputes where we had paid money or

22  Delta had paid money to us, and where then, when somebody

23  audited a bill, they argued that -- because have a period of

24  time for truing up and auditing under the contract -- they had

25  an argument that something wasn't correct.  That's another just

1  good-faith dispute that was out there.  Not due and payable,

2  just good faith.

3          Then we get to the issue which is probably the biggest

4  issue about these -- the setoff we did pre-petition, which is

5  the pilot reimbursement issue and the rate reset.  Our

6  contracts provided that for the period that -- I guess I'll

7  step back for a second.

8          There was a new joint pilot agreement which we had

9  talked about in the first-day declaration, and Your Honor may

10  remember that, that was entered into for the pilots that

11  involve all three of the airlines, Mesaba and Pinnacle and

12  Colgan, where they were all under one joint pilot agreement.

13  We call it the JCPA.  So -- JCBA.  So what happened with that

14  agreement is and that process is that because we were going to

15  have an integration where we bought Mesaba, we were now going

16  to go ahead and integrate Mesaba into the Pinnacle process, and

17  we were going to try to go from three certificate holders,

18  three different airlines, into two certificates at the time, we

19  knew that there'd be a period of time for that integration;

20  there'd be some training that was related to it.  And as part

21  of the bargaining when Pinnacle bought the stock of Mesaba,

22  there was an agreement and an amendment made to the contracts

23  that allowed for there to be a one-year look-back from the time

24  that the collective bargaining agreement was approved and took

25  effect until a year later, to allow for some reimbursement of

1  additional costs that related to those items.

2          There's a very extensive formula that's set forth in

3  the contract, in particular the CRJ-200 contract on this point.

4  And what happened -- what would have happened with respect to

5  that is, that under the terms of that agreement, we were

6  obligated, at the end of the year, to provide Delta with data

7  on what the amount was that we were entitled to under that --

8  we believed we were entitled to under that contract.

9          The contract period for the year look-back ended

10 February 17th, 2012.  On February 27th, we submitted

11 calculations to Delta.  Under the terms of our contract with

12 Delta, it's very clear that what has to happen is the parties

13 are obligated to negotiate in good faith.  And we are talking

14 about one year's worth of data that somebody has to go through

15 and analyze, as well as all the formula calculations.  And then

16 if the parties have negotiations and they can't reach an

17 agreement, there is a provision that goes to what we're

18 affectionately calling baseball arbitration.

19         We're either in front of one arbitrator, or if we

20 can't agree on that, we each pick one, and we get a third.  So

21 we have three arbitrators.  And then they either pick our

22 calculation or Delta's calculation.  And that's what the

23 contract provides.

24         So there's been a lot of publicity, including in

25 people's statements, in the pleadings that people have filed,

1  in things that have been put in the press, about how somehow

2  Delta didn't make a payment to us when they were supposed to.

3  Well, that's not true.  We had this dispute that finally --

4  this provision in our contract.  We gave them data.  We didn't

5  agree on the data.  We negotiated.  Delta felt that the number

6  was more like sixteen to eighteen million dollars.  And there

7  was reasons for that.  There was a difference in the contract

8  interpretation language of the provision on whether there is --

9  it was governed by a pay parity agreement.  There was issues

10  about the calculation of the numbers and how much was due to

11  actual training versus flight instructors or productivity

12  issues and whether that was reimbursable.  So we had a dispute.

13  That also got resolved in the mix.

14        And then we had the provision that there is a rate

15  reset that was provided for under the contract.  So when we

16  were negotiating the contracts with Delta, not surprisingly,

17  Delta said when they were negotiating the rates they wanted to

18  remove that rate reset.  We obviously negotiated on the rates,

19  and we ended up at rates that are in certain cases higher than

20  our existing rates were prior to the contract, but they are

21  dealt with in different ways from a commercial perspective.

22        So we had these disputes.  As part of the deal to get

23  a DIP we had to try to settle and resolve those.  Depending on

24  how those ultimately came out, really, the pilot reimbursement

25  payment we're talking about, whether it was sixteen or eighteen

1  or forty-four million dollars, we either owed Delta, maybe even

2  as much as twenty million dollars, or Delta owed us money, also

3  maybe something like fifteen million dollars.  So we resolved

4  it at zero pre-bankruptcy, as a setoff.  Because our choices

5  were -- and this goes to the best interests of the estate -- is

6  that we had a package that the board -- now I'm going to go

7  back to what the board was thinking.  We had this package.

8  We'd negotiated this for a month.  And this was the best we

9  could get to.

10  We got some good things, some not so good things in

11  our contract, we didn't get everything we wanted, they didn't

12  get everything we (sic) wanted.  We negotiated on our offsets.

13  It was a condition upon them that we sign new CBAs before the

14  filing, that we get the DIP commitment and that we resolve all

15  these disputes, because we were going to be seeking to assume

16  the contracts.  We did that.  That was what our choice was.

17  So the board then had to decide, did it want to sign

18  on to that deal?  Was that in the best interests of all

19  stakeholders?  And what was the alternative?  So the board did

20  consider alternatives.  The board looked at a liquidation.

21  Obviously not a better situation, I'm sure, as Your Honor

22  understands, for the creditors, particularly many of the

23  creditors here who are -- either are employees who would like

24  to have jobs, people who sell to the company, provide key

25  parts, et cetera.  So not in the best interests of all

1 | stakeholders; and not economically better.

2 | We then had the choice of do we go naked? Do we file
3 | Chapter 11 and we don't have a DIP, and we know we have sixty
4 | days of cash? Does the board do that or does the board take
5 | the collective overall deal? So the board weighed that. And
6 | it weighed it for days. It was not one meeting where we had
7 | this conversation, Your Honor. As someone who's in all those
8 | board meetings, I can say that. It was very serious where we
9 | were having negotiations with Delta, and then the board would
10 | tell us if we could get X, Y, or Z, then maybe they would be
11 | comfortable with this. We'd go back to negotiating with Delta;
12 | we'd make some progress on some of those issues; we'd come back
13 | and have another discussion with the board. And at the end of
14 | the day, the board really weighed the options.

15 | And because of what we had been told by Delta, which
16 | was don't count on us being there on the other side for you for
17 | a DIP, and if we are, the terms will be worse; we also knew we
18 | hadn't been able to find anyone else. We'd shopped this for
19 | months. We had Mr. Shapiro, who's a fabulous investment
20 | banker, helping us out. And he couldn't find us money. And he
21 | couldn't find us money for lots of good reasons, because as I
22 | said, this isn't a particularly attractive DIP for someone who
23 | doesn't have an interest in the outcome of this organization,
24 | from a pure DIP economic perspective.

25 | So the board did really consider what was in the best

1  interests of the estate.  And what about this deal the board

2  felt was comfortable is, a) it gives the company sufficient

3  cash to run these Chapter 11 cases, to enable us to negotiate

4  the cost savings that are necessary for this company to

5  reorganize.  And that honestly would have been true whether we

6  had changed our contracts or not changed our contracts, because

7  we have a lot of issues which I think were outlined in both Mr.

8  Spanjers' first-day declaration and Mr. Menke's declaration,

9  about what led us here.  And it wasn't Delta who caused our

10 liquidity crisis.  It was four other major problems that we had

11 in our business that did not just happen overnight.  And we're

12 sitting here having to decide, is something going to change in

13 the sixty days that we're in proceedings, where we're going to

14 magically find the DIP lender; where we're going to be able to

15 negotiate better terms with Delta?  Are our commercial

16 agreement terms going to be better?  Is Delta all of a sudden

17 going to tell us, oh no, you don't need to renegotiate those;

18 we'll just give you the DIP at that rate?

19      Your Honor, we considered all that, and we determined

20 that to preserve the estate, to have it have a chance to

21 reorganize with the exit financing and the DIP, the board felt

22 that this was in the best interests of stakeholders to move

23 forward with the package versus the alternative.  So I think

24 that answers why we thought it was in the best interests of the

25 estate, from our perspective.  So I'm going to pause there

1    before I go on to the next part, the terms were appropriate.

2           All right.  Then I'll talk about the terms.  I will

3    say to you that we -- the economics, I've addressed.

4           THE COURT:  Pause, please, Ms. Beckerman.  My

5    principal concerns on the terms -- subject to your opponents

6    being heard, they're modest -- are constraints on the debtors'

7    exercise of its fiduciary duties and constraints upon me,

8    mainly in the area of making sure that labor and management

9    work cooperatively.  Put your emphasis there.

10          MS. BECKERMAN:  I will.  Okay, Your Honor.  So why

11   don't we start with the labor issues, just -- maybe that's just

12   the first thing to start with.

13          It's not uncommon, as Your Honor knows, for there to

14   be provisions in the DIP that either get at these issues

15   directly or indirectly.  I will put it that way, because that

16   is the way I think of it as a bankruptcy attorney.  What I mean

17   by indirectly is, you have an entity that's very labor-

18   intensive and has unionized workforce and has a situation where

19   there are issues about whether they need to have labor cost

20   savings and other cost savings in a bankruptcy.  That probably

21   accounts for many cases that come before this Court, and

22   probably just about every airline that's ever filed for Chapter

23   11.

24          So what does the DIP do in that circumstance?  The DIP

25   either has a provision that just says you have to get your

1    costs down by a certain amount, which we have in ours, which is

2    October.  DIPs sometimes also have specific milestones related

3    to the 1113 process, because those are very significant parts

4    of our costs, and in many other cases, those as well.  And that

5    does not mean when those milestones are in the DIP that the

6    debtor doesn't have to fully comply with the 1113 process in

7    order to, if it were going to file a motion and seek relief,

8    satisfy you that we've done so, which means negotiating in good

9    faith, providing the union with the appropriate information,

10   having a back and forth, trying to reach an agreement, and then

11   filing the motion if we are unable to do so, seeking to explain

12   to the Court why we need the relief and seek these changes in

13   the contract and why we ask for them; which we would be doing

14   here.

15          The timing on it.  The creditors' committee was very

16   concerned that we did not have enough time in our original

17   milestones to allow for there to be a consensual resolution.

18   So one of the changes that the creditors' committee negotiated

19   in the timeline was that our date by which a motion had to be

20   filed got pushed back by almost a month, by twenty-three days,

21   to enable people to get more time.  And I think that was based

22   on their discussions, in part, with the unions.

23          THE COURT:  This is the deadline for the initial

24   filing of any 1113 motion?

25          MS. BECKERMAN:  Correct.  And that is now July 13th.

1    We filed Chapter 11 on April 1st.  We delivered proposals to

2    the unions on May 8th.  That would mean that we would have had

3    two months of negotiation to try to reach a deal.

4            As Your Honor knows from many other cases that are

5    pending and from what the statute says is required, the time

6    frame for the ability to commence an action after you make a

7    proposal, obviously, in the statute is much shorter.  And in

8    many other cases, including ones going on in this district

9    right now, such as American or others, there isn't necessarily

10   the same exact timing.  We felt that this was negotiated out

11   with Delta.  It's obvious that the committee was negotiating it

12   with Delta as well.  And we came up with this date that was

13   extended, that gives more time for a consensual resolution,

14           Then the next date.  The next date is the 1113

15   decision deadline.  Your Honor is quite right that the statute

16   obviously allows for leeway for that extended, and the initial

17   time period for that is obviously relatively short.  But we are

18   talking about ninety days from the filing of the motion.  And

19   if the motion is filed July 13th, we are talking about a date

20   that would obviously be October, before we'd be at a situation

21   where we needed a decision.  And that would be approximately

22   six months from the time we filed Chapter 11.  And our labor

23   costs make up more than fifty percent of our costs in this case

24   and are obviously one of the more significant issues that have

25   to be addressed.

PINNACLE AIRLINES CORP, ET AL.                              31

1          And we obviously have a DIP that matures in a year

2  from our filing date.  And we have to have a plan confirmation

3  process.  And we have to go effective.  And so there isn't --

4  if Your Honor looks at all the deadlines, I don't really -- our

5  viewpoint is that this is not very tight compared to what the

6  statute requires or in not giving enough time for the Court to

7  determine the decision in giving you ninety days from the time

8  we file the motion.

9          THE COURT:  Pause, please, Ms. Beckerman.  I don't

10  know all the facts.  And I haven't talked to Judge Lane about

11  this.  And I would think before I did -- although I might

12  ultimately come to the view that there's no problem in it --

13  but I have heard triple anecdotally that in the middle of an

14  ongoing 1113 process, Judge Lane thought that a mediation might

15  be constructive, and he either encouraged the parties to do

16  that and they agreed or he directed it, and I'm not sure which.

17  You or the others can help me understand that in my own mind.

18          If I were to come to the view that mediation is

19  helpful in the middle of an 1113 process, even with having

20  started taking testimony and the like, to what degree is there

21  any impediment to my making such a decision?

22          MS. BECKERMAN:  Well, I don't think there's --

23          THE COURT:  Or any conditions on that or limits on my

24  ability to do that?

25          MS. BECKERMAN:  I think the practical answer to that,

1   which I'm sure Your Honor knows, is that there wouldn't be any

2   limits on your doing that.  We have a covenant with the DIP

3   lender that says we have to have a decision by a certain date

4   or we have a default.  Now, obviously, as Your Honor knows,

5   sometimes that's done, as I said, in other ways that are even

6   indirect with cash -- we also have a cash covenant where we

7   have to get certain cost savings by that date.

8           The answer would be that we'd obviously have to go

9   back to our lender if it was going to extend further than that,

10  and ask for permission to extend that issue if there was going

11  to be a good-faith determination by the Court.  Right now,

12  that's what would happen under our agreement.  I don't think it

13  precludes you from sending it to mediation, but it obviously

14  does put a time limit on needing a decision.

15          THE COURT:  Yes, well let me tell you what's bothering

16  me, partly because I'm interested in the welfare of this case,

17  and partly because I'm interested in the welfare of all the

18  other eleven cases in my docket, some of which are even bigger

19  than this one.

20          In Lyondell Chemical, people tried to put the same gun

21  to my head on one of the milestones, and they wanted me, if I

22  recall correctly, to issue some decision right in the middle of

23  the Christmas season on a very important issue, an issue that

24  was of great importance to both the debtor and the lenders --

25  or the debtors' unsecured creditors and the lenders.  And I

1  thought it was too tight.  And I think, in fact, it was in the

2  context of a final DIP, just like this.

3        And sometimes I have to be the heavy and say that I'm

4  too squeezed on it.  Should I be talking to you or should I be

5  talking to Delta about this?

6        MS. BECKERMAN:  Well, Your Honor, I think you're going

7  to have to -- we're going to have to talk to Delta about it.

8  But why don't I at least try to address some of the other

9  issues I know that were raised with the 1113 as well --

10        THE COURT:  Okay.

11        MS. BECKERMAN:  -- which I think was your question

12  about the reasonableness issues.  We obviously have a number of

13  milestones that have reasonableness provisions.  So I don't

14  think the plan having to be reasonably acceptable to the

15  lenders when we file it is unusual.  We've obviously provided

16  you with tremendous amounts of precedent on that.  And Your

17  Honor said it yourself, it's not unusual.  Mr. Shapiro's

18  declaration also says in the many DIPs he's done, it's not

19  unusual either.

20        We have a provision for the plan as confirmed having

21  to be reasonably acceptable.  Also, I think, not unusual in a

22  circumstance like this, particularly where we don't -- we

23  obviously don't -- we have a secured creditor going in and

24  lending more money and wanting to be clear they're either going

25  to get paid off or have some treatment that's acceptable to

PINNACLE AIRLINES CORP, ET AL.                                    34

1  them at the end of the day.  Not very unusual for a DIP lender.

2          The 1113 milestones provide that the settlement, if

3  there is a settlement in the negotiations, does have to be

4  reasonably acceptable to the lender, again, governed by

5  "reasonably".  And if there's --

6          THE COURT:  And I have the power to decide reasonable?

7          MS. BECKERMAN:  Well, Your Honor, you always have the

8  determination to figure out if the settlement is reasonable, so

9  I think that the lender would have a hard time, obviously,

10 arguing if you approved a settlement that it wasn't reasonable.

11 But I'll let Mr. Seligman address that one when we get to him.

12 And --

13         THE COURT:  Yes, you're in the traditional mode of a

14 debtor who's caught in the middle.  And I well understand that.

15 We won't be done until I hear from Mr. Seligman.

16         MS. BECKERMAN:  Oh, I understand that.  But I just

17 want to make sure I've addressed -- I do understand that.  And

18 I'm sure Mr. Seligman, who's been the debtor's counsel many

19 times in other cases understands that, sitting in court.

20         THE COURT:  Okay.

21         MS. BECKERMAN:  But why don't I just finish.  I'm not

22 sure if there were other terms that you were concerned about

23 the reasonableness.  But I do think we have addressed them in

24 our papers about -- for example, we've talked about the

25 reasonableness standard.  We've talked about why we have

**PINNACLE AIRLINES CORP, ET AL.**                                   35

1  financial covenants which I think are fairly standard.  And our

2  financial covenants are very standard here.  There's a cash

3  covenant, there's a budget variance, and there's an overall

4  cost-saving covenant, which is not unusual, particularly in a

5  case that is going to be going through a process where the

6  company needs cost savings.

7        I think that we've tried to provide for, timing-wise,

8  reasonable dates for some of these other milestones.  For

9  example, our plan filing deadline is 30 days after the 1113 or

10  the date which is 225 days from the time we filed for a Chapter

11  11.  And that -- then when you add on our 90 days for

12  confirmation, we're already at 315 days in this proceeding,

13  when we have 365 days of usage under the DIP.  So --

14        THE COURT:  I heard the 365 days of use on the DIP.

15  What was the number of days that you're already at after the

16  miles --

17        MS. BECKERMAN:  If we file a plan, our plan milestone

18  finding is 225 days into the case, which is obviously well

19  beyond --

20        THE COURT:  225 days to the filing of a plan?

21        MS. BECKERMAN:  Right.

22        THE COURT:  As compared and contrasted to confirmation

23  of the plan, of course.

24        MS. BECKERMAN:  Confirmation is another 90 days; 315

25  days in total.  And we have to emerge -- and no one would ever

1  put these dates out with no slippage, Your Honor.  I'm sure, as

2  you understand, having been in practice for a long time before

3  you went on the bench -- so I don't think we feel that these

4  deadlines are tight.  Some people have complained about that.

5  We don't feel that our covenants are too tight.  We have

6  obviously negotiated that with the assistance of our financial

7  advisor, the debtors' management and their business, based on

8  their business plan.

9  We're obviously comfortable that we should be able to

10  satisfy and meet these covenants and that they're reasonable,

11  and the types of covenants are customary.  I don't -- I guess

12  we should probably talk about the roll-up.

13  THE COURT:  Pause, please, before you get to the roll-

14  up.  You're here, of course, as conflicts counsel for reasons I

15  well understand and for which I'm very comfortable.  But when

16  you move away from your dealings with Delta into case

17  management as a whole, you have co-counsel, who I assume is

18  going to be carrying the ball on confirmation, and presumably

19  drafting a plan.  Have you coordinated with your co-counsel,

20  Davis Polk, to make sure that you're not putting them into a

21  pickle?

22  MS. BECKERMAN:  Yes, Your Honor, we have.

23  THE COURT:  And they're okay with the timelines that

24  you've been putting before me --

25  MS. BECKERMAN:  Mr. Huebner is here.  I'm sure he can

1   speak for himself.

2        THE COURT:  Yes, he's out in shallower right field.  I

3   see him.

4        MS. BECKERMAN:  Okay.  Yes, we've coordinated very

5   carefully in this case, Your Honor.  I guess that's one of the

6   ironic things about having spent two years fighting with each

7   other in Delta.  We obviously do know each other pretty well.

8   And having both decided to work on this assignment together, we

9   have worked very closely together, obviously within the bounds

10  of our conflict issues.  But we have coordinated on issues like

11  that.

12       THE COURT:  Okay.  Keep going.

13       MS. BECKERMAN:  Okay.  So then we should probably talk

14  about the roll-up, because I think that's obviously drawn some

15  commentary.  Your Honor, we had looked at the collateral

16  package for the pre-petition debt for Delta, and it obviously

17  was made up of two flight simulators, some other equipment, and

18  the Mesaba stock, which obviously, in our bankruptcy situation,

19  you'd have to sort of focus on the hard assets, probably, for.

20  But it also has the right of setoffs under the promissory note.

21  And those, as well as the contracts, pre-amendment, also

22  included very broad setoff rights across contracts, and

23  including with the Mesaba note.

24       So when we were analyzing the collateral here and the

25  amount of the debt, we looked at forty-four million dollars of

1   debt, we looked at the fact that at any point in our Chapter 11

2   timeline, whenever we would commence Chapter 11, there is

3   always some substantial amount that would come due relating to

4   pre-petition flying that wouldn't be due and payable until

5   post-petition.  So in other words, Delta would have monies that

6   they would owe that related to the pre-petition period, because

7   they pay us in arrears under our contract.  So for example, if

8   we fly through the end of the month, our second half of the

9   month flying doesn't get paid till the fifteenth day or the

10  sixteenth day, depending on whether it falls a weekday or not,

11  the next month.

12         So at any time, there's always an amount of money that

13  we are owed from Delta that's not insignificant.  Here, when we

14  filed, the amount -- and we obviously, from the first-day

15  declarations, Your Honor is aware that we had a reason we had

16  to file at the beginning of April, which was we were going to

17  run out of money completely by April 13th if we didn't.  And

18  that was in Mr. Menke's declaration as well as Mr. Shapiro's

19  declaration.

20         So when we knew we were going to -- we had a sense

21  that we were going to try to file around then; we'd obviously

22  looked at the amount that we were talking about.  And the

23  amount that Delta has -- that they would have owed us from the

24  pre-petition flying was about twenty-nine million dollars, Your

25  Honor.  So at any given point in time, when we were looking at

1   this, we were looking at the flight simulator, the equipment,

2   and the twenty-nine million dollars.  And I think we got

3   comfortable, from our perspective, from the debtors'

4   perspective, that that meant that this loan was fully secured,

5   largely due to the setoff issue, but because of the setoff

6   issue; and that our order follows the local rules, which

7   allows, obviously, for the creditors' committee or other

8   parties to challenge that and to seek disgorgement.  Obviously

9   Delta is a creditworthy party for any disgorgement if that were

10  to ultimately be ordered.  And we couldn't get the DIP without

11  the roll-up.  Plain and simple, it was a condition that Delta

12  absolutely insisted on.

13          We did not put out our -- my first term sheet did not

14  have a roll-up in it.  I'm sure you would understand that.  But

15  we had a lot of negotiation.  This was --

16          THE COURT:  Pause, again, please.  If you didn't have

17  the roll-up, as I sense your first term sheet contemplated, how

18  would you have dealt with the priming issues associated with an

19  alternative -- with the loan without -- it would be --

20          MS. BECKERMAN:  Well, with --

21          THE COURT:  -- presumably it would be Delta priming

22  itself.

23          MS. BECKERMAN:  Right.

24          THE COURT:  But did the issue of priming come up with

25  any of your alternative DIP lenders?

**PINNACLE AIRLINES CORP, ET AL.**                                40

1    MS. BECKERMAN:  No, because they were aware that we

2  didn't think we could possibly prime Delta under the

3  circumstances or it would be a big fight.  And I don't think

4  anybody we were talking about with alternatives was looking at

5  the priming fight.  Since we never --

6    THE COURT:  So they would lend on a junior lien?

7    MS. BECKERMAN:  They would lend on the unencumbered

8  collateral and on a junior lien on anything that they could get

9  a junior lien on.  That is exactly what the collateral

10 package -- and you have to also understand that there's some

11 things that we can't lien.  And so maybe I should cover those,

12 because they're very clearly covered in our order.  We actually

13 ended up adding a lot of language at the request of the

14 aircraft -- various aircraft finance parties.

15    But as you understand, under 1110, we will have a

16 deadline coming up very shortly -- it's May 30th -- that we

17 have to make decisions on whether we're going to have an

18 1110(a) election, whether we're going to ultimately have some

19 kind of 1110(b) stipulation that puts out that and has some

20 terms for a short time period so we have more time to

21 negotiate --

22    THE COURT:  I need to interrupt you again.

23    MS. BECKERMAN:  Sure.

24    THE COURT:  Because I don't know 1110 as well as I

25 know other provisions of the Code.  Under 1110, does a debtor

PINNACLE AIRLINES CORP, ET AL.                                    41

1   have the option of meeting its current obligations to its

2   aircraft lessors without either assuming or rejecting?

3          MS. BECKERMAN:  Yes.  It does.  But it's what I was

4   referring to as 1110(a).  So what it means is most debtors,

5   including us with respect to some of our aircraft -- most of

6   our aircraft -- have made the election during the first sixty

7   days, which is the time period you have for making the decision

8   not to actually pay what you owe during those sixty days.  And

9   in some cases there could be amounts that would be owed

10  otherwise pre-petition as well.  Not -- we were current, but it

11  could happen.  So that's one thing.

12         And the debtor has really three options under 1110.

13  One is 1110(a) which says I'm going to cure everything I owe --

14  cure all defaults, both monetary and nonmonetary under my

15  agreement; and I'm going to perform on my agreement going

16  forward.  It's not an assumption, but it is a performance

17  obligation, which is what you're asking --

18         THE COURT:  Why would a debtor ever want to do that?

19         MS. BECKERMAN:  Sometimes, Your Honor, it can't

20  negotiate better terms with the lessor.  It tries.  It's an

21  important aircraft.  The lessor has something else it could

22  sell it for, for more money.  Your rates are good.  You can't

23  really do better.  I mean, there's a lot of reasons, from my

24  experience in other aircraft, why sometimes people 1110(a)

25  aircraft.

1    THE COURT:  I would have assumed, though, that the

2  sweet spot is the stay current going forward, and keep your

3  options open.

4    MS. BECKERMAN:  Well, you wouldn't assume -- that's

5  1110(a), Your Honor.  Cure arrearages, stay current, and your

6  options are open about assumption and rejection.

7    1110(b) is you go to the aircraft finance party; you

8  negotiate some other interim deal with them, which says I know

9  you have this sixty-day deadline.  You don't want to -- either

10 because you don't think their rates are appropriate, you

11 negotiate other terms for the interim while you have time to

12 negotiate a long-term deal.  There's a lot of things that go

13 into an 1110(b) mix, from my experience being both committee

14 counsel to airlines and a debtors' counsel to Hawaiian, for

15 example.  And so that's one option.

