Exhibit 8

DELTA**MEC**
# Negotiators' Notepad

June 21, 2012                                                                                               **12-13**

## Contract 2012 – Rumor, Innuendo and Misrepresentations

Since the publication of *Negotiators' Notepad 12-11 – Frequently Asked questions,* we continue to read and hear inaccurate rumors and receive additional questions that have little or no basis in fact.

Please remember that the Delta Pilot Network (DPN) is staffed seven days per week during normal business hours. If the DPN volunteer cannot readily answer your question, he has access to a full array of subject matter experts who can.  Your question will be answered, and it will be answered *accurately*.  We strongly encourage you not to rely on internet posts and crew van gossip if you have questions you need answered before you cast an informed vote.  You can reach the DPN Monday through Friday at 1-800-USA-ALPA.  From 9am to 5pm ET over the weekend, you may call 1-866-239-0437 to speak with a DPN volunteer.

### *Rumor, Innuendo and Misrepresentations:*
**Q1      I'm suspicious as to why we were able to reach an agreement so quickly.  We *had* to have left money on the table if management agreed to this deal so quickly, right?**  `FALSE`

A1       The short answer is that we were able to reach an agreement because an opportunity presented itself, and both parties were motivated to take advantage of the opportunity.  The following is the first slide we put up during the recent round of road shows.

## What is the opportunity?

✦ **Delta wants to upgauge its fleet to further its strategic advantage over its competition**
  – Has already started decreasing 50-seat aircraft
✦ **Delta has long term financing and contractual arrangements with DCI carriers that prohibit it from reducing that flying unilaterally**
  – The 50 seaters are not going away on their own
  – Would have to pay other carriers NOT to fly airplanes
  – Would still have to pay mortgage/lease costs
✦ **Delta needs an incentive to get the debt holders and DCI carriers to accept the loss of 50-seat aircraft**

2

The Company has the opportunity to acquire what we now know to be 88 B-717 aircraft in order to upgauge its fleet.  If the agreement is ratified, the end result of this upgauging will be a massive shift of flying to the mainline.

The opportunity will not last indefinitely, however.   We believe we extracted significant value from management with this agreement and that the perception that money was "left on the table" is without merit.

**Q2      Management achieved *a lot* of savings with this TA by not having to pay for 50-seat RJ flying that they don't want.  We squandered our leverage by making this contract cost neutral.**   **FALSE**

A2      As it pertains to the pilot group, this is anything *but* a cost neutral contract.  In fact, the increased value over the life of the contract will be on the order of approximately one billion dollars.

If the agreement is ratified, Delta will save approximately $184 million in above normal run rate CRJ-200 engine maintenance costs.  In addition, Delta will save approximately $289 million in DCI contract and CRJ-200 ownership costs.  This represents a total net savings of $473 million over the life of the agreement.  *These are one time savings that don't continue into the future unlike the increases in pilot costs in this TA, which continue to accrue.*

The acquisition costs of the B-717 and 76-seat jets are not public, but at current market prices can be estimated at approximately $2 billion.  The *savings* generated by management not having to pay for the 50-seat RJ flying that they don't want is more than offset by the acquisition *costs* of the B-717 and the 76-seat jets.

**Q3      The CEO of Republic Airlines was quoted as saying that the new Bombardier C series aircraft could "fit into a global alliance as (a low-cost carrier) component to a broader North American strategy for a SkyTeam or Star or oneworld."  Is this true?**   **FALSE**

A3      That CEO's *theoretical* proposed use of Bombardier C series aircraft is simply not allowed under the terms of the Delta PWA. These aircraft could be flown by Delta pilots for Delta Air Lines but they could not be operated as Delta Connection flights since the Bombardier C Series aircraft  would not be a permitted aircraft type (76 seats and below *and* weight limitations) under the PWA.  If these aircraft were flown by a DCI carrier but in service for *another* airline, the PWA would prohibit them from being placed on routes that compete with Delta mainline service or from causing mainline block hours to decrease.

**Q4      Since the Q400s in the Horizon operation are excluded, doesn't that open the door for Delta to get unlimited numbers of them?**   **FALSE**

A4      No.  The Horizon Q400s are *not* DCI aircraft and are subject to the same code share restrictions as Alaska (AS) mainline flying.  Delta does not receive all of the revenue nor pay the operating costs for these flights as they do under a DCI capacity purchase agreement.  AS flights are pro-rate agreements where only the operator of a flight gets paid for the operated segment and the booking carrier gets a small "finder's fee."

If Delta were to buy or lease Q400s for its own DCI operation, they would still be subject to all the existing Scope restrictions as well as the hard 450 aircraft cap, the ratio requirements and seat restrictions.

**Q5      I heard we gave up green slips or at the very least, that they would be greatly reduced under this agreement.  Is that true?**   **FALSE**

A5      No, it's not.  Green slip assignments have little to do with reserve pilots having filled up and more to do with there being no one on call and legal with the right number of days of availability.

Green slips also often result when the trip is short notice, less than 12 hours, with insufficient short call pilots available with the right number of days of availability.  Nothing in the TA has changed the trip coverage sequence.  In these cases, white slips will still be proffered first, then short call reserves would be used, and then green slips would be awarded.  A pilot's ability to fly to ALV+15 has little to no bearing on whether he can cover a short-notice trip as a reserve or with a green slip.

**Q6      Several years ago, the Delta pilots won a grievance against management's practice of calling pilots while sick.  Doesn't this TA overturn the arbitration award in favor of management?** 

A6      Absolutely not, and the premise of the question is inaccurate.  To answer this question, we contacted Capt. John Morgado, the then Contract Administration Committee chairman, who prosecuted the grievance.  He provided us with this answer.

