UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PINNACLE AIRLINES CORP., *et al.*, | ) Case No. 09-12-11343 (REG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

### DECLARATION OF JASON CUDE

I, Jason Cude, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

### BACKGROUND

1. I am a General Manager, Financial Analysis, for Delta Air Lines, Inc. ("Delta"). I have worked for Delta and (before the merger) Northwest Airlines since 1997. Prior to joining Northwest, I received a bachelor of science degree in aeronautical engineering from Purdue University and a MBA in aviation from Embry-Riddle Aeronautical University.

2. I have spent my whole career in the airline industry. Over my fifteen years in the business, I have spent time in project finance, supply chain management, flight operations, financial planning and analysis, and planning/staffing at either or both of Northwest and Delta. As part of my work for Northwest and Delta, I have become familiar with regional airline financial matters in general, Delta Connection carriers' financial matters in particular, and Delta's agreements with regional carriers that operate in the Delta Connection network. In my current role, I (along with my staff of three) am responsible for analytics and financial analyses at Delta Connection, including the analyses underlying the bidding and awarding of new lift as well as reconciliation pursuant to current agreements between Delta and its Delta Connection carriers.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and experience with the operations of Delta. If called to testify, I would testify competently to the facts set forth in this declaration.

4. Pinnacle Airlines, Inc. ("Pinnacle") currently flies 50-seat CRJ-200 and 76-seat CRJ-900 regional aircraft pursuant to certain Delta Connection Agreements (collectively, the "Pinnacle DCAs"). I understand that the Pinnacle DCAs have been presented to and approved by the Bankruptcy Court and have been assumed by Pinnacle.

5. In June 2012, I was asked to evaluate the costs of Pinnacle's services under the Pinnacle DCAs and to compare them with the costs that Pinnacle's competitors in the Delta Connection network charge Delta for similar lift. My team conducted this analysis after Delta had reached a tentative agreement with Delta's pilots, as represented by the Air Line Pilots Association, International, which, among other things, provided for an increase in mainline flying and a substantial reduction in the number of 50-seat aircraft operated by Delta Connection carriers in Delta's network. The purpose of this analysis was to determine whether Pinnacle would be a candidate for future lift awards from Delta, should Pinnacle offer the same prices that it charges Delta under the Pinnacle DCAs.

6. Based on my team's analysis, under the rates charged Delta by Pinnacle under the Pinnacle DCAs, Pinnacle's current rates materially exceed the average rates charged by Delta Connection's regional carriers (the "DC average").

7. When Delta informed Pinnacle of the information above, I understand that Pinnacle requested that Delta describe the cost gaps between Pinnacle and other Delta Connection carriers in writing. Accordingly, I helped draft a written letter dated August 1, 2012, summarizing the results of my team's analysis and the methodology used to estimate the cost

gaps. The letter provided at Pinnacle's request (the "Letter") is attached to this declaration as Exhibit A.

8. As explained in the Letter, based on my team's analysis, estimated base rate amounts payable by Delta to Pinnacle for 50-seat lift in 2012 will be approximately ▉ per aircraft higher than the DC average payable by Delta in 2012 to other operators of similar gauge aircraft, and the estimated base rate amounts payable by Delta to Pinnacle for 76-seat lift in 2012 would be approximately ▉ per aircraft higher than the DC average payable by Delta in 2012 to other operators of similar gauge aircraft. Our methodology and assumptions for coming to these conclusions is explained in the Letter.

9. As also explained in the Letter, our calculations are based on Delta's commercial agreements with other Delta Connection carriers. These contracts are highly confidential and Delta is contractually prohibited from disclosing them, particularly to competitors of these carriers such as Pinnacle. Accordingly, Delta is not at liberty to disclose additional information about Pinnacle's cost gaps other than the information provided in the Letter and in this Declaration.

10. As a result of the cost gaps described in the Letter and in this Declaration, under the rates it is charging Delta under the DCAs, Pinnacle is not cost-competitive when compared to the DC average. For purposes of competing for any future lift that may be awarded by Delta, Pinnacle's annual cost gaps, based on the current DC average and the costs being charged under the Pinnacle DCAs, are approximately ▉ per aircraft for 76-seat aircraft and approximately ▉ per aircraft for 50-seat aircraft.

I, Jason Cude, declare under penalty of perjury that the foregoing is true and correct.

September 13, 2012          /s/ *Jason Cude*

            Jason Cude