**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**In re:**

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

---

### DECLARATION OF W. CHRIS HARRISON IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113

W. Chris Harrison declares and says:

1. I am the Vice President of Labor Relations for Pinnacle Airlines Corp. ("Pinnacle" or the "Company"). I have been employed in this position since 2011. From 2005 through 2011, I served as a staff attorney and director of legal affairs for Pinnacle Airlines, Inc., a wholly owned operating subsidiary of Pinnacle. Before joining Pinnacle, I was a founding partner of Harrison & Bradley, PLLC, and practiced in the areas of labor and employment law, corporate law, and civil litigation.

2. I have actively participated on behalf of Pinnacle in Section 1113 negotiations with the Company's current flight attendant union, the Association of Flight Attendants-CWA ("AFA"); prior flight attendant union, the United Steelworkers ("USW"); and flight dispatcher union, the Transport Workers Union of America ("TWU"), before a consensual deal was reached with TWU. I offer this declaration in support of Debtors' motion pursuant to 11 U.S.C. § 1113 to reject the collective bargaining agreements between Pinnacle and the Air Line Pilots Association, International ("ALPA") and AFA.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, experience, and review of relevant business records and information. If called upon to testify, I would testify competently to the facts set forth in this declaration.

## I. Delivery of Initial Proposal

4. On May 8, 2012, Pinnacle presented its unions with proposed collective bargaining agreement ("CBA") modifications necessary for Pinnacle's reorganization. Pinnacle delivered these proposals to its unions over the course of several meetings held on May 8, 2012, beginning with a joint overview presentation by the Company to the unions. Pinnacle representatives at this initial meeting besides me included Sean Menke, Pinnacle's former Chief Executive Officer; John Spanjers, Pinnacle's current Chief Executive Officer; Jerrold Glass, Pinnacle's lead Section 1113 negotiator and President of F&H Solutions Group; Susan Otten, Pinnacle's former Director of Benefits and Compensation; Ginger Hughes, Executive Director and Co-Head of Airline Corporate Advisory at Seabury Group; Patrick Ryan, Vice President of Manpower Planning and Staffing for Pinnacle; and Joseph Restifo, Vice President of Flight Operations for Pinnacle.

5. During this initial meeting, Sean Menke, John Spanjers, and Ginger Hughes provided an overview of (1) the events leading up to Pinnacle's bankruptcy filing; (2) the evolution of the regional airline industry; (3) Pinnacle's liquidity shortfall and the process of obtaining DIP financing; (4) Pinnacle's recent financial performance and its reorganization business plan; and (5) the labor cost reductions sought by the Company.

6. Following this initial meeting, I, along with several other representatives of Pinnacle including Susan Otten, met separately with USW to discuss in more detail Pinnacle's proposed modifications to the flight attendant CBA. During this meeting, we distributed a term sheet to USW leadership and walked them through the specific proposals, answering questions

2

and identifying issues for follow-up discussion. I explained that I had cleared my calendar for the next month-and-a-half and was available to meet at any time, day or night. That same day, Pinnacle provided USW with access to a web-based electronic "Data Room," a continually updated source of information regarding the Company's proposals, discussed further below.

## II.     Flight Attendant Negotiations

### A.     May 8, 2012 Proposal

7.     Starting with the initial meetings on May 8, 2012, Pinnacle has worked continually to reach a consensual resolution with its flight attendants regarding necessary CBA modifications. I and other Pinnacle representatives have made ourselves available to meet with USW, and later AFA, every day, around the clock. We have participated in numerous formal and informal meetings, calls, presentations, working sessions, sub-group conferences, email exchanges, and other communication with USW and AFA regarding the proposed modifications. Over the course of May, June, and July, I and other Pinnacle representatives – often including Barb Setsvold, Vice President of Inflight; Dan Copp, Labor Relations Manager; Ben Murray, Director of Financial Planning; Susan Otten, former Director of Benefits; and/or others most familiar with the particular topics to be discussed – met in person or conferred via teleconference with USW on no fewer than 14 separate occasions, totaling approximately 25 hours, including the following:

- On the morning of May 21, 2012, my team and I participated in a teleconference with USW leadership for approximately forty minutes to discuss, among other things, USW's data requests. We also answered USW's questions about the Company's business plan and various costing calculations.

