UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

## DECLARATION OF PATRICK RYAN IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113

Patrick Ryan declares and says:

1.    I am the Vice President of Manpower Planning and Staffing for Pinnacle Airlines Corp. ("Pinnacle" or the "Company"). I have been employed in this position since 2011. Before joining Pinnacle, I was Director of Crew Planning at JetBlue Airways. I have also served in senior level positions in Flight Operations Planning at Frontier Airlines and Comair, Inc., and held several crew scheduling and planning positions at America West Airlines.

2.    I have actively participated on behalf of Pinnacle in Section 1113 negotiations with the Company's pilots union, the Air Line Pilots Association, International ("ALPA"). I offer this declaration in support of Debtors' motion pursuant to 11 U.S.C. § 1113 to reject the collective bargaining agreements between Pinnacle and ALPA and the Association of Flight Attendants-CWA ("AFA").

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, experience, and review of relevant business records and information. If called upon to testify, I would testify competently to the facts set forth in this declaration.

I.    **May 8, 2012 Proposal**

4.    On May 8, 2012, Pinnacle presented its pilot, flight attendant, and flight dispatcher unions with proposed collective bargaining agreement ("CBA") modifications necessary for Pinnacle's reorganization.  Pinnacle delivered this proposal to ALPA over the course of several meetings held on May 8, 2012, beginning with an overview presentation by the Company to all three unions.  Pinnacle representatives at this initial meeting besides me included Sean Menke, Pinnacle's former Chief Executive Officer; John Spanjers, Pinnacle's current Chief Executive Officer; Jerrold Glass, Pinnacle's lead Section 1113 negotiator and President of F&H Solutions Group; W. Chris Harrison, Pinnacle's Vice President of Labor Relations; Susan Otten, Pinnacle's former Director of Benefits and Compensation; Ginger Hughes, Executive Director and Co-Head of Airline Corporate Advisory at Seabury Group; and Joseph Restifo, Vice President of Flight Operations for Pinnacle.

5.    During this initial meeting, Sean Menke, John Spanjers, and Ginger Hughes provided an overview of (1) the events leading up to Pinnacle's bankruptcy filing; (2) the evolution of the regional airline industry; (3) Pinnacle's liquidity shortfall and the process of obtaining DIP financing; (4) Pinnacle's recent financial performance and its reorganization business plan; and (5) the labor cost reductions sought by the Company.

6.    Following this initial meeting, I, along with several other representatives of Pinnacle, including Joseph Restifo, Jerrold Glass, W. Chris Harrison, Alan English, Pinnacle's Manager of Labor Relations, and Ronald Pekar, Pinnacle's Director of Staffing and Analysis, met with ALPA's negotiation team to discuss in more detail Pinnacle's proposed modifications to the pilot Joint Collective Bargaining Agreement ("JCBA").  Participants on behalf of ALPA included Jane Schraft, John Gaffney, Paul Hallin, Jonathan Allen, Marcia Eubanks and Tom Wychor, ALPA's Master Executive Council ("MEC") Chairman.  During this meeting, we

2

distributed a term sheet to ALPA leadership and walked them through the specific proposals, answering questions and identifying issues for follow-up discussion. I explained to ALPA representatives that the Company's representatives were available to meet at any time, day or night. That same day, Pinnacle provided ALPA representatives with access to a web-based electronic "Data Room," a continually updated source of information regarding the Company's proposals, as discussed further below.

7.      Starting with the initial meetings on May 8, 2012, Pinnacle has worked continually to reach a consensual resolution with its pilots regarding necessary CBA modifications. I and other Pinnacle representatives have made ourselves available to meet with ALPA every day, around the clock. We have participated in numerous formal and informal meetings, calls, presentations, working sessions, sub-group conferences, email exchanges, and other communications with ALPA regarding the proposed modifications. Over the course of May, June and July, I and other Pinnacle representatives – often including Jerrold Glass, Joseph Restifo, Alan English, Ronald Pekar, and/or others most familiar with the particular topics to be discussed – met in person or conferred via teleconference with ALPA on no fewer than 30 separate occasions. Those meetings, totaling approximately 39 hours, have included the following, among others:

- On May 9, 2012, my team and I met twice with ALPA leadership for a total of approximately one-and-a-half hours. In these meetings, we discussed, among other things, the business plan and modifications to specific provisions, such as those regarding the integrated seniority list and pilot furloughs.

