UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PINNACLE AIRLINES CORP., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 12-11343 (REG)<br><br>(Jointly Administered) |

DECLARATION OF MARK SHAPIRO IN SUPPORT OF DEBTORS' MOTION TO
REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIRLINE
PILOTS' ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION
OF FLIGHT ATTENDANTS-CWA, PURSUANT TO 11 U.S.C. § 1113

Mark Shapiro declares and says:

1. I am a managing director of Barclays Capital Inc. ("Barclays"). Barclays is a registered broker-dealer with the United States Securities and Exchange Commission. Barclays serves as an investment banker and financial adviser to Pinnacle Airlines Corp. ("Pinnacle" or the "Company").

2. I offer this declaration in support of Pinnacle's motion pursuant to 11 U.S.C. § 1113(c) for authorization to reject collective bargaining agreements with certain of its unions.

I. **Qualifications and Assignment**

3. As explained in prior filings in these cases, Barclays is a leading financial and restructuring adviser with extensive experience advising and financing companies in financial distress. I personally have 20 years of restructuring and Chapter 11 experience across a wide range of companies and industries. Barclays has been providing financial advisory services to Pinnacle since October 2011, including serving as Pinnacle's exclusive placement agent for an attempted out-of-court capital raise, assisting Pinnacle with its search for, and negotiation of,

debtor-in-possession ("DIP") financing, and advising and assisting Pinnacle on various matters in its Chapter 11 cases.[1]

4. I have been asked to describe the risks that Pinnacle would face under its DIP financing credit agreement and with respect to emergence from Chapter 11 more generally if Pinnacle does not obtain the requisite labor savings that would enable it to compete for future regional flying business for major airline carriers. As explained below, I conclude that Pinnacle faces various risks that are likely to jeopardize its ability to emerge from bankruptcy and/or survive post-emergence if it does not achieve labor cost savings rendering it cost-competitive to compete and obtain future business.

5. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and belief, my review of relevant documents, information provided to me by Pinnacle and its advisors (the accuracy of which I have not independently verified), or other employees of Barclays working with me and/or under my supervision, or my opinion based upon experience, knowledge, and information concerning Pinnacle's finances and the finances of reorganizing companies generally. The views set forth in this declaration reflect my professional opinions based on all currently available information. These views are subject to supplementation and modification to account for new information received, including any future input received from prospective investors or other information bearing on Pinnacle's prospects for successfully emerging from Chapter 11.

6. I am not being compensated for this testimony other than through payments received by Barclays as a professional retained by Pinnacle. I am authorized to submit this

---

[1] For a more detailed description of Barclays' qualifications, experience, and role in these Chapter 11 cases, see the Application of the Debtors for Authority to Employ and Retain Barclays Capital Inc. as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date [Dkt # 223], filed on April 27, 2012.

declaration on behalf of Barclays, and if called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## II.  DIP Covenants

7.  The terms of Pinnacle's DIP financing are set forth in the Senior Secured Super-Priority Debtor in Possession Agreement among the Debtors, Delta Airlines Corp. and Delta Air Lines Inc. dated May 18, 2012 (as amended on July 13, 2012 and August 15, 2012, the "DIP Agreement"), attached as Exhibit 1 to this declaration. The DIP Agreement provides a $74,285,000 DIP facility, convertible into exit financing, subject to the achievement of various milestones, financial covenants and other requirements with which Pinnacle must comply both to avoid an event of default and to satisfy the conditions for conversion into the exit facility. (Ex. 1, DIP Agreement, Sections 1.14, 8.1, 8.2.)

8.  Based on its current financial condition, Pinnacle will be at risk of violating the DIP Agreement requirements listed below if it does not obtain significant labor cost savings. Violation of any of these requirements would trigger an automatic event of default under the DIP Agreement, entitling Delta to accelerate all amounts owed to it under the DIP Agreement, and resulting in a failure of one or more conditions for conversion into the exit facility. (DIP Agreement, Sections 1.14, 8.2(b).) Under the Court's order approving the DIP facility, Delta could invoke its acceleration remedy on five business days' notice. (Ex. 2, DIP Order, Dkt. # 316 ¶ 9(a).)

