Exhibit 1

K&E DRAFT 5/13/12

**$74,285,000**

**SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION**

**CREDIT AGREEMENT Dated as of May 17, 2012**

**among PINNACLE AIRLINES CORP.,**

**a Debtor and Debtor in Possession,**

**as the Borrower,**

**THE OTHER CREDIT PARTIES SIGNATORY HERETO,**
**each a Debtor and Debtor in Possession,**
**as Credit Parties,**

**THE LENDERS SIGNATORY HERETO FROM TIME TO TIME,**
**as Lenders**

**and**

**DELTA AIR LINES, INC.,**
**as Administrative Agent and a Lender**

# TABLE OF CONTENTS

Page

1.  AMOUNT AND TERMS OF CREDIT .......................................................................1
    1.1   Credit Facilities.........................................................................................1
    1.2   Procedure for Loan Borrowing ..................................................................2
    1.3   Prepayments and Commitment Reduction..................................................3
    1.4   Priority and Application of Payments .......................................................4
    1.5   Use of Proceeds.........................................................................................4
    1.6   Interest and Applicable Margins ...............................................................4
    1.7   Cash Management Systems ........................................................................5
    1.8   Setoff Against Delta Connection Agreement ............................................5
    1.9   Receipt of Payments .................................................................................5
    1.10  Loan Account and Accounting ..................................................................5
    1.11  Indemnity ..................................................................................................6
    1.12  Access .......................................................................................................6
    1.13  Taxes .........................................................................................................8
    1.14  Conversion to Exit Facility .......................................................................8

2.  CONDITIONS PRECEDENT .................................................................................8
    2.1   Conditions to Closing ...............................................................................8
    2.2   Conditions to Subsequent Term Loans ...................................................11

3.  REPRESENTATIONS AND WARRANTIES.........................................................12
    3.1   Corporate Existence; Compliance with Law ..........................................12
    3.2   Executive Offices, Collateral Locations, FEIN ......................................13
    3.3   Corporate Power, Authorization, Enforceable Obligations ....................13
    3.4   Financial Statements and Projections ......................................................14
    3.5   Material Adverse Effect; Burdensome Restrictions; Default ..................14
    3.6   Ownership of Property; Real Estate; Liens..............................................15
    3.7   Labor Matters ..........................................................................................15
    3.8   Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ........15
    3.9   Government Regulation ............................................................................15
    3.10  Margin Regulations..................................................................................16
    3.11  Taxes .......................................................................................................16
    3.12  Compliance with ERISA ..........................................................................16
    3.13  No Litigation ...........................................................................................16
    3.14  Intellectual Property................................................................................17
    3.15  Full Disclosure ........................................................................................17
    3.16  [Reserved] ...............................................................................................17
    3.17  Insurance .................................................................................................17
    3.18  [Reserved] ...............................................................................................17
    3.19  Deposit Accounts .....................................................................................17
    3.20  [Reserved] ...............................................................................................17
    3.21  Compliance With Industry Standards ......................................................18

i

3.22   [Reserved] ...................................................................................................18
3.23   Secured, Super-Priority Obligations ...............................................................18
3.24   Certificated Air Carrier ..................................................................................19
3.25   U.S. Citizen .....................................................................................................19
3.26   Slots.................................................................................................................19
3.27   Airframes; Engines ..........................................................................................19
3.28   Gates and Routes ..............................................................................................19

4.   FINANCIAL STATEMENTS AND INFORMATION ...........................................20
4.1   Reports and Notices .........................................................................................20
4.2   Communication with Accountants ...................................................................20

5.   AFFIRMATIVE COVENANTS ..............................................................................20
5.1   Maintenance of Existence and Conduct of Business .......................................20
5.2   Payment of Charges .........................................................................................20
5.3   Books and Records ...........................................................................................21
5.4   Insurance; Damage to or Destruction of Collateral .........................................21
5.5   Compliance with Laws .....................................................................................22
5.6   Intellectual Property .........................................................................................22
5.7   Environmental Matters......................................................................................22
5.8   [Reserved] ........................................................................................................22
5.9   [Reserved] ........................................................................................................23
5.10   Milestones .........................................................................................................23
5.11   Further Assurances............................................................................................23
5.12   Additional Guaranties and Collateral Documents ...........................................23
5.13   Financial Consultant .........................................................................................23
5.14   Aircraft Mortgage; Spare Parts Mortgage; GR Security Agreement....................23
5.15   Gate Interests ....................................................................................................23
5.16   ERISA/Labor Matters .......................................................................................24
5.17   [Reserved] ........................................................................................................24
5.18   Use of Proceeds.................................................................................................24
5.19   Cash Management Systems ...............................................................................24
5.20   [Reserved] ........................................................................................................24
5.21   Air Carrier Status .............................................................................................24

6.   NEGATIVE COVENANTS .....................................................................................24
6.1   Mergers, Subsidiaries, Etc. ..............................................................................25
6.2   Investments; Term Loans and Advances ..........................................................25
6.3   Indebtedness......................................................................................................25
6.4   Affiliate Transactions........................................................................................26
6.5   Capital Structure and Business .........................................................................27
6.6   Formation of New Entities; Investments in Joint Ventures ..............................27
6.7   Liens..................................................................................................................27
6.8   Sale of Stock and Assets ...................................................................................28
6.9   ERISA ...............................................................................................................29
6.10   Financial Covenants..........................................................................................29
6.11   Line of Business................................................................................................29

6.12     Sale-Leasebacks ................................................................................29
6.13     Restricted Payments ...........................................................................29
6.14     Change of Corporate Name or Location; Change of Fiscal Year ........29
6.15     No Impairment of Intercompany Transfers ........................................30
6.16     Limitation on Negative Pledge Clauses .............................................30
6.17     No Speculative Transactions ..............................................................30
6.18     Bankruptcy Related Matters ..............................................................31

7.     TERM ...............................................................................................................31
7.1     Termination .......................................................................................31
7.2     Survival of Obligations Upon Termination of Financing Arrangements .............31

8.     EVENTS OF DEFAULT; RIGHTS AND REMEDIES .....................................32
8.1     Events of Default ...............................................................................32
8.2     Remedies ...........................................................................................35
8.3     Waivers by Credit Parties ..................................................................35

9.     GUARANTY ....................................................................................................36
9.1     Guaranty of Obligations of the Borrower ..........................................36
9.2     Demand by Secured Parties ...............................................................37
9.3     Enforcement of Guaranty ..................................................................37
9.4     Waiver ...............................................................................................37
9.5     Benefit of Guaranty ...........................................................................38
9.6     Modification of Obligations, Etc .......................................................38
9.7     Waiver of Subrogation, Etc ...............................................................39
9.8     Election of Remedies .........................................................................39
9.9     Reinstatement; Stay of Acceleration ..................................................40
9.10     Information .........................................................................................40
9.11     Taxes ..................................................................................................40
9.12     Maximum Liability ............................................................................40
9.13     Contribution .......................................................................................41
9.14     Liability Cumulative ..........................................................................41

10.     SECURITY .......................................................................................................41
10.1     Security ..............................................................................................41
10.2     Perfection of Security Interests .........................................................43
10.3     Rights of Lender; Limitations on Lenders Obligations ......................45
10.4     Covenants of the Credit Parties with Respect to Collateral ...............46
10.5     Performance by the Administrative Agent of the Credit Parties Obligations ........50
10.6     Limitation on the Administrative Agent's duty in Respect of Collateral .............50
10.7     Remedies; Rights Upon Default .........................................................51
10.8     The Administrative Agent's Appointment as Attorney-in-Fact ..........57
10.9     Modifications .....................................................................................58

11.     ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF
ADMINISTRATIVE AGENT ...........................................................................59
11.1     Assignment and Participations ..........................................................59

11.2    Appointment of the Administrative Agent ...........................................................60
11.3    The Administrative Agent's Reliance, Etc ..........................................................61
11.4    Delta and Affiliates..............................................................................................61
11.5    Lender Credit Decision ........................................................................................61
11.6    Indemnification ....................................................................................................62
11.7    Successor Agents ..................................................................................................62
11.8    Setoff and Sharing of Payments...........................................................................63
11.9    Payments; Non-Funding Lenders; Information; Actions in Concert....................63

12.    SUCCESSORS AND ASSIGNS ......................................................................................65
12.1    Successors and Assigns.........................................................................................65

13.    MISCELLANEOUS ..........................................................................................................65
13.1    Complete Agreement; Modification of Agreement ..............................................65
13.2    Amendments and Waivers ....................................................................................65
13.3    Costs and Expenses ..............................................................................................66
13.4    No Waiver .............................................................................................................67
13.5    Remedies ...............................................................................................................67
13.6    Severability ...........................................................................................................67
13.7    Conflict of Terms .................................................................................................67
13.8    Confidentiality ......................................................................................................67
13.9    GOVERNING LAW ............................................................................................68
13.10   Notices ..................................................................................................................69
13.11   Section Titles ........................................................................................................70
13.12   Counterparts ..........................................................................................................70
13.13   WAIVER OF JURY TRIAL.................................................................................70
13.14   Press Releases and Related Matters .....................................................................71
13.15   [Reserved] .............................................................................................................71
13.16   Advice of Counsel.................................................................................................71
13.17   No Strict Construction ..........................................................................................71

## INDEX OF APPENDICES

| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.7) | - | Cash Management Systems |
| Annex C (Section 2.1(e)) | - | Closing Checklist |
| Annex D (Section 4.1(a)) | - | Financial Statements and Projections -- Reporting |
| Annex E (Section 4.1(b)) | - | Collateral Reports |
| Annex F (Section 5.10) | - | Milestones |
| Annex G (Section 6.10) | - | Financial Covenants |
| Annex H (Section 11.9(a)) | - | Lenders Wire Transfer Information |
| Annex I (Section 13.10) | - | Notice Addresses |
| Annex J (from Annex A - Commitments Definition) | - | Commitments as of Closing Date |

Annex K (from Annex A - Permitted Investments          Investments Guidelines
Definition)

Exhibit 1.1                              -        Form of Note
Exhibit 1.2                              -        Form of Notice of Borrowing
Exhibit 1.15                             -        Form of Exit Note
Exhibit 2                                -        Budget
Disclosure Schedule 3.1                  -        Type of Entity; State of Organization
Disclosure Schedule 3.2                  -        Executive Offices, Collateral Locations,
                                                  FEIN

Disclosure Schedule 3.6                  -        Real Estate and Leases:
       Part 1                            -        Owned Real Estate
       Part 2                            -        Material Real Estate Contracts
       Part 3                            -        Leases Affecting Owned Real Estate
Disclosure Schedule 3.8                  -        Ventures, Subsidiaries and Affiliates;
                                                  Outstanding Stock

Disclosure Schedule 3.11                 -        Tax Matters
Disclosure Schedule 3.14                 -        Intellectual Property
Disclosure Schedule 3.17                 -        Insurance:
       Part 1                            -        Insurance Policies
       Part 2                            -        Those Insurance Policies which relate to
                                                  Collateral

Disclosure Schedule 3.19                 -        Deposit Accounts
Disclosure Schedule 3.27                 -        Aircraft; Engines
Disclosure Schedule 3.28                 -        Gates and Routes
Disclosure Schedule 5.1                  -        Trade Names
Disclosure Schedule 6.2                  -        Existing Investments
Disclosure Schedule 6.3                  -        Existing Indebtedness
Disclosure Schedule 6.7                  -        Existing Liens
Disclosure Schedule 6.15                 -        Restrictions on Intercompany Transfers
Disclosure Schedule 6.16                 -        Limitations on Negative Pledge Clauses
Disclosure Schedule 10.1                 -        Commercial Tort Claims
Disclosure Schedule 10.4                 -        Pledged Collateral
       Part 1                            -        Pledged Shares
       Part 2                            -        Pledged Indebtedness

This SENIOR SECURED SUPER-PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of May 17, 2012, by and among PINNACLE AIRLINES CORP., a Delaware corporation, as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"); the other Credit Parties signatory hereto, each as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code; the Lenders (as defined below) from time to time party hereto; and DELTA AIR LINES, INC., a Delaware corporation ("Delta"), as Administrative Agent (the "Administrative Agent");

WHEREAS, on April 1, 2012, (the "Petition Date"), the Borrower and each of the other Credit Parties filed a voluntary petition for relief (collectively, the "Cases") under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Borrower and the other Credit Parties are continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide senior secured super-priority term loan facilities of up to $74,285,000 in order to fund the continued operation of the Credit Parties businesses as debtors and debtors in possession under the Bankruptcy Code and repay amounts owing under the Promissory Note;

WHEREAS, the Lenders are willing to make available to the Borrower such post-petition loans and other extensions of credit upon the terms and subject to the conditions set forth herein;

WHEREAS, each of the Guarantors has agreed to guaranty the obligations of the Borrower hereunder, and each of the Credit Parties has agreed to secure its obligations to the Secured Parties hereunder with, inter alia, security interests in, and liens on, all of its property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree as follows:

## 1.    AMOUNT AND TERMS OF CREDIT

### 1.1    Credit Facilities.

(a) Initial Term Loan.

(i)        Each Lender severally and not jointly with the other Lenders agrees, upon the terms and subject to the conditions herein set forth, to make term loans (each a "Term Loan" and collectively, the "Term Loans") to the Borrower at any time and from time to time during the period commencing on the date hereof and ending on the Maturity Date in an aggregate principal amount not to exceed the Commitment of such Lender.  At no time shall the then outstanding aggregate principal amount of the Loans exceed the Commitment minus the Reserve, as the Commitment may be reduced from time to time pursuant to terms herein.

(ii)        On the Closing Date, the Borrower shall be deemed to borrow an amount equal to all outstanding principal and accrued interest under the Promissory Note, which borrowing shall be used to repay in full in cash the Promissory Note.

(b)        Delayed Draw Term Loan. Subject to the terms and conditions hereof, each Lender agrees to make additional term loans (each, a "Delayed Draw Term Loan" and collectively the "Delayed Draw Term Loans") in accordance with the terms of the Budget.

(c)        Subject to Section 1.14, the aggregate outstanding principal balance of the Term Loans shall be due and payable in full in immediately available funds on the Maturity Date, if not sooner paid in full. No payment with respect to the Term Loans may be reborrowed.

(d)        Each payment of principal with respect to the Term Loans shall be paid to the Administrative Agent for each Lender's Pro Rata Share.

(e)        The Closing Date Term Loans shall, upon the request of any Lender pursuant to Section 1.10, be evidenced by promissory notes substantially in the form of Exhibit 1.1 (each a "Note" and collectively the "Notes"), and, upon such request as provided in Section 1.10, the Borrower shall execute and deliver each Note to the applicable Lender. Each Note shall represent the obligation of the Borrower to pay the amount of the applicable Lender's Term Loans, together with interest thereon as prescribed in Section 1.6.

1.2        Procedure for Loan Borrowing.   The Borrower shall have given the Administrative Agent written notice by E-Fax or e-mail substantially in the form of Exhibit 1.2 (a "Notice of Borrowing") (which notice must be received by the Administrative Agent prior to 12:00 P.M., New York City time, five (5) Business Days prior to the requested Borrowing Date), specifying (a) the amount to be borrowed, (b) the requested Borrowing Date and (c) instructions for remittance of the applicable Term Loans to be borrowed.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof.  Each Lender will make the amount of its pro rata share of the Term Loans available to the Administrative Agent for the account of the Borrower at the Funding Office  prior to 12:00 Noon, New York City time, in funds immediately available to the Administrative Agent, on the applicable Borrowing Date.  Such Term Loans will then be made available to the Borrower by the Administrative Agent crediting such account as is designated in writing to the Administrative Agent by the Borrower, with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent. Notwithstanding anything to the contrary contained herein, the Borrower shall only be entitled to make three (3) requests for Term Loans during the term of this Agreement and each request shall be in the minimum amount of $10,000,000.

1.3     Prepayments and Commitment Reduction.

(a)     Voluntary Prepayments. The Borrower may at any time on at least three (3) Business Days' prior written notice to the Administrative Agent, voluntarily prepay all or part of the Term Loans; provided that any such prepayment shall be in a minimum amount of $1,000,000 and integral multiples of $1,000,000 in excess of such amount (or, if less, the outstanding amount of the Term Loans or any other amount approved by the Requisite Lenders); provided, further, that any such prepayment shall be applied pursuant to Section 1.4.

(b)     Mandatory Prepayments.

(i)     Except as provided under Section 1.3(c), upon receipt by any Credit Party of Net Cash Proceeds arising from an Asset Sale or Property Loss Event, the Borrower shall immediately prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds; provided, that, immediately upon receipt by any Credit Party of such Net Cash Proceeds, the Borrower may, at its option, deposit 100% of such Net Cash Proceeds in the Cash Collateral Account, in each case, to be applied in accordance with Section 1.4.

(ii)     Upon receipt by any Credit Party of any Net Cash Proceeds from any issuance of Indebtedness (other than Debt permitted under Section 6.3 hereof), the Borrower shall immediately prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds.

(iii)     Upon receipt by any Credit Party of any Net Cash Proceeds from any issuance of its equity securities (other than an Excluded Issuance), the Borrower shall immediately prepay the Term Loans in an amount equal to 100% of such Net Cash Proceeds.

(c)     Application of Net Cash Proceeds. Any Net Cash Proceeds received by the Borrower or any other Credit Party or the Administrative Agent under any Loan Document (except as otherwise expressly provided herein or therein) shall be applied pursuant to Section 1.4; provided, however, that, in the event the Borrower has elected to deposit such Net Cash Proceeds in the Cash Collateral Account in accordance with Section 1.3(b)(i), so long as no Default or Event of Default shall have occurred or be continuing, all or a portion of such Net Cash Proceeds may be used to acquire, construct, replace, restore or repair assets used or useful in such Person's business if such use of Net Cash Proceeds shall be made within 90 days of receipt of Net Cash Proceeds from such Asset Sale or Property Loss Event.

(d)     Optional Commitment Reduction.  The Borrower may, upon irrevocable written notice to the Administrative Agent, terminate the unused Commitments, or from time to time permanently reduce the unused Commitments, in each case without premium or penalty; provided that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in a minimum aggregate amount of $1,000,000, as applicable, or any whole multiple of $1,000,000, in excess.

(e)     Mandatory Commitment Reduction.  The Commitment shall automatically and permanently terminate on the Maturity Date.  The Commitments of all Lenders hereunder shall

automatically terminate if the Closing Date does not occur on or prior to 5:00 p.m. (New York, New York time) on May 1, 2012.

(f)     No Implied Consent. Nothing in this <u>Section 1.3</u> shall be construed to constitute the Administrative Agent's or any Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

1.4     <u>Priority and Application of Payments</u>.  So long as no Event of Default has occurred and is continuing, payments matching specific scheduled or required payments then due shall be applied to those scheduled or required payments.  As to any other payment and as to all payments made when an Event of Default has occurred and is continuing or following the Maturity Date, the Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of the Borrower, and the Borrower and each Secured Party hereby irrevocably agrees that the Administrative Agent shall have the continuing exclusive right to apply any and all such payments against the Obligations as follows: first, to reimbursable costs and expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents; second, to unpaid reimbursable costs and expenses of Lenders then due and payable pursuant to any of the Loan Documents; third, to interest then due and payable on the Term Loans; fourth, to prepay the remaining principal amount of the Term Loans, until the Term Loans shall have been paid in full; and fifth, to all other Obligations then due and payable to the Lenders. All payments and prepayments applied to a particular Term Loan shall be applied ratably to the portion thereof held by each Lender as determined by its Pro Rata Share.

1.5     <u>Use of Proceeds</u>.  The Borrower shall utilize the proceeds of the Term Loans solely (i) to provide working capital for, and for other general corporate purpose of, the Credit Parties, in each case in accordance with the Budget, (ii) to repay in full the Promissory Note on the Closing Date, and (iii) to pay the costs and expenses of the Lenders and the Administrative Agent.

1.6     <u>Interest and Applicable Margins</u>.

(a)     The Borrower shall pay interest to the Administrative Agent, for the ratable benefit of Lenders in accordance with the Term Loans being made by each Lender, in arrears on each applicable Interest Payment Date, at 12.5% per annum.

(b)     If any payment on any Term Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of interest shall be made by the Administrative Agent on the basis of a 365/366 day year, in each case, for the actual number of days occurring in the period for which such interest is payable. Each determination by the Administrative Agent of interest rates hereunder shall be presumptive evidence of the correctness of such rates.

(d)     So long as an Event of Default has occurred and is continuing, (i) the interest rates applicable to the Term Loans shall be increased by two percentage points (2%) per annum above

4

the rates of interest otherwise applicable to such Term Loan hereunder (the "Default Rate"), and (ii) all other outstanding Obligations shall bear interest at the Default Rate. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is cured or waived and shall be payable upon demand.

(e)    Notwithstanding anything to the contrary set forth in this Section 1.6, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Administrative Agent, on behalf of applicable Lenders, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

1.7    Cash Management Systems.  On or prior to the Closing Date, the Borrower will establish and will maintain until the Termination Date, the cash management systems described in Annex B (the "Cash Management Systems").

1.8    Setoff Against Delta Connection Agreement.  Unless Delta otherwise elects upon at least three Business Days' prior written notice to the Borrower (so long as Delta or its affiliates are the sole Lenders), payments of principal hereof and interest hereon in each case due and payable shall be made on the applicable due date by deductions from amounts due and payable to the Credit Parties under the Delta Connection Agreement in the manner set forth therein.

1.9    Receipt of Payments.  The Borrower shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest as of any date, all payments shall be deemed received on the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time. Payments received after 2:00 p.m. New York time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

1.10    Loan Account and Accounting.  The Administrative Agent shall maintain a loan account (the "Loan Account") on its books to record the Term Loans, all payments made by the Borrower with respect to the Term Loans, and all other debits and credits as provided in this Agreement with respect to the Term Loans or any other Obligations with respect to the Term Loans.  All entries in the Loan Account shall be made in accordance with the Administrative Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on the Administrative Agent's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to

the Administrative Agent and the Lenders by the Borrower; provided, that any failure to so record or any error in so recording shall not limit or otherwise affect the Borrower's duty to pay the Obligations with respect to the Term Loans. The Administrative Agent shall render to the Borrower a monthly accounting of transactions with respect to the Term Loans setting forth the balance of the Loan Account for the immediately preceding month. Any Lender may elect, by notice to the Borrower and the Administrative Agent, to have such Lender's Term Loans be evidenced by a Note issued to that Lender. If no such Note is requested, such Lender may rely on the Term Loan Account as evidence of the amount of Obligations with respect to the Term Loan from time to time owing to it. Unless the Borrower notifies the Administrative Agent in writing of any objection to any such accounting (specifically describing the basis for such objection), within thirty (30) days after the date thereof, each and every such accounting shall be presumptive evidence of all matters reflected therein. Only those items expressly objected to in such notice shall be deemed to be disputed by the Borrower.

1.11   Indemnity.  Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless each of the Administrative Agent, Lenders and their respective Affiliates, and each such Person's respective officers, directors, employees, advisors, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, costs and expenses (including attorneys fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of the financing contemplated hereby or the use or the proposed use of proceeds thereof under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents, and associated with Electronic Transmissions or E-Systems as well as failures caused by the Borrower's equipment, software, services or otherwise used in connection therewith (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability, cost or expense results from that Indemnified Person's gross negligence or willful misconduct as determined by a final and non-appealable order of a court of competent jurisdiction. NEITHER THE LENDERS, THE ADMINISTRATIVE AGENT NOR ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY CREDIT PARTY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH CREDIT PARTY, ANY OF SUCH CREDIT PARTY'S SUBSIDIARIES OR ANY OTHER PERSON, FOR INDIRECT, PUNITIVE, EXEMPLARY, SPECIAL OR CONSEQUENTIAL DAMAGES.

1.12   Access.

(a)   Each Credit Party shall, during normal business hours, from time to time upon reasonable prior notice as frequently as the Administrative Agent and each Lender reasonably determines to be appropriate: (i) provide the Administrative Agent and each Lender and any of its or their officers, employees and agents access to its officers and employees, and with prior notice and the opportunity to be present, advisors of each Credit Party; (ii) permit the

Administrative Agent and each Lender, and any of its or their officers, employees and agents, to inspect, audit and make extracts from any Credit Party's Books and Records (subject to requirements under any confidentiality agreements, if applicable); and (iii) permit the Administrative Agent and each Lender, and any of its or their officers, employees and agents, to have access to properties, facilities and to the Collateral and to inspect, audit, review, evaluate, conduct field examinations and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party.  Each Credit Party shall make available to the Administrative Agent and each Lender and its (or their) counsel reasonably promptly originals or copies of all Books and Records (subject to requirements under any confidentiality agreements, if applicable) that the Administrative Agent and each Lender may reasonably request. Each Credit Party shall deliver any document or instrument necessary for the Administrative Agent and each Lender, as it may from time to time request, to obtain records from any service bureau or other Person that maintains records for such Credit Party and shall maintain supporting documentation on media, including computer tapes and discs owned by such Credit Party. The Administrative Agent and each Lender will give Lenders prior written notice of regularly scheduled audits.

(b)    If an Event of Default has occurred and is continuing, each such Credit Party shall provide such access as set forth in clause (a) above to the Administrative Agent and to each Lender at all times and without advance notice. Furthermore, the Borrower shall provide the Administrative Agent and each Lender with access, with prior notice and opportunity for the Borrower to be present, to its suppliers, service providers (including independent public accountants) and customers.

1.13    Taxes.  Any and all payments by the Borrower hereunder or under the Notes shall be made, in accordance with this Section 1.13, free and clear of and without deduction or withholding for any and all present or future Taxes, except as required by applicable law. If the Borrower shall be required by law to deduct or withhold any Taxes from or in respect of any sum payable hereunder or under the Notes, (i) the Borrower shall make such deductions, (ii) the Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law, and (iii) the sum payable shall be increased as much as shall be necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section 1.13), the Administrative Agent or Lender, as applicable, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. Within ten (10) days after the date of any such payment of Taxes, the Borrower shall furnish to the Administrative Agent the original or a certified copy of a receipt evidencing payment thereof.

1.14    Conversion to Exit Facility.  Upon (a) substantial consummation of the Plan of Reorganization, (b) the absence of any continuing or unwaived Default or Event of Default under the Loan Documents, (c) the absence of any continuing or unwaived Default (as defined in the Exit Loan Documents) or Event of Default (as defined in the Exit Loan Documents), (d) satisfaction of all conditions precedent set forth in the Exit Note and (e) payment of the Lenders' costs and expenses in connection with negotiation and documentation of the Exit Facility, the Obligations hereunder shall convert to obligations under Exit Loan Documents.

## 2.    CONDITIONS PRECEDENT

2.1    Conditions to Closing.  This Agreement, including the obligation of each Lender to make the Term Loans requested to be made by it, shall not become effective until the date (the "Closing Date") on which each of the following conditions precedent is satisfied or provided for in a manner reasonably satisfactory to the Lenders, or duly waived in writing in accordance with Section 13.2:

(a)    Commencement of the Cases. The Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the Lenders and shall be reasonably satisfactory in form and substance to the Lenders (it being understood that all such orders and pleadings have been reviewed in advance by the Lenders and are reasonably satisfactory to the Lenders).

(b)    DIP Motion. Not later than the Petition Date, the Credit Parties shall have filed a motion to the Bankruptcy Court, in form and substance satisfactory to the Lenders, seeking approval of the Loan Documents and assumption of the Delta Connection Agreement (it being understood that Debtors' Motion Pursuant To Sections 105, 361, 362, 364, 365, 502, 1107 And 1108 Of The Bankruptcy Code For Order (i) Authorizing Debtors To Obtain Post-Petition Financing, (ii) Granting Liens And Providing Super-Priority Administrative Expense Status, (iii) Granting Adequate Protection To Prepetition Secured Parties, (iv) Authorizing Debtors To Assume Connection Agreements With Delta Air Lines, Inc., And (v) Allowing General

Unsecured Claim, filed with the Bankruptcy Court on the Petition Date (the "<u>DIP Motion</u>") is satisfactory to the Lenders).

(c)     <u>Final Order</u>. Not later than 30 days following the Petition Date, the Final Order shall have been entered by the Bankruptcy Court.  The Final Order shall have been entered on such prior notice to such parties as may be satisfactory to the Lenders (it being agreed that the notice of the DIP Motion is satisfactory notice).

(d)     <u>Compliance with Final Order</u>. The Credit Parties shall be in compliance in all respects with the Final Order.  The Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated, in the case of any modification or amendment, in any manner, or relating to a matter, without the consent of the Lenders.

(e)     <u>Loan Documents</u>. This Agreement, the Loan Documents, all amendments to the Delta Connection Agreement, such documents, instruments, agreements and legal opinions listed on <u>Annex C</u> and such other documents, instruments, agreements and legal opinions as the Lenders shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents and to effectuate the requirements set forth in <u>Annex F</u> (and all motions and orders related thereto), each in form and substance satisfactory to the Lenders, shall have been executed and delivered by all parties thereto.

(f)     <u>Financial Statements, Budgets and Reports</u>.  The Lenders shall have received (i) the Initial Budget, which Initial Budget shall be in form and substance satisfactory to the Lenders (it being understood that the Initial Budget attached to the commitment letter, dated as of April 23, 2012, from Delta Air Lines, Inc. to the Credit Parties as Schedule I to Annex I thereto is satisfactory to the Lenders), (ii) the Operating Forecast, which shall be in form and substance satisfactory to the Lenders (it being understood that the Operating Forecast that was made available to the Lenders on April 1, 2012 is satisfactory to the Lenders) and (iii) such information (financial or otherwise) as may be requested by the Lenders and in form and substance satisfactory to the Lenders, including, without limitation, (x) the Credit Parties' business plans, consolidated and by division, for the period ending on the last day of the fiscal quarter in which the Maturity Date is scheduled to occur and such business plans shall be satisfactory to the Lenders (including, without limitation, the financial projections and business plans as required herein), (y) all reports, audits and other information regarding compliance with laws and regulations, including environmental laws and regulations and (z) the required periodic updates of the Initial Budget and weekly variance reports.  The Credit Parties shall be in compliance in all respects with the Initial Budget as of the Closing Date.

(g)     <u>Approvals</u>. The Lenders shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution and delivery of this Agreement and the other Loan Documents and such consents and approvals shall be in full force and effect, (ii) satisfactory evidence that the Credit Parties have obtained all material governmental and third party approvals or waivers necessary in connection with the performance and consummation of this Agreement and the other Loan Documents and the continuing operations of the Borrower and its Subsidiaries shall have been obtained and be in full force and effect, or (iii) an officer's

certificate in form and substance reasonably satisfactory to the Administrative Agent affirming that no such consents or approvals are required.

(h)     Payment of Costs and Expenses; Satisfaction of Conditions. All costs and expenses (including, without limitation, reasonable legal fees) contemplated by the Loan Documents to be payable to the Administrative Agent and Lenders shall have been paid to the extent due and the Credit Parties shall have complied with all of their other obligations to the Lenders.

(i)     Documents and Certificates.  The Lenders shall have received such documents and certificates as the Lenders or their counsel may reasonably request relating to the organization, existence, incumbency and good standing of the Credit Parties, the authorization of the transactions described in the Loan Documents and any other legal matters relating to the Credit Parties, this Agreement or the transactions described in the Loan Documents, all in form and substance satisfactory to the Lenders and their counsel.

(j)     Notice of Borrowing.  To the extent the Borrower is requesting any Term Loans other than to the extent used to repay in full the Promissory Note, the Administrative Agent shall have received a Notice of Borrowing.

(k)     Cash Management Order.  The cash management order encompassing cash management arrangements satisfactory to the Lenders shall be in full force and effect (it being understood that the Cash Management Order is satisfactory to the Lenders).

(l)     No Trustee or Examiner.  No trustee or examiner with expanded powers shall have been appointed with respect to the Borrower or any other Credit Party or their respective properties.

(m)     No Material Adverse Effect. Since September 30, 2011, there shall not have been any change, development or event that has occurred (and the Lenders shall not have discovered or otherwise become aware of facts or conditions not previously known to them other than the commencement of the Cases, events leading up to the commencement of the Cases, and matters otherwise disclosed in writing to the Lenders or prior to April 1, 2012 (provided, that solely the filing of an objection by any party in interest to this Agreement, the transactions contemplated hereunder or the amendments to or assumption of the Delta Connection Agreement shall not be deemed to have a material adverse effect)), which the Lenders shall determine has had or could reasonably be expected to have a material adverse effect on the transactions.

(n)     No Action, Suit, Litigation. Other than the Cases, there shall exist no action, suit, investigation, litigation, or proceeding pending (or, to the knowledge of the Borrower or any other Credit Party, threatened) in any court or before any arbitrator or governmental instrumentality, which could reasonably be expected to result in a Material Adverse Effect.

(o)     No Violation of Law or Injunction. The consummation of the transactions contemplated hereby shall not, after giving effect to such transactions, (i) violate any applicable law, statute, rule or regulation or (ii) conflict with, or result in a default or event of default under, any material agreement of the Borrower or any of its Subsidiaries entered into or assumed after the commencement of the Cases, and there shall be in effect no temporary restraining order,

preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of, or imposing adverse conditions on, the transactions contemplated hereby.

(p)     Access. The Lenders shall have been given ongoing access (subject to requirements under any confidentiality agreements, if applicable) to the management, records, books of account, contracts, and properties of the Borrower, the Guarantors, and their respective Subsidiaries and shall have received such financial, business, legal, and other information regarding the Borrower, the Guarantors, and their respective Subsidiaries, in each case as the Administrative Agent and Lenders and their respective counsel shall have reasonably requested.

(q)     Cash Management Systems. The Administrative Agent shall be reasonably satisfied that the Cash Management Systems have been established in accordance with Annex B and are in full force and effect.

(r)     No Default. No Default or Event of Default shall exist or arise immediately after giving effect to the transactions.