16    If you don't do either 1110 or 1110(b) -- and that has

17 to be with the agreement of the party, 1110(b), and that

18 doesn't constitute an assumption or a rejection either.  It's

19 just you agree we're going to do whatever we negotiated, and

20 that's going to satisfy me, and meanwhile I'm not going to make

21 you return the aircraft.  If you do neither, the stay is lifted

22 under the Code, and someone can come repossess your aircraft or

23 take it back.

24    So this is why that deadline is very important.  And

25 so what I was trying to explain in the context of the DIP,

**PINNACLE AIRLINES CORP, ET AL.** 43

1  which I'll go back to, is we can't -- under our agreements,

2  which is very standard with our aircraft lessors and also our

3  aircraft financiers, more importantly -- and when I say

4  "aircraft", that also includes spare parts for aircraft,

5  because spare parts are covered by 1110 as well -- we can't put

6  liens on -- junior liens or any liens on their assets, because

7  we have negative pledge provisions.  In the case of our parts

8  facility, we are modifying it in an 1110(a), in other words,

9  staying current, and we can't cure a default if we allow

10  someone to have a lien on it that's a default, and we can't

11  cure that; so that's not possible.

12         And so that even took out more collateral that we

13  could possibly have to pledge in these circumstances, because

14  obviously we can't give someone a junior lien on those assets

15  for that reason, for example, on our spare parts.

16         So you were asking me what someone was going to do

17  when they're looking at this.  You know, that made -- that is

18  why it's hard to find a lender in this situation, Your Honor,

19  because we don't have a lot of collateral; there's some

20  collateral we can't give them junior liens on, because we can't

21  operate otherwise.  Our parts will go away; our aircraft will

22  go away; we don't have a business.  So that's where we were

23  with respect to that.

24         So I think when we were discussing this, we didn't

25  really have a lot of issues about priming, because I don't

PINNACLE AIRLINES CORP, ET AL.                                    44

1   think people thought they wanted to have a priming fight with

2   Delta, and I think they understood they couldn't get 1110

3   assets.  So that just meant that people had to decide they were

4   lending on the cash flow operations of the company and the

5   unencumbered collateral that they can get under this DIP, which

6   is primarily Saab aircraft as well as some ground handling

7   equipment and some other miscellaneous equipment and systems.

8           So I hope that explains to you why it was challenging.

9           THE COURT:  Yes, thank you.

10          MS. BECKERMAN:  So getting back to the reasonableness,

11   there was a lot of issues that were raised by parties.  I think

12   I addressed the timing on the plan process.  I think I

13   addressed the 1113 timing, subject to Mr. Seligman.  I'm just

14   putting that in.  The reasonableness point we talked about.  I

15   mentioned, I've already put on the record for purposes with the

16   unions that we are obviously going to have to fully comply if

17   we go down the 1113 process with the 1113 requirements.  So I

18   don't look at anything in this DIP as in any way affecting

19   that, in the sense of what we'd have to do on the debtors' side

20   for that.

21          There was a complaint about the change-of-control

22   provision.  As you know, that's pretty typical in DIPs.  We

23   have obviously provided you with authority for that, both from

24   Mr. Shapiro and our chart.

25          Cross defaults.  Interesting issue.  Not uncommon to

1    have cross defaults with major contracts. In other words, if

2    you default under a major contract, your DIP goes into default.

3    That is in a lot of DIPs, depending on what's a major contract.

4    In Delta and United, there were cross defaults like these where

5    the parties had related agreements, and so they were all cross

6    defaulted. And pre-petition, before we amended any of our

7    flying agreements, we already had cross defaults between all

8    our flying agreements and the promissory note. So the only

9    change that we're doing here is obviously adding the DIP into

10   the mix. And that's obviously replacing and refinancing the

11   Mesaba note, which was already cross defaulted.

12           I guess we were talking about the rollup. Sorry. So

13   maybe I should just go back to that for a second. We've cited

14   to you, obviously, cases that support the basis for approving a

15   DIP with a rollup. We've explained to you what our -- I

16   explained to you what our viewpoint was on the setoff rights.

17   We also had the unique thing that the debtor was clearly --

18   that we couldn't get the DIP without agreeing to the rollup.

19           As I said to you, I did not start with a rollup. But

20   I got comfortable recommending it to the board, which I did,

21   for a number of reasons; the first being the collateral/setoff

22   analysis I did; the second being that it is subject to review

23   and challenge by appropriate parties, including Mr. Miller

24   sitting over there. And the other issue which I raised in my

25   papers and I called the "creeping rollup", is that even if we

1    hadn't done this, we would have ended up with a large

2    percentage of this happening anyway through the setoff rights.

3            So let's just say I had managed to convince Mr.

4    Seligman that we would assume these contracts but we would not

5    roll up the DIP -- which I wasn't able to do, but let's just

6    say I had been able to convince him of that and Delta was

7    willing to do that -- what would have happened is, the same

8    amount I mentioned to you before, that was a pre-petition

9    amount that came due and owing, they would have gone to this

10   Court, sought permission to set off against the Mesaba note,

11   which is a pre-petition obligation, and -- by all the same

12   parties, where the contract is clear that that's permissible --

13   and our view was that that would have happened anyway.  That's

14   twenty-nine million of the forty-four.

15           So our viewpoint was, we would have ultimately had

16   creeping rollup.  Then we would have had an issue of what

17   happens to the rest.  If we assume these contracts and then all

18   of our obligations are kind of -- have to be cured and are

19   fungible, will we have seen further setoff arguments from Delta

20   coming, again, through this Court, potentially?  But would that

21   have even made that number bigger?

22           So I think we got comfortable that with all those

23   issues with respect to the rollup, that there was really not a

24   harm here for the company, and because of the safeguards that

25   we have in this DIP that protect it, and because we were

PINNACLE AIRLINES CORP, ET AL. 47

1  comfortable recommending, based on the setoff rights that we

2  thought that this was a fully secured piece of paper.

3      And we couldn't obtain credit on some other terms.  I

4  think you've heard enough about why we couldn't get

5  administrative credit or superpriority credit or credit from

6  anybody else on any terms different than these.  So I don't

7  think there's really a question about what we're asking for

8  with liens, et cetera.

9      I don't know if there was anything else you wanted me

10  to specifically address.  I thought I could address, if you

11  wanted, because there was a lot of argument about it, about why

12  this is a sub rosa plan; why this is overreaching.

13      THE COURT:  Why don't you save that for reply if you

14  need to address it at all.

15      MS. BECKERMAN:  Okay.  All right.  I guess -- did you

16  want to hear from Mr. Seligman next?

17      THE COURT:  Yes.  Mr. Seligman, come on up.

18      MR. SELIGMAN:  Good morning, Your Honor.

19      THE COURT:  Mr. Seligman, my concern, one that I

20  assume you share at least in substantial part, is while I

21  happily want your client's money, I want to keep my debtor

22  healthy.  And as a judge with institutional concerns, and in a

23  case where I would have to be blind not to notice that labor

24  peace is a very important issue in this case, and that I don't

25  want labor and management killing each other while the debtor's

**PINNACLE AIRLINES CORP, ET AL.**                                      48

1  on the operating table, I want to have the maximum flexibility

2  I can to help people reach a consensual deal.  I want to keep

3  the limits on my discretion in helping people stay friendly to

4  be minimized.  I think I said that right.  I want the limits on

5  my ability to do my job minimized.  And I want to know the

6  downside, if any, if I were to give a conditional approval, as

7  I did in Lyondell, saying I'm going to suck it up, agree to the

8  milestones, but I absolutely need an extra -- I forgot what I

9  asked for in Lyondell -- maybe thirty days, to help the 1113

10 process or the alternatives to reach a more consensual

11 resolution.

12        MR. SELIGMAN:  Your Honor, I appreciate and totally

13 hear your comments.  Let me just maybe just take a step back

14 and give you some context for how we perceived these

15 milestones, because that just may give you some context from

16 where we're coming from and our perspective.  And certainly,

17 Delta, having gone through its own Chapter 11, having gone

18 through its own 1113 process, is sensitive to the labor issues.

19        Delta was willing to provide a one-year DIP.  And so

20 when people were wanting to design some milestones, it was with

21 the intention to keep the debtors moving along in its

22 restructuring efforts so that it could hit that one-year

23 deadline.  And as a matter of fact, when we were in the process

24 of discussing these milestones, it was just at that time that

25 the DIP in Hostess was approved, and we actually modeled our

 1  milestones based upon the approved milestones in the Hostess

 2  case with respect to plan filing and 1113.

 3          And so when we looked at it and we realized that there

 4  was going to be twelve months here, we kind of worked backwards

 5  from there and we realized there has to be some -- basically

 6  three phases.  There has to be an initial period for the debtor

 7  to develop its business plan, because that's going to be the

 8  formula -- the basis for it to even make its 1113 proposals.

 9  So there was deadlines associated with that.  We figured then

10  the next stage was the 1113 process by which it obtains, either

11  through litigation or hopefully a consensual resolution,

12  whatever labor modifications it feels it needs.  And then would

13  be the plan process, by which it -- once it has those savings,

14  it was going to turn to the plan process.  And that was all

15  geared -- and as Ms. Beckerman mentioned, it was all geared to

16  try and hit that twelve-month period.

17          And if you actually look at the dates, assuming that

18  people take the maximum time under those milestones, you get

19  to -- assuming that it's the type of confirmation plus a two-

20  week stay period -- you get to March 1st, 2013.  So that leaves

21  you one month --

22          THE COURT:  I thought the milestone went to

23  confirmation, it didn't go to effective date?

24          MR. SELIGMAN:  It did not.  But assuming --

25          THE COURT:  Then why did you mention the two-week stay

**PINNACLE AIRLINES CORP, ET AL.** 50

1   period?

2       MR. SELIGMAN:  I just mentioned that because you're

3   right, it could be waived; but I just -- you're right that the

4   last milestone is February 15th, basically, for plan

5   confirmation.  But we assumed --

6       THE COURT:  Entry of a confirmation order?

7       MR. SELIGMAN:  Entry of a confirmation order.  So we

8   just budgeted that if there was going to be a stay, and then a

9   little bit of -- we figured thirty days flexibility to hit the

10  one-month period.  So that was the context in which we were

11  discussing these milestones.  It wasn't trying to twist

12  anybody's arm.  But we wanted to keep people on pace to hit the

13  twelve-month period.  That was the --

14      THE COURT:  If I read the -- if I read the deadline as

15  I think you explained to me and as Ms. Beckerman explained to

16  me, as going to entry of a confirmation order, that two weeks

17  that you had provided for, for the post-confirmation entry

18  stay, is an extra two weeks that I can play with in helping

19  people reach peace, isn't it?

20      MR. SELIGMAN:  It may be, Your Honor.  And I guess

21  what I would say in response to your comments is, is that

22  certainly if we get to that -- I think it's -- working from the

23  dates, about October 13th for the period for an 1113 order to

24  be entered, I'm certainly telling you on behalf of Delta, that

25  if Your Honor says I need an extra couple of weeks or a month

PINNACLE AIRLINES CORP, ET AL.                                              51

 1   or whatever, to enter my ruling, we're not going to have a

 2   problem with that.  What was important for us was that we do

 3   have the November 15th plan filing deadline to at least get the

 4   plan process started, and if that's the way it works, that's

 5   the way it works.

 6          THE COURT:  I appreciate that, Mr. Seligman.  Because

 7   while I'm perfectly happy to allow parties to put guns to their

 8   heads, I'm less generous when the gun's aimed at mine.

 9          MR. SELIGMAN:  Sure.  So I can certainly say that on

10   behalf of -- that we're going to be flexible with that at --

11   obviously, we have the one year.  And that's why we worked

12   backwards from the plan filing deadline.  And maybe it turns

13   out that the -- if Your Honor says you need an extra two weeks

14   or whatever it may be, there's a shorter period of time between

15   the implementation of that and the plan filing deadline.  But

16   there are obviously other milestones and other pieces to the

17   whole pie.  But we're not going to hold up on that issue.

18          THE COURT:  You're explaining to me that there is an

19   orderly progression, and that inevitably one step along the

20   chain has the potential, at least, to affect others further

21   down the chain.

22          MR. SELIGMAN:  Exactly, Your Honor.

23          THE COURT:  I hear you.  Were there other questions

24   that I said I thought I might want to ask you instead of Ms.

25   Beckerman at the time?  I was mainly listening to her, and I

PINNACLE AIRLINES CORP, ET AL.                    52

1    didn't write them down in my notes.

2          MR. SELIGMAN:  I think the other issue that you raised

3    was the question about there are certain things that have to be

4    reasonably acceptable to Delta.  And certainly, Your Honor,

5    you're the arbiter of that.  And if there are disputes, we

6    will -- I'm sure we'll be coming to Your Honor on those

7    questions.

8          THE COURT:  All right.  Thank you.

9          Okay.  I would like to hear from you, Mr. Miller, and

10   then we've gone a long time without a break.  We'll take five

11   minutes or ten minutes after you're done.

12         MR. MILLER:  Thank you, Your Honor.  Brett Miller,

13   Morrison & Foerster on behalf of the creditors' committee, and

14   I will be brief.

15         At the outset of the case, when the committee was

16   formed, the committee had a number of issues with the proposed

17   DIP financing, and asked both Delta and the debtors for an

18   adjournment, and they graciously agreed.  We said they didn't

19   need the money.  They agreed that the money was more of a June

20   time frame need for the debtor.  And we used the several weeks

21   to negotiate with both the debtors and Delta.

22         The negotiations covered the DIP order as well as the

23   Delta agreements.  The committee is comprised of experienced

24   players in the airline/aircraft field.  We raised a number of

25   issues regarding the Delta agreements, regarding specific

1    issues that Ms. Beckerman said the debtor had asked for and

2    Delta had denied.  We continued to press Delta on a number of

3    those issues and were successful in making changes to the Delta

4    agreements, which are referenced in the revised documents.

5            Additionally, with regard to the order, we were able

6    to expand the milestones, extend out the time, add in an

7    extended period of challenge for the committee as well as

8    standing for the committee to bring any actions, if, during the

9    challenge period, it finds that there's something that should

10   be brought by the estate which the committee would be suing

11   for.

12           This is not a typical DIP.  This is not a typical DIP

13   lender.  But when you take it apart piece by piece as Ms.

14   Beckerman just did during her presentation, and look

15   specifically at the Farmland factors, I believe that it was an

16   exercise of sound business judgment and in the best interests

17   of the estate.  On that point, I think it's important to note

18   the difference between the creditors' committee and perhaps the

19   objectors is the creditors' committee was looking at this as

20   having no backup plan.  The creditors' committee went out

21   during the extension, during the adjourn period, and spoke with

22   a number of DIP lenders.  We had meetings with these potential

23   DIP lenders.  We got at least one to enter into a new

24   confidentiality agreement, nondisclosure agreement with the

25   debtors.  We went back to some of the parties who the debtors

**PINNACLE AIRLINES CORP, ET AL.**                                      54

1  had spoken to prior to filing.

2          And we came back with the same result.  There was no

3  one interested in providing alternative financing for this

4  company.  And we were met with the option of playing chicken,

5  essentially, with Delta, and objecting to the DIP, and hoping

6  that Your Honor denied the DIP and perhaps Delta opened up

7  negotiations and gave a better proposal.  But if they didn't,

8  we were faced with a probable liquidation of the company in the

9  short term, because there are liquidity concerns that kick in

10 in the next couple of weeks, and without financing, and without

11 an alternative financing source, there's really no plan B here.

12         And there's no soft landing in airline liquidations.

13 I've represented committees in certain other airline

14 liquidations, and it's not pretty.  And as the committee

15 represents unions, employees, suppliers, creditors, we opted

16 for what we think is the most sound decision here, which is to

17 go forward with this DIP financing, with Delta as the partner,

18 and hopefully Your Honor will approve the DIP under the terms,

19 as modified during the adjourn period by the committee.

20         THE COURT:  Okay.

21         MR. MILLER:  Thank you.

22         THE COURT:  Thank you.  Folks, we'll take ten minutes,

23 and then I'll hear from the objectors.  We're in recess.

24     (Recess from 11:37 a.m. until 11:47 a.m.)

25         THE COURT:  Okay.  Let's continue.

1     MR. JONAS:  Your Honor, Jeff Jonas of Brown Rudnick

2 for a number of shareholders holding approximately ten percent

3 of the debtors' stock.  Your Honor, if it's okay with the

4 Court, what I'd like to do -- and I'll try and keep my entire

5 presentation brief -- but what I'd like to do is first make

6 some general comments and remarks, and then, if I could, I will

7 specifically address the Court's questions.

8          Your Honor, this is not a typical or customary DIP.

9 It is extraordinary in any number of regards, some of which

10 I'll highlight now, and some of which I hope we'll have the

11 opportunity to put on through the evidence.  Your Honor, the

12 Court should not approve the DIP motion because it represents a

13 perversion of the bankruptcy process in that the DIP lender,

14 Delta, is taking advantage of the debtors in every way

15 possible, and using the DIP:  first, to force prematurely the

16 favorable settlement of pre- and post-petition claims against

17 both the debtors and against itself, including obtaining for

18 itself a broad release; second, it's using the DIP to strong-

19 arm the immediate assumption of key contracts between the

20 debtors and Delta, which were amended literally minutes before

21 the bankruptcy was filed, apparently in an effort to avoid

22 bankruptcy court review of those amendments.

23          The debtors admit, Your Honor, that these amendments

24 were beneficial to Delta and economically disadvantageous to

25 the debtors.  Shockingly, Your Honor, the debtors also admit

1  that these contracts, on a net basis, are money losers for the

2  debtor.  Query the last time, Your Honor, that the Court

3  approved a debtor's assumption of admittedly money-losing

4  contracts.

5         And third, Your Honor, Delta is using the DIP to take

6  control of the cases, in effect, a sub rosa plan, including,

7  pursuant to the contract amendments and the assumptions and

8  other events promulgated in the first days of the bankruptcy

9  cases, Delta will be the debtors' sole customer; Delta will be

10  the debtors' sole lessor of planes; and Delta will be the sole

11  source of financing.  All of these arrangements will be cross

12  defaulted, and the cases will blow up if the debtors default in

13  any regard under any of those arrangements, also, Your Honor,

14  pursuant to covenants in the DIP including minimum cash

15  requirements, budget compliance, change-of-control limitations,

16  all of which restrict the debtors' ability to both operate and

17  reorganize.

18         Also, Your Honor, pursuant to the tight milestones

19  built into the DIP requiring the debtors, among other things,

20  to modify their collective bargaining agreements or reject them

21  and to file a plan of reorganization which must be approved by

22  Delta, again, all going to the effect of Delta taking control

23  of these cases.

24         Your Honor, the Court shouldn't approve the DIP

25  motion, because the standard for approval, which we agree on --

1    that is, Farmland as cited in our papers -- can't be met.  And,

2    Your Honor, as you've already pointed out, Farmland stands for

3    much more than the business judgment of the debtors as

4    highlighted by the debtors so far.  And I just think it's worth

5    repeating, Your Honor, as the Court knows the standard, first

6    the proposed financing has to be an exercise of sound and

7    reasonable business judgment.  Second, the financing is in the

8    best interests of the estate and its creditors.  Third the

9    transaction is necessary to preserve the assets of the estate,

10   and is necessary, essential, and appropriate for the continued

11   operation of the debtors' business.  Fourth, the terms of the

12   transaction are fair, reasonable, and adequate, given the

13   circumstances of the debtor-borrower and the proposed lender.

14   And fifth, the financing was negotiated in good faith and at

15   arm's length, by the debtor on the one hand and the lender on

16   the other.

17          Here, Your Honor, each of the foregoing tests, based

18   on the evidence, is in doubt, because of the debtors' desperate

19   situation, lack of options, absolute dependence on Delta, all

20   of which were fostered by purposeful harmful actions taken by

21   Delta, frankly calling into question whether the arrangement

22   was negotiated in good faith and at arm's length, and because

23   of the unfair and unreasonable terms obtained by Delta.

24          Your Honor, as stated in the Mid-State Raceway case,

25   323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005), the court said,

**PINNACLE AIRLINES CORP, ET AL.** 58

1  "Bankruptcy courts do not allow terms in financing arrangements

2  that convert the bankruptcy process from one designed to

3  benefit all creditors to one designed for the unwarranted

4  benefit of the post-petition lender."

5  Your Honor, the Court will hear much about the

6  debtors' alleged desperate need for the DIP financing and the

7  fact that the process to obtain the financing was allegedly

8  fair.  But desperate need and fair process are not enough to

9  overcome the Farmland approval standards and/or the

10  admonishment of Mid-State Raceway.

11  Your Honor, I'd like to address -- because I think you

12  were spot-on with a number of your questions, I'd like to

13  address those.  We wish we had a clear alternative to the DIP.

14  We don't.  But because it's the only game in town doesn't make

15  it right, and it doesn't automatically mean that the Farmland

16  factors are met.  If that were the case, Your Honor, a DIP

17  lender in that situation might as well charge a hundred percent

18  interest, take over the entire case, take all the collateral,

19  et cetera, et cetera.  That's not the standard.

20  The standard is whether the factors are met.  I

21  appreciate whether there's an alternative or the lack of

22  alternative and the impact that might have on the case -- I

23  appreciate that that's relevant.  But it's not the be-all and

24  end-all.  That is, notwithstanding that as I stand here, I

25  can't tell you there's an alternative source of financing.

PINNACLE AIRLINES CORP, ET AL.                                    59

1  That doesn't mean that the Court is compelled to approve this

2  DIP, if this DIP, as we believe it does, doesn't pass muster.

3         Your Honor, we also believe that through the testimony

4  you'll hear today -- and we hope we'll have an opportunity to

5  put the evidence on, Your honor, you'll see that the dire

6  projection -- and this goes to --

7         THE COURT:  Did you notify my chambers of an intention

8  to be putting on live witnesses?

9         MR. JONAS:  Your Honor, we've -- I haven't

10 communicated with chambers.  We've had numerous discussions

11 with the debtors.

12        THE COURT:  Doesn't my case management order require

13 exactly that?

14        MR. JONAS:  Your Honor, my apologies, Your Honor, if

15 that's the case.  We anticipated that the debtors had put the

16 declarations on and we'd have an opportunity -- we've conducted

17 depositions yesterday, and we thought we'd have an opportunity

18 for some brief cross-examination today.

19        THE COURT:  I'm going to have to think about that, Mr.

20 Jonas.  You're talking about materially extending the duration

21 of a hearing, when the debtor has some very tight time frames

22 here, and where my case management order -- and I won't say

23 you're the only one who disregarded it in proceedings before

24 today, but this is one of the most important things -- is

25 intended to avoid exactly this kind of a situation.

PINNACLE AIRLINES CORP, ET AL.                                    60

1        You better make the remainder of your argument, and

2    I'll think about whether I have material issues of fact after

3    your opponents have had a chance to be heard and reply and the

4    other objectors have had a chance to be heard.

5            MR. JONAS:  Understood, Your Honor.

6        And again, I'd point out just a few facts.  I'll take

7    the opportunity now just to point out a few facts, some of

8    which I've already highlighted, that I think are absolutely

9    critical, and I think do not come through, if you will, in the

10   presentation that's been delivered today.  And those are the

11   following, Your Honor.  And I'll just highlight the key facts.

12   And frankly, I'm not sure they're -- at this point, based on

13   the fact that I think they are within the testimony based on

14   the depositions over the last forty-eight hours -- I'm not sure

15   the debtor will even dispute them, Your Honor.

16           THE COURT:  Well, if you have representations to me as

17   to what the depositions showed or if you have transcripts to

18   hand up to me, subject to your opponents' rights to be heard, I

19   wouldn't necessary conclude that they have the same infirmities

20   as to your desire to put on live witnesses.

21           MR. JONAS:  Understood, Your Honor.  And again, my

22   apologies if we haven't complied with the case management

23   order.  I will say, Your Honor -- and it doesn't excuse it by

24   any means -- I will say, Your Honor, we've had a lot of

25   discussion with the debtors over the last -- and the committee

1    and others over the last few days, and frankly, I think at

2    least the parties, Your Honor -- again no excuse -- but at

3    least the parties' anticipation was that in fact, we would have

4    testimony today.  That's why we were doing what we were doing,

5    if you will, leading up till today's hearing.  Again, that's on

6    me, Your Honor, and I accept that responsibility with respect

7    to the case management order.

8          But I just wanted the Court to be aware that the

9    parties have been proceeding -- unfortunately, the most

10   important person in the case is you and you weren't under the

11   same perception, but at least the parties' perception was that

12   that's how we would proceed today.

13         Your Honor, as I said, I've highlighted some of the

14   facts, but I'll just come back to those, because I think

15   there's really two or three absolute key facts.  Number one, we

16   believe that both witnesses that we've heard from, that is,

17   we've deposed over the last forty-eight hours, three witnesses,

18   Your Honor:  the two declarants, the debtors' two declarants,

19   Mr. Menke and Mr. Spanjers; and also Mr. Shapiro, the FA in the

20   case.

21         And both of the debtors' employees, I believe their

22   testimony supports the fact that certainly on a net basis, the

23   two contracts in this case, which were -- if you look at the

24   amendments in the documents before the Court, Your Honor,

25   you'll see they're dated the same date the case was filed.  And

**PINNACLE AIRLINES CORP, ET AL.** 62

1    the testimony supports the fact that they were working around

2    the clock and literally got the amendments done, if not

3    minutes, hours or days prior to the bankruptcy filing.

4    And those amendments, Your Honor, to the critical

5    contracts between the debtors and Delta, make these

6    contracts -- or as they now stand, as amended, which was done

7    shortly before the case -- money-losing contracts.  Again,

8    there was a difference in testimony from the two employees, but

9    on -- there's no doubt that on a net basis, these are money-

10   losing contracts that they are asking you to assume today as

11   part, if you will, of the DIP arrangement.

12   I think that's unheard of, Your Honor.  If our facts

13   are right, I'd be hard-pressed, I think, to find a case where a

14   court has approved assumption of contracts which are admittedly

15   money-losing contracts.