"The arbitration award did not prohibit the Company from contacting a pilot.  In the award, commonly referred to as the 'Harris Award' or 'Reliability Decision,' the arbitrator stated 'Having a base chief pilot talk to an individual pilot about anything involving a pilot's job performance is clearly within the right of management.'  The award confirmed that management cannot impose a reliability policy that allows the discipline of a pilot for his use of sick leave.  This TA actually *further* limits management's ability to verify a pilot's sick leave usage.  This TA will end the Company's sick leave monitoring program and stop the 'routine' calls from the chief pilot. It does *not* change the prohibition, established in the Harris Award, on management imposing a reliability policy that disciplines pilots for sick leave usage.

- Current contract language allows management to verify sickness if the pilot is absent more than seven consecutive days "under normal conditions."  Under the TA, management may only require verification if the absence is *15* days or more.
- Current contract language allows management to require verification of sickness if the pilot is absent less than seven consecutive days if the absence is not "under normal conditions."  However, "normal" is not defined.  Under the TA, management can require verification for less than 15 consecutive days of sick leave *only* if they have a "good faith basis."  They cannot use the amount and frequency of sick leave usage to form that basis.  Unlike "normal," "good faith basis" is a much higher standard and further limits when management may require verification.
- Under current contract language, management could require verification regardless of the amount of sick leave a pilot has used. Under the TA, other than the exceptions noted above, they must wait until the pilot uses 100 or more hours of *unverified* sick leave.  Last year, over 85% of Delta pilots used less than 100 hours of sick leave.  Of the remaining 15%, two-thirds went on disability.  Remember too, that at the pilot's option, he can initiate verification of any sick leave to stay below the 100-hour threshold.

**Q7      I heard we gave up our Business Class seating for international deadheads.  Is that true?** 

A7      No, that's not true.  This rumor *probably* started as an inaccurate assessment of the TA's *improvements* for domestic deadheads.  Under this TA, domestic coach seat assignments for deadheading pilots are made in the following order (for a duty period greater than 10 hours and deadhead of at least 3:45 block to block).
- Exit Row (aisle seat, then window seat)
- Any aisle seat
- Any window seat
- Middle seat exit row
- Any seat

**Q8      I wanted larger pay increases.  You ignored the Contract Survey.**

A8      The survey was not ignored.  In any negotiation, there are gives and takes; that's why it's called negotiations.  In his most recent *Chairman's Letter,* Captain O'Malley wrote:

> *". . . I freely admit that the agreement did not achieve all of our goals; negotiated agreements rarely if ever do.  But when viewed in the aggregate, this TA represents a huge win for the Delta pilots, particularly in the areas of scope, sick leave, and reserve work rules.  While pay rate increases were less than what many of us had hoped for, over the*

*life of the agreement, those increases will place between $54,000 and $110,000 in the pockets of Delta pilots and their families (based on an 80-hour month) and tens of thousands more for those on reserve. And that money will begin to accumulate immediately rather than having us wait for some unknown amount at some undetermined point down the road.*

We wholeheartedly concur. We openly admit that we did not achieve every goal laid out in the contract survey. The scope, sick leave, and reserve enhancements, however, provide us with improvements that are arguably the best in the industry, and we will achieve pay rate increase of almost 20% only 24 months beyond our current amendable date. Let's make this perfectly clear: If we believed more were available, we'd have brought it to you in this agreement.

**Q9      I'm satisfied with most of the agreement, but I'd like to see it "tweaked" in the area of _____.   If we reject the agreement, we can make some quick tweaks and vote on the new agreement, right?**  **FALSE**

A9      We believe this agreement is a huge win for the Delta pilots and that it stands on its own merits. That is why we closed each of our recent *Negotiators' Notepads* by writing:

> *Your Negotiating Committee believes that this is a significant agreement for the Delta pilots and our families. As such, we strongly endorse this agreement and recommend that when the voting window opens, **you vote in favor of ratifying C2012**.*

The membership ratification process, however, provides the Delta pilots with the ultimate authority to decide whether to ratify or reject the agreement, and we respect that process. If the agreement is ratified, we will begin to see real and significant improvements on July 1. If, on the other hand, the agreement is rejected, it is our view that we will most likely revert to traditional Section 6 negotiations. We would expect the MEC to reconvene and for additional polling to take place prior to any additional direction being provided to the committee. Then, we would likely attempt to meet with the Company to attempt to reach a revised agreement at the earliest opportunity. But as the pilots who were at the table during these negotiations (which consisted of over 100 face-to-face meeting and over 300 proposal exchanges), if the agreement is rejected, it is our view that it is unlikely we will reach an acceptable agreement in the near term. We further believe that the leverage related to the scope changes (B-717s, block hour ratios, shift of block hours to mainline) may very well evaporate before we are able to reach a subsequent agreement. This is not meant as a scare tactic; it is simply the observation of the pilots who were at the negotiating table.

As part of the expedited negotiations, both parties agreed that if an agreement was not ratified, work to date would be non-precedential to subsequent negotiations. In other words, while we are free to seek changes in a subsequent agreement, the Company is also free to seek changes, and since regional jets configured with up to 82 seats was one of the Company's very last table positions, we would expect them to revisit this issue in particular.

The bottom line though is that *eventually*, we will reach an agreement with management; it's just a matter of when and what. In the absence of an agreement by March 31, 2013, the parties have agreed to jointly petition the National Mediation Board for mediation services.

Delta MEC Negotiating Committee
Parri Olmstead, Matt Coons, Heiko Kallenbach, and Dan Vician