3

- On the afternoon of May 21, 2012, my team and I spoke with USW leadership and Emily Woodward, Executive Director of the Steelworkers Health & Welfare Fund for about thirty minutes. During this meeting, we discussed, among other things, proposed modifications to the flight attendant insurance plans.
Ms. Woodward requested that we provide certain employee-related information from ALPA and TWU. We provided this information to USW on May 30, 2012, after receiving permission from ALPA and TWU.

- On May 31, 2012, my team and I met with USW leadership for over five hours. During this meeting, we discussed, among other things, the labor costing model used in connection with Pinnacle's proposals, including assumptions underlying the model. We also discussed Pinnacle's proposals regarding furloughs, hotel savings, holidays, time off and insurance plans. In addition, we presented USW with a revised term sheet eliminating the home study and distance learning programs from the Company's proposal.

- On June 1, 2012, my team and I met with USW leadership for over three hours. During this meeting, we discussed, among other things, Pinnacle's costing with respect to holiday pay and certain pilot work rules, as well as potential modifications to the assumptions underlying Pinnacle's model.

- On June 5, 2012, my team and I met with USW leadership for approximately seven-and-a-half hours. During this meeting, we discussed, among other things, work rules associated with flight pay loss and the assumptions underlying Pinnacle's model.

4

- On June 6, 2012, my team and I met with USW leadership and arranged to have Pinnacle's investment banking advisor, Barclays, participate by teleconference. During this meeting, which lasted approximately forty-five minutes, we discussed, among other things, various financial assumptions underlying Pinnacle's proposal.

- On June 7, 2012, my team and I met with USW leadership for an hour and fifteen minutes. During this meeting, we discussed USW's requests for information and data concerning, among other things, Pinnacle's attrition assumptions, calculations concerning holiday pay and per diem rates, and historical merit and bonus information. We directed USW to the location of much of this information in the Data Room, or within Pinnacle's business model, and agreed to provide them with the additional information they had requested.

- On June 11, 2012, my team and I met with USW leadership for approximately twenty minutes to discuss the live labor costing model.

- On the morning of June 12, 2012, my team and I met with USW leadership for more than an hour. During this meeting, we discussed, among other things, staffing reserves, ways to optimize Pinnacle's flight attendants' productivity, and Pinnacle's flight attendant staffing models.

- On the afternoon of June 12, 2012, my team and I met with USW leadership for almost two hours. During this meeting, we discussed, among other things, USW's proposed "perfect attendance" program and modifications to the flight attendant reserves rules. I requested that USW provide my team with a written proposal concerning these modifications so that Pinnacle could examine the

   costing and determine whether the proposed modification would reduce costs if adopted.

- On June 13, 2012, my team and I met with USW leadership for two-and-a-half hours to discuss, among other things, certain USW information requests, flight attendant training programs, and assumptions underlying the Company's business model.

- On June 19, 2012, my team and I met with USW leadership for approximately one hour to discuss, among other things, costing of eliminating holiday pay and reducing premium pay for junior assignments. We also discussed flight attendant attrition numbers and several USW proposals, including allowing flight attendants to drop more hours, increasing the number of part time flight attendants, a perfect attendance program, and a jumpseat program.

- On June 21, 2012, my team and I had a conference call with USW leadership for approximately thirty minutes to discuss, among other things, costing of the pay increase and eliminating holiday pay.

- On July 11, 2012, my team and I met briefly with USW to discuss the suspension of negotiations.