- On May 10, 2012, my team and I met twice with ALPA leadership, for almost three-and-a-half hours. During these meetings, we discussed the proposal and my

team provided ALPA with a savings summary and explained proposed
modifications regarding health benefits and short-term disability benefits.

- On May 11, 2012, my team and I met with ALPA leadership for almost an hour-and-a-half. In this meeting, we discussed, among other things, a long-term leave of absence proposal by ALPA.

- On May 14, 2012, my team and I had a conference call with ALPA for forty-five minutes. During this meeting, we discussed the long-term leave of absence proposal.

- On May 15, 2012, my team and I met with ALPA leadership for almost an hour and continued to discuss ALPA's proposal regarding long-term leave of absence and pilot furloughs.

- On May 17, 2012, my team and I met with Marcia Eubanks and Paul Hallin of ALPA to discuss Pinnacle's business plan.

- On May 18, 2012, my team and I met with ALPA leadership for almost an hour-and-a-half. In this meeting, we provided ALPA with a revised term sheet to correct certain errors identified in Pinnacle's costing model, and further discussed ALPA's proposal regarding long-term leave of absence and pilot furloughs.

- On May 21, 2012, my team and I met with ALPA leadership for almost five hours. In this meeting, we discussed, among other things, modifications regarding pilot training and attrition rates, and the assumptions behind various costing calculations.

- On May 22, 2012, my team and I met twice with ALPA leadership for a total of almost three hours. In the first meeting, we discussed, among other things,

modifications regarding health and retirement benefits. During our second

meeting with ALPA, Gary Sultan and Mark Shapiro of Barclays, participating via

conference call, discussed Pinnacle's business plan and answered questions from

ALPA leadership.

- On May 24, 2012, my team and I met with ALPA leadership for an hour and

  discussed, among other things, pilot attrition, modifications regarding pilot

  training, and other key costing assumptions.

- On May 30, 2012, my team and I met with ALPA leadership for over an hour-

  and-a-half. In this meeting, ALPA provided the Company with a partial counter-

  proposal.

- On May 31, 2012, my team and I met with ALPA leadership for over an hour. In

  this meeting, we provided ALPA leadership with a response to ALPA's proposal

  regarding long-term leave of absence.

- On June 1, 2012, my team and I met with ALPA leadership for an hour. In this

  meeting, we discussed, among other things, modifications to work rules regarding

  long-term leave of absence and pilot furloughs.

- On June 5, 2012, Jerrold Glass (via telephone), Joseph Restifo, Alan English, and

  Ronald Pekar met with ALPA leadership for an hour. At this meeting, they

  provided ALPA with a partial counter-proposal outlining the Company's response

  to certain issues, and identifying other issues for further discussion. On the same

  date, my team and I also had a conference call with ALPA and representatives

  from Barclays to review the assumptions of the Company's business plan.

- On June 11, 2012, my team and I met with ALPA leadership for an hour-and-a-half. In this meeting, we discussed, among other things, the extent to which modifications to long-term leave of absence provisions would generate savings.

- On June 12, 2012, my team and I met with ALPA leadership for three hours. During this meeting, we discussed, among other things, ALPA's proposal for revising work rules related to Pinnacle's Preferential Bidding System ("PBS").

- On June 13, 2012, my team and I met with ALPA leadership for approximately forty-five minutes. During this meeting, we discussed, among other things, proposed modifications to work rules regarding pilot training.

- On June 14, 2012, my team and I met with ALPA leadership for over an hour. During this meeting, we discussed, among other things, ALPA's proposal regarding Pinnacle's "Long Call Available" ("LCA") work rules and various concepts related to potential vacancy bid procedures.

- On June 19, 2012, my team and I met with ALPA leadership for almost an hour. During this meeting, we discussed, among other things, Pinnacle's pilot attrition forecasts and modifications to work rules regarding LCA and pilot training.