### A.  Financial Covenants

9.  Annex G of the DIP Agreement contains three "Financial Covenants" with which Pinnacle must comply pursuant to Section 6.10 of the DIP Agreement, all of which I believe will be at risk of being violated absent significant savings.

3

### 1. *Minimum Unrestricted Liquidity*

10. Under the first Financial Covenant, Pinnacle's unrestricted cash and cash equivalents are not permitted to fall below $25 million as of the last day of any calendar month or the first business day of the next month if the last day falls on a weekend. (Ex. 1, DIP Agreement, Annex G/Section 6.10(a).)[2]

11. Pinnacle's liquidity is rapidly approaching critical levels and continues to decrease given that the Company's only revenue-producing contracts will continue to lose money absent significant labor cost savings. As set forth in the Declaration of Virginia L. Hughes, Pinnacle's unrestricted cash balance is currently projected to be ▄▄▄▄ more than is required by the Minimum Unrestricted Liquidity covenant. (Hughes Decl. ¶ 12.) On the present course, I believe Pinnacle will be at risk of breaching its minimum unrestricted liquidity covenant as of the ▄▄▄▄ testing date unless it obtains significant labor cost savings before such date. In addition to the risk of breaching this covenant, absent labor cost savings, starting in ▄▄▄▄, I believe the Company would be operating at projected liquidity levels that could put its operations at risk.

### 2. *Material Budget Deviation*

12. The second Financial Covenant limits the extent to which Pinnacle's operating expenses may deviate from what Pinnacle has budgeted. In addition to the initial budget provided for in the DIP Agreement, Pinnacle is required to submit thirteen-week budgets to Delta on a weekly basis. (Ex. 1, DIP Agreement, Section 4.1(a) & Annex D, ¶ (e).) Pinnacle's actual operating expenses must not exceed budgeted expenses by more than the "Material

---

[2] There is a parallel requirement in the DIP exit note requiring that Pinnacle's month-end unrestricted cash and cash equivalents not fall below $25 million for the first six months following closing of the exit note, and $30 million thereafter. (Ex. 1, DIP Agreement, Exhibit 1.15, Form of Exit Note, Section 5(g).)

4

Budget Deviation," defined as 15% above the budgeted level. (Ex. 1, DIP Agreement, Annex G/Section 6.10(b).)

13. Pinnacle's total operating disbursements for the four-week period ending November 30, 2012 are currently projected to be approximately ▇▇▇. (*See* Ex. 3, DIP Budget – 13 Week Cash Flow Forecast, dated September 5, 2012.) Assuming total operating disbursements for the above four-week period are similar to the total operating disbursements for the four-week period ending ▇▇▇ (excluding the impact of the labor savings), the Material Budget Deviation of 15% would provide approximately ▇▇▇ of cushion. The business plan currently reflects ▇▇▇ of labor cost savings in the month of ▇▇▇, or approximately ▇▇% ▇▇▇ of total operating disbursements. Furthermore, in six of the preceding 22 weeks ending August 31, 2012, Pinnacle's total operating expenses have exceeded projected budgeted expenses by more than ▇▇▇. Therefore, absent substantial labor cost savings, Pinnacle will be at risk of breaching the Material Budget Deviation covenant by ▇▇▇ ▇▇▇.

### 3. *Maximum Adjusted Total Operating Expenses*

14. The third Financial Covenant places fixed limits on Pinnacle's monthly adjusted total operating expenses beginning in October. Under the DIP Agreement, for the month ending October 31, 2012, Pinnacle's adjusted total operating expenses may not exceed $44 million. This limit progressively decreases under the DIP Agreement for the months that follow, ultimately requiring adjusted total operating expenses of no more than $36.5 million for the month ending March 31, 2013. (Ex. 1, DIP Agreement, Annex G/Section 6.10(c).)