(s)     Representations and Warranties. All representations and warranties in this Agreement or any other Loan Document shall be true and correct in all material respects (except where qualified by materiality, then just the accuracy thereof) as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except where qualified by materiality, then just the accuracy thereof) as of such earlier date.

(t)     Lien Searches.  The Administrative Agent shall have received UCC and other lien searches (including tax liens and judgments) conducted in the jurisdictions in which the Borrower and the Guarantors are incorporated and Lien searches conducted in the recording office of the FAA and at the "international registry" (as defined in the Cape Town Treaty) satisfactory to the Administrative Agent (dated as of a date reasonably satisfactory to the Agents).  The Lenders shall hold perfected security interests in and Liens (having the priority provided for herein and in the Final Order) upon the Collateral, and the Lenders shall have received such evidence of the foregoing as they reasonably require, other than (i) Liens permitted hereunder, (ii) Liens which will terminate on or prior to the Closing Date and (iii) as may be satisfactory to the Lenders.

(u)     Other Conditions.  Such other customary conditions for facilities of this type as are satisfactory to the Lenders.

2.2     Conditions to Subsequent Term Loans.  No Lender shall be obligated to make the remaining Term Loans requested to be made by it after the Closing Date pursuant to Section 1.1(b) unless each of the following conditions precedent is satisfied or provided for in a manner reasonably satisfactory to the Lenders, or duly waived in writing in accordance with Section 13.2:

(a)     Final Order. Each Credit Party shall be in compliance with the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders.

(b)     <u>Notice of Borrowing</u>.  The Administrative Agent shall have received a Notice of Borrowing.

(c)     <u>Representations and Warranties</u>. All representations and warranties in this Agreement or any other Loan Document shall be true and correct in all material respects (except where qualified by materiality, then just the accuracy thereof), as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except where qualified by materiality, then just the accuracy thereof) as of such earlier date.

(d)     <u>No Default</u>. No Default or Event of Default under this Agreement or any other Loan Document shall exist or shall arise immediately thereafter.

(e)     <u>No Violation of Law or Injunction</u>.  The consummation of the transactions contemplated hereby shall not, after giving effect to such transactions, (i) violate any applicable law, statute, rule or regulation or (ii) conflict with, or result in a default or event of default under, any material agreement of Borrower or any of its Subsidiaries entered into or assumed after the commencement of the Cases, and there shall be in effect no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of, or imposing adverse conditions on, the transactions contemplated hereby or shall arise thereafter.

The acceptance by the Borrower of the proceeds of any Term Loan upon the request of the Borrower shall be deemed to constitute, as of the date thereof, a representation and warranty by the Borrower that the conditions in this <u>Section 2.2</u> have been satisfied.

## 3.     REPRESENTATIONS AND WARRANTIES

To induce the Lenders to make the Term Loans, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to the Administrative Agent and each Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1     <u>Corporate Existence; Compliance with Law</u>.  Each Credit Party (a) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization set forth in <u>Disclosure Schedule 3.1</u>; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (c) subject to the entry by the Bankruptcy Court of the Final Order, has the requisite power and authority to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (d) has all licenses, permits, consents or approvals from or by, and has made all filings with, and has given all notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct, except where the failure to do so would not result in losses or liabilities which could reasonably be expected to have a Material Adverse Effect; (e) is

in compliance with its charter and bylaws or partnership or operating agreement, as applicable;
(f) is in compliance with all applicable provisions of law, except where the failure to comply,
individually or in the aggregate, could not reasonably be expected to have a Material Adverse
Effect; and (g) has assumed (as applicable) the Delta Connection Agreement and is in
compliance with the Delta Connection Agreement.

3.2     Executive Offices, Collateral Locations, FEIN.  As of the Closing Date, each
Credit Party's name as it appears in official filings in its state of incorporation or organization,
state of incorporation or organization, organization type, organization number, if any, issued by
its state of incorporation or organization, and the location as of the Closing Date of each Credit
Party's chief executive office, principal place of business and location and the hangars,
terminals, maintenance facilities, warehouses and premises at which any Collateral (except for
Collateral in transit or out for repair) valued in excess of $1,000,000 is located as of the Closing
Date are set forth in Disclosure Schedule 3.2, and none of such Collateral has been kept at any
location other than the locations listed on Disclosure Schedule 3.2 within four (4) months
preceding the Closing Date (or since its acquisition if less than four (4) months prior to the
Closing Date). In addition, Disclosure Schedule 3.2 lists the federal employer identification
number and organizational number of each Credit Party as of the Closing Date. Each Credit
Party has only one jurisdiction of existence, incorporation or organization, as applicable.

3.3     Corporate Power, Authorization, Enforceable Obligations.  Upon the entry by the
Bankruptcy Court of the Final Order, the execution, delivery and performance by each Credit
Party of the Loan Documents to which it is a party and the creation of all Liens provided for
therein: (a) are within such Person's power; (b) have been duly authorized by all necessary
corporate or limited liability company action; (c) do not contravene any provision of such
Person's charter, bylaws or operating agreement as applicable; (d) do not violate any law or
regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict
with or result in the breach or termination of, constitute a default under or accelerate or permit
the acceleration of any performance required by, any material lease, material agreement or other
material instrument entered into or assumed by such Person after the commencement of the
Cases to which such Person is a party or by which such Person or any of its property is bound; (f)
do not result in the creation or imposition of any Lien upon any of the property of such Person
other than those in favor of the Administrative Agent for the benefit of the Secured Parties,
pursuant to the Loan Documents and the Final Order; and (g) do not require the consent or
approval of any Governmental Authority or any other Person, except (i) those referred to in
Section 2.1(g) all of which will have been duly obtained, made or complied with on or prior to
the Closing Date (such consents and approvals to be in form and substance reasonably
satisfactory to the Lenders) and (ii) any consents, notices or approvals pursuant to the Federal
Assignment of Claims Act of 1940 or any applicable state, county or municipal law restricting
the assignment of any Accounts for which the Account Debtor is the United States government
or a political subdivision thereof or any state, county or municipality or department, agency or
instrumentality thereof.  Each of the Loan Documents have been duly executed and delivered by
each Credit Party that is a party thereto and, subject to the entry of the Final Order, each such
Loan Document shall constitute a legal, valid and binding obligation of such Credit Party
enforceable against it in accordance with its terms.

3.4    <u>Financial Statements and Projections</u>.  Except for the Projections, all Financial Statements concerning the Borrower and its Subsidiaries that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the consolidated financial position of the Borrower and its Subsidiaries as at the dates thereof and the consolidated results of their operations and cash flows for the periods then ended.

(a)    <u>Financial Statements</u>. The following Financial Statements have been delivered on the date hereof:

(i)    The audited consolidated balance sheet at December 31, 2010 of the Borrower and its Subsidiaries and the related consolidated statements of operations, cash flows and shareowners (deficit) equity for the Fiscal Year then ended, reported on by Ernst & Young LLP.

(ii)    The unaudited consolidated balance sheet at September 30, 2011 of the Borrower and its Subsidiaries and the related consolidated statements of operations and cash flows for the nine (9) months then ended.

(b)    <u>Projections.</u> The Projections delivered to Lenders prior to the date hereof have been prepared by the Borrower and reflect projections for the period beginning on April 1, 2012 on a month-by-month basis through December 31, 2013 and on an annual basis thereafter through December 31, 2015. The Projections are based upon the same accounting principles (other than adjustments related to the impact of the Cases) as those used in the preparation of the financial statements described above and are based on assumptions believed by the Borrower to be reasonable at the time such Projections were delivered in light of conditions and facts known to the Borrower as of the date thereof (it being understood that projections by their nature are inherently uncertain, the Projections are not a guaranty of future performance, and actual results may differ materially from the Projections).

3.5    <u>Material Adverse Effect; Burdensome Restrictions; Default</u>.  Since the date of the Borrower's Form 10-Q for the nine-month period ended September 30, 2011, (a) no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long term leases or unusual forward or long-term commitments that are not reflected in the Projections delivered to Lenders prior to the date hereof and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect, (b) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has or could reasonably be expected to have a Material Adverse Effect, and (c) no Credit Party is in default (other than any bankruptcy default as a result of the commencement of the Cases), and to the best of the Borrower's knowledge no third party is in default under any material contract, lease or other agreement or instrument that alone or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Since the date of the Borrower's Form 10-Q for the nine-month period ended September 30, 2011, no event has occurred, that alone or together with other events, could reasonably be expected to have a Material Adverse Effect.

3.6    Ownership of Property; Real Estate; Liens.

(a)    Each Credit Party warrants that it has good, marketable, legal and valid title to, or legal and valid leasehold interests in, or right to use, all of its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business at such properties or to utilize such properties for their intended purpose as currently conducted.

(b)    The real estate listed in Part 1 of Disclosure Schedule 3.6 constitutes all of the real property owned by any Credit Party (together with any real property owned thereafter by any Credit Party in fee title, "Owned Real Estate"). The leases and other agreements listed in Part 2 of Disclosure Schedule 3.6 (as updated from time to time) constitute all of the Material Real Estate Contracts.  Each Credit Party owns good and marketable fee simple title to all of its Owned Real Estate except for minor defects in title that do not interfere with its ability to conduct its business at such properties for their intended purpose as currently conducted.  The Borrower and each Credit Party has valid and enforceable leasehold interests in all of its material leased real estate (such material leased real estate of the Credit Parties, together with the Owned Real Estate, being herein collectively referred to as "Real Estate").  There are no purchase options, rights of first refusal or similar contractual rights that exist with respect to the Owned Real Estate, except as disclosed in Part 1 of Disclosure Schedule 3.6.  None of the properties and assets of any Credit Party are subject to any Liens other than Liens permitted by Section 6.7. No portion of any Credit Party's Owned Real Estate has suffered any material damage by fire or other casualty loss since September 30, 2011 that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. All material permits required to have been issued or appropriate to enable the Owned Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.7    Labor Matters.  No strikes are pending against any Credit Party (a) in the United States and (b) outside of the United States, except those that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the operations of such Credit Party.

3.8    Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. Except as set forth in Disclosure Schedule 3.8, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person. As of the Closing Date, all of the issued and outstanding Stock of each Credit Party (other than the Borrower) is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule 3.8. Except as set forth in Disclosure Schedule 3.8, there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party (other than the Borrower) may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness of each Credit Party as of the Closing Date (except for the Obligations) is described in Section 6.3 (including Disclosure Schedule 6.3).

3.9    Government Regulation.  No Credit Party is required to register as an investment company as such term is defined in the Investment Company Act of 1940. The making of the Term Loans by Lenders to the Borrower, the application of the proceeds thereof and repayment

15

thereof will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.10    <u>Margin Regulations</u>.  No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "<u>Margin Stock</u>"). None of the proceeds of the Term Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Term Loans or other extensions of credit under this Agreement to be considered a purpose credit within the meaning of Regulations T, U or X of the Federal Reserve Board.

3.11    <u>Taxes</u>.  Except as provided on <u>Disclosure Schedule 3.11</u>, (and except as otherwise permitted by the Bankruptcy Court and the Bankruptcy Code) all Federal and other material tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority, all such returns, reports and statements are true and correct and, subject to the automatic stay, all Charges due and payable by such Credit Party (whether or not shown on any returns, reports or statements) have been or will be timely paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, excluding Charges or other amounts being contested in accordance with <u>Section 5.2(b)</u>. Proper and accurate amounts have been withheld by each Credit Party from amounts paid to its respective employees for all periods in full and complete compliance with all applicable federal, state, local and foreign laws and such withholdings have been or will be timely paid, subject to the automatic stay, to the respective Governmental Authorities. To each Credit Party's knowledge, as of the Closing Date, none of the Credit Parties and their respective predecessors are liable for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) as a transferee. As of the Closing Date, no Credit Party has made, agreed to make or been requested to make any adjustment under IRC Section 48 1(a), by reason of a change in accounting method or otherwise.

3.12    <u>Compliance with ERISA</u>.  Each employee benefit plan (as defined under ERISA) of each Credit Party is in full compliance with all applicable requirements of ERISA and the IRC, as amended, no steps have been taken to terminate any such plan and no contribution failure has occurred with respect to any such plan sufficient to give rise to a lien under ERISA, except in each case as could not be reasonably expected to result in a Material Adverse Effect. No such employee benefit plan is a Title IV Plan or a Multiemployer Plan.  No condition exists or event or transaction has occurred with respect to any such plan which might result in the incurrence by any Credit Party of any material liability, fine or penalty.

3.13    <u>No Litigation</u>.  Other than the Cases, no unstayed action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any officer of such Credit Party, threatened in writing against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "<u>Litigation</u>") that, individually or in the aggregate, (a) challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of

any Loan Document or any action taken thereunder (excluding the filing of an objection by any party in interest to this Agreement, the transactions contemplated hereunder or the assumption of the Delta Connection Agreement) or (b) could reasonably be expected to have a Material Adverse Effect.

3.14    Intellectual Property.  Each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it, and each U.S. registered Patent, U.S. registered Trademark, U.S. registered Copyright and U.S. License in effect on the Closing Date is listed, together with application or registration numbers, as applicable, in Disclosure Schedule 3.14. Each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and no material claim or litigation regarding any of the foregoing is pending or threatened. Except as set forth in Disclosure Schedule 3.14, no Credit Party is aware of any infringement claim by any other Person with respect to any material Intellectual Property.

3.15    Full Disclosure.  No information contained in this Agreement, any of the other Loan Documents, Financial Statements or Collateral Reports or other written reports from time to time prepared by any Credit Party and delivered hereunder or any written statement prepared by any Credit Party and furnished by or on behalf of any Credit Party to the Administrative Agent or Lender pursuant to the terms of this Agreement (other than any Projections) contains or will contain, when taken as a whole, any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made and as of the date when made. Projections from time to time delivered hereunder are or will be based upon the estimates and assumptions stated therein, all of which the Borrower believed at the time of delivery to be reasonable in light of the conditions and facts known to the Borrower as of such delivery date (it being understood that projections by their nature are inherently uncertain, such Projections are not a guaranty of future performance and actual results may differ materially from those set forth in such Projections).

3.16    [Reserved]

3.17    Insurance.  Part 1 of Disclosure Schedule 3.17 lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the scope and term of each such policy. Part 2 of Disclosure Schedule 3.17 identifies those insurance policies which relate to the Collateral.

3.18    [Reserved].

3.19    Deposit Accounts.  Disclosure Schedule 3.19 (as updated from time to time) lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts in the United States, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held and the complete account number therefor.

3.20    [Reserved].

3.21    Compliance With Industry Standards.  The Borrower maintains its Books and Records, Airframes, Engines, Spare Parts and other assets and properties that are used in the conduct of its business in compliance in all material respects with applicable law, including but not limited to all rules, regulations and standards of the FAA or any other applicable Aviation Authority.

3.22    [Reserved].

3.23    Secured, Super-Priority Obligations.

(a)    On and after the Closing Date, the provisions of the Loan Documents and the Final Order are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Final Order) in all right, title and interest in the Collateral, enforceable against each Credit Party that owns an interest in such Collateral.

(b)    All Obligations shall at all times:

(i)    Pursuant to subsection 364(c)(1) of the Bankruptcy Code, be entitled to joint and several Super-Priority Claims in the Cases having priority over all administrative expenses of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code;

(ii)    Pursuant to subsection 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority Lien on the Collateral to the extent that such Collateral is not subject to valid, perfected and non-avoidable Liens as of the commencement of the Cases;

(iii)    pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior Lien on all Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable Liens in favor of third parties in existence at the time of the commencement of the Cases or to valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing Liens that secure the obligations under the Promissory Note, which Liens shall be primed by the Liens securing the obligations under the Loan Documents in accordance with the terms of this Agreement) excluding only the Collateral that is an Excluded Section 1110 Asset or applicable law  precludes such Lien) (the "Existing Liens"); and

(iv)    pursuant to Bankruptcy Code section 364(d), be secured by a perfected first-priority priming Lien on the Promissory Note Collateral (the "Primed Liens"), all of which Primed Liens shall be primed by and made subject and subordinate with respect to the Promissory Note Collateral to the perfected first priority senior Liens to be granted to the Administrative Agent for the benefit of the Secured Parties, which senior priming Liens in favor of the Lenders shall also prime any Liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens;

subject in each case only to the Carve-Out.  Notwithstanding the foregoing, no portion of the Carve-Out or proceeds of the Term Loans may be used in connection with the investigation (including, without limitation, discovery proceedings), initiation or prosecution of any claims,

causes of action, objections or other litigation against the Lenders or the Promissory Note Lender, including, but not limited to, (i) with respect to raising any defense to the validity, perfection, priority, extent, or enforceability of the obligations under the Loan Documents and/or the Promissory Note including the Liens with respect thereto and (ii) with respect to pursuing any potential claims against the Lenders or the Promissory Note Lender (or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors) asserting or alleging any claims including, but not limited to, "lender liability"-type claims or causes of action, causes of actions under chapter 5 of the Bankruptcy Code (including under section 502(d) of the Bankruptcy Code), or any other claims or causes of action under, or in any way otherwise relating to, the Loan Documents, the Loans, the Promissory Note or the Promissory Note Security Agreement; *provided* that up to $50,000 in the aggregate may be used to reimburse any Committee for the reasonable fees and out-of-pocket expenses incurred in connection with the investigation of the validity, perfection and/or priority of the Liens securing the Promissory Note.

(c)     The Final Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed in any manner without the prior written consent of the Lenders.

3.24     Certificated Air Carrier.  Each Air Carrier is a Certificated Air Carrier and possesses all certificates, franchises, licenses, permits, rights, designations, authorizations, exemptions, concessions and consents which are material to the operation of the routes flown by it and the conduct of its business and operations as currently conducted (the "Permits") except for the discontinuance of holding such Permits by Colgan Air, Inc. upon and after the completion of the Colgan Wind-down. Neither the DOT nor FAA nor any other Aviation Authority has taken any action or proposed or threatened to take any action, to amend, modify, suspend, revoke, terminate, cancel, or otherwise affect such Permits and Op Specs, in each case, in an adverse manner.

3.25     U.S. Citizen.  Each Air Carrier is a citizen of the United States as defined in Section 40102(a)(15) of Title 49.

3.26     Slots.  No Credit Party owns, directly or indirectly, any Slots.

3.27     Airframes; Engines.  Set forth on Disclosure Schedule 3.27 is a true, correct and complete list of unencumbered Airframes and unencumbered Engines as of the Closing Date.

3.28     Gates and Routes.  Set forth on Disclosure Schedule 3.28 is a complete and accurate list, as of the Closing Date, of all Routes of the Credit Parties. Such Disclosure Schedule 3.28 shall be revised from time to time by the Borrower, or as reasonably requested by the Lenders, to reflect all Routes of such Credit Parties. The Credit Parties are utilizing, or causing to be utilized, in all material respects, the Gate Interests and Routes as required by the applicable Governmental Authority, Airport Authority or Foreign Aviation Authority (as applicable). None of the Credit Parties has received any notice from any Governmental Authority, Airport Authority or Foreign Aviation Authority or is aware of any other event or circumstance, that would be reasonably likely to impair its right to hold and use Gate Interests or the Routes.

4.    **FINANCIAL STATEMENTS AND INFORMATION**

4.1    <u>Reports and Notices</u>.

(a)    The Borrower hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to the Administrative Agent and the Lenders, as required, the Financial Statements, notices, Projections, Budgets and other information at the times, to the Persons and in the manner set forth in <u>Annex D</u>.

(b)    The Borrower hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to the Administrative Agent and Lenders, as required, the various Collateral Reports at the times, to the Persons and in the manner set forth in <u>Annex E</u>.

4.2    <u>Communication with Accountants</u>.  Each Credit Party executing this Agreement authorizes the Administrative Agent and each Lender to communicate, with prior notice to the Borrower and the Borrower's opportunity to be present, directly with its independent registered public accountants, including Ernst & Young LLP, and authorizes and shall instruct those accountants to communicate to such the Administrative Agent and Lenders, with notice to the Borrower, information relating to any Credit Party with respect to the business, results of operations and financial condition of any Credit Party as the Administrative Agent or such Lenders shall reasonably request.

5.    **AFFIRMATIVE COVENANTS**

Each Credit Party agrees that from and after the Closing Date and until the Termination Date:

5.1    <u>Maintenance of Existence and Conduct of Business</u>.  Except as otherwise required by the Bankruptcy Code, each Credit Party shall (a) except (i) as otherwise permitted by <u>Section 6.1</u> or <u>Section 6.8</u>, (ii) with respect to the Colgan Air, Inc., upon or after the completion of the Colgan Wind-down and (iii) with respect to Mesaba's air carrier certificate, do or cause to be done all things to preserve and keep in full force and effect its legal existence, all rights, permits, licenses, approvals and privileges (including all Permits) necessary in the conduct of its business, and its material rights and franchises and (b) at all times maintain, preserve and protect in all material respects all of its assets and properties (including all Collateral) used or useful and necessary in the conduct of its business, and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices except as otherwise permitted in the applicable Loan Documents; and (d) transact business only in such corporate and trade names as are set forth in <u>Disclosure Schedule 5.1</u>.

5.2    <u>Payment of Charges</u>.

(a)    Unless payment thereof is precluded by the Cases and subject to <u>Section 5.2(b)</u>, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges, except where the failure to pay or discharge such Charges could not reasonably be expected to result in a Material Adverse Effect.

(b)    Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in Section 5.2(a); provided, that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP; (ii) no Lien shall be imposed to secure payment of such Charges that is superior to any of the Liens securing payment of the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges (except in the case of where the failure to pay or discharge such Charges could not reasonably be expected to result in a Material Adverse Effect); (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest; and (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses and shall deliver to the Lenders evidence reasonably acceptable to the Lenders of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this Section 5.2(b)) are no longer met.

5.3    Books and Records.  Each Credit Party shall keep adequate Books and Records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as Disclosure Schedule 3.4(a)). Upon reasonable request of the Administrative Agent or any Lender, each Credit Party shall deliver any requested Chattel Paper or Instrument to the Administrative Agent (in each case, accompanied by instruments of transfer executed in blank), and shall, if requested by the Administrative Agent, mark any Chattel Paper or Instrument that has not been delivered to the Administrative Agent with a legend that provides that the writing and the obligations evidenced or secured thereby are subject to the security interest of the Administrative Agent for the benefit of the Secured Parties.

5.4    Insurance; Damage to or Destruction of Collateral.

(a)    The Credit Parties shall, at their sole cost and expense, maintain insurance at all times against such risks as is customary for companies of the same or similar size in the same or similar business and industry or as otherwise required in the Collateral Documents.  Such policies of insurance are described, collectively, in Part 1 and Part 2 of Disclosure Schedule 3.17. The policies of insurance (or the loss payable and additional insured endorsements delivered to the Administrative Agent) described in Part 2 of Disclosure Schedule 3.17, which lists those policies relating to the Collateral, shall contain provisions pursuant to which the insurer agrees to provide thirty (30) days prior written notice to the Administrative Agent in the event of any non-renewal, cancellation or material adverse amendment of any such insurance policy. If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance listed in Part 2 of Disclosure Schedule 3.17 or to pay all premiums relating thereto, the Administrative Agent may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that the Administrative Agent deem advisable. The Administrative Agent shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, the Administrative Agent shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor. All sums so disbursed, including attorneys fees, court costs and other charges related thereto,

shall be payable on demand by the Borrower to the Administrative Agent and shall be additional Obligations hereunder secured by the Collateral.

(b)        The Borrower on behalf of each Credit Party shall deliver to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, with respect to the insurance policies listed on Part 2 of Disclosure Schedule 3.17, endorsements to (i) all risk property and business interruption insurance naming the Administrative Agent for the benefit of Secured Parties, as lender loss payee as its interests may appear; provided, that, with respect to business interruption insurance only, so long as no Event of Default has occurred or is continuing, the Administrative Agent shall promptly release to the Borrower any insurance proceeds received in connection with such business interruption insurance, and (ii) all general liability and other liability policies naming the Administrative Agent for the benefit of Secured Parties, as an additional insured as its interests may appear. The Borrower on behalf of each Credit Party irrevocably makes, constitutes and appoints the Administrative Agent (all officers, employees or agents designated by the Administrative Agent) as the Borrower's and each Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such All Risk property policies of insurance, endorsing the name of the Borrower or such Credit Party on any check or other item of payment for the proceeds of such All Risk property policies of insurance and for making all determinations and decisions with respect to such All Risk property policies of insurance. The Administrative Agent shall have no duty to exercise any rights or powers granted to them pursuant to the foregoing power-of-attorney. The Borrower shall promptly notify the Administrative Agent of any loss, damage, or destruction to the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance. All Net Cash Proceeds from insurance required under the Loan Documents shall be applied in accordance with Section 1.3.

5.5        Compliance with Laws.  Each Credit Party shall comply in all material respects with all federal, state, local and foreign laws and regulations applicable to it, including labor laws, and Environmental Laws and Environmental Permits, and laws and regulations of any Aviation Authority applicable to it.

5.6        Intellectual Property.  Each Credit Party shall own or have rights to use all material Intellectual Property necessary to continue to conduct its business as now conducted by it or presently proposed to be conducted by it.  Each Credit Party shall do or cause to be done all things necessary to preserve and keep in full force and effect at all times all material registered Patents, Trademarks, trade names, Copyrights and service marks necessary in the conduct of its business. Each Credit Party shall conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.

5.7        Environmental Matters.  Except as otherwise required by the Bankruptcy Code, such Credit Party, each Credit Party shall and shall cause each Person within its control to: conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect.

5.8        [Reserved].

5.9     [Reserved].

5.10    Milestones.  The Credit Parties shall satisfy the Milestones on or prior to the dates set forth on Annex F.

5.11    Further Assurances.  Each Credit Party executing this Agreement agrees that it shall, at such Credit Party's expense and upon the reasonable request of the Administrative Agent or any Lender, duly execute and deliver, or cause to be duly executed and delivered, to the Administrative Agent or any Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Administrative Agent or any Lender, to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

5.12    Additional Guaranties and Collateral Documents.  The Credit Parties shall take any actions requested by Administrative Agent to maintain, ensure, protect, evidence and/or demonstrate that the Liens and security interests granted by the applicable Collateral Documents or Final Order with the priority set forth in the Final Order in the Collateral are valid, perfected and enforceable under the Code or as otherwise required by the Collateral Documents, including (a) executing additional security agreements, mortgages, control agreements and other agreements or documents, (b) delivering such certificates, instruments, Stock, other debt Securities and other documents representing all Collateral required to be pledged and delivered under the Collateral Documents and (c) delivering opinions, surveys, appraisals and certificates.

5.13    Financial Consultant.  The Borrower shall continue to retain, on terms and conditions reasonably acceptable to the Lenders and at the sole cost and expense of the Borrower, Barclays Capital and Seabury Group or such other business consultant as is reasonably acceptable to the Administrative Agent (the "Consultant") to, among other things, advise the Borrower in connection with the management and operation of its business and to assist the Borrower with preparation of the Budget and the other financial and collateral reporting required to be delivered to the Administrative Agent pursuant to this Agreement (it being understood that the terms and conditions of the engagement of the Consultants that have been provided to the Administrative Agent are satisfactory to the Administrative Agent).  The Borrower shall cause the Consultant to consult with the Administrative Agent and Lenders on a regular basis as requested by the Administrative Agent or the Lenders.  In the event the Consultant ceases for any reason to act in that capacity, the Company shall engage a successor Consultant reasonably acceptable to the Administrative Agent within thirty days (or such later date agreed to by the Administrative Agent) of such event.

5.14    Aircraft Mortgage; Spare Parts Mortgage; GR Security Agreement.  Each Air Carrier that is a Credit Party shall execute an Aircraft Mortgage, a Spare Parts Mortgage and a GR Security Agreement to the extent requested by the Administrative Agent.

5.15    Gate Interests.  Maintain Gate Interests sufficient to ensure its ability to retain its right in and to the Routes other than failure to maintain such Gate Interests and Routes which could not reasonably be expected to result in a Material Adverse Effect.

5.16    ERISA/Labor Matters.

The Credit Parties shall furnish the Administrative Agent (with sufficient copies for each of Lenders) each of the following:

(a)    promptly after the filing or receiving thereof, copies of all material reports and notices which any Credit Party files under ERISA with respect to any Title IV Plan with the IRS or the PBGC or the U.S. Department of Labor or which any Credit Party receives from such corporation or any other government agency, in each case other than in the ordinary course of business; and

(b)    simultaneously with the date that any Credit Party (i) commences or terminates negotiations with any collective bargaining agent for the purpose of materially changing any collective bargaining agreement; (ii) reaches an agreement with any collective bargaining agent prior to ratification for the purpose of materially changing any collective bargaining agreement; (iii) ratifies any agreement reached with a collective bargaining agent for the purpose of materially changing any collective bargaining agreement; or (iv) becomes subject to a cooling off period under the auspices of the National Mediation Board, notification of the commencement or termination of such negotiations, a copy of such agreement or notice of such ratification or a cooling off period, as the case may be.

5.17    [Reserved].

5.18    Use of Proceeds.  The proceeds of the Term Loans will be used by the Borrower and the other Credit Parties, (i) for working capital and for general corporate purposes, including the payment of expenses and administration in the Cases, in each case, in accordance with the Budget, (ii) to pay the costs and expenses of the Lenders and (iii) to repay the Promissory Note in full on the Closing Date.

5.19    Cash Management Systems.  The Borrower will establish and will maintain until the Termination Date, the cash management systems described on the Cash Management Order (the "Cash Management Systems").

5.20    [Reserved].

5.21    Air Carrier Status.  In the case of each Air Carrier (except with respect to Colgan Air, Inc. upon and after the completion of the Colgan Wind-down), (a) maintain at all times its status as an "air carrier" within the meaning of Section 40102(a)(2) of Title 49, and hold a certificate under Section 41102(a)(1) of Title 49; (b) at all times hereunder be a United States Citizen; and (c) maintain at all times its status at the FAA as an air carrier and hold an air carrier operating certificate and other operating authorizations issued by the FAA pursuant to 14 C.F.R. Parts 119 and 121 as currently in effect or as may be amended or recodified from time to time.

## 6.    NEGATIVE COVENANTS

Each Credit Party agrees that from and after the Closing Date until the Termination Date:

6.1    Mergers, Subsidiaries, Etc.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, or otherwise dispose of (in one transaction or in a series of transactions) the Stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or otherwise liquidate or dissolve, except that, a Credit Party may merge into or consolidate with another Credit Party so long as (a) no Default or Event of Default exists and (b) the Borrower is the surviving entity in any transaction involving such Person.

6.2    Investments; Term Loans and Advances.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, make any loan or advance to any Person, except for:

(i)      any loan or advance to any Credit Party;

(ii)     travel and other ordinary course of business advances to officers and employees consistent with past practice;

(iii)    without limiting clause (i), other loans or advances to Persons who are not directors, officers, employees or affiliates of any Credit Party in an aggregate outstanding principal amount with respect to all such other loans and advances not in excess of $100,000;

(iv)    hold Investments comprised of notes payable, or stock or other securities issued by Account Debtors to such Credit Party or the Subsidiary of any Credit Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(v)     make Investments in Permitted Investments; and

(vi)    existing loans or advances outstanding on the Petition Date and set forth on Disclosure Schedule 6.2.

6.3    Indebtedness.

(a)    No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to create, incur, assume or suffer to exist any Indebtedness except:

(i)     Indebtedness secured by purchase money security interests and Capital Leases (including in the form of sale-leaseback, synthetic lease or similar transactions) to the extent such Indebtedness was incurred to finance the acquisition or construction of aircraft, aircraft spare parts, equipment and real estate; provided, that (i) the amount of such Indebtedness does not exceed 100% of the purchase price or construction cost (including any capitalized interest and issuance fees) of the subject asset and (ii) such Indebtedness in incurred to the extent permitted by the Budget;

(ii)    the Term Loans and the other Obligations;

(iii)   existing Indebtedness described in Disclosure Schedule 6.3;

(iv)    Indebtedness consisting of intercompany loans and advances made among Credit Parties;

(v)    Indebtedness in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house transfers of funds (but subject to compliance with <u>Section 5.19</u>);

(vi)    Indebtedness consisting of take-or-pay obligations contained in supply agreements entered into in the ordinary course of business and consistent with past practices;

(vii)    Indebtedness to credit card processors in connection with credit card processing services incurred in the ordinary course of business and consistent with past practices;

(viii)    Indebtedness arising in the ordinary course of business, providing netting services with respect to intercompany Indebtedness permitted to be incurred and outstanding pursuant to this Agreement so long as such Indebtedness does not remain outstanding for more than three (3) Business Days from the date of its incurrence;

(ix)    Indebtedness in respect of letters of credit (including such letters of credit described on <u>Disclosure Schedule 6.3</u>) in an aggregate amount not to exceed $9,500,000 at any time outstanding;

(x)    surety bonds (including such surety bonds described on <u>Disclosure Schedule 6.3</u>) in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(xi)    other unsecured Indebtedness incurred subsequent to the Closing Date in an aggregate amount not to exceed $500,000 outstanding at any time; and

(xii)    other unsecured Indebtedness incurred subsequent to the Closing Date in any amount, provided that the Net Cash Proceeds thereof are used to prepay the Term Loans.

(b)    No Credit Party shall, directly or indirectly, voluntarily repay, redeem, purchase, defease or otherwise satisfy any Indebtedness, except for (i) payments under the Promissory Note or (ii) payments included in the Budget or otherwise approved by the Bankruptcy Court with the consent of the Requisite Lenders.

6.4    <u>Affiliate Transactions</u>.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, sell or transfer any property or assets to, or otherwise engage in any other transactions with any of its Affiliates other than the Credit Parties, other than (a) on terms and conditions no less favorable to such Credit Party than could be obtained on an arm's length basis from unrelated third parties, (b) reasonable and customary fees and compensation paid to, and indemnity provided on behalf of, officers, directors or employees of such Credit Party or Subsidiary, (c) travel and other ordinary course of business advances to officers and employees permitted pursuant to <u>Section 6.2</u> and (d) any dividends, other distributions or payments permitted by <u>Section 6.13</u>.