16   Now, what they'll say, Your Honor, is well, they may

17   be money-losers today, but through the concessions we hope to

18   obtain from labor, then they will no longer be money-losing

19   contracts.  That's all well and good, Your Honor.  But the fact

20   of the matter is, I don't think the Court can presuppose what's

21   going to happen with labor or otherwise.  I think the fact of

22   the matter is, if, in fact, these are money-losing contracts, I

23   think the Court should find itself hard-pressed to approve

24   assumption today, as part of the DIP arrangement.

25   And I don't think -- by the way, Your Honor, my own

1  view is that's a very critical fact that -- and I'm not

2  suggesting anything untoward, but if you read the declarations,

3  nowhere would you find any sort of testimony, if you will, as

4  to the economics of those contracts, which I think is

5  critically important.

6          Second, Your Honor, the -- and this fact, if you will,

7  I think ties into one of your main concerns, which is, I think

8  you said you don't want to have a gun to your head.  Your

9  Honor, I can assure you that if you approve this DIP today, you

10  do have a gun to your head.  Because what it does is puts you

11  in a straightjacket, because it ties -- one of the milestones

12  is approval, not only of labor concessions, but those are all

13  pre-baked.  The amendments that were done the day this case

14  filed, or the day before this case filed, the rates that are

15  contained in those amendments, require, if you will, certain

16  concessions from labor.

17          So I'm not sure what this negotiation is going to look

18  like, Your Honor, because the debtor must obtain certain, if

19  you will, predetermined concessions.  And if they don't get

20  those, they have to come to you and they have to seek to reject

21  those contracts, and they have to do that on a timeline.  And

22  if they don't do that, this case blows up.  There's defaults

23  under the DIP; it gives the DIP lender rights.  Effectively,

24  it's the end of the story.  The case is over.

25          So I think, Your Honor, that goes directly to your

1    concern.  It's a valid concern.  And I think it does put you in

2    a very small box, which is not where you should be, if you, in

3    fact, approve the DIP.

4            Your Honor, another fact --

5            THE COURT:  You can get me out of the box if you -- if

6    either your clients or anybody they know will give me thirty

7    million bucks of new money.

8            MR. JONAS:  Your Honor, I absolutely appreciate that.

9    And as I said, I wish very much -- and I can assure you, we

10   thought of that.  And I knew I'd be standing before you today,

11   and I would have liked nothing better than to have been here

12   with a DIP.  We're not.  We don't have that today.  But I keep

13   coming back to -- and I'm sorry to belabor it -- but I don't

14   think that's the standard.  I don't think the fact that there's

15   no alternative means that what -- if that were the case, Your

16   Honor, that whatever they put before you, because there's no

17   alternative, you have to approve, I don't think that can

18   possibly be the standard.

19           And it's not.  Because Farmland lays out a standard.

20   The standard is either met or it's not.  And if it's not, you

21   can't approve this arrangement.  And for the reasons we've

22   already identified, and for some more I'm going to give you in

23   a minute, I don't think you can approve this DIP.  I'm sorry

24   about that.  I know it's very bad for the case, and I

25   appreciate that.  But my clients felt it was not appropriate to

1    roll over, if you will, and just accept what was deemed to be

2    or viewed to be an extraordinary, improper arrangement.

3        THE COURT: Well, forgive me for pursuing this, but if

4    this case craters and it liquidates, not just equity -- which

5    may or may not be in the money at this point, I don't know --

6    but three or four different creditor classes senior to equity

7    are going to go down with the Titanic: workers, vendors,

8    hopefully there aren't as many tort litigants as I've had in

9    other cases, but those as well. That's a lot of people to be

10   putting at risk of a liquidation to improve the deal when we

11   have no known alternative.

12       MR. JONAS: Your Honor, I think the point, though,

13   is -- and I'm sensing the Court's -- perhaps it's frustration

14   that the Court's in a tough position, which is if I don't

15   approve this, there's a lot of folks that are going to feel a

16   lot of pain. And I appreciate that. But that's not your job.

17   The job was for the debtors to get it right, to come before you

18   with a DIP that passes muster. They haven't.

19       So while you may be sympathetic, or empathetic, and I

20   appreciate that, as am I, it's not our job to just take

21   whatever's stuffed down our throats because there's no

22   alternative. Again, Your Honor, I keep coming back; if that's

23   the ration -- that can't be the rationale. Because then,

24   first, as you do anyway, I think, you have every debtor who

25   cries it's a melting iceberg; I'm running out of cash -- and

 1 | I'm going to get to that in a minute, Your Honor, because I'm
 2 | not so sure that's the case here, or at least not as presented.

 3 | You have that all the time anyway. You'd have it in
 4 | spades. And then you'd have the DIP lender coming in, grabbing
 5 | everything and anything, and just say, well that's it. We
 6 | could do whatever we want. There's no alternative; so that's
 7 | what you're going to take. And I just don't think that's the
 8 | case, Your Honor. Again, I share your concern, but I think
 9 | it's incumbent on the debtor, on the DIP lender, in this case,
10 | to get it right.

11 | Your Honor, the other factual issue I wanted to come
12 | back to, which is tied to this, if you will, is this issue
13 | about the debtors running out of cash, and it's going to happen
14 | on June 1st or sometime in June; it's coming upon us. Again,
15 | no choice, got to do this.

16 | Your Honor, I believe that the testimony we elicited
17 | through the depositions demonstrates that, in fact -- and I
18 | believe it's Mr. Menke's declaration -- was incomplete.
19 | Because the analysis that was done, and there's a budget
20 | attached to Mr. Menke's declaration -- and by the way, Your
21 | Honor, I'm not disparaging Mr. Menke. He seems like a lovely
22 | gentleman. I'm sure he's doing the best he can. But the
23 | testimony that was elicited shows that the budget, to get to
24 | the point that they run out of cash in June, assumes that
25 | Delta's going to exercise their setoff right.

1        And that may be fine. It may not be, Your Honor. But

2 even if I accept the assumption, the analysis was that well, we

3 owe them money, and they owe us money under the contract, so

4 that gets you to a ten million dollar number. And lo and

5 behold, if you look in June, Your Honor, you'll see the cash is

6 at something like ten million dollars. And if they exercise

7 the setoff, it gets down to zero, we're out of cash.

8        But what it doesn't do, Your Honor, is if -- it's in

9 our papers, but if we had an opportunity -- and we, by the way,

10 have no affirmative witnesses, Your Honor. We think we could

11 prove our case solely through brief cross-examinations of the

12 debtors' witnesses -- what we think we can show Your Honor is

13 that that analysis, if you will, didn't include multiple other

14 claims running -- in this case, running that the debtor had

15 against Delta, that would, if not reduce, possibly eliminate

16 that setoff right; such that our view is that there was a

17 conclusion, which is, okay, we need a budget to support the

18 DIP, we need to show we're running out of cash, and that was

19 reached, but it was reached in a faulty manner.

20        Because the full story isn't baked into the numbers.

21 Only two numbers were looked at, not the full story, which

22 is -- and you see from our papers, Your Honor, and you heard, I

23 think from some of the presentations that were already made,

24 yeah, there were a lot of claims running back and forth. I

25 think Ms. Beckerman referred to, well, in connection with

1  assumption of those contracts, even though it was done out of

2  your purview a day before the bankruptcy case, they were trying

3  to deal with cure issues.

4          And there were claims running back and forth.  But my

5  point, Your Honor, is when they did a budget and they put in a

6  declaration to support running out of cash, they didn't tell

7  the full story.  And if the full story is told, we believe,

8  Your Honor, it would change that interpretation and maybe,

9  maybe change the story on when the debtor runs out of cash.

10  And I haven't -- we can't look -- from the outside looking in,

11  Your Honor, we can't run that analysis, so it's hard for us to

12  do, but I think at least, Your Honor, my point is, the full

13  story should be told, if nothing else.  And then the Court can

14  make a determination as to the efficacy of those facts and

15  whether or not they support, in this case, approval of the DIP.

16          Your Honor, I won't belabor this.  I think I've really

17  only highlighted a few facts.  I hope the facts that I

18  presented are uncontestable, so perhaps we don't even need the

19  testimony.  I don't know.  But again, the point is, Your Honor,

20  this is truly extraordinary.  It's not just a DIP.  It's a DIP;

21  it's approval of amend -- it's assumption of contracts that

22  were amended literally minutes before the bankruptcy filing, so

23  that they could be amended outside the Court's purview, in our

24  opinion; it's approval of a setoff and mutual release agreement

25  that was executed minutes before this bankruptcy filing, again,

1  outside of this Court's purview.

2       I'd urge the Court to ask the question:  why were

3  those done?  Why did -- and by the way, Your Honor, the debtor

4  tells us they adamantly opposed that.  Well, to no avail.  Why?

5  Because it's another theme we would present, Your Honor.  The

6  debtor had no options.  The only game in town for the debtor

7  was Delta.  So they did what Delta told them to do.  They did

8  their bidding.

9       You want to amend contracts a minute before we file?

10  Sure.  Does it matter that those contracts are economically

11  disadvantageous to us?  Well, we don't really have a choice, so

12  we'll take that deal.  You want to sign up a mutual setoff and

13  release agreement a minute before we file bankruptcy?  Sure,

14  we'll do that.  You want to put us under tight milestones and

15  basically presuppose or predetermine how labor's going to be

16  treated in this case?  Sure.

17       And you might ask yourself, Your Honor, why does Delta

18  care about -- why are they trying to put you in a box and deal

19  with labor in the fashion they have?  The reason is, Your

20  Honor, because under the contracts -- at least under the pre-

21  amended contracts -- and this was innate -- this was a dispute

22  between the debtors and Delta -- but nevertheless, the debtors'

23  position under those contracts before they were amended -- the

24  debtors' position was that Delta was responsible for increased

25  labor costs.  Well, Delta didn't like that.  Delta would like

1 | to not have to be responsible for those increased labor costs.

2 | So effectively, what has happened here?  They took

3 | advantage of the debtor, who was very easily taken advantage of

4 | in light of their situation.  They amended the contracts,

5 | number one.  And now, to get the contracts to be profitable for

6 | the debtor, the debtor has to obtain certain labor concessions.

7 | And if they don't obtain them, they must get a rejection from

8 | the Court.

9 | So it all fits together, Your Honor.  But the way it

10 | fits together is that Delta basically has control of this

11 | process.  They continue to control this process.  And I don't

12 | think -- based on what we've already presented, I don't think

13 | the Farmland standards are met, and I don't think that the

14 | Court can or should approve the DIP arrangement today.  Thank

15 | you, Your Honor.

16 | THE COURT:  Thank you.  Okay.  Next, who wants to be

17 | heard next?

18 | MR. MORRIS:  This is Ryan Morris.  May I go next, Your

19 | Honor?

20 | THE COURT:  Yes, Mr. Morris.  Go ahead.

21 | MR. MORRIS:  Yes, thank you for allowing me to speak

22 | here, Your Honor.  I'm a pro se objector; I'm not a lawyer.

23 | THE COURT:  Although I noticed your papers, they sure

24 | walked and talked and quacked a lot like papers I get from

25 | lawyers.

**PINNACLE AIRLINES CORP, ET AL.**                    71

1          MR. MORRIS:  I have a lot of --

2          THE COURT:  Did you, like, drop out of law school or

3     go to law school or get some help from a lawyer on them?

4          MR. MORRIS:  I had help from a fellow amateur lawyer

5     who's another equity holder here.  But no, I'm not a lawyer.

6     My background, I'm an engineer is to do your programming does

7     need work in the law, and this is a hierarchy and everything,

8     but I --

9          THE COURT:  Yeah, I got an engineering degree too, but

10    I thought I'd go on to law school.  Go ahead.

11         MR. MORRIS:  I mean, everything -- I agree with

12    everything that Brown Rudnick just said, and so I won't

13    duplicate anything they said, but perhaps I could offer a bit

14    of, you know, some different additional perspective here.

15         Certainly twelve months ago, the debtor was describing

16    in the conference call I attached to my filing, describing a

17    picture of the company, in particular, what the 2013 resets

18    would allow them to earn in potential profit on their CRJ-200,

19    which is, I think is a plane for Delta.  And now despite record

20    profitability for Delta, we find ourselves in a bankruptcy

21    court where they're arguing the equity substantially out of the

22    money.

23         And if you look to the root cause for why we're here,

24    I think it's fairly clear that the reason is when Pinnacle

25    acquired Mesaba in 2010, about two years ago, from Delta after

1  they acquired Northwest, which acquired Mesaba several years

2  before, and what choice did they have in that matter? And I

3  don't know if there's any testimony in this from Brown Rudnick,

4  because they're fairly new employees, but my understanding from

5  trying to farm ways is that there really was very little choice

6  to say no to this.

7      And it seems that now that Delta's finance, their gift

8  has sort of turned out to be a Trojan horse to extract

9  tremendous value for Delta. I'm not saying that it was

10  intended that way, but frankly, I suspect Delta feels somewhat

11  justified in this extraction, because I'm not sure if you're

12  aware, but the reason why Pinnacle has so much value is due to

13  a 300 million roughly unsecured claim against the former

14  bankrupt customer they had, Northwest, which was sold for cash

15  in the market in 2007, but ultimately Delta acquired that. So

16  in some sense, Delta effectively paid that claim indirectly

17  through acquiring Northwest.

18      So and to be honest, I mean, Delta, they have

19  positioned themselves and maneuvered over the last two years,

20  brilliantly. I mean, that's not sarcastic at all. I mean,

21  it's really an amazing job that their lawyers and their

22  businesspeople have done to position their new strength in this

23  consolidated industry. And so as I look at it, over the last

24  in two years, and sort of every move that they've made, it led

25  to some sort of, frankly, inevitable outcome here. I mean,

1  just looking and going back to the alternatives that you have,

2  and obviously we don't have an alternative DIP loan at the

3  moment, and I doubt anything would come, I would posit to you

4  that frankly, I think we need your help here for the

5  negotiating side of it, in the sense that, if you look at the

6  side of the debtors, or the board and the management -- and

7  this is no -- I'm not calling them conflicted in any sense, but

8  frankly the way they behave, it's as if they're Delta

9  employees.  And I think it's because they frankly haven't had

10  much of a choice.

11      It's not been necessarily out of anything nefarious,

12  but I mean, just to be thinking at a social level, this is a

13  fairly tight industry, the airline industry.  You know, these

14  regionals are generally stepping stones for people to go to the

15  big carriers where you make substantially more money.  It's not

16  exactly an industry that produces a lot of independently

17  wealthy individuals that can just act out of their own -- you

18  know, what they think is right.  And so they just -- Delta had

19  a lot of power over the individuals that frankly wouldn't allow

20  them to really stand up for something they believed in.

21      I mean, obviously some people have left, perhaps out

22  of that issue, that have -- just have strong personal ethics

23  and strong beliefs.  So in terms of an alternative, I would

24  certainly posit that I don't think Delta is going to have a

25  feeder for I think at least a billion dollars of their own

**PINNACLE AIRLINES CORP, ET AL.**                                    74

1  revenue disappear overnight over an issue of thirty million

2  dollars.  So that -- I mean, I don't personally -- I don't

3  really know exactly the mechanisms for this, but they won't --

4  the debtor won't be able to get that kind of a concession

5  without the help of some kind of external party, because

6  otherwise they're frankly, they're branding themselves in an

7  industry, especially with some individuals in their early

8  forties, that have a long career ahead of them, and if they get

9  branded for being very difficult people to work with, then

10  that's just an impossible position for that individual to be

11  in.

12          But I think it's very clear.  I mean, Sean Menke made

13  a declaration to the employees on May 3rd.  I'm not sure if

14  that was filed or not.  But there was a quote, in early

15  January, Delta notified us that they were not participating in

16  restructuring outside of bankruptcy.  And for Delta that's

17  standard protocol.  By steering this process towards basically

18  what was an inevitable bankruptcy back in January, requiring

19  everything to be court-approved, they get this huge benefit of

20  washing their hands of all the liability of all the prior

21  actions that led up to that.  And I believe that's part of this

22  DIP loan.

23          So I certainly appreciate the position -- the

24  difficult position they're in and I think that's what we were

25  really hoping to be able to get some more light on.  And

1  unfortunately as you know, the trustee at least at the moment

2  has denied an equity committee, so we can't see any of the

3  things that have all been filed under seal, so we really can't

4  make much of a determination.  I'm certainly interested in

5  getting Brown Rudnick's testimony that they collected.  I don't

6  have the resources to do that, at the moment.

7           THE COURT:  Pause, please, Mr. Morris.  Apropos that,

8  have you restricted yourself?  Restricted in the sense of

9  agreeing not to trade in securities of the debtor?

10          MR. MORRIS:  I believe I did in the letter that we

11 sent to the trustee.  I certainly don't intend to.  I filed a

12 13(d), and I wouldn't do that, no.  If I'm not restricted, I'm

13 restricting myself right now on this call.

14          THE COURT:  Your holdings had reached the level that

15 under the Williams Act you had to file a 13(d)?

16          MR. MORRIS:  It was as a group, actually.  So I own

17 below five percent, just under five, but I had formed a group

18 with another shareholder.  We had attempted to get a couple

19 board seats on -- basically to help to prevent a bankruptcy

20 filing, because again, there was nobody on the board that we

21 believed could really stand up to Delta because of their own

22 future career issues that it would have raised.  And so we

23 attempted to -- Wayne King and I attempted to engage with

24 debtor back in February and we spoke with -- you know, spoke

25 with them.  And we had continued to some degree dialoging.  The

1  date that they were supposed to respond, we were in our

2  meeting, they indicated we were likely to be welcomed onto the

3  board; they responded by delaying the end of the meeting and

4  then filing bankruptcy shortly thereafter.

5       I mean, frankly, I'm just confused by their behavior.

6  I mean, I don't understand -- I mean, I sort of understand both

7  the conflicts that they have from a career point of view, but I

8  just don't understand what their upside is as to being so one-

9  sided with Delta.  I mean, even Don Breeding, the chairman, he

10  called me back several weeks ago saying we're not going to

11  object to the equity committee, we're going to be neutral on

12  that issue, and then of course, a week and a half later,

13  there's these extreme objections from the debtor.  So it's odd

14  behavior.  And I, honestly again, I don't know exactly the

15  mechanisms, but some kind of examination has to dig it up.

16  Because we, right now, as equity, have no idea what's going on,

17  because everything has been filed under seal.

18       THE COURT:  Okay.  You want to get back to any final

19  thoughts you have on the wisdom or lack of wisdom of the DIP?

20       MR. MORRIS:  Yeah.  So I just -- on the DIP in terms

21  of -- and I certainly understand your position, them not having

22  an alternative, but I think the DIP as it is, particularly with

23  the contract amendments that were basically the most valuable

24  assets that the debtor had, which was to give eight percent

25  margin, publicly disclosed -- although that's now been redacted

1 in the new form, this seventy million dollars of EBIT roughly

2 over roughly five years, starting next year, the fact that that

3 was given away as part of the thirty-five million or forty-

4 million DIP, probably makes this the highest return on an

5 investment of anything in the airline industry ever. And it's

6 certainly not fair terms. But they really couldn't stand up

7 for themselves. And frankly, I doubt Delta is going to let

8 this -- risk it going through a liquidation, because the cost

9 to them of losing over a billion of revenues of these feeder

10 flights, I don't think that they would get into that game of

11 chicken. But I also think the debtor is, for these sort of, I

12 say nonlegal social reasons, unable to stand up for itself, and

13 so I think that's hopefully the role that you can help play

14 here. I'm not exactly sure the mechanism, again, but I defer

15 to you and Brown Rudnick on that. Thank you, Your Honor.

16    THE COURT: All right. Thank you.

17    Okay, Mr. Kolko, did you want to be heard?

18    MR. KOLKO: Sure. Thank you, Judge. Hanan Kolko,

19 H-A-N-A-N, last name K-O-L-K-O, on behalf of the steel workers.

20 Your Honor, I will be brief.

21    In light of the modifications to the DIP agreement

22 which the debtors and the committee negotiated after we filed

23 our objections, we are withdrawing our objections. And I want

24 to just make two brief points.

25    First of all, we will reserve our rights at the

1  appropriate point to object on the basis that debtors have not

2  complied with the procedural and substantive requirements of

3  1113, if we get there.

4  Second of all, picking up on a point that Your Honor

5  made, you said that you were anxious for there to be

6  constructive labor negotiations and that you were willing to

7  help the parties in that process. And on behalf of the steel

8  workers, we welcome that. In the negotiations, an issue which

9  we think will loom large, is the extent to which these aren't

10  bilateral negotiations, that is, it's not going to merely be

11  negotiations between the debtors and the unions, but they will

12  be multilateral negotiations, where the unions, at least the

13  steel workers, are likely to be seeking things from parties

14  other than the debtors, and in particular, Delta.

15  There's been a lot of talk about the amended DCAs. It

16  is our view --

17  THE COURT: Pause, please, Mr. Kolko. You haven't sat

18  through other hearings with me. I go nuts with acronyms,

19  because I don't live with my cases the way the parties do. I

20  think DCA stands for, what, Delta Connection agreements?

21  MR. KOLKO: Yes, Judge.

22  THE COURT: Would you indulge me -- actually it's in

23  my case management order, so it's more than indulging me, it's

24  complying with a court order. If you want to talk about the

25  UAW, I understand that that's auto workers, and I know what the

1  FCC is and I know what the U.S. is.  But minimize the acronyms

2  if you would, please, Mr. Kolko.

3         MR. KOLKO:  Sure.  I apologize, Judge.  Is it okay if

4  I now refer to them as the amended DCAs?

5         THE COURT:  You're over the dam on that one, so you

6  can go on.

7         MR. KOLKO:  Okay.  And I will make every effort --

8         THE COURT:  Dam is a double entendre in this context.

9         MR. KOLKO:  I apologize, Judge.  Back to the point.

10  We may be coming to both Delta and Your Honor and say the

11  amended DCAs, as they stand now, require the debtor to obtain

12  way too drastic labor cost concessions.  And it may be that in

13  connection with reaching a consensual resolution of the labor

14  issues, that we will be seeking from Delta and ultimately from

15  Your Honor, changes to those agreements, so that debtors can

16  operate profitably with the level of labor cost savings that

17  can, in fact, be achieved during this process.  And we're just

18  flagging that issue now, so that nobody can claim to have been

19  blindsided when it comes up in earnest during the negotiation

20  and 1113 process.

21         THE COURT:  Okay.

22         MR. KOLKO:  Thank you, Judge.

23         THE COURT:  Thank you sir.

24         Mr. Seltzer, is it?

25         MR. SELTZER:  Yes, thank you.

**PINNACLE AIRLINES CORP, ET AL.**                                80

1    THE COURT:  Come on up, please.

2    MR. SELTZER:  Richard Seltzer, of Cohen, Weiss and

3    Simon for the Air Line Pilots' Association, also known as ALPA.

4    I may have the distinction of being the shortest speaker today,

5    Your Honor.

6    We appreciate your comments about wanting to retain

7    discretion to do whatever you can to help encourage a

8    consensual resolution.  As our papers stated, ALPA reserves its

9    rights.  And we appreciate also the comments of counsel for the

10   company and Delta, confirming that the obligations of the

11   company under 1113, to the extent we get there, and we hope we

12   don't get there frankly, are not changed or modified in any way

13   by the proposed DIP order.  Thank you.

14   THE COURT:  Okay.  Thank you.

15   Anybody else before I give Ms. Beckerman or any of her

16   colleagues a chance to reply?  Mr. Huebner, are you rising to

17   be heard?

18   MR. HUEBNER:  I am, Your Honor.

19   THE COURT:  Sure.

20   MR. HUEBNER:  For the record, Your Honor, I'm Marshall

21   Huebner of Davis, Polk & Wardwell, on behalf of Pinnacle.  I'm

22   not, obviously, participating in the Delta hearing, but Mr.

23   Morris went a little bit far afield in some of the things that

24   he said, that were really related to other matters.  And so I

25   just want the record to be very clear --

1  THE COURT:  Sure.  Just pause, Mr. Huebner.  You tend

2  sometimes to be a little soft spoken, so could you pull that

3  mic close to you?

4  MR. HUEBNER:  Yes.  I apologize, Your Honor.  Just to

5  be very clear, the dialog with the U.S. Trustee about the

6  formation of an equity committee, which was denied by the U.S.

7  Trustee's Office, as was previously alluded to, was based on a

8  detailed set of facts presented to the U.S. Trustee, including,

9  among other things, that the equity holders, in fact, had made

10  substantial post-filing acquisition of additional shares at

11  pennies on the dollar.  So your question about did the equity

12  holders offer to get restricted; did they ever, for example,

13  ask for information or ask to sign a confidentiality agreement;

14  the answer to those questions, among other things, are no.

15  And maybe Mr. King or Mr. Morris are under the

16  misimpression that one has to have official status in order to

17  seek information.  That obviously is not true.  We have very

18  different views about many of the things he said.  I will leave

19  aside for right now the utterly unsupported repeated

20  accusations about breach of fiduciary duty and the fact that

21  people were shilling for future jobs in the airline industry,

22  and so the entire board and all of management did not do what

23  they were supposed to to protect the company.  Those

24  accusations, suffice it to say, are things which with we

25  extraordinarily, strongly disagree, and as to which there's

1  absolutely no basis in the record.

2          In fact, at the risk of getting heat when they see the

3  transcript, I think if you looked at the seniority and average

4  age of the board members, you would probably laugh out loud at

5  the accusation that what they're really looking for is a future

6  job in the airline industry.

7          THE COURT:  Okay.  Thank you.

8          Ms. Beckerman?

9          MS. BECKERMAN:  I think Mr. Jonas had something he

10  wanted to --

11          MR. JONAS:  If I may, Your Honor?

12          MS. BECKERMAN:  -- rise on before I got --

13          MR. JONAS:  I'll just --

14          MS. BECKERMAN:  -- to my reply.

15          THE COURT:  Sure.  Come on up, please, Mr. Jonas.

16          MR. JONAS:  Your Honor, Ms. Beckerman's been kind

17  enough to give me one minute.  I just wanted to apologize to

18  the Court, because I think -- I take seriously your case

19  management orders, and obviously I misinterpreted them, because

20  I just want the Court to appreciate that when I read it and I

21  saw in Section 2 --

22          THE COURT:  Give me a second, I have it here

23  somewhere.