8.   In addition to these and various other meetings and communications, Pinnacle has supplied substantial amounts of information to USW (and later AFA) via the electronic Data Room, both proactively and in response to numerous requests. The Data Room contained nearly 300 documents and over 7,000 pages of information as of September 12, 2012, including – among numerous other documents – Pinnacle's budgets and projections, summaries of its carrier

contracts, information concerning collective bargaining agreements with other carriers, data on Pinnacle's monthly flight profitability, and static versions of its business model.

9. Pinnacle has shared electronic information with USW via the Data Room and/or through email on numerous occasions, including the following, among many others:

- On May 8, 2012, Pinnacle granted USW access to the Data Room, which contained certain financial and other documents related to Pinnacle's proposal.

- On May 9, 2012, Pinnacle provided USW with its labor costing model.

- On May 11, 2012, Pinnacle provided USW with financial due diligence information.

- On May 21, 2012, Pinnacle provided USW with information concerning Pinnacle's existing and proposed health plans.

- On May 25, 2012, Pinnacle provided USW with various static model print-outs.

- On May 29, 2012, Pinnacle provided USW with various analyses regarding its contracts with Delta.

- On June 4, 2012, Pinnacle provided USW with various budgeting and pilot productivity data.

- On June 15, 2012, Pinnacle provided USW with information concerning pilot training.

10. Pinnacle also made a "live" version of its labor costing model available to USW in a private room at its headquarters in Memphis, Tennessee. USW was given a key to this private room and the ability to run the model with alternate assumptions and otherwise manipulate the model in any way it chose, without any monitoring or participation by the Company, unless it requested assistance.

7

11. In parallel with its negotiations with USW, Pinnacle began supplying information regarding its proposed CBA modifications to AFA in early June 2012, after it was announced that AFA had obtained a sufficient "showing of interest" to trigger a representation election between USW and AFA, and therefore might soon become the authorized representative of Pinnacle's flight attendants. So as to avoid potential delay to the negotiations process in the event that AFA won the election, Pinnacle sought and obtained from the Court permission to begin sharing relevant information with AFA. Pursuant to the Court's guidance, Pinnacle entered into a confidentiality agreement with AFA on or about June 15 and immediately thereafter granted AFA access to Pinnacle's labor negotiations Data Room and invited AFA to access the same room available to USW at Pinnacle's headquarters containing the live business model. AFA chose not to access the live model at that time.

12. On June 14, 2012, I and other members of Pinnacle's management team, including John Spanjers, as well as various of Pinnacle's advisors, traveled to the offices of F&H Solutions Group in Washington, D.C. to deliver a full-day briefing to AFA on various topics, including the status of Pinnacle's restructuring, the Company's business plan and current financial condition, and the proposed modifications to the Company's collective bargaining agreements. During this meeting, which lasted approximately five hours, Pinnacle presented to AFA the same materials that had been presented to the unions by management on May 8, 2012 when the Company's initial proposals were delivered.

13. Pinnacle withdrew its proposal and temporarily suspended negotiations with its unions on June 22, 2012, after receiving new information from Delta Air Lines. On July 16, 2012, AFA was elected as the authorized representative of Pinnacle's flight attendants.

### B. Revised August 16, 2012 Proposal

14. Pinnacle presented revised proposals and resumed negotiations with its unions on August 16, 2012. On that day, Pinnacle representatives met individually with each of the unions to distribute revised term sheets and to walk the unions through the details of the revised proposals for modification of the CBAs.