- On June 21, 2012, my team and I met with ALPA leadership for over an hour-and-a-half. During this meeting, we discussed, among other things, the costing analysis for the hotel buy-out work rule modification. ALPA also provided the Company with a proposal regarding the LCA work rules and long-term leave of absence.

8.    Pinnacle withdrew its proposal and temporarily suspended negotiations with its unions on June 22, 2012, after receiving new information from Delta Air Lines.  The parties, however, continued to meet at ALPA's request to discuss various discrete issues.  For example:

- On June 26, 2012, members of my team had a conference call with ALPA regarding, among other things, work rules related to co-domiciles.

- On June 28, 2012, my team and I met twice with ALPA leadership for a total of approximately forty-five minutes.  During these meetings, we discussed, among other things, work rules related to pilot training and Pinnacle's plans regarding the Q-400 wind down.

- On July 6, 2012, my team and I met with ALPA leadership for almost three hours. In this meeting, we discussed, among other things, the Q-400 wind down and associated pilot displacements and training costs, the need for an investor to emerge from bankruptcy, and ALPA's long-term leave of absence proposal.

- On July 17, 2012, members of Pinnacle's negotiating team, including Jerrold Glass, Joseph Restifo, and Alan English had a conference call with ALPA leadership for about forty-five minutes.  During this call, they discussed, among other things, ALPA's long term leave of absence proposal and Pinnacle's concerns regarding the administrative burdens it would entail.

- On July 18, 2012, my team and I had a conference call with ALPA leadership for about twenty minutes.  During this call, we discussed, among other things, ALPA's long-term leave of absence proposal.

- On July 25, 2012, my team and I had a conference call with ALPA leadership for over an hour-and-a-half. During this call, we discussed, among other things, modifications to work rules related to pilot training.

- On July 26, 2012, my team and I met with ALPA leadership. During this meeting, we continued to discuss temporary modifications to work rules related to pilot training.

- On August 1, 2012, my team and I met with ALPA leadership. During this meeting, we continued to discuss temporary modifications to work rules related to pilot training.

- On August 6, 2012, my team and I had a conference call with ALPA. During this call, we continued to discuss temporary modifications to work rules related to pilot training.

- On August 14, 2012, my team and I met with ALPA leadership for approximately an hour. During this meeting, we discussed, among other things, work rule modifications regarding pilot training.

9.     In addition to participating in numerous meetings and other communications with ALPA and continually making itself available to negotiate, Pinnacle has continually provided information to ALPA related to its proposed JCBA modifications, both proactively and in response to ALPA's requests, utilizing the electronic Data Room. The Data Room contained nearly 300 documents and over 7,000 pages of information as of September 12, 2012, including – among numerous other documents – Pinnacle's budgets and projections, summaries of its carrier contracts, information concerning collective bargaining agreements with other carriers, data on Pinnacle's monthly flight profitability, and static versions of Pinnacle's business model.

10.    Pinnacle has shared electronic information with ALPA via the Data Room and/or through email on numerous occasions, including the following, among many others:

- On May 9, 2012, Pinnacle provided ALPA with information regarding sick day accrual and the use of sick leave.

- On May 11, 2012, Pinnacle provided ALPA with its seniority list, a summary of pilot longevity dates, a fleet plan, and financial due diligence information.

- On May 14, 2012, Pinnacle provided ALPA with information regarding proposed health plans and a static version of the costing model.

- On May 15, 2012, Pinnacle provided ALPA with information regarding 401(k) participation, pilot benefits, pilot payroll tax percentages, pilot attrition, and pilot staffing.

- On May 18, 2012, Pinnacle provided ALPA with information regarding the average time Pinnacle pilots were away from their base each month, and certain pilot payroll information.

- On May 21, 2012, Pinnacle provided ALPA with information regarding Pinnacle's operational performance.

- On May 22, 2012, Pinnacle provided ALPA with information regarding the business plan, long-term disability, moving expenses, retiree medical benefits, pilot training, crew planner wages, 401(k) participation, pilot attrition, and the costing of various work rules.

- On May 23, 2012, Pinnacle provided ALPA with financial due diligence information regarding the costs of pilot training and medical benefits.