15. Pinnacle's adjusted operating expenses for ▇▇▇ are currently projected to be ▇▇▇. (*See* Ex. 4, Adjusted Total Operating Expenses.) The business plan currently reflects ▇▇▇ of labor cost savings in ▇▇▇. Thus, absent the requested labor cost

5

savings, Pinnacle's Adjusted Total Operating Expenses would be ▆▆▆ in ▆▆▆ providing a cushion of only approximately ▆▆▆ against the ▆▆▆ covenant of ▆▆▆ (a cushion of ▆▆). Thus, absent significant reduction in its operating expenses or relief from this covenant, I believe Pinnacle may be at risk of breaching the maximum operating expense covenant in ▆▆▆.

### B.  Milestones and Other Requirements

16.    Pinnacle must also comply with various milestones and other requirements to avoid an event of default under the DIP Agreement and preserve its ability to convert the DIP financing into an exit facility.

17.    Annex F of the DIP Agreement sets forth defined "Milestones" relating to the Section 1113 process and Pinnacle's plan of reorganization with which Pinnacle must comply pursuant to Section 5.10 of the DIP Agreement. In the absence of a consensual agreement with Pinnacle's unions, Pinnacle is required to file a motion under Section 1113, "in form and substance reasonably acceptable" to Delta, seeking necessary modifications to certain of Pinnacle's collective bargaining agreements. By no later than 90 days after filing that motion, Pinnacle is required to have obtained a decision from the Court granting Section 1113 relief or approving consensual collective bargaining agreement modifications, in each case also "reasonably acceptable" to Delta. (Ex. 1, DIP Agreement, Annex F/Section 5.10(II)(6).)[3] Annex F also requires Pinnacle to seek and obtain confirmation of a plan of reorganization that is "reasonably acceptable" to Delta. (Ex. 1, DIP Agreement, Annex F/Section 5.10(I)(2)-(3).)

---

[3] The original deadlines for delivery of Section 1113 proposals and filing of the motion have been extended through amendments to the DIP Agreement. The current operative deadline for filing the motion is September 13, 2012.

18. Failure to comply with any of these Milestone requirements triggers an event of default under the DIP Agreement and results in a failure of a condition required to convert the DIP financing into an exit facility. (Ex. 1, DIP Agreement, Section 1.14.)

19. Furthermore, Section 8.1 of the DIP Agreement sets forth events of default under the DIP Agreement, including a default in the event that a 13-week budget approved by the Lenders (a "Budget") does not remain in full force and effect. (Ex. 1, DIP Agreement, Section 8.1(i).)

20. Delta has expressed the view that a cost reduction of ▮▮▮▮ per 76-seat aircraft, which Pinnacle's proposed labor costs are designed to achieve, is necessary to make Pinnacle cost competitive compared to the average rates charged by other Delta Connection carriers. (Cude Decl. ¶ 10; *id.*, Ex. A.) Although the current Budget does not yet reflect any labor cost savings, there is significant risk that Delta will not deem subsequent proposed budgets acceptable without the requested labor cost savings, which would cause an additional event of default to occur under the DIP Agreement.

\*      \*      \*

21. As described above, I believe that Pinnacle faces the risk of triggering events of default under its DIP Agreement and failing to satisfy conditions required to convert the DIP financing into an exit facility if it does not obtain significant labor cost savings.

### III. Additional Funding Needed to Emerge From Bankruptcy

22. Even if Pinnacle can overcome the above hurdles and satisfy all DIP Agreement requirements, including the conditions for converting the DIP financing into an exit facility, it is my belief that it is very likely that Pinnacle will still need additional capital to emerge from bankruptcy, as discussed below. Based on my general investment banking experience and my specific experience with Pinnacle – including extensive but ultimately failed efforts to attract

7

potential DIP investors other than Delta earlier this year – I believe that Pinnacle is very unlikely to obtain any third-party equity capital investment unless it can achieve a competitive cost structure through the requested labor savings permitting it to compete for future business.