6.5    <u>Capital Structure and Business</u>.  Except as required by the UA Order, no Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, amend, modify or waive any of its rights under (a) any agreement relating to any Material Indebtedness, (b) its Organizational Documents or (c) any Material Contract, in each case to the extent any such amendment, modification or waiver is materially adverse to the Lenders (it being understood that the amendment to that certain Credit Agreement, dated as of July 30, 2009, as amended through the Petition Date, among Pinnacle Airlines, Inc. Colgan Air, Inc., Mesaba, the loan parties thereto, the lenders party thereto and C.I.T. Leasing Corporation, as administrative agent and collateral agent in the form of a draft amended and restated credit agreement filed with the Bankruptcy Court on May 2, 2012 shall not be deemed materially adverse to the Lenders).

6.6    <u>Formation of New Entities; Investments in Joint Ventures</u>.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, (a) form or acquire any Subsidiary or (b) make any Investment in a joint venture.

6.7    <u>Liens</u>.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, create, incur, assume or permit to exist any Lien on any property or assets, except:

(a)    Permitted Liens;

(b)    Liens created by the Loan Documents in favor of the Administrative Agent, for the benefit of the Secured Parties;

(c)    Liens in existence on the date hereof and summarized on <u>Disclosure Schedule 6.7</u>;

(d)    Liens created after the date hereof in connection with Capital Leases or purchase money Indebtedness, in each case, permitted in Section 6.3(a)(i); provided, that such Liens attach only to the assets (and the proceeds thereof) subject to such purchase money debt or Capital Lease and such Indebtedness is incurred within one hundred eighty (180) days following such purchase and does not exceed 100% of the purchase price of the subject assets;

(e)    other Liens securing Indebtedness permitted by <u>Section 6.3(a)(v)</u> and <u>6.3(a)(viii)</u>;

(f)    Liens on the imprest accounts that are used solely to fund health-related claims; provided, that not more than $1,000,000 is maintained in such imprest account at any time;

(g)    any interest or title of a licensor, lessor or sublessor granted to others, but only to the extent permitted by any of the Collateral Documents;

(h)    Liens or deposits in favor of credit card processors securing obligations in connection with credit card processing services incurred in the ordinary course of business and consistent with past practices;

(i)    Liens on the Escrow Accounts and amounts on deposit therein in favor of the beneficiaries of the amounts on deposit therein to the extent such Liens secure obligations owed to such beneficiaries;

(j)        any Lien on any equipment described in Section 1110(a)(3) of the Bankruptcy Code (as in effect on the Petition Date); provided, that such Liens attach only to the assets securing the applicable Indebtedness;

(k)        other Liens so long as the value of the property subject to such Liens, and the Indebtedness and other obligations secured thereby, do not exceed, in the aggregate, $100,000;

(l)        Liens created after the Closing Date in connection with operating leases (which in no event constitute Indebtedness) in the ordinary course of business and consistent with past practices; provided, that such Liens attach only to such lease or the assets subject to such lease (including other assets integral to the use thereof);

(m)        deposits securing Indebtedness permitted by Sections 6.3(a)(ix) and (x); and

(n)        the Carve-Out, solely to the extent set forth in the Final Order.

6.8        Sale of Stock and Assets.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, sell, transfer, lease or dispose of any assets (any such disposition being an "Asset Sale", it being agreed that collections of accounts receivables and use or disposition of cash or Cash Equivalents shall not be deemed an Asset Sale) other than:

(a)        sales and other disposition of inventory in the ordinary course of business;

(b)        sales or dispositions of damaged, obsolete, uneconomical or worn out equipment no longer used in the business of the Credit Parties;

(c)        sale or disposition of Section 1110 Assets permitted by the Budget, Operating Forecast and the Delta Connection Agreement;

(d)        sales or dispositions of assets among the Credit Parties;

(e)        sales or dispositions of other assets in arm's-length transactions at Fair Market Value in an aggregate amount not to exceed $500,000 in the aggregate in any Fiscal Year;

(f)        any exchange of Parts for other Parts of comparable or greater value in the ordinary course of business and consistent with past practices;

(g)        sales or dispositions of auction rate securities or the options thereof in accordance with the terms thereof for Fair Market Value and one hundred percent (100%) cash consideration.

(h)        abandonment of Gates or Routes; provided, that such abandonments (taken as a whole) are (i) in connection with the downsizing of any hub or other facility, which does not adversely affect the business of Borrower and the Guarantors (it being agreed that the downsizing contemplated in the UA Order shall not be deemed adversely affect the business of Borrower and the Guarantors), or (ii) in the ordinary course of business consistent with past practices and does not adversely affect the business of Borrower and the Guarantors;

28

(i)      to the extent not prohibited by any of the Loan Documents, the disposition of leasehold or similar interests in non-Owned Real Estate, including through assignment, sublease or lease termination or rejection, in whole or in part, or the return, surrender, exchange or abandonment of any property subject thereto (x) in the ordinary course of business and consistent with past practice, (y) to the extent disclosed in writing to the Administrative Agent prior to the date hereof or (z) to the extent constituting a lease of real estate, any lease which requires less than $500,000 in lease payments in any year, and when aggregated with each other real estate leases terminated or rejected pursuant to this Section 6.8(i)(z), $2,000,000 in lease payments in any year; and

(j)      any Property Loss Event (without giving effect to the thresholds set forth in the definition thereof).

6.9      ERISA.  No Credit Party or a Subsidiary of a Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur (i) an event that could result in the imposition of a Lien under Section 430 of the IRC or Section 303 or 4068 of ERISA or (ii) an ERISA Event (other than the Cases) to the extent such ERISA Event would reasonably be expected to result in taxes, penalties and other liability in excess of $100,000 in the aggregate.

6.10      Financial Covenants.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to breach or fail to comply with any of the Financial Covenants.

6.11      Line of Business.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to, engage in any line of business different from the Business conducted by the Credit Parties on the Closing Date.

6.12      Sale-Leasebacks.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets (including without limitation, any aircraft).

6.13      Restricted Payments.  No Credit Party or a Subsidiary of a Credit Party will, nor will it seek Bankruptcy Court approval to make (or agree to make), directly or indirectly, any Restricted Payment, except

(a)      payments of principal of and interest on intercompany loans and advances between Credit Parties to the extent permitted by Section 6.3; and

(b)      so long as no Event of Default exists, dividends and distributions by Subsidiaries of the Borrower on a pro rata basis.

6.14      Change of Corporate Name or Location; Change of Fiscal Year.  No Credit Party shall (a) change its name as it appears in official filings in the state of its incorporation or other organization, (b) change, from such locations as set forth on Disclosure Schedule 6.14, its chief executive office, principal place of business, corporate offices or warehouses, hangars, terminals, maintenance facilities or other locations at which Collateral (except for Collateral in transit or out for repair) with book value in excess of $1,000,000, individually or in the aggregate, is held or stored, or the location of its records concerning such Collateral, (c) change the type of entity

that it is, (d) change its organization identification number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization, in each case, without at least thirty (30) days prior written notice to the Administrative Agent; provided, that in the case of clauses (b) or (e), any such new location shall be in the continental United States.  No Credit Party shall change its Fiscal Year.

6.15    No Impairment of Intercompany Transfers.  No Credit Party will, nor will it seek approval to directly or indirectly enter into or become contractually bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions by a Subsidiary or a Credit Party, the making or repayment of intercompany loans by a Subsidiary of a Credit Party to the Credit Party or the transfer of assets between and among the Credit Parties and their Subsidiaries; other than (a) prohibitions or restrictions existing on the Closing Date and listed on Disclosure Schedule 6.15, and any extension or renewal thereof on terms no less favorable to such Credit Party and (b) prohibitions or restrictions imposed by law or by this Agreement or any of the other Loan Documents, (c) customary restrictions and conditions contained in agreements relating to the sale of a subsidiary or any asset pending such sale, provided such restrictions and conditions apply only to the subsidiary or asset that is to be sold and such sale is permitted hereunder, (d) prohibitions or restrictions imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations and (e) the foregoing shall not apply to customary provisions in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

6.16    Limitation on Negative Pledge Clauses.  No Credit Party will, nor will it seek approval to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Credit Party or any Subsidiary to create, incur, assume or permit to exist any Lien to secure its Obligations under the Loan Documents; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement or any of the other Loan Documents, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Disclosure Schedule 6.16 (but shall apply to any amendment or modification expanding the scope or duration of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any asset pending such sale, provided such restrictions and conditions apply only to the Subsidiary or asset that is to be sold and such sale is permitted hereunder, (iv) the foregoing shall not apply to prohibitions or restrictions imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations and (v) the foregoing shall not apply to customary provisions in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

6.17    No Speculative Transactions.  No Credit Party will, nor will it seek approval to engage in any transaction involving commodity options, futures contracts or similar transactions, except solely to hedge in the ordinary course of business.

6.18    Bankruptcy Related Matters. The Credit Parties shall not permit any of the following (or file any motion seeking authorization):

(a)    except with respect to the Lenders, entry into any agreement to return any of its property to any of its creditors for application against any prepetition Indebtedness, prepetition trade payables or other prepetition claims under Section 546(g) of the Bankruptcy Code or enter into any agreement which allows any creditor to take any setoff or recoupment other than (i) in accordance with the Operating Forecast against any of its prepetition Indebtedness, prepetition trade payables or other prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code, (ii) in connection with the Delta Connection Agreement in accordance with Section 1.8, (iii) in connection with the Capacity Purchase Agreement, (iv) as approved by the First Day Orders or (v) in connection with the cash deposit or cash collateral provided by the Credit Parties to any third party prior to the commencement of the Cases, in the case of this clause (v), in an amount not to exceed $200,000;

(b)    any order which authorizes the payment of any Indebtedness (other than the Promissory Note, Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Requisite Lenders) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than adequate protection granted pursuant to the UA Order or expressly provided for in the Budget or Operating Forecast); or

(c)    any order seeking authority to take any action that is prohibited by the terms of this Agreement, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

6.19    Negative Pledge.  No Credit Party will, nor will it seek Bankruptcy Court approval to, incur, crease, assume or suffer to exist any Lien on any Excluded Section 1110 Assets or the proceeds thereof (other than Liens (i) granted in favor of the Administrative Agent or (ii) expressly identified on Disclosure Schedule 6.7).

## 7.    TERM

7.1    Termination.  The financing arrangements contemplated hereby shall be in effect until the Maturity Date, and the Term Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2    Survival of Obligations Upon Termination of Financing Arrangements.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of the Administrative Agent and the Lenders relating to any unpaid portion of the Term Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Maturity Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of the Administrative Agent and each Lender, all

as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; provided, that the provisions of Article 13, the payment obligations under Section 1.13 and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 8.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1    Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    The Borrower (i) fails to make any payment of principal of the Term Loans when due and payable, (ii) fails to make any payment of interest on the Term Loans or any of the other Obligations when due and payable, or (iii) fails to pay or reimburse the Administrative Agent or Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following the demand for such reimbursement or payment of expenses.

(b)    Any Credit Party fails or neglects to perform, keep or observe any of the provisions of Sections 1.2, 1.3, 1.4, 1.5 1.7, 5.3, 5.4, 5.10, 5.14, 5.15, 5.16, 5.21 or Article 6, the insurance provisions in the Collateral Documents or any of the provisions set forth in Annex B, Sections (h), (o) and (p) of Annex D and Annex G, respectively.

(c)    Any Credit Party fails or neglects to perform, keep or observe any of the provisions of Section (e) of Annex D and the same shall remain unremedied for one (1) Business Day.

(d)    The Borrower fails or neglects to perform, keep or observe any of the provisions of Section 4.1 or any provisions set forth in Annex D (other than Sections (e), (h), (o) and (p) respectively, and the same shall remain unremedied for three (3) Business Days.

(e)    (x) The Borrower fails to perform or observe any covenant, condition or agreement to be performed or observed by it under this Agreement or any other Loan Document (other than as described in clauses (a), (b), (c) or (d) above) and such failure shall remain unremedied for 30 days from notice to or knowledge of any Credit Party.

(f)    A default or breach (after giving effect to any required written notice from Delta and after giving effect to any applicable grace period) by any Credit Party under any Delta Connection Agreement, which give Delta (or its Affiliates) the right to terminate such agreements.

(g)    Any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Administrative Agent or any Lender by any Credit Party is untrue or incorrect or false in any material respect, in each case, as of the date when made or deemed made.

(h)    Any Credit Party shall reject any Delta Connection Agreement without the prior consent of the Lenders.

(i)     At any time after the thirteen-week anniversary of the date of commencement of the Cases, a Budget that has been approved by the Lenders in accordance with the Loan Documents is not then in full force and effect.

(j)     The Loan Documents and the Final Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided for herein and in the Final Order, or any Credit Party shall so allege in any pleading filed in any court or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on each Credit Party party thereto (or any Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms).

(k)     (i) Any judgment or judgments for the payment of any post-petition obligations in excess of $1,000,000 in the aggregate at any time are outstanding against one or more of the Credit Parties (which judgments are not covered by insurance policies as to which liability has been accepted by the insurance carrier) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in each case, the same are not, within thirty (30) days after the entry thereof, discharged or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay.

(l)     Suspension of all or substantially all of the Credit Parties flight and other operations for longer than two days or entry of an order by the Bankruptcy Court authorizing the same.

(m)     Any Change of Control occurs.

(n)     In the case of any Gates or Routes (i) any applicable Aviation Authority modifies, suspends, revokes, terminates, cancels or otherwise takes any action that adversely affects any Credit Party's Permits or any Credit Party's use or occupation or maintenance of such Gates or Routes due to any Credit Party's failure to abide by applicable law or any contract governing the use of such Gates or Routes, or (ii) any Credit Party otherwise ceases to use, occupy or maintain such Gates or Routes, and any event referred to in this clause (ii) could reasonably be expected to have a Material Adverse Effect.

(o)     A default occurs under any lease or leases by a Credit Party as lessee of any real or personal property, excluding any defaults due to Credit Party's Chapter 11 filing or any Bankruptcy Court approved rejection of such lease or leases under section 365 or 1110 of the Bankruptcy Code, regarding a failure to make a post-petition payment under which the aggregate rentals payable under such lease or all such leases in the aggregate exceed $1,000,000.

(p)     An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

(q)     The commencement of any adversary proceeding, contested matter or other action by any Credit Party asserting any claims and defenses or otherwise against the Promissory Note Lender with respect to the obligations of any Credit Party thereunder or the liens granted to the Promissory Note Lender to secure the obligations under the Promissory Note.

(r)     (i) Any of the Cases shall be dismissed without a provision for indefeasible payment of all of the Obligations in full in cash (or the Bankruptcy Court shall make a ruling requiring the dismissal of the Cases) or converted to a case under chapter 7 of the Bankruptcy Code, (ii) any Credit Party shall file any pleading requesting any such relief, (iii) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases without the prior written consent of the Lenders; or (iv) an application shall be filed by any Credit Party for the approval of, or the Bankruptcy Court shall enter an order (x) granting any Lien that is *pari passu* or senior to any lien granted to the Lenders under the Loan Documents or the Final Order, except as expressly permitted therein; (y) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (z) to grant a superpriority claim, other than that granted in the Final Order (and other than with respect to the Carve-Out), which is *pari passu* with or senior to any of the claims of the Lenders against the Borrower or any other Guarantor hereunder, under the Final Order (or there shall arise or be granted any superpriority claim *pari passu* or senior to any such claims).

(s)     Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving any payment (as adequate protection or otherwise) on account of any Claim against any Credit Party arising or deemed to have arisen prior to the Petition Date, other than a Permitted Prepetition Payment, or any Credit Party shall make such a payment, (ii) approving any other First Day Order not acceptable to the Lenders, (iii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any other security interest or Lien (other than the Lenders) in any Collateral to permit the pursuit of any judicial or non-judicial transfer or other remedy against any of the Collateral with a value in excess of $1,000,000 subject to any such relief from the automatic stay, or granting any form of adequate protection, including, without limitation, requiring cash payments by such Credit Party to such holder or holders, in lieu of such relief other than (x) in connection with granting the first day relief as proposed by the Credit Parties or relief granted under section 1110 of the Bankruptcy Code (that is acceptable to the Lenders) or (y) to the extent that the Credit Parties shall remain in compliance with the Budget after giving effect to the foregoing and such relief shall not be adverse to the interests of the Lenders, (iv) authorizing the sale of all or substantially all of the Borrower's assets (unless such order contemplates the indefeasible payment in full in cash of the Obligations upon consummation of such sale, whether pursuant to a Plan of Reorganization or otherwise); (v) except as permitted under Section 6.8, approving the implementation of liquidation under chapter 11 of the Bankruptcy Code in any Case or (vi) any plan of reorganization or liquidation which does not provide for the indefeasible payment in full in cash of all Obligations on or before the date of the effectiveness of such plan is confirmed without the express prior written consent of the Lenders.

(t)      Any other party shall both seek and obtain allowance of any order in the Cases to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code.

(u)      (i) the Final Order shall not have been entered by the Bankruptcy Court on or before the 30th day following the Petition Date, or (ii) from and after the date of entry thereof, the Final Order shall cease to be in full force and effect, or (iii) any Credit Party shall fail to comply with the terms of the Final Order, or (iv) the Final Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any of the Credit Parties shall apply for authority to do so), in each case, without the prior written consent of the Administrative Agent.

8.2      Remedies.

(a)      If any Event of Default has occurred and is continuing, without further order of, application to, or action by, the Bankruptcy Court, the rate of interest applicable to the Term Loans shall be increased to the Default Rate.

(b)      If any Event of Default has occurred and is continuing, without further order of, application to, or action by, the Bankruptcy Court, (i) the Administrative Agent may, without notice, declare all or any portion of the Obligations, including all or any portion of any Term Loans to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Borrower and each other Credit Party; and (ii) the Administrative Agent may (and at the written request of the Requisite Lenders, shall), without notice except as required by the Final Order, exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the Code; provided that the Lenders shall provide to the Credit Parties (with a copy to counsel for (A) the Credit Parties, (B) any statutory committee appointed in the Cases and (C) the United States Trustee for the Southern District of New York) within five (5) Business Days prior written notice (the "Notice Period"). If an Event of Default shall have occurred and is continuing, Delta (so long as it is a Lender) shall have the right to deduct such amount from amounts due and payable to Credit Parties under any Delta Connection Agreement.

(c)      In addition, subject solely to any requirement of the giving of notice by the terms the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors.

8.3      Waivers by Credit Parties.  Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Administrative Agent on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever the Administrative Agent may do in

this regard; (b) all rights to notice and a hearing prior to the Administrative Agent's taking possession or control of, or to the Administrative Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Administrative Agent to exercise any of their remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

## 9.   GUARANTY

9.1    <u>Guaranty of Obligations of the Borrower</u>. Each Guarantor hereby jointly and severally and absolutely and unconditionally guarantees to the Administrative Agent and the Secured Parties, and their respective successors, endorsees, transferees and assigns, the prompt payment when due (whether at stated maturity, by acceleration or otherwise) and performance of the Obligations of the Borrower and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees and expenses paid or incurred by the Administrative Agent and the Lenders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any Guarantor or any other guarantor of all or any part of the Obligations.  The Guarantors agree that this Guaranty is a guaranty of payment and performance and not of collection, and that their obligations under this Guaranty shall be primary, absolute and unconditional, irrespective of, and unaffected by:

(a)    any claim of waiver, release, amendment, extension, renewal, settlement, surrender, alteration, or compromise of any of the Obligations or any of the Loan Documents, by operation of law or otherwise;

(b)    any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor;

(c)    the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Credit Party, the Administrative Agent, any Lender, or any other person, whether in connection herewith or in any unrelated transactions;

(d)    the genuineness, validity, regularity, enforceability or any future amendment of, or change in any other Loan Document or any other agreement, document or instrument to which any Credit Party and/or the Guarantors are or may become a party;

(e)    the absence of any action, claim or demand to enforce any of the Obligations or any other Loan Document or the waiver or consent by the Administrative Agent or any Lender with respect to any of the provisions thereof;

(f)    the existence, release, non-perfection, invalidity, value or condition of, or failure to perfect its Lien against, any collateral for the Obligations or any action, or the absence of any action, by the Administrative Agent or any Lender in respect thereof (including, without limitation, the release of any such security);

(g)    the insolvency of any Credit Party; or

(h)    any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or the guarantor, it being agreed by each Guarantor

that its obligations under this Guaranty shall not be discharged until the Termination Date. Each Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations. Each Guarantor agrees that any notice or directive given at any time to Secured Parties which is inconsistent with the waiver in the immediately preceding sentence shall be null and void and may be ignored by the Administrative Agent and the Lenders, and, in addition, may not be pleaded or introduced as evidence in any litigation relating to this Guaranty for the reason that such pleading or introduction would be at variance with the written terms of this Guaranty, unless Secured Parties have specifically agreed otherwise in writing. It is agreed among each Guarantor and Secured Parties that the foregoing waivers are of the essence of the transaction contemplated by the Loan Documents and that, but for this Guaranty and such waivers, Secured Parties would decline to enter into this Agreement.

9.2     Demand by Secured Parties. In addition to the terms of the Guaranty set forth in Section 9.1 hereof, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if, at any time, the outstanding Obligations under this Agreement (including all accrued interest thereon) are declared to be immediately due and payable, then the Guarantors shall, without demand, pay to the holders of the Obligations the entire amount of the outstanding Obligations due and owing to such holders. Payment by the Guarantors shall be made to the Administrative Agent in immediately available Federal funds to the Cash Collateral Account and applied to the Obligations.

9.3     Enforcement of Guaranty. In no event shall the Administrative Agent or any Lender have any obligation (although it is entitled, at its option) to proceed against the Borrower or any other Credit Party or any Collateral pledged to secure Obligations or any other Guarantor before seeking satisfaction from any or all of the Guarantors, and the Administrative Agent and the Secured Parties may proceed, prior or subsequent to, or simultaneously with, the enforcement of their rights hereunder, to exercise any right or remedy which it may have against any Collateral, as a result of any Lien it may have as security for all or any portion of the Obligations.

9.4     Waiver. To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than, subject to Section 9.9, the indefeasible payment in full in cash of the Obligations (other than unasserted contingent indemnification obligations). Without limiting the foregoing, in addition to the waivers contained in Section 9.1 hereof, the Guarantors waive, and agree that they shall not at any time insist upon, plead or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshaling of assets or redemption laws, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by the Guarantors of their Obligations under, or the enforcement by Secured Parties of, this Guaranty. Each Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Guarantors hereby waive diligence, presentment and demand (whether for non-payment or protest or of acceptance, maturity, extension of time, change in nature or form of the Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Obligations, notice of adverse change in the Borrower's financial condition or any other

37

fact which might increase the risk to the Guarantors) with respect to any of the Obligations or all other demands whatsoever and waive the benefit of all provisions of law which are or might be in conflict with the terms of this Guaranty. The Guarantors represent, warrant and jointly and severally agree that, as of the date of this Guaranty, their obligations under this Guaranty are not subject to any offsets or defenses against the Administrative Agent, any Secured Parties or any Credit Party of any kind. The Guarantors further jointly and severally agree that their obligations under this Guaranty shall not be subject to any counterclaims or offsets or defenses against Secured Parties or against any Credit Party of any kind which may arise in the future.

9.5     Benefit of Guaranty. The provisions of this Guaranty are for the benefit of Secured Parties and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any Credit Party and Secured Parties, the obligations of any Credit Party under the Loan Documents. In the event all or any part of the Obligations are transferred, indorsed or assigned by any Secured Party to any Person or Persons, any reference to Secured Party herein shall be deemed to refer equally to such Person or Persons.

9.6     Modification of Obligations, Etc. Each Guarantor hereby acknowledges and agrees that Secured Parties may at any time or from time to time, with or without the consent of, or notice to, the Guarantors or any of them:

(a)     change or extend the manner, place or terms of payment of, or renew or alter all or any portion of, the Obligations;

(b)     take any action under or in respect of the Loan Documents in the exercise of any remedy, power or privilege contained therein or available to it at law, equity or otherwise, or waive or refrain from exercising any such remedies, powers or privileges;

(c)     amend or modify, in any manner whatsoever, the Loan Documents;

(d)     extend or waive the time for any Credit Party's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Loan Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(e)     take and hold collateral for the payment of the Obligations guaranteed hereby or sell, exchange, release, dispose of, or otherwise deal with, any property pledged, mortgaged or conveyed, or in which Secured Parties have been granted a Lien, to secure any Obligations;

(f)     release anyone who may be liable in any manner for the payment of any amounts owed by other the Guarantors or any other Credit Party to any Secured Party;

(g)     modify or terminate the terms of any intercreditor or subordination agreement pursuant to which claims of other creditors of any Guarantor or any Credit Party are subordinated to the claims of Secured Parties; and/or

(h)     apply any sums by whomever paid or however realized to any amounts owing by any other the Guarantor or any other Credit Party to any Secured Party in such manner as any Secured Party shall determine in its discretion; and Secured Parties shall not incur any liability to

the Guarantors as a result thereof, and no such action shall impair or release the Obligations of the Guarantors or any of them under this Guaranty.

      9.7    Waiver of Subrogation, Etc.  Notwithstanding anything to the contrary in this Guaranty, or in any other Loan Document, each Guarantor hereby:

      (a)    expressly and irrevocably waives, on behalf of itself and its successors and assigns (including any surety), any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which such Guarantor may have or hereafter acquire against any Credit Party in connection with or as a result of such Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which such Guarantor is a party or otherwise; and

      (b)    acknowledges and agrees (i) that this waiver is intended to benefit Secured Parties and shall not limit or otherwise effect any Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 9.7 and their rights under this Section 9.7 shall survive payment in full of the Obligations.

      9.8    Election of Remedies. If the Administrative Agent may, under applicable law, proceed to realize benefits under any of the Loan Documents giving Secured Parties a Lien upon any Collateral owned by any Credit Party, either by judicial foreclosure or by non-judicial sale or enforcement, the Administrative Agent may, at its sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, the Administrative Agent shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Credit Party, whether because of any applicable laws pertaining to election of remedies or the like, the Guarantors hereby consent to such action by the Administrative Agent and waive any claim based upon such action, even if such action by the Administrative Agent shall result in a full or partial loss of any rights of subrogation which the Guarantors might otherwise have had but for such action by the Administrative Agent. Any election of remedies which results in the denial or impairment of the right of the Administrative Agent to seek a deficiency judgment against any Credit Party shall not impair each Guarantor's obligation to pay the full amount of the Obligations. In the event the Administrative Agent shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the Loan Documents, the Administrative Agent may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by the Administrative Agent but shall be credited against the Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Secured Parties might otherwise be entitled but for such bidding at any such sale.

9.9    Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Obligations is rescinded or must otherwise be restored or returned, each Guarantor's obligations under this Agreement with respect to that payment shall be reinstated at such time as though the payment had not been made.  If acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Administrative Agent.

9.10    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Agreement, and agrees that neither the Administrative Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

9.11    Taxes.  All payments of the Obligations will be made by each Guarantor free and clear of and without deduction or withholding for any Taxes; provided that if any Guarantor shall be required to deduct or withhold any Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

9.12    Maximum Liability.  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Lenders hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

9.13    Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article X, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the indefeasible payment in full in cash of the Obligations.  This provision is for the benefit of the Administrative Agent, the Lenders and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

9.14    Liability Cumulative.  The liability of each Loan Party as a Guarantor under this Guaranty is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 10.    SECURITY

10.1    Security.

(a)    To secure the prompt and complete payment, performance and observance of all of the Secured Obligations, in addition to other Collateral upon which a Lien is granted under the other Collateral Documents, each Credit Party hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to the Administrative Agent, for itself and for the benefit of the Secured Parties, a first priority Lien (subject only to (i) valid, perfected, nonavoidable and enforceable Liens existing as of the Petition Date, (ii) valid Liens in existence at the commencement of the Cases to the extent perfected subsequent to such commencement as permitted by Section 546(b) of the Code and (iii) the Carve-Out) in accordance with sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code upon all of the following property now owned

or at any time hereafter acquired by a Credit Party or in which such Credit Party now has or at any time in the future may acquire any right, title or interest:

(i)      all Accounts;

(ii)     all Chattel Paper;

(iii)    all Copyrights, Patents and Trademarks;

(iv)     all Documents;

(v)      all Fixtures;

(vi)     all General Intangibles (including Payment Intangibles and Software);

(vii)    all Goods, Inventory and Equipment, including Airframes, Engines, Spare Engines, Spare Parts, Flight Simulators and Tooling, and other personal property, whether tangible or intangible or wherever located;

(viii)   all Instruments;

(ix)     all Investment Property, including Securities Accounts;

(x)      all Vehicles;

(xi)     all Real Property;

(xii)    the Commercial Tort Claims described on Disclosure Schedule 10.1;

(xiii)   all Deposit Accounts of any Credit Party, including all Blocked Accounts, Concentration Accounts and all other bank accounts and all deposits therein;

(xiv)    all money, cash or cash equivalents of any Credit Party;

(xv)     all Supporting Obligations and Letter of Credit Rights of any Credit Party;

(xvi)    to the extent not otherwise included, all monies and other property of any kind which is, after the Petition Date, received by such Credit Party in connection with refunds with respect to taxes, assessments and governmental charges imposed on such Credit Party or any of its property or income;

(xvii)   to the extent not otherwise included, all causes of action (other than claims of the Credit Parties under sections 544, 545, 547 and 548 of the Bankruptcy Code) and all monies and other property of any kind received therefrom, and all monies and other property of any kind recovered by any Credit Party;

(xviii)  all property of any Credit Party held by the Administrative Agent or any Lender, including all property of every description, in the possession or custody of or in transit

42

to the Administrative Agent or such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power; and

(xix)    to the extent not otherwise included, all Proceeds of each of the foregoing, tort claims, insurance claims and other rights to payment not otherwise included in the foregoing (including any proceeds of claims of the Credit Parties under sections 544, 545, 547 and 548 of the Bankruptcy Code) and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing.

(a)    Collateral shall not include the Excluded Collateral provided that if and when any property shall cease to be Excluded Collateral, such property shall be deemed at all times from and after the date such property ceased to be Excluded Collateral to constitute Collateral.

(b)    In addition, to secure the prompt and complete payment, performance and observance of the Obligations and in order to induce Secured Parties as aforesaid, each Credit Party hereby grants to the Administrative Agent, for itself and the benefit of Secured Parties, a right of setoff against the property of such Credit Party held by the Administrative Agent or any Secured Party, consisting of Collateral now or hereafter in the possession or custody of or in transit to the Administrative Agent or any Secured Party, for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party, or as to which such Credit Party may have any right or power.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent or any Lender may exercise such right of setoff upon at least five (5) Business Days' prior written notice to the Credit Parties and the Committee (or the U.S. Trustee if no Committee has been appointed).

(c)    To the extent a security interest hereunder would be created in any asset in which a security interest is created under any Loan Document, to the extent of conflict, the rights, remedies and obligations of the relevant Credit Party, the Administrative Agent and the Secured Parties with respect to such asset shall be governed by such Loan Document and not this Agreement.

10.2    Perfection of Security Interests.

(a)    At any time and from time to time, upon the request of the Administrative Agent and at the sole expense of the Credit Parties, each Credit Party shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as the Administrative Agent or any Lender may deem desirable to obtain the full benefits of any security interest granted or purported to be granted by such Credit Party hereunder and of the rights and powers herein granted, including (i) upon the request of the Administrative Agent or any Lender using its commercially reasonable efforts to secure all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Administrative Agent of any License or Contract held by such Credit Party and to enforce the security interests granted hereunder, (ii) upon the request of the Administrative Agent or any Lender, delivering to the Administrative Agent all Collateral consisting of negotiable Documents, certificated Securities, Chattel Paper and Instruments (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank) promptly after such Credit Party receives the same,

43

(iii) obtaining (x) a blocked account or similar agreement with each bank or financial institution holding a Deposit Account for such Credit Party and (y) authenticated Control Letters from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities, in each case constituting Collateral, to or for any Credit Party; provided, that the Administrative Agent shall not deliver a notice that it is exercising exclusive control over any financial assets or commodities to any such issuer, securities intermediary or commodities intermediary unless an Event of Default has occurred and is continuing, (iv) for each Credit Party that is or becomes the beneficiary of a letter of credit with a face amount in excess of $1,000,000, promptly, and in any event within two (2) Business Days after becoming a beneficiary, notifying the Administrative Agent thereof and thereafter, unless the related Letter-of-Credit Rights constitute a Supporting Obligation for which the Administrative Agent's security interest is perfected, using its commercially reasonable efforts to cause the issuer and/or confirmation bank with respect to such Letter-of-Credit Rights to enter into a tri-party agreement with the Administrative Agent assigning such Letter-of-Credit Rights to the Administrative Agent and directing all payments thereunder to a Blocked Account, all in form and substance reasonably satisfactory to the Administrative Agent, (v) promptly, and in any event within five (5) Business Days after the same is acquired by it, notifying the Administrative Agent of any Commercial Tort Claim involving a claim of more than $1,000,000 acquired by it and if requested by the Administrative Agent, entering into a supplement to this Agreement, granting to the Administrative Agent a Lien in such Commercial Tort Claim and (vi) maintaining complete and accurate stock records.

(b)      Each Credit Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets of such Credit Party" or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Code in such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Credit Party is an organization, the type of organization and any organization identification number issued to such Credit Party, and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Each Credit Party agrees to furnish any such information to the Administrative Agent promptly upon request. Each Credit Party also ratifies its authorization for the Administrative Agent to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)      Each Credit Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file any filings with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country) or other documents (including pursuant to the Cape Town Treaty) in order to perfect the Administrative Agent's security interest in the Collateral.

(d)      Notwithstanding subsections (a) , (b) and (c) of this Section 10.2, or any failure on the part of any Credit Party or the Administrative Agent to take any of the actions set forth in such subsections, the Liens and security interests granted herein shall be deemed valid,

enforceable and perfected by entry of the Final Order. No financing statement, notice of lien, mortgage, deed of trust or similar instrument in any jurisdiction or filing office need be filed or any other action taken in order to validate and perfect the Liens and security interests granted by or pursuant to this Agreement or the Final Order.