24          MR. JONAS:  Sure.  And I'm not challenging you, Your

25  Honor, by no means.  I'm really just somewhat apologetic,

 1  because I'm a bit embarrassed.  I'm sorry, it's Section 3 on

 2  page -- it begins on page 2.

 3          THE COURT:  You better read it to me.

 4          MR. JONAS:  Sure.

 5          THE COURT:  I thought I brought it out here, but I

 6  can't find it.

 7          MR. JONAS:  Sure.  Your Honor, this is case management

 8  order number 1 in the Pinnacle case.  And paragraph 3 on page 2

 9  says, "The initial hearing on all Motions in Contested Matters

10  will be nonevidentiary," I agree, "unless," and then sub (c)

11  says -- and these are ors, Your Honor, (a), (b), (c) or (d) --

12  (c) says, "the Motion is of a type specified in Local

13  Bankruptcy Rule 9014-2(b), (c), (d), or (e)."  So when I looked

14  at --

15          THE COURT:  Okay.  And this is one of those that's --

16          MR. JONAS:  Yes, it is, Your Honor.

17          THE COURT:  -- encompassed within the cross reference?

18          MR. JONAS:  Yes, it is.

19          THE COURT:  Okay.  Thank you.

20          MR. JONAS:  So if I'm mistaken, I certainly apologize,

21  Your Honor.

22          THE COURT:  Fair enough.  Okay.  Ms. Beckerman?

23          MS. BECKERMAN:  Your Honor, I'm going to try to

24  address some of Mr. Jonas' and other arguments, to respond to

25  them in order.  The first I'm going to start with is our cash

**PINNACLE AIRLINES CORP, ET AL.**                                      84

1  needs.

2          We've obviously filed an amended commitment letter and

3  attached that as a budget.  And the budget shows that we need

4  to draw ten million dollars on June 1st.  And the reason that

5  we need to draw ten million dollars on June 1st is that we have

6  a view of management that we cannot safely operate this airline

7  with less than twenty million dollars of cash, which is in Mr.

8  Menke's first-day declaration.

9          And therefore, if we didn't have the draws on the DIP

10  that are scheduled for June under this budget, we would be at,

11  at the end of June, eleven million dollars.  And that does not

12  take into account the intermonth -- interweek swings that we

13  have, because we have, as we discussed before when I was

14  addressing you previously, under the contracts we have a lot of

15  payments that go back and forth under our agreements between

16  ourselves and Delta.  And also that's true for some of our

17  other capacity purchase agreements that are winding down as

18  well.

19          And so what happens -- but primarily Delta -- and what

20  happens is, at certain points when we have payroll or other

21  items that come due, our cash dips and then it rebounds later

22  in the week when payments come in.  We have swings that are as

23  much as twenty million dollars, which is in Mr. Menke's

24  declaration as well.  There are serious interweek swings.

25          We can't operate this airline without that.  We're not

1  standing here asking you to borrow money for a DIP that we

2  don't need.  And we're not saying that we need it on June 1st

3  because we don't.  We need it.  So that's why we're here.

4  The second thing that was addressed was the issue

5  about the contracts.  So I wanted to discuss that.  If Mr.

6  Menke -- I mentioned before the discussions that went back and

7  forth in negotiations between the parties for a month, and

8  including issues about the rates; and that not surprisingly,

9  one of the things that Delta had proposed was lower rates, and

10 we obviously negotiated the rates up.

11 Well, part of that was because we did an analysis

12 ourselves of a couple of things on the debtors' side.  The

13 first thing is, we did an analysis of what -- an extensive

14 analysis of benchmarking all of our labor costs.  And that

15 included our pay rates; it included our benefits; it included

16 our work rules.  And in the context of doing that analysis and

17 trying to figure out for our negotiations whether we could come

18 up with a workable business plan on the rates, we had to

19 consider that.

20 And we did consider that in connection with that.  And

21 not surprisingly, Your Honor -- I'm sure we'll have a lot more

22 discussion about that if unfortunately, if we ever get to 1113;

23 hopefully we won't -- but there are obviously issues with the

24 debtors' costs not being in line with what is the band of

25 what's average in our area, in our competitors.  And we have

## PINNACLE AIRLINES CORP, ET AL. 86

1  very serious problems relating to our pilot agreement.  No

2  disrespect to the pilots in any way, of course, because it's

3  not their -- you know, it's just the terms of our agreement,

4  but we've had a number of issues that have come up that are

5  outlined in Mr. Spanjers' and Mr. Menke's declaration that led

6  to our liquidity problems.

7      And our liquidity problems were not caused by Delta.

8  You know, we discussed before the fact that there wasn't any

9  payment that was due and owing under the terms of our contract

10  that Delta had failed to make.  That's what I had discussed

11  before when I was up previously.

12      So Mr. Spanjers and Mr. Menke both explained that our

13  liquidity crisis came from four factors.  I'd alluded to them

14  before, but they're spelled out in their declarations, and

15  they're spelled out very extensively in Mr. Spanjers' first-day

16  declaration.  The first was, I mentioned the integration, that

17  we were trying to go from three certificates to two and

18  integrate Mesaba into our operations.  And we had -- the

19  company had an idea that that would take a certain amount of

20  time, and had expected that that was going to be done by May

21  11th.  And it didn't happen -- of 2011 -- May of 2011.  And it

22  didn't happen till January of 2012.

23      And that delay obviously caused a lot of additional

24  costs and redundancies to have to be in place, because when you

25  have these various operating certificates, you have to have a

1  certain number of officers that are in charge of each separate

2  operating functions.  You have a lot of duplication in terms of

3  functions.  And we weren't able to get the efficiencies of

4  going down to the second certificate as quickly as we hoped.

5  It's a process we have to work through with the FAA.  The FAA

6  has to approve it.  It's not necessarily something that was in

7  anyone's control, but unfortunately, it caused loss of money.

8         The second thing was our collective bargaining

9  agreement outlined, again, in Mr. Spanjers' first-day

10  declaration.  Unfortunately, we have a lot of issues with

11  respect to our training events and some other issues regarding

12  what I'll describe as issues about vacancies and how that --

13  when for example, there's a vacancy and there's a seniority

14  list that was put in place through the arbitration process and

15  through the issuance of the list, that this caused unusual

16  training events beyond what the company had had before.  And

17  that caused a significant amount of dollars to go out the door

18  on these training events, much more than the company had

19  anticipated.

20         Again, none of this is Delta's fault.  This is what

21  happened to us pre-bankruptcy and what we're facing.

22         We have a bunch of unprofitable contracts.  We

23  discussed the unprofitable Delta contract.  Previously, on the

24  first day, we discussed the unprofitable United contract, which

25  was losing a lot of money, and that's why the company got

1  permission to terminate that agreement from Your Honor

2  previously.

3         We also had already made the decision before the

4  company did -- before the bankruptcy filing to wind down US Air

5  flying.  And then we had just other oper --

6         THE COURT:  To wind down what?  Excuse me.

7         MS. BECKERMAN:  US Air's pro-rate flying.  We had

8  agreements with US Air.  And that had been decided many months

9  before the bankruptcy filing, because what had happened is, as

10  also set forth in both Mr. Menke's declaration and Mr.

11  Spanjers' declaration, is that in July of 2011, Mr. Menke

12  joined the debtors' operations.  And Mr. Menke, having been

13  involved before in Frontier and having been the CEO of Frontier

14  in its bankruptcy process, was asked to look at -- as he would

15  do coming into any new position -- he looked at all the

16  company's contracts and all the company's situation.

17         And when the company's new management came in, the new

18  CFO, Mr. Christie, and Mr. Menke, and conducted this analysis,

19  and including with outside help from Seabury, these issues came

20  to the forefront of how problematic all these things were and

21  how much money the company had been losing.  And I think that

22  the company took steps to try to address that to avoid

23  bankruptcy.  That's all spelled out in the declarations.

24         And so the company ended up in a liquidity crisis

25  because it had these four problems.  It had the three I just

12-11343-reg Doc 375 Filed 05/21/12 Entered 06/04/12 12:35:02 Main Document Pg 89 of 191



mentioned and plus it wasn't making -- it wasn't satisfying its operational performance requirements under contracts in 2011, which caused it to pay penalties. And until it could deal with fixing some of those problems, it was losing money due to that.

So the company got to this point, not because of Delta. It got to this point because it had these four major problems plus, I'm sure, any number of other ones. But we'll just highlight on those four. So the fact that people are surprised that we're standing here or are somehow thinking that Delta forced this to happen, is just clearly not the case, based on the testimony.

So then we get to well, all right, we had these contracts with Delta, the Delta Connection agreements. I'll try not to use DCAs, sorry. I apologize; I think I did it before.

THE COURT: You have about fifty percent compliance. I guess you should be congratulated.

MS. BECKERMAN: Sorry. So we had these three agreements. We talked about the one that was just unprofitable, period. So when we were in the negotiations with Delta and we couldn't renegotiate that agreement, were then focused on the other two agreements, which obviously the company felt could be profitable and the company was operating under.

So you say well, what would we think about could be


12-11343-reg Doc 375 Filed 05/21/12 Entered 06/04/12 12:35:02 Main Document
Pg 90 of 191



profitable? Well, we started the Delta proposed rates. We obviously pushed back based on what we thought were achievable cost savings based on that benchmark study that the company did about where our labor rates and other issues are, and based on the fact that in Chapter 11, people also get cost savings, not just from labor, of course, in this situation, but facilities, lease rejections, contract renegotiations, as happens in every bankruptcy, and certainly in any airline bankruptcy we've ever been involved in has all that.

So when management was renegotiating these contracts, it was with the understanding that it couldn't, with our pilot contract and all of our seniority problems and our vacancy bidding and our training costs that have gone through the roof -- we couldn't just operate without changes. If we didn't have any changes to these Delta agreements, we would still be in a position where we would have all these reasons that led to our liquidity problem. We would have to be in Chapter 11. And we'd have to be seeking concessions.

So when we were negotiating these contracts, the management took in mind what was achievable. They obviously didn't pick situations where there would have to be cost savings. But what Mr. Jonas is saying is, if we get absolutely zero in cost savings from either labor or nonlabor, we would be in a situation where these contracts aren't profitable. That's true. I mean, that is true. The two contracts we're talking

**PINNACLE AIRLINES CORP, ET AL.**                                   91

1  about, if we got absolutely zero.

2         But I don't think there's ever been a bankruptcy

3  proceeding for an airline where somebody didn't get either

4  nonunion, nonlabor-related cost savings, by renegotiating their

5  facilities, looking at their leases, dealing with their

6  contracts.  And also, in most bankruptcies for airlines, there

7  is obviously an issue about the labor cost savings, both the

8  union and nonunion, in this case.

9         And so the fact that these contracts that we're asking

10  to assume presume that we need to get these cost savings, yes,

11  that's true.  We need some cost savings.  We do need some cost

12  savings.  If we had zero, these would be unprofitable.  But I

13  don't think the expectation sitting in Chapter 11 today, is

14  that we would get zero cost savings from those buckets, number

15  one; and that the whole reason we need to be in Chapter 11 is

16  because we have issues with some of our contracts, including,

17  unfortunately, some of the issues in our pilot contract, in

18  particular.  And so we would be needing to renegotiate those,

19  whatever we had done with the Delta Connection agreements, the

20  other two.

21         So from our perspective, the idea that Mr. Jonas is

22  saying that you shouldn't go ahead and allow us to move forward

23  and have the DIP approved today because we are asking you to

24  assume contracts that would be unprofitable if we had zero cost

25  savings, I don't think is -- I don't think it's unreasonable on

1  our part to be asking you to assume those contracts, because we

2  can't get the DIP without it.  We've discussed that.  Yes, it's

3  certainly true.  I did not -- my first term sheet certainly

4  didn't involve assuming these -- modifying these contracts and

5  assuming them, or then modifying them and assuming them after

6  the bankruptcy.  Of course.

7           But we are in the situation where we needed to move

8  forward in a situation where we were going to run out of money,

9  and we needed to have a DIP financing.  And as we've discussed

10  before, this is truly the only alternative.  And the

11  management, which has fiduciary duties to everybody, would not

12  have negotiated contracts that required cost savings if it

13  didn't think that they were reasonably achievable.  And the

14  declarations say that they believe they're reasonably

15  achievable, and they're not based on getting cost savings

16  beyond what exists out there in its competitors.  It's based on

17  what the management thinks is achievable.

18           And these contracts are not unprofitable if we don't

19  get every dollar of cost savings that we're seeking.  They are

20  certainly going to be unprofitable if we get zero dollars of

21  cost savings.  But that's not realistic being in Chapter 11.

22  And that's not the purpose -- our Chapter 11 process requires

23  us to reorganize and analyze all those things, and that's the

24  whole purpose.

25           So from our perspective, I understand Mr. Jonas'

1  argument.  He's right, if I got not one dime of cost savings.

2  But that's not our situation, and we think, based on the fact

3  that -- of the type of industry we're in, the type of situation

4  we're in, the management's judgment on this, that it's

5  appropriate to allow us to assume our agreements on a business

6  judgment -- as part of the DIP process.  So I wanted to make

7  sure I mentioned that.

8          Mr. Morris, I think, talked about the sort of

9  relationship and how much influence Delta has over this process

10  and how he congratulates them for running this process.  Well,

11  again, respectfully, Mr. Spanjers' declaration from the first

12  day explains what led this company into bankruptcy proceedings,

13  and it wasn't Delta.  And Mr. Menke's declaration explains that

14  Delta had not failed to make a payment that was due and owing

15  to us.  So it isn't Delta's fault that we had a liquidity

16  crisis.

17          And Delta is not responsible for any of the four

18  things that we talked about, other than the fact that we had

19  our unprofitable 900 contract with Delta -- that's the third

20  contract that we are winding down, as opposed to the other two

21  that we will continue flying under for long periods of time, if

22  the assumption's granted.  But they are -- but in connection

23  with that, I think he -- you can't blame all this on Delta.

24          Now, is Delta really important for this company?  Yes.

25  If we had never amended these contracts, Delta was already our

 1  eighty-percent customer before any wind-down of United and US

 2  Air.  The US Air decision had already been made way -- a number

 3  of months prior to the bankruptcy.  Delta had nothing to do

 4  with that.  The United decision to discontinue flying, you've

 5  heard a lot of information about that in connection with the

 6  motion to terminate the United contract.  That certainly was

 7  not Delta's decision.  That was an analysis that was done by

 8  management.  And in fact, Delta had told us if we could

 9  restructure it in a way that worked, they weren't opposed to

10  it.  We just could never do that.  So we never were in a

11  situation that it could work.

12          So the idea that Delta is forcing us to go down to

13  them as our only customer is just simply not correct.  That's

14  decisions made by the management after looking at the analysis

15  of the contracts, trying to renegotiate them with these other

16  third parties, and not being able to in a way that made

17  economic sense for the company.

18          Then we get to the situation of, okay, Delta is our

19  lessor, our primary lessor of our aircraft.  That's true; we

20  lease 181 aircraft.  If we never made one change to the DCA,

21  Delta Connection agreement -- sorry, I stopped myself; I

22  apologize -- we would be in the same position.  They're -- they

23  clearly played a major impetus in our business plan.  They are

24  also a secured creditor of ours since 2010.  That -- that's

25  also true.  They have a note; we've made payments on it in

1  accordance with the terms.  As of the bankruptcy filing, it's

2  owed forty-four million dollars; they have some collateral that

3  we discussed before; they have their rights and that's -- they

4  wear many hats.

5       That was before we got to the DIP lender hat.  So all

6  that would have been out there.  No matter what happened in

7  this proceeding, Delta would have been in all those hats that

8  we just talked about and would have a major influence.

9       But does that mean that we capitulated to Delta or we

10  did exactly what they said?  The evidence does not show that,

11  Your Honor.  Our declarations that we put in from the company

12  clearly show that there was arm's-length negotiations that went

13  on for a month over the DIP and the contract terms; that people

14  did not get everything that they wanted in this -- Delta ended

15  up getting -- having to agree to do many things they did not

16  want to do with us; we had to -- unfortunately, we did not get

17  everything we wanted from them.  And that is the evidence --

18  the perfect example of arm's-length bargaining.

19       And while I realize that there are many people in

20  court who don't know me, there are many people in court who do

21  know me.  And the people who do know me and remember me from

22  the Delta bankruptcy proceeding would know that I have spent

23  two years in my prior role as committee counsel fighting with

24  Delta.  When I took this assignment, I knew I would be fighting

25  with Delta; I knew that these would be difficult negotiations.

1  The management team understood these would be difficult

2  negotiations.  And they were.  We're not telling you they were

3  easy.  Management came down to a decision at the end of the day

4  that it weighed very seriously, but made the decision it felt

5  was best for the estates and the interests of all stakeholders.

6       But this was not a lay-down.  We spent -- I would

7  describe it as a fifteen-round slugfest.  I mean we did not

8  agree to these changes easily.  There was a lot of negotiation

9  back and forth.  We exchanged many term sheets.  And people can

10  say what they want, but that's just the facts of it.

11      Now, does Delta have a lot of cards in this situation?

12  Sure.  But did we have any cards on the other hand?  Yeah.  If

13  we shut down 200 planes, while it's not in the best interests

14  of our stakeholders, it's definitely going to cause some havoc

15  in their business.  So it's not that we had no role in this.

16  And management was exercising its fiduciary responsibilities to

17  the entire enterprise and all of its stakeholders when it

18  entered into these negotiations and management and the board

19  made their decision.

20      Is anything perfect?  Would there be things I would

21  like to change in any agreement?  Sure.  We didn't get

22  everything we wanted, but I think we have an overall package

23  that management ultimately was faced with and had to decide --

24  and the board.  Are we doing this or are we going naked into

25  bankruptcy and letting this whole process fail?

PINNACLE AIRLINES CORP, ET AL.                                          97

1    Okay, and then what can happen now that -- if the

2    Court were to approve the DIP?  We obviously have an exit,

3    potentially.  So we know we can get out.  That was definitely a

4    point that we were -- fought very hard for; Delta did not want

5    to do that.  It did not want to.  But the management team and

6    the board was pretty adamant that we weren't going in here if

7    we didn't know if we could get out.

8    And between the management and the professionals, we

9    obviously negotiated a very favorable exit facility as well as

10   a DIP in this circumstance, potentially staple.  Is the company

11   required to take that?  No.  If we find something better, if

12   something changes, we don't have to take it, but it's there.

13   So it's out there to allow us to get out of bankruptcy.

14   We have enough time because we have a year from our

15   filing date to accomplish our cost savings.  We have an ability

16   to run our business in the meantime.  We have employment for

17   our employees.  We have an ability to potentially reorganize

18   based on all those things if we can get those achieved cost

19   savings and have a profitable business plan where our creditors

20   are going to get repaid.  That's what the decision the board

21   was facing when it was looking at the factors that were

22   discussed in Farmland and what was in the best interests of the

23   estate.  That was all there if we took the package.  Is

24   everything perfect?  Would we like things to change?  No, but

25   that's what was our choice.  That was management's choice.

 1    And the other choice is to -- would have been to just

 2  look at liquidation and shut down or take our risks here,

 3  knowing -- file for bankruptcy, knowing that we could just have

 4  to shut down sixty days in and nothing was going to change.  We

 5  really have seen -- because we've already been in bankruptcy

 6  forty-five days -- that we haven't found another DIP lender;

 7  that, despite the creditors' committee going out and trying to

 8  look for one, Mark Shapiro going out and trying -- his team

 9  going out to look for one -- we didn't find someone else.  So

10  we would have gotten to our point in the cash where we would

11  have had to shut down if the board had made the other decision.

12    And while I understand why the equity holders and

13  other parties would have liked to see us not have to agree to

14  resolve the outstanding disputes we had with Delta at that

15  point -- and I wanted to raise a point on that -- people have

16  complained about our release.  The settlement and release

17  agreement, as you know, Your Honor, is filed under seal, but I

18  know you have an unredacted copy so you can obviously see it

19  yourself.  It just releases the causes of action that were

20  settled, there very specific ones; that's it.  It's not a broad

21  release; it doesn't release anything else.

22    In the DIP, which the order is clear about, we have a

23  release for Delta as the DIP lender, as every DIP lender gets

24  in its capacity as DIP lender, but not in its capacity as pre-

25  petition lender or with respect to its pre-petition issues.

1  And there is a provision, as Mr. Miller made reference to in

2  his statement, that we have a challenge period that has been

3  lengthened by another thirty days for the committee and is

4  seventy-five days for other people, to allow them to

5  investigate, do what they need to do --

6          THE COURT:  Pause right there.  Do the other people

7  have to make a Housecraft, Commodore or STN showing before they

8  can be going after --

9          MS. BECKERMAN:  They would have to come in for

10  standing, yes, the other parties.  We gave the committee --

11          THE COURT:  The creditors' committee gets automatic

12  standing, but the others have to make an STN or --

13          MS. BECKERMAN:  That's correct.

14          THE COURT:  -- Commodore showing?

15          MS. BECKERMAN:  That's correct.

16          THE COURT:  Okay.

17          MS. BECKERMAN:  That's correct.  And I'm sure Mr.

18  Miller would tell you he's going to investigate because I've

19  been in other cases with Mr. Miller where he was the creditors'

20  committee and he does what he's supposed to do, his team, so

21  I'm sure they will do their investigation.  And if they find

22  something, I'm sure we will be hearing about it.  So I think

23  that those are preserved.

24          We're not releasing Delta in any other capacity,

25  though.  The provisions of the DIP order were specifically

1  crafted, frankly, in the way I drafted them myself to be clear

2  that the stipulations that we, the debtor, are bound by on day

3  one all relate to the pre-petition promissory note and the

4  collateral and the liens related to that in their capacity as

5  lender.  And it relates to, obviously, the DIP process that

6  we're agreeing to give them a release on, and that's what it

7  is.  And even those stipulations are not binding on other

8  people until after the challenge period.  I don't think I would

9  describe this as a broad release of Delta.  We're not releasing

10 them for everything we could ever have a claim for on day one

11 under any of our other agreements.  It's just -- that's simply

12 not true.

13        So people -- again, we have provided for appropriate

14 safeguards for other parties, who have a chance to come in and

15 look at things to challenge if they think there's something

16 that happened that was untoward or problematic.  So I think

17 that is an appropriate balancing of those safeguards under the

18 circumstances.

19        Yes, I agree with Mr. Miller that this is an unusual

20 DIP.  I think I said it when I started.  It's not that typical

21 to have another airline providing a DIP to a other airline.  In

22 airline bankruptcies, DIPs seem to be a little unusual with the

23 credit card companies doing them in other circumstances, like

24 Delta and United.  But you under -- from the reasons that we've

25 explained -- I explained to you before and other people have

1  commented on, there is not an ability to get a traditional DIP

2  in this circumstance; a traditional DIP lender wasn't

3  interested for all the reasons.

4  So we are obviously in a situation where the party

5  that cared the most about Pinnacle's survival was Delta.  And I

6  don't think that they used their position to extract untoward

7  provisions, either in the contract or unfair negotiations out

8  of this process or that these negotiations should not be deemed

9  to be arm's length and appropriate.  And therefore, Your Honor,

10  I would ask you to approve the DIP and the assumption of the

11  contracts and the allowance of the claim as we're seeking in

12  our motion today.

13  THE COURT:  All right.  Now, Ms. Beckerman, Mr. Jonas

14  made a point in his second round of remarks that I had failed

15  to focus on the fact that there's a carve-out from my case

16  management order on evidentiary hearings where certain types of

17  hearings identified by number in the Local Rule are

18  incorporated by reference, and he indicated he wants to cross-

19  examine your witnesses.

20  I'm wondering if he's right on what the local rule in

21  the case management order says.  And my next question, then, is

22  is he, in fact, wrong and do you have witnesses who can answer

23  his questions?

24  MS. BECKERMAN:  Okay.  Your Honor, we think he's

25  right.  In fairness, he represented correctly what the

 1    discussions have been between ourselves and the creditors'

 2    committee counsel, et cetera.  We all read the rule, hopefully

 3    correctly, that that's an exception; the DIP hearing is

 4    generally a position where a first hearing can be evidentiary,

 5    and our assumption was it would be.  We have all three of our

 6    declarants in court.  We would obviously be happy to allow them

 7    to be cross-examined with, obviously, having the opportunity to

 8    redirect.  But we would be happy to offer them up --

 9             THE COURT:  All right.  Here's what I want --

10             MS. BECKERMAN:  -- if Your Honor would like to do

11    that.

12             THE COURT:  Forgive me.  Here's what I want you to do,

13    then.  It's now five of 1 anyway.  I want you to -- we're going

14    to take a lunch break.  And I customarily take or give counsel,

15    both, an hour and a quarter.  I think we should probably do it

16    in an hour and a half because I'm going to have a second task

17    for you over the lunch hour.  And find out from Mr. Jonas who

18    he wants to cross and put up those witnesses at the end of the

19    lunch break.  Then I will take no further oral argument on this

20    after the lunch break, except if anybody thinks any very, very

21    brief argument based on the cross is appropriate by way of

22    summation.  But I think I understand the issues here now.

23             Secondly, your second assignment, if I can use that

24    expression, over the lunch hour -- is Ms. Ellerman here?  Yeah.

25             Welcome, Ms. Ellerman.  I actually like seeing out-of-

1 | town lawyers in the court; they're a refreshing change, with no

2 | disrespect from -- to --

3 |     MS. ELLERMAN:  The usual suspects?

4 |     THE COURT:  -- to the usual suspects.  And I don't

5 | blame you for not knowing about my case management order; there

6 | were a bunch of things that weren't complied with, but the most

7 | important one that wasn't complied with was the duty to confer

8 | for a consensual resolution on relief-from-stay motions.  I'd

9 | like you to talk to Ms. Beckerman and her designee -- or her

10 | designee over the course of the lunch hour over the first

11 | question that I would be asking you guys on the oral argument,

12 | is a possible way, by consensually making your deal to respond

13 | to the first question I'd be asking, which is, given the Second

14 | Circuit's Yale Express case, given the potential prejudice to

15 | the debtor of terminating this contract before they have a

16 | pinch hitter, but on the other hand, the fact that I wouldn't

17 | expect your client to provide its services for free without

18 | being compensated for its out-of-pocket costs, whether there

19 | are advantages or disadvantages to what my ruling might

20 | ultimately be, which is you can't pull the plug until they can

21 | get a substitute within the ninety days that they're talking

22 | about, but that either Delta or the debtor or some combination

23 | of them has to make sure that you're made whole on your out-of-

24 | pocket costs.  And I want you guys to discuss that over the

25 | lunch hour.  I don't expect a substantive response right now.