15. During our August 16 meeting with AFA leadership, my team and I provided an overview of the labor negotiations and the overall restructuring process to date and explained the reasons the Company had temporarily suspended negotiations. Steve Rossum, Pinnacle's Chief Restructuring Officer, explained that since negotiations had been temporarily suspended, the Company had worked to devise a new business plan and revised its Section 1113 proposals. Mr. Rossum explained that Delta's decision to reduce its 50-seat aircraft flying had a substantial impact on Pinnacle's business and that the Company's new business plan would make Pinnacle competitive for the business of Delta and other mainline carriers. Ginger Hughes of Seabury provided an overview of the Company's cash position, comparing its actual revenues with the revenues it had budgeted for the second quarter. Ms. Hughes also explained how Pinnacle had sought to validate the cost differential identified by Delta between Pinnacle's rates for 76-seat flying and those of its competitors. Jerrold Glass walked AFA through a number of new work rule modifications in the revised proposal. During this meeting, I informed AFA that I was available to meet at any time, including nights and weekends, to further discuss the revised proposal.

16. At the meeting, Pinnacle also supplemented the information that it had previously provided to the unions with additional information related to the revised proposal. In addition to the revised term sheet, my team and I provided AFA with the documents explaining Pinnacle's

9

revised business plan and the concessions necessary to the Company's successful restructuring. These documents included Pinnacle's latest consolidated financial results and forecast; a comparison of Pinnacle's revised business plan against its 2012 forecast; a summary of expected savings under Pinnacle's revised business plan; Pinnacle's DIP budget and thirteen-week cash flow forecast; an explanation of the methodology Pinnacle used to apportion savings between work groups; a comparison of known, identifiable cost differences between Pinnacle and Compass with respect to CRJ-900 jets; and a letter from Donald Bornhorst of Delta Air Lines to John Spanjers explaining that the rates Pinnacle charges to Delta for 50- and 76-seat flying are higher than those of other regional carriers.

17.     Since negotiations resumed, I and other Pinnacle representatives, including Jerrold Glass, Dan Copp, Barb Setsvold, Steve Rossum, and Ginger Hughes, have made ourselves continuously available to meet at any time requested by AFA. Since the resumption of negotiations on August 16, there have been at least seven additional meetings or conference calls between Pinnacle and AFA, totaling over 10 hours, including the following:

- On August 28, 2012, my team and I met in New York with AFA's financial analyst, Dan Akins, for almost five hours. During this meeting, we walked Mr. Akins through the same charts and exhibits that we provided to AFA when we submitted the revised proposal on August 16, 2012, including the letter from Donald Bornhorst of Delta Air Lines, and answered Mr. Akin's questions about the revised proposal.

- On August 29, 2012, my team and I met with AFA leadership for almost an hour. During this meeting, we discussed, among other things, the proposed wage reductions, holiday pay, uniform allowances, base balancing strategies, home

10

reserve policies, Pinnacle's 401k policy, and health insurance benefits. We agreed to perform a costing analysis concerning these work rule modifications. AFA also informed us that it would deliver a formal counter-proposal once this analysis was complete.

- On August 31, 2012, my team and I met with AFA leadership for approximately half an hour. During this meeting, we discussed AFA's proposal, including pay issues and seniority.

- On September 4, 2012, my team and I met with AFA leadership for approximately forty-five minutes. During this meeting, we discussed, among other things, the costing of AFA's savings proposals.

- On September 7, 2012, my team and I met with AFA leadership for approximately forty-five minutes. During this meeting, AFA submitted a counter-proposal, which we discussed over the course of the meeting.

- On September 10, 2012, my team and I met with AFA leadership for approximately one hour. During this meeting, we provided AFA with a counter-proposal. We also discussed costing of AFA's September 7, 2012 counter-proposal and costing of the Company's counter-proposal.

- On September 12, 2012, my team and I met with AFA leadership for approximately twenty-five minutes. During this meeting, AFA provided the Company with a counter-proposal.

- On September 13, 2012, my team and I met with AFA leadership for thirty minutes. During this meeting, we presented AFA with a counter-proposal.

11

18. In addition to granting AFA continual access to the Data Room and Pinnacle's updated live model, the Company has continued to share information with AFA, both providing information proactively and promptly responding to numerous requests. Examples include, among others:

- On August 16, 2012, Pinnacle provided AFA with various documents related to the Company's revised proposal.