9

- On May 24, 2012, Pinnacle provided ALPA with information regarding pilot health benefits.

- On May 29, 2012, Pinnacle provided ALPA with information regarding pilot attrition, pilot wages, pilot training, and disability benefits.

- On May 30, 2012, Pinnacle provided ALPA with information regarding pilot training.

- On May 31, 2012, Pinnacle provided ALPA with information regarding Family and Medical Leave Act ("FMLA") eligibility.

- On May 31, 2012, Pinnacle provided ALPA with information regarding per diem, FMLA eligibility and training hotel savings, as well as other documents related to Pinnacle's proposal.

- On June 1, 2012, Pinnacle provided ALPA with information regarding future pilot vacancies.

- On June 6, 2012, Pinnacle provided ALPA with information regarding pilot attrition.

- On June 13, 2012, Pinnacle provided ALPA with information regarding its DIP budget and pilot attrition.

- On June 15, 2012, Pinnacle provided ALPA with information regarding the implementation of the hotel buyout program.

- On June 27, 2012, Pinnacle provided ALPA with information regarding sick leave and fence training.

- On June 27, 2012, Pinnacle provided ALPA with certain costing data related to international report time and co-domiciles.

10

- On July 13, 2012, Pinnacle provided ALPA with information regarding pilot attrition.

- On August 3, 2012, Pinnacle provided ALPA with information regarding cost savings related to modifications to the retiree medical plan, the hotel buyout program, Pinnacle's 2012 budget, and comparisons of work rules in Pinnacle's proposal to the work rules of competitors.

11.    Pinnacle also made a "live" version of its labor costing model available to ALPA in a private room at its headquarters in Memphis, Tennessee, providing ALPA with a key to this private room and the ability to manipulate the model without any monitoring or presence by company representatives, except to the extent requested by ALPA to answer questions. Pinnacle offered to provide an on-site tutorial of the model to explain its methodology, review its assumptions, answer ALPA's questions, and provide ALPA with all of the information necessary to understand and evaluate the model.

## II.    Revised August 16, 2012 Proposal

12.    Pinnacle presented revised proposals and resumed negotiations with its unions on August 16, 2012. On that day, several Pinnacle representatives and I met with ALPA to distribute a revised term sheet, and to walk ALPA through the details of the revised proposals for modification of the JCBA. During our meeting with ALPA, my team and I provided an overview of the reasons the Company had suspended negotiations. Steven Rossum, Pinnacle's Chief Restructuring Officer, began the meeting with an overview of the labor negotiations and the overall restructuring process. Mr. Rossum explained that, since negotiations were temporarily suspended, the Company had worked to devise a new business plan and a revised proposal. Mr. Rossum explained that Delta's decision to reduce 50-seat aircraft flying was a

11

"game changer," and that the Company's new business plan would make Pinnacle competitive for the business of Delta and other mainline carriers. Ginger Hughes of Seabury presented an overview of the Company's cash position, comparing its actual revenues with the revenues it had budgeted for the second quarter. Ms. Hughes also explained how Pinnacle had sought to validate the cost differential identified by Delta between Pinnacle's rates for 76-seat flying and those of its competitors. Jerrold Glass walked ALPA through a number of new work rule modifications in the revised proposal. Mr. Glass explained that Pinnacle was prepared to meet every day for the next month to negotiate.

13.     At the August 16, 2012 meeting, Pinnacle also supplemented the information that it had previously provided to ALPA with additional information related to the revised proposal. In addition to the revised term sheet, my team and I provided ALPA with the documents explaining Pinnacle's revised business plan and the concessions necessary to the Company's successful restructuring. These documents included Pinnacle's latest consolidated financial results and forecast; a comparison of Pinnacle's revised business plan against its 2012 forecast; a summary of expected savings under Pinnacle's revised business plan; Pinnacle's DIP budget and thirteen-week cash flow forecast; an explanation of the methodology Pinnacle used to apportion savings between work groups; a comparison of known, identifiable cost differences between Pinnacle and Compass with respect to CRJ-900 jets; and a letter from Donald Bornhorst of Delta Air Lines to John Spanjers explaining that the rates Pinnacle charges to Delta for 50- and 76-seat flying are higher than those of other regional carriers.