23.    Pinnacle needs to be in a position to emerge from Chapter 11 prior to March 31, 2013 based on the current final maturity of the DIP Agreement.

24.    Pinnacle's successful emergence from Chapter 11 prior to March 31, 2013, depends on, among other things, having sufficient capital to pay administrative, priority, and other claims not incorporated into the business plan in cash on the exit date (currently estimated to be in the range of $15 to $22 million as of March 31, 2013). In addition, upon exit from Chapter 11, the Company must have under the proposed exit note not less than $25 million in minimum unrestricted liquidity at month end for the first six months following closing of the exit note, and $30 million thereafter. (Ex. 1, DIP Agreement, Exhibit 1.15, Form of Exit Note, Section 5(g).) However, we believe that $25 million of liquidity at emergence, when compared to Pinnacle's peer regional airlines, would leave it in a financially precarious position. Assuming Pinnacle achieves the requisite savings, Pinnacle is currently projected to have approximate ▇▇▇▇▇▇ of unrestricted cash on the balance sheet as of March 31, 2013, or approximately ▇▇% of projected 2013 revenue. This projected cash balance is based on the sum of $▇▇▇▇ of cash on December 31, 2012 (see Hughes Decl. ¶ 12) and $▇▇▇▇ of cash generated from January 1, 2013 through March 31, 2013, inclusive of the provisional March CRJ200 payment from Delta, which will be paid on April 1, 2013. (See Ex. 5, Pinnacle Long-Range Operating Forecast, dated August 16, 2012.) Pinnacle's peer regional airlines, Republic Airways Holdings Inc. ("Republic") and SkyWest, Inc. ("SkyWest"), had unrestricted cash and cash equivalents as of June 30, 2012 equal to 6.4% and 16.1% of projected 2013 revenues, respectively. (See Ex. 6,

Comparable Company Analysis.) A more prudent approach would require Pinnacle to have at least as much unrestricted liquidity as a percentage of projected 2013 revenue as its lowest peer, Republic, or approximately ▮▮▮ (6.4% of projected 2013 revenue of ▮▮▮ million) as of Pinnacle's projected Chapter 11 exit date of March 31, 2013. Based on these requirements, Pinnacle is projected to need approximately $▮▮▮, and more prudently, ▮▮▮ of additional capital to exit Chapter 11 beyond the capital provided by conversion of its DIP financing into an exit facility.

25. As outlined in the Declaration of John Spanjers, based on the August 1, 2012 letter from Delta, and as confirmed in the analyses performed by Compass Lexecon and Seabury, the Company believes that, without achieving the labor cost savings requested by the Section 1113 Motion, Pinnacle will not be in a position to compete for new business. Without the possibility of competing for new business, it is my opinion that it is very unlikely that Pinnacle will be able to raise the capital required to emerge from bankruptcy in the form of an equity investment.

26. Given the significant downward pressure in the industry, potential equity investors will demand very high returns in order to invest in the equity of a regional airline. The challenges of attracting an equity investor are further underscored by the facts that the stock prices of Republic and SkyWest have declined 75% and 60%, respectively, over the last five years, and Mesa Air Group Inc. ("Mesa") and Pinnacle both filed for bankruptcy. (*See* Ex. 7, Regional Airline Historical Equity Pricing.) It is my view that a potential equity investor would consider various factors impacting Pinnacle's long-term performance, principal among which are Pinnacle's prospects for future business beyond its current contracts.