10.3    Rights of Lender; Limitations on Lenders Obligations.

(a)    Subject to each Credit Party's rights and duties under the Bankruptcy Code (including section 365 of the Bankruptcy Code), it is expressly agreed by each Credit Party that, anything herein to the contrary notwithstanding, each such Credit Party shall remain liable under each of its Contracts and each of its Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder, unless such Credit Party determines in its reasonable good faith judgment and in accordance with the terms of this Agreement that such Contract or License is no longer valuable to such Credit Party's business, economically or otherwise. Neither the Administrative Agent nor any Secured Party shall have any obligation or liability under any Contract or License by reason of or arising out of this Agreement or the granting herein of a Lien thereon or the receipt by Administrative Agent or any Secured Party of any payment relating to any Contract or License pursuant hereto. Neither Administrative Agent nor any Secured Party shall be required or obligated in any manner to perform or fulfill any of the obligations of any Credit Party under or pursuant to any Contract or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any Contract or License, or to present or file any claims, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)    Subject to Section 10.5 hereof, the Administrative Agent authorizes each Credit Party to collect its Accounts, provided that such collection is performed in accordance with such Credit Party's customary procedures, and the Administrative Agent may, upon the occurrence and during the continuation of any Event of Default and without notice, other than any requirement of notice provided in the Final Order, limit or terminate said authority at any time.

(c)    The Administrative Agent may at any time notify Account Debtors and other Persons obligated on the Collateral that the Administrative Agent has a security interest therein, and, after an Event of Default or Default has occurred and is continuing without any notice to any Credit Party, that payments shall be made directly to the Administrative Agent. Subject to any requirement of notice provided in the Final Order, upon the reasonable request of the Administrative Agent, each Credit Party shall so notify Account Debtors and other Persons obligated on Collateral. Once any such notice has been given to any Account Debtor or other Person obligated on the Collateral, the affected Credit Party shall not give any contrary instructions to such Account Debtor or other Person without the Administrative Agent's prior written consent. Subject to any requirement of notice provided in the Final Order, upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may in its own name, or in the name of others, communicate with such parties to such Accounts, Contracts, Instruments, Investment Property and Chattel Paper to verify with such Persons to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any such Accounts, Contracts, Instruments, Investment Property or Chattel Paper.

(d)      The Administrative Agent may at any time in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent or in the name of any Credit Party communicate (by mail, telephone, facsimile or otherwise) with Account Debtors to verify with such Persons, to the Administrative Agent's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts and/or payment intangibles comprising Collateral; provided that unless an Event of Default shall have occurred and be continuing, the Administrative Agent shall not do any of the foregoing except during normal business hours and after giving such Credit Party reasonable prior notice and opportunity to be present. If an Event of Default shall have occurred and be continuing, each Credit Party, at its own expense, shall cause the independent certified public accountants then engaged by such Credit Party to prepare and deliver to the Administrative Agent and each Lender at any time and from time to time promptly upon the Administrative Agent's written request the following reports with respect to each Credit Party: (i) a reconciliation of all Accounts; (ii) an aging of all Accounts; (iii) trial balances; and (iv) a test verification of such Accounts as the Administrative Agent may request. The Administrative Agent may at any time in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent or in the name of any Credit Party communicate (by mail, telephone, facsimile or otherwise) with parties to Contracts and obligors in respect of Instruments to verify with such Persons, to the Administrative Agent's satisfaction, the existence, amount, terms of, and any other matter relating to, Instruments, Chattel Paper and/or payment intangibles comprising Collateral; provided that unless an Event of Default shall have occurred and be continuing, the Administrative Agent shall not do any of the foregoing except during normal business hours and after giving such Credit Party reasonable prior notice and opportunity to be present. Each Credit Party, at its own expense, shall deliver to the Administrative Agent the results of each physical verification, if any, which such Credit Party may in its discretion have made, or caused any other Person to have made on its behalf, of all or any portion of its Inventory.

10.4     Covenants of the Credit Parties with Respect to Collateral. Each Credit Party covenants and agrees with the Administrative Agent, for the benefit of the Secured Parties, that from and after the date of this Agreement and until the Termination Date:

(a)      Maintenance of Records. Credit Parties shall keep and maintain, at their own cost and expense, satisfactory and complete records of the Collateral, including a record of any and all payments received and any and all credits granted with respect to the Collateral and all other dealings with the Collateral, in each case in a manner consistent with past practice. Upon request by the Administrative Agent, Credit Parties shall mark their books and records pertaining to the Collateral to evidence this Agreement and the Liens granted hereby. If any Credit Party retains possession of any Chattel Paper or Instruments with the Administrative Agent's consent, such Chattel Paper and Instruments shall, if requested by the Administrative Agent, be marked with the following legend: This writing and the obligations evidenced or secured hereby are subject to the security interest of Delta Air Lines, Inc., as the Administrative Agent, for the benefit of Secured Parties.

(b)      Covenants Regarding Patent, Trademark and Copyright Collateral.

(i)      Each Credit Party shall notify the Administrative Agent promptly if it knows or has reason to know that any application or registration relating to any material Patent,

Trademark or Copyright (now or hereafter existing) may become abandoned or dedicated, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding any Credit Party's ownership of any material Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same.

(ii)    Promptly after any Credit Party, either itself or through the Administrative Agent, employee, licensee or designee, files an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, such Credit Party shall give the Administrative Agent written notice of such filing and, upon request of the Administrative Agent, Credit Party shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements or Trademark Security Agreements as the Administrative Agent may request to evidence the Administrative Agent's Lien on such Patent, Trademark or Copyright, and the General Intangibles of such Credit Party relating thereto or represented thereby.

(iii)    The Credit Parties shall take all actions necessary or requested by the Administrative Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the Patents, Trademarks and Copyrights (now or hereafter existing), including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings unless such Credit Party reasonably determines that such Patent, Trademark or Copyright Collateral is in no way material to the conduct of its business or operations,

(iv)    In the event that any of the Patent, Trademark or Copyright Collateral is infringed upon, or misappropriated or diluted by a third party, such Credit Party shall comply with Section 10.2 of this Agreement. Such Credit Party shall, unless such Credit Party reasonably determines that such Patent, Trademark or Copyright Collateral is in no way material to the conduct of its business or operations, sue for infringement, misappropriation or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and shall take such other actions as the Administrative Agent shall deem appropriate under the circumstances to protect such Patent, Trademark or Copyright Collateral.

(c)    Compliance with Terms of Accounts, etc. Each Credit Party will perform and comply in all material respects with all obligations in respect of the Collateral and all other agreements to which it is a party or by which it is bound relating to the Collateral.

(d)    Further Identification of Collateral. Credit Parties will, if so requested by the Administrative Agent, furnish to the Administrative Agent, as often as the Administrative Agent requests, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Administrative Agent may reasonably request, all in such detail as the Administrative Agent may specify.

(e)    Notices. Credit Parties will advise the Administrative Agent promptly, in reasonable detail, (i) of any Lien or claim made or asserted against any of the Collateral other than in respect of Permitted Liens, and (ii) of the occurrence of any other event which would

have a material adverse effect on the aggregate value of the Collateral or on the Liens created hereunder or under any other Loan Document.

(f)    No Reincorporation. Without limiting the restrictions on mergers involving the Credit Parties contained in this Agreement, no Credit Party shall reincorporate or reorganize itself under the laws of any jurisdiction other than the jurisdiction in which it is incorporated or organized as of the date hereof without the prior written consent of the Administrative Agent.

(g)    Terminations; Amendments Not Authorized. Except to the extent permitted by clause (h), each Credit Party acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement relating to the Collateral and filed pursuant to the terms hereof without the prior written consent of the Administrative Agent and agrees that it will not do so without the prior written consent of the Administrative Agent, subject to such Credit Party's rights under Section 9-509(d)(2) of the Code.

(h)    Authorized Terminations and Subordinations. The Administrative Agent will promptly deliver to each Credit Party, after a reasonable period of time following receipt of an officer's certificate from such Credit Party, for filing or authorize each Credit Party to prepare and file termination statements and releases in respect of any sales, transfers, conveyances, assignments or other dispositions of Collateral made in accordance with Section 6.8 of this Agreement; provided that such Credit Party shall represent and warrant in such officer's certificate that such sale, transfer, conveyance assignment or other disposition of Collateral was made in compliance with Section 6.8. The Administrative Agent will, upon request of any Credit Party, and after a reasonable period of time following receipt of an officer's certificate from such Credit Party, expressly subordinate, in form and substance reasonably satisfactory to the Administrative Agent the Liens granted hereunder to any prior Lien permitted under Section 6.7 of this Agreement; provided that such Credit Party shall represent and warrant in such officer's certificate that such prior Lien is permitted under Section 6.7.

(i)    Motor Vehicles. Upon request, each Credit Party shall deliver to the Administrative Agent a motor vehicle certificate of title, if any, for all motor vehicles from time to time owned by it and shall cause those title certificates to be filed (with the Administrative Agent's Lien noted thereon) in the appropriate state motor vehicle filing office.

(j)    Pledged Collateral.

(i)    All certificates and all promissory notes and Instruments evidencing the Pledged Collateral shall be delivered to and held by or on behalf of the Administrative Agent, for itself and the benefit of Secured Parties, pursuant hereto. All Pledged Shares shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Administrative Agent and all promissory notes or other instruments evidencing the Pledged Indebtedness shall be endorsed by the applicable Credit Party. In addition, the Administrative Agent shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

48

(ii)     No Credit Party will sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral, or any unpaid dividends, interest or other distributions or payments with respect to the Pledged Collateral or grant a Lien in the Pledged Collateral, unless otherwise expressly permitted by this Agreement;

(iii)     Each Credit Party will, at its expense, promptly execute, acknowledge and deliver all such instruments and take all such actions as the Administrative Agent (or any Lender) from time to time may reasonably request in order to ensure to the Administrative Agent and Secured Parties the benefits of the Liens in and to the Pledged Collateral intended to be created by this Agreement, including the filing of any necessary Code financing statements, which may be filed by the Administrative Agent with or (to the extent permitted by law) without the signature of Credit Party, and will cooperate with the Administrative Agent, at such Credit Party's expense, in obtaining all necessary approvals and making all necessary filings under federal, state, local or foreign law in connection with such Liens or any sale or transfer of the Pledged Collateral; provided that the Administrative Agent shall not, prior to the occurrence of any Event of Default, require any actions to be taken with respect to property the acquisition or construction of which was financed through Indebtedness (existing as of the Closing Date or as permitted by Section 6.3(a) of this Agreement);

(iv)     Each Credit Party has and will defend the title to the Pledged Collateral and the Liens of the Administrative Agent in the Pledged Collateral against the claim of any Person (other than the holder of a Permitted Lien) and will maintain and preserve such Liens; and

(v)     Each Credit Party will, upon obtaining ownership of any additional Stock of a Pledged Entity or promissory notes or instruments representing Pledged Indebtedness or Stock or promissory notes or instruments otherwise required to be pledged to the Administrative Agent pursuant to any of the Loan Documents, which Stock, notes or instruments are not already Pledged Collateral, promptly (and in any event within five (5) Business Days) deliver to the Administrative Agent a Pledge Amendment, duly executed by such Credit Party, in form and substance reasonably acceptable to the Administrative Agent (a "Pledge Amendment") in respect of any such additional Stock, notes or instruments, pursuant to which such Credit Party shall pledge to the Administrative Agent all of such additional Stock, notes and instruments; provided, that such Credit Party shall be required to do the foregoing with respect to any such promissory note or instrument only if requested to do so by the Administrative Agent pursuant to Section 10.2(a)(ii) of this Agreement. Credit Party hereby authorizes the Administrative Agent to attach each Pledge Amendment to this Agreement and agrees that all Pledged Shares and Pledged Indebtedness listed on any Pledge Amendment delivered to the Administrative Agent shall for all purposes hereunder be considered Pledged Collateral. This clause (v) shall not apply to any Excluded Equity.

(vi)     At any time that an Event of Default has occurred and is then continuing, subject to any requirement of notice provided in the Final Order:

A.     All rights of the Pledgor to exercise voting and other consensual rights in respect of the Pledged Shares shall immediately cease and all such voting and other consensual rights shall become vested in the Pledgee, and the Pledgee

shall thereupon have the sole right to exercise such voting and other consensual rights (; provided, the voting and other consensual rights of the Pledgor in respect of the Pledged Shares shall automatically be restored in full upon the cure or waiver of all Events of Default then existing.  In order to effect the foregoing, the Pledgor hereby grants to the Pledgee an irrevocable proxy to vote the Pledged Shares and, any time that an Event of Default exists, the Pledgor agrees to execute such other proxies as the Pledgee may request; and

B.    All rights of the Pledgor to receive and retain any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares shall immediately cease and any such distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares shall be paid to the Pledgee (for application to the Obligations with respect to any cash or cash equivalents, or to be held by the Pledgee as additional security).  Any distributions, dividends (in the form of cash, securities or otherwise), instruments, chattel paper or other property paid or payable with respect to any of the Pledged Shares and received by the Pledgor contrary to the provisions of this Agreement shall be received in trust for the benefit of the Pledgee, shall be segregated from other assets (including, in the case of cash or cash equivalents, other funds) of Pledgor and shall be immediately delivered to the Pledgee (for application to the Obligations with respect to any cash or cash equivalents, or to be held by the Pledgee as additional security).

10.5    Performance by the Administrative Agent of the Credit Parties Obligations. If any Credit Party fails to perform or comply with any of its agreements contained herein and the Administrative Agent, as provided for by the terms of this Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Administrative Agent incurred in connection with such performance or compliance, together with interest thereon at the rate then in effect in respect of the Term Loans, shall be payable by such Credit Party to the Administrative Agent on demand and shall constitute Obligations secured by the Collateral. Performance of such Credit Party's obligations as permitted under this Section 10.5 shall in no way constitute a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party hereby waives applicability thereof. Moreover, the Administrative Agent shall in no way be responsible for the payment of any costs incurred in connection with preserving or disposing of Collateral pursuant to section 506(c) of the Bankruptcy Code and the Collateral may not be charged for the incurrence of any such cost.

10.6    Limitation on the Administrative Agent's duty in Respect of Collateral. The Administrative Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control. Neither the Administrative Agent nor any Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

10.7    Remedies; Rights Upon Default.

(a)    In addition to all other rights and remedies granted to it under the other Loan Documents and under any other instrument or agreement securing, evidencing or relating to any of the Secured Obligations, if any Event of Default shall have occurred and be continuing, the Administrative Agent may exercise all rights and remedies of a secured party under the Code. Without limiting the generality of the foregoing, each Credit Party expressly agrees that in any such event the Administrative Agent, without demand of performance or other demand, advertisement or notice of any kind (except the notice required by the Final Order or the notice specified below of time and place of public or private sale) to or upon such Credit Party or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code and other applicable law), may, to the maximum extent permitted by law, forthwith enter upon the premises of such Credit Party where any Collateral is located through self-help, without judicial process, without first obtaining a final judgment or giving such Credit Party or any other Person notice and opportunity for a hearing on the Administrative Agent's claim or action and may collect, receive, assemble, process, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, license, assign, give an option or options to purchase, or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at a public or private sale or sales, at any exchange at such prices as it may deem acceptable, for cash or on credit or for future delivery without assumption of any credit risk. The Administrative Agent or any Secured Party shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of Secured Parties, the whole or any part of said Collateral so sold, free of any right or equity of redemption, which equity of redemption each Credit Party hereby releases. Such sales may be adjourned and continued from time to time with or without notice. The Administrative Agent shall have the right to conduct such sales on any Credit Party's premises or elsewhere and shall have the right to use any Credit Party's premises without charge for such time or times as the Administrative Agent may deem necessary or advisable. EACH CREDIT PARTY HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS ADMINISTRATIVE AGENT AS THE PROXY AND ATTORNEY-IN-FACT OF SUCH CREDIT PARTY WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING THE RIGHT TO VOTE THE PLEDGED SHARES, WITH FULL POWER OF SUBSTITUTION TO DO SO. THE APPOINTMENT OF ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION DATE. IN ADDITION TO THE RIGHT TO VOTE THE PLEDGED SHARES, THE APPOINTMENT OF ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF THE PLEDGED SHARES WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS). SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY PLEDGED SHARES ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF THE PLEDGED SHARES OR ANY OFFICER OR AGENT THEREOF). NOTWITHSTANDING THE FOREGOING, ADMINISTRATIVE AGENT SHALL NOT HAVE ANY DUTY TO EXERCISE ANY SUCH RIGHT OR TO

PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO.

(b)    If any Event of Default shall have occurred and be continuing, each Credit Party further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at a place or places designated by the Administrative Agent which are reasonably convenient to the Administrative Agent and such Credit Party, whether at such Credit Party's premises or elsewhere. Until the Administrative Agent is able to effect a sale, lease, or other disposition of Collateral, the Administrative Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent. The Administrative Agent shall have no obligation to any Credit Party to maintain or preserve the rights of Credit Party as against third parties with respect to Collateral while Collateral is in the possession of the Administrative Agent. The Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Administrative Agent shall deposit the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale to the Cash Collateral Account and such net proceeds shall be applied in accordance with Section 1.3. To the maximum extent permitted by applicable law, each Credit Party waives all claims, damages, and demands against the Administrative Agent or any Secured Party arising out of the repossession, retention or sale of the Collateral except such as arise solely out of the gross negligence or willful misconduct of the Administrative Agent or such Secured Party as finally determined by a court of competent jurisdiction. Each Credit Party agrees that ten (10) days prior notice by the Administrative Agent of the time and place of any public sale or of the time after which a private sale may take place is reasonable notification of such matters. Credit Parties shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Secured Obligations, including any attorneys fees and other expenses incurred by the Administrative Agent or any Secured Party to collect such deficiency.

(c)    Except as otherwise specifically provided herein, each Credit Party hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

(d)    To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Credit Party acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent (i) to fail to incur expenses reasonably deemed significant by the Administrative Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise

dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as the Credit Parties, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Credit Party acknowledges that the purpose of this Section 10.7(d) is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would not be commercially unreasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 10.7(d). Without limitation upon the foregoing, nothing contained in this Section 10.7(d) shall be construed to grant any rights to any Credit Party or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 10.7(d).

(e)    Neither the Administrative Agent nor any Secured Party shall be required to make any demand upon, or pursue or exhaust any of their rights or remedies against, any Credit Party, any other obligor, the Guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefore or any direct or indirect guarantee thereof. Neither the Administrative Agent nor the Secured Parties shall be required to marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, and all of its and their rights hereunder or under any other Loan Document shall be cumulative. To the extent it may lawfully do so, each Credit Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

(f)    Upon the occurrence of an Event of Default and during the continuation of such Event of Default, the Administrative Agent is hereby authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a holder with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon, to sell in one or more sales after ten (10) days notice of the

time and place of any public sale or of the time at which a private sale is to take place (which notice Credit Parties agree is commercially reasonable) the whole or any part of the Pledged Collateral and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof. Any sale shall be made at a public or private sale at the Administrative Agent's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as the Administrative Agent may deem fair, and the Administrative Agent may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of such Credit Party or any right of redemption. Each sale shall be made to the highest bidder, but the Administrative Agent reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer or agent of the Administrative Agent.

(g)     If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral has been offered for sale in lots, and if at any of such sales, the highest bid for the lot offered for sale would indicate to the Administrative Agent, in its discretion, that the proceeds of the sales of the whole of the Pledged Collateral would be unlikely to be sufficient to discharge all the Secured Obligations, the Administrative Agent may, on one or more occasions and in its sole discretion, postpone effectuating any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived.

(h)     If, at any time when the Administrative Agent in its sole discretion determines, following the occurrence and during the continuance of an Event of Default, that, in connection with any actual or contemplated exercise of its rights (when permitted under this Section (h) to sell the whole or any part of the Pledged Shares hereunder, it is necessary or advisable to effect a public registration of all or part of the Pledged Collateral pursuant to the Securities Act of 1933, as amended (or any similar statute then in effect) (the "Act" ), such Credit Party shall, in an expeditious manner, cause the issuers of Pledged Collateral to:

(i)     Prepare and file with the Securities and Exchange Commission (the "Commission") a registration statement with respect to the Pledged Shares and in good faith use commercially reasonable efforts to cause such registration statement to become and remain effective;

(ii)     Prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Act with respect to the sale or other disposition of the Pledged Shares covered by such registration statement whenever the Administrative Agent shall desire to sell or otherwise dispose of the Pledged Shares;

(iii)     Furnish to the Administrative Agent such numbers of copies of a prospectus and a preliminary prospectus, in conformity with the requirements of the Act, and such other documents as the Administrative Agent may request in order to facilitate the public sale or other disposition of the Pledged Shares by the Administrative Agent;

(iv)     Use commercially reasonable efforts to register or qualify the Pledged Shares covered by such registration statement under such other securities or blue sky laws of such jurisdictions within the United States and Puerto Rico as the Administrative Agent shall request, and do such other reasonable acts and things as may be required of it to enable the Administrative Agent to consummate the public sale or other disposition in such jurisdictions of the Pledged Shares by the Administrative Agent;

(v)     Furnish, at the request of the Administrative Agent, on the date that shares of the Pledged Collateral are delivered to the underwriters for sale pursuant to such registration or, if the security is not being sold through underwriters, on the date that the registration statement with respect to such Pledged Shares becomes effective, (A) an opinion, dated such date, of the independent counsel representing such registrant for the purposes of such registration, addressed to the underwriters, if any, and in the event the Pledged Shares are not being sold through underwriters, then to the Administrative Agent, in customary form and covering matters of the type customarily covered in such legal opinions; and (B) a comfort letter, dated such date, from the independent certified public accountants of such registrant, addressed to the underwriters, if any, and in the event the Pledged Shares are not being sold through underwriters, then to the Administrative Agent, in a customary form and covering matters of the type customarily covered by such comfort letters and as the underwriters or the Administrative Agent shall reasonably request. The opinion of counsel referred to above shall additionally cover such other legal matters with respect to the registration in respect of which such opinion is being given as the Administrative Agent may reasonably request. The letter referred to above from the independent certified public accountants shall additionally cover such other financial matters (including information as to the period ending not more than five (5) Business Days prior to the date of such letter) with respect to the registration in respect of which such letter is being given as the Administrative Agent may reasonably request; and

(vi)     Otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but not later than 18 months after the effective date of the registration statement, an earnings statement covering the period of at least 12 months beginning with the first full month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Act.

(i)     All expenses incurred in complying with <u>Section 10.7</u> hereof, including, without limitation, all registration and filing fees (including all expenses incident to filing with the National Association of Securities Dealers, Inc.), printing expenses, fees and disbursements of counsel for the registrant, the fees and expenses of counsel for the Administrative Agent, expenses of the independent certified public accountants (including any special audits incident to or required by any such registration) and expenses of complying with the securities or blue sky laws or any jurisdictions, shall be paid by Credit Parties.

(j)       If, at any time when the Administrative Agent shall determine to exercise its right to sell the whole or any part of the Pledged Collateral hereunder, such Pledged Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Act, the Administrative Agent may, in its discretion (subject only to applicable requirements of law), sell such Pledged Collateral or part thereof by private sale in such manner and under such circumstances as the Administrative Agent may deem necessary or advisable, but subject to the other requirements of this Section 10.7, and shall not be required to effect such registration or to cause the same to be effected. Without limiting the generality of the foregoing, in any such event, the Administrative Agent in its discretion (i) may, in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or part thereof could be or shall have been filed under said Act (or similar statute), (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who is an accredited investor under the Act and who will represent and agree that such purchaser is purchasing for its own account, for investment and not with a view to the distribution or sale of such Pledged Collateral or any part thereof. In addition to a private sale as provided above in this Section 10.7, if any of the Pledged Collateral shall not be freely distributable to the public without registration under the Act (or similar statute) at the time of any proposed sale pursuant to this Section 10.7, then the Administrative Agent shall not be required to effect such registration or cause the same to be effected but, in its discretion (subject only to applicable requirements of law), may require that any sale hereunder (including a sale at auction) be conducted subject to restrictions:

(i)       as to the financial sophistication and ability of any Person permitted to bid or purchase at any such sale;

(ii)       as to the content of legends to be placed upon any certificates representing the Pledged Collateral sold in such sale, including restrictions on future transfer thereof;

(iii)       as to the representations required to be made by each Person bidding or purchasing at such sale relating to that Person's access to financial information about such Credit Party and such Person's intentions as to the holding of the Pledged Collateral so sold for investment for its own account and not with a view to the distribution thereof; and

(iv)       as to such other matters as the Administrative Agent may, in its discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors rights and the Act and all applicable state securities laws.

(k)       Each Credit Party recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof in accordance with clause (j) above. Each Credit Party also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to

permit the Pledged Entity to register such securities for public sale under the Act, or under applicable state securities laws, even if such Credit Party and the Pledged Entity would agree to do so.

(l)     Each Credit Party agrees to the maximum extent permitted by applicable law that following the occurrence and during the continuance of an Event of Default it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale hereunder, and each Credit Party waives the benefit of all such laws to the extent it lawfully may do so. Each Credit Party agrees that it will not interfere with any right, power and remedy of the Administrative Agent provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Administrative Agent of any one or more of such rights, powers or remedies. No failure or delay on the part of the Administrative Agent to exercise any such right, power or remedy and no notice or demand which may be given to or made upon Credit Parties by the Administrative Agent with respect to any such remedies shall operate as a waiver thereof, or limit or impair the Administrative Agent's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against any Credit Party in any respect.

(m)    Each Credit Party further agrees that a breach of any of the covenants contained in this Section 10.7 will cause irreparable injury to the Administrative Agent, that the Administrative Agent shall have no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 10.7 shall be specifically enforceable against the Credit Parties, and each Credit Party hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that the Secured Obligations are not then due and payable in accordance with the agreements and instruments governing and evidencing such Obligations.

(n)    To the extent that any rights and remedies under this Section 10.7 would otherwise be in violation of the automatic stay of section 362 of the Bankruptcy Code, such stay shall be deemed modified, as set forth in the Final Order, to the extent necessary to permit the Administrative Agent to exercise such rights and remedies.

10.8    The Administrative Agent's Appointment as Attorney-in-Fact.

(a)    On the Closing Date each Credit Party shall execute and deliver to the Administrative Agent a power of attorney (the "Power of Attorney") substantially in the form attached hereto as Exhibit A. The power of attorney granted pursuant to the Power of Attorney is a power coupled with an interest and shall be irrevocable until the Termination Date. The powers conferred on the Administrative Agent, for the benefit of Secured Parties, under the Power of Attorney are solely to protect the Administrative Agent's interests (for the benefit of Secured Parties) in the Collateral and shall not impose any duty upon the Administrative Agent or any Secured Party to exercise any such powers. The Administrative Agent agrees that it shall account for any moneys received by the Administrative Agent in respect of any foreclosure on or disposition of Collateral pursuant to the Power of Attorney; provided, that neither the

Administrative Agent nor any Secured Party shall have any duty as to any Collateral, and the Administrative Agent and the Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers. NEITHER THE ADMINISTRATIVE AGENT, THE SECURED PARTIES NOR THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL BE RESPONSIBLE TO ANY CREDIT PARTY FOR ANY ACT OR FAILURE TO ACT UNDER ANY POWER OF ATTORNEY OR OTHERWISE, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, NOR FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

(b)     The Credit Parties hereby ratify, to the extent permitted by law, all that said attorneys shall lawfully do or cause to be done by virtue hereof. Exercise by the Administrative Agent of the powers granted hereunder is not a violation of the automatic stay provided by section 362 of the Bankruptcy Code and each Credit Party waives applicability thereof. The power of attorney granted pursuant to this Section 10.8 is a power coupled with an interest and shall be irrevocable until the Obligations are indefeasibly paid in full in cash.

(c)     The powers conferred on the Administrative Agent hereunder are solely to protect the Administrative Agent's and the Lenders' interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Administrative Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers.

(d)     Each Credit Party also authorizes the Administrative Agent, at any time and from time to time upon the occurrence and during the continuation of any Event of Default or as otherwise expressly permitted by this Agreement, (i) to communicate in its own name or the name of its Subsidiaries with any party to any Contract with regard to the assignment of the right, title and interest of such Credit Party in and under the Contracts hereunder and other matters relating thereto and (ii) to execute any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(e)     All Obligations shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, claims against the Borrower and each Credit Party in their respective Cases which are administrative expense claims having priority over any all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

10.9    Modifications.

(a)     The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent for the benefit of the Lenders pursuant to this Agreement, and the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Credit Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the

Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except for the Carve-Out having priority over the Obligations, no costs or expenses of administration which have been or may be incurred in any of the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Administrative Agent or the Lenders against the Credit Parties in respect of any Obligation;

(ii)    the Liens and security interests granted herein shall constitute valid and perfected Liens on and security interests (having the priority provided for herein and in the Final Order); in all right, title and interest in the Collateral; and

(iii)    the Liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable nonbankruptcy law.

(b)    Notwithstanding any failure on the part of any Credit Party or the Administrative Agent or the Lenders to perfect, maintain, protect or enforce the liens and security interests in the Collateral granted hereunder, the Final Order (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral.

## 11.    ASSIGNMENT AND PARTICIPATIONS; APPOINTMENT OF ADMINISTRATIVE AGENT

11.1    <u>Assignment and Participations</u>.

(a)    <u>Right to Assign</u>. Each Lender may sell, transfer, negotiate or assign (an "<u>Assignment</u>") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Term Loans) with the Borrower's (so long as no Event of Default is continuing) reasonable approval, such approval not to be unreasonably withheld, delayed or conditioned.

(b)    <u>Grant of Security Interests</u>. In addition to the other rights provided in this <u>Section 11.1</u>, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Term Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to the Administrative Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Securities or any debt obligations by notice to the Administrative Agent; <u>provided</u>, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with <u>clause (b)</u> above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(c)    <u>Participants</u>.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in

59

the Term Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

    11.2    Appointment of the Administrative Agent. Delta is hereby appointed to act as the Administrative Agent on behalf of the Lenders and the Secured Parties under this Agreement and the other Loan Documents. The provisions of this Section 11.2 are solely for the benefit of the Administrative Agent and Lenders and no Credit Party nor any other Person shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement and the other Loan Documents, the Administrative Agent shall act solely as an agent of the Lenders, and the Administrative Agent does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Credit Party or any other Person. The Administrative Agent shall have no duties or responsibilities except for those expressly set forth in this Agreement and the other Term Loans Documents. The duties of the Administrative Agent shall be mechanical and administrative in nature, and the Administrative Agent shall not have, or be deemed to have, by reason of this Agreement, any other Loan Document or otherwise a fiduciary relationship in respect of any Lender. Except as expressly set forth in this Agreement and the other Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to any Credit Party or any of their respective Subsidiaries or any Account Debtor that is communicated to or obtained by Delta or any of its Affiliates in any capacity. Neither the Administrative Agent nor any of its Affiliates nor any of their respective officers, directors, employees, agents or representatives shall be liable to any Lender for any action taken or omitted to be taken by it hereunder or under any other Loan Document, or in connection herewith or therewith, except for damages caused by its or their own gross negligence or willful misconduct.

    If the Administrative Agent shall request instructions from Requisite Lenders, all Lenders or all affected Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, then the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from Requisite Lenders, all Lenders or all affected Lenders, as the case may be, and the Administrative Agent shall not incur liability to any Person by reason of so refraining. The Administrative Agent shall be fully justified in failing or refusing to take any action hereunder or under any other Loan Document (a) if such action would, in the opinion of the Administrative Agent, be contrary to law or the terms of this Agreement or any other Loan Document, (b) if such action would, in the opinion of the Administrative Agent, expose the Administrative Agent to Environmental Liabilities or (c) if the Administrative Agent shall not

first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of Requisite Lenders, all Lenders or all affected Lenders, as applicable.

11.3    <u>The Administrative Agent's Reliance, Etc</u>. None of the Administrative Agent or any of its Affiliates or any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Administrative Agent: (a) may treat the payee of any Note as the holder thereof until the Administrative Agent receives written notice of the assignment or transfer thereof signed by such payee and in form reasonably satisfactory to the Administrative Agent; (b) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Credit Party or to inspect the Collateral (including the Books and Records to the extent not prohibited by a confidentiality agreement in favor of a third party) of any Credit Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (f) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by telecopy, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

11.4    <u>Delta and Affiliates</u>.  With respect to its Commitments hereunder, Delta shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent; and the term Lender or Lenders shall, unless otherwise expressly indicated, include Delta in its individual capacity.  Delta and its Affiliates may lend money to, invest in, and generally engage in any kind of business with, any Credit Party, any of their Affiliates and any Person who may do business with or own securities of any Credit Party or any such Affiliate, all as if Delta were not the Administrative Agent and without any duty to account therefor to Lenders.  Delta and its Affiliates may accept fees and other consideration from any Credit Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders. Each Lender acknowledges the potential conflict of interest between Delta as a Lender holding disproportionate interests in the Term Loans and Delta as the Administrative Agent.

11.5    <u>Lender Credit Decision</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on the Financial Statements referred to in <u>Section 3.4(a)</u> and such other documents and information as it

has deemed appropriate, made its own credit and financial analysis of the Credit Parties and its own decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement. Each Lender acknowledges the potential conflict of interest of each other Lender as a result of Lenders holding disproportionate interests in the Term Loans, and expressly consents to, and waives any claim based upon, such conflict of interest.

 11.6 <u>Indemnification</u>. Lenders agree to indemnify the Administrative Agent (to the extent not reimbursed by Credit Parties and without limiting the Obligations of Credit Parties hereunder), ratably according to their respective Pro Rata Shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Administrative Agent in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that the Administrative Agent is not reimbursed for such expenses by Credit Parties.