1    MS. ELLERMAN:  Thank you, Your Honor.  First, I would

2    like to apologize for any failure to comply with the Court's

3    order; that certainly wasn't my intention and will not happen

4    again.

5         THE COURT:  Sure.

6         MS. ELLERMAN:  Secondly, we have been having

7    discussions, and I think we have effectively reached an

8    agreement that would need to be papered.  We did not discuss

9    the Court's second point regarding the costs, and I think

10   that --

11        THE COURT:  Well, if you have a deal, I don't want --

12        MS. ELLERMAN:  Yeah, I think --

13        THE COURT:  -- to blow the deal.

14        MS. ELLERMAN:  Right.

15        MS. BECKERMAN:  Yes.  Thank you, Your Honor.

16        THE COURT:  But --

17        MS. ELLERMAN:  Yeah, the Court's comments went beyond

18   what was agreed to, but our view is that we will have an

19   administrative claim on it for our out-of-pocket costs.

20        THE COURT:  Oh, okay.  And would it help you to put

21   whatever you and she agreed on on the record now so you can

22   catch a plane and go home?  Unless you find this entertaining?

23   The remaining --

24        MS. ELLERMAN:  That would be helpful, Your Honor.  If

25   I could grab my binder very quickly --

1      THE COURT:  Sure.

2      MS. ELLERMAN:  -- then I think we can do that.

3      THE COURT:  Sure.

4      MS. ELLERMAN:  Your Honor, we've also consulted with

5  counsel for Delta as well with respect to this.  Let's see.

6      The parties -- I don't know that I can recite it

7  eloquently, Your Honor, but in sum, the parties have agreed

8  with the counterproposal that's contained in the debtors'

9  objection to the motion for relief from stay, which provides

10  that the debtors shall receive at least ninety days to ensure

11  that Standard Aero (a) completes all work in process, including

12  any engines, line replacement units and piece parts within the

13  turnaround time requirements of the maintenance agreement --

14  is, I believe, how it's defined in the motion -- winds down

15  such work in an orderly fashion, returns all tooling owned by

16  the debtors or Delta and permits the debtors and Delta return

17  four on-wing leased engines to allow for necessary maintenance

18  and other facilities, and provides for a waiver to permit the

19  debtors to begin a transition to other third parties.

20      I would, consistent with the Court's statement, also

21  include language that Standard Aero reserves all rights to file

22  any claims on a go-forward.  That's already contained in the

23  DIP order.

24      MS. BECKERMAN:  Yeah, and we will -- our DIP order

25  says that we are not waiving -- we're not releasing you from --

1    MS. ELLERMAN:  Right.

2    MS. BECKERMAN:  -- we're not being released from any

3    claims.  I don't think that's the same thing exactly.  But I

4    understand.  We don't -- I will just say Delta and ourselves

5    feel that they have to comply with the contract.  So we

6    obviously think if we pay the contract, there isn't any

7    administrative claim.  People can file anything; we can dispute

8    it if that's what we're talking about.

9    MS. ELLERMAN:  Yeah.

10    MS. BECKERMAN:  But I don't think we're agreeing that

11    they have some other claim beyond what we owe them under the

12    terms of our agreement.

13    MS. ELLERMAN:  Your Honor, that's not what we've asked

14    for.  We just want to include a reservation of rights in the

15    order, which I think is reasonable under the circumstances.

16    THE COURT:  I, with my experience, can sense when you

17    have the makings of a deal on the one hand or what -- and when

18    we have the makings of a blow-up on the other.  I think this is

19    the makings of a deal.  And what I think you guys should do is

20    paper your deal.  And I'm going to continue your motion so it

21    doesn't fall between the outfielders until you've got your

22    deal.  And I think what you've done is constructive and it's so

23    close to what a possible outcome might have been if you'd

24    litigated it anyway that it's not likely to be disapproved by

25    me if you can get it papered.

1      MS. ELLERMAN:  Thank you, Your Honor.

2      THE COURT:  Okay.  Have I given everybody who wanted

3  to weigh in on this an opportunity to speak?

4      MS. BECKERMAN:  I don't know.  I was actually looking

5  at Delta's counsel, who's the third party to this agreement, as

6  you know.  And, obviously, I think Ms. Ellerman mentioned that

7  the agreement would be terminated at the end of the ninety-

8  day --

9      MS. ELLERMAN:  Running from today's date.

10      THE COURT:  Well, I thought your arbitrator already

11  ruled that it was going to be terminated vis-a-vis Delta.

12      MS. BECKERMAN:  Well, I guess people can argue about

13  that.  But I'm not Delta's lawyer, so I'm not arguing about

14  that.  But what we're agreeing is that it will be terminated,

15  period, in ninety days.

16      THE COURT:  In any event, as far as Pinnacle's

17  concerned, it is.

18      MS. BECKERMAN:  Yes.  In ninety days.

19      THE COURT:  All right.  Does Delta have a desire to be

20  heard?

21      MR. SELIGMAN:  Your Honor, if I could just confer with

22  Ms. Beckerman.

23      THE COURT:  Yeah, sure.  Take a second, Mr. Seligman.

24      All right.  I'm not going to make him come, no.

25      MR. SELIGMAN:  Your Honor, the understanding was

```
1  correct and it will be deemed terminated as between all parties
2  on the ninetieth day.
3        THE COURT:  Okay.  Then go ahead, folks.  Paper it.
4  You can put in appropriate reservations of rights, but the more
5  that you can agree to so you don't have to reserve further
6  rights, the better I'm going to like it.
7        MS. ELLERMAN:  Thank you, Your Honor.
8        THE COURT:  Okay.
9        MS. BECKERMAN:  Thank you.
10     (Discussion re previous case on docket)
11        THE COURT:  Okay.  Ms. Ellerman, did you have
12  something?
13        MS. ELLERMAN:  I just wanted a clarification, Your
14  Honor.  Your Honor is asking us to go ahead and write up the
15  agreed order during the recess and submit it to the Court?
16        THE COURT:  Oh, I don't think you need to do it in the
17  recess.
18        MS. ELLERMAN:  Okay.  Okay.
19        THE COURT:  In fact, I thought --
20        MS. ELLERMAN:  Just to submit it to the Court.
21        THE COURT:  -- that if you had a chance to -- I don't
22  know if you have a plane that you want to catch back to
23  Cincinnati but if you do, I'm not standing in the way of that.
24        MS. ELLERMAN:  Thank you, Your Honor.  I just wanted
25  the clarification.
```

1    THE COURT:  I would like you to deal with it at your

2   earliest reasonable convenience.

3          MS. ELLERMAN:  Of course.  Thank you.

4          THE COURT:  Sure.

5          MS. BECKERMAN:  We will.

6          THE COURT:  Okay.  All right.  We're going to break

7   for an hour and a half.  And I'll -- well, actually, given

8   this, can we now do it in an hour and a quarter?  Can you guys

9   eat your lunch and be ready to proceed in an hour and a

10  quarter?

11         MS. BECKERMAN:  Yeah.

12         THE COURT:  All right.  Let's do that.  See you guys

13  at 2:20.  We're in recess.

14         MS. BECKERMAN:  Thank you, Your Honor.

15         MR. QURESHI:  Thank you, Your Honor.

16     (Recess from 1:06 p.m. until 2:26 p.m.)

17         THE COURT:  Mr. Qureshi?

18         MR. QURESHI:  Good afternoon, Your Honor.  For the

19  record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, on behalf

20  of Pinnacle Airlines.

21         If I could, very briefly, Your Honor, just let the

22  Court know what we discussed over the lunch break and how we

23  would propose to proceed.

24         So the debtor has two witnesses in support of the DIP.

25  And the declarations for those witnesses, as per Your Honor's

1      case management order, have been submitted. We have also made

2      a reference to the first-day declaration of Mr. Spanjers. That

3      is already in the record and so we did not intend to call him

4      as a witness as such. We have agreed with the objectors on a

5      joint book of exhibits and handed a set up to Your Honor and to

6      Your Honor's clerk -- or they should be up there somewhere.

7      So, Your Honor, what we discussed at the break was

8      that we would make all of our witnesses available for cross-

9      examination, of course, but that Mr. Jonas would attempt first,

10      through the cross-examination of Mr. Menke, to get done

11      everything he needs to get done. What we would propose is a

12      short break after his testimony is concluded so that they can

13      consider and, with any luck, be done with any further

14      witnesses. But, of course, that would be their call once we

15      get through Mr. Menke.

16      THE COURT: Okay. Mr. Jonas, did he get it right?

17      MR. JONAS: He did, Your Honor.

18      THE COURT: Okay.

19      MR. QURESHI: And so, Your Honor, I may as well, I

20      think, just move the admission of those exhibits because I

21      don't think there's any objection. It's exhibits 1 through 22,

22      which are the two volumes that we handed up. And just to

23      direct Your Honor, Mr. Menke's original declaration is at

24      Exhibit 15. And he also submitted a supplemental declaration

25      at Exhibit 16.

**PINNACLE AIRLINES CORP, ET AL.**                    111

1    THE COURT:  Okay.  Mr. Jonas, first, any objection to

2    the introduction of the exhibits?

3          MR. JONAS:  No, Your Honor.  We've worked fully

4    cooperatively and I think this should go very smoothly.  We've

5    agreed on all the exhibits.  We have copies of the transcripts,

6    if that's necessary, in terms of the cross.  And I think we're

7    ready to go.

8          THE COURT:  Okay.  Any evidentiary objections to the

9    matter in the affidavits?

10         MR. JONAS:  No, Your Honor.

11         THE COURT:  Okay.

12      (Various documents were hereby received into evidence as

13   Joint Exhibits 1 through 22, as of this date.)

14         MR. QURESHI:  Okay.  With that, we'll offer --

15         THE COURT:  Then you want to bring him up, Mr.

16   Qureshi?

17         MR. QURESHI:  Yeah.  Mr. Menke's the president and

18   chief executive officer of Pinnacle and we'll make him

19   available now.

20         THE COURT:  Okay.  Mr. Menke, would you mind remaining

21   standing, please, and be sworn?

22      (Witness sworn)

23         THE COURT:  Just a minute, before we begin.  It's kind

24   of noisy.  Is that a blower or is that the air outside?

25         UNIDENTIFIED SPEAKER:  It's outside.

1   THE COURT:  Okay.  Mr. Menke, have a seat, please.

2   Mr. Jonas, when you're ready.

3          MR. JONAS:  Thank you, Your Honor.

4   CROSS-EXAMINATION

5   BY MR. JONAS:

6   Q.   Good afternoon, Mr. Menke.  How are you?

7   A.   I'm fine.  Good afternoon.

8   Q.   As you know, my name is Jeff Jonas, from Brown Rudnick,

9   and I represent certain equity holders that are objecting to

10  the debtors' DIP motion, and we're here in connection with that

11  objection.  And just, for the record, we did depose you

12  yesterday, is that right?

13  A.   Yes, sir.

14  Q.   Okay.  Mr. Menke, under the capacity purchase agreements

15  or contracts that the debtor has with Delta, in February 2012,

16  the debtors submitted to Delta a bill or invoice for forty-four

17  million dollars for the retroactive pilot reset amount due

18  under those contracts, is that right?

19  A.   That's correct.  It was submitted February 27th.

20  Q.   And forty-four million dollars was what the debtors

21  believed Delta owed them under those contracts as a

22  reimbursable, retroactive adjustment to cover certain increased

23  labor costs, is that right?

24  A.   That is correct, sir.  It -- it included labor costs as

25  well as training expense.

1  Q.   And the forty-four-million-dollar amount was based on the

2  debtors' thorough analysis, correct?

3  A.   That is correct.  It was based on our analysis.

4  Q.   And Delta acknowledged that Delta was accruing at least

5  eighteen million dollars on their books for this retroactive

6  pilot reset amount, is that right?

7  A.   That is correct.  There was a management member of Delta

8  that stated that they were accruing eighteen million dollars.

9  It was also stated that they need to review the analysis, but

10  there was an accrual that was taking place.

11  Q.   Okay.  But you billed them for forty-four and Delta told

12  you that they agreed at least that eighteen million dollars was

13  due, is that right?

14  A.   They did not agree that it was eighteen million dollars;

15  they just said they were accruing, which went back to,

16  actually, their interpretation from previous management and

17  what they thought would take place, so they were accruing an

18  amount.

19  Q.   Okay.  In connection with the capacity pricing

20  agreements -- purchase agreements -- excuse me -- the

21  amendments, you're aware of amendments which are dated April

22  1st, 2012?

23  A.   Yes, sir.

24  Q.   Okay.  And the debtors filed bankruptcy on April 1st,

25  2012, is that right?

1  A.   Yes, sir.

2  Q.   Well, in terms of timing, what time did the debtors file

3  bankruptcy?

4  A.   The filing of the bankruptcy was the evening of the -- of

5  April 1st.

6  Q.   Okay.  And what time did the debtors sign the amendments

7  to the two contracts with Delta?

8  A.   I -- I can't remember exactly the time.

9  Q.   Okay.  But it was sometime that day?

10  A.   It was -- it -- I -- I don't know if it was exactly that

11  day, but I -- it was about that period, correct.

12  Q.   Okay.  And why did the debtors --

13       MR. JONAS:  Strike that.

14  Q.   Is it fair to say that these amendments are fairly

15  material?

16  A.   Yes, sir.

17  Q.   Okay.  And those contracts, is it fair to say those are

18  fairly material to the debtors' business?

19  A.   Yes, they are.

20  Q.   In fact, Delta, going forward, will be the debtors' only

21  customer?

22  A.   That is correct.

23  Q.   Okay.  And those contracts will be the key contracts with

24  the debtors' only customer, is that right?

25  A.   Yes, sir.

 1  Q.   Sir, why is it that these amendments were done minutes or
 2  hours before the debtors filed bankruptcy?
 3  A.   As we have outlined, there were certain requirements that
 4  Delta had, relative to providing a DIP.  One was the
 5  renegotiation of the contracts.  The others were other things
 6  that we have discussed in the past, but it was a contingent,
 7  relative to getting a DIP loan.
 8  Q.   Okay.  Did you appreciate that the fact of the contracts
 9  being amended before entering bankruptcy would, at least in
10  some circumstances, remove those contracts from review by the
11  bankruptcy court -- the amendments from review by the
12  bankruptcy court?
13  A.   Yes, sir, we did understand that.  But we also understood
14  where Delta stated relative to providing the organization a DIP
15  loan, meaning that if we did not make certain agreements or
16  negotiate certain agreements, that the ability of actually
17  having a DIP loan on the other side may not exist or may be
18  worse.
19  Q.   Okay.  So Delta told you, if you don't do these amendments
20  and you don't do them before you go into bankruptcy, we're not
21  going to make the DIP loan?
22  A.   They were a contingency of actually getting a DIP loan,
23  that is correct.
24  Q.   Okay.  Let me try the question my way:  Delta told the
25  debtors that if the debtors didn't execute the amendments prior

**PINNACLE AIRLINES CORP, ET AL.**                                          116

1   to going into bankruptcy, it wouldn't make the DIP loan; is

2   that -- yes or no?

3   A.    That's correct.

4   Q.    In connection with those amendments and the setoff and

5   release agreement that the debtors --

6         MR. JONAS:  Strike that.

7   Q.    The debtors also entered into a setoff and release

8   agreement with Delta shortly before it entered bankruptcy,

9   right?

10  A.    I'm assuming you're preferring (sic) to the discrepancies,

11  correct?

12  Q.    I'm actually referring to a document which we could show

13  you, which is titled "Setoff and Mutual Release Agreement",

14  which the debtors signed -- the debtors and Delta signed.

15  A.    That is correct, relative to discrepancies.

16  Q.    Okay.  And that's dated April 1st, 2012 as well?

17  A.    Yes, sir.

18  Q.    So that was signed up, if you will, moments before the

19  debtors entered bankruptcy, right?

20  A.    That is correct.

21  Q.    Okay.  That's another agreement that Delta insisted that

22  the debtors sign before they entered bankruptcy or else they

23  wouldn't get the DIP, is that right?

24  A.    That is correct.

25  Q.    Okay.  And in connection with the capacity purchase

1  agreement amendments and the setoff and release agreement that

2  the debtors entered into with Delta moments before filing

3  bankruptcy, the debtors gave up the forty-four-million-dollar

4  claim for zero dollars in terms of payment by Delta, is that

5  right?

6  A.   Well, as you will remember, it was actually a larger -- it

7  was a grand pot that we were looking at, relative to different

8  discrepancies and how they actually wash out at the end of the

9  day.

10  Q.   Just bear with me one second.

11  A.   Yes, sir.

12       (Pause)

13  Q.   One of the reasons --

14       MR. JONAS:   Strike that.

15  Q.   I just want to return to your last answer because I want

16  to know if, in fact, any specific payment was made by Delta to

17  the debtors on account of the debtors giving up that forty-

18  four-million-dollar retroactive claim.

19  A.   There was not a specific payment to that; there was a

20  global settlement relative to a number of disputes, and that

21  was one that was included.

22  Q.   Okay.  And one of the reasons this happened was because

23  Delta, the debtors' lessor of planes and soon-to-be sole

24  customer, held all the cards and the debtors were in a -- to

25  use your words -- "disadvantaged leverage position", is that

**PINNACLE AIRLINES CORP, ET AL.**                                    118

1  right?

2  A.   They did have negotiating power if you look at the -- the

3  circumstances.

4  Q.   Okay.  And I just want to make sure -- I want to use your

5  words from the deposition.  I'd be happy to show it to you, but

6  I think you used the word, dis -- referring to the debtors, you

7  said "disadvantaged leverage position".  Does that sound like

8  something you would have said?

9  A.   That's correct.

10 Q.   Okay.  Did the debt -- now, the forty-four-million-dollar

11 retroactive payment that you billed Delta for, that Delta

12 said -- or said they were accruing an eighteen million dollars,

13 did the debtors ever say, okay, Delta, give us the eighteen

14 million bucks?

15 A.   Can you repeat the question, please?

16 Q.   Sure.  Delta said they're accruing what you billed them

17 forty-four million dollars for at eighteen million dollars,

18 correct?

19 A.   That's correct.

20 Q.   Okay.  Did the debtors ever say --

21      MR. JONAS:  Strike that.

22 Q.   The debtors, leading up to the bankruptcy, had liquidity

23 issues, right?

24 A.   That is correct.

25 Q.   Okay.  Did the debtors ever say to Delta, well, we billed

 1  you forty-four; we know you're accruing eighteen; so just pay

 2  us the eighteen million dollars?

 3  A.    There was a discussion about the eighteen, relative to an

 4  out-of-court restructure plan that we had actually put in front

 5  of Delta when we were working with a number of other parties,

 6  and that was a request that we had actually asked of them.

 7  Q.    I'm sorry; I couldn't hear the last piece.

 8  A.    That -- that was a request that we had of them, was to

 9  provide that with the out-of-bankruptcy restructure we were

10  working on.

11  Q.    Right.  And they said no.

12  A.    They said no to just assisting us on the out-of-court

13  restructure.

14  Q.    Okay.  You asked them for the eighteen and they said, no,

15  we're not going to pay you the eighteen, right?

16  A.    It was a lot more than just the eighteen million dollars;

17  there was a number of things that we were actually seeking.

18  Q.    Right.  Did they pay you the eighteen million dollars at

19  any point in time?

20  A.    No, they did not pay us, but, again, just to remind you

21  that we submitted the bill on February 27th.  There was

22  actually, as was described earlier, a process relative to

23  negotiating in good faith, which we outline relative to being

24  forty-five to sixty days.  We understood that there was a

25  process relative to an arbitration.  During our discussions

 1  with Delta, as we were leading into bankruptcy, which actually

 2  took place on March 5th, this was when we had a discussion

 3  about the laundry list of discrepancies that were taking place.

 4  Delta made it -- Delta made it very clear during that period of

 5  time that they had a difference of opinion on our forty-four

 6  million dollars, so essentially, that's where we continued to

 7  focus on, relative to a global settlement on the -- on the

 8  discrepancies.

 9  Q.    They didn't dispute the eighteen million dollars, did

10  they?

11  A.    They -- they accrued eighteen million dollars.  They have

12  the right to analyze the information.  We provided them the

13  information on February 27th.  It's important to understand the

14  amount of information that we provided them was a year's worth

15  of data of an organization that was integrating three different

16  carriers; three certificates to two certificates; that was

17  actually going through a significant hiring phase because of

18  issues associated with -- with crews, associated with one of

19  the certificate carriers.  So essentially, we provided them the

20  data on February 27th, ten days after the February 17th look-

21  back period.

22  Q.    And now, I apologize, I'm a little confused.  When did you

23  say to them, we'll take the eighteen million dollars?

24  A.    The eighteen million dollars was never offered.  There's a

25  negotiation that needs to take place relative to the agreement.

1  Q.    Okay.  I thought you told us -- and you can correct it if
2  I've got it wrong -- I thought you told us at one point the
3  debtors were willing to take eighteen million dollars to
4  resolve the retroactive pilot reset adjustment.
5  A.    Yeah.  And that took place during, probably, the late
6  December/early January period, when we were trying to seek a
7  negotiation, an out-of-court restructure process, which is one
8  of several elements that we were asking Delta to participate in
9  as well as other parties.
10 Q.    Okay.  Now, at about the same time, that is, late February
11 2012, the debtors also had discussions with Delta about the
12 prospective rate adjustment due under the capacity purchase
13 agreements, is that right?
14 A.    They were preliminary discussions relative to what needed
15 take place.  But again, they just received the information on
16 February 27th, relative to what potentially would be negotiated
17 on a go-forward basis.  As I mentioned in the deposition, the
18 vast majority of the focus was actually on the reimbursement
19 because that was the information that we had -- had provided
20 them relative to the year look-back.
21 Q.    Okay.  And the debtors believe that the prospective rate
22 adjustment was in the range of fifteen to twenty million
23 dollars per year, is that right?
24 A.    What I stated is that that was our preliminary look, is at
25 fifteen to twenty million dollars, but our focus was on the

1  reimbursement of the forty-four million dollars, and that's

2  where the vast majority of our work was done.  There was still

3  significant amount of negotiations as well as looking at data

4  on a go-forward basis, potentially to what the funds would be

5  on a go-forward.

6  Q.    Okay.  So let me just see if I got this right.  In late

7  February, the debtors believed -- based on their pretty

8  thorough analysis, the debtors believed that Delta owed them

9  forty-four million dollars on account of the retroactive

10  reimbursement, right?

11  A.    That is correct.

12  Q.    Okay.  And in late February 2012, I guess based on a

13  preliminary analysis, the debtors believed that the prospective

14  adjustment -- another component under the contract -- the

15  debtors believed that the prospective adjustment would be

16  fifteen to twenty million dollars a year, is that right?

17  A.    That's potentially what I stated, relative to further

18  analysis that needed to be done.

19  Q.    Okay.  I think you just said that's potentially what I

20  stated, so I want to make sure I understand.  Let me try to

21  make the question simpler.  In late February 2012, the debtors

22  had preliminarily concluded that, under the contracts with

23  Delta, under the section that provided for a prospective

24  adjustment based on labor costs, the debtors had concluded that

25  the adjustment should be fifteen to twenty million dollars per

1 year, is that right?

2 A.   It was an estimation depending on further analysis.

3 Q.   Okay.   In connection with the capacity purchase agreement

4 amendments and the setoff and release agreement -- which the

5 debtors entered into on the day that they filed bankruptcy --

6 the debtors also gave up the fifteen to twenty-million-dollar

7 prospective -- claim for prospective adjustment -- the fifteen

8 to twenty million dollars per year for a zero-dollar payment by

9 Delta, correct?

10 A.   Well, I think you misunderstand how the contract actually

11 works.   So it did not give up the amount because there actually

12 is a negotiation relative to -- the prospective actually gets

13 built into a per-block-hour rate.

14 Q.   Just one second.

15     (Pause)

16 Q.   So I just want to come back because I -- and I'm not

17 trying to trick you -- I asked at the deposition and my

18 question was:  "So my question is I take it, then, it's fair to

19 say that specifically with respect to the prospective

20 adjustment, the debtor" -- says get -- "getting a specific

21 amount paid to it."  I think the question was the debtor wasn't

22 get anything paid to it.

23     And your answer was:  "That's correct."

24     And I'm just trying to confirm whether, today, that's

25 correct or not.

 1          MR. QURESHI:  Sorry to interrupt.  I just need the

 2   page number.

 3          MR. JONAS:  That's fine.  I'm sorry.  It's page 51.

 4          And, Your Honor, I'm not sure you have a copy.

 5          THE COURT:  I don't think I do.

 6          MR. JONAS:  Happy to hand that up.  May I?

 7          THE COURT:  Yes.

 8          MR. JONAS:  Thank you.

 9          THE COURT:  Did you say 51, Mr. Jonas?

10          MR. JONAS:  Page 51, yes, Your Honor.  It's a

11   compressed version --

12          THE COURT:  Sure.

13          MR. JONAS:  -- just to make things easier.

14   Q.   And rather than do it the hard way, I'll try and do it the

15   easy way, Mr. Menke.  If you just look at page 51, maybe this

16   will refresh both of us.  If you just read from line 3

17   through -- I'm sorry; line 6 through 16.  And then I'll just

18   pose a new question to you and we'll see if we can straighten

19   this out.  Hopefully, I can just move on.

20   A.   Okay.  I got it.

21   Q.   Okay.  My question is, in connection with the capacity

22   purchase agreement amendments that were executed on the day the

23   debtors filed bankruptcy, were the debtors compensated for the

24   claims they had for the prospective rate adjustment?

25   A.   There was no compensation.  The contract clearly states

**PINNACLE AIRLINES CORP, ET AL.**                    125

 1  that there will be a negotiation focused on what those rates

 2  would be on a go-forward basis.