- On August 17, 2012, Pinnacle provided AFA with a static version of the labor costing model.

- On August 20, 2012, Pinnacle provided AFA with information regarding work rules and benefits of Delta Connection carriers.

- On August 23, 2012, Pinnacle provided AFA with an analysis by Compass Lexecon regarding the cost gap identified by Delta.

- On August 24, 2012, Pinnacle provided AFA with additional information regarding the Compass Lexecon analysis.

- On August 28, 2012, Pinnacle provided AFA with information updating its wage comparisons.

- On August 29, 2012, Pinnacle provided AFA with information related to its mark-to-market analysis, its business plan, and financial results.

- On August 30, 2012, Pinnacle provided AFA with various documents relating to its financial results and flight attendant benefits.

- On September 4, 2012, Pinnacle provided AFA with a costing analysis requested by AFA.

12-11343-reg    Doc 653    Filed 09/21/12    Entered 09/21/12 17:03:27    Main Document
Pg 13 of 15

- On September 5, 2012, Pinnacle provided AFA with costing information related to AFA's alternative proposals and flight attendant work rules and benefits.
- On September 11, 2012, Pinnacle provided AFA with information regarding healthcare plan participation and premiums.

19. On September 7, 2012, AFA presented Pinnacle with a counter-proposal. The counter-proposal accepted limited portions of the Company's flight attendant work rule proposals, including those related to U.S. Customs pay, deadhead pay, schedule credit for flight attendant training, minimum days of flying, and extended sick leave. The counter-proposal also included several work rule proposals that were similar to those the Company had proposed. However, it otherwise deviated from the Company's proposal on its most substantial elements. For example, AFA did not accept any amount of wage cuts, proposing instead a short-term longevity freeze. Nor did AFA accept any reductions to retirement benefits or health benefits for full-time flight attendants. Moreover, AFA's counter-proposal was limited to four years.

20. AFA claimed that its September 7, 2012 counter-proposal would provide Pinnacle with approximately $3.7 million in annual savings, as compared to the approximately $6.4 million in annual savings that Pinnacle has requested from its flight attendants. The Company's costing analysis is ongoing, but it appears that AFA's counter-proposal approaches $3.7 million in annual savings over AFA's proposed duration of four years.

21. On September 10, 2012, the Company provided AFA with a counter-proposal incorporating various items contained in or adapted from AFA's September 7, 2012 counter-proposal – including items related to part-time flight attendant benefits, vacation accrual, uniform allowances, flight attendant report time, pay and longevity freezes, holiday pay, and co-terminals.

22. On September 12, 2012, AFA provided Pinnacle with a counter-proposal in response to the Company's September 10, 2012 counter-proposal. AFA's September 12 counter-proposal is substantially similar to its September 7 counter-proposal, again including portions of the Company's proposals regarding U.S. Customs pay, deadhead pay, schedule credit for flight attendant training, minimum days of flying, and extended sick leave. However, AFA has withdrawn its initial acceptance of the Company's profit sharing proposal and has proposed a more costly profit sharing plan. Given its similarity to AFA's first counter-proposal, AFA's second counter-proposal would also leave unaddressed a significant portion of the $6.4 million in annual savings that the Company has requested of its flight attendants.

23. Negotiations with AFA are ongoing, and Pinnacle remains committed to reaching a consensual deal.

### III.   Dispatcher Negotiations and Agreement

24. Pinnacle negotiated in good faith with TWU and reached a tentative agreement with the union on modifications to the flight dispatchers CBA on August 30, 2012, which was ratified by TWU's membership on September 11, 2012. The agreed-upon modifications include a 5% reduction in dispatcher pay rates, elimination of extended sick leave, and changes to the dispatchers' health plans and retirement benefits.

I, W. Chris Harrison, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee
Dated: September 13, 2012

_W. Chris Harrison_
W. Chris Harrison
Vice President, Labor Relations
Pinnacle Airlines Corp.