14.     Since negotiations resumed, Pinnacle representatives have again made themselves continuously available to meet at any time requested by ALPA, including express invitations to negotiate during weekends and over the Labor Day holiday.

15.    Since the resumption of negotiations on August 16, 2012, there have been at least

15 additional meetings or conference calls between Pinnacle and ALPA, totaling approximately

26 additional hours, including the following:

- On August 17, 2012, my team and I met with ALPA leadership for approximately

  half an hour.  During this meeting, we discussed, among other things, scheduling

  issues and additional data requests from ALPA.

- On August 20, 2012, my team and I met with ALPA leadership for over an hour.

  We discussed, among other things, the reasons why Pinnacle decided it was

  necessary to develop a revised proposal and pilot training.

- On August 21, 2012, my team and I met twice with ALPA leadership for a total of

  over two hours.  During the first meeting, the parties discussed, among other

  things, the letter that Pinnacle received from Donald Bornhorst of Delta,

  discussions between Pinnacle and Delta representatives regarding the letter, and

  Pinnacle's efforts to test the figures contained in the Bornhorst letter.  During the

  second meeting, the parties discussed, among other things, the costing analysis

  performed by Pinnacle's financial advisors in connection with generating the

  revised proposal.

- On August 22, 2012, my team and I met twice with ALPA leadership for a total of

  over four hours.  During the first meeting, Gary Sultan and Mark Shapiro of

  Barclays discussed Pinnacle's revised business plan and answered questions from

  ALPA leadership.  During the second meeting, we discussed, among other things,

  modifications to work rules regarding pilot training.

13

- On August 23, 2012, my team and I met with ALPA leadership twice for a total of approximately two hours. During the first meeting, we discussed, among other things, the bases for the pay rate proposal and pilot training modifications. During the second meeting, we discussed, among other things, work rules related to pilot domicile relocation.

- On August 27, 2012, my team and I had a conference call with ALPA. During this call, we discussed, among other things, the savings associated with the Company's retiree medical proposal.

- On August 30, 2012, my team and I met with ALPA for approximately two hours. During this meeting, ALPA submitted a counter-proposal, which Pinnacle has considered and reviewed with ALPA in detail, as discussed below.

- On August 31, 2012, my team and I met with ALPA for approximately two hours. During this meeting, we discussed, among other things, the assumptions and methodology used in costing Pinnacle's revised proposal.

- On September 4, 2012, my team and I met with ALPA for almost three hours. During this meeting, we discussed, among other things, modifications to work rules related to pilot scheduling.

- On September 5, 2012, my team and I met with ALPA for almost two hours. During this meeting, we discussed, among other things, the costing of various elements of Pinnacle's revised proposal and ALPA's counter-proposal.

- On September 6, 2012, my team and I met twice with ALPA for a total of over two hours. During the first meeting, we discussed, among other things, the

14

costing of health benefits for both active and retired pilots. During the second

meeting, my team and I provided ALPA with a revised proposal.

- On September 10, 2012, my team and I met twice with ALPA for a total of

  approximately two-and-a-half hours. During the first meeting, we discussed,

  among other things, modifications to work rules related to pilot scheduling.

  During the second meeting, Darrin Lee, an economist from Compass Lexecon,

  participated via conference call, and answered questions about Compass

  Lexecon's analysis of the cost gap identified by Delta.

- On September 11, 2012, my team and I met twice with ALPA for a total of

  approximately three hours. During the first meeting, Stephen Hunyor and Derek

  Brand of Seabury presented a costing analysis of ALPA's August 30, 2012

  counter-proposal, and answered questions from ALPA leadership. During the

  second meeting, we continued to discuss costing of ALPA's counter-proposal.

16.    All together since the initial May 8, 2012 ask, there have been at least 50

meetings and/or teleconferences between Pinnacle and ALPA, lasting an aggregate of more than

65 hours.

17.    Since negotiations resumed on August 16, in addition to granting ALPA continual

access to the Data Room and Pinnacle's updated live model, the Company has continued to share

information with ALPA, both providing information proactively and promptly responding to

numerous requests. Examples have included, among others:

- On August 16, 2012 and August 17, 2012, Pinnacle provided ALPA with over 13

  new documents relating to its revised proposal.