27. Pinnacle's existing contracts currently lose money, so a prudent potential investor would condition any capital contribution on Pinnacle's reducing its costs to enable it to earn a profit on those contracts. However, it is my view that this minimal level of cost savings is unlikely to be sufficient for a prospective equity investor. If, notwithstanding temporary profitability, Pinnacle's costs remain too high to win future business, Pinnacle would be at a severe disadvantage to its competitors, thereby placing Pinnacle on an inevitable path to extinction, rendering any significant, long-term equity investment in the Company extremely risky. Pinnacle's contracts with Delta are not subject to any "minimum utilization" requirement, allowing Delta to reduce flying as it sees fit at any time, leading to potential unpredictability in Pinnacle's revenue streams. Pinnacle's agreements are subject to rate resets in 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For all these reasons, I believe that it is very unlikely that Pinnacle could raise the required ▮▮▮▮▮▮▮▮▮▮▮▮ necessary to emerge from Chapter 11 from third parties as equity capital without a cost structure that would enable Pinnacle to be in a position to compete for new business opportunities beyond its current Delta contracts.

28. Moreover, it is my opinion that it also will be very challenging for Pinnacle to attract an investor willing to make an unsecured debt investment if Pinnacle will not be in a position to obtain significant labor savings allowing it to compete for new business. Absent future business prospects, a potential unsecured debt investor without the benefit of any collateral would have to be satisfied that the short term forecasted cash flows generated by the Company would be sufficient to amortize a short term note and to pay current interest on such note (at a very high interest rate) and additionally, that the risk that such projected cash flows could be reduced is small. One significant risk to Pinnacle's future financial performance is a

continuation of the reduction in flying hours provided by Pinnacle to Delta under the existing contracts. Such a risk is not speculative, as Pinnacle's projected flying hours have been reduced for the second half of 2012 by 7%. (Hughes Decl. ¶ 39.) In addition, assuming the existence of the Delta exit note following emergence, an unsecured investor would need to be satisfied that there will be no risk of an event of default under that note. (Ex. 1, DIP Agreement, Exhibit 1.15, Form of Secured Promissory Note, Sections 5(g) and (h).) These significant risks to the Company's short term cash flow coupled with the general uncertainty in the regional airline industry, in my opinion, make it very challenging for Pinnacle to raise the required ▮▮▮▮▮ to emerge from Chapter 11 as unsecured debt, absent a cost structure that enables Pinnacle to compete for new business.

29.    This view is reinforced by my experience earlier this year attempting to find alternative DIP financing sources for Pinnacle. As described in my declaration submitted in connection with Pinnacle's DIP motion ("Shapiro DIP Declaration"), Barclays undertook an extensive DIP financing search for Pinnacle beginning in January 2012, speaking to approximately 17 potential DIP lenders.[4] Ultimately, only Delta was interested in providing DIP financing. Pinnacle was challenged by several factors in seeking DIP financing, including Pinnacle's limited unencumbered collateral, its inability to grant second liens on any of its encumbered assets, and provisions in Pinnacle's contracts with Delta allowing Delta to exercise contractual rights detrimental to Pinnacle in the event of a changes in control of Pinnacle (triggered by change in beneficial ownership of more than 25% of the Company's voting stock).

---

[4] *See* Declaration of Mark Shapiro in Support of Debtors' Motion Pursuant to Sections 105, 361, 362, 364, 365, 502, 1107 And 1108 of the Bankruptcy Code for Order (I) Authorizing Debtors To Obtain Post-Petition Financing, (II) Granting Liens And Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Authorizing Debtors To Assume Connection Agreements With Delta Air Lines, Inc., and (V) Allowing General Unsecured Claim, [Dkt # 25], filed April 2, 2012.

(*See generally* Shapiro DIP Declaration ¶¶14-26.) All of these challenges would exist again in a new search for exit capital.

*   *   *

30. Based on the above, it is my view that – absent cost savings necessary to achieve future competitive viability – it is very unlikely that Pinnacle will be able to raise as equity or debt capital the ███████████████ necessary for Pinnacle to emerge from bankruptcy. Combined with the risk of DIP Agreement events of default and inevitable extinction without the ability to win future business, it is my view that Pinnacle faces substantial short- and long-term risks if it does not obtain labor savings to support a competitive cost structure that would allow Pinnacle to compete for future regional flying.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            September 13, 2012

_____
Mark Shapiro