 11.7 <u>Successor Agents</u>. The Administrative Agent may resign at any time by giving not less than thirty (30) days prior written notice thereof to Lenders and the Borrower. Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor the Administrative Agent. If a successor Administrative Agent shall not have been so appointed by the Requisite Lenders and shall not have accepted such appointment within thirty (30) days after the resigning Administrative Agent's giving notice of resignation, then such resigning Administrative Agent on behalf of the Lenders may appoint a successor Administrative Agent, which shall be a Lender, if such Lender is willing to accept such appointment, or otherwise shall be a commercial bank or financial institution or a subsidiary of a commercial bank or financial institution if such commercial bank or financial institution is organized under the laws of the United States of America or of any State thereof and has a combined capital and surplus of at least $300,000,000. If a successor Administrative Agent has not been appointed pursuant to the foregoing, within thirty (30) days after the date such notice of resignation was given by such resigning Administrative Agent, such resignation shall become effective and the Requisite Lenders shall thereafter perform all the duties of the Administrative Agent hereunder until such time, if any, as the Requisite Lenders appoint a successor Administrative Agent as provided above. Any successor Administrative Agent appointed by Requisite Lenders hereunder shall be subject to the approval of the Borrower, such approval not to be unreasonably withheld, delayed or conditioned; provided, that such approval shall not be required if a Default or an Event of Default has occurred and is continuing. Upon the acceptance of any appointment as

Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent. Upon the earlier of (i) the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent or (ii) the effective date of the resigning Administrative Agent's resignation, such resigning Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents, except that any indemnity rights or other rights in favor of such resigning Administrative Agent shall continue. After any Administrative Agent's resignation hereunder, the provisions of this Article 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as the Administrative Agent under this Agreement and the other Loan Documents.

11.8    Setoff and Sharing of Payments.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, each Lender is hereby authorized upon the occurrence and during the continuance of any Event of Default and subject to Section 11.9(d), at any time or from time to time, without prior notice to any Credit Party or to any Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrower or any Guarantor (regardless of whether such balances are then due to the Borrower or any Guarantor) and any other properties or assets at any time held or owing by that Lender or that holder to or for the credit or for the account of the Borrower or any Guarantor against and on account of any of the Obligations that are not paid when due; provided, that the Lender exercising such offset rights shall not be required to give notice thereof to the affected Credit Party, except as otherwise required by the Final Order, promptly after exercising such rights. Any Lender exercising a right of setoff or otherwise receiving any payment on account of the Obligations in excess of its Pro Rata Share thereof shall purchase for cash (and the other Lenders or holders shall sell) such participations in each such other Lender's or holder's Pro Rata Share of the Obligations as would be necessary to cause such Lender to share the amount so offset or otherwise received with each other Lender or holder in accordance with their respective Pro Rata Shares, (other than offset rights exercised by any Lender with respect to Section 1.11 or 1.13). The Borrower and each Guarantor agrees, to the fullest extent permitted by law, that (a) any Lender may exercise its right to offset with respect to amounts in excess of its Pro Rata Share of the Obligations and may sell participations in such amounts so offset to other Lenders and holders and (b) any Lender so purchasing a participation in the Term Loans made or other Obligations held by other Lenders or holders may exercise all rights of offset, bankers lien, counterclaim or similar rights with respect to such participation as fully as if such Lender or holder were a direct holder of the Term Loans and the other Obligations in the amount of such participation. Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Lender that has exercised the right of offset, the purchase of participations by that Lender shall be rescinded and the purchase price restored without interest.

11.9    Payments; Non-Funding Lenders; Information; Actions in Concert.

(a)    Payments. Not less than once during each calendar month or more frequently at the Administrative Agent's election (each, a "Settlement Date"), the Administrative Agent shall advise each Lender by telephone, or telecopy of the amount of such Lender's Pro Rata Share of

principal and interest paid for the benefit of Lenders with respect to each applicable Term Loan. Provided that each Lender has funded all payments and Term Loans required to be made by it and purchased all participations required to be purchased by it under this Agreement and the other Loan Documents as of such Settlement Date, the Administrative Agent shall pay to each Lender such Lender's Pro Rata Share of principal and interest paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Term Loans held by it. To the extent that any Lender (a "Non-Funding Lender") has failed to fund all such payments and Term Loans or failed to fund the purchase of all such participations, the Administrative Agent shall be entitled to set off the funding short-fall against that Non-Funding Lender's Pro Rata Share of all payments received from the Borrower. Such payments shall be made by wire transfer to such Lender's account (as specified by such Lender in Annex H or the applicable Assignment Agreement) not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date.

(b)    Return of Payments.

(i)    If the Administrative Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by the Administrative Agent from the Borrower and such related payment is not received by the Administrative Agent, then the Administrative Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If the Administrative Agent determines at any time that any amount received by the Administrative Agent under this Agreement must be returned to the Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, the Administrative Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to the Administrative Agent on demand any portion of such amount that the Administrative Agent has distributed to such Lender, together with interest at such rate, if any, as the Administrative Agent is required to pay to the Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(c)    Dissemination of Information. The Administrative Agent shall use reasonable efforts to provide Lenders with any notice of Default or Event of Default received by the Administrative Agent from, or delivered by the Administrative Agent to, any Credit Party, with notice of any Event of Default of which the Administrative Agent has actually become aware and with notice of any action taken by the Administrative Agent following any Event of Default; provided, that the Administrative Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to the Administrative Agent's gross negligence or willful misconduct. Lenders acknowledge that the Borrower is required to provide Financial Statements and Collateral Reports to Lenders in accordance with Annexes D and E hereto and agree that the Administrative Agent shall not have the duty to provide the same to Lenders.

(d)    Actions in Concert. Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Notes (including

exercising any rights of setoff) without first obtaining the prior written consent of the Administrative Agent and Requisite Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of the Administrative Agent or Requisite Lenders.

## 12.    SUCCESSORS AND ASSIGNS

12.1    <u>Successors and Assigns</u>.  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Credit Party, the Administrative Agent, Lenders and their respective successors and assigns (including, in the case of any Credit Party, a debtor-in-possession on behalf of such Credit Party), except as otherwise provided herein or therein. No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and the Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of the Administrative Agent and Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, the Administrative Agent and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 13.    MISCELLANEOUS

13.1    <u>Complete Agreement; Modification of Agreement</u>.  The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in <u>Section 13.2</u>. Any fee letter or confidentiality agreement, if any, between any Credit Party and the Administrative Agent or any Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

13.2    <u>Amendments and Waivers</u>.

(a)    Except as otherwise expressly provided in this Agreement, the Requisite Lenders (or the Administrative Agent with the prior written consent of the Requisite Lenders), on the one hand, and the Borrower, on the other hand, may from time to time enter into written amendments, supplements or modifications for the purpose of adding, deleting or modifying any provision of any Loan Document or changing in any manner the rights, remedies, obligations and duties of the parties thereto, and with the written consent of the Requisite Lenders, the Administrative Agent, on behalf of Lenders, may execute and deliver a written instrument waiving, on such terms and conditions as may be specified in such instrument, any of the requirements applicable to the Credit Parties, as the case may be, party to any Loan Document, or any Default or Event of Default and its consequences.

(b)    Upon the Termination Date, to the extent reasonably requested by the Borrower, the Administrative Agent shall promptly deliver to the Borrower termination statements, mortgage releases, reconveyances and other documents necessary to evidence the termination of the Liens securing payment and performance of the Obligations.

13.3    <u>Costs and Expenses</u>.  The Borrower shall reimburse (i) the Administrative Agent and the Lenders for all fees, costs and expenses (including the fees and expenses of all of its counsel, advisors, consultants and auditors) and (ii) the Administrative Agent and the Lenders for all fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors (including environmental and management consultants and appraisers) incurred in connection with the negotiation, preparation and filing and/or recordation of the Loan Documents and incurred in connection with:

(a)    any amendment, modification or waiver of, or consent with respect to, or termination of, any of the Loan Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(b)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Administrative Agent, any Lender, any Credit Party or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents, any financing provided thereunder or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against any or all of the Credit Parties or any other Person that may be obligated to the Administrative Agent by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans; <u>provided</u>, that no Person shall be entitled to reimbursement under this <u>clause (b)</u> in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct as determined by a final and non-appealable order of a court of competent jurisdiction;

(c)    any attempt to enforce any remedies of the Administrative Agent or any Lender against any or all of the Credit Parties or any other Person that may be obligated to the Administrative Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(d)    any workout or restructuring of the Term Loans; and

(e)    efforts to (i) monitor the Term Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral, in each case pursuant to and in accordance with the terms of the Loan Documents;

including, as to each of <u>clauses (a)</u> through (e) above, all attorneys and other professional and service providers fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 13.3</u>, all of which shall be payable, on demand, by the Borrower to the Administrative Agent or Lender, as applicable. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers,

management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; charges for any E-System; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

13.4    No Waiver.  The Administrative Agent's or any Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of the Administrative Agent or such Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of Section 13.2, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or waived by the Administrative Agent or any Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of the Administrative Agent and the applicable required Lenders and directed to the Borrower specifying such suspension or waiver.

13.5    Remedies.  The Administrative Agent's and Lenders rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the Administrative Agent or any Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

13.6    Severability.  Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

13.7    Conflict of Terms.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, (i) if any provision contained in this Agreement or any of the other Loan Documents conflicts with the Final Order, the provision contained in the Final Order shall govern and control and (ii) if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

13.8    Confidentiality.  The Administrative Agent and Lender agree to use commercially reasonable efforts (equivalent to the efforts the Administrative Agent or Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to them by the Credit Parties and designated as confidential for a period of two (2) years following receipt thereof, except that the Administrative Agent and Lender may disclose such information (a) to Persons employed or engaged by the Administrative Agent or such Lender; (b) to any bona fide assignee or participant or potential assignee or

participant that has agreed to comply with the covenant contained in this Section 13.8 (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any Governmental Authority or reasonably believed by the Administrative Agent or Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which the Administrative Agent or Lender is a party; (f) that ceases to be confidential through no fault of the Administrative Agent or Lender; (g) to its affiliates and its and their directors, officers, employees, advisors, representatives or agents, and (h) to ratings agencies.

13.9    GOVERNING LAW. **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. EACH CREDIT PARTY HEREBY CONSENTS AND AGREES TO THE EXCLUSIVE JURISDICTION OF (I) THE BANKRUPTCY COURT UPON THE COMMENCEMENT OF THE CASES AND (II) IF SUCH CASES ARE NOT COMMENCED OR THE BANKRUPTCY COURT DECLINES TO EXERCISE JURISDICTION, THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK SHALL HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, THE ADMINISTRATIVE AGENT AND LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED, THAT THE ADMINISTRATIVE AGENT, LENDERS AND THE CREDIT PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK COUNTY AND; PROVIDED, FURTHER THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE ADMINISTRATIVE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE ADMINISTRATIVE AGENT. EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH CREDIT PARTY HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS, TO THE EXTENT PERMITTED BY LAW, TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH CREDIT PARTY HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS**

**ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN ANNEX I OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL, TO THE EXTENT PERMITTED BY LAW, BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.**

13.10    Notices.

(a)    Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other parties, or whenever any of the parties desires to give or serve upon any other parties any communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (i) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section 13.10); (iii) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid or (iv) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated in Annex I or to such other address (or facsimile number) as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than the Borrower or the Administrative Agent) designated in Annex I to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

(b)    Subject to the provisions of Section 13.10(a), each of the Administrative Agent, the Borrower, the Lenders and their authorized agents is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein; provided, that notices to any Credit Party shall not be made by any posting to an Internet or extranet based site or other equivalent service but may be made by e-mail or E-fax, if available, so long as such notices are also sent in accordance with Section 13.10(a). Each Credit Party, the Administrative Agent and each Lender hereby acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(c)    Subject to the provisions of Section 13.10(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a signature and (C) each

69

such posting shall be deemed sufficient to satisfy any requirement for a <u>writing</u>, in each case including pursuant to any Loan Document, any applicable provision of any Uniform Commercial Code, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which each Secured Party and Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(d)    All uses of an E-System shall be governed by and subject to, in addition to this <u>Section 13.10</u>, separate terms and conditions posted or referenced in such E-System and related contractual obligations executed by the Administrative Agent, the Lenders and the Credit Parties in connection with the use of such E-System.

(e)    ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED <u>AS IS</u> AND <u>AS AVAILABLE</u>. NONE OF THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN. NO WARRANTY OF ANY KIND IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PERSONS IN CONNECTION WITH ANY E SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. The Credit Parties agree (and the Borrower shall cause each other Credit Party to agree) that the Administrative Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

13.11   <u>Section Titles</u>.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

13.12   <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.  Any counterpart delivered via facsimile or other electronic transmission shall be deemed to be an original signature hereto.

13.13   <u>WAIVER OF JURY TRIAL</u>.  **BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST**

**QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG THE ADMINISTRATIVE AGENT, LENDERS AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.**

13.14   <u>Press Releases and Related Matters</u>.  Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Administrative Agent or its Affiliates or referring to this Agreement, the other Loan Documents without at least two (2) Business Days prior notice to the Administrative Agent, and without the prior written consent of the Administrative Agent, unless (and only to the extent that) such Credit Party or Affiliate is required to do so under law and then, in any event, such Credit Party or Affiliate will consult, to the extent permitted by law, with the Administrative Agent before issuing such press release or other public disclosure.

13.15   [Reserved].

13.16   <u>Advice of Counsel</u>.  Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of <u>Sections 13.9</u> and <u>13.13</u>, with its counsel.

13.17   <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

*[The remainder of this page is intentionally left blank.]*

71

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**PINNACLE AIRLINES CORP.**, as the Borrower


By: _____

Name: _____

Title: _____



**DELTA AIR LINES, INC.**, as Administrative Agent and Lender


By: _____

Name: _____

Title: _____

The following Persons are signatories to this Agreement in their capacity as Credit Parties and not as Borrower:

**PINNACLE AIRLINES, INC.**


By: _____
Name:_____
Title: _____


**PINNACLE EAST COAST OPERATIONS INC**.


By: _____
Name:_____
Title: _____


**MESABA AVIATION, INC.**


By: _____
Name:_____
Title: _____


**COLGAN AIR, INC.**


By: _____
Name:_____
Title: _____

**ANNEX A (Recitals)**
**to**
**CREDIT AGREEMENT**

**DEFINITIONS**

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"Account Debtor" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board (the "FASB"), the Emerging Issues Task Force ("EITF") of the FASB or, if applicable, the SEC.

"Accounts" means all accounts, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all Healthcare Insurance Receivables (as such term is defined in the Code), and (e) all collateral security of any kind, now or hereafter in existence, given by any Account Debtor or other Person with respect to any of the foregoing.

"Adjusted Total Operating Expenses" means (a) Total Operating Expenses minus (b) (i) Total Pass-through Expenses, plus (ii) noncash charges plus (iii) non-recurring, unusual or extraordinary items.

"Administrative Agent" has the meaning ascribed to it in the Preamble.

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, 10% or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, and (c) each of such Person's joint venturers and partners who are Affiliates under clause (a) hereof. For the purposes of this definition, control of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, that the term Affiliate, when used with reference to a Credit Party, shall specifically exclude the Administrative Agent and each Lender.

"Aggregate Cash On Hand" means the amount of cash and Cash Equivalents of the Credit Parties that may be classified, in accordance with GAAP, as unrestricted on the consolidated balance sheets of the Borrower.

"Air Carrier" means each of Pinnacle Airlines, Inc. and, solely prior to the completion of the Colgan Wind-down, Colgan Air, Inc.

"Airframe" means (i) each airframe (excluding Engines and engines either initially or from time to time installed thereon) specified by manufacturer, model, United States Registration Number and manufacturer's serial number and (ii) in either case, any and all Parts which are from time to time incorporated or installed in or attached thereto or which have been removed therefrom.

"Aircraft Mortgage" means any Aircraft Mortgage and Security Agreement entered into by and among the Administrative Agent for the benefit of the Secured Parties that is a signatory thereto.

"Aircraft Protocol" shall mean the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, as the same may be amended from time to time, available at: http://www.unidroit.org/english/conventions/mobile-equipment/aircraftprotocol.pdf, or any successor URL.

"Airport Authority" shall mean any public or private board or other body or organization chartered or otherwise established for the purpose of administering, operating or managing airports or related facilities.

"Appendices" has the meaning ascribed to it in the recitals to the Agreement.

"Appraisers" shall mean any appraiser acceptable to the Administrative Agent.

"Asset Sale" has the meaning ascribed to it in Section 6.8.

"Assignment" has the meaning ascribed to it in Section 11.1(a).

"Assignment Agreement" means the agreement, in a form acceptable to the Administrative Agent, by which an Assignment shall be made.

"Aviation Authority" means any nation or government or national or governmental authority of any nation, state, province or other political subdivision thereof, and any agency, department, regulator, airport authority, air navigation authority or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government in respect of the regulation of commercial aviation or the registration, airworthiness or operation of civil aircraft and having jurisdiction over the Credit Parties including, without limitation, the FAA or DOT.

"Avoidance Actions" shall mean the Credit Parties claims and causes of action arising under Section 502(d), 544, 547, 548 or 550 of the Bankruptcy Code or any other avoidance

action under the Bankruptcy Code; provided, that Avoidance Actions shall not include any Proceeds of such property.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" has the meaning ascribed to it in the Preamble or shall mean any other court having competent jurisdiction over the Cases.

"Blocked Account" means any account of any Credit Party that is subject to a Blocked Account Agreement or a Control Letter pursuant to Annex B.

"Blocked Account Agreement" means a control agreement, in form and substance satisfactory to the Administrative Agent, among any Credit Party, the Administrative Agent for the benefit of the Secured Parties and the applicable bank or financial institution.

"Books and Records" means books and records of the Credit Parties, including financial, corporate, operations and sales books, records, books of account, sales and purchase records, lists of suppliers and customers, formulae, business reports, plans and projections and all other documents, logs, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, and all aircraft manuals, log books and other documents and records, including all data and information stored on computer-related or other electronic media.

"Borrower" has the meaning ascribed thereto in the preamble to the Agreement.

"Borrowing Date" shall mean any Business Day specified by the Borrower as a date on which the Borrower requests the Lenders to make Term Loans hereunder.

"Budget" means the Initial Budget and, as delivered thereafter in accordance with section (e) of Annex D, the updated 13-week Budget for the subsequent 13-week period, which update shall be acceptable to the Lenders. Notwithstanding anything to the contrary herein, the parties hereto agree to revise the then current Budget to reflect the impact of the accelerated removal of aircraft pursuant to terms of Article II.C(y) of 2007 CRJ-900 Agreement on the Credit Parties' financial performance.

"Business" means the operation of a regional jet fleet and/or turboprop fleet and the provision of regional airline capacity to other air carriers.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York or the State of Georgia.

"Cape Town Treaty" shall mean, collectively, the Aircraft Protocol and the Convention, as the same may be amended from time to time.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"Carve-Out" shall have the meaning set forth in the Final Order.

"Cases" has the meaning ascribed to it in the Preamble.

"Cash Collateral Account" means a cash collateral account in the name of the Borrower and subject to a Blocked Account Agreement, into which the Net Cash Proceeds of the Collateral and, at the election of the Borrower, cash or Cash Equivalents are deposited pursuant to the Agreement, the Collateral Documents and any other Loan Document.

"Cash Equivalents" means Permitted Investments.

"Cash Management Order" means Interim Order Authorizing (i) Debtors to Continue to Use Existing Cash Management System and Maintain Existing Bank Accounts and Business Forms and (ii) Financial Institutions to Honor and Process Related Checks and Transactions, entered on April 2, 2012 [Docket No. 33] and any final order entered into in connection therewith.

"Cash Management Systems" has the meaning ascribed to it in Section 1.7.

"Change of Control" shall mean (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of shares representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of a Person, (ii) the occupation of a majority of the seats (other than vacant seats) on the board of directors of a Person by Persons who were neither (A) nominated by the board of directors of the Person nor (B) appointed by directors so nominated, (iii) a "change of control" under the (x) Existing Credit Agreement or (y) any Delta Connection Agreement.

"Closing Date" has the meaning ascribed to it in Section 2.1.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.).

"Certificated Air Carrier" shall mean an air carrier within the meaning of Section 40102 of Title 49, holding a certificate of public convenience and necessity under Section 41102 of Title 49 and an air carrier operating certificate under 14 C.F.R. Part 121 of the Federal Aviation Regulations authorizing its operations to/from/within the United States.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances (including interest and penalties relating thereto) upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"<u>Chattel Paper</u>" means any chattel paper, as such term is defined in the Code, including Electronic Chattel Paper, now owned or hereafter acquired by any Credit Party, wherever located.

"<u>Claim</u>" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"<u>Closing Checklist</u>" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as <u>Annex C</u>.

"<u>Closing Date</u>" means May 17, 2012.

"<u>Code</u>" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; <u>provided</u>, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; <u>provided</u>, <u>further</u>, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Administrative Agent's or Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the Term Code shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"<u>Colgan Wind-down</u>" means the (i) the rejection of the Capacity Purchase Agreement, dated as of February 2, 2007 (as amended, supplemented or otherwise modified up to the Petition Date, the "<u>Capacity Purchase Agreement</u>") among Colgan Air, Inc., the other Credit Parties party thereto and Continental Airlines, Inc. and the Ancillary Agreements (as defined in the Capacity Purchase Agreement, and together with the Capacity Purchase Agreement, the "<u>Rejected Agreements</u>"), (ii) the wind-down of Colgan Air, Inc. and the other applicable Credit Parties' operations under the Rejected Agreements over time, and (iii) turnover of the related twenty-eight Q400 and Q400NG aircraft to EDC as the flying winds down, in full or partial satisfaction of the debt secured by the relevant aircraft.

"<u>Collateral</u>" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Credit Party in or upon which a Lien is granted under this Agreement or any Collateral Documents.

"<u>Collateral Documents</u>" means this Agreement, each Mortgage, any GR Security Agreement each Aircraft Mortgage, any Copyright Security Agreement, any Patent Security Agreement, any Trademark Security Agreement and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"<u>Collateral Reports</u>" means the reports with respect to the Collateral referred to in <u>Annex E</u>.

"<u>Collection Account</u>" means that certain account of the Administrative Agent, account number 730131026 at JPMorgan Chase Bank, N.A., or such other account as may be specified in writing by the Administrative Agent as the Collection Account.

"<u>Commercial Tort Claims</u>" means any commercial tort claim, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"<u>Commitments</u>" means (a) as to any Lender, the aggregate of such Lender's Term Commitment as set forth on <u>Annex J</u> to the Agreement or in the most recent Assignment Agreement executed by such Lender and (b) as to all Lenders, the aggregate of all Lenders Term Commitments as to each of <u>clauses (a) and (b)</u>, as such Commitments may be reduced, amortized or adjusted from time to time in accordance with the Agreement.

"<u>Committee</u>" means the official statutory committee of unsecured creditors approved in the Cases pursuant to section 1102 of the Bankruptcy Code.

"<u>Commodities Account</u>" shall have the meaning ascribed to it in the Code.

"<u>Concentration Account</u>" has the meaning ascribed to it in <u>Section (c)</u> of <u>Annex B</u>.

"<u>Contracts</u>" means all contracts, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"<u>Control Letter</u>" means a letter agreement, in form and substance satisfactory to the Administrative Agent, between the Administrative Agent and (i) the issuer of uncertificated securities with respect to uncertificated securities in the name of any Credit Party, (ii) a securities intermediary with respect to securities, whether certificated or uncertificated, securities entitlements and other financial assets held in a securities account in the name of any Credit Party, (iii) a futures commission merchant or clearinghouse, as applicable, with respect to commodity accounts and commodity contracts held by any Credit Party, whereby, among other things, the issuer, securities intermediary or futures commission merchant limits any security interest in the applicable financial assets in a manner satisfactory to the Administrative Agent, acknowledges the Lien of the Administrative Agent for the benefit of Secured Parties on such financial assets, and agrees to follow the instructions or entitlement orders of the Administrative Agent without further consent by the affected Credit Party.

"<u>Convention</u>" shall mean the Convention on International Interests in Mobile Equipment (Cape Town, 2001), as the same may be amended from time to time, available at: http://www.unidroit.org/english/conventions/mobile-equipment/mobile-equipment.pdf, or any successor URL.

"<u>Copyright</u>" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright

Office or in any similar office or agency under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"<u>Copyright License</u>" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"<u>Copyright Security Agreements</u>" means the Copyright Security Agreements made in favor of the Administrative Agent for the benefit of the Secured Parties, by each applicable Credit Party in form and substance acceptable o the Administrative Agent.

"<u>Credit Parties</u>" means the Borrower and each of the Guarantors.

"<u>Default</u>" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"<u>Default Rate</u>" has the meaning ascribed to it in <u>Section 1.6(d)</u>.

"<u>Delayed Draw Term Loan</u>" has the meaning ascribed to it in <u>Section 1.1(b)</u>.

"<u>Delta Connection Agreement</u>" means, collectively, (i) the Delta Connection Agreement, dated as of April 27, 2007, by and among Borrower, Pinnacle Airlines and Delta (as amended, the "<u>2007 CRJ-900 Agreement</u>"); (ii) the Fourth Amended and Restated Airline Services Agreement, dated as of May 13, 2012 by and among Borrower, Pinnacle Airlines and Delta (as amended, the <u>CRJ-200 Agreement</u>"); and (iii) the Amended and Restated 2010 Delta Connection Agreement dated as of April 1, 2012 by and among Borrower, Pinnacle Airlines and Delta (as amended, the <u>2010 CRJ-900 Agreement</u>").

"<u>Deposit Accounts</u>" means all deposit accounts as such term is defined in the Code, now or hereafter held in the name of any Credit Party.

"<u>DIP Motion</u>" has the meaning ascribed to it in <u>Section 2.1(b)</u>.

"<u>Documents</u>" means any documents, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"<u>Dollars</u>" or "<u>$</u>" means lawful currency of the United States of America.

"<u>Domestic Subsidiary</u>" means a Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States of America.

"<u>DOT</u>" shall mean the United States Department of Transportation or any analogous successor agency.

"<u>E-Fax</u>" means any system used to receive or transmit faxes electronically.

"E-Signature" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"E-System" means any electronic system, including Intralinks® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"EDC" means Export Development Canada.

"Electronic Chattel Paper" means any electronic chattel paper, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

"Electronic Transmission" means each notice, request, instruction, demand, report, authorization, agreement, document, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail, E-Fax, Internet or extranet based site or any other equivalent electronic service, whether owned, operated or hosted by the Administrative Agent, any Affiliate of the Administrative Agent or any other Person.

"Engines" shall mean (i) each of the engines listed whether or not either initially or from time to time installed on an Airframe or any other airframe and (ii) any and all Parts which are from time to time incorporated or installed in or attached to any such Engine and any and all Parts removed therefrom.

"Entry Date" means the date of the entry of the Final Order.

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include CERCLA; the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses

(including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all equipment as such term is defined in the Code, including any Ground Service Equipment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, any regulations promulgated thereunder or any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Credit Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any reportable event described in Section 4043 of ERISA with respect to a Title IV Plan (other than a reportable event to which the 30-day notice is waived); (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within thirty (30) days; (g) any other event or condition that would reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (i) the loss of a Qualified Plan's qualification or tax exempt status; or (j) the cessation of operations at a facility of any Credit Party or ERISA Affiliate that results in any liability to a Credit Party or any ERISA Affiliate.

"Escrow Accounts" shall mean accounts of the Borrower or any Subsidiary, solely to the extent any such accounts hold funds set aside by the Borrower or any Subsidiary to manage the collection and payment of amounts collected, withheld or incurred by the Borrower or such Subsidiary for the benefit of third parties relating to: (a) federal income tax withholding and

backup withholding tax, employment taxes, transportation excise taxes and security related charges; (b) any and all state and local income tax withholding, employment taxes and related charges and fees and similar taxes, charges and fees, including, but not limited to, state and local payroll withholding taxes, unemployment and supplemental unemployment taxes, disability taxes, workman's or workers compensation charges and related charges and fees; (c) state and local taxes imposed on overall gross receipts, sales and use taxes, fuel excise taxes and hotel occupancy taxes; (d) passenger facility fees and charges collected on behalf of and owed to various administrators, institutions, authorities, agencies and entities; and (e) other similar federal, state or local taxes, charges and fees (including without limitation any amount required to be withheld or collected under applicable law); in each case, held in escrow accounts, trust funds or other segregated accounts in an aggregate amount for all of such escrow accounts not in excess of $3,500,000, plus accrued interest; provided, that such amount may be increased upon an increase in any of the foregoing taxes, fees and charges for which the Borrower's or any Subsidiary's officers and directors may have personal liability if not paid.

"Event of Default" has the meaning ascribed to it in Section 8.1.

"Excluded Account" means any of the following: (i) any Escrow Account; (ii) any collateral account permitted under Section 6.7 hereof; (iii) any imprest account solely to fund health-related claims; (iv) any account that is solely used to fund the required payments under a long-term lease agreement with the Memphis-Shelby County Airport Authority no more than two days prior to the payment due dates; (v) the investment accounts, which, in the aggregate, hold cash, Cash Equivalents or Permitted Investments with Fair Market Value of not more than $100,000 at any time; (vi) the ACH accounts, which are used to satisfy charges presented through airline clearing house; or (vii) any other deposit account, in which, when aggregated with any other deposit account that does not constitute a Blocked Account (other than the deposit accounts described in clauses (i) through (vi) herein) not more than $500,000 is maintained at any time.

"Excluded Collateral" means, collectively, (i) Escrow Accounts (other than the Credit Parties rights to receive any excess funds remaining in the Escrow Accounts following the payment in full of the taxes, fees and charges payable from such Escrow Accounts, (ii) Excluded Equity, (iii) Section 1110 Assets and (iv) Avoidance Actions.

"Excluded Equity" means any Voting Stock in excess of 65% of the total outstanding Voting Stock of any Foreign Subsidiary of any Credit Party. For purposes of this definition, "Voting Stock" means, as to any issuer, the issued and outstanding shares of each class of capital stock or other membership interests of such issuer entitled to vote (within the meaning of Treasury Regulations § 1.956-2(c)(2)).

"Excluded Obligations" means contingent indemnification and expense reimbursement obligations not yet due and owing or for which no demand has been made.

"Excluded Section 1110 Assets" has the meaning set forth in the Final Order.

"Existing Credit Agreement" means that certain Credit Agreement, dated as of July 30, 2009, by and among Pinnacle Airlines, Inc. and Colgan Air, Inc., as borrowers, the loan parties

thereto, C.I.T. Leasing Corporation, as administrative agent and collateral agent, CIT Bank, as a lender and other lenders signatory thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"Existing Liens" has the meaning ascribed to it in Section 3.23(b)(iii).

"Exit Facility" means the term loan provided by the Holder (as defined in the Exit Note) to the Credit Parties pursuant to the terms of the Exit Loan Documents.

"Exit Loan Documents" means the (i) Exit Note, (ii) each aircraft mortgage, real estate mortgages, security agreement, pledge agreement, deposit account control agreement, securities account control agreement, intellectual property security agreement and each other agreement to which a Borrower or Guarantor is party and that creates or purports to create a lien in any Collateral in favor of the Holder (as defined in the Exit Note) and (iii) any amendment, modification or supplement to any of the foregoing.

"Exit Note" means that certain Secured Promissory Note, to be dated on the date of substantial consummation of the Plan of Reorganization, issued by the Borrower and each Guarantor in favor of the holder thereof, in the form attached hereto as Exhibit 1.15.

"FAA" means the Federal Aviation Administration of the United States of America, and any successor Governmental Authority.

"Fair Market Value" means (a) with respect to any asset or group of assets (other than a marketable Security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Chief Financial Officer or Treasurer or, if such asset shall have been the subject of an appraisal within the last twelve months by an independent third party appraiser, the basic assumptions underlying which have not materially changed since its date, the value set forth in such appraisal and (b) with respect to any marketable Security at any date, the closing sale price of such Security on the Business Day next preceding such date, as appearing in any published list of any national securities exchange or the NASDAQ Stock Market or, if there is no such closing sale price of such Security, the final price for the purchase of such Security at face value quoted on such Business Day by a financial institution of recognized standing regularly dealing in Securities of such type and selected by the Administrative Agent.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System.

"Fifth-Freedom Rights" shall mean the operational right to enplane passenger traffic and cargo in a foreign country and deplane it in another foreign country.

"Final Order" means an order, in form and substance acceptable to the Lenders, approving and authorizing (a) the Term Loans and transactions contemplated herein, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, (b) extensions of credit in amounts not in excess of $74,285,000, (c) payment by the Borrower of all of the costs and expenses provided for in this Agreement (d) adequate

protection for the benefit of the Promissory Note Lender, in each case in form and substance satisfactory to the Lenders on a motion by the Borrower that is in and substance satisfactory to the Lenders, (e) estate stipulations, (f) releases from liability for all claims and causes of action arising out of or relating to the Loan Documents and all agreements, certificates, instruments and other documents and statements related thereto (i) for the Lenders, effective immediately, and (ii) for the Promissory Note Lender, effective only upon the expiry of the challenge period for third parties, (g) indemnification for the Lenders relating to the Loan Documents, (h) the Credit Parties' assumption of the Delta Connection Agreement, (i) the allowance of an unsecured claim for damages as a result of modifications to the 2007 CRJ-900 Agreement, in an amount to be determined by the Bankruptcy Court and (j) other customary provisions.

"Financial Covenants" means the financial covenants set forth in Annex G.

"Financial Statements" means the consolidated income statements and stockholders' equity, statements of cash flows and balance sheets of the Borrower delivered in accordance with Section 3.4 and Annex D.

"First Day Orders" means all orders entered by the Bankruptcy Court in respect of all motions and all related pleadings filed on the Petition Date or within five Business Days thereafter.

"Fiscal Month" means any of the monthly accounting periods of the Borrower.

"Fiscal Quarter" means any of the quarterly accounting periods of the Borrower, ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Borrower ending on December 31 of each year.

"Fixtures" means all fixtures as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Flight Simulators" means the flight simulators and flight training devices of the Borrower or any Subsidiary.