 3  Q.   Thank you.  Let me ask you, sir, had Delta paid the

 4  debtors the forty-four-million-dollar retroactive reimbursement

 5  and the fifteen to twenty-million-dollar per year -- but let's

 6  just use it for the first year -- prospective adjustment, would

 7  the -- might the debtors have been able to avoid filing

 8  bankruptcy on April 1st, 2012?

 9  A.   Well, for operating outside of the boundary of what the

10  contract states relative to negotiating such a lump sum and

11  they would have paid it at face value, it would have kept the

12  organization out of bankruptcy.  But, again, I refer back to

13  the contract that we had with Delta that stated that there was

14  a time frame relative to negotiating a significant amount of

15  complicated material and the ability to actually go through a

16  process that both -- both parties had agreed to.

17  Q.   Okay.  Just so we don't confuse things, I think it can be

18  answered yes and no.  If Delta paid the forty-four-million-

19  dollar bill that the debtors had submitted for the retroactive

20  rate adjustment and the fifteen to twenty million dollars,

21  which the debtors had estimated was due on account of the

22  prospective rate adjustment, might the debtors have avoided

23  filing bankruptcy on April 1st, 2012?

24  A.   Yes.

25  Q.   Okay.  Want to move on to Exhibit 15.

1   MR. JONAS:  I think you have a binder, Your Honor.

2   I'm going to -- if I may approach, I'll hand the --

3   Is the binder there?

4   THE COURT:  Yes, I do.

5   MR. JONAS:  Thank you.

6   THE COURT:  If I heard you right, you said 50?

7   MR. JONAS:  15, Your Honor.

8   THE COURT:  Okay.

9   MR. JONAS:  In volume -- it should be in volume 2, not

10  that that matters.

11  Q.   Mr. Menke, this is Exhibit 15.  It's your declaration.

12  It's dated April 1st.  And I just want to -- I don't want to

13  spend a lot of time on this; we'll just do a few questions.

14  Take a look at paragraph 15.  And do you see the sentence that

15  says "The debtors' month-end cash balance, absent a DIP loan,

16  and the assumption that Delta would be authorized to exercise

17  their right to setoff would be less than five million dollars

18  by the end of June 2012."  Do you see that?

19  A.   Yes, sir.

20  Q.   And if I look -- I take it that you were able to make that

21  statement based on the budget, which is attached as Exhibit A

22  at the end of your declaration, is that right?

23  A.   That is correct --

24  Q.   Okay.

25  A.   -- if you're looking at the cash flow, yes, sir.

**PINNACLE AIRLINES CORP, ET AL.** 127

1  Q.  And what I'd like you to do to simplify this, can you just

2  walk the Court through how the budget supports your statement

3  that by June, the debtors would be effectively out of cash?

4  A.  Yes, I will do that.  If you look at June 29th -- it's the

5  last page, Your Honor.

6          THE COURT:  The spreadsheet?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Give me a second.

9          The column that's headed June 29th?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  I'm with you.

12          THE WITNESS:  Okay.  If you look at the ending cash

13  balance at 40.2 million dollars -- the lower, right-hand

14  corner.

15          THE COURT:  40.222?

16          THE WITNESS:  That's -- that's correct, Your Honor.

17          THE COURT:  Yes.

18          THE WITNESS:  If you subtract thirty million dollars,

19  which is the DIP loan -- if you look at the May 4th column,

20  you'll see proceeds of a DIP loan of thirty million dollars.

21          THE COURT:  That being 300 because it's in thousands?

22          THE WITNESS:  Yes, that's correct.  If you look at the

23  DIP facility, 74.285 on the May 4th column under financing

24  activities --

25          THE COURT:  Oh, I'm sorry; I was looking in the wrong

1 place.  Now I see it.

2          THE WITNESS:  Okay.  So that's the thirty-million DIP

3 loan, Your Honor, that we've been talking about.

4          THE COURT:  Um-hum.

5          THE WITNESS:  So if we did not get the DIP loan, you

6 would subtract that thirty million from the forty million that

7 I outlined on the lower, right-hand corner.  So that's the ten

8 million.  And then, as I had stated in my declaration, that if

9 Delta would exercise their setoff rights, the organization

10 would be at, essentially, zero dollars.

11 BY MR. JONAS:

12 Q.    So in order to reach the conclusion that in June you'd be

13 out of cash, you made an assumption that Delta would be able to

14 exercise setoff rights, is that right?

15 A.    That is correct.

16 Q.    Okay.  Are you aware that in order to exercise setoff

17 rights, Delta would have to come before the bankruptcy court?

18 A.    That is correct.

19 Q.    Okay.  But nevertheless, you made the assumption that they

20 would be able to do that?

21 A.    I did, but I've also stated in the declaration that the

22 organization can never run under twenty million dollars in cash

23 at any one point.

24 Q.    Okay.  I appreciate that, and we'll talk about the twenty

25 million.  Right now, I just want to focus on the fact that your

1   testimony in your declaration was you'd be out of cash in June,

2   based on Delta exercising ten million dollars of setoff rights,

3   correct?

4   A.    And -- and -- and the important thing is, is that you

5   actually have pretty -- pretty big fluctuations intra-month,

6   and the large -- the higher cash position is actually at the

7   end of the -- at the end of the month raced on -- based on the

8   payments that were actually outlined by counsel earlier.

9   Q.    Okay.  But I just want to keep it simple.

10  A.    Okay.

11  Q.    Your budget shows at the end of the -- excuse me -- the

12  end of June, you're out of cash and the way you get there is

13  you have forty million, you take away the DIP -- because you're

14  assuming you're not going to get the DIP, correct?

15  A.    That's correct.

16  Q.    And you got ten million dollars and then you're assuming

17  that the ten million dollars goes away because Delta exercises

18  ten million dollars of setoff rights, correct?

19  A.    That's correct.

20  Q.    Okay.  Now tell me how you arrived at Delta being able

21  to -- how you arrive at the math for the ten-million-dollar

22  exercise by Delta of a setoff right?

23  A.    Okay.  There was -- prior to bankruptcy filing, Delta owed

24  us -- because we get paid in arrears -- we were owed

25  approximately twenty million dollars.  That was based on fees

1  owed on the air service agreement, which we call the ASA, as

2  well as some ground handling.  On the other side of that, we

3  actually owe Delta for services that they provided us relative

4  the operation that was nineteen million dollars, so that

5  difference is the ten million dollars that we had forecast that

6  they would have the capability of setting off.

7  Q.   Okay.  So twenty-nine minus nineteen, ten that they get to

8  exercise setoff, right?

9  A.   That is correct.

10  Q.   Sir, I'm a little confused because where is the forty-four

11  million dollars -- let's just stick with the forty-four million

12  dollars -- that you billed Delta for?  Why isn't that figured

13  out when you're trying to figure out how much setoff rights

14  they could have?

15  A.   It's not factored in there because it wasn't negotiated at

16  that point in time.

17  Q.   Sir, you billed them; you sent an invoice to Delta and you

18  said, you owe us forty-four million dollars, right?

19  A.   That's correct.

20  Q.   So when you did your analysis to figure out what setoff

21  rights, you were comparing how much we owe them and how much

22  they owe us, right?

23  A.   That is correct.

24  Q.   But you didn't include the forty-four million dollars that

25  you had sent them a bill for?

1  A.  Well, first, we wouldn't have made it to that point if we

2  did not have a DIP loan.

3  Q.  Sir, this assumes that you don't have a DIP loan.  Isn't

4  that the whole point of the budget?

5  A.  This assumes we have a DIP loan.

6  Q.  No, you did an analysis and your statement in paragraph 15

7  is that the debtors' month-end cash balance, absent --

8  absent a DIP loan and the assumption that Delta would be

9  authorized to exercise their right to setoff, would be less

10  than five million dollars by the end of June, correct?

11  A.  That's correct.

12  Q.  And you made that statement and you prepared the

13  declaration and you did the budget in order to offer up support

14  to the Court on why the Court should approve the Delta DIP,

15  right?

16  A.  I disagree.

17  Q.  You don't think your declaration is in support of the

18  Court's approval of the DIP?

19  A.  Well, I -- I agree with that, but it's based on the

20  budget, relative to the cash position without a DIP, what the

21  DIP does and what Delta could do relative to setoff rights if

22  they did get approval.

23  Q.  Let me try it this way.  That declaration and that DIP,

24  what that says to the judge is, Judge, if we don't get this

25  DIP, we're out of cash in June.  Isn't that what that says?

1   A.   That is correct.

2   Q.   Okay.  And to get there, to get to that conclusion, you

3   looked at how much you owed Delta and how much Delta owed you

4   so you could see how much Delta would set off to effectively

5   hit or wipe out your cash, right?  That's what happened?

6   A.   If you're in -- referencing to the twenty-nine and the

7   nineteen --

8   Q.   Yes.

9   A.   -- gets a ten, that's correct.

10  Q.   And, sir, I apologize and if it's the best we can do

11  today, I understand and I'm not going to belabor it, but I

12  still don't understand where the forty-four million dollars

13  went.  You billed them and you did this analysis of offsets

14  back and forth under the contract, and you didn't include the

15  forty-four million dollars.  Where did it go?

16  A.   It was not negotiated because there was a negotiating

17  phase that we needed to talk about.

18  Q.   Okay.  Let's try the prospective rate adjustment, which

19  the debtors estimated at fifteen to twenty million dollars due

20  to the debtors under the contract, right?

21  A.   Estimated.

22  Q.   Estimated, yeah.  You didn't bill them that amount, did

23  you?

24  A.   It was under negotiation.  Again --

25  Q.   Got it.

**PINNACLE AIRLINES CORP, ET AL.** 133

1  A.   -- if you read the terms of the contract, at February

2  17th, we were required to provide information.  We provided it

3  on February 27th.  There's a negotiating period that needs to

4  take place.  So there was nothing that was billed to Delta.

5  Q.   Sir, where is the prospective rate adjustment when you did

6  the analysis on what Delta's setoff rights are?

7  A.   It was negotiated -- there was nothing in there relative

8  to the fifteen to twenty million.

9  Q.   Right.  Okay.  Let's talk about these contracts which got

10 amended on the date you filed bankruptcy, correct?

11 A.   Correct.

12 Q.   Okay.  You wanted the judge to assume the debtors'

13 approval of those contracts today, right?

14 A.   That is correct.

15 Q.   Okay.  And I think at your deposition you told me that,

16 over the debtors' adamant objection, Delta insisted that the

17 contracts be amended immediately prior to the bankruptcy

18 filing, right?

19 A.   We were trying to negotiate that those would be nego --

20 that those would be amended afterwards, but they were focused

21 that they actually had to be amended prior to the bankruptcy

22 filing.

23 Q.   As a result of those amendments, Delta is actually paying

24 the debtors less than it would under the contracts prior to the

25 amendments, right?

1  A.    Well, that's not absolutely correct.  There were actually

2  rate adjustments that were made that actually had an impact, a

3  positive impact, but didn't have the same impact that you would

4  have potentially had if you'd have gone through the rate

5  resets.

6  Q.    Let's take a look at your deposition transcript from

7  yesterday, page 137.  And I'm going to read the question at

8  line 20, and you can read the answer you gave me yesterday,

9  okay?  That's page 137.  I'm going to read the question at line

10  20.  You'll see Mr. Qureshi has an objection, which we can read

11  into the record, and then I'd like you to read your answer,

12  okay?

13  A.    Yes.

14  Q.    "And let me ask you, do you think the amended contracts

15  are beneficial to Delta viewed as opposed to prior to the

16  amendments?"

17  A.    "The economics are different and they pay less for the

18  flying."

19  Q.    "They pay less for the flying."  That was your answer,

20  right?

21  A.    May I add a comment, sir?

22  Q.    Sure.

23  A.    After reviewing this last night, based on my statement, I

24  was referring -- thinking through the rate resets that would

25  actually take place.  There was a pilot rate reset that was to

1  be negotiated and then there was a 2013 reset under those

2  contracts.

3  Q.    So the answer you gave me at the deposition, that wasn't

4  correct?

5  A.    That's correct.  That's correct, it -- it was based on --

6  if you're comparing the two contracts at the same period of

7  time without any resets, my statement yesterday was inaccurate.

8  Q.    Inaccurate?  I see.  Well, let me try it a different way.

9  The contract amendments done in the hours before the debtors

10  filed bankruptcy, they were beneficial to Delta, correct?

11  A.    There was financial benefit, that's correct.

12  Q.    Okay.  And the amendments done minutes before the

13  bankruptcy, they make these contracts -- I want to get your

14  words correct -- "economically worse for the debtors", correct?

15  A.    Compared to what a reset would actually take place.

16  Q.    Well, compared to right before you did the amendments,

17  comparing that contract with the amended contracts, they're

18  worse for the debtors, correct?

19  A.    Well, that was the statement that we just discussed, if

20  you look at the two at the exact time that it was signed.

21  Q.    Let's try it this way.  Taken together today, these are

22  money-losing contracts, correct?

23  A.    With the rates that they would provide us and the cost

24  structure that we have, meaning no concessions, they would be

25  money-losing contracts --

1    Q.    Okay.

2    A.    -- today.

3    Q.    So let me see if I can bring this piece to a close.  The

4    debtors are asking the Court to approve, as part of its DIP,

5    the assumption of two -- the most material contracts that the

6    debtors have, you're asking the Court to -- that were amended

7    in the minutes before the bankruptcy filing, that are worse for

8    the debtors, under which today the debtors are losing money,

9    you're asking the judge to approve assumption of those today,

10   is that right?

11   A.    That is correct.

12   Q.    Okay.  Do you understand what happens when a contract's

13   assumed in bankruptcy?  Has anybody discussed that with you?

14   And don't tell me about your discussions with legal counsel; do

15   you understand it?

16   A.    Yes, I do.

17   Q.    And what is your understanding of what happens when the

18   Court approves the assumption of a contract?

19   A.    We have to abide by that.

20   Q.    Do you understand that it rises to the level of an

21   administrative priority?

22   A.    Understood.

23   Q.    Okay.  And today you're losing money?

24   A.    That is correct.

25   Q.    Okay.  One of the Delta-required milestones in the DIP is

1  that you obtain certain labor concessions, is that right?

2  A.   It's cost savings.

3  Q.   Okay.  And let me ask you, a fair point, of your costs,

4  how much of your -- percentage-wise, how much of the debtors'

5  costs, roughly, are labor?

6  A.   If you exclude pass-through costs and you focus on what I

7  would say are controllable costs, they're over fifty percent.

8  Q.   So is it your expectation that to achieve the cost savings

9  that Delta is requiring that you achieve under the DIP, that at

10  least a material portion of those cost savings is going to have

11  to come from labor concessions?

12  A.   Labor concessions and other items, that is correct.

13  Q.   Okay.  Well, do you think that about half of the

14  concessions you have to get relate to labor in light of the

15  fact that labor makes up half of your expenses?

16  A.   That is correct.

17  Q.   And in fact, the contracts -- the now amended contracts

18  that you have with Delta, you can correlate from those

19  contracts how much cost savings you have to achieve in order

20  for you to be profitable under those contracts, right?

21  A.   Yes, we do, and that is based on the negotiation that we

22  had with Delta and what was outlined earlier relative to the

23  company doing a significant amount of analysis relative to our

24  contracts and what market contracts are relative to compete in

25  the regional business.

12-12343-reg Doc 975-4 Filed 05/21/12 Entered 06/04/12 12:56:38 Main Document
Pg 139 of 191

1  Q.   Well, do you have an expectation as to how much the

2  debtors have to get, by way of concessions from labor, in order

3  to meet the requirement under the DIP, the cost-saving

4  requirement?

5  A.   Relative to what we need to do, there was a number

6  relative to the global cost that we needed to get, which was

7  approximately seventy million dollars.  Of that, labor makes up

8  about forty-two million dollars.  And there is components in

9  the -- when I go back to the seventy million dollars, is that

10  as we shrink the airline there will be overhead structure,

11  meaning management professionals, that will shrink, but that is

12  not concessionary in nature.

13  Q.   Mr. Menke, what you need to do with labor in this case is

14  already baked, isn't it?  You know what you have to get out of

15  them, don't you?

16  A.   We're aware of the concession level we are seeking

17  relative to the marketplace, yes, sir.

18  Q.   So when you go to them, what's the negotiation?  You're

19  just going to say this is what we need from you, right?

20  A.   Well, it'll be a negotiation.  We've already been in

21  discussions with them.  There are -- if you look at the

22  components, and the largest component is actually the pilot

23  group, and the pilot group makes up, relative to what we are

24  looking at, relative to cost savings, is wages, benefits and

25  work rules, and a big part of it is actually work rules.

1  Q.   And if labor doesn't give you the concessions that you

2  need, you're required to seek rejection of the labor contracts,

3  right?

4  A.   That is correct.

5  Q.   And your expectation would be that through rejection of

6  the labor contracts, that's how you'll achieve the cost savings

7  that Delta is requiring under the DIP, correct?

8  A.   That is correct, if we can't get the cost savings

9  somewhere else.

10 Q.   So if you come to the point in time where you need to

11 reject these contracts, the labor contracts --

12 A.   Um-hum.

13 Q.   -- and the alternative will be you either reject the

14 contracts or things will just blow up, you'll be in default

15 under the DIP, and effectively the case could end, is that your

16 understanding?

17 A.   Correct, potentially, if they would exercise their --

18 their rights.

19 Q.   So if the point in time comes when you have to seek -- you

20 can't make a deal and you have to seek to reject, you'll come

21 before the Court and say:  Judge, we need you to reject these

22 or the case is over.  Is that right?

23 A.   Again, there would be a discussion with Delta as well,

24 relative to what rights they would actually exercise.

25 Q.   Would you say that Delta's been pretty easy to deal with

1  during this process?

2  A.    They're a very good business group.  They negotiate hard.

3  Q.    So when you --

4  A.    They work within their contracts.

5  Q.    Sorry.  But do you have an expectation that if you need a

6  further favor from them to reduce the labor cost savings that

7  they're requiring, that they'll say sure, we'll do that for

8  you?  Is that -- based on your history, based on your

9  experience of negotiating with Delta over the last weeks and

10 months, is that your expectation, that if you need that they're

11 going to give it to you?

12 A.    Well, they did give us some things we were seeking when we

13 went -- when we filed, meaning we were looking for exit

14 financing; we actually did get increases relative to the rates

15 that we were looking at getting.  There were rates that were

16 provided to us that we were focused on looking at.  That didn't

17 work.  We went back with our analysis to show what was going to

18 be a viable return for this organization, and they made

19 adjustments.  So if you provide information and you provide the

20 argument relative to why certain things are important and why

21 it actually works for the organization, yes, they have done

22 things for the organization.

23 Q.    Okay.  But just to bring up one point, when you went to

24 them in the end of February and you said, hey, guys, here's all

25 the information on the forty-four million dollars you owe us,

PINNACLE AIRLINES CORP, ET AL.                                   141

1   you never got that forty-four million, did you?

2   A.   No.

3   Q.   Okay.  And when you went to them on the prospective

4   adjustment, fifteen to twenty million dollars a year, and you

5   said, hey, that's what it is, we'll give you whatever

6   information you want, you didn't get that from them, did you?

7   A.   Again, I'm going to go back to what the contract states

8   relative to the negotiating period and their ability to look at

9   a vast amount of material and not handing over fifteen to

10  twenty million dollars.

11  Q.   Mr. Menke, Delta told the debtors that in order for Delta

12  to be part of a restructuring, the debtors were required --

13  must file bankruptcy, isn't that right?

14  A.   They said that they would be -- if the debtors filed

15  bankruptcy, they would be willing to help in the form of a DIP

16  loan.

17  Q.   Well, you didn't want to file bankruptcy, did you?

18  A.   No, I spent numerous months and hours trying to keep the

19  organization out of bankruptcy.

20  Q.   Right, and ultimately, the reason you filed was because

21  your only option was Delta, and Delta told you that you had to

22  file, isn't that right?

23  A.   No, they didn't tell me I needed to file; I was running

24  out of cash.

25  Q.   Right, and they were the only option for you, right?

1  A.    And I filed.  I would have filed either way.

2  Q.    I just want to come back, one more point on these labor

3  costs we're talking about.  You understand that any reduction

4  in labor costs in bankruptcy will get passed through to Delta

5  under the capacity purchase agreements, don't you?

6  A.    Well, the rates are already set, so there's not really a

7  pass through that takes place.  If they're paying us on a per

8  block hour basis -- that's how we get paid, Your Honor, is we

9  fly an aircraft one hour and we get compensated for that --

10  that's the negotiated rate.

11  Q.    Take a look at page 46 of your deposition transcript from

12  yesterday, and I'm going to read the question at line 3.  This

13  is page 46.  And you just read your answer, which is on line 6.

14  "So any benefit to reduction of labor costs in bankruptcy also

15  gets passed down to Delta, if you will, correct?"  And what was

16  your answer?

17  A.    I'm sorry, which line, again?

18  Q.    I just read line 3 through 5, and I'd like you to read

19  line 6, which was your answer.

20  A.    "That's correct."

21  Q.    Okay.

22  A.    Can I clarify that?

23  Q.    No, sir.  Sir, I want to talk about the Mesaba note.  When

24  I say the Mesaba note, you know I'm referring to the forty-four

25  million dollar note that -- in connection with the Mesaba

**PINNACLE AIRLINES CORP, ET AL.**                    143

1  transaction where Pinnacle bought Mesaba from Delta a number of

2  years ago.  Pinnacle issued a forty-four million dollar note to

3  Delta, correct?

4  A.   That's correct.

5  Q.   Did the debtors -- and as part of the DIP, the forty-four

6  million dollar Mesaba note is getting paid off, right?

7  A.   That is correct; it is being rolled up.

8  Q.   Rolled up, paid off, okay.  The debtors never sought any

9  relief or restructure of the forty-four million dollar Mesaba

10  note owing to Delta, did they?

11  A.   No.

12  Q.   The debtors didn't do it because -- I'll quote you from

13  your deposition:  "It wasn't in the pot of things we were

14  negotiating."  That's what you said, right?

15  A.   That's correct.

16  Q.   And it never occurred to you to try and seek a discount or

17  restructure the Mesaba note because "it was something that

18  wasn't discussed", is that right?

19  A.   That's correct.

20  Q.   And I want to show you Exhibit 12-C, which is the proposed

21  order in this case approving the DIP in this case, because

22  we've had some discussion so far today about what gets released

23  and doesn't get released.  I want to make sure I understand the

24  company's management's view on that.  So if you look at Exhibit

25  12-C, paragraph -- it's on page 29, it rolls -- I'm sorry, it

1  begins at the bottom of 28, it rolls over to 29.  It's

2  paragraph 19.  It says "Indemnity and release from liability",

3  and I'm going to read paragraph sub (b).  Do you see where I

4  am?

5  A.   Yes.

6        THE COURT:  I don't.  I must be looking at the wrong

7  document.

8        MR. JONAS:  It --

9        THE COURT:  Mine has sections on page 29.

10        MR. JONAS:  If I may approach, Your Honor?

11        THE COURT:  Yes.

12        THE WITNESS:  Can I also just confirm with you?

13        MR. JONAS:  Sure.

14        THE COURT:  Wait, I have -- I think I was looking in

15  the wrong volume.

16        MR. JONAS:  Wrong volume, sorry, Your Honor.  There's

17  two.  This is volume 2 of 2.

18        THE COURT:  Okay.  This is the order.

19        MR. JONAS:  Yeah.

20        THE COURT:  Okay.  And page 29, did you say?

21        MR. JONAS:  It's actually, Your Honor, at the bottom

22  of 28.  It rolls over to 29.

23        THE COURT:  "The DIP lenders, effective

24  immediately --"?

25        MR. JONAS:  Yes, Your Honor.

1    THE COURT:  I'm with you now.

2    Q.   And this is the proposed -- Mr. Menke, you understand this

3    is the order approving the DIP that the debtors have submitted

4    to the Court for execution today if the DIP's approved?

5    A.   Yes, sir.

6    Q.   And again, I just want to understand the company's view on

7    this, because I'm confused.  In 19(b) it says, "The DIP

8    lenders, effective immediately, and" -- so it says "The DIP

9    lenders, effective immediately", and then it says, comma, "and

10   the promissory note lender, effective only upon the expiry of

11   the challenge period, are hereby released from liability for

12   all claims and causes of action existing as of the petition

13   date arising out of or relating to the DIP facility, the

14   promissory note documents and all other agreements,

15   certificates, instruments, and any documents, statements

16   related thereto."  Do you see that?

17   A.   Yes, sir.

18   Q.   I'm trying to figure out, does the company believe that,

19   pursuant to this language, Delta is being released for any of

20   its pre-petition conduct under the contract, the capacity

21   purchase agreements?

22   A.   No, sir.

23   Q.   No, sir?  Your answer was no?

24   A.   Yes.

25   Q.   Okay.  So at least from the debtors' point of view, those

1  types of claims will be preserved for challenge by the

2  creditors' committee.

3  A.    That's correct.

4  Q.    Okay.  And you don't think that this language, that the

5  interpretation of this language is that the only thing that the

6  creditors' committee can challenge is the -- what's referred to

7  as the promissory note, which is the forty-four million dollar

8  Mesaba note.  You don't take that view?  The company doesn't

9  have that view, right?

10         MR. QURESHI:  Objection, Your Honor.  He's asking the

11  witness to give a legal interpretation of the document.  He's

12  already asked the witness what his understanding is as a

13  businessperson.  The witness provided --

14         THE COURT:  Mr. Jonas, if you want to be heard in

15  opposition to what Mr. Qureshi just said, I'm going to ask the

16  witness to leave the room.  If you don't want to be heard, I'll

17  rule on his objection.

18         MR. JONAS:  You can rule on the objection, Your Honor.

19         THE COURT:  I'm sustaining it.

20         MR. QURESHI:  Thank you, Your Honor.

21         MR. JONAS:  Can I have one moment, Your Honor?  I

22  think I can wrap up.

23         THE COURT:  You bet.

24         MR. JONAS:  Your Honor, we're finished with this

25  witness.