- On August 20, 2012, Pinnacle provided ALPA with a version of the Seabury
  Costing model with tabs.

- On August 21, 2012, Pinnacle provided ALPA with costing information regarding
  pilot instructors and backup information for certain mark-to-market calculations.

- On August 22, 2012, Pinnacle provided ALPA with an analysis of Pinnacle's cost
  disadvantage compared to GoJet.

- On August 23, 2012, Pinnacle provided ALPA with an analysis by Compass
  Lexecon regarding the cost gap identified by Delta and information regarding
  pilot attrition.

- On September 7, 2012, Pinnacle provided ALPA with an updated version of its
  business plan analysis.

- On September 9, 2012, Pinnacle provided ALPA with information regarding the
  hotel buyout program.

- On September 11, 2012, Pinnacle provided ALPA with information regarding
  U.S. Customs pay.

### III.    ALPA Counter-Proposals and Limited Agreed Upon Savings

18.    Pinnacle has considered and discussed at length with ALPA all of its counter-
proposals and alternative ideas for savings.

19.    On May 30, 2012, ALPA provided the Company with a partial counter-proposal
in response to the Company's initial May 8, 2012 ask.  The partial counter-proposal addressed,
among other things, per diem payments, training, virtual vacation credit, uniform allowance,
"long call" pilot assignments, profit sharing, home study, and other work rules regarding pilot
training.  During our meeting, Paul Hallin of ALPA noted that ALPA had not costed many of the

items contained in its counter-proposal. According to Pinnacle's calculations, the total value of

ALPA's partial counter-proposal was approximately $3.7 million in annual savings. Over the

next few weeks, my team and I discussed the partial counter-proposal with ALPA. The parties

generated a series of redline mark-ups reflecting our positions on particular work rule

modifications, which we exchanged for purposes of discussion. My team and I reached tentative

agreements with ALPA on several work rule modifications before negotiations were temporarily

suspended on June 22, 2012. As of that time, ALPA had not yet provided Pinnacle with a

complete counter-proposal.

20.    Pinnacle has been able to reach agreement with ALPA on a small number of

discrete issues, as described in the following paragraphs.

21.    On May 9, 2012, ALPA provided Pinnacle with a long-term leave of absence

proposal to replace the voluntary furlough provision in the JCBA. The parties discussed this

proposal over the next two months, exchanging a series of counter-proposals on the following

dates: May 14, 2012 (ALPA counter-proposal), May 31, 2012 (Pinnacle counter-proposal),

June 5, 2012 (Pinnacle counter-proposal), June 13, 2012 (Pinnacle counter-proposal), June 21,

2012 (ALPA counter-proposal), June 27, 2012 (Pinnacle counter-proposal), July 17, 2012

(ALPA counter-proposal), and July 18, 2012 (Pinnacle counter-proposal). We reached an

agreement with ALPA regarding long-term leave of absence on July 30, 2012, which was

memorialized in a letter of agreement (LOA 27) of the same date. This letter of agreement

provides that pilots who are being displaced as part of a reduction or realignment that may result

in furloughs must be given the option to take long-term leave of absence if they wish to explore

opportunities with other employers, thereby preserving their right to return to full-time

employment with Pinnacle. This agreement provides a benefit to Pinnacle's pilots but does not result in a corresponding cost savings to the Company.

22.      ALPA also proposed that Pinnacle change its approach to hotel costs associated with training by providing compensation to pilots who forgo a hotel room during training. Pinnacle currently provides lodging at Company expense to pilots undergoing training away from their domicile regardless of actual need (*e.g.*, regardless of whether a pilot may have alternative free lodging near the training site). ALPA suggested that Pinnacle offer an incentive to pilots to forgo such lodging when they do not actually require it by offering to split the resulting lodging savings with those pilots. On June 7, 2012, Pinnacle agreed to ALPA's proposal, which was memorialized in a letter of agreement (LOA 25) dated August 1, 2012. The Company began offering the hotel buy-out program to its pilots on June 15, 2012. This program provides Pinnacle with modest savings of approximately $30,000 to $41,000 per year based on savings achieved to date.