"Foreign Aviation Authority" shall mean any foreign governmental, quasi-governmental, regulatory or other agencies, public corporations or private entities that exercise jurisdiction over the issuance or authorization (a) to serve any foreign point on each of the Routes and/or to conduct operations related to the Routes and supporting route facilities and/or (b) to hold and operate any Slots.

"Foreign Subsidiary" means any Subsidiary which is a controlled foreign corporation within the meaning of the Internal Revenue Code of 1986, as amended from time to time.

"Funding Office" shall mean the office of the Administrative Agent at 1030 Delta Boulevard. Atlanta, GA 30320 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"Funding Termination Date" shall have the meaning set forth in the Final Order.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied, as such term is further defined in Annex G to the Agreement.

"Gate" shall mean all of the right, title, privilege, interest, and authority now or hereafter acquired or held by the Borrower or, if applicable, a Guarantor in connection with the right to use or occupy space in any airport or terminal at which the Borrower or any Guarantor conducts scheduled operations.

"Gate Interests" means all of the right, title, privilege, interest and authority now or hereinafter acquired or held by a Credit Party in connection with the right to use or occupy space in any airport terminal to the extent such Gate Interest is actually used in conjunction with service over a Route.

 "General Intangibles" means general intangibles, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all Books and Records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including but not limited to, any Aviation Authority.

"GR Security Agreement" means the Gate and Route Security and Pledge Agreement from Borrower in favor of the Administrative Agent for the benefit of the Secured Parties in form and substance acceptable to the Administrative Agent.

"<u>Ground Service Equipment</u>" means ground service equipment, de-icers, ground support equipment, aircraft cleaning devices, materials handling equipment and other similar equipment used to service equipment.

"<u>Guaranteed Indebtedness</u>" means, as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness (primary obligation) of any other Person (the primary obligor) in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"<u>Guarantors</u>" means each Domestic Subsidiary of the Borrower and each other Person, if any, that executes a guaranty or other similar agreement in favor of the Administrative Agent for the benefit of the Secured Parties in connection with the transactions contemplated by the Agreement and the other Loan Documents.

"<u>Hazardous Material</u>" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a solid waste, hazardous waste, hazardous material, hazardous substance, extremely hazardous waste, restricted hazardous waste, pollutant, contaminant, hazardous constituent, special waste, toxic substance or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"<u>Hedging Obligations</u>" has the meaning ascribed to it in the definition of Indebtedness.

"<u>IATA</u>" means International Air Transport Association.

"<u>Indebtedness</u>" means, with respect to any Person, without duplication (a) all obligations of such Person for borrowed money or with respect to advances of any kind, (b) obligations for the deferred purchase price of property but excluding obligations to trade creditors incurred and paid in the ordinary course of business, (c) all reimbursement and other obligations with respect to letters of credit, bankers acceptances and surety bonds, whether or not matured, (d) all obligations evidenced by notes, bonds, debentures or similar instruments, (e) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender

under such agreement in the event of default are limited to repossession or sale of such property), (f) all Capital Lease Obligations and the present value of future rental payments under all synthetic leases, (g) all Guaranteed Indebtedness, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) "earnouts" and similar payment obligations of such Person, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under (i) commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (ii) any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured (collectively, "Hedging Obligations"), (l) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (m) the Obligations.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" has the meaning ascribed to it in Section 1.11.

"Indemnified Person" has the meaning ascribed to it in Section 1.11.

"Initial Budget" means the initial thirteen (13) week budget annexed as Exhibit 2 to this Agreement.

"Instruments" means all instruments, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks, and Technology.

"Interest Payment Date" means the thirtieth (30th) calendar day of each Fiscal Month to occur while any Term Loans are outstanding (or the Business Day immediately preceding the 30th calendar day if such day is not a Business Day); provided, that in addition to the foregoing, each of (x) the date upon which all of the Commitments have been terminated and the Term Loans have been paid in full and (y) the Maturity Date shall be deemed to be an Interest Payment Date with respect to any interest that has then accrued under the Agreement.

"Inventory" means any inventory, as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that

constitute raw materials, work in process, finished goods, returned goods, supplies or materials of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded Software.

"Investment Property" means all investment property as such term is defined in the Code now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares, (ii) all securities entitlements of any Credit Party, including the rights of such Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account, (iii) all Securities Accounts of any Credit Party, (iv) all commodity contracts of any Credit Party and (v) all Commodity Accounts held by any Credit Party.

"Investments" means the purchase, holding or acquisition (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) of any Stock, evidence of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing), any investment, loan or advance or any other interest in, any other Person, and the purchase or other acquisition of (in one transaction or a series of transactions) any assets of any other Person constituting a business unit.

"IRC" means the Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

"IRS" means the Internal Revenue Service.

"Lenders" means Delta, the other Lenders named on the signature pages of the Agreement and, if any such Lender shall decide to assign all or any portion of the Obligations in accordance with Section 11.1(a), such term shall include any assignee of such Lender.

"Letter of Credit and Surety Bond Motion" means the Debtors' Motion for an Order Authorizing the Debtors to Continue and Renew Letter of Credit and Surety Bond Programs, filed with the Bankruptcy Court on the Petition Date.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"License" means any Copyright License, Patent License, Trademark License or other similar license of rights or interests now held or hereafter acquired by any Credit Party.

"Lien" means, with respect to any asset or property, or any interest therein, (i) any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge,

claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or property and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such security.

"<u>Litigation</u>" has the meaning ascribed to it in <u>Section 3.13</u>.

"<u>Loan</u>" means any loan made by any Lender pursuant to this Agreement.

"<u>Loan Account</u>" has the meaning ascribed to it in <u>Section 1.10</u>.

"<u>Loan Documents</u>" means the Agreement, the Notes, the Collateral Documents and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Administrative Agent or any Lender in connection with the Agreement and the transactions contemplated thereby and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written agreements whether heretofore, now or hereafter executed by or on behalf of any Credit Party and delivered to the Administrative Agent or any Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Margin Stock</u>" has the meaning ascribed to it in <u>Section 3.10</u>.

"<u>Material Adverse Effect</u>" means a material adverse effect on (i) the business, assets, properties, liabilities, operations, condition (financial or otherwise) or operating results of the Credit Parties taken as a whole, (ii) the ability of the Credit Parties to pay any of the Term Loans or any of the other Obligations in accordance with the terms of this Agreement, (iii) the Collateral or the Liens in favor of the Administrative Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens, or (iv) the Administrative Agent's or Lender's rights and remedies under the Agreement and the other Loan Documents, in each case, other than the commencement of the Cases, events leading up to the commencement of the Cases and matters otherwise disclosed in writing to the Administrative Agent on or prior to April 1, 2012 (provided, that solely the filing of an objection by any party in interest to this Agreement, the transactions contemplated hereunder or the amendments to or assumption of the Delta Connection Agreement shall not be deemed to have a material adverse effect).

"<u>Material Budget Deviation</u>" shall mean, with respect to each Test Period ending a Friday of each week if the actual Total Operating Expenses of the Credit Parties during such Test Period exceed one hundred fifteen (115%) percent of the projected Total Operating Expenses during such Test Period as reflected in the Budget.

"<u>Material Contract</u>" means any contract, agreement or other arrangement to which the Borrower or any of its Subsidiaries is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"<u>Material Indebtedness</u>" means Indebtedness (other than the Term Loans) of any one or more of the Credit Parties in an aggregate principal amount outstanding or committed as of the date of such determination  including undrawn committed or available amounts) equal to or exceeding $1,000,000.

"<u>Material Real Estate Contracts</u>" means (for purposes of the Agreement only) any lease, usufruct, use agreement, license, permit or other occupancy or facility use agreement under which a Credit Party is a tenant or counterparty, that (i) requires a Credit Party make lease payments in excess of $1,000,000 in any year or (ii) relates to facilities required for a Credit Party's operations, the loss of the lease, usufruct, use agreement, license, permit or other occupancy or facility use agreement with respect thereto could reasonably be expected to adversely affect a Credit Party's ability to conduct its business as now being conducted (after giving effect to the Operating Forecast and Budget).

"<u>Maturity Date</u>" the earliest of (a) Scheduled Maturity Date, (b) the effective date of a Plan of Reorganization and (c) the date of termination of Lenders obligations to permit existing Term Loans to remain outstanding pursuant to <u>Section 8.2(b)</u>.

"<u>Mesaba</u>" means Mesaba Aviation, Inc., a Minnesota corporation.

"<u>Milestones</u>" shall have the meaning in <u>Annex F</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgaged Properties</u>" has the meaning ascribed to it in <u>Annex C</u>.

"<u>Mortgage</u>" means each of the mortgages, deeds to secured debt, deeds of trust or other real estate security documents delivered by any Credit Party to the Administrative Agent on behalf of itself and Lenders with respect to the Mortgaged Properties in form and substance acceptable to the Administrative Agent.

"<u>Multiemployer Plan</u>" means a plan as defined in Section 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"<u>Net Cash Proceeds</u>" means proceeds received by any Credit Party after the Closing Date in cash or Cash Equivalents from:

(a)      (i) Asset Sales other than any Asset Sale permitted under <u>Sections 6.8(d)</u>, in each case, net of (1) the reasonable cash costs of sale, assignment or other disposition, (2) taxes paid or reasonably estimated to be payable as a result thereof, (3) reserves provided, to the extent required by GAAP, against any liabilities that are directly attributed to such Asset Sale (<u>clauses (1), (2) and (3)</u> collectively referred to herein as the "<u>Sale Costs</u>") and (4) any amount of

Indebtedness or other obligations (other than the Obligations) payable to a Person that is not an Affiliate of a Credit Party which is secured by the assets subject to such Asset Sale, or otherwise required to be repaid as a result of such Asset Sale, in each case only to the extent the such Person's security is senior in right of payment to the Administrative Agent and the Lenders; and

(b)    Property Loss Event, net of (1) the costs of collection (the "Collection Costs" and, together with the Sale Costs, "Costs"), and (2) any amount of Indebtedness or other obligations (other than the Obligations) payable to a Person that is not an Affiliate of a Credit Party which is secured by the assets subject to such Property Loss Event, or otherwise required to be repaid as a result of such Property Loss Event, in each case only to the extent the such Person's security is senior in right of payment to the Administrative Agent and the Lenders.

"Non-Funding Lender" has the meaning ascribed to it in Section 11.9(a).

"Non-Stayed Order" means an order of the Bankruptcy Court which is in full force and effect, as to which no stay has been entered and which has not been reversed, modified, vacated or overturned.

"Note" has the meaning assigned to it in Section 1.1(e).

"Notice of Borrowing" has the meaning assigned to it in Section 1.2.

"Notice Period" has the meaning assigned to it in Section 8.2.

"Obligations" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to the Administrative Agent or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement, or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed in such case or proceeding), expenses, attorneys fees and any other sum chargeable to any Credit Party under the Agreement or any of the other Loan Documents.

"Op Specs" means Operating Specifications issued by the FAA under Part 121 of the Federal Aviation Regulations authorizing an air carrier's operations to/from/within the United States.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Owned Real Estate" has the meaning ascribed to it in Section 3.6(b).

"Participant Register" has the meaning ascribed to it in Section 11.1(c).

"Parts" shall mean, with respect to an Airframe or Engine, any and all appliances, parts, instruments, appurtenances, accessories, avionics, furnishings, seats, and other equipment of whatever nature (other than (a) complete Engines or engines and (b) any items leased by a Credit Party from a third party, so long as title thereto shall remain vested in such third party) which may from time to time be incorporated or installed in or attached to such Airframe or Engine or which have been removed therefrom.

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patent Security Agreement" means a Patent Security Agreements made in favor of the Administrative Agent for the benefit of the Secured Parties by each applicable Credit Party, in form and substance acceptable to the Administrative Agent.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise, all registrations and recordings thereof, and all applications for letters patent under United States, Canadian, multinational or foreign laws or otherwise, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency under United States, State, Canadian, multinational or foreign laws or otherwise,, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permits" has the meaning ascribed to it in Section 3.24.

"Permitted Investments" means Investments made in accordance with the Investment Policy set forth in the Cash Management Order.

"Permitted Liens" means: (i) Liens securing Indebtedness under the Promissory Note or under this Agreement; (ii) Liens existing on the date of this Agreement and listed in Disclosure Schedule 6.7 hereto; (iii) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, and for which adequate reserves in accordance with GAAP are being maintained on the financial statements of the applicable Credit Party; (iv) landlords', carriers', workmen's, warehousemen's, mechanic's, materialmen's, repairmen's, employees' or other like Liens arising in the ordinary course of business with respect to amounts which are not yet delinquent or that are being contested in good faith by appropriate proceedings; (v) pledges or deposits made in the ordinary course of business in connection with (a) leases, performance bonds or similar obligations, (b) workers' compensation, unemployment insurance and other social security legislation or public liability laws or similar legislation or (c) securing the performance of surety bonds and appeal or customs bonds required (I) in the ordinary course of business or in connection with the enforcement of rights or claims of the Credit Parties or (II) in connection with judgments that do not give rise to an Event of a Default; (vi) with respect to

Real Property or interests therein, zoning restrictions, easements, licenses, rights-of-way, restrictions, minor defects or irregularities in title and other similar encumbrances which, in the aggregate, do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Credit Parties or liens disclosed in title reports; and (vii) Liens on any property other than the Collateral.

"<u>Permitted Prepetition Payment</u>" means a payment (as adequate protection or otherwise) on account of any Claim against any Credit Party arising or deemed to have arisen prior to the Petition Date, which payments are (i) approved by the Bankruptcy Court and the Lenders, or (ii) set forth in the Budget.

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" has the meaning ascribed to it in the Preamble.

"<u>Pinnacle Airlines</u>" means Pinnacle Airlines, Inc., a Georgia corporation.

"<u>Plan of Reorganization</u>" means a plan of reorganization in the Cases under chapter 11 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Lenders.

"<u>Pledged Collateral</u>" means all of the following property now owned or at anytime acquired by a Credit Party or in which such Credit Party now has or at any time in the future may acquire any right, title or interest:

(a)    the Pledged Shares, the certificates representing the Pledged Shares and all other stock, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares; and

(b)    the Pledged Indebtedness and the promissory notes or instruments evidencing the Pledged Indebtedness, and all interest, cash, instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of the Pledged Indebtedness; and

(c)    all additional Indebtedness arising after the date hereof and owing to Credit Party and evidenced by promissory notes or other instruments, together with such promissory notes and instruments, and all interest, cash, instruments and other property and assets from time to time received, receivable or otherwise distributed in respect of that Indebtedness.

"<u>Pledged Indebtedness</u>" means the Indebtedness evidenced by promissory notes and instruments listed on Part 2 of <u>Disclosure Schedule 10.4</u> hereto (as amended from time to time).

"<u>Pledged Shares</u>" means the stock listed on Part 1 of <u>Disclosure Schedule 10.4</u> hereto.

"<u>Primed Liens</u>" has the meaning ascribed to it in <u>Section 3.23(b)(iv)</u>.

"<u>Proceeds</u>" means <u>proceeds</u>, as such term is defined in the Code, including (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Credit Party from time to time with respect to any asset, (b) any and all payments (in any form whatsoever) made or due and payable to any Credit Party from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such property by any Governmental Authority (or any Person acting under color of governmental authority), (c) any claim of any Credit Party against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Copyright, Copyright License, Trademark or Trademark License, or for injury to the goodwill associated with any Trademark or Trademark License, (d) any recoveries by any Credit Party against third parties with respect to any litigation or dispute concerning such property including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, such property, (e) all amounts collected on, or distributed on account of, other property, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of such property and all rights arising out of such property.

"<u>Professionals</u>" shall have the meaning set forth in the Final Order.

"<u>Projections</u>" means the Borrower's forecasted consolidated (a) balance sheets, (b) profit and loss statements and (c) cash flow statements consistent with the historical Financial Statements of the Borrower (other than adjustments related to the impact of the Cases), together with appropriate supporting details and a statement of underlying assumptions.

"<u>Promissory Note</u>" means that certain Promissory Note, dated July 1, 2010 issued by the Borrower, Pinnacle Airlines and Mesaba to Promissory Note Lender, as amended prior to the date hereof.

"<u>Promissory Note Collateral</u>" means assets pledged pursuant to the Promissory Note Security Agreement.

"<u>Promissory Note Security Agreement</u>" means that certain Security and Pledge Agreement, dated as of July 1, 2010 among Delta, the Borrower, Pinnacle Airlines and Mesaba, as amended prior to the date hereof.

"<u>Promissory Note Lender</u>" means Delta, as the lender under the Promissory Note.

"<u>Property Loss Event</u>" means (a) any loss of or damage to property of any Credit Party that results in the receipt by such Person of proceeds of insurance, (b) any taking of property of any Credit Party that results in the receipt by such Person of a compensation payment in respect thereof, or (c) an Event of Loss (as such term is defined in any Aircraft Mortgage or any spare parts mortgage).

"<u>Pro Rata Share</u>" means with respect to all matters relating to any Lender, with respect to the Term Loans, the percentage obtained by dividing (i) the aggregate Commitments of that

Lender by (ii) the aggregate Commitments of all Lenders and, on and after the Maturity Date, the percentage obtained by dividing (i) the aggregate outstanding principal balance of the Term Loans held by that Lender by (ii) the outstanding principal balance of all Term Loans held by all Lenders, in each case, as any such percentages may be adjusted by assignments permitted pursuant to Section 11.1.

"Qualified Plan" means an employee benefit plan that is intended to be tax-qualified under Section 401(a) of the IRC.

"Real Estate" has the meaning ascribed to it in Section 3.6(b).

"Real Property" means all real property as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"Release" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Requirement of Law" means, with respect to any Person, the common law and all federal, state, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees and other legal requirements or determinations of any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Requisite Lenders" means Lenders holding greater than 50.1% of the aggregate amount of Term Loans and unused Commitments.

"Reserve" means a reserve in an amount equal to the Termination Carve-Out.

"Restricted Payment" means, with respect to any Credit Party (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of Stock; (b) any payment on account of the purchase, redemption, defeasance, sinking fund or other retirement of such Credit Party's Stock or any other payment or distribution made in respect thereof, either directly or indirectly; and (c) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire Stock of such Credit Party now or hereafter outstanding.

"Routes" shall mean the routes for which the Borrower or, if applicable, a Guarantor, holds or hereafter acquires the requisite authority to operate foreign air transportation pursuant to Title 49 including, without limitation, applicable frequencies, exemption and certificate authorities, Fifth-Freedom Rights and "behind/beyond rights", whether or not utilized by the Borrower or such other Guarantor.

"S&P" means Standard & Poor's Ratings Group.

"Scheduled Maturity Date" means March 31, 2013.

"Sell" means, with respect to any property, to sell, convey, transfer, assign, license, lease or otherwise dispose of, any interest therein or to permit any Person to acquire any such interest, including, in each case, through a Sale and Leaseback Transaction or through a sale, factoring at maturity, collection of or other disposal, with or without recourse, of any notes or accounts receivable. Conjugated forms thereof and the noun Sale have correlative meanings.

"Section 1110 Assets" shall mean (a) property that qualifies as an aircraft, aircraft engine, propeller, appliance or spare part (as defined in Section 40102 of Title 49) as those terms are used in Section 1110(a)(3)(A)(i) and (B) of the Bankruptcy Code and all agreements related to such property, to the extent that the Credit Parties are prohibited from granting liens thereon or assignments thereof under the terms of any security agreement, lease or conditional sale agreement related thereto in effect at the commencement of the Cases under which the applicable secured party, lessor or seller is entitled to the protections afforded under Section 1110 of the Bankruptcy Code with respect to such property or agreements, (b) all deposits and reserves held or maintained pursuant to such agreement or (c) property referred to in the previous clause that the Borrower or any of the Guarantors elects to return to the party providing financing therefor in exchange for a discharge of the related indebtedness; provided, that Section 1110 Assets shall not include any Proceeds of such property to which the Credit Parties are entitled.

"Secured Obligations" means, in the case of the Borrower, the Obligations and, in the case of any other Credit Party, the obligations of such Credit Party under the Guaranties and the other Loan Documents to which it is a party.

"Secured Parties" means the Lenders, the Administrative Agent, and any other holder of any Secured Obligation.

"Securities Account" shall have the meaning set forth in the Code.

"Security" means any Stock, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"Settlement Date" has the meaning ascribed to it in Section 11.9(a)(i).

"Slot" shall mean all of the rights and operational authority of the Borrower and, if applicable, a Guarantor, now held or hereafter acquired, (i) to conduct one Instrument Flight Rule (as defined under the FAA regulations) landing or takeoff operation during a specific hour or half-hour period at any Airport pursuant to FAA regulations, including Title 14 and (ii) to conduct one landing or takeoff at a specific time or in a specific time period on a specific day of the week at each non-U.S. airport served in conjunction with Borrower's, or, if applicable, a Guarantor's operations over a Route.

"Software" shall mean computer programs whether in source code or object code form, together with all related documentation.

"Spare Parts" shall mean any and all appliances, engines, parts, instruments, appurtenances, accessories, furnishings, avionics, seats and other equipment of whatever nature (including, but not limited to, "spare parts" as defined at 49 U.S.C. § 40102(a)(38), "appliances" as defined at 49 U.S.C. § 40102(a)(11) and Parts) (other than complete Airframes, airframes, Engines or engines, unless being surveyed) designated generally by type which are now or hereafter maintained as spare parts or appliances by or on behalf of a Credit Party.

"Stock" means all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other equity security (as such term is defined in Rule 3(a) of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"Stockholder" means, with respect to any Person, each holder of Stock of such Person.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, (ii) more than half of the issued share capital is at the time beneficially owned or (iii) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Super-Priority Claim" shall mean a claim against any Credit Party in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" means taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of the Administrative Agent or a Lender by the jurisdictions under the laws of which the Administrative Agent and Lenders are organized or conduct business or any political subdivision thereof.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, methods, techniques, ideas, know-how, programs, subroutines, tools, inventions, creations, improvements, works of authorship, Software, other similar materials, and all recordings, graphs, drawings, reports, analyses, other writings, and any other embodiment of the above, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in or displayed by any of the foregoing, or used or useful in the design, development, reproduction, maintenance or modification of any of the foregoing.

"Term Loans" shall mean the Closing Date Term Loans and the Delayed Draw Term Loans.

"Termination Carve-Out" shall have the meaning set forth in the Final Order.

"Termination Date" means the date on which (a) the Term Loans have been indefeasibly repaid in full in cash, (b) all other monetary Obligations (other than Excluded Obligations) pursuant to the Agreement and the other Loan Documents have been completely discharged, and (c) the Borrower shall not have any further right to borrow any monies under the Agreement.

"Test Period" shall mean, as of each measurement date, the last four calendar weeks.

"Title 49" means Title 49 of the United States Code, which, among other things, recodified and replaced the Aviation Act of 1958, as amended, and the regulations promulgated pursuant thereto or any subsequent legislation that amends, supplements, or supercedes such provisions.

"Title IV Plan" means a plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Tooling" means tooling inventory, including but not limited to dies, molds, tooling, casting patterns, gauges, jigs, racks and stands for engines, cowls, radome and wheels, aircraft jacks, test benches, test equipment, lathes, welders, grinders, presses, punches and hoists and other similar items (whether or not completed or fixed or handheld).

"Total Operating Expenses" shall mean, as defined in the Budget, expenses incurred by the Credit Parties associated with performing their business operations.

"Total Pass-through Expenses" shall mean, as defined in the Budget, expenses incurred by the Credit Parties associated with performing their business operations but reimbursed by Delta.

"Trademark Security Agreements" means the Trademark Security Agreements made in favor of the Administrative Agent for the benefit of the Secured Parties by each applicable Credit Party, in form and substance acceptable o the Administrative Agent.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency under United States, any State or territory thereof, Canadian, multinational or foreign laws or otherwise; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"UA Order" means Interim Order Authorizing the Debtors to (i) Reject the Capacity Purchase Agreement and Related Agreements With United Air Lines, Inc. and Continental

Airlines, Inc. and Terminate Related Guarantee and (ii) Perform under Certain Term Sheets, entered on April 2, 2012 [Docket 49] and any final order entered into in connection therewith.

"Uniform Commercial Code jurisdiction" means any jurisdiction that has adopted all or substantially all of Article 9 as contained in the 2000 Official Text of the Uniform Commercial Code, as recommended by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, together with any subsequent amendments or modifications to the Official Text.

"Vehicles" means all vehicles covered by a certificate of title law of any state.

Rules of construction with respect to accounting terms used in the Agreement or the other Loan Documents shall be as set forth in Annex G. All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Code, the definition contained in Article or Division 9 shall control. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause refer to such Section, subsection or clause as contained in the Agreement. The words "herein", "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive.  References to a Person includes its respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons.  References to statutes and related regulations shall include any amendments, modifications, restatements and successors of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

**ANNEX B (Section 1.7)**
**to**
**CREDIT AGREEMENT**

**CASH MANAGEMENT SYSTEM**

Each Credit Party shall establish and maintain the Cash Management Systems described below:

(a)     On or before the Closing Date and until the Termination Date, each Credit Party shall cause each of its accounts to be Blocked Accounts; provided, Excluded Accounts shall not be required to be Blocked Accounts.

(b)     On or before the Closing Date (or such later date as the Administrative Agent shall consent to in writing), (i) each bank or financial institution where any Credit Party maintains a deposit account (other than an Excluded Account) shall have entered into a Blocked Account Agreement with the applicable Credit Party and the Administrative Agent, for the benefit of Secured Parties and (ii) each financial institution where any Credit Party has an investment account (other than an Excluded Account) shall have entered into a Control Letter, with the applicable Credit Party and the Administrative Agent for the benefit of Secured Parties, in each effective as of the Closing Date (or such later date as the Administrative Agent shall consent to in writing). Each such Blocked Account Agreement and Control Letter shall provide, unless otherwise agreed by the Administrative Agent, that  (i) upon notice from the Administrative Agent, such bank or financial institution agrees to forward immediately all amounts in each Blocked Account or investment account to the account set forth by the Administrative Agent in such notice or to any other account designated by the Administrative Agent (the "Concentration Account") and to commence the process of daily sweeps from such Blocked Account into the Concentration Account and otherwise accept directions from the Administrative Agent without consent of any Credit Party.

(c)     The Borrower may only open or close any deposit accounts or investment accounts with the Administrative Agent's prior written consent.  Prior to the time of the opening of such account (unless such account is an Excluded Account) after the Closing Date, the relevant Credit Party and such bank or financial institution shall have executed and delivered to the Administrative Agent a Blocked Account Agreement or Control Letter, as applicable. The Borrower shall close any of its Blocked Accounts (and establish replacement accounts in accordance with the foregoing sentence) as promptly as practicable and (i) in any event within ninety (90) days following notice from the Administrative Agent that the creditworthiness of any bank holding Blocked Accounts is no longer acceptable in the Administrative Agent's reasonable judgment, or (ii) in any event within sixty (60) days following notice from the Administrative Agent that the operating performance, funds transfer or availability procedures or performance with respect to Blocked Accounts or lock boxes of the bank holding such accounts or the Administrative Agent's liability under the Blocked Account Agreement or Control Letter with such bank is no longer acceptable in such Agent's reasonable judgment provided that those Blocked Accounts as of the Closing Date shall be deemed acceptable to the Administrative Agent.

(d)      The Blocked Accounts (including the Cash Collateral Account) and Concentration Account shall be cash collateral accounts, with all cash, checks and other similar items of payment in such accounts securing payment of the Term Loans and all other Obligations, and in which each applicable Credit Party shall have granted a Lien to the Administrative Agent for the benefit of Secured Parties pursuant to the Agreement and the other Loan Documents.

(e)      All amounts deposited in the Collection Account shall be deemed received by the Administrative Agent in accordance with Section 1.9 and shall be applied (and allocated) by the Administrative Agent in accordance with Section 1.4. In no event shall any amount be so applied unless and until such amount shall have been credited in immediately available funds to the Collection Account or Cash Collateral Account.

(f)      Each Credit Party, on behalf of itself and each of its Related Persons, agrees to hold in trust for the Administrative Agent for the benefit of Secured Parties all checks, cash and other items of payment received by such Credit Party or any such Related Person to the extent constituting Collateral, provided that any such checks, cash and other items may be applied in any manner not prohibited by the Credit Agreement. Each Credit Party, on behalf of itself and each Related Person, acknowledges and agrees that all cash, checks or other items of payment constituting proceeds of the Collateral are part of the Collateral. All Net Cash Proceeds arising from the sale or other disposition of any assets shall be deposited directly into the Cash Collateral Account or into the Collection Account to the extent required by Section 1.3 of the Agreement.

(g)      The Administrative Agent shall not deliver a notice that it is exercising exclusive control over any Blocked Account to any such bank or financial institution unless an Event of Default has occurred and is continuing.

(h)      The Credit Parties shall only invest and/or maintain Cash Equivalents constituting Permitted Investments.

**ANNEX C (Section 2.1(e))**
**to**
**CREDIT AGREEMENT**

**CLOSING CHECKLIST**

In addition to, and not in limitation of, the conditions described in <u>Section 2.1</u> of the Agreement, pursuant to <u>Section 2.1(e)</u>, the following items must be received by the Administrative Agent in form and substance satisfactory to the Administrative Agent and the Lenders (it being understood that any document delivered substantially in the form of the applicable Exhibit hereto shall be deemed to be in form and substance satisfactory to the Administrative Agent) or waived in writing by the Administrative Agent and the Lenders on or prior to the Closing Date (each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in <u>Annex A</u> to the Agreement):

1.  <u>Appendices</u>. All Appendices to the Agreement, in form and substance satisfactory to the Administrative Agent and the Lenders (it being agreed that Appendices substantially identical to the Appendices attached to the Credit Agreement on the Closing Date shall be deemed to be in form and substance satisfactory to the Administrative Agent).

2.  <u>Term Notes</u>. To the extent requested by the Lenders, duly executed originals of the Term Notes for each applicable Lender, dated the Closing Date.

3.  <u>Security Agreements</u>. To the extent requested by the Administrative Agent or the Lenders, duly executed originals of the GR Security Agreement, the Spare Parts Mortgage and the Aircraft Mortgage, each dated as of the Closing Date, and all instruments, documents and agreements executed pursuant thereto.

4.  <u>Security Interests; Filings; Lien Search Results</u>. (a) Evidence reasonably satisfactory to the Administrative Agent that (for the benefit of Secured Parties) has a valid and perfected first priority security interest in the Collateral (or, if applicable, subject to the relative priorities set forth in the Loan Documents), and that all documents and instruments (including financing statements under the Code) required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to perfect Secured Parties security interests in the Collateral shall have been filed, registered or recorded, or shall have been delivered to the Administrative Agent for filing, registration or recording and (b) the results of a recent Lien, tax and judgment search in each relevant jurisdiction, including the FAA registry, with respect to the Credit Parties, revealing no Liens on any of the assets of the Credit Parties, other than Liens permitted hereby.

5.  <u>Insurance</u>. Satisfactory evidence that the insurance policies required by <u>Section 5.4</u> and the Collateral Documents are in full force and effect, together with appropriate evidence showing loss payable and/or additional insured clauses or endorsements, as requested by the Administrative Agent, in favor of itself on behalf of the Secured Parties.

6.   <u>Control Letters</u>. To the extent requested by the Administrative Agent or any Lender, Control Letters from (a) all issuers of uncertificated securities and financial assets held by the Borrower, (b) all securities intermediaries with respect to all Securities Accounts and securities entitlements of the Borrower, and (c) all futures commission agents and clearing houses with respect to all commodities contracts and Commodities Accounts held by the Borrower, in each case to the extent required by the Loan Documents.

7.   <u>Intellectual Property Security Agreements</u>. To the extent requested by the Administrative Agent or any Lender, duly executed originals of Trademark Security Agreements, Copyright Security Agreements and Patent Security Agreements, each dated as of the Closing Date and signed by each Credit Party which owns U.S. registered Trademarks, Copyrights and/or Patents, as applicable, all in form and substance satisfactory to the Administrative Agent, together with all instruments, documents and agreements executed pursuant thereto.

8.   <u>Budget</u>.  The Borrower shall have prepared and delivered to the Administrative Agent and Lenders the Initial Budget.  The Initial Budget shall be in form and substance acceptable to the Administrative Agent and the lenders and sets forth sources and uses and sets forth for the periods covered thereby: (a) projected weekly operating cash receipts; and (b) projected weekly operating cash disbursements (collectively, the "<u>Projected Information</u>") (it being understood that the Initial Budget attached to the commitment letter, dated as of April 23, 2012, from Delta Air Lines, Inc. to the Credit Parties as Schedule I to Annex I thereto is satisfactory to the Lenders).

9.   <u>Operating Forecast</u>.  The Administrative Agent and each Lender shall have received a business plan and projected operating budget for a period of one year, broken down by month, including without limitation, incomes statements, balance sheets, cash flow statements, projected capital expenditures, asset sales and estimated costs savings and a line item for total available liquidity, which Operating Forecast shall be in form and substance acceptable to the Administrative Agent (the "<u>Operating Forecast</u>") (it being understood that the Operating Forecast delivered to the Lenders on or about April 1, 2012 is satisfactory to the Lenders).

10.   <u>Cash Management System; Blocked Account Agreements</u>. Evidence satisfactory to the Administrative Agent and the Lenders that, as of the Closing Date, Cash Management Systems complying with Annex B to the Agreement have been established and are currently being maintained in the manner set forth in such Annex B, together with copies of duly executed tri-party blocked account and lock box agreements, satisfactory to the Administrative Agent, with the banks as required by Annex B and this Annex C.

11.   <u>Opinions of Counsel</u>. If requested by the Administrative Agent or any Lender, duly executed originals of opinions of (a) counsel for the Credit Parties, and (b) any special, local, regulatory and in-house counsel opinions reasonably requested

by the Administrative Agent or any Lender, each in form and substance reasonably satisfactory to the Administrative Agent and its counsel, dated the Closing Date, and each such opinion to include an express statement to the effect that the Administrative Agent and Lenders are authorized to rely on such opinion.