PINNACLE AIRLINES CORP, ET AL.                                    147

1    Thank you, Mr. Menke.

2         THE COURT:  Okay.

3         THE WITNESS:  Thank you.

4         THE COURT:  Mr. Qureshi, redirect?

5         MR. QURESHI:  Thank you, Your Honor.

6    REDIRECT EXAMINATION

7    BY MR. QURESHI:

8    Q.   Mr. Menke, let's start, if we could, please, with the

9    discussion you just had with Mr. Jonas about the forty-four

10   million dollar retroactive adjustment.  And start if you would,

11   please, by simply explaining to the Court, first of all, what

12   that adjustment is.

13   A.   Okay.  When Pinnacle Airlines had acquired Mesaba there

14   was -- within the contract agreement there was the capability

15   of when the carriers were integrating -- because we essentially

16   had three different airlines:  Pinnacle Airlines, Colgan

17   Airlines, and Mesaba Airlines.  When we were moving through the

18   taking three certificates down to two certificates, because we

19   were going to operate two airlines, Your Honor, there was

20   language within the contract that if the organization

21   renegotiated a contract with its pilots that there would be a

22   look-back period effective February 17 -- effective one year

23   after the contract was actually signed that would actually

24   compensate the airline for the added wage increases as well as

25   the integration expenses.

1  In addition to that, when that was completed, meaning that

2  year look-back, the organization would also negotiate with

3  Delta on a pilot rate reset which would reset the per block

4  hour amount, again, going back to what I mentioned earlier when

5  we fly one aircraft one hour, that that rate would also be

6  increased.  That's a high-level summary of what you're asking.

7  Q.    Okay.  Now, you were also asked about a prospective rate

8  adjustment of between fifteen and twenty million dollars.

9  Please explain to the Court what the prospective rate

10  adjustment is.

11  A.    The prospective rate is really what I had just mentioned

12  relative to the reset on a go-forward basis.  And in doing

13  that, it was taking the information that we had actually had

14  over the previous twelve months, understanding the impact of

15  what that rate reset or the pilot wage increase was, as well as

16  some other items that would then be negotiated into what a new

17  rate or an increased rate would be on a per block hour basis.

18  Q.    Okay.  Now with respect to the forty-four million dollar

19  retroactive adjustment, you testified on cross-examination that

20  in the end of February, Pinnacle provided a bill, an invoice to

21  Delta for that amount.  Is that right?

22  A.    On February 27th.

23  Q.    Okay.  Can you please explain to the Court why on that

24  particular date Pinnacle provided that bill to Delta?

25  A.    Well, the look-back period, as I mentioned, was February

1  17th.  We took some time to compile the final information

2  because February 17th was the date.  We had compiled that

3  information.  As I mentioned earlier, it was extremely detailed

4  with a lot of moving pieces because there's a lot of work rules

5  associated with pilots and understanding the line items and

6  actually what each of those costs actually is.  So we spent a

7  significant amount of time breaking that out, and then we

8  submitted it to Delta on February 27th.

9  Q.   Now, under the contract that you have with Delta, pursuant

10  to which you gave that invoice, I want you to describe for the

11  Court, please, your understanding of the procedure that would

12  have to follow, pursuant to that contract, once Pinnacle

13  delivered to Delta the invoice with its claim for the

14  retroactive adjustment.

15  A.   Yes, sir.  So the way that the contract is laid out is

16  that once we submit, they're going to go through a period of

17  analysis and then we go into a period of good faith

18  negotiations.  We looked at the good faith negotiations;

19  because of the amount of material that was being provided to

20  Delta, it would probably take forty-five to sixty days to work

21  through.  At that time we felt that if we weren't going to get

22  to an agreement -- and this is the Pinnacle side, this is not

23  stating how Delta was looking at it -- that that was the amount

24  of time we should be able to have good faith negotiations.  It

25  would then go to -- each side actually appoints an arbiter.  If

1  we cannot actually agree to that arbiter, the two arbiters

2  actually appoint another one. So the way that we looked at is

3  the capability, if it would actually go down the entire path,

4  is that the company probably wouldn't be reimbursed for that

5  until the third or fourth quarter of 2012, Your Honor.

6  Q. Okay. Now, if after good faith negotiations that are

7  required by the contract, Delta and Pinnacle were unable to

8  agree upon what the right retrospective adjustment was, please

9  give the Court your understanding of what the next step would

10  be under the contract?

11  A. That would be to assign an arbiter.

12  Q. Okay. And do you have an understanding of how the

13  arbitration would then proceed?

14  A. Well, I walked through the time frame relative to what

15  would take place, meaning you'd appoint an arbiter; if you

16  couldn't agree upon this, the two arbiters would appoint an

17  arbiter.

18  Q. Okay. Mr. Menke, in your opinion, was there -- well, let

19  me back up. At the end of February, do you recall

20  approximately what the debtors' then current projection was for

21  when it would go below what you viewed to be the minimum cash

22  requirements for the company?

23  A. April 13th.

24  Q. Okay. So at the time the invoice was submitted to Delta

25  for Pinnacle's claim of forty-four million dollars, did you,

1 sir, believe there was any prospect of Delta -- of Pinnacle,

2 I'm sorry, actually receiving from Delta the forty-four million

3 dollars that Pinnacle claimed prior to running below the

4 minimum cash balance that you believed was necessary for the

5 organization?

6 A.   My belief was that it was going to be difficult to get to

7 forty-four million dollars because the number that they were

8 looking at was much smaller, so we were going to have to take

9 the time to walk them through the significant amount of detail

10 on what was the difference relative to what their assumption

11 was and what the actual invoice or the analysis we provided on

12 February 27th.

13 Q.   Okay.  And when did you think, taking yourself back to

14 that time frame, that it was likely that Pinnacle might

15 actually get a dollar amount from Delta based on this claim,

16 whether it's the forty-four million that Pinnacle was claiming

17 or some lesser amount?

18 A.   I didn't believe it was actually going to take place until

19 the 3rd or 4th quarter of 2012.

20 Q.   Okay.  Now let's turn to the fifteen to twenty million

21 dollar prospective adjustment.

22 A.   Yes.

23 Q.   The procedure that you just described for good faith

24 negotiations, followed by an arbitration if agreement could not

25 be reached, is that your understanding the same procedure

 1  applicable to the prospect of adjustment or is it different?

 2  A.   It's the same.

 3  Q.   Okay.  So again, in the end of February of this year, what

 4  was your best guess of when, pursuant to the steps you had to

 5  follow in the contract, Pinnacle might actually receive from

 6  Delta a payment in respect of this prospective rate adjustment?

 7  A.   On that one, in fairness, the amount of analysis that we

 8  had done was more on the reimbursement.  On the prospective

 9  basis, again, I knew it was going to be difficult, but I didn't

10  put a time frame that it would be, you know, the forty-five to

11  sixty days or the third or fourth quarter.  But based on the

12  difficulty I assumed was going to take place with

13  reimbursement, I would assume that they would have taken place

14  here as well in the third or fourth quarter.

15  Q.   Okay.  So in your view, at the time, did these claims,

16  both the retrospective and the prospective rate adjustment,

17  present a solution to the debtors' liquidity crisis?

18  A.   No, sir.

19  Q.   Okay.  Now let's switch gears and talk for a minute about

20  the setoff that was discussed, and specifically on cross-

21  examination you gave a couple of numbers; you said Delta -- I'm

22  sorry, Pinnacle was owed twenty-nine million dollars, is that

23  right?

24  A.   Yes, sir.

25  Q.   Okay.  Let's start with the twenty-nine.  Please explain

1   to the Court what the twenty-nine million dollars is and for

2   what period of time that relates to.

3   A.   The twenty-nine million dollars that we were owed is

4   really two components.  It was for services that we provided

5   Delta under the air service agreement, meaning that's the

6   flying of the CRJ-200 aircraft as well as some of the ground --

7   some ground handling that we had actually provided Delta

8   Airlines.

9   Q.   Okay.  So that's dollars owed by Delta to Pinnacle?

10  A.   That's correct.  So it was earned in March and it was to

11  be paid, actually, post-petition, meaning after the filing.

12  Q.   Okay.  You also mentioned on cross-examination a nineteen

13  million dollar number going the other way.  Please describe for

14  the Court what the nineteen million dollar number consists of

15  and the period of time to which it relates.

16  A.   So it is very similar.  It was actually services that

17  Delta had provided to Pinnacle Airlines which had to do with

18  catering, ground handling services, and some other items that

19  actually was for the March time frame, but again, was to be

20  paid post-petition.

21  Q.   Now, based on your business understanding of the contracts

22  that governed the relationship between Delta and Pinnacle at

23  this time, do you have an understanding of whether Delta was

24  permitted to offset those two amounts?

25  A.   Yes, they did have the right to do that.

1 | Q. Just to close out this area of questioning, you were asked

2 | on cross-examination to assume a hypothetical. Specifically,

3 | you were asked to assume that Delta would write you a check for

4 | forty-four million dollars for the retrospective adjustment and

5 | fifteen to twenty million dollars for the prospective

6 | adjustment the moment you asked for it. Sir, was that a

7 | realistic possibility at the time?

8 | A. No.

9 | Q. Let's move on to a new area now, your declaration -- your

10 | original declaration.

11 |         MR. QURESHI: Your Honor, that is Exhibit 15.

12 | Q. And I want to --

13 |         MR. QURESHI: I apologize, Your Honor.

14 | Q. I'd like you to turn to the budget at the back of your

15 | exhibit. Let's start, Mr. Menke, with this. What is, in your

16 | opinion as the chief executive officer, the minimum level of

17 | cash that the debtors need at all times to safely operate?

18 | A. Twenty million dollars is what I had stated.

19 | Q. And can you just describe, in general terms, why twenty

20 | million dollars?

21 | A. Yeah, and this is assuming that we're current on all

22 | payables. In the airline business, specifically in these

23 | contracts, we have some very huge fluctuations in cash flows

24 | relative to payments that go back and forth between ourselves

25 | and Delta, also with payroll. And typically what we find in

1  our organization is that the low cash point actually happens in

2  the middle of the month, so the low -- so if you call it the

3  trough to the peak, cash flow within the month can actually be

4  twenty million dollars.  The twenty million dollars, in all

5  fairness, relative to the regional airline, is small when you

6  look at it as a percentage of total revenues.  But based on

7  actually having contracts that work over a period of time,

8  which is what we're focused on attaining, your cash

9  requirements, you would like to have them higher than this, but

10 very clearly twenty million dollars was the minimum we would be

11 able to be operating with, and that's what I have in my

12 declaration.

13         THE COURT:  Pause, please, Mr. Qureshi.

14         Is the twenty million dollars that you referred to,

15 Mr. Menke, at the low point of that -- at that mid-month, or is

16 it the high point, or is it a mean, or is it some other

17 possibility?

18         THE WITNESS:  Your Honor, the low point is typically

19 in the middle of the month, so the twenty million is the middle

20 of the month.  That's why I'm saying your low point, the twenty

21 million that I say I need to be at, would be in that middle of

22 the month and you would have a higher cash balance, typically,

23 at the end of the month.

24         THE COURT:  So if I'm understanding you correctly, the

25 company hits the low point in the middle of the month, and

1  that's the point at which you've got to be twenty million bucks

2  or higher?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  Okay, continue, please, Mr. Qureshi.

5          MR. QURESHI:  Thank you, Your Honor.

6  Q.   You were asked on cross-examination to go through a

7  mathematical exercise of looking at this budget and assuming no

8  DIP.  I'd like to return to that for a minute.  So if you look

9  at the June 29th column, it's the far right of the page, and

10  the bottom right-hand corner shows ending cash of forty million

11  dollars and change, is that correct?

12  A.   Yes.

13  Q.   Okay.  If you back out the DIP proceeds of thirty million

14  dollars, what's left?

15  A.   Ten million dollars.

16  Q.   Okay.  So assuming no setoff by Delta of any amount, in

17  the scenario of no DIP, based on this budget, would the debtor

18  have been left with sufficient cash by the end of June?

19  A.   No.  It's below the threshold that I had stated.

20  Q.   You were also asked, in connection with this mathematical

21  exercise, why there's no assumption in this, without a DIP

22  analysis, if you will, of forty-four million dollars coming

23  into the company for the retrospective adjustment.  Why not?

24  A.   I go back to my statement relative to one, the amount of

25  time it would take to actually negotiate it, based on my

1   knowledge of the situation.  And two, I go back to we wouldn't

2   have been here if we did not have a DIP by this time frame,

3   meaning if we didn't file for bankruptcy and worked to have a

4   DIP, we wouldn't be getting the forty-four million dollars.

5   Q.   Okay.  Let's move on to another area.  Again, on cross-

6   examination you were asked about the contract amendments that

7   have been agreed to with Delta.  And specifically, you agreed

8   with Mr. Jonas that your cost structure -- assuming your cost

9   structure is unchanged, those contracts would be money-losing

10  contracts today, is that correct?

11  A.   That is correct.

12  Q.   Okay.  Let's start with this.  How does Pinnacle's cost

13  structure today compare with its regional airline competitors?

14  A.   It is out of market.  Your Honor, it is high.  The one

15  thing that has been mentioned quite a bit in this case is the

16  JCBA, which is a joint collective bargaining agreement with the

17  airline pilots association that was signed in February of 2010.

18  That contract, not only on the weight side, but more

19  specifically to work rules, has been very onerous on the

20  organization.  Throughout the case will be discussion relative

21  to the ability for pilots to move from different aircraft and

22  the impact that it actually had on training.  So with that,

23  when you look at that contract, specifically, it's

24  significantly out of market based on our analysis.

25       The other thing that's important to note, and this goes

1  into the evaluation that I did with the organization when I

2  joined, there was a significant amount of overhead, meaning

3  management professional staff that I didn't feel was required

4  in the size of the organization, which actually has cascaded

5  throughout the organization. So again, from a cost structure

6  perspective, out of line. So there's a number of things that,

7  as I look at the organization, there is cost savings

8  opportunities, but more importantly, is not in line with the

9  cost structure of other regional airlines.

10  Q.    Now, at the time that the debtors agreed to enter into the

11  amended contract with Delta, what was management's expectation

12  with respect to the future profitability of those contracts?

13  A.    The future profitability of the contracts, based on our

14  capability of actually reaching, essentially, the cost savings

15  that we're looking for, is that it does become a profitable

16  business.

17  Q.    Okay. Now, the cost savings that you're looking for,

18  let's just start with, what are the categories of cost savings

19  that the debtors hope to achieve in the course of these Chapter

20  11 proceedings?

21  A.    So in looking at Pinnacle Airlines and looking at the cost

22  structure which we really control, and that gets -- that's the

23  important piece of it is what does the organization actually

24  control, it really revolves around, really, the size of the

25  organization from, let's call it the management structure. It

1  gets into facilities, it gets into a number of material

2  services relative to our equipment, and then it gets into

3  labor.  And there's a small -- smaller bucket.  But in

4  comparison to other airlines that I've worked for, it's a much

5  smaller piece that we actually control.

6  Q.   Okay.  Now, in terms of the labor savings, what -- well,

7  let me back up.  You were asked on cross-examination about the

8  milestones in the DIP concerning adjusted operating costs,

9  correct?

10  A.   Yes.

11  Q.   Okay.  First, just at a high level, please give the Court

12  your understanding of those milestones.

13  A.   The milestones that we have to reach throughout the

14  process is that we have to reduce our operating expenses, and

15  the threshold, the real threshold that initially was in place

16  was September that we had to have our operating costs,

17  excluding pass-throughs, down to forty-four million dollars per

18  month.

19  Q.   Now, in order to hit, if you will, the cost reductions

20  that are provided for in the DIP, where does Pinnacle need to

21  get its labor costs, relative to your regional airline

22  competitors?

23  A.   From a dollar perspective, the bucket that we're looking

24  for is approximately forty-two million dollars annually.

25  Q.   Okay.

1  A.   And that's all work groups, and it's wages, benefits and

2  work rules that are included in that, not just wages.

3  Q.   Okay.  And if those cost reductions are achieved, will

4  that bring Pinnacle labor costs in line with its regional

5  airline competitors?

6  A.   Based on our analysis, yes.

7  Q.   Okay.  And I gather in order to --

8       MR. QURESHI:  Well, let me restate.

9  Q.   In order to achieve the targeted cost reductions, are

10 there savings other than from labor that Pinnacle expects to

11 achieve?

12 A.   Yeah, the one we're focused on is material services,

13 actually reducing the overhead structure of the organization to

14 rightsize it to what the airline will look like in the future,

15 and then the number of facilities that we have.  And then we

16 still have the ability to negotiate smaller contracts that we

17 have in what I consider to be the other bucket.

18 Q.   You are a member of the board of directors --

19 A.   Yes, sir.

20 Q.   -- of the debtors, correct?  Did you participate in the

21 board meetings in which the DIP and the agreements with Delta

22 were discussed?

23 A.   Yes, I was.

24 Q.   And can you give me a ballpark of how many times the board

25 met to consider the agreements and the DIP?

1  A.    Yeah.  If I could back up a little bit, because I think it

2  goes back to the restructuring to understand how involved the

3  board was not in only the last month, two months as we were

4  focused on potentially bankruptcy, but going back close to,

5  actually, when I joined the organization, Your Honor, is -- I

6  was brought in, ended up going through a series of looking into

7  each of these contracts, pilot contracts, other contracts in

8  the fall of 2011, began to raise the concerns with the board

9  relative to what I was seeing.

10       We ended up brining financial advisors on, one, to help us

11  do benchmarking in a number of different areas relative to

12  where we were in the industry, as well as actually looking for

13  liquidity, which actually began in the October/November time

14  frame of last year.  With that we had made a number of

15  assumptions, meaning the new management team, myself and the

16  new CFO, and provided those to the board of the directors.

17       The board of directors, with that information that we

18  provided, because it was different relative to what they had

19  been seeing prior, asked for outside validation to take place,

20  so we brought a third party in to validate what we had outlined

21  as the concerns.  Those concerns were validated, actually, the

22  week of Thanksgiving of last year, and then shortly thereafter

23  we actually filed an 8-K announcing concerns that we had with

24  contracts within the organization as well as bringing advisors

25  on board.

**PINNACLE AIRLINES CORP, ET AL.**                                        162

1   Following that -- and the important thing is I had the

2   board engaged throughout that process, meaning walking them

3   through, having individual meetings with the board of directors

4   to explain the findings that I had, to make sure that they had

5   all their questions answered relative to what we were finding.

6       In December we then began -- we had already began the

7   process of looking for additional liquidity, and we identified

8   a plan that was focused on contract changes with United

9   Airlines, some changes with our labor contracts, as well as

10  discussions with Delta Airlines.  Those conversations went

11  through the holidays.  We were then notified that -- Delta

12  notified us in early January that they were not going to

13  participate.

14      The organization, at the time, actually, then began to

15  focus on bankruptcy protection, but it's not my nature to do

16  that, and we continued to try to find another path.  In

17  extending the runway, we ended up negotiating a deal with the

18  Exportbank of Canada to defer principal and interest payments

19  on our own aircraft.  And we entered into an interim agreement

20  with United Airlines that provided us time, really, to April

21  1st to continue to look at solutions.  We spent time with some

22  of our other lenders trying to get additional liquidity as we

23  were trying to negotiate, really, our pilot contract and United

24  contract at the time.

25      We were unable to come to terms with our labor groups,

 1   specifically the pilots, at the end of February, and at that

 2   point in time is when we really began to focus on putting the

 3   organization into bankruptcy.  Throughout that process, the

 4   board was involved, they understood exactly what we were trying

 5   to do to avoid bankruptcy, which led us into the phase of

 6   preparing the organization for bankruptcy.

 7        I think the most important -- one of the most important

 8   meetings that we had with them was actually on March 22nd, that

 9   I had recapped for them everything that we had tried to

10   accomplish over the last nine months.  In doing that, we

11   recapped for them what we tried to do to keep the organization

12   out of bankruptcy.

13        We also, at that time, walked them through the current

14   situation, where we stood relative to the negotiations with a

15   number of different parties.  And then we provided them,

16   essentially, here are the options if we do not find the money,

17   and it really boiled down to finding the DIP, one being,

18   potentially, Delta Airlines or finding another DIP lender.  And

19   as everybody has heard, it has been very difficult for this

20   organization to find another DIP lender due to the inability of

21   actually having collateral.

22        And the other option was liquidation.  And in doing that,

23   because we were not able to find an additional DIP lender, one

24   that was actually involved -- actually, there was a group that

25   provided us a term sheet in the middle of March.  They actually

1  withdrew from the process towards the end of March, right

2  towards when we were getting close to filing for bankruptcy and

3  we were in the midst of negotiations with Delta.

4      I've heard many things be said here but I can tell you the

5  board was very adamant on a number of different things in

6  getting the organization, if it was going to go into bankruptcy

7  and have to make some changes to Delta contracts that we had to

8  be focused on how do we make sure this organization, at the end

9  of the day, if it's filing, is looking out for the employees,

10  is looking out for the creditors, is looking out for all of its

11  constituents.  And that was everything we were focused on as we

12  were going through this process.  So the board was very heavily

13  engaged throughout the process.

14  Q.  Okay.

15      THE COURT:  Mr. Jonas, you rose?

16      MR. JONAS:  Too late, Your Honor.  I was going to

17  object because I'm not sure what the question was, but it was a

18  narrative answer that I'm sure answered a lot of questions that

19  weren't asked, but at this point we'll just let it --

20      THE COURT:  Well, that's right, but narrative answers

21  are sometimes helpful.  The more I'm learning about this case

22  the better I like it.

23      MR. JONAS:  Understood, Your Honor.

24      THE COURT:  Okay.

25  Q.  Absent the Delta DIP -- you've testified already that the

1  company was unable to get any other DIP -- what other

2  alternative did the board consider?

3  A.   The board considered going into bankruptcy without a DIP

4  loan.

5  Q.   And what conclusion did the board reach with respect to

6  that course of conduct?

7  A.   The board concluded that because we did not have any

8  success in finding DIP lenders up to this point in time, the

9  ability for the organization to actually get a DIP lender post

10  of filing was going to be extremely difficult, if not

11  impossible, as it had been impossible up to that point in time.

12  We also were aware that Delta made it very clear that if we

13  filed and weren't going to move forward with them as a DIP

14  lender, they made it clear that, one, they may not be there, or

15  two, the terms aren't going to be what they are today.

16  Q.   And did the board consider how that potential course of

17  action would have impacted the debtors' various constituencies?

18  A.   Absolutely.  It was a very specific topic relative to

19  understanding the roles and responsibilities of the board

20  following a bankruptcy and what their responsibilities are.

21  Q.   Okay.

22       MR. QURESHI:  Two other quick areas, Your Honor, and

23  then I'll be done.

24  Q.   On cross-examination you were asked about the setoff and

25  mutual release agreement, and I just want to touch on that

1    briefly.  And we can refer to the document if we need to, but

2    can you describe for the Court the disputes that were at issue

3    and ultimately settled in connection with that agreement?

4    A.    Yes.  Your Honor, I'll just give you the line items of

5    what they were.

6          On what Pinnacle thought Delta owed us, it was actually

7    the pilot reset.  Because the reset was going to take place on

8    February 17th, there would be an accruing amount that would

9    take place with the pilot reset.  There was a dollar amount

10   associated with a heavy maintenance dispute.  There was a

11   dollar amount that was associated with the wind-down of Saab

12   340 operation, which is a small aircraft that we operate.

13            THE COURT:  It's a turboprop?

14            THE WITNESS:  Yes, sir.

15   A.    And then the last one was actually related to ARINC.

16   ARINC is a navigation system for the airlines.  That's what we

17   felt that Delta owed us.

18         Delta felt that we owed them dollars associated with heavy

19   maintenance on our CRJ-900 contract.  It's called Power-by-the-

20   Hour; we call it a PBH agreement.  There was also a dispute on

21   heavy maintenance associated with our CRJ-200, which was a

22   fifty-seater, Your Honor.

23            THE COURT:  The 900s are bigger?

24            THE WITNESS:  Yes, sir; it has seventy-six seats.

25            THE COURT:  Go on.

1  A.   The other dispute was associated with commissary, which is

2  really beverages, snacks.  That was approximately 1.6 million

3  dollars.  There is 300,000 dollars associated with parking in

4  Atlanta airport.  And then there is an additional 2.2 million

5  dollars' discrepancy.  That was -- the discrepancy is on both

6  sides.

7  Q.   So if you total up, if you could, the various categories,

8  in rough numbers, how much were the total claims running from

9  Pinnacle to Delta?

10  A.   The claims that Delta was asserting was approximately

11  forty-nine million dollars.  The claims that Pinnacle was

12  claiming was approximately sixty-five million dollars.  Again,

13  there's a lot of -- and this gets into, as we were moving into

14  negotiating this, there was definitely two different opinions

15  on where each party stood in those discrepancies.

16  Q.   Okay.  Now, the sixty-five million dollars that Pinnacle

17  claimed it was owed from Delta, included in that is the forty-

18  four million retrospective rate adjustment, correct?

19  A.   Yes, sir.

20  Q.   Okay.  So let's back that out for the moment, because

21  you've already described under the contract what the process is

22  to settle that dispute, or ultimately to arbitrate it.

23       With respect to all of the other items that you've

24  described, running both ways between Pinnacle and Delta, if an

25  agreement could not be reached between the parties

1  consensually, what did the contract provide for, based on your

2  business understanding, in terms of how to ultimately resolve

3  those disputes?

4  A.    Outside of the pilot contract that we already discussed,

5  the other ones would be settled through litigation.

6  Q.    And am I correct that you testified on cross that Pinnacle

7  agreed to effectively zero out all of those claims with Delta

8  in connection with the DIP and contract amendment discussions?

9  A.    Yes, sir.

10 Q.    Okay.  Can you please explain to the Court why?

11 A.    Because when you looked at it, as I mentioned, there were

12 differences in opinions relative to -- and I'll just focus a

13 little bit on parity in pay as it related to the pilot

14 reimbursement, that Delta had their interpretation, we had our

15 interpretation.  You could actually find a situation that we

16 potentially would owe them money at the end of the day,

17 depending on the level of interpretation you have in each of

18 these contracts.

19 Q.    Last area, if you could please take out your deposition

20 transcript that you have in front of you.  Mr. Jonas asked you

21 to look at some testimony on page 46.

22 A.    I'm sorry, which section is that, please?

23 Q.    It's your deposition transcript.  It should be loose.  He

24 directed you to page 46, and he asked you to read a question

25 and answer.  You wanted to give an explanation which he

**PINNACLE AIRLINES CORP, ET AL.**  169

1  declined to hear.