23.      On June 28, 2012, the parties entered into a letter of agreement (LOA 26) regarding the scheduling of turbo-prop pilots during and immediately after the wind-down of Colgan Air operations. The agreement provides significant quality of life benefits to the pilots but little, if any, measurable cost savings for the Company.

24.      On August 28, 2012, the parties agreed to enter into a letter of agreement (LOA 28) regarding the potential reduction of pilot training events for pilots who will be displaced when the Company reduces its fleet and displaces all remaining turbo-prop pilots. This agreement modifies work rules regarding the bidding for and awarding of pilot positions and related pilot training. The potential relief and associated savings of this agreement are contingent upon the parties agreeing to the value of such cost savings after closing the next pilot

system bid award and evaluating the output. If the parties cannot agree upon the value of this agreement, the Company must award the bid without taking advantage of the potential relief provisions. If the Company is able to take advantage of the relief elements of this agreement, the Company will receive a one-time cost savings. The Company estimates that this one-time savings will be less than $2 million.

25.     On September 4, 2012, Pinnacle and ALPA agreed that a pilot undergoing fence training will be treated as a displaced pilot for vacation purposes. This agreement provides that a pilot whose training overlaps with his awarded vacation will be permitted to bid from among the remaining open vacations this year, carry his vacation over until next year, or be paid out for his vacation. This agreement provides the Company with no cost savings.

26.     To date, the parties have not been able to reach any further material agreement beyond those discussed above.

27.     On August 30, 2012, ALPA presented Pinnacle with an overall counter-proposal. The counter-proposal accepted limited portions of the Company's pilot work rule proposals, including those covering U.S. Customs credits, virtual vacation credit, home study programs, medical reimbursement, and association flight pay loss. However, it otherwise largely deviated from the Company's proposal with respect to its most important elements. For example, ALPA did not accept any amount of wage cuts, proposing instead a freeze of already above-market wages. Nor did ALPA accept any reductions to health or retirement benefits. Moreover, ALPA proposed a profit sharing plan that would provide for payments to pilots following any profitable quarter, but would make no adjustment for quarters in which the Company sustained losses. ALPA's proposal also limited the amended JCBA's duration to 18 months and imposed automatic annual 3% wage increases beginning one year after expiration of the 18 months.

19

28.    ALPA initially claimed that its counter-proposal would provide Pinnacle with "in excess of" $20 million in savings, including savings from LOA 25, but excluding any potential one-time credits for savings generated by LOA 28, as compared to the approximately $60 million Pinnacle has requested from its pilots. After making its counter-proposal, ALPA was less definitive about its view of the savings achieved by the proposal, indicating that it believed but was not sure that the proposal accomplished $20 million in savings. According to the Company's ongoing costing analysis, it appeared that the value of ALPA's counter-proposal was between $13.6 million and $15.7 million in annual savings over ALPA's proposed duration of eighteen months, and likely closer to $13.6 million than $15.7 million.

29.    On September 6, 2012, the Company provided ALPA with a counter-proposal incorporating various items contained in or adapted from ALPA's August 30, 2012 counter-proposal – including items related to pilot report time, pilot check-in procedures, investigation, discipline and disciplinary grievance procedures, single days of duty, and schedule credit value of planned activities.

30.    On September 12, 2012, ALPA provided Pinnacle with a counter-proposal in response to the Company's September 6, 2012 counter-proposal. ALPA's September 12 counter-proposal appears to be substantially similar to its August 30 counter-proposal, although ALPA claims that it achieves $25.6 million in annual cost savings (*i.e.*, up to $5.6 million more than the claimed savings under the August 30 counter-proposal). The Company's costing is ongoing, but given the similarities between ALPA's August 30 and September 12 counter-proposals, it appears that the true savings associated with ALPA's latest counter-proposal will prove to be similar to those associated with ALPA's initial counter-proposal, and fall significantly short of the $25.6 million in savings that ALPA has now claimed.

I, Patrick Ryan, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee
Dated:  September 13, 2012

Patrick Ryan
Vice President, Manpower
Planning and Staffing
Pinnacle Airlines Corp.