12.    Officer's Certificate.  The Administrative Agent shall have received duly executed originals of a certificate of the Chief Operating Officer of Borrower, dated the Closing Date, certifying that, as of the Closing Date, (i) all representations and warranties set forth in the Credit Agreement are true and correct (except where qualified by materiality, then just the accuracy thereof) as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except where qualified by materiality, then just the accuracy thereof) as of such earlier date, (ii) all covenants, agreements and conditions contained in the Credit Agreement and other Loan Documents which are required to have been performed or complied with by Borrower on or before the date hereof have been so performed or complied with or waived on or before the Closing Date, (iii) no Default or Event of Default has occurred and is continuing as of the Closing Date and after giving effect to the Credit Agreement and (iv) there has been no Material Adverse Effect since September 30, 2011.

13.    Mortgages. If requested  by the Administrative Agent or any Lender, mortgages covering all of the Owned Real Estate (the "Mortgaged Properties") together with: (a) title insurance policies, current as-built surveys, flood plain certificate and certificates of occupancy (or affirmative title insurance coverage insuring against risks arising from the lack thereof), in each case satisfactory in form and substance to the Administrative Agent, in its sole discretion; (b) evidence that counterparts of the Mortgages have been recorded or arrangements satisfactory to the Administrative Agent have been made to record in all places to the extent necessary or desirable, in the judgment of the Administrative Agent, to create a valid, perfected and enforceable first priority lien (subject only to Permitted Liens) on each Mortgaged Property in favor of the Administrative Agent for the benefit of the Secured Parties; and (c) an opinion of counsel in each state in which any Mortgaged Property is located in form and substance and from counsel satisfactory to the Administrative Agent.

14.    Environmental Reports. If requested by the Administrative Agent or any Lender, the Administrative Agent shall have received any available Phase I Environmental Site Assessment Reports, consistent with American Society of Testing and Materials (ASTM) Standard E 1527-00 (or the current ASTM standard for Phase I environmental site assessment reports), and applicable state requirements, on the Owned Real Estate.

15.    Audited Financials; Financial Condition. The Administrative Agent shall have received the Financial Statements, Projections and other materials set forth in Section 3.4, certified by the Borrower's Chief Financial Officer, Chief Executive

Officer or Chief Operating Officer, in each case in form and substance satisfactory to the Administrative Agent, and the Administrative Agent shall be satisfied, in its sole discretion, with all of the foregoing. The Administrative Agent shall have further received a certificate of the Chief Financial Officer, Chief Executive Officer or Chief Operating Officer of the Borrower to the effect that the Projections are based upon assumptions believed by the Borrower to be reasonable at the time such Projections were delivered in light of conditions and facts known to the Borrower, as of the date thereof (it being understood that Projections by their nature are inherently uncertain, the Projections are not a guaranty of future performance and actual results may differ materially from the Projections).

<u>**ANNEX D (Section 4.1(a))**</u>
<u>**to**</u>
<u>**CREDIT AGREEMENT**</u>

**<u>FINANCIAL STATEMENTS AND PROJECTIONS – REPORTING</u>**

The Borrower shall deliver or cause to be delivered to the Administrative Agent or to the Administrative Agent and Lenders, as indicated, the following:

(a)    <u>Monthly Financials</u>. To the Administrative Agent and Lenders, within thirty (30) days after the end of the first two Fiscal Months of each Fiscal Quarter, financial information regarding the Borrower and its Subsidiaries, certified by the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower, consisting of consolidated (i) unaudited balance sheets as of the close of such Fiscal Month and the related statements of income and cash flows for that portion of the Fiscal Year ending as of the close of such Fiscal Month; and (ii) unaudited statements of income and cash flows for such Fiscal Month, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Projections for such Fiscal Year, all (except for Projections) prepared in accordance with GAAP (subject to normal quarter-end or year-end adjustments). Such financial information shall be accompanied by the certification of the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower that (1) such financial information (except for Projections) presents fairly in all material respects in accordance with GAAP (subject to normal quarter-end or year-end adjustments) the financial position and results of operations of the Borrower and its Subsidiaries, on a consolidated basis, in each case as at the end of such Fiscal Month and for that portion of the Fiscal Year then ended, (2) any other information (except for Projections) presented is true, correct and complete in all material respects and that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default shall have occurred and be continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default, and (3) reporting certain accrued taxes, fees and assessments and payments made with respect to any such taxes, fees and assessments during the immediately preceding Fiscal Month.

(b)    <u>Quarterly Financials</u>. To the Administrative Agent and Lenders, within forty-five (45) days after the end of the first three Fiscal Quarters of each Fiscal Year (or with respect to the Fiscal Quarter ended March 31, 2012, no later than June 30, 2012), consolidated financial information regarding the Borrower and its Subsidiaries, certified by the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower, consisting of (i) unaudited consolidated balance sheet as of the close of such Fiscal Quarter and the related statements of income, cash flow and stockholders' equity for that portion of the Fiscal Year ending as of the close of such Fiscal Quarter, and (ii) unaudited consolidated statements of income and cash flows for such Fiscal Quarter, in each case setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Projections for such Fiscal Year, all (except for Projections) prepared in accordance with GAAP (subject to normal year-end adjustments). Such financial information shall be accompanied by the certification of the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower that (A) such financial information (except for Projections) presents fairly in all material respects in accordance with GAAP (subject to normal year-end adjustments) the financial position, results

of operations and statements of cash flows of the Borrower and its Subsidiaries, on a consolidated or a consolidating basis (as applicable), as at the end of such Fiscal Quarter and for that portion of the Fiscal Year then ended, (B) any other information (except for Projections) presented is true, correct and complete in all material respects and that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default. In addition, the Borrower shall deliver to the Administrative Agent and Lenders, within forty-five (45) days after the end of each Fiscal Quarter, a management discussion and analysis for the Borrower and its Subsidiaries on a consolidated basis that includes a comparison of performance for that Fiscal Quarter to the corresponding period in the prior year.

(c)     Operating Plan. To the Administrative Agent and Lenders, as soon as available, but not later than thirty (30) days after the end of each Fiscal Year, an annual operating plan for the Borrower, approved by the Board of Directors of the Borrower, for the following Fiscal Year, which (i) includes a statement of all of the material assumptions on which such plan is based, (ii) includes monthly balance sheets and a monthly budget for the following year and (iii) integrates operating revenues, operating expenses, operating profit and cash flow projections, all prepared on the same basis and in similar detail as that on which operating results are reported (and in the case of cash flow projections, based on assumptions believed by the Borrower to be reasonable at the time such projections were delivered in light of conditions and facts known to the Borrower as of the date of their delivery).

(d)     Annual Audited Financials. To the Administrative Agent and Lenders, within one hundred twenty (120) days after the end of each Fiscal Year (or with respect to the Fiscal Year ended December 31, 2011, no later than June 1, 2012), consolidated financial information regarding the Borrower and its Subsidiaries, consisting of (i) audited consolidated balance sheet as of the close of such Fiscal Year and the related statements of income and cash flows for the Fiscal Year then ended, all prepared in accordance with GAAP, in each case, setting forth in comparative form in each case the figures for the previous Fiscal Year, which Financial Statements shall be prepared in accordance with GAAP and in the case of the Financial Statements referred to in (i), certified without qualification (other than going-concern or like qualification), by Ernst & Young LLP or another independent registered public accounting firm otherwise acceptable to the Administrative Agent. Such Financial Statements shall be accompanied by (1) a report from such accounting firm to the effect that, in connection with their audit examination, nothing has come to their attention to cause them to believe that a Default or Event of Default has occurred with respect to the Financial Covenants (or specifying those Defaults and Events of Default that they became aware of), it being understood that such audit examination extended only to accounting matters and that no special investigation was made with respect to the existence of Defaults or Events of Default, (2) the annual letters to such accountants in connection with their audit examination detailing contingent liabilities and material litigation matters, and (3) the certification of the Chief Executive Officer, Chief Operating Officer or Chief Financial Officer of the Borrower that all such Financial Statements present fairly in all material respects in accordance with GAAP the financial position, results of operations and statements of cash flows of the Borrower and its Subsidiaries on a consolidated, as at the end of such Fiscal Year and for the period then ended, and that there was no Default or Event of Default in existence as of such time or, if a Default or Event of Default has occurred

and is continuing, describing the nature thereof and all efforts undertaken to cure such Default or Event of Default.

(e)      Budget.  By no later than 5:00 p.m. (Eastern time) on Wednesday of each week , the Borrower shall furnish to the Administrative Agent and Lenders , in form and substance satisfactory to the Lenders, (i) a report that sets forth for the immediately preceding week a comparison of the actual cash receipts and cash disbursements to the Projected Information for such weekly periods set forth in the Budget on a line item basis, noting all variances, together with (A) a certification from the Chief Financial Officer, Chief Operating Officer or Chief Executive Officer of the Borrower that no Material Budget  Deviation has occurred and (B) a management's (or Chief Financial Officer's) discussion and analysis with respect to any material variance between the Projected Information for such period and the actual cash receipts and cash disbursements for such period   , and  (ii)  a  subsequent thirteen   (13)  week Budget , which subsequent Budget(s) shall (A) roll-forward by one  week, the then existing Budget and (B) be approved by the Consultant and be acceptable to the Lenders.

(f)      Transition Agreement.  To the extent requested by the Administrative Agent and the Lenders, the Credit Parties shall (i) provide all information necessary or advisable in connection with establishing a mutually acceptable transition agreement providing for an orderly transition in the event of the Credit Parties' rejection, material breach, or termination of either the CRJ-200 Agreement or the 2010 CRJ-900 Agreement and (ii) negotiate in good faith with Delta to reach agreement on any such transition agreement.

(g)      Management Letters. To the Administrative Agent and Lenders, promptly after receipt thereof by any Credit Party, copies of all management letters, exception reports or similar letters or reports received by such Credit Party from its independent registered public accountants.

(h)      Default Notices. To the Administrative Agent and Lenders, as soon as practicable, and in any event within five (5) Business Days after a Credit Party obtains knowledge of the existence of any Default, Event of Default or other event that has had or could be expected to result in a Material Adverse Effect, written notice specifying the nature of such Default or Event of Default or other event, including the anticipated effect thereof.

(i)      SEC Filings and Press Releases. To the Administrative Agent and Lenders, promptly upon their becoming available, copies of: (i) all Financial Statements, reports, notices and proxy statements made publicly available by any Credit Party to its security holders; (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by any Credit Party with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority; and (iii) all press releases and other statements made available by any Credit Party to the public concerning material changes or developments in the business of any such Person.

(j)      Litigation. To the Administrative Agent and Lenders in writing, promptly upon obtaining knowledge thereof, notice of any Litigation commenced or threatened against any Credit Party that (i) seeks damages in excess of $1,000,000, (ii) seeks injunctive relief that could reasonably be expected to result in costs and/or liabilities or loss of revenues to Credit Parties in

excess of $1,000,000, (iii) is asserted or instituted against any Plan of Reorganization, its fiduciaries or its assets or against any Credit Party or ERISA Affiliate in connection with any Plan of Reorganization, (iv) alleges criminal misconduct by any Credit Party, or (v) alleges the violation of any law regarding, or seeks remedies in connection with, any Environmental Liabilities if such Litigation is reasonably likely to result in any Credit Party incurring Environmental Liabilities in excess of $100,000 individually.

(k)    <u>Governmental Investigation</u>.    To the Administrative Agent and Lenders in writing, promptly upon obtaining knowledge thereof, notice of the commencement of any investigation by a Governmental Authority of any Credit Party including, without limitation, any non-routine FAA audit of any Credit Party which could be expected to result in a Material Adverse Effect.

(l)    <u>Change in Accounting Practices</u>.    To the Administrative Agent and Lenders in writing, notice of any change in any Credit Party's accounting practices with regard to depreciation and/or establishing reserves for any or all of the Collateral or any other material change in any accounting practices or procedures of the Credit Parties, in each case no later than five (5) Business Days of such change

(m)    <u>Insurance Notices</u>. To the Administrative Agent, disclosure of losses or casualties required by <u>Section 5.4</u>.

(n)    <u>Documents Filed with Bankruptcy Court</u>. To the Administrative Agent, delivery of, reasonably in advance of filing under the circumstances to permit review by the Lenders any motions, pleadings, replies, objections, memoranda, financial information, applications, judicial information or other documents to be filed with the Bankruptcy Court (or any other court) in, or in connection with, the Cases (the "Court Documents").

(o)    <u>Documents Provided to Committees</u>.    To the Administrative Agent contemporaneous with delivery to official committee (the "Committee"), copies of any reports filed in any Case and provided to the Committee (collectively, the "Committee Documents"); <u>provided</u>, <u>however</u>, that any such Committee Documents subject to attorney client privilege or filed under seal or subject to confidentiality and other restrictions prohibiting disclosure to the Administrative Agent shall not be provided to Administrative Agent.

(p)    <u>Other Documents</u>. To the Administrative Agent and Lenders, such other financial and other information respecting any Credit Party's business, assets, prospects, condition (financial or otherwise) as the Administrative Agent or any Lender shall, from time to time, reasonably request.

(q)    Documents required to be delivered pursuant to <u>paragraphs (b), (d) or (g)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which the Borrower gives notice to the Lenders that such documents have been posted to the Borrower's Internet site on the Internet at <u>www.Pinnacle.com,</u> at <u>www.sec.gov/edaux/searches.html</u> or at another website identified in such notice and accessible

D-4

to the Lenders without charge; <u>provided</u> that the Borrower shall deliver paper copies of such documents to any Lender that requests the Borrower to deliver such paper copies.

**ANNEX E (Section 4.1(b))**
**to**
**CREDIT AGREEMENT**

**COLLATERAL REPORTS AND APPRAISALS**

The Borrower shall deliver or cause to be delivered the following:

(a)      To the Administrative Agent, as requested by the Administrative Agent but not less often than once each Fiscal Quarter, (i) a listing of government contracts of the Borrower subject to the Federal Assignment of Claims Act of 1940; and (ii) a list of any applications for the registration of any Patent, Trademark or Copyright filed by any Credit Party with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the prior Fiscal Quarter;

(b)      To the Administrative Agent and the Lenders, at its own expense, the results of each physical verification, if any, that the Borrower or any of its Subsidiaries may in their discretion have made, or caused any other Person to have made on their behalf, of all or any portion of their Collateral (and, if a Default or an Event of Default has occurred and be continuing, the Borrower shall, upon the request of the Administrative Agent, conduct, and deliver the results of, such physical verifications as the Administrative Agent or the Lenders may require);

(c)      Appraisals, and each Credit Party shall permit the Administrative Agent to have an Appraiser conduct such appraisals, for purposes of monitoring value of such Collateral as reasonably requested by the Administrative Agent; and

(d)      Such other reports, statements and reconciliations with respect to the Collateral or Obligations of any or all Credit Parties as the Administrative Agent or any Lender shall from time to time request in its or their discretion.

### ANNEX F (Section 5.10)
### to
### CREDIT AGREEMENT

### MILESTONES

The Credit Parties are required to meet the following milestones in Cases (the "Milestones"):

## I.    BUSINESS PLAN/PLAN OF REORGANIZATION

1.    By no later than 37 days after the Petition Date, the Credit Parties shall deliver to the Administrative Agent and the Lenders and their counsel a comprehensive business plan and projected budget for a period commencing from the fiscal year 2013 through the fiscal year 2018, including, without limitation, explanations regarding the material assumptions contained therein, income statements, balance sheets, cash flow statements, projected capital expenditures, asset sales, and estimated cost savings, and a line item for total available liquidity.

2.    By no later than the earlier of (i) 30 days after entry of a final order or final orders by the Bankruptcy Court granting the Section 1113 Motions (as defined below) or approving a settlement regarding modifications of the CBAs (as defined below) and (ii) 225 days after the Petition Date (the earlier of such dates, the "Plan Filing Date"), the Credit Parties must file a Plan of Reorganization and disclosure statement that are reasonably acceptable to the Administrative Agent and the Lenders.

3.    By no later than 90 days after the Plan Filing Date, the Credit Parties must have obtained confirmation of a Plan of Reorganization that is reasonably acceptable to the Administrative Agent and the Lenders.

## II.    SECTION 1113

4.    By no later than 37 days after the Petition Date, the Credit Parties shall deliver proposals seeking modifications to the collective bargaining agreements to which the Credit Parties are a party (the "CBAs") as contemplated in section 1113(b)(1) of the Bankruptcy Code to the authorized representatives of the employees covered by each of the CBAs together with all relevant information needed for the unions to evaluate such proposals.

5.    By no later than July 13, 2012, unless a settlement has been reached regarding modification of the CBAs (in form and substance reasonably acceptable to the Administrative Agent and the Lenders), the Credit Parties must file motions pursuant to Section 1113 of the Bankruptcy Code with respect to the CBAs (the "Section 1113 Motions") and, contemporaneously therewith, the Credit Parties must file a motion or motions for an order, in form and substance reasonably acceptable to the Administrative Agent and the Lenders, setting forth notice, discovery and other related procedures and hearing dates with respect to the Section 1113 Motions (the "Section 1113 Scheduling Motion").

6.    In the event that Section 1113 Motions are filed, by no later than 90 days following the date that the Section 1113 Motions are filed, the Bankruptcy Court shall have entered a

F-1

final order or final orders granting the Section 1113 Motions or approving a settlement regarding modifications of the CBAs (in each case, reasonably acceptable to the Administrative Agent and the Lenders).

**ANNEX G (Section 6.10)**
**to**
**CREDIT AGREEMENT**

**FINANCIAL COVENANTS**

The Borrower shall not breach or fail to comply with any of the following financial covenants, each of which shall be calculated in accordance with GAAP consistently applied, as applicable:

(a)    <u>Minimum Unrestricted Liquidity</u>. The Borrower and its Subsidiaries (on a consolidated basis) shall not permit Aggregated Cash on Hand to be less than $25,000,000 as of the last day of any calendar month (or if such day is not a Business Day, the next proceeding Business Day).

(b)    <u>Budget</u>. The Borrower and its Subsidiaries (on a consolidated basis) shall not permit there to occur a Material Budget Deviation.

(c)    <u>Adjusted Total Operating Expenses</u>. The Borrower and its Subsidiaries (on a consolidated basis) shall not permit the Adjusted Total Operating Expenses to exceed the amount set forth below for the applicable month as set forth opposite such level:

| For the Month Ending | Maximum Adjusted Total Operating Expenses |
|---|---|
| October 31, 2012 | $44,000,000 |
| November 30, 2012 | $42,000,000 |
| December 31, 2012 | $42,000,000 |
| January 31, 2013 | $37,000,000 |
| February 28, 2013 | $35,000,000 |
| March 31, 2013 | $36,500,000 |

Unless otherwise specifically provided herein, any accounting term used in the Agreement shall have the meaning customarily given such term "in accordance with GAAP", and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase in accordance with GAAP shall in no way be construed to limit the foregoing. If any Accounting Changes occur and such changes result in a change in the calculation of the financial covenants, standards or terms used in the Agreement or any other Loan Document, then the Borrower, the Administrative Agent and Lenders agree to enter into negotiations in order to amend such provisions of the Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's and its Subsidiaries financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made;

provided, however, that the agreement of Requisite Lenders to any required amendments of such provisions shall be sufficient to bind all Lenders.

If the Administrative Agent, the Borrower and Requisite Lenders agree upon the required amendments, then after appropriate amendments have been executed and the underlying Accounting Change with respect thereto has been implemented, any reference to GAAP contained in the Agreement or in any other Loan Document shall, only to the extent of such Accounting Change, refer to GAAP, consistently applied after giving effect to the implementation of such Accounting Change. If the Administrative Agent, the Borrower and Requisite Lenders cannot agree upon the required amendments, then all Financial Statements delivered and all calculations of financial covenants and other standards and terms in accordance with the Agreement and the other Loan Documents shall be prepared, delivered and made without regard to the underlying Accounting Change. For purposes of Section 8.1, a breach of a Financial Covenant contained in this Annex G shall be deemed to have occurred as of any date of determination by the Administrative Agent or as of the last day of any specified measurement period, regardless of when the Financial Statements reflecting such breach are delivered to the Administrative Agent.

## ANNEX H (Section 11.9(a))
### to
### CREDIT AGREEMENT

### LENDERS WIRE TRANSFER INFORMATION

Account Name:  Delta Air Lines, Inc.
Bank: JPMorgan Chase Bank, N.A.
Routing Number:  021000021
Account Number:  730131026

**ANNEX I (Section 13.10)**
**to**
**CREDIT AGREEMENT**

**NOTICE ADDRESSES**

If to the Borrower, at Pinnacle Airlines Corp.

Pinnacle Airlines Corp.
One Commerce Square
40 S. Main St.
Memphis, TN
Attention: Chief Executive Officer
Facsimile: (901) 348-4178

with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention: Lisa Beckerman
Telephone: (212) 872-8012
Telecopier No.: (212) 872-1002

If to the Administrative Agent, at Delta Air Lines, Inc.

Delta Air Lines, Inc.
1030 Delta Boulevard
Atlanta, GA 30320
Attention:  Kenneth W. Morge, II, Vice President and Treasurer
Telephone: (404) 715-4862
Telecopier No.  (404) 715-3110
Attention: Richard B. Hirst, Senior Vice President & General Counsel
Telephone:  (404) 715-7882
Telecopier No.: (404) 715-2233

with copies to:

Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, IL 60654
Attention: David R. Seligman, P.C.
Telephone No.: (312) 862-2463
Telecopier No.: (312) 862-2200
Attention: Michelle Kilkenney
Telephone No.: (312) 862-2487
Telecopier No.: (312) 862-2200

## ANNEX J (from Annex A - Commitments definition)
## to
## CREDIT AGREEMENT

<u>Lender</u>:

Delta Air Lines, Inc.

Term Commitment:                              $74,285,000

**ANNEX K (from Annex A Permitted Investments definition)**
**to**
**CREDIT AGREEMENT**

**INVESTMENT GUIDELINES**

a    Direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

b    Investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, which have the highest credit rating obtainable from S&P or from Moody's;

c    Investments in certificates of deposit, banker's acceptances,  time deposits, eurodollar time deposits or overnight bank deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any other commercial bank of recognized standing organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

d    Investments of money in an investment company organized under the Investment Company Act of 1940, as amended, or in pooled accounts or funds offered through mutual funds, investment advisors, banks and brokerage houses which invest its assets in obligations of the type described in (a) through (c) above.  This could include, but not be limited to, money market funds or short-term and intermediate bonds funds;

e    Securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's;

f    Money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA (or the equivalent thereof) by S&P and Aaa (or the equivalent thereof) by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

g    Deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $500,000,000.

**Exhibit 1.15**

**EXIT NOTE**

## SECURED PROMISSORY NOTE

Due [Maturity Date: fifth anniversary of the effective date of the plan of reorganization]

Atlanta, Georgia

[Closing Date: effective date of the plan of reorganization]

$[balance of DIP amount as of the effective date of the Plan]

FOR VALUE RECEIVED, each of Pinnacle Airlines Corp., a Delaware corporation ("PAC"), Pinnacle Airlines, Inc., a Georgia corporation ("PAI"), Colgan Air, Inc., a Virginia corporation ("Colgan")[1], Pinnacle East Coast Operations Inc., a New York corporation ("Pinnacle East") and Mesaba Aviation, Inc., a Minnesota corporation ("Mesaba" and, together with PAC, PAI, Colgan and Pinnacle East, individually "Borrower" and collectively "Borrowers"), hereby jointly and severally promises to pay to the order of Delta Air Lines, Inc. (together with its successors and assigns, the "Holder"), or its assignees on [the fifth anniversary of the Closing Date] (the "Maturity Date") the principal sum of [outstanding amount under the DIP Credit Facility as of the Closing Date] ($[•]) (or, if less, the then remaining outstanding principal amount) together with interest on the outstanding principal amount hereof at a rate per annum equal to 12.5% calculated on the basis of a year comprised of 365 (or where appropriate 366) days (without compounding), payable in arrears on March 31, June 30, September 30 and December 31 (each, a "Repayment Date"), commencing [_____][2], and at maturity (whether by required prepayment, acceleration, declaration or otherwise) and thereafter on demand. Any portion of the principal amount hereof which is not paid at maturity (as aforesaid) shall thereafter bear interest at a rate per annum until paid equal to the sum of 2% plus the then applicable interest rate hereunder from time to time.

On April 1, 2012, the Borrowers filed cases (the "Cases") for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). In connection with the Cases, the Holder and the Borrowers executed that certain Secured Super-Priority Debtor in Possession Credit Agreement (as amended, modified or supplemented, the "DIP Credit Facility") pursuant to which the Holder loaned PAC $_____ and each other Borrower guaranteed such loans. On _____ __, 2012, the Borrowers submitted the Plan and the Plan was confirmed on _____, ___, 201_. In order to consummate the Plan and subject to the terms and conditions contained herein, the Holder is converting all amounts outstanding under the DIP Credit Agreement to amounts outstanding under this Secured Promissory Note.[3]

---

[1]   To be a Borrower to the extent in existence on the Closing Date.

[2]   First of the Repayment Dates after the Closing Date.

[3]   To be completed with correct dates as of the Closing Date.

In consideration of the premises and to induce the Holder to enter into this Secured Promissory Note and to convert $_____[4] of obligations under the DIP Credit Facility to principal outstanding under this Secured Promissory Note pursuant to the terms of this Secured Promissory Note and the other Note Documents, the Borrowers hereby agree with the Holder as follows:

SECTION 1.  <u>Principal Payments</u>.  (a) The Borrowers shall make payments of the outstanding principal amount hereof in installments on each quarterly anniversary of the Closing Date, commencing the first quarterly anniversary of the Closing Date and continuing through Maturity Date, in an amount equal in the case of each such installment to one twentieth of the original principal amount of this Secured Promissory Note (the "Secured Promissory Note").

(a)      In addition, Borrowers may, at any time and from time to time with at least three Business Days' prior written notice to the Holder, prepay without premium or penalty all, or any portion in an integral multiple of $1,000,000, of the principal amount hereof (each such prepayment to be accompanied by the payment of all interest accrued through the date of such prepayment on the principal amount prepaid and to be applied against all remaining installments in the inverse order of the maturity thereof).

(b)      Within three (3) Business Days of receipt, the Borrowers shall prepay the amounts outstanding under this Secured Promissory Note in an amount equal to the Net Cash Proceeds received from the Disposition of any Collateral (each such prepayment to be accompanied by the payment of all interest accrued through the date of such prepayment on the principal amount prepaid and to be applied pro rata against all remaining installments thereof).

(c)      Within one Business Day of making the Aircraft Rent Election, the Borrowers shall prepay the amounts outstanding under this Secured Promissory Note in an amount equal to the Rental Payments (each such prepayment to be accompanied by the payment of all interest accrued through the date of such prepayment on the principal amount prepaid and to be applied pro rata against all remaining installments thereof).

SECTION 2.  <u>Payments etc.</u>  Both principal and interest are payable in lawful money of the United States of America in immediately available funds to such account of the Holder as the Holder may notify to Borrowers from time to time, free and clear of, and without deduction for or on account of, any and all present and future taxes, levies, imposts, deductions, charges, withholdings and all liabilities with respect thereto. Whenever any payment to be made hereunder shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment.  Unless the Holder otherwise elects upon at least three Business Days' prior written notice to PAC, (so long as Delta Air Lines Inc. ("<u>Delta</u>") or its affiliates are the sole Holders), payments of principal hereof and interest hereon in each case due and

---

[4]      Amount outstanding as of the Closing Date.

2

payable shall be made on the applicable Repayment Date by deductions from amounts due and payable to Borrowers under the ASA Connection Agreement in the manner set forth therein; provided, however, in addition to any rights of the Holder under the Connection Carrier Agreements, if an Event of Default shall have occurred and is continuing, the Holder shall have the right to deduct such amount from amounts due and payable to Borrowers under any Connection Carrier Agreement.

SECTION 3. <u>Representations and Warranties</u>. Each Borrower represents and warrants as of the date hereof, after giving effect to consummation of the Plan, as follows:

(a) Each Borrower is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and is duly qualified to do business and in good standing as a foreign corporation in each jurisdiction where the nature of its business requires such qualification, except for such failures to be qualified and in good standing, if any, that when taken together with all other such failures could not be reasonably expected to have a Material Adverse Effect.

(b) Each Borrower's execution, delivery and performance of this Note and each other document or instrument to which it is a party delivered in connection herewith (including the Security Agreement and each other Note Document) are within such Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not contravene

(i) such Borrower's charter or by-laws;

(ii) any law, rule or regulation applicable to such Borrower (including without limitation, Regulation G, T, U or X of the Board of Governors of the Federal Reserve System); or

(iii) any contractual restriction binding on or affecting such Borrower;

except, with respect to <u>clauses</u> (ii) and (iii) above, to the extent such contravention could not be reasonably expected to result in a Material Adverse Effect.

(c) No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance of this Note and each other Note Document by each Borrower, other than the filing of any applicable Uniform Commercial Code financing statements and those listed on Schedule 3(c) hereof.

(d) Each of this Note and each other Note Document is the legal, valid and binding obligation of each Borrower that is a party thereto enforceable against each such Borrower in accordance with its terms, except as the enforceability thereof may be limited by (A) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws (whether statutory, regulatory or decisional), now or hereafter in effect, affecting the enforcement of creditors' rights generally and (B) the

3

application of general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(e)    PAC's audited consolidated balance sheet as at [most recent date prior to effective date of the Plan], and PAC's related audited consolidated statements of income and stockholders' equity for the fiscal year then ended, copies of which have been furnished to the Holder, fairly present in all material respects PAC's consolidated financial condition as at such date and the results of its consolidated operations for the period ended on such date, all in accordance with generally accepted accounting principles consistently applied.

(f)    There is no action, suit or proceeding pending against, or, to any Borrower's knowledge, threatened against or affecting, any Borrower before any court or arbitrator or any governmental body, agency or official which has had or could be reasonably expected to have a Material Adverse Effect.

(g)    No Borrower is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(h)    No Borrower is in default under any of its obligations to banks or other financial institutions or with respect to any Federal or state agency which default has had or could be reasonably expected to have a Material Adverse Effect.

(i)    PAC has no subsidiaries except PAI, Mesaba, Colgan and Pinnacle East.

(j)    [Each of] PAI [and Mesaba][5] Mesaba is a citizen of the United States (as defined in Section 40102(a)(15) of Title 49 of the United States Code) holding a carrier operating certificate issued by the Secretary of Transportation pursuant to Chapter 447 of Title 49 of the United States Code (or any successor provision) for aircraft capable of carrying ten or more individuals or 6,000 pounds or more of cargo.

(k)    Each employee benefit plan (as defined in the Employment Retirement Income Security Act of 1974, as amended ("ERISA")) of each Borrower is in full compliance with all applicable requirements of ERISA and the Internal Revenue Code of 1986, as amended, no steps have been taken to terminate any such plan and no contribution failure has occurred with respect to any such plan sufficient to give rise to a lien under ERISA, except in each case as could not be reasonably expected to result in a Material Adverse Effect.  No condition exists or event or transaction has occurred with respect to any such plan which might result in the incurrence by any Borrower of any material liability, fine or penalty.

(l)    All factual information heretofore or contemporaneously furnished by or on behalf of any Borrower in writing to the Holder for purposes of or in connection

---

[5]    Bracketed language to be deleted if Mesaba is no longer an air carrier.

4

with this Note or any transaction contemplated hereby is, and all other such factual information hereafter furnished by or on behalf of any Borrower in writing to the Holder will be, taken as a whole, true and accurate in every material respect on the date as of which such information is dated or certified, and such information is not, or shall not be, as the case may be, incomplete by omitting to state any material fact necessary to make such information not materially misleading.

(m)    (i) The fair value of the assets of the Borrowers and their subsidiaries, taken as a whole and on a consolidated basis, at a fair valuation, will exceed the debts and liabilities of the Borrowers and their subsidiaries, taken as a whole and on a consolidated basis, respectively.  (ii) The present fair salable value of the property of the Borrowers and their subsidiaries, taken as a whole and measured on a consolidated basis, is not less than the amount that will be required to pay the probable liability on the existing debts and other liabilities (including contingent liabilities) of the Borrowers and their subsidiaries, as they become absolute and mature. (iii) The Borrowers and their subsidiaries, taken as a whole and on a consolidated basis, will not have unreasonably small capital for the Borrowers and their subsidiaries to carry out their business as now conducted and as proposed to be conducted following the date of this Note.  (iv) No Borrower intends to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by such Borrower, and of timing and amounts of cash to be payable on or in respect of debt of such Borrower)..

SECTION 4.  <u>Affirmative Covenants</u>.  So long as any amount under this Note remains unpaid, PAC will, and will cause each of its subsidiaries to:

(a)    <u>Maintain Property</u>.  Keep all material tangible property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; maintain, with financially sound and reputable insurance companies, insurance on all of its material property (subject to customary deductibles), in at least such amounts and against at least such risks, as are usually insured against in the same general area by companies of established repute engaged in the same or a similar business; and furnish to the Holder all information as to the insurance carried upon reasonable request.

(b)    <u>Business Activities</u>.  Continue to engage solely in the business in which it is engaged on the date hereof and activities incidental and related thereto, except that Mesaba, Pinnacle East or PAI may merge with and into PAI, Pinnacle East or Mesaba (as the case may be) or Colgan; *provided*, that after giving effect to such merger no Default or Event of Default, which shall have occurred and be continuing.

(c)    <u>Books and Records</u>.  Keep proper books of record and account in conformity with generally accepted accounting principles, and permit the Holder representatives to visit and inspect any of its properties, to examine and make abstracts from any of its books and records and to discuss its affairs, finances and accounts with its officers, employees and independent public accountants, all with reasonable advance written notice, at their own expenses, during normal business hours for no more than one time each year as long as no Event of Default has occurred and is continuing and subject to customary confidentiality obligations.