2      Just so the record's clear, the question was, "So any

3  benefit to reduction of labor costs in bankruptcy also gets

4  passed down to Delta, if you will, correct?"  And your answer

5  is, "That's correct."

6      Please give the Court the explanation that you wanted to

7  give to Mr. Jonas.

8  A.   Yeah, the savings that I'm assuming gets passed along to

9  Delta in this is based on the rate reset, which would be a

10  lower rate reset if you did not have the pilot reset in what is

11  considered to be the 2013 reset.  So they would actually get

12  savings associated with that which would then translate into

13  contractual savings.

14  Q.   Well, let me see if we can simplify this area a little

15  bit.  Under the old contracts, was labor a pass-through cost?

16  A.   No, it was not.

17  Q.   Okay.  Explain -- let's do it this way.  First of all,

18  explain what is a pass-through cost, maybe, by way of

19  example --

20  A.   Yeah.

21  Q.   -- under the old contract.

22  A.   Pass-through costs are operations similar to ground

23  handling; that's a pass-through cost, meaning we essentially --

24  ground handling, landing fees when an aircraft lands, those are

25  expenses that we actually have and we pass them along to Delta

1  Airlines.  That's a pass-through cost.

2  Q.    Okay.  Under the old contracts, if Delta -- if Pinnacle,

3  rather, experienced an increase in its labor costs, what

4  mechanism, if any, was available for Pinnacle to shift that

5  increased cost to Delta?

6  A.    There was not, because that was built in the negotiated

7  rate which goes into the block hour.

8  Q.    And explain what that negotiated rate is and how changes

9  in labor costs impact that rate, if at all.

10 A.    It's different for different regional airlines and the

11 capacity purchase agreements they have.  What typically takes

12 place is when you negotiate a capacity purchase agreement with

13 United or Delta, you negotiate a block hour rate, a flight hour

14 rate, different variables.  So in doing that, you then get an

15 annual increase that could be based on CPI or CPPI.  So any --

16 and that's what you get paid relative to flying the aircraft

17 for one hour.  How you manage your cost structure is really up

18 to you, meaning you built the contract based on your expenses,

19 but if you decided that you wanted to give everybody a ten

20 percent pay increase, that does not get passed along.  That

21 gets -- that ends up being impacted, or it actually gets

22 deducted relative to the dollars that you're earning from the

23 partner carrier.

24 Q.    Last question.  Given your testimony that today, with

25 absolutely no changes in Pinnacle's cost structure, the amended

**PINNACLE AIRLINES CORP, ET AL.**                                    171

1  Delta contracts would be money losers, in light of that

2  testimony, please just explain to the Court in your words why

3  the company elected, nonetheless, to proceed with those

4  contracts.

5  A.   One, it was a condition relative to getting the DIP.  The

6  other thing that I think is very important, and this goes into

7  the phase that this organization is right now, and that's

8  building a viable company that actually can be profitable with

9  these contracts but is also important relative to the airline

10 actually growing.  And the capability of this airline growing

11 is really based on its cost structure.  And that's competing

12 against other regional marketplace -- other regional airlines

13 in the marketplace.  And our capability of actually executing

14 upon the budget that we have put together will give this

15 organization, one, the capability of being profitable with the

16 Delta contracts, but two, it'll give it a platform that it can

17 actually go out and bid on contracts or bid on flying in the

18 future.  That would be beneficial, I believe, to the employees

19 and a number of other constituents.

20 Q.   Thank you.

21       MR. QURESHI:  No further questions.

22       THE COURT:  Okay.  Recross, limited, of course, to

23 what you heard in redirect.

24       MR. JONAS:  No further questions.  No further

25 witnesses, Your Honor.

**PINNACLE AIRLINES CORP, ET AL.**                                172

1       THE COURT:  Oh, okay.

2       Then Mr. Menke, you're excused, and if I -- Mr.

3   Seltzer, are you rising to question?

4       MR. SELTZER:  I'm rising to not question, Your Honor.

5       THE COURT:  Oh.

6       MR. SELTZER:  I just -- but I just wanted to clarify

7   the record.  There obviously was some testimony about the

8   comparative labor rate, et cetera, that may become relevant if

9   there, unfortunately, ever is an 1113 proceeding.  We don't

10  want to litigate that today.  We don't want to have a mini 1113

11  hearing today.  We just want to reserve our rights, but we

12  don't want someone to say later that since we didn't question

13  the witness we were somehow accepting his testimony.

14      THE COURT:  Would it be helpful if I were to say,

15  assuming the other parties agree, that the testimony that we

16  heard today was solely for the purpose of the DIP?

17      MR. SELTZER:  That would be very helpful, Your Honor.

18      THE COURT:  Is there any objection to that?

19      MR. JONAS:  No objection.

20      MS. BECKERMAN:  No, Your Honor.

21      MR. SELTZER:  Thank you, Your Honor.

22      THE COURT:  Okay, Mr. Kolko, the same thought?

23      MR. KOLKO:  Yes, thank you, Judge.

24      THE COURT:  Okay.  Mr. Menke, you can sit and stay or

25  leave, as you prefer.

1    Okay.  If I heard you all right, we have no further

2    questioning.  Does anybody have the desire to make remarks in

3    the nature of summation based on the live testimony that was

4    heard?

5            MR. JONAS:  Not here, Your Honor.

6            MR. BECKERMAN:  Not here, Your Honor.

7            THE COURT:  Okay.  Then are we in a position where we

8    can take a recess so that I can rule?

9            All right.  I can't give you any assurances as to how

10   long it'll take me.  I'd like to have you back in about forty-

11   five minutes, but I may have you cooling your heels, if it runs

12   longer.  But that's what we're going to do.

13           We're in recess.

14           MR. QURESHI:  Thank you, Your Honor.

15           MS. BECKERMAN:  Thank you, Your Honor.

16       (Recess from 3:53 p.m. until 5:50 p.m.)

17           THE COURT: Have seats, please.  I apologize for

18   keeping you all waiting.

19           In this contested matter in the Chapter 11 cases of

20   Pinnacle Airlines and its affiliates, I have the debtors'

21   motion for approval of their DIP financing from Delta Airlines.

22           The motion for approval of that facility on the terms

23   set forth in the motion and the proposed revised order that was

24   submitted to my chambers after the creditors' committee got

25   involved is approved, subject only to confirming in that

 1   approval order what Mr. Seligman, counsel for Delta, stated on

 2   the record today in response to the two concerns I previously

 3   had.  The objections, to the extent not withdrawn before I had

 4   to rule, and except as they were addressed by Mr. Seligman's

 5   remarks, are overruled.

 6          The following are my findings of fact and bases for

 7   the exercise of my discretion in that regard.

 8          Turning first to my findings of fact, I found the

 9   debtors' witness, Mr. Menke, whose testimony I heard live, to

10   be fully credible in everything he said today, and I have no

11   reason to doubt either his testimony by declaration or the

12   other evidence that was submitted by declaration.  Thus, my

13   decision is also informed by what appeared in the declarations.

14          The factual dispute, to the extent one exists, it

15   seems to me, is not with respect to the underlying facts, but

16   rather with respect to the wisdom of the debtors and their

17   advisors having made decisions or proposing to act

18   prospectively based on largely or wholly undisputed facts, and

19   to the extent it's different, on the extent to which Delta

20   should be blamed for the debtors' difficulties and whether past

21   events or the relationship between Delta and the debtors,

22   should cause Delta to be disqualified as a DIP lender.

23          Of course, there's another technically separate issue

24   as to the extent to which the Farmland factors are satisfied,

25   and the extent to which imperfections in the DIP financing deal

1   that was ultimately reached should cause me to disapprove it

2   and tell the debtors they should start over or proceed with no

3   DIP financing at all. I'll deal with some of those latter

4   concerns shortly.

5          I find as facts that the debtors have a critical need

6   for DIP financing and are in a liquidity crunch. I accept as

7   true the testimony I heard that the debtors simply can't run

8   without less than a minimum of twenty million dollars in cash

9   at any time and that without the proposed DIP financing, the

10  debtors will go way below that number. I accept as true that

11  they could go down as low as five million dollars if they don't

12  receive the DIP loan and if Delta exercised its setoff rights,

13  which is at least foreseeable. If the DIP financing is

14  disapproved, the debtors will have to continue searching for

15  alternative sources of DIP financing with no alternatives

16  having yet been identified, if they ever will be, while the

17  debtors' funds continue to dwindle. If the debtors run out of

18  working capital, they'll have to halt all operations, and all

19  pilots, flight attendants, and ground handling employees would

20  have to be terminated. Under those circumstances, I would see

21  little alternative to liquidation.

22         The DIP financing is not a luxury; it is a necessity,

23  as the debtors will otherwise run out of the necessary

24  liquidity on or shortly after June 1, about two weeks from now.

25  That is a highly material fact, in my view, whose importance

1  has been understated by the objectors.  I think we all must

2  keep it in mind.

3        I also find as a fact that the debtors and their

4  agents, including a skilled investment banker, conscientiously

5  shopped for alternative DIP financing options, but none was

6  forthcoming.  The evidence was persuasive that the debtors were

7  not an attractive DIP-lending candidate for a number of

8  reasons, including, perhaps most significantly, an inability to

9  offer collateral in the quantity and quality that DIP lenders

10  typically require.  It was no surprise to me that Mr. Shapiro

11  couldn't find alternative financing that might be a practical

12  alternative for what we have before me.  The offer from Delta

13  is the only option the debtors have.  Neither objector disputed

14  that, and objector Jonas expressly conceded that.  I don't

15  fault him for that, of course; he was just arguing the matter

16  with candor.

17        I also find as a fact that it wasn't Delta that forced

18  the debtors into bankruptcy.  It was an amalgam of many factors

19  including delays in integrating the flying of debtors'

20  subsidiaries, unanticipated developments arising out of the new

21  joint collective bargaining agreement with the debtors' pilots,

22  increasingly unprofitable contracts with airline customers, and

23  poor operational performance and increased operational

24  expenses.

25        Let me pause to underscore the two main factual

1  findings that I've just made, putting aside the details and

2  going right to the bottom line, putting them in the plainest

3  possible terms. Without DIP financing, the debtors are going

4  to run out of money, and they have no DIP financing

5  alternatives. So if I disapprove the financing, the debtors

6  will lose the liquidity that is essential to their survival.

7  The objectors essentially ask me to ignore that. My

8  unwillingness to ignore that underscores the exercise of my

9  discretion in significant aspects throughout the remainder of

10  this decision. Other relevant factual findings appear in the

11  remainder of this discussion.

12       Now, turning to my conclusions of law and bases for

13  the exercise of my discretion. Both sides agree that the

14  standards applicable to consideration of a Section 364 motion

15  of this character appear in Judge Jerry Venters' decision in

16  Farmland Industries, 294 B.R. 855, 880 (W.D. Mo. 2003). As

17  Jerry Venters observed after synthesizing the earlier cases, a

18  court considering a motion for Section 364 financing should

19  consider whether (1) the proposed financing is an exercise of

20  sound and reasonable business judgment, (2) the financing is in

21  the best interests of the estate and its creditors, (3) the

22  credit transaction is necessary to preserve the assets of the

23  estate and is necessary, essential, and appropriate for the

24  continued operation of the debtors' businesses, (4) the terms

25  of the transaction are fair, reasonable and adequate, given the

1  circumstances of the debtor-borrower and the proposed lender,

2  and (5) the financing agreement was negotiated in good faith

3  and at arm's length between the debtors on the one hand and the

4  proposed DIP lender on the other.  See 294 B.R. at page 881.

5  After considering those factors, as I've indicated, I've

6  determined that the DIP financing should be approved, and as I

7  mentioned, the proposed order requires only the slightest

8  tweaking.

9           Turning now to the particular Farmland factors and the

10  facts that inform my consideration of each of them.  One:

11  business judgment.  In this case, I have the luxury -- which I

12  don't always have, especially in my smaller Chapter 11 cases --

13  of a fully functioning debtor board of directors.  The evidence

14  supports a finding, and I find that the debtors' board

15  carefully considered their DIP financing options as well as the

16  debtors' other courses of action as its liquidity crisis

17  increased, including with respect to the terms of the DIP

18  financing that would be offered.  I find that in connection

19  with securing the DIP financing, the debtors' board exercised

20  appropriate business judgment and that it held the meetings and

21  otherwise took the steps necessary to provide a sound basis for

22  the exercise of business judgment.  I also find that the DIP

23  financing was satisfactorily shopped and that after a diligent

24  search, the debtors did not have alternate financing

25  opportunities, much less did they reject any.

1    Two:  best interests of the estate.  I further find

2    that the DIP financing that the debtors secured is in the best

3    interests of the estate.  Indeed, I find that in the absence of

4    DIP financing, the likely, if not certain alternative would be

5    liquidation, a result that would be disastrous for the debtors'

6    creditors, employees, vendors, and any who might have tort

7    claims against the debtors.  I think it's significant that

8    neither of the remaining objectors disputed that the debtors

9    have no alternatives.  In substance, they simply wanted me to

10   disapprove the financing anyway.  Frankly, I can't imagine how

11   I or any other judge could act so irresponsibly.

12       Particular terms of the DIP financing, and in

13   particular, other aspects of the overall deal, such as the

14   settlement and the assumption of contracts that were revised on

15   the eve of filing of the Chapter 11 case, have been criticized

16   by the objectors.  Some aspects of those are not optimum, but

17   the debtors have satisfactorily explained that they tried to

18   get better terms and were only partially successful.  The

19   creditors' committee tried to get better terms, and while it

20   succeeded in some very helpful respects, I don't know if the

21   creditors' committee would say that it was totally successful,

22   either.  But getting better terms was an exercise in achieving

23   the attainable.  The evidence strongly supports a finding, and

24   I find that there was an imbalance in bargaining power, and

25   that under the circumstances, the debtors did pretty well.  As

1  importantly, Mr. Menke's testimony evidenced how the debtors

2  lacked the ability, as a practical matter, to hold out for

3  better recoveries on the forty-four million dollars and on

4  other sums due or possibly due to them and that if they waited

5  for arbitration or plenary litigation to take its course, they

6  likely, if not certainly, would have run out of money before

7  they collected any material portion of the amounts in question.

8  One way -- it's not the legal test, of course -- that

9  I think about best interest of the estate issues, and this, of

10  course, is in contrast to business judgment issues, is to see

11  whether I would have made the same decisions under the

12  circumstances. And here, I think I would.

13  Three: necessity. The next factor can be analyzed

14  with the shorthand catch-line as "necessity". It asks whether

15  the credit transaction is necessary to preserve the assets of

16  the estate and is necessary, essential, and appropriate for the

17  continued operation of the debtors' business. Here, the answer

18  to that question can't seriously be disputed, though I was

19  surprised by the failure of the objectors to address it more

20  directly. The debtors desperately need this money. It's

21  essential to the continued operation of the debtors' business.

22  They have no alternative. What more can we say?

23  The objectors don't dispute that or any of those

24  facts, but in essence, they want me to disapprove the financing

25  anyway. I won't accept that gamble. First, of course, I must

1  note that total absence of any evidence from the objectors or

2  anywhere else in the record of any alternatives.  In essence,

3  the objectors want me to either hope that something nobody now

4  knows about will materialize, or they want me to play chicken

5  with Delta, leaving the debtors hanging out with no DIP

6  financing at all on the assumption that something might

7  materialize.  I'm not of a mind to require the debtors to do so

8  or to engage in such an exercise, myself.

9         What they ask me to do is remarkably similar to what I

10  was asked to do in two other large Chapter 11 cases on my watch

11  earlier in my judicial tenure:  Adelphia and General Motors.

12  In Adelphia, certain bondholders asked me to disapprove a

13  settlement with the U.S. government under which Adelphia would

14  provide a very large amount of plan consideration to the

15  government to settle civil litigation against the company and,

16  more importantly, avoid a criminal indictment of the company,

17  as contrasted to the former Adelphia officers who had acted so

18  badly.  The objectors said the government would never really

19  indict the company, and they faulted the company's board for

20  declining to take the gamble.  I said I couldn't blame the

21  board for not betting the company on that gamble, and I

22  approved the settlement.  As I said in that decision, it was at

23  least prudent for Adelphia's board to protect the entity under

24  its stewardship from its destruction and to avoid taking such a

25  gamble.  I said the Adelphia board couldn't be faulted for

1    declining to bet the company on what would be little more than

2    a guess as to the decision that the counterparty, there the

3    DOJ, would make.  On appeal of that determination, Judge Lewis

4    Kaplan of the district court, focusing on that exact issue,

5    affirmed me in that respect and others.

6              Similarly, in General Motors, bondholders were

7    objecting to the 363 sale of the company, telling me that they

8    preferred a much longer Chapter 11 and that I shouldn't take

9    the U.S. government at its word when it said it wouldn't

10   finance a Chapter 11 case of that duration.  I observed,

11   referring to remarks of GM's -- General Motor's counsel, in

12   summation, that the objecting bondholders were "expecting this

13   Court to play Russian roulette," and the comparison was apt.

14   So that they could throw the company into a plan negotiation

15   process, I, as the Court, would have to gamble on the notion

16   that the U.S. government didn't mean it when it said that it

17   would not keep funding GM.  And I continued in language that

18   has a fair amount of analogy here:  "There's no reason why any

19   fiduciary or any court would take that gamble."  And I

20   continued, "This is hardly the first time this Court has seen

21   creditors risk Doomsday consequences to increase their

22   incremental recoveries, and this Court, which is focused on

23   preserving and maximizing value, allowing suppliers to survive

24   and helping employees keep their jobs, is not of a mind to

25   jeopardize all those goals."

1    It requires very little of a jump to change creditors

2    to equity securityholders and to see how considerations of that

3    character have equal applicability here when people are asking

4    me to disapprove a DIP financing facility that is so important

5    to the company's health.  Here, the need for this financing is

6    there; it's essential; it's critical.  And the objectors don't

7    contend to the contrary.  Given that, I don't think that the

8    risk of the consequences of disapproval can responsibly be

9    ignored.

10       Next, five:  good faith.  And I'm going to skip to the

11   fifth factor, coming back to the fourth, because that requires

12   a little more discussion.  The fifth factor is referred to, in

13   shorthand, as "good faith".  Stated more fully, the Court must

14   consider whether the financing agreement was negotiated in good

15   faith and at arm's length between the debtors, on the one hand,

16   and the DIP lender, on the other.  Here, I find as a mixed

17   question of fact and law that the financing was negotiated in

18   good faith.  This was an arm's-length negotiation, and an

19   imbalance in bargaining power doesn't make a negotiation any

20   less at arm's length.  It just inevitably affects how

21   successful the weaker party can hope to be, as Judge Kaplan

22   observed when he affirmed me on that Adelphia settlement.  See

23   337 B.R. 475.  And, of course, the participation of the

24   creditors' committee to help improve the deal gives me further

25   comfort in this regard.

1    Then going back to factor number four: particular

2    terms. This is the only factor as to which there really can be

3    any legitimate debate, that dealing with particular terms of

4    the transaction which, in a perfect world, many would prefer

5    not to have at all or in the form in which they appear. The

6    full standard, as articulated by Judge Venters in Farmland

7    Industries, is whether the terms "are fair, reasonable, and

8    adequate given the circumstances of the debtor-borrower and the

9    proposed lender." This factor requires a court to look at any

10   particular terms that are the subject of the objection. A

11   bankruptcy court has the power to say it won't approve one or

12   more of such terms, but at the same time, the court can't

13   require a lender to lend, and thus, the bankruptcy court must

14   use its power with some common sense, knowing that if it

15   overreaches and tries to rewrite a deal under which tens of

16   millions of dollars of financing are to be advanced, the lender

17   will simply say, nope, I just won't lend on that basis. I

18   won't lend if I lose the protection I need or want.

19   Importantly, that standard requires the Court to consider the

20   last clause of the language I quoted, "given the circumstances

21   of the debtor-borrower and proposed lender". A court can't

22   ignore those circumstances. Decisions of this character are

23   made in the real world.

24        With all of that stated, there are, of course, terms

25   that DIP lenders sometimes ask for that are beyond the pale,

**PINNACLE AIRLINES CORP, ET AL.**                                    185

1   that are overreaching by the DIP lenders, and that simply

2   require the court to say no, I'm not going to bless that.

3   Fortunately, this case is not in that category.

4           In the connection of looking at the particular terms,

5   we judges look at those terms with the prism, if I can use that

6   expression, of what has become customary in DIP financing

7   transactions and look to legitimate needs and concerns of the

8   lender's side.  And I'm going to talk about some of those

9   particular terms in that context.  Milestones have become

10  common in DIP financing transactions, as was shown at some

11  length by the debtors in their papers, having given me tables

12  with respect to several of the important provisions evidencing

13  their basis in precedent.  Though I wish it were otherwise,

14  terms that I would prefer not to have in a perfect world have

15  now become common, if not customary, in DIP financing

16  transactions.  Though I wish it were otherwise, I've learned to

17  live with DIP financing facilities with durations of only one

18  year; facilities of longer duration are much rarer than they

19  were when I started doing bankruptcy work, and even when I came

20  on the bench.

21          Milestones for filing a plan have also become

22  customary, or at least ubiquitous, and they're also acceptable,

23  so long as the time to do so isn't unreasonable under the

24  circumstances.  Here, that deadline is within the range of

25  reasonableness.

1  DIP lenders also have legitimate needs and concerns

2  with respect to getting paid back.  That is the concept

3  underlying change-of-control provisions which are sometimes

4  referred to in slang as "know thy borrower".  The legitimate

5  need to get paid back also justifies many provisions requiring

6  the debtor to show progress in increasing its profitability,

7  and though I wouldn't provide an advisory opinion as to the

8  extent to which they're appropriate in other cases with each

9  case being unique, and Farmland having reminded us that the

10  inquiry is made "given the circumstances" of the debtor and

11  lender, I think they're okay here.

12  I did have reservations as to a potential impairment

13  of my ability to do my job in helping the debtors' management

14  and labor get along with each other and to reach a consensual

15  resolution without requiring a full-blown and potentially

16  stressful 1113 hearing; and Delta, to its credit, gave me the

17  extra comfort I needed in that regard; the creditors' committee

18  was also helpful in that respect.

19  Rollups are evaluated on a case-by-case basis.  Here,

20  I found the explanations for the rollup, including as most

21  important to me, Delta's setoff rights, to be satisfactory, and

22  I saw no material prejudice to the unsecured creditors in this

23  case or to the equity which, of course, represents the

24  objectors here.  The releases aren't as broad as the objectors

25  thought they were, and in any event, strike me as reasonable

1   under the circumstances.

2          To the extent I haven't expressly discussed other

3   particular terms that were the subject of the objection, it's

4   only because I've been talking for so long and I've already

5   gone at such great length.  But to the extent it's necessary

6   for the record, I've considered the other points and rejected

7   them.

8          Now, with that said, I do not find all of the

9   individual terms that are part of this DIP financing

10  transaction necessarily to be desirable from the debtors'

11  perspective or even find that those terms are wholly benign.

12  But at the risk of repeating myself, decisions of this

13  character must be made in light of the risks associated with

14  disapproving the proposed DIP financing facility, and in light,

15  especially, of the debtors' need for DIP financing, the

16  alternatives or lack of alternatives, and the consequences of

17  disapproval, nor do I suggest or especially rule, that each of

18  these terms would be appropriate in another case or under other

19  circumstances.  But they all have a basis in precedent, and

20  under the facts here, are not unreasonable.

21         Finally, a few other considerations.  I don't analyze

22  a DIP financing facility by counting noses as to who supports

23  the facility and who objects.  I look, instead, to the Farmland

24  factors.  But consideration of the level of comfort of the

25  stakeholders whose money and jobs are on the line is often a

1   useful reality check when considering a motion of this

2   character.  Thus, it's worthy of mention that none of the

3   senior stakeholders or more senior stakeholders now object.

4   The creditors' committee, the fiduciary for all of the debtors'

5   unsecured creditor, now supports the DIP financing after

6   successful efforts to improve it.  It likewise is worthy of

7   mention that the debtors' union creditors either did not oppose

8   the DIP financing or withdrew their objections even though they

9   well understand that the debtors will be looking to negotiate

10  concessions from them.  Having done this job for many years, I

11  think I can infer the reasons.  They recognize the lack of

12  alternatives and that a liquidation would grievously hurt

13  everybody.

14          Finally, on a motion involving an exercise of my

15  discretion, I'm allowed to use my experience on the job, which

16  in large Chapter 11 cases is substantial.  I can't help but

17  notice that the two objectors are at the very bottom of the

18  capital structure.  It's more than occasionally tempting for

19  those who are at the low end of the capital structure to want

20  the estate to gamble on approaches that would more likely put

21  them into the money -- or put them more in the money,

22  subjecting the more senior classes to the resulting risk.

23  There's nothing unethical about that; if I were a lawyer and

24  advocate, I might do the same.  But I'm not a lawyer and

25  advocate anymore.  I'm in the judge's role looking out for the

 1   welfare of the estate as a whole.  If I disapprove this

 2   facility, there's no plan B.  Taking the gamble that

 3   equityholders want the debtor to take would subject the debtors

 4   to the risk of liquidation.  I wasn't prepared to subject the

 5   stakeholders in General Motors to that risk, and I won't do so

 6   here.

 7          Ms. Beckerman, you or your colleagues are to work with

 8   Delta to paper the things that I was told earlier in today's

 9   hearing, to stick them into the DIP financing order, and to get

10   it to me at your earliest reasonable convenience.  The time to

11   appeal or move for leave to appeal this determination will run

12   from the time of the entry of that order and not from the time

13   of this dictated decision.

14          It's been a long day and a long night.  We're

15   adjourned.

16      (Whereupon these proceedings were concluded at 6:26 PM)

17

18

19

20

21

22

23

24

25

190

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Sean E. Menke | Mr. Jonas | 112 |
| Sean E. Menke | Mr. Qureshi | 147 |

E X H I B I T S

| JOINT | DESCRIPTION | PAGE |
|---|---|---|
| 1 through 22 | Various documents | 111 |

RULINGS

| | Page | Line |
|---|---|---|
| Motion for approval of DIP facility approved as amended on the record | 173 | 22 |

191

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  May 21, 2012