5

(d)    <u>Compliance with Laws etc</u>.  Comply in all material aspects with all applicable laws, rules, regulations and orders, such compliance to include paying before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon any of its properties except to the extent contested in good faith and by appropriate proceedings promptly instituted and diligently pursued.

(e)    <u>Reporting Requirements</u>.  Furnish to the Holder (it being agreed that the filing of any publicly available reports and registration statements with the Securities and Exchange Commission or any national securities exchange shall satisfy the relevant reporting requirement under this <u>clause (e)</u>):

(i)    as soon as available and in any event within 45 days after the end of each of PAC's first three quarters of each of its fiscal years, PAC's consolidated balance sheets as of the end of such quarter and consolidated statements of income and stockholders' equity for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, certified by PAC's chief executive officer or chief financial officer;

(ii)    as soon as available and in any event with 90 days after the end of each of PAC's fiscal years, a copy of PAC's annual report for such year containing financial statements for such year certified without a going concern or similar qualification and without a qualification as to the scope of the audit by Ernst & Young LLP or other independent public accountants reasonably acceptable to the Holder;

(iii)    not later than 10 days after each date as of which liquidity is measured in accordance with Section 5(g), a statement of the cash and cash equivalents balance of PAC and its subsidiaries as of the close of such date;

(iv)    as soon as possible and in any event within five days after any senior officer of any Borrower has actual knowledge of any Default or Event of Default continuing on the date of such statement, a statement of PAC's chief executive officer or chief financial officer setting forth details of such Default or Event of Default or event and the action which Borrowers have taken and propose to take with respect thereto;

(v)    promptly after the sending or filing thereof, copies of all reports which PAC makes available to any of its security holders;

(vi)    promptly after the filing or receiving thereof, copies of all material reports and notices which PAC or any of its subsidiaries files under ERISA with the Internal Revenue Service or the Pension Benefit Guaranty Corporation or the U.S. Department of Labor or which PAC or any of its subsidiaries receives from such corporation or any other

government agency, in each case other than in the ordinary course of business; and

(vii)   upon written request from the Holder on the basis of its reasonable belief that a Material Adverse Effect has occurred or is reasonably likely to occur, such other information respecting the condition or operations, financial or otherwise, of PAC or any of its subsidiaries, in each case subject to applicable confidentiality obligations.

All financial statements furnished pursuant to this clause (e) shall be prepared in accordance with generally accepted accounting principles applied on a basis consistent with those used in the preparation of financial statements described in clause (e) of Section 3.

(f)   Air Carrier Status.   Cause PAI [and Mesaba][6] to remain a certificated air carrier in accordance with the provisions of clause (j) of Section 3 (except as permitted by clause (b) of this Section 4).

(g)   Payment of Obligations.   Pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations, except, in each case, to the extent any such obligation is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or the failure to pay or discharge the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)   Further Assurances.   Promptly upon request by the Holder (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Note Document or other document or instrument relating to any Collateral, and (ii) execute and deliver any and all further documents, agreements and instruments, and take all further actions, (x) that may be required or advisable under applicable law or that the Holder may request, in order to effectuate the transactions contemplated by the Note Documents, (y) in order to create, grant, establish, preserve, protect and perfect the validity, perfection and priority of the liens and security interests created or intended to be created by the Note Documents and (z) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Holder the rights granted now or hereafter intended to be granted by the Borrowers to the Holder under any Note Document.

SECTION 5.   Negative Covenants.   So long as any amount under this Note remains unpaid, PAC will not, and will not permit any of its subsidiaries to:

(a)   Debt.   Create or suffer to exist any Debt other than (i) Debt under this Note, (ii) Debt outstanding on the date hereof and indentified in Schedule I hereto, (iii) Debt created with the prior written consent of the Holder, (iv) Debt secured by a

---

[6]   Delete if at time no longer air carrier.

Permitted Lien, (v) Debt owed to any other Borrower and subordinated to the Debt under this Note and (vi) other unsecured Debt.

(b)     <u>Liens, etc</u>.   Create or suffer to exist any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any of its properties, whether now owned or hereafter acquired, or assign any right to receive income, other than (i) the Note Documents and (ii) Permitted Liens.

(c)     <u>Dividends</u>.   Declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of any of its classes of capital stock, or purchase, redeem or otherwise acquire for value any shares of any of its classes of capital stock or any warrants, rights, or options to acquire any such shares, now or hereafter outstanding, except for cash dividends paid by any subsidiary of PAC to PAC.

(d)     <u>Loans and Advances</u>.   Make any loan or advance to any Person, except for (i) any loan or advance to any Borrower, (ii) travel and other ordinary course of business advances to officers and employees and (iii) without limiting <u>clause (i)</u>, other loans or advances to Persons who are not directors, officers, employees or affiliates of PAC or any of its subsidiaries in an aggregate outstanding principal amount with respect to all such other loans and advances not in excess of $5,000,000.

(e)     <u>Transactions with Affiliates</u>.   Enter into any transaction or series of related transactions with any of its Affiliates, other than on terms and conditions substantially as favorable to it as would reasonably be obtained by it at that time in a comparable arms-length transaction with a Person other than an Affiliate.

(f)     <u>Mergers, etc.</u>   PAC shall not merge or consolidate with or into any Person unless PAC is the surviving entity of such merger or consolidation and after giving effect to such merger or consolidation, no Default or Event of Default, shall have occurred and be continuing.

(g)     <u>Minimum Liquidity</u>.   Permit the sum of all cash and cash equivalents of PAC and its subsidiaries to be less than $25,000,000 (or to the extent the Borrower has made the Aircraft Rent Election, the Modified Initial Liquidity) as of the close of business of the first six month ends after the Closing Date and $30,000,000 (or to the extent the Borrower has made the Aircraft Rent Election, the Modified Permanent Liquidity) as of the close of business on the last day of each calendar month thereafter (and if such day falls on a day that is not a Business Day, then the first Business Day in the next calendar month); *provided* that the covenant in this <u>clause (g)</u> shall no longer be applicable at any time when the aggregate outstanding principal amount under this Note is less than $20,000,000.

(h)     <u>Financial Test</u>.   Permit the ratio of Consolidated EBITDAR to Consolidated Fixed Charges for any period of four consecutive fiscal quarters ending on each date set forth below, to be less than the ratio opposite such date.

8

| Four Consecutive Fiscal Quarter Period Ending | Ratio of Consolidated EBITDAR to Consolidated Fixed Charges |
|---|---|
| June 30, 2013, September 30, 2013, and December 31, 2013 | 1.05:1.00 |
| March 31, 2014 | 1.075:1.00 |
| June 30, 2014, September 30, 2014, and December 31, 2014 | 1.10:1.00 |
| March 31, 2015 and the last day of each calendar quarter thereafter | 1.15:1.00 |

SECTION 6.  <u>Events of Default</u>.  If any of the following events ("Events of Default") occurs and is continuing:

(a)     Borrowers fail to pay

(i)     any principal of this Note when due;

(ii)    any interest on this Note within five (5) Business Days after the date when due; or

(iii)   any other amounts payable under this Note within ten (10) Business Days after the date when due;

(b)     any representation or warranty made by any Borrower in or in connection with this Note proves to have been incorrect in any material respect when made;

(c)     any Borrower fails to perform or observe any covenant or agreement contained in <u>Section 5</u> and, if such failure can be remedied, such failure remains unremedied for seven (7) days after the earlier of (i) a Borrower obtaining knowledge of such failure and (ii) written notice thereof is given to Borrowers by Holder;

(d)     any Borrower fails to perform or observe any other term, covenant or agreement contained in this Note or the Security Agreement on its part to be performed or observed and any such failure remains unremedied for thirty (30) days after the earlier of (i) a Borrower obtaining knowledge of such failure and (ii) written notice thereof is given to Borrowers by Holder;

(e)     any event or condition occurs which results in the acceleration of the maturity of any indebtedness for borrowed money of any Borrower exceeding $3,000,000 in aggregate principal amount at the time outstanding or which permits (or, with the giving of notice or lapse of time or both, would enable) the holder of such

9

indebtedness for borrowed money or any Person acting on such holder's behalf to accelerate the maturity thereof;

(f)    any default occurs under any lease or leases by any Borrower as lessee of any real or personal property under which the aggregate rentals payable under such lease or all such leases in the aggregate exceed $3,000,000;

(g)    (i) PAC or any of its subsidiaries admits in writing its inability to pay debts, or makes a general assignment for the benefit of creditors; (ii) any proceeding is instituted by or against PAC or any of its subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver, trustee or other similar official for PAC or any of its subsidiaries or for any substantial part of its property and such proceeding (if instituted against PAC or any of its subsidiaries) is not dismissed or stayed within 60 days of the commencement thereof; or (iii) PAC or any of its subsidiaries takes any corporate action to authorize any of the actions set forth in this clause (g);

(h)    one or more final judgments or orders for the payment of money in excess of $1,000,000 in the aggregate shall be rendered against any Borrower and such judgment or order shall continue unsatisfied and unstayed for a period of 60 days;

(i)    any Borrower fails to perform or observe any term, covenant or agreement contained in any other agreement with Holder or any of its affiliates on its part to be performed or observed which failure has resulted in an "event of default" (or similar term) thereunder;

(j)    any of the following events shall occur with respect to any employee benefit plans of PAC or any of its subsidiaries, except in each case as could not be reasonably expected to result in a Material Adverse Effect: (i) the institution by any Borrower of any steps to terminate any such plan; (ii) or a contribution failure occurs with respect to any such plan sufficient to give rise to a lien under ERISA;

(k)    Holder terminates any Connection Carrier Agreement;

(l)    any material provision of any Note Document shall, for any reason (other than as specifically set forth therein), cease to be valid and binding on any Borrower, or any Borrower shall so assert in any pleading filed in any court or any material portion of any lien on the Collateral (as reasonably determined by the Holder) intended to be created by the Loan Documents shall cease to be or shall not be a valid and perfected lien having the priorities contemplated hereby or thereby; or

(m)    Any Note Document after delivery thereof shall for any reason ceases to create a valid and perfected lien, with the priority required by the Note Documents on and security interest in any material portion of the Collateral (as reasonably determined by the Holder) purported to be covered thereby.

10

then, if any Event of Default described in the preceding <u>clause (g)</u> shall occur, the outstanding principal amount of this Note and other obligations hereunder and under each other Note Document shall automatically be and become immediately due and payable, without notice or demand.  If any Event of Default (other than any Event of Default described in the preceding <u>clause (g)</u>) shall occur for any reason, whether voluntary or involuntary, and be continuing, (i) the Holder may by notice to the Borrowers declare all or any portion of the outstanding principal amount of this Note and other obligations hereunder and under each other Note Document to be due and payable, whereupon the full unpaid amount of this Note and other obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment and (ii) exercise any and all remedies under and in accordance with the Note Documents and under applicable law available to the Holder.  During the continuance of an Event of Default, at the election of the Holder, the principal amount outstanding hereunder shall accrue interest at a rate per annum equal to the sum of 2.0% plus the then applicable rate hereunder.

SECTION 7.  <u>Amendments, etc</u>.  No amendment to or waiver of any provision of this Note or any other document or instrument delivered in connection herewith, nor consent to any departure by any Borrower therefrom, will in any event be effective unless the same is in writing and signed by the Holder and the Borrowers and then such amendment, waiver or consent will be effective only in the specified instance and for the specific purpose for which given.

SECTION 8.  <u>Notices, etc</u>.  All notices and other communications provided for hereunder must be in writing (including facsimile communication) and mailed or facsimiled or delivered, if to Borrowers, at Pinnacle Airlines Corp., One Commerce Square, 40 South Main Street, 14th Floor, Memphis, TN 38103, Fax No: 901-348-4100, Attention: Chief Executive Officer, with a copy to: Pinnacle Airlines Corp., One Commerce Square, 40 South Main Street, 14th Floor, Memphis, TN 38103, Fax No: 901-348-4178, Attention: General Counsel (and notice given to such address shall be deemed to be notice to all Borrowers); and if to the Holder, at 1030 Delta Boulevard, Department 856, Atlanta, GA 30354, Fax No: 404-773-7345, Attention: Senior Vice President and Treasurer; or, as to Borrowers and the Holder, at such other address as designated by any party in a written notice to the other parties.  All such notices and communications will, when mailed or facsimiled, be effective when received in the mails or sent by facsimile (receipt confirmed), respectively, addressed as aforesaid.

SECTION 9.  <u>Accounting and Certain Other Terms</u>.  (a)  All accounting terms not specifically defined herein shall be construed and consistently applied in accordance with those generally accepted accounting principles applied in the preparation of the financial statements referred to in clause (e) of Section 3, except as otherwise stated herein.

(a)    In addition, for purposes of this Note, the following terms will have the following meanings:

"<u>Affiliate</u>" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such

Person. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of the Controlled Person whether by contract or otherwise; provided, that in no event shall the Holder constitute an Affiliate of the Borrowers.

"Aircraft Rent Election" shall mean the written notice of the Borrowers to the Lenders in accordance with the terms of that certain letter agreement, dated as of May __, 2012, by and among the Lender and the Borrowers pursuant to which the Borrowers elect to terminate, under certain conditions, direct rental payments from the Borrowers to the Lenders under the Existing Aircraft Subleases, in each case as more fully described therein.

"Bankruptcy Court" means United States Bankruptcy Court for the Southern District of New York.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Business Day" means a day on which banks are not required or authorized to close in Atlanta, Georgia or Minneapolis, Minnesota.

"Closing Date" means [_____][7].

"Code" has the meaning set forth in the recitals.

"Collateral" means the "Collateral" as defined in the Security Agreement and any other assets pledged or in which a lien is granted pursuant to any Note Document, including, without limitation, any mortgaged property.[8]

"Connection Carrier Agreement" means (i) the Delta Connection Agreement, dated as of April 27, 2007, by and among PAC, PAI and Delta (the "2007 Connection Agreement"), (ii) the Fourth Amended and Restated Airline Services Agreement, dated as of May 13, 2012 by and among PAC, PAI and Delta ("ASA Connection Agreement") and (iii) the Amended and Restated 2010 Delta Connection Agreement dated as of April 1, 2012 by and among PAC, PAI and Delta.

"Consolidated EBITDAR" shall for any period mean the consolidated operating income of PAC and its subsidiaries for such period plus (i) consolidated aircraft operating rental expenses of PAC and its subsidiaries for such period plus (ii) amortization and depreciation that were deducted in arriving at the amount of such

---

[7]    Date of conversion.

[8]    Collateral shall be assets that the DIP Credit Facility has a lien on at emergence, which exclude (i) assets that are subject to the Existing Credit Agreement (as defined in the DIP Credit Facility), (ii) any assets to the extent that, and for so long as, such grant of a security interest therein would violate applicable law or regulation or, in the case of assets acquired after the Closing Date, such grant of a security interest therein would violate an enforceable contractual obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets in each case after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code (other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibition) and (iii) other assets identified by Delta.

consolidated operating income for such period plus (iii) interest income of PAC and its subsidiaries for such period, all as determined on a consolidated basis in accordance with generally accepted accounting principles applied on a basis consistent with those used in the preparation of the financial statements referred to in clause (e) of Section 3 plus (iv) all fees, costs and expenses (including, without limitation, all restructuring costs and expenses, professional fees and other charges), write-downs and payments payable by the Borrowers in connection with the Cases, the Plan and the Note Documents plus (v) fees, costs and expenses incurred as a result of Delta accelerating the removal of aircraft pursuant to Article II.C(y) of the 2007 Connection Agreement.

"Consolidated Fixed Charges" shall for any period mean the total consolidated interest expense of PAC and its subsidiaries (excluding interest expense on any aircraft indebtedness and any aircraft parts indebtedness in respect of the CR- 900 Aircraft) payable or paid in cash for such period (calculated without regard to any limitations on the payment thereof) plus the total consolidated aircraft operating rental expenses of PAC and its subsidiaries for such period plus the principal amount of all scheduled amortization payments on all Debt, all as determined on a consolidated basis in accordance with generally accepted accounting principles applied on a basis consistent with those used in the preparation of the financial statements referred to in clause (e) of Section 3.  The total consolidated interest expense and principal amount of scheduled amortization payments for the period of four consecutive quarters ended on June 30, 2013 shall be calculated as the total consolidated interest expense and principal amount of scheduled amortization payments for the calendar quarter ended on June 30, 2013 *times* four; the total consolidated interest expense and principal amount of scheduled amortization payments for the period of four consecutive quarters ended on September 30, 2013 shall be calculated as the total consolidated interest expense and principal amount of scheduled amortization payments for the period of two consecutive calendar quarters ended on September 30, 2013 *times* two; and the total consolidated interest expense and principal amount of scheduled amortization payments for the period of four consecutive quarters ended on December 31, 2013 shall be calculated as the total consolidated interest expense and principal amount of scheduled amortization payments for the period of three consecutive calendar quarters ended on December 31, 2013 *times* 4/3.

"CR-900 Aircraft" means the aircraft operated by a Borrower pursuant to the 2007 Connection Agreement.

"Debt" means, when used with reference to any Person:

     (i)     indebtedness of such Person for borrowed money,

     (ii)     obligations of such Person evidenced by bonds, debentures, notes or other similar instruments,

     (iii)     obligations of such Person to pay the deferred purchase price of property or services (other than trade debt on customary terms incurred in the ordinary course of business),

(iv)    obligations of such Person as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, consistently applied, recorded as capital leases,

(v)    obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above, and

(vi)    liabilities of such Person in respect of unfunded vested benefits under plans covered by Title IV of ERISA, together with the regulations thereunder, in each case as in effect from time to time.

"Default" shall mean any event or condition which, upon the giving of notice or expiration of any cure period or both would, unless cured or waived, constitute an Event of Default.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith and any casualty or condemnation (it being agreed that collections of account receivables, use or other disposition of cash or cash equivalents and disposition of assets among the Borrowers shall not be deemed Disposition of Collateral).

"DIP Credit Facility" shall have the meaning set forth in the recitals to this Secured Promissory Note.

"Existing Aircraft Subleases" means the "Leases" (as defined in the CRJ-200 Agreement) with respect to each "Aircraft" (as defined in the CRJ-200 Agreement).

"Material Adverse Effect" means a material adverse effect on (a) the business, operations or financial condition of PAC and its subsidiaries, taken as a whole, (b) the validity or enforceability of this Note, the Security Agreement or the rights and remedies of the Holder hereunder or thereunder (c) the ability of any Borrower to pay its obligations under this Note or any other Note Document or (d) a material adverse effect on the Collateral or the liens in favor of the Holder on the Collateral or the priority of such liens.

"Modified Initial Liquidity" mean $25,000,000 minus the Rental Payments, as determined by the Lender; provided that the Lender shall provide prompt written notice of such determination to the Borrower following receipt of the Aircraft Rent Election.

"Modified Permanent Liquidity" mean $30,000,000 minus the Rental Payments, as determined by the Lender; provided that the Lender shall provide prompt written notice of such determination to the Borrower following receipt of the Aircraft Rent Election.

"Net Cash Proceeds" means proceeds received by any Borrower after the Closing Date in cash or cash equivalents from any Disposition of Collateral in each case,

14

net of (i) the reasonable cash costs of sale, assignment or other disposition, (ii) taxes paid or reasonably estimated to be payable as a result thereof, (ii) reserves provided, to the extent required by GAAP, against any liabilities that are directly attributed to such Disposition and (iv) any amount payable to a Person that is not an Affiliate of a Borrower which is secured by the assets subject to such solely to the extent the such Person's security is senior in right of payment to the Holder; *provided*, that, if (i) PAC shall deliver an Officer's Certificate to the Holder promptly following receipt of any such proceeds setting forth PAC or the applicable Borrower's intention to use any portion of such proceeds, to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of PAC and its subsidiaries which shall be subject to a first priority Lien under the Note Documents within 6 months of such receipt and (ii) no Default or Event of Default exists at the time of delivery of such notice or at the time of reinvestment of such Net Cash Proceeds, such portion of such proceeds shall not constitute Net Cash Proceeds except to the extent not, within 6 months of such receipt, so used; *provided*, further, that no Net Cash Proceeds calculated in accordance with the foregoing realized in any fiscal year shall constitute Net Cash Proceeds in such fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $1,000,000.

"Note Documents" means, collectively, (i) this Secured Promissory Note, (ii) the Security Agreement, (iii) each aircraft mortgage, real estate mortgages, security agreement, pledge agreement, deposit account control agreement, securities account control agreement, intellectual property security agreement and each other agreement to which a Borrower is a party and that creates or purports to create a lien in any Collateral in favor of the Holder and (iv) any amendment, modification or supplement to any of the foregoing.

"Permitted Liens" means: (i) liens securing Debt under this Note; (ii) liens existing on the date of this Note and listed in Schedule II hereto; (iii) liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (iv) landlords', carriers', workmen's, warehousemen's, mechanic's, materialmen's, repairmen's, employees' or other like liens arising in the ordinary course of business with respect to amounts which are not yet delinquent or that are being contested in good faith by appropriate proceedings; (v) pledges or deposits made in the ordinary course of business in connection with (a) leases, performance bonds or similar obligations, (b) workers' compensation, unemployment insurance and other social security legislation or (c) securing the performance of surety bonds and appeal bonds required (I) in the ordinary course of business or in connection with the enforcement of rights or claims of the Borrowers or (II) in connection with judgments that do not give rise to an Event of a Default; (vi) with respect to real property or interests therein, easements, licenses, rights-of-way, restrictions, minor defects or irregularities in title and other similar encumbrances which, in the aggregate, do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrowers or liens disclosed in title reports; and (vii) liens on any property other than the Collateral (as such term is defined in the Security Agreement).

15

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Plan" means [COMPLETE TITLE OF PLAN], which shall be in form and substance reasonably acceptable to the Holder.

"Rental Payments" means the aggregate amount of base rate rental payments that would have been due from the Borrowers to the Lender pursuant to the terms of the Existing Aircraft Subleases during the calendar month in which the Aircraft Election is made, as determined by the Lender.

"Repayment Date" has the meaning set forth in the recitals.

"Security Agreement" means that certain Security and Pledge Agreement, dated as of the date hereof, by and among the Borrowers and Holder.

"Transactions" means, collectively, (i) the transactions in connection with and as contemplated by the Note Documents, (ii) the consummation of the Plan and (iii) all other related transactions, including the payment of fees and expenses in connection therewith

(b)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, extended, amended and restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law (including by succession of comparable successor laws), (iii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restriction on assignment set forth herein) and, in the case of any governmental authority, any other governmental authority that shall have succeeded to any or all of the functions thereof, (iv) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Secured Promissory Note in its entirety and not to any particular provision hereof, (v) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Secured Promissory Note and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 10. Conditions Precedent. The Borrowers shall have no rights under this Note and the Holder shall not be obligated to advance any funds to the

Borrowers hereunder, or to take, fulfill, or perform any other action hereunder, until the following conditions have been fulfilled to the reasonable satisfaction of the Holder:

       (a)   <u>Note Documents</u>.  This Secured Promissory Note, the Security Agreement and each other Note Document required hereunder shall have been executed and delivered, in form, scope and substance reasonably satisfactory to the Holder, to the Holder, and the Holder shall have a first priority perfected security interest (subject to Permitted Liens) in all Collateral.

       (b)   <u>The Plan</u>.  The Plan shall be reasonably acceptable to the Holder and shall have been approved by all necessary parties and confirmed by the Bankruptcy Court in the Cases.  Additionally, there shall be no pending avoidance actions in respect of any claims of Holder against any Borrower.

       (c)   <u>Governmental Approvals</u>.  All necessary governmental (domestic and foreign), Bankruptcy Court and third party orders, approvals and consents in connection with the Plan and otherwise referred to therein shall have been obtained and remain in effect, and all applicable waiting periods shall have expired without any action being taken by any competent authority which, in the judgment of the Holder, restrains, prevents, or imposes materially adverse conditions upon, the consummation of the Plan or otherwise referred to therein. Additionally, there shall not exist any judgment, order, injunction or other restraint prohibiting or imposing materially adverse conditions upon the Plan, this Secured Promissory Note or the other Note Documents.

       (d)   <u>Officer's Certificate</u>.  The Holder shall have received an Officer's Certificate from the Borrowers certifying (i) as to the truth of the representations and warranties contained in the Note Documents as though made on and as of the Closing Date and (ii) compliance with the conditions precedent set forth in this Section 10.

       (e)   <u>Representations and Warranties</u>.  All representations and warranties shall be true and correct on and as of the Closing Date (although any representations and warranties which expressly relate to a given date or period shall be required to be true and correct as of the respective date or for the respective period, as the case may be), after giving effect to the Transactions, as though made on and as of such date.

       (f)   <u>Absence of Defaults</u>.  No Default or Event of Default shall have occurred and be continuing, or would result from consummation of the Transactions.  No Default (as defined in the DIP Credit Facility) or Event of Default (as defined in the DIP Credit Facility) shall have occurred and be continuing.

       (g)   <u>Corporate Documents</u>.  The Holder shall have received copies of (i) resolutions of each Borrower authorizing the transactions contained herein, (ii) a secretary's certificate of each Borrower, (iii) a good standing certificate of each Borrower certified by the Secretary of State of the State of the jurisdiction of incorporation or organization of the Borrowers or Guarantor, as applicable, and (iv) incumbency

certificates of each Borrower, each in form and substance reasonably satisfactory to the Holder.

(h)    Notice.  The Holder's shall have received a written notice from the Borrower electing to convert amounts outstanding under the DIP Credit Facility to amounts outstanding under this Secured Promissory Note at least ten (10) business days prior to the Closing Date.

(i)    Payment of Fees and Expenses.  The Borrowers shall have paid to the Holder the then unpaid balance of all accrued and unpaid costs and expenses then due, owing and payable to the Holder under and pursuant to Note Documents (including the fees and out-of-pocket expenses of counsel to the Holder) as to which invoices have been issued and presented on or before the Closing Date.

(j)    Insurance.  The Holder shall have received certificates of insurance with respect to insurance maintained by the Borrowers, as the case may be, which certificates evidence compliance by the Borrowers with the insurance requirements set forth herein and in the Note Documents as of the Closing Date and the Holder shall have been named as loss payees with respect to all Collateral and additional insureds (as their interests may appear), on such policies of insurance of the Borrowers as the Holders as specified in the Note Documents.

SECTION 11. Costs and Expenses.  Each Borrower jointly and severally agrees to pay on demand all (a) all costs and expenses of the Holder associated with the preparation, execution, delivery and administration of the Note Documents and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsel (including local, conflicts and special counsel as necessary) and, to the extent in "work out" or restructuring, financial advisors for the Holder), (b) all expenses of the Holder (including the fees, disbursements and other charges of counsel (including local, conflicts and special counsel) for the Holder) and financial advisors in connection with the enforcement of the Note Documents and (c) all expenses associated with collateral monitoring, collateral reviews and appraisals, environmental reviews and fees and expenses of other advisors and professionals engaged by the Holder.

SECTION 12. Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, the Holder hereof is hereby authorized at any time and from time to time, without notice to Borrowers (any such notice being expressly waived), to set off and apply any and all obligations at any time owing by such holder to or for any Borrower's credit or account against any and all of such Borrower's obligations now or hereafter existing under this Note or any other document or instrument delivered in connection herewith, irrespective of whether or not such holder has made any demand under this Note or any other document or instrument delivered in connection herewith, and although such obligations may be unmatured.  The Holder's rights under this Section 12 are in addition to other rights and remedies (including other rights of set-off) which it may have and, so long as Delta or any of its affiliates are the sole Holders, are in addition to Holder's right to cause payments of principal hereof and

interest hereon to be made by deductions from amounts payable to Borrowers under the Connection Carrier Agreements in the manner set forth therein.

SECTION 13. <u>Indemnification and Survival</u>.    Each Borrower hereby jointly and severally indemnifies, exonerates and holds the Holder (including Delta) and each of its affiliates, officers, directors, employees and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all actions, causes of action, suits, losses, costs, liabilities, damages and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including attorneys' fees and disbursements (collectively, the "Indemnified Liabilities"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to

(a)    any investigation, litigation or proceeding related to any environmental cleanup, audit, compliance or other matter relating to the protection of the environment and any Borrower; or

(b)    the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, discharging or releases from, any real property owned or operated by any Borrower of any hazardous material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any environmental law), regardless of whether caused by, or within the control of, such Borrower,

except for any such Indemnified Liabilities arising for the account of a particular Indemnified Party by reason of the relevant Indemnified Party's gross negligence or willful misconduct as determined by a non-appealable order of a court of competent jurisdiction, and if and to the extent that the foregoing undertaking may be unenforceable for any reason, each Borrower hereby jointly and severally agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.   Each Borrower's obligations under this <u>Section 13</u> and under <u>Section 11</u> shall in each case survive the payment in full of all obligations hereunder.

SECTION 14. <u>Assignment</u>.    The rights and obligations of the Borrowers may not be assigned by the Borrowers without the prior written consent of the Holder, which consent may be granted or withheld in the Holder's sole discretion.   The Holder may assign at any time this Note to any other Person with, so long as no Event of Default has occurred and is continuing, the consent of the Borrowers (such consent not to be unreasonably withheld, delayed or conditioned), in which event, the assignee shall have, to the extent of such assignment, the same rights and benefits as it would have if it were the Holder, except as otherwise provided by the terms of such assignment or participation.   Upon a valid assignment of a party's rights and obligations under this Note, this Note shall inure to the benefit of and be binding upon the successors and permitted assigns and transferees of the Borrowers and the Holder.

SECTION 15. <u>Governing Law.</u> THIS NOTE AND EACH OTHER DOCUMENT OR INSTRUMENT DELIVERED IN CONNECTION HEREWITH SHALL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND

19

GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK, UNITED STATES OF AMERICA.

SECTION 16. <u>Forum Selection and Consent to Jurisdiction</u>.    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(a)    SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE AND THE OTHER RELATED DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

(b)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(c)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO IT AT ITS ADDRESS SET FORTH IN SECTION 8 OR AT SUCH OTHER ADDRESS OF WHICH THE OTHER PARTIES SHALL HAVE BEEN NOTIFIED PURSUANT THERETO; AND

(d)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

SECTION 17. <u>Waiver of Jury Trial</u>.    EACH BORROWER AND HOLDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS NOTE OR THE SECURITY AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF IT.

SECTION 18. <u>Joint and Several Obligations</u>.    The obligations of the Borrowers hereunder are joint and several.  Each Borrower agrees that its obligations are a primary obligation of such Borrower and not merely a contract of surety.  Each Borrower waives presentation to, demand for payment from and protest to such Borrower or any other Borrower, and also waives notice of protest for nonpayment.  The

obligations of Borrowers hereunder shall not be affected by (i) the failure of the Holder to assert any claim or demand or to enforce any right or remedy against any Borrower under the provisions of this Note or otherwise, (ii) any extension or renewal of any provision hereof, (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of this Note, the Security Agreement or any other Note Document, (iv) the release, exchange waiver or foreclosure of any security held by the Holder, (v) the failure of the Holder to exercise any right or remedy against any Borrower, or (vi) the release or substitution of any collateral. Each Borrower further waives any right to require that any resort be had by the Holder to any security held for payment of this Note or to any balance of any deposit, account or credit on the books of the Holder in favor of any Borrower.

Each Borrower hereby waives any defense that it might have based on a failure to remain informed of the financial condition of any other Borrower and any circumstances affecting the ability of any other Borrower to perform under this Note. Each Borrower's obligations hereunder shall not be affected by the genuineness, validity, regularity or enforceability of this Note, the Security Agreement or any other Note Document or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance which might otherwise constitute a defense to such obligations.

The obligations of the Borrowers hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, alteration, or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegally or unenforceability of such obligations. Without limiting the generality of the foregoing, the obligations of the Borrowers hereunder shall not be discharged or impaired or otherwise affected by failure of the Holder to assert any claim or demand or to enforce any remedy under this Note or any other agreement, by any waiver or modification of any provision hereof or thereof, by any default, failure or delay, willful or otherwise, in the performance of such obligations, or by any other act or thing or omission or delay or do any other act or thing which may or might in any manner or to any extent vary the risk of any Borrower or would otherwise operate as a discharge of any Borrower as a matter of law.

Each Borrower further agrees that its obligations hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any obligation hereunder is rescinded or must otherwise be restored by Holder upon the bankruptcy or reorganization of such Borrower or otherwise.

Upon payment by any Borrower of any sums to the Holder hereunder, all rights of such Borrower against any other Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior payment in full of all the obligations of the Borrowers hereunder (including interest accruing on and after the filing of any petition in bankruptcy or of reorganization of a Borrower whether or not post filing interest is allowed in such proceeding). If any amount shall be paid to such Borrower for the account of any other Borrower relating to the obligations hereunder, such amount shall be held in trust for the

21

benefit of the Holder and shall forthwith be paid to the Holder to be credited and applied
to the obligations hereunder, whether matured or unmatured.

PINNACLE AIRLINES CORP.


By: _____
Name:  Brian T. Hunt
Title:    Vice President and General Counsel


PINNACLE AIRLINES, INC.


By: _____
Name:  Brian T. Hunt
Title:    Vice President and General Counsel


MESABA AVIATION, INC.


By: _____
Name:  Brian T. Hunt
Title:    Vice President


PINNACLE EAST COAST OPERATIONS INC.


By: _____
Name:  Brian T. Hunt
Title:    Vice President and General Counsel


COLGAN AIRLINES, INC.


By: _____
Name:  Brian T. Hunt
Title:    Vice President and General Counsel

Acknowledged and Agreed:

DELTA AIR LINES, INC.

By: _____

Name: Donald T. Bornhorst

Title:  Senior Vice President – Delta Connection

**SCHEDULE I**
**to Secured Promissory Note**

**<u>DEBT</u>**

**SCHEDULE II**
**to Secured Promissory Note**

**<u>LIENS</u>**

**SCHEDULE 3(c)**
**to Secured Promissory Note**

<u>FILINGS</u>