**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

## DECLARATION OF JERROLD A. GLASS IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113

## TABLE OF CONTENTS

I.    IDENTIFICATION OF DECLARANT ........................................................... 1

    A.    Employment History ...................................................................... 1

        1.    Current Employment ................................................... 1

        2.    Prior Employment ....................................................... 2

    B.    Experience in Airline Labor Relations and Collective Bargaining ...................... 3

    C.    Other Experience and Educational Background ................................... 6

    D.    Prior Testimony ........................................................................ 7

II.    ASSIGNMENT:  COMPARE PINNACLE'S CURRENT AND PROPOSED LABOR CONTRACT TERMS TO DETERMINE ITS COMPETITIVENESS WITH ITS MARKET GROUP ......................................................................... 8

III.    INTRODUCTION:  DETERMINING AN AIRLINE'S COMPARATORS AND COMPARING CONTRACT PROVISIONS ................................................. 9

    A.    Determining An Airline's Comparators ............................................. 9

    B.    Apportioning the Necessary Savings ............................................... 10

IV.    SUMMARY OF CONCLUSIONS:  PINNACLE'S LABOR CONTRACTS ON THE WHOLE HAVE AMONG THE HIGHEST COSTS AND LOWEST PRODUCTIVITY AS COMPARED TO ITS COMPETITORS .................................... 15

        1.    Compensation ........................................................... 15

        2.    Work Rules ............................................................... 16

    B.    Flight Attendants ........................................................................ 18

        1.    Compensation ........................................................... 18

        2.    Work Rules ............................................................... 18

    C.    Employee Benefits ...................................................................... 19

V.    CARRIERS IN BANKRUPTCY CANNOT AIM FOR "AVERAGE" CONTRACT PROVISIONS WHEN SEEKING LABOR COST REDUCTIONS ........ 21

    A.    Regional Carrier Labor Cost Reductions in Bankruptcy Over the Past Decade ..................................................................................... 23

B.  Major Airline Labor Cost Reductions in Bankruptcy Over The Past Decade ........................................................................................................ 27

1.  US Airways:  Four Rounds of Concessions Over Two Bankruptcies ..................................................................................... 29

2.  United Airlines:  Three Years in Bankruptcy With Two Rounds of 1113 Motions ........................................................................ 31

3.  Delta Airlines:  Two Rounds of Concessions – Once Before Bankruptcy and Again During Bankruptcy ............................... 36

4.  Northwest Airlines:  Two Rounds of Labor Cost Reduction Agreements – Once Pre-Bankruptcy and Once During Bankruptcy ....... 38

5.  Continental Air Lines:  Even More Concessions Years After Two Bankruptcies ..................................................................... 41

VI.  PINNACLE'S PILOT CONTRACT PROVIDES HIGHER COSTS, LOWER PRODUCTIVITY, AND MORE RESTRICTIONS ON THE COMPANY THAN ITS COMPETITORS ............................................................................................ 43

A.  Pinnacle's Pilot Compensation Is Above Market ................................ 43

B.  Pinnacle's Pilot Work Rules Are Among The Most Costly And Least Productive In The Industry .................................................................. 50

VII.  PINNACLE'S FLIGHT ATTENDANT CONTRACT CONTAINS A NUMBER OF PROVISIONS THAT ARE MORE COSTLY AND PROVIDE LESS PRODUCTIVITY THAN ITS COMPETITORS ............................................ 79

A.  Pinnacle's Flight Attendant Compensation Is At Market Rates ......................... 79

B.  Pinnacle's Flight Attendant Work Rules Are Costly ......................................... 81

VIII.  PINNACLE'S EMPLOYEE BENEFITS ARE AMONG THE MOST COSTLY IN THE INDUSTRY ..................................................................................... 93

A.  Medical Plans ..................................................................................... 93

B.  Sick Leave and Disability ................................................................... 98

C.  401(k) Retirement Benefits ................................................................. 100

D.  Profit Sharing ..................................................................................... 103

I, JERROLD A. GLASS, subject to the penalties provided by law for perjury, do hereby declare the following to be true and correct on the basis of my personal knowledge and upon information from documents I have reviewed, including those in my custody and control.  I offer this declaration in support of Pinnacle's motion pursuant to 11 U.S.C. § 1113 to reject the collective bargaining agreements between Pinnacle and the Air Line Pilots Association, International ("ALPA") and the Association of Flight Attendants-CWA ("AFA").

## I.     IDENTIFICATION OF DECLARANT

### A.     Employment History

#### 1.     Current Employment

1.     **F&H Solutions Group.**  I am currently employed as President of F&H Solutions Group, a human resources and labor relations consulting firm with offices in four locations. F&H Solutions Group was formed in May 2006 as the successor to my previous consulting firm, J. Glass & Associates, which was formed in 1989.  I was employed by J. Glass and Associates from 1989 until I joined US Airways in April, 2002; I rejoined J. Glass & Associates upon my departure from US Airways in October 2005.  J. Glass & Associates specialized in representing transportation sector companies, including airlines and railroads, in labor and employee relations matters.  J. Glass and Associates also conducted ad hoc surveys for individual airline and railroad companies and provided clients with other analyses related to labor and employee relations.  J. Glass & Associates also provided expert witness testimony in labor arbitrations and litigation.

2.     There are currently 17 full-time professional consultants employed at F&H Solutions Group.  The initial client base of F&H Solutions Group were air carriers carried over from J. Glass and Associates; F&H Solutions continues to do considerable work for air carriers, but the client base has also grown to include non-airline clients as well.  The work at

-1-

F&H Solutions Group also includes recruiting, human resource assessments, diversity and

inclusion training, compensation analysis, and FMLA administration.  The firm is also

responsible for producing pay, work rule, and benefit comparisons on behalf of various trade

associations.  These include:

- Regional Airline Association – surveys covering pay, work rules, and benefits for pilots, flight attendants, ground employees, and management personnel;

- Airline Human Resource Association – surveys covering ground employees of foreign airlines working in the United States; and

- Labor Relations Association of Passenger Railroads – surveys covering shopcraft employees, trainmen and engineers, maintenance-of-way employees, agents and clerks, and supervisors.

2.    **Prior Employment**

3.    **US Airways, Inc.**  I was employed by US Airways, Inc. as Senior Vice President

of Employee Relations from April 2002 to April 2004, at which time I was promoted to

Executive Vice President and Chief Human Resources Officer.  I remained in that position at

US Airways, Inc. until September 30, 2005, when US Airways merged with America West

Airlines and relocated its headquarters from Arlington, Virginia to Tempe, Arizona.  I was at

US Airways throughout the time of their first (2002-03) and second (2004-05) bankruptcy

proceedings.  I was responsible for all aspects of human resources and labor relations,

including all collective bargaining, human resources policy assessment and implementation,

benefit administration, benefit strategy and design, recruiting, compensation, corporate

learning and development, and labor relations.

4.    **J. Glass & Associates.**  I started and served as President of J. Glass & Associates

in September 1989 as a consulting firm targeted toward airline clients seeking outside support

for their labor relations team for special projects or assistance in collective bargaining, with

particular focus on contract negotiations (chief negotiator), costing (valuation) of company and

union proposals, and contract analysis and research on any of the various subjects usually found in airline labor contracts.  I remained at the firm until my departure for US Airways in April 2002.  During my thirteen years of consulting work, I developed a practice strong enough to survive and prosper despite my hiatus from 2002 to 2005.  Three associates continued to provide assistance to clients during my years at US Airways.  At J. Glass & Associates, I provided consulting services to nearly 50 different airlines, including majors, nationals, cargo, foreign flag and regional airlines.

5.    **Airline Industrial Relations Conference.**  From 1980 to 1989, I served in several capacities with the Airline Industrial Relations Conference ("AIRCon"), a membership organization of U.S. air carriers.  AIRCon was created to serve as the information exchange and labor policy organization of U.S. scheduled air carriers.  At AIRCon, I started employment as Director of Labor Relations Research, later being promoted to Vice President and Secretary-Treasurer.  My responsibilities at AIRCon included analysis of all collective bargaining agreements in the airline industry, including newly ratified agreements, and preparation and updating of reports on the contract terms in effect at the various airlines, which included all pay, work rule, and benefits information contained in an airlines' collective bargaining agreements.  AIRCon's members were especially interested in such comparative information when their own agreements were coming up for negotiations.  The knowledge and experience I gained at AIRCon formed the basis of my subsequent work as a consultant on airline labor relations issues.

B.    **Experience in Airline Labor Relations and Collective Bargaining**

6.    **Airline Collective Bargaining Experience.**  I have negotiated in excess of 100 airline collective bargaining agreements.  I have served as chief negotiator and/or advisor to the following airlines with regard to the employee groups indicated:

- ACJet (Pilots and Flight Attendants);

- Allegheny Airlines (Mechanic & Related);

- Air Wisconsin (Pilots, Flight Attendants, Mechanic & Related, Fleet and Passenger Service, Dispatchers);

- America West Airlines (Pilots, Flight Attendants, Mechanic & Related);

- ATA Airlines (Pilots);

- Atlantic Coast Airlines (Pilots, Flight Attendants, and Mechanic & Related);

- Atlas Airlines (Pilots);

- Capital Cargo Airlines (Pilots);

- Colgan Airlines (Pilots, Flight Attendants);

- DHL Airways (Pilots);

- Frontier Airlines (Pilots);

- Hawaiian Airlines (Pilots, Flight Attendants, Mechanic & Related, Fleet and Passenger Service, Dispatchers);

- Independence Air (Pilots, Flight Attendants);

- Mesaba Airlines (Flight Attendants, Mechanic & Related, Dispatchers);

- Midwest Airlines (Pilots, Flight Attendants);

- Offshore Logistics (Pilots);

- Pinnacle Airlines (Pilots, Flight Attendants, Dispatchers);

- PSA Airlines (Pilots);

- Sun Country Airlines (Pilots, Flight Attendants);

- Tower Air (Pilots, Flight Attendants); and

- US Airways (Pilots, Flight Attendants, Mechanic & Related, Fleet Service, Passenger Service, Dispatchers, Maintenance Training Specialists, Flight Simulator Engineers, Flight Crew Training Instructors).

7.     In addition, I have represented at the collective bargaining table four foreign flag airlines operating in the United States – Bahamasair, British Airways, Mexicana Airlines, and Virgin Atlantic (all with regard to customer service agents).

8.     **Other Collective Bargaining Experience.**  I have also negotiated contracts in other industries including the passenger railroad and manufacturing sectors.  I have represented the Northern Indiana Commuter Transportation District (NICTD) in negotiations and advised Amtrak, Long Island Railroad (LIRR), Metro North Railroad, Massachusetts Bay Commuter Railroad (MBCR), New Jersey Transit (NJT), NICTD, Port Authority Trans Hudson Line (PATH), Southeastern Pennsylvania Transportation Authority (SEPTA) in various labor matters.  Also, I represented the National Elevator Bargaining Association (NEBA) in two rounds of multiemployer national bargaining and one round of local bargaining.  NEBA represents the largest elevator construction companies in the United States.  Furthermore, I have been retained by many other major, national, cargo, regional, and foreign flag airlines to assist in analyzing air carrier pay, work rules, and benefits.  A list of all airline and related clients is listed in Attachment I.

9.     **Costing and Valuation of Proposals; Research and Analysis.**  One type of assignment in our consulting work is to assist airline clients in determining the estimated costs (or savings) likely to arise as a result of various proposed contract terms.  While wage rates can be relatively easy to quantify, intimate knowledge of airline industry work rules and practices is essential to proper evaluation of other contract terms.  Airline work rules are notoriously complex and interrelated, requiring a broad working knowledge of the industry in order to properly evaluate.  Many airlines have sufficient staff and resources for this task, but sometimes need outside help, e.g., when multiple contracts are in negotiation at the same time.

Smaller and regional carriers generally have fewer internal resources and frequently need outside support and advice on costing/valuation, comparative contract provisions, and analysis of contract issues when negotiating collective bargaining agreements.

10.   **Experience in Airline Bankruptcy Cases.**  I have been involved in several airline bankruptcies.  In 1993, I served as chief negotiator and labor advisor to Hawaiian Airlines when the airline sought bankruptcy protection.  Also, I served as a labor advisor and chief negotiator for Frontier Airlines and Independence Air after those airlines filed for bankruptcy protection.  I was employed at US Airways as the Senior Vice President of Employee Relations when the company sought bankruptcy protection in August 2002.  I was still with US Airways as the Executive Vice President and Chief Human Resources Officer when the airline filed for bankruptcy protection a second time in September 2004.

11.   **Other Airline-Related Work.**  I have also advised airlines on bargaining strategies and have been retained by investment firms to advise them on the labor aspects of airline mergers/acquisitions, consolidations, asset sales, and the impact of labor settlements on the air carrier's overall cost structure.

C.   <u>Other Experience and Educational Background</u>

12.   Prior to joining AIRCon, I was the assistant to the director of economic studies at the American Association of University Professors, a trade association and union of college professors, where I analyzed salary and benefit data from more than 2,600 colleges and universities for inclusion in an annual report on the economic status of college professors.  I received a bachelor's degree in political science from Boston University in 1976 and a master's degree in public administration from The George Washington University in 1978.  In addition to the experience outlined in this Declaration, throughout the years I have served as a speaker on numerous panels on the subject of labor and employee relations in the airline industry.  I am

frequently asked to provide analysis to the media and have been quoted or appeared on television and radio on numerous occasions to discuss airline and other industry labor relations matters.

### D. **Prior Testimony**

13.    I testified on two separate occasions in Bankruptcy Court in the Eastern District of Virginia on behalf of US Airways during the course of its two bankruptcy proceedings.  The subjects of my testimony included labor costs and projections, management compensation, retention, and staffing issues.  During my work as a consultant, I have testified at least 50 times on behalf of air carriers in labor arbitration proceedings on a variety of airline contract interpretation issues, including wage, work rule and benefit comparisons, negotiations history, and seniority.  In addition, I have testified in a number of interest arbitration proceedings involving pay rates of pilots, flight attendants, and mechanics.  I have been retained as an expert to advise law firms and their clients on airline matters.  Examples include calculations involving prevailing wage rate issues (Service Contract Act), seniority issues (Bertulli v. IACP and Continental Airlines), and 3-pilot vs. 2-pilot issues (Tice v. American).  I have also testified as an expert witness in the following matters: *Pinoli v. Westermeyer* (citation not available) and *Crocker v. Piedmont Aviation*, 741 F. Supp. 241 (D.D.C. 1989).  I appeared as an expert witness to opine on comparative pay, work rules, and benefits in the regional airline industry in the United States Bankruptcy Court for the Southern District of New York in *In re Delta Air Lines, et al*, Debtors (Chapter 11 Case No. 05-17923 (ASH)).  I recently testified as an expert witness on major airline comparative pay, work rules, and benefits in the United States Bankruptcy Court for the Southern District of New York in *In re AMR Corporation, et al*, Debtors (Chapter 11 Case No. 11-15463 (SHL)).

## II.    ASSIGNMENT:  COMPARE PINNACLE'S CURRENT AND PROPOSED LABOR CONTRACT TERMS TO DETERMINE ITS COMPETITIVENESS WITH ITS MARKET GROUP

14.    I am currently serving as the lead labor negotiator for Pinnacle Airlines, Inc. ("Pinnacle" or the "Company") and have advised on all aspects of the labor ask.  I have been asked to compare the Company's current labor contracts, including the Joint Collective Bargaining Agreement (the "JCBA") by and between Pinnacle Airlines, Inc., Mesaba Aviation, Inc., and Colgan Air, Inc. and the Pilots in Their Service as represented by ALPA, attached hereto as Ex. 54, and the Agreement between Pinnacle Airlines, Inc. and its Flight Attendants as represented by AFA (the "AFA CBA"), attached hereto as Ex. 55, as well as the Company's proposed modifications with the labor contracts of its competitors.  I have also been asked to provide background and context for this comparison based on my industry expertise.  The remainder of my declaration is organized as follows:

- Section III:  Introduction
- Section IV:  Summary of Conclusions
- Section V:  Experience of Other Carriers in Bankruptcy
- Section VI:  Pilots
- Section VII:  Flight Attendants
- Section VIII:  Employee Benefits for All Groups of Unionized Employees

## III.   INTRODUCTION:  DETERMINING AN AIRLINE'S COMPARATORS AND COMPARING CONTRACT PROVISIONS

### A.   Determining an Airline's Comparators

15.   It is standard practice for carriers and unions in the airline industry to compare pay, work rules, and benefits for a group of employees[1] to a peer set when negotiating changes to their collective bargaining agreements (CBAs).  This practice is known as "pattern bargaining."  For each section of the agreement, unions generally seek to match or exceed the best (from an employee standpoint) contract terms in place at comparable carriers, while carriers usually seek to control costs and/or to increase productivity within boundaries set by the pattern of their particular peer set.  In the case of regional airlines, the peer set is usually determined by examining the CBAs for those regional airlines that (1) serve the same mainline partner as the airline under review (e.g., Pinnacle and Delta) and (2) serve other mainline partners.  Each of these categories – or "Comparator Groups" – includes airlines that fly the same or similar equipment to the airline under review.

16.   For Pinnacle, the primary Comparator Group consists of other regional carriers that provide passenger feed for Delta Air Lines (known as "Delta Connection Inc.," carriers or "DCI Carriers" or "DCI Comparators").[2]  In addition, a secondary set of Comparators would include regional carriers that operate aircraft similar to Pinnacle, but do not provide passenger feed to Delta (known as "Other Airlines" or "OALs" or "Non-DCI Carriers" "Non-DCI

---

[1] Under the Railway Labor Act, which governs airline unions among others, each major work group, such as pilots or flight attendants, is a separate "craft or class."  The scope of each craft or class, and the election of union representatives, are determined by the National Mediation Board pursuant to the provisions of Section 2, Ninth of the RLA.  45 U.S.C. § 152, Ninth. (2006 & amended by P.L. 112-95, Feb. 14 2012).  Each craft or class is nationwide in geographic scope.

[2] The DCI Carriers are:  ExpressJet-CRJ (formerly Atlantic Southeast Airlines), Comair, Compass Airlines, GoJet Airlines, Republic Airlines, and SkyWest Airlines.

Comparators").[3]  It is logical for Pinnacle to compare its collective bargaining terms to other

DCI Carriers.  However, it is also necessary for Pinnacle and other regional airlines to compare

themselves to OALs because the market for securing regional airline business is very

competitive and whenever a Request For Proposal (RFP) is issued by a mainline carrier, the

bidding is generally open to most or all regional airlines that have or could readily acquire the

required aircraft to fly the required routes.

B.    **Apportioning the Necessary Savings**

17.    In determining the distribution of the required savings for the total ask, the

Company apportioned the additional required savings in the percentages seen in the row

labeled "*Percentage Of Total Ask*" of Ex. 17, Determination of Ask by Employee Group,

which reflects the apportionment of the required savings under its May 8 proposals.  The

apportionment of the May 8 proposals, described more fully below, was based on a mark-to-

market analysis as well as a comparison to the work rules of other DCI carriers.

18.    In determining the May 2012 proposal,[4] the Company utilized the airline

comparisons to conduct a "mark-to-market" analysis which was used, in part, to determine how

---

[3] The Non-DCI Comparators are:  Air Wisconsin, American Eagle Airlines, ExpressJet-ERJ (formerly ExpressJet), Mesa Airlines, and Trans States Airlines.

[4] The Company presented initial proposals on May 8, 2012.  On May 18 (pilots) and May 31 (flight attendants), these proposals were adjusted to account for a modeling error.  However, the total amount of the labor savings sought did not change.  This declaration focuses primarily on the labor proposals put forward by the Company on August 16, 2012, which total $76.5 million in annual savings.  Over the course of negotiations, which are ongoing, the Company has provided and continues to provide counter-proposals that would achieve the same total amount of savings as the August 16 proposal, but through different combinations of cost-savings initiatives, based on input from the unions.  For example, on September 13, the Company provided a new counter-proposal to AFA with certain key modifications, including a decrease in the Company's proposed initial pay cut from 5% to 2% and several work rule changes suggested by AFA.  However, these counter-proposals have not produced a consensual agreement with AFA and ALPA, and can be expected to continue to evolve after the date of this declaration.

to apportion the labor concessions to the various employee groups at the Company.

Specifically, the Company needed to determine the level of savings required from each work

group[5] to achieve the total initial cost gap of $42.6 million.[6]  The Company carefully

considered how to reach the necessary savings through the most fair and equitable distribution

of required savings across all work groups.

19.    As part of this process, the Company conducted an analysis of its wage-related

costs[7] compared to the DCI Carriers.[8]  The Company compared each work group's wage-

related costs versus market pay rates, to determine relative industry wage competitiveness.  In

instances where one of Pinnacle's work group's wage costs were found to be above market,

that work group's costs were categorized as a driver of a cost disadvantage for the Company.

20.    In Ex. 17, Determination of Ask by Employee Group, the row labeled "*Pinnacle*

*Base Wage-Related Costs Per Year*" represents the Company's average annual wage-related

costs from 2013-2018, based on current labor contracts or pay-related costs as calculated in

costing models built by the Company for each individual work group.

21.    In the same document, the row labeled "*Percentage (%) Wage-Related Costs Are*

*Above (Below) DCI Average (in 2013)*" represents a weighted average comparison of wage-

related costs for 2013.  For Pilots, the weighted average pay rate was calculated by applying

the Company's projected 2013 Pilot longevity distribution to DCI average pay rates.  The DCI

---

[5] The five work groups in question are: Pilots (including Instructors), Flight Attendants,
Dispatchers, Salaried Employees and Non-Contract Hourly Employees.

[6] Required savings as calculated in the Company 2013-2018 Business Plan.

[7] Wage-related costs are all costs that move in concert with changes to wages: Wages, 401k,
FICA, Life Insurance, and Long Term Disability (LTD) insurance.

[8] The DCI Carriers included in the analysis are ExpressJet-CRJ (formerly Atlantic Southeast
Airlines), Comair, Compass Airlines, GoJet Airlines, Republic Airlines and SkyWest Airlines.

average pay rates represent a straight average of DCI Carrier pay rates at each longevity step, by aircraft type.  The analysis covers the two aircraft types operated by the Company: CRJ-200s and CRJ-900s.

22.    The rate comparison analysis led to the conclusion that the Company's wage-related costs for the Pilot work group are 6 percent above what they would be if the DCI average rates were used for 2013.  The wage-related costs of all other work groups were found to be below the DCI average, ranging from -0.5 percent to -2.6 percent.[9]

23.    When that cost difference of 6 percent was applied to the Company's Pilot wage-related costs, it resulted in an annual cost disadvantage of over $9 million.  The results can be seen in the row labeled, "*Value Of Cost Disadvantage (Advantage) vs. DCI Average*" of Ex. 17, Determination of Ask by Employee Group.

24.    The Company also compared Pinnacle's work rules to those of the DCI Carriers by comparing the respective labor contracts of each work group against all other DCI Carriers. The Company identified specific contractual provisions which, when compared to a majority of the DCI Carriers, were unfavorable; that is, Pinnacle's work rules drove higher costs for the Company when compared to the work rules of the majority of DCI Carriers.

25.    The costing attributed to such unfavorable provisions represents the annual cost to the Company of compliance therewith, as modeled in the Company's costing models.  The values are shown in the row labeled "*Value Of Work Rule Disadvantage (advantage) vs. DCI Carriers*" of Ex. 17, Determination of Ask by Employee Group.

---

[9] Industry benchmarks were not available for the Management work group.  For the Non-Contract Hourly work group, the industry comparisons were specifically for Mechanics.

26.   The Company's work rule analysis led to the conclusion that the Company's Pilot labor contract drives more than $6.9 million in additional costs per year when compared to the labor contracts of other DCI Carriers.  The Flight Attendant labor contract was determined to drive more than $230,000 in additional costs per year versus the Comparator Group.

27.   The "*Component Of Total 'Ask' From Mark-to-Market*" row of Ex. 17, Determination of Ask by Employee Group, adds together the value of the wage-related cost comparison and the work rule comparison.  It demonstrates that Pinnacle suffers from a $16 million annual cost disadvantage vis-a-via other DCI carriers with respect to the Pilot work group.  The equivalent over-market value for the Flight Attendants is approximately $85,000. The labor costs of the remaining work groups were found to be at or below market.

28.   The Company distributed additional required savings based on the relative size of each work group cost base.  The Company also considered its mark-to-market analysis and apportioned additional savings to match the total initial cost gap by seeking contributions from each work group in proportion to its all-in labor cost base.[10]  The "*Pinnacle Cost Base (SW&B all-in) Per Year*" row in Ex. 17, Determination of Ask by Employee Group, shows each work group's all-in cost base for a typical year.[11]

29.   Through an analysis to determine an equitable basis for dividing up the remaining labor savings needed, the Company found that a savings contribution of approximately 10 percent of each work group's respective cost base would achieve the target savings.  After

---

[10] All-in labor costs include salaries, wages, and benefits whether wage-driven or headcount-driven.  Headcount-driven costs include medical, dental, worker's compensation, vision, claims reimbursement, stop-loss, benefits administration, Extended Sick Leave (ESL), post-retirement health, benefits contra account, and loss of license insurance. Other costs include per diem.

[11] Pilots (including Instructors), and Flight Attendants are 2014 values from the Business Plan, which is considered a steady state year.  Dispatchers, Salaried, and Hourly are 2013-2018 average values from the Company's costing models.

further analysis was conducted to determine how each work group could practically contribute such savings,[12] the target contribution of the work groups ranged from 9.1 to 12 percent. These percentages are shown in dollar terms in the "*Total Additional Ask Required After Mark-to-Market*" row of Ex. 17, Determination of Ask by Employee Group.  In the case of the Pilot work group, the additional savings beyond those calculated in the mark-to-market analysis represent 9.4 percent of the Pilot all-in labor cost base, or approximately $17.1 million annually.  The percentages for all the labor groups can be seen in the "*Additional Ask As % Of Cost Base*" row of Ex. 17, Determination of Ask by Employee Group.

30.    The "*Total Ask Excluding Recent Concessions*" row of Ex. 17, Determination of Ask by Employee Group, tallies the apportioned savings.[13]  The final row in the spreadsheet, "*Percentage (%) Of Total Ask,*" shows each work group's savings as a percentage of the total required savings from all work groups (that is, the $42.6 million).

31.    The savings sought from the Pilot group represent 78 percent of total savings. The required savings from the Pilot work group represents the majority of savings due to that group's uncompetitive wage rates, work rules and benefits, and the size of its "all-in" labor cost base relative to the other work groups.

---

[12] Certain cost saving initiatives were designed to apply across all work groups.  The proposed initiatives include a 5 percent wage reduction, new health care plan designs, a change to the Company's 401k matching policy, elimination of Extended Sick Leave (ESL) coverage, and an employee contribution to the cost of Long Term Disability (LTD) insurance.

[13] Note that in order to determine required savings, two work groups were given credit for recent concessions.  The Salaried work group was credited $1.6 million for forgoing its 2012 COLA increase, which represents run-rate savings.  The Non-Contract Hourly Work Group was credited $1.7 million for forgoing its 2012 merit increases, which also represent run-rate savings.

IV.    **SUMMARY OF CONCLUSIONS:  PINNACLE'S LABOR CONTRACTS ON THE WHOLE HAVE AMONG THE HIGHEST COSTS AND LOWEST PRODUCTIVITY AS COMPARED TO ITS COMPETITORS**

32.    As part of our analysis on pay, work rules, and benefits, I conducted a comparison of nearly every proposed pay, work rule, and benefit change.  In Exhibits 1a through 8b, I analyzed Pinnacle's current and proposed work rule and benefit items we have proposed to change and compared them to similar provisions at DCI and OAL carriers.  If Pinnacle's provision was more restrictive for Pinnacle than that of a competitor, the item is designated in red as "Pinnacle is Less Favorable."  If Pinnacle's contract provision was less restrictive for Pinnacle than that of a competitor, the item is designated in green as "Pinnacle is More Favorable."  If Pinnacle's contract provision was similar to that of its competition, the item is designated as "Pinnacle is Comparable."  The results of this analysis are identified in Exhibits 1a through 8b and in the paragraphs within this section, below.  This work is based on my personal analysis of the contract provisions and my experience as a negotiator of more than 100 airline contracts.  In addition, my analysis and conclusions in this declaration are also based on my experience as a former senior executive at a mainline carrier with intimate knowledge about how mainline partners select regional partners.  My overall conclusion is that Pinnacle suffers from crippling disadvantages due to its uncompetitive works rules and benefits, as set forth in more detail below.

1.    **Compensation**

33.    **Current Contract Terms.**  Pinnacle's pilot pay scale is among the highest in the regional airline industry, and this disadvantage is only exacerbated by Pinnacle's "seniority disadvantage" – i.e., the relatively high seniority of its pilots compared to those of other competitors – which leads to significantly higher costs.  These disadvantages contribute to an unsustainable cost, particularly given competition from lower cost and younger airlines like

Compass and GoJet.[14]  I have provided more detail on the specific cost disadvantages of the Pinnacle pay scales starting in paragraph 71 of this declaration.

34.  **Section 1113 Proposal.**  Pinnacle's compensation proposal has three elements: (1) a new pay scale that is competitive with low cost regional airlines like Compass and GoJet; (2) a reduction in the Captain longevity scale from 18 years for the CRJ-200 and 20 years for the CRJ-900 to 12 years for each and a reduction in the First Officer longevity scale from 8 years to 4 years; and (3) a new pay system whereby First Officers move to the first step on the Captain pay scale instead of carrying their longevity over with them when moving to the Captain position.  These changes are necessary to address the extraordinarily high seniority at Pinnacle and to bring its costs in line with other DCI competitors.  I have provided more detail of the Company's proposals starting in paragraph 80 of the declaration.

2.  **Work Rules**

35.  **Current Contract Terms.**  Pinnacle's pilot work rules are uncompetitive in various key respects.  As explained in greater detail in Section VI of this declaration, many of Pinnacle's pilot work rules significantly limit pilot productivity by a series of provisions, including works rules related to minimum day rigs, open time posting, duty days, and various others.  Pinnacle is also uncompetitive with respect to the rules governing pilots' ability to take time off – e.g., vacation accruals, vacation credit, extended sick leave, and use of FMLA, which are among the industry's costliest and cannot be sufficiently monitored or managed under Pinnacle's pilot contract.  Taken together, these provisions result in lower pilot

---

[14] Currently, Compass operates 36 ERJ-175 aircraft.  These ERJ-175s are multi-class aircraft configured with 76 seats.  As a DCI Carrier already flying ERJ-175 aircraft for Delta, Compass is in a prime position to receive new growth opportunities as Delta begins to award additional 76-seat regional flying under its new pilot contract.

productivity at Pinnacle compared to the Comparator Group and often require more pilots and more payable hours by Pinnacle than required by its competitors to fly comparable routes and aircraft.  In Ex. 1a, Pinnacle Current Pilot Work Rules vs. DCI Carriers – More/Less Favorable Comparison, and Ex. 2a, Pinnacle Current Pilot Work Rules vs. OALs – More/Less Favorable Comparison, more than 40 different work rules at Pinnacle are evaluated against the comparable provisions at each of the 11 airlines in the Comparator Group.  Because some airlines do not have a comparable work rule for every item, those individual comparisons were deemed "not applicable" and did not count toward the total number of comparisons.  Against every comparator, regardless of whether it was a DCI carrier or an OAL carrier, the majority of the surveyed work rules are less favorable at Pinnacle.  For example, when compared to low cost regional airline competitors GoJet and Compass, 32 (or 76 percent) and 25 (or 58 percent) of the comparable work rules, respectively, are more restrictive, or less favorable, to Pinnacle.  Overall, in about 60 percent of the applicable comparisons (63 percent at DCI carriers), Pinnacle work rules were found to be less favorable to the Company than those of its competition.  Only 17 percent of those work rules surveyed by Pinnacle are more favorable to the Company than those of other regional airlines.  As explained above, the classification "less favorable" means that the work rule is more restrictive and thus, generally more costly to the Company.

36.  **Section 1113 Proposal.**  Pinnacle's proposed work rules shift a number of the surveyed rules from being less favorable, to being comparable or more favorable than the work rules at the other carriers.  Even taking into account Pinnacle's 1113 proposal, only about half of the surveyed work rules are more favorable to Pinnacle than the other regional airlines.  *See* Ex. 3a, Pinnacle Proposed Pilot Work Rules vs. DCI Carriers – More/Less Favorable

Comparison, and Ex. 4a, Pinnacle Proposed Pilot Work Rules vs. OALs – More/Less

Favorable Comparison.  This shift will improve pilot productivity, placing Pinnacle on

generally equal terms with the Comparator Group.  The Company's proposal helps Pinnacle

narrow the productivity gap between Pinnacle and the Comparator Group.

### B.     Flight Attendants

#### 1.     Compensation

37.  **Current Contract Terms.**  As noted in Section VII of this declaration, Pinnacle's

flight attendant pay scale is on a par with other DCI and OAL regional airlines, although this

does not take account of Pinnacle's seniority disadvantage.

38.  **Section 1113 Proposal.**  Pinnacle is proposing a 5 percent pay cut for flight

attendants – the same or lower than every other employee group – and a reduction in the

longevity scale from 16 to 12 years.  The reduction in the longevity scale will help Pinnacle

address its seniority disadvantage to low cost regional airlines like Compass and GoJet.

#### 2.     Work Rules

39.  **Current Contract Terms.**  The following provisions constrain flight attendant

productivity as compared to those of other DCI and OAL carriers:  holiday pay, per diem,

vacation accrual, pay and credit for recurring training, open time posting, customs credit, and

minimum days for part-time flight attendants.  Many of these and other flight attendant work

rules result in higher costs and require Pinnacle to keep more flight attendants on the active

payroll to cover its operational needs.  I evaluated 18 work rules at Pinnacle against the

comparable provisions at each of the 11 comparator airlines.  *See* Ex. 5a, Pinnacle Current

Flight Attendant Work Rules vs. DCI Carriers – More/Less Favorable Comparison, and Ex. 6a,

Pinnacle Current Flight Attendant Work Rules vs. OALs – More/Less Favorable Comparison.

Because some airlines do not have a comparable work rule for every item, those individual

comparisons were deemed "not applicable" and did not count toward the total number of comparisons. Against every comparator, the majority of the surveyed work rules are less favorable at Pinnacle. For example, when compared to GoJet and Compass, 57 percent and 67 percent of the comparable work rules, respectively, are more restrictive, or less favorable to Pinnacle. In more than 63 percent of the applicable comparisons, Pinnacle was found less favorable than its regional airline competition.

40. **Section 1113 Proposal.** Pinnacle's proposal will improve its flight attendant productivity and close the gap between Pinnacle and the Comparator Group. While some of the work rules shift from being less favorable to being comparable or more favorable under the proposed terms, the flight attendant work rules at Pinnacle will generally be in line with those of the Comparator Group. Forty-four percent of work rule comparisons will be more favorable at Pinnacle, but around 18 percent will still be more favorable at other airlines. The remaining 38 percent of the individual comparisons indicate that Pinnacle's work rules are comparable to the other regional airlines. The proposed modifications will place Pinnacle at a competitive position within the industry with respect to its work rules. *See* Ex. 7a, Pinnacle Proposed Flight Attendant Work Rules vs. DCI Carriers – More/Less Favorable Comparison; Ex. 8a, Pinnacle Proposed Flight Attendant Work Rules vs. OALs – More/Less Favorable Comparison.

### C.    Employee Benefits

41. **Current Contract Terms:  Medical Benefit Plans.** Health care costs are a critical problem for employers in the United States. The airline industry is not immune from this problem, and the Comparator Group continues to attempt to address this by modifying plan designs and increasing employee contributions to health care plan premiums. Because health care plan design features are somewhat interdependent, it is difficult to assess whether discrete

plan design features are more or less favorable to Pinnacle. In my opinion, however, when comparing Pinnacle's current active medical plan provisions to the plans offered by other DCI carriers and the OALs, Pinnacle's employee contribution level is not competitive. Pinnacle's employees currently contribute an average of about 26 percent toward their healthcare coverage (27 percent for the Open Access Plan ("OAP"); 25 percent for Health Reimbursement Arrangement Plan ("HRA")). This is a smaller percentage than the contribution percentages required by many of the DCI and OAL airlines, especially for pilots.

42.    **Current Contract Terms:  Future Retiree Medical Benefits.**  Currently, Pinnacle is one of the few regional airlines to offer medical plans to its retirees. Only two of the six other DCI carriers offer retiree medical benefits.

43.    **Current Contract Terms:  Retirement Income Plans.**  As for retirement plans, Pinnacle's current 401(k) plan is the most generous in the regional industry. At the top of scale, if an employee contributes 12.5 percent of his or her salary to the 401(k) plan, the Company is required to match the contribution. No other regional airline requires this level of company contribution.

44.    **Current Contract Terms:  Profit Sharing Plan.**  Most airlines in the Comparator Group do not have detailed profit sharing plans in their contracts. Typically, profit sharing plans can be changed or modified at the discretion of the Company.

45.    With very few exceptions, the benefit provisions at Pinnacle are currently less favorable than those of all of the Comparator Group. *See* Ex. 1b, Pinnacle Current Pilot Benefits vs. DCI Carriers – More/Less Favorable Comparison; Ex. 2b, Pinnacle Current Pilot Benefits vs. OALs – More/Less Favorable Comparison; Ex. 5b, Pinnacle Current Flight

Attendant Benefits vs. DCI Carriers – More/Less Favorable Comparison; Ex. 6b, Pinnacle

Current Flight Attendant Benefits vs. OALs – More/Less Favorable Comparison.

46.   **Section 1113 Proposal.**  Pinnacle's Section 1113 proposals covering active

medical plans, retiree medical plans for future retirees, and retirement plans will put Pinnacle

on par with the Comparator Group.  Pinnacle's proposed profit sharing plan for pilots and

flight attendants would be the most generous in the regional airline industry and would

guarantee employees a share in the future profits of the Company.[15]

## V.   CARRIERS IN BANKRUPTCY CANNOT AIM FOR "AVERAGE" CONTRACT PROVISIONS WHEN SEEKING LABOR COST REDUCTIONS

47.   The Airline Deregulation Act of 1978 was expected to, and did, introduce intense

competition in all segments of the U.S. airline industry.  The first phase of deregulation, from

1978 through September 11, 2001, led to dramatic changes in the industry.  Many carriers who

could not compete effectively simply failed – including those who were not able to lower their

labor costs through consensual agreements with the historically strong airline labor unions.

Over the past decade, however, even those carriers that had successfully navigated the first

phase of deregulation have been challenged more harshly than ever before, both by increased

competition and by external events beyond anyone's expectation – especially the events of

September 11, 2001 and their dramatic consequences for the aviation industry – as well as

multiple recessions, wars, epidemics, tsunamis, and earthquakes, all combined with

unprecedented increases and volatility in the price of fuel.

---

[15] American Eagle's profit sharing plan agreed to in the recently ratified flight attendant agreement and provided in the pilot Agreement in Principle ("AIP") provides between 5 and 25 percent of a profit sharing pool for various levels of AE profit margins.  Pinnacle's proposal provides 10 percent of a bonus pool for profit margins up to 4 percent and 15 percent for profit margins above 4 percent.

48.    These challenges have severely impacted the regional airline industry, creating an extremely difficult environment in which to operate during the past decade.  Major airlines[16] have dramatically reduced capacity since 2001, restructured their labor contracts, and sought cost savings from every aspect of their business.  Thousands of mainline pilots have been furloughed, leaving regional airline pilots with few, if any, flying opportunities at mainline airlines, resulting in increased seniority at the regionals and corresponding higher payroll costs.  With more senior pilots came union demands for higher pay, better benefit plans, and more restrictive work rules.

49.    As the Executive Vice President and Chief Human Resources Officer at US Airways, I had firsthand experience with the Chapter 11 bankruptcy process as my former employer went through two court-sponsored restructurings.  In addition, I have been involved with the bankruptcy proceedings of Hawaiian Airlines in 1993, Independence Air in 2005, and Frontier Airlines in 2008.  I served as chief negotiator for all four of those carriers during their bankruptcy proceedings.  In addition, I have advised several other airlines as they restructured their labor costs.  As a result, I have become very familiar with the dynamics of collective bargaining during bankruptcy and how organized labor reacts to airline proposals for labor cost reductions.

50.    What I learned at US Airways and observed by watching the restructurings at other airlines is that airline unions consistently argue that the carrier has asked for too much and that the labor cost reductions proposed by the carrier are not truly "necessary" for a

---

[16] According to the Code of Federal Regulations, there are three main carrier groupings.  A carrier's classification to one of these groups is based upon the carrier's level and nature of operations, which is determined by its total operating revenues.  Carriers with total annual operating revenues of $1 billion or more are in "Carrier Group III," often referred to as "Major Airlines."

successful reorganization.  Many times, eager for consensual agreements rather than

confrontation, carriers have settled – at least initially – for less than what was truly needed,

only to be forced by economic realities to return in relatively short order to the bargaining table

for greater labor cost reductions.

A.    **Regional Carrier Labor Cost Reductions in Bankruptcy Over the Past Decade**

51.    In the past decade, three regional carriers have filed for and subsequently emerged

from Chapter 11 bankruptcy protection.  Comair filed in September 2005 and emerged in April

2007; Mesaba filed in October 2005 and emerged in April 2007; and Mesa filed in January

2010 and emerged in March 2011.[17]  While Mesa did not need labor concessions during its

restructuring because the terms of its collective bargaining agreements were already at the

bottom of the industry, Comair and Mesaba each achieved concessionary agreements with their

labor groups.  In addition to these three in the past decade, Piedmont and PSA were

restructured during the initial US Airways bankruptcy just over 10 years ago.  While these two

subsidiaries of US Airways participated by taking minimal cuts during the initial bankruptcy

filing, any additional cuts were deemed to be relatively insignificant to the big picture and,

therefore, additional cuts were not taken in subsequent rounds of restructuring.  Finally,

American Eagle filed for Chapter 11 bankruptcy protection as a result of the American Airlines

filing on November 29, 2011, but has not yet emerged and the final result of its restructuring

has yet to be determined.

---

[17] This list does not include Independence Air, which filed under Chapter 11 in November 2005 but subsequently filed under Chapter 7 and ceased operations in January 2006, or Gulfstream International Airlines, which filed for Chapter 11 in November 2010 and was subsequently purchased by asset management company Victory Park Capital and was rebranded Silver Airways.  It also does not include carriers that went straight to Chapter 7:  CCAir, Midway, Chicago Express, and Great Plains Airlines.

52.   Unlike the mainline carriers, (see paragraphs 54-56) when Comair and Mesaba negotiated and settled with labor just prior to or during bankruptcy, the resulting pay rates, work rules, and benefits did not greatly effect their relative standing in most areas and generally did not end up at the "bottom of the pack" when compared to their peer set.  In the case of Comair, the initial round of restructuring with its pilots and flight attendants did not give it the level of relief necessary to emerge from bankruptcy with a healthy enough structure, resulting in an additional round of labor concessions.  While this demonstrates the importance of gaining sufficient labor cost reductions during restructuring in order to eliminate the need to go through additional painful rounds of concessions, even going through two rounds of restructuring ultimately proved insufficient to save the airline.  Comair's shutdown has been attributed to its aging aircraft, cost structure, and the bleak outlook for 50-seat regional flying.[18]  Pinnacle finds itself facing the same challenges and must act decisively to avoid a fate similar to Comair.

53.   To illustrate the point that regional airlines have generally emerged from bankruptcy with pay and other provisions which did not provide sufficient cuts to sustain their business plan, I took the pre-bankruptcy pay rates of Comair and Mesaba and compared them to their rates after their restructurings.  In general, the airlines' relative position within their peer set dropped only a few positions.  In addition to pay rates, I looked at other measurable work rule and benefit provisions of the two carriers both pre-bankruptcy and post-restructuring.

---

[18] "The discontinuation of Comair's operations is in no way a failure or a reflection of your work – it is an unfortunate necessity due to the economic limitations of our aging aircraft, cost structure, the long-term outlook for 50-seat aircraft, and our challenging industry and economy," Comair President Ryan Gumm said in a memo that announced the shutdown to workers.  *See* Mem. from Ryan Gumm to all Comair employees, dated July 27, 2012, available at http://travel.usatoday.com/flights/post/2012/07/full-text-delta-comair-memo/813348/1.

Again, for rule changes at Comair, there was a modest to minimal decline in their relative

position after restructurings were completed.  *See* Exhibits 9a, 9b, 9c, and 9d (reproduced

below) for pre- and post-restructuring rankings for Comair and Mesaba pilots and flight

attendants.  Mesaba made no meaningful pilot work rule changes, as its rule changes were only

temporary in nature or had no measurable impact.

Exhibit 9a

### Comair Pilots

### Prior to Filing Bankruptcy
### Bankruptcy filed September 14, 2005

| | Comair | Air Wisconsin | American Eagle | ASA | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Comair |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 5/21/2006 | 10/1/2011 | 1/1/2013 | 9/15/2002 | 11/30/2008 | 9/19/2007 | 1/31/2009 | 10/17/2007 | | 7/31/2006 | Relative |
| Eff Date | 6/22/2004 | 10/1/2005 | 1/1/2005 | 9/14/2002 | 12/1/2004 | 9/19/2004 | 1/31/2005 | 10/1/2005 | | 8/1/2005 | Rank |
| Aircraft Type | CRJ-70 | 51-70 Seat | CRJ-70 | CRJ-70 | | CRJ-70 | RJ 85 | 60-78 Seat | | | |
| Rate (18th Yr) | $113.12 | $97.11 | $94.24 | $102.59 | | $90.12 | $94.48 | $99.24 | | | 1 |
| Aircraft Type | CRJ-50 | CRJ-50 | ERJ145 | CRJ-50 | ERJ145 | 50-59 Seat | 40-59 Seat | ERJ145 | | ERJ145 | |
| Rate (15th Year) | $92.38 | $83.66 | $89.53 | $81.98 | $84.95 | $77.79 | $83.83 | $87.33 | | $81.54 | 2 |
| Per Diem | $1.75 | $1.40 | $1.55 | $1.50 | $1.60 | $1.21 | $1.50 | $1.55 | | $1.40 | 1 |
| Vacation Pay | 3:00 | 3:00 | 3:45 | 2:40 | 3:45 | 3:00 | 2:51 | 4:00 | | 3:00 | 5 |
| Reserve Days Off | 137 | 144 | 132 | 120 | 137 | 96 | 132 | 132 | | 120 | 2 |
| | | | | | | | | | | | |
| Top Of Scale | 18 | 20 / 18 | 18 | 18 / 15 | 18 | 20 / 15 | 18 | 18 | | 15 | |

### As of Final Restructuring Agreement
### Effective March 2, 2007

| | Comair | Air Wisconsin | American Eagle | ASA | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Comair |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 3/1/2011 | 10/1/2011 | 1/1/2013 | 9/15/2002 | 11/30/2008 | 9/19/2007 | 1/31/2009 | 10/17/2007 | | 7/31/2006 | Relative |
| Eff Date | 3/2/2007 | 10/1/2006 | 1/1/2007 | 9/14/2002 | 12/1/2004 | 9/19/2006 | 12/1/2006 | 10/1/2006 | | 8/1/2005 | Rank |
| Aircraft Type | CRJ-70 | 51-70 Seat | CRJ-70 | CRJ-70 | | CRJ-70 | RJ 85 | 60-78 Seat | | | |
| Rate (18th Yr) | $98.98 | $98.57 | $98.43 | $102.59 | | $88.97 | $91.08 | $101.22 | | | 3 |
| Aircraft Type | CRJ-50 | CRJ-50 | ERJ145 | CRJ-50 | ERJ145 | 50-59 Seat | CRJ-50 | ERJ145 | | ERJ145 | |
| Rate (15th Year) | $85.22 | $86.37 | $93.51 | $81.98 | $89.25 | $79.34 | $81.23 | $89.08 | | $81.54 | 6 |
| Per Diem | $1.55 | $1.50 | $1.65 | $1.60 | $1.70 | $1.27 | $1.55 | $1.65 | | $1.40 | 6 |
| Vacation Pay | 2:52 | 3:00 | 3:45 | 3:00 | 3:45 | 3:00 | 2:51 | 2:34 | | 3:00 | 8 |
| Reserve Days Off | 132 | 144 | 132 | 132 | 137 | 96 | 132 | 132 | | 120 | 3 |
| | | | | | | | | | | | |
| Top Of Scale | 18 | 20 / 18 | 18 | 18 / 15 | 18 | 20 / 15 | 18 | 20 | | 15 | |

Exhibit 9b

### Comair Flight Attendants

#### Prior to Filing Bankruptcy
#### Bankruptcy filed September 14, 2005

|  | Comair | Air Wisconsin | American Eagle | ASA | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Comair |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 7/19/2007 | 10/1/2008 | 9/2/2002 | 9/26/2003 | 12/31/2004 | 6/13/2006 | 3/31/2006 | 9/1/2009 |  | 7/31/2006 | Relative |
| Eff Date | 11/19/2004 | 10/1/2005 | 12/31/2001 | 9/1/2003 | 11/1/2003 | 1/31/2005 | 4/1/2005 | 9/1/2005 |  | 7/1/2002 | Rank |
| Rate (15th Year) | $37.95 | $31.77 | $27.63 | $32.00 | $31.00 | $27.44 | $28.41 | $30.25 |  | $23.50 | 1 |
| Per Diem | $1.75 | $1.55 | $1.55 | $1.50 | $1.40 | $1.24 | $1.50 | $1.55 |  | $1.15 | 1 |
| Top Of Scale | 18 | 27 | 13 | 15 | 15 | 18 | 14 | 15 |  | 11 | |

#### As of Final Restructuring Agreement
#### Effective March 2, 2007

|  | Comair | Air Wisconsin | American Eagle | ASA | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Comair |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 12/31/2010 | 10/1/2008 | 10/27/2009 | 9/26/2003 | 7/31/2010 | 6/13/2006 | 12/1/2010 | 9/1/2009 |  | 7/31/2006 | Relative |
| Eff Date | 12/31/2006 | 10/1/2006 | 10/27/2006 | 9/1/2003 | 8/1/2006 | 1/31/2006 | 12/1/2006 | 9/1/2006 |  | 7/1/2002 | Rank |
| Rate (15th Year) | $36.33 | $32.41 | $31.31 | $32.00 | $37.55 | $28.12 | $27.64 | $31.01 |  | $23.50 | 2 |
| Per Diem | $1.55 | $1.55 | $1.65 | $1.50 | $1.65 | $1.27 | $1.35 | $1.60 |  | $1.15 | 5 |
| Top Of Scale | 18 | 27 | 13 | 15 | 15 | 18 | 14 | 15 |  | 11 | |

Exhibit 9c

### Mesaba Pilots

#### Prior to Filing Bankruptcy
#### Bankruptcy filed October 13, 2005

|  | Mesaba | Air Wisconsin | American Eagle | ASA | Comair | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Mesaba |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 1/31/2009 | 10/1/2011 | 1/1/2013 | 9/15/2002 | 5/21/2006 | 11/30/2008 | 9/19/2007 | 1/31/2009 | 10/17/2007 |  | 7/31/2006 | Relative |
| Eff Date | 1/31/2005 | 10/1/2005 | 1/1/2007 | 9/14/2002 | 6/22/2004 | 12/1/2004 | 9/19/2004 | 1/31/2005 | 10/1/2005 |  | 8/1/2005 | Rank |
| Aircraft Type | RJ 85 | 51-70 Seat | CRJ 70 | CRJ 70 | CRJ 70 |  | CRJ 70 |  | 60-78 Seat |  |  | |
| Rate (18th Yr) | $94.48 | $97.11 | $94.24 | $102.59 | $113.12 |  | $90.12 | $94.48 | $99.24 |  |  | 5 |
| Aircraft Type | 40-59 Seat | CRJ-50 | ERJ145 | CRJ-50 | CRJ-50 | ERJ145 | 50-59 Seat | 40-59 Seat | ERJ145 |  | ERJ145 | |
| Rate (15th Year) | $83.83 | $83.06 | $89.53 | $81.98 | $92.38 | $84.95 | $77.79 | $83.83 | $87.33 |  | $81.54 | 6 |
| Top Of Scale | 18 | 20 / 18 | 18 | 18 / 15 | 18 | 18 | 20 / 15 | 18 | 18 |  | 15 | |

#### As of Final Restructuring Agreement
#### Effective December 1, 2006

|  | Mesaba | Air Wisconsin | American Eagle | ASA | Comair | ExpressJet | Mesa | Mesaba | Republic / Chautauqua | Skywest | Trans States | Mesaba |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 1/31/2009 | 10/1/2011 | 1/1/2013 | 9/15/2002 | 5/21/2006 | 11/30/2008 | 9/19/2007 | 1/31/2009 | 10/17/2007 |  | 7/31/2006 | Relative |
| Eff Date | 12/1/2006 | 10/1/2006 | 1/1/2007 | 9/14/2002 | 6/22/2004 | 12/1/2004 | 9/19/2004 | 12/1/2006 | 10/1/2006 |  | 8/1/2005 | Rank |
| Aircraft Type | RJ85 | 51-70 Seat | CRJ 70 | CRJ 70 | CRJ-70 |  | CRJ-70 | RJ 85 | 60-78 Seat |  |  | |
| Rate (18th Yr) | $91.08 | $98.57 | $98.43 | $102.59 | $113.12 |  | $88.97 | $91.08 | $101.22 |  |  | 7 |
| Aircraft Type | CRJ-50 | CRJ-50 | ERJ145 | CRJ-50 | CRJ-50 | ERJ145 | 50-59 Seat | CRJ-50 | ERJ145 |  | ERJ145 | |
| Rate (15th Year) | $81.23 | $86.37 | $93.51 | $81.98 | $92.38 | $89.25 | $79.34 | $81.23 | $89.03 |  | $81.54 | 9 |
| Top Of Scale | 18 | 20 / 18 | 18 | 18 / 15 | 18 | 18 | 20 / 15 | 18 | 20 |  | 15 | |

Exhibit 9d



**Mesaba Flight Attendants**

**Prior to Filing Bankruptcy**
**Bankruptcy filed October 13, 2005**

| | Mesaba | Air Wisconsin | American Eagle | ASA | Comair | ExpressJet | Mesa | Republic / Chautauqua | Skywest | Trans States | Mesaba |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 3/31/2006 | 10/1/2008 | 9/2/2002 | 9/26/2003 | 7/19/2007 | 12/31/2004 | 6/13/2006 | 9/1/2009 | | 7/31/2006 | Relative |
| Eff Date | 4/1/2005 | 10/1/2005 | 12/31/2004 | 9/1/2003 | 11/19/2004 | 11/1/2003 | 1/31/2005 | 9/1/2005 | | 7/1/2002 | Rank |
| Rate (15th Year) | $28.41 | $31.77 | $27.68 | $32.00 | $37.95 | $31.00 | $27.44 | $30.25 | | $23.50 | 7 |
| Per Diem | $1.50 | $1.55 | $1.55 | $1.50 | $1.75 | $1.40 | $1.24 | $1.55 | | $1.15 | 6 |
| | | | | | | | | | | | |
| Top Of Scale | 14 | 27 | 13 | 15 | 18 | 15 | 18 | 15 | | 11 | |

**As of Final Restructuring Agreement**
**Effective December 1, 2006**

| | Mesaba | Air Wisconsin | American Eagle | ASA | Comair | ExpressJet | Mesa | Republic / Chautauqua | Skywest | Trans States | Mesaba |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amendable Date | 12/1/2010 | 10/1/2008 | 10/27/2009 | 9/26/2003 | 12/31/2010 | 7/31/2010 | 6/13/2006 | 9/1/2009 | | 7/31/2006 | Relative |
| Eff Date | 12/1/2006 | 10/1/2006 | 10/27/2006 | 9/1/2003 | 12/31/2006 | 8/1/2006 | 1/31/2006 | 9/1/2006 | | 7/1/2002 | Rank |
| Rate (15th Year) | $27.64 | $32.41 | $31.31 | $32.00 | $36.33 | $37.55 | $28.12 | $31.01 | | $23.50 | 9 |
| Per Diem | $1.35 | $1.55 | $1.65 | $1.50 | $1.55 | $1.65 | $1.27 | $1.60 | | $1.15 | 8 |
| | | | | | | | | | | | |
| Top Of Scale | 14 | 27 | 13 | 15 | 18 | 15 | 18 | 15 | | 11 | |

## B.    Major Airline Labor Cost Reductions in Bankruptcy Over The Past Decade

54.    Since 2002, US Airways, United, Delta, and Northwest have all gone through bankruptcy to restructure their costs, including especially their labor costs.[19]  As I did above for the regional airlines, I set forth below a review of the labor terms before and during the Chapter 11 restructurings at US Airways, United, Delta, and Northwest.  This review illustrates that airline unions have consistently sought, and carriers often agreed to, labor cost reductions less than what was truly needed, only to be forced back into concessions negotiations.

55.    Unlike the regional airline analysis above, where the evidence shows changes in pay rates, work rules, and benefits resulted in minimal change in relative position, changes at mainline carriers generally produced a relative result towards or at the bottom of the peer set.

---

[19] Continental Airlines survived phase one of deregulation only because it successfully navigated through two bankruptcy proceedings, the first from 1983-85, and the second from 1990-1992. The major airline unions at Continental launched strikes in opposition to its implementation of new wages and work rules upon filing for Chapter 11.  *See In re Continental Airlines Corp.*, 38 B.R. 67 (Bankr. S.D. Tex. 1984).  Continental survived the bitter strikes with markedly lower labor costs and a largely non-union workforce.

For example, United had the second highest top-of-scale Captain rates for large narrow body

aircraft (B757 or B737 depending on the airline) among a peer set of seven airlines (Alaska,

American, Delta, Continental, Northwest, United, and US Airways).  After its restructurings,

United's top-of-scale Captain pay dropped to the sixth highest out of the seven.  Ex. 10a,

United Captain Narrowbody Top of Scale Pre- and Post-Bankruptcy (reproduced below).  For

flight attendants, United's top-of-scale pay dropped from the fifth lowest to the sixth lowest.

Ex. 10b, United Domestic Flight Attendant Top of Scale Pre- and Post-Bankruptcy

(reproduced below).[20]

**Captain - Largest Narrowbody TOS Hourly Pay**

|  | Equipment | Prior To UA Rsx | 1st UA Rsx (Interim Pay Cut) 1/1/2003 | 2nd UA Rsx 5/1/2003 | 3nd UA Rsx 1/1/2005 |
|---|---|---|---|---|---|
| United | B757 | 242.55 | 172.21 | 169.79 | 149.75 |
| Alaska* | B737 | 181.95 | 181.95 | 189.23 | 196.80 |
| American | B757 | 195.64 | 195.64 | 149.68 | 163.76 |
| Continenta | B757 | 178.66 | 178.66 | 178.66 | 178.66 |
| Delta | B757 | 244.97 | 244.97 | 256.00 | 180.57 |
| Northwest | B757 | 208.49 | 208.49 | 208.49 | 186.97 |
| US Airways | B757 | 185.98 | 171.10 | 164.17 | 144.02 |
| United Rank in Peer Group | | 2 | 6 | 5 | 6 |

*Notes
Alaska operates only B737 narrowbody aircraft.

Ex. 10a, United Captain Narrowbody Top of Scale Pre- and Post-Bankruptcy.

---

[20] *See* Ex. 11 regarding United mechanics and fleet service employees; Ex. 12 regarding Delta groups; Ex. 13 regarding Northwest groups; Ex. 14 regarding US Airways groups.

**F/A - Domestic TOS Hourly Pay**

|  | Prior To UA Rsx | 1st UA Rsx (Interim Pay Cut) 12/31/2002 | 2nd UA Rsx 5/1/2003 | 3nd UA Rsx 1/7/2005 |
|---|---|---|---|---|
| United | 45.02 | 41.35 | 40.97 | 37.08 |
| Alaska* | 47.95 | 47.95 | 47.95 | 47.95 |
| American | 49.12 | 49.12 | 42.70 | 43.34 |
| Continental | 46.87 | 46.87 | 46.87 | 48.15 |
| Delta* | 43.78 | 43.78 | 43.78 | 44.60 |
| Northwest | 46.51 | 46.51 | 46.51 | 49.10 |
| US Airways East* | 40.24 | 40.24 | 38.23 | 32.43 |
|  |  |  |  |  |
| United Rank in Peer Group | 5 | 6 | 6 | 6 |

*Notes
Alaska - Trip rates have been converted to hourly rates on the basis of 1 trip = 52.66 minutes.
Delta - Maximum longevity premium included above: 4/1/04 - $0.80/hr ($60/mo), 1/1/05 - $0.72/hr ($54/mo).
US Airways East - 4/1/03 - $38.23/hr rate reflects temporary 5% pay deferral for Iraq war.

Ex. 10b, United Domestic Flight Attendant Top of Scale Pre- and Post-Bankruptcy.

56.    Equally painful changes were made in work rules and benefits, so the pattern requiring the airline to move aggressively to restructure labor costs has been consistent throughout the industry.  *See* Ex. 15, Mainline Airline Work Rules Pre- and Post-Bankruptcy; Ex. 16, Mainline Airline Retirement Pre- and Post-Bankruptcy.

1.    **US Airways:  Four Rounds of Concessions Over Two Bankruptcies**

57.    **First Bankruptcy (2002-2004).**  The first of the legacy carriers to file for bankruptcy in the past decade was US Airways.  Prior to filing in August 2002, the company asked its labor unions for $850 million in concessions through a combination of wage, benefit, and work rule modifications including:  (1) rollback of wages to 1998 levels; (2) reduction in pension plan benefits; (3) redesign of health and welfare benefit plans to provide, among other things, a single national medical insurance program for all employees; and (4) modifications in work rules to increase productivity.

•    **First Round of Concessions.**  US Airways reached agreements with two of its three major unions prior to bankruptcy, accepting cost reductions totaling 85

percent of the company's "ask." The company agreed to similar terms with the third union shortly after filing for bankruptcy. The pilots' agreement loosened scope clause restrictions, permitting the company's code sharing partners to fly up to 315 medium (45-50 seat) or large (51-70 seat) regional jets (RJ).

- **Second Round of Concessions.** Ongoing operating losses quickly made it apparent, however, that these agreements did not provide the company with the necessary cost levels. Nor had the labor agreements addressed the huge liabilities arising from US Airways' Defined Benefit plan ("DB plan"). As a result, in December 2002, US Airways went back to the bargaining table and reached agreements with each of the three unions for the additional 15 percent in savings the company had sought, but not achieved, from its original proposals during the Summer 2002. This second round of voluntary restructuring agreements with all of its unions netted another $200 million in labor cost savings, largely from changes in work rules and health benefits – although pilots took an additional 8 percent pay reduction on top of the previous cut of 26 to 37.4 percent.

- **Third Round of Concessions.** The December 2002 concessions did not resolve the future of US Airways' DB plans. The company soon realized it could not survive without terminating its DB plans. In March 2003, the company reached an agreement with ALPA to terminate its DB plan, but the DB plans covering other work groups remained in effect.

58. In sum, over the span of less than 10 months, US Airways negotiated three concessionary agreements with ALPA and two with each of its other unions. A subsequent letter of agreement between the two bankruptcies permitted the 76-seat RJ to begin operating at the code sharing partners operating as US Airways Express.

59. **Second Bankruptcy (2004-2005).** About 18 months after emerging from its first Chapter 11 proceeding, US Airways filed for a second time, announcing that it needed $900 million per year in labor cost reductions in addition to those obtained during its first bankruptcy case. US Airways sought and obtained court approval under Section 1113(e) for a 4-month, 21 percent reduction in pay and related savings. Many months later, between September 2004 and January 2005, US Airways' unions agreed to new contracts, called "Transformation Agreements," which provided for slightly lower pay reductions in exchange for more productivity through work rule changes. Among other things, these agreements:

- removed many restrictions on outsourcing, which resulted in the elimination of approximately one-third of the mechanics (almost 1,000 positions), fifteen percent of the stock clerks (61 positions), nearly all utility workers (975 jobs), and 700 Fleet Service positions when ground handling was outsourced at 21 stations;

- provided for termination of all the rest of the employees' remaining DB pension plans; and

- further loosened restrictions in the pilots' scope clause, permitting 60 Regional Jets to be flown with between 90 and 97 seats. Today, US Airways can operate more than 295 regional aircraft with more than 50 seats.

60.    In sum, the restructuring of US Airways was an incredibly painful process, but for the 25,000 employees who retained their jobs in the hopes that the airline would once again be profitable, it proved to be the right decision. In September 2005, US Airways and America West Airlines merged. Today, the combined airline is profitable and projects a secure future.

    2.    **United Airlines:  Three Years in Bankruptcy With Two Rounds of 1113 Motions**

61.    United Airlines entered Chapter 11 in December 2002 and quickly obtained interim relief pursuant to Section 1113(e).[21]  In March 2003, United filed its Section 1113

---

[21] United's pilots and flight attendants agreed to interim wage reductions (pilots: 29 %; flight attendants: 9 %), Mem. in Support of the Debtors' Motion for Interim Relief from their Collective Bargaining Agreements with the IAM Pursuant to Section 1113(e) at 6, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Jan. 8, 2003), and the Court granted interim relief as to IAM-represented agents, mechanics, and fleet service employees (13 percent).  Order Authorizing Interim Relief from the Debtors' Collective Bargaining Agreements with the IAM Pursuant to 11 U.S.C. § 1113(e) at 2 ¶ 5(b), *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Jan. 10, 2003).  The pay cuts saved enough money to help meet immediate requirements of debtor-in-possession financing and provide breathing room for negotiations of permanent restructuring agreements. Mem. in Support of Debtors' Motion to Reject their Collective Bargaining Agreements Pursuant to Section 1113(c) at 11, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003).  In exchange, United agreed to defer filing its 1113 Motion to Reject for an additional ten weeks. Mem. in Support of the Debtors' Motion for Interim Relief from their Collective Bargaining Agreements with the IAM Pursuant to Section 1113(e) at 10, Ex. B at 3-4 ¶ 9, Ex. B at 5 ¶ 13, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Jan. 8, 2003).

motion, seeking total labor cost reductions per year of $2.56 billion, including $1.1 billion in annual savings from pilots alone.[22]

62.    **First Round of Concessions: Spring 2003.**  In March and April 2003, the first round of permanent restructuring agreements was reached with all union groups, yielding $2.2 billion in annual cost reductions.[23]  These agreements continued the deep pay cuts of the interim agreements,[24] but also contained fundamental changes in work rules to achieve savings through greater productivity and efficiency.  United's pilots agreed to reduce or eliminate many of the restrictions in their Scope Clause, including the total ban on flying 70-seat RJs.[25] As a result, today United can operate an unlimited number of regional aircraft of up to 70 seats. In addition, United's pilots and flight attendants agreed to substantial productivity improvements, including:

---

[22] Mem. in Support of Debtors' Motion to Reject their Collective Bargaining Agreements Pursuant to Section 1113(c) at 2, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 18, 2003); Proposed Changes to Airline Pilots Association (ALPA) Agreement for Pilots at 1, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003).

[23] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 2-3 ¶¶ 5-8, 6 ¶ 14, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[24] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 8 ¶ 19, 11 ¶ 26, 14 ¶ 32, 17 ¶ 44, 18 ¶ 47, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[25] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 10 ¶ 24, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

- decreasing the amount of credit for hours not actually flown;[26]

- increasing the scheduled maximum;[27]

- decreasing the monthly guarantee;[28]

- eliminating or reducing a variety of pay premiums;[29]

- changing the vacation scheduling system so that employees were paid only for the days they were on vacation and could no longer stretch out their vacation to get paid for all trips missed due to the vacation;[30]

---

[26] Proposed Changes to Air Line Pilots Association (ALPA) Agreement for Pilots at 12-13, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Proposed Changes to Association of Flight Attendants (AFA) Agreement for Flight Attendants at 24, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion Ex. B at 9, Ex. C at 16, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[27] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 9 ¶ 21, 12 ¶ 28, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[28] Proposed Changes to Air Line Pilots Association (ALPA) Agreement for Pilots at 47-48, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Proposed Changes to Association of Flight Attendants (AFA) Agreement for Flight Attendants at 20, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at Ex. B at 14, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[29] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion Ex. B at 6; Ex. C at 5; *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

•   replacing 5 separate health plans with one redesigned plan, with higher employee contributions.[31]

63.   For ground employees, the International Association of Machinists and Aerospace

Workers, District 143 ("IAM") agreed to greater flexibility to use part-time fleet service

workers[32] and permitted the disposition of the company's Oakland and Indianapolis

maintenance facilities,[33] resulting in the furlough of approximately 1,200 mechanics from the

---

[30] *See* Proposed Changes to Air Line Pilots Association (ALPA) Agreement for Pilots at 18-19, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Proposed Changes to Association of Flight Attendants (AFA) Agreement for Flight Attendants at 38-39, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion Ex. B at 3; Ex. C at 17; *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[31] Proposed Uniform Employee Benefits Plan at 6, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Mar. 17, 2003); Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 9 ¶ 20, 11 ¶ 27, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003).

[32] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 14-15 ¶ 35, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003); Restructuring Agreement Amendment 2003-2009 For The Ramp and Stores Between United Air Lines, Inc. and District Lodge 141 International Association of Machinists And Aerospace Workers at 9 Art. VI.B (May 1, 2003).

[33] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association, Association of Flight Attendants, International Association of Machinists and Aerospace Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union and to Withdraw their Section 1113(c) Motion at 15 ¶ 36, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 30, 2003); UAL/IAMAW District 141M Restructuring Agreement Amendment 2003—2009 Mechanics, Fleet Technical Instructors, and Maintenance Instructors at 7-8 Art. II-D (July 11, 2003).

closure of the Indianapolis facility alone.[34]  In addition, the IAM agreed to allow contracting

out of certain heavy maintenance visits and to eliminate a restriction on the outsourcing of

work that would result in the furlough of any IAM employee.[35]

      64.  **Second Round of Concessions:  November 2004.**  Approximately 18 months

after achieving its first round of labor cost reductions – and during the same bankruptcy

proceeding – in November 2004, United filed Section 1113 motions for the second time,

stating it needed an additional $725 million per year in labor cost savings.[36]  Pilot pay rates

were cut by an additional 11.8 percent, but the bulk of the savings were achieved from benefit

changes and work rule changes.[37]  In addition to the $725 million of direct labor cost

---

[34] Louis Uchitelle, "*Retraining Laid-Off Workers, but for What?*" NEW YORK TIMES ONLINE
(Mar. 26, 2006) available at
http://www.nytimes.com/2006/03/26/business/yourmoney/26lou.html?_r=1&pagewanted=print;
Bloomberg BNA Daily Labor Report, "Furlough Benefits Granted to Mechanics At Indianapolis
Site Under United Settlement," 65 DLR A-10 (Apr. 4, 2003).

[35] Debtors' Agreed-To Motion to Approve the Modifications to their Collective Bargaining
Agreements Pursuant to the Restructuring Agreements with the Air Line Pilots Association,
Association of Flight Attendants, International Association of Machinists and Aerospace
Workers, Professional Airline Flight Controllers Association, and the Transport Workers Union
and to Withdraw their Section 1113(c) Motion at 15 ¶ 36, *In re UAL Corp.*, No. 02-B-48191
(N.D. Ill. Apr. 30, 2003); UAL/IAMAW District 141M Restructuring Agreement Amendment
2003—2009 Mechanics, Fleet Technical Instructors, and Maintenance Instructors at 7-8 Art. II-
D (July 11, 2003).

[36] Debtors' Motion for Authority to Reject Their Collective Bargaining Agreements Pursuant to
Section 1113(c) at 3 ¶ 4, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Nov. 24, 2004).

[37] *See* Debtors' Emergency Motion to Approve Agreements Modifying their Collective
Bargaining Agreements with (A) The Air Line Pilots Association; (B) The Association of Flight
Attendants; and (C) The Aircraft Mechanics Fraternal Association at 5 ¶ 10, *In re UAL Corp.*,
No. 02-B-48191 (N.D. Ill. Jan. 19, 2005); Mem. in Support of the Debtors' Emergency Motion
for Interim Relief from their Collective Bargaining Agreement with AMFA Pursuant to Section
1113(e) at 4, 13, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Jan. 31, 2005).

reductions realized from changes to the labor contracts, the PBGC reached a settlement with

United, agreeing to the involuntary termination of all of United's DB pension plans.[38]

### 3.    Delta Airlines:  Two Rounds of Concessions – Once Before Bankruptcy and Again During Bankruptcy

65.   **Pre-Bankruptcy Concessions.**[39]  Beginning in early 2003, Delta asked its pilot

union for an immediate $600 million pay cut, pension changes, and other concessions, together

totaling $1 billion.[40]  These negotiations extended until Delta was on the brink of a bankruptcy

filing in October 2004.[41]  At that point, Delta's pilots, represented by ALPA, agreed to a

restructuring plan that saved Delta $1 billion per year, including a 32.5 percent pay cut and

numerous changes in pilot work rules, resulting in greater efficiencies in staffing and

scheduling.[42]

---

[38] Debtors' Emergency Motion to Approve Agreement with PBGC at 1 ¶ 1, *In re UAL Corp.*, No. 02-B-48191 (N.D. Ill. Apr. 26, 2005).

[39] With the exception of pilots and dispatchers, Delta's employees are largely nonunion.  Decl. of Geraldine P. Carolan in Support of Motion to Reject ALPA Collective Bargaining Agreement at 4-5 ¶ 7, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 1, 2005).  As a result, Delta was able to effectuate much of its labor cost restructuring unilaterally.  *See* Mem. in Support of Motion to Reject ALPA Collective Bargaining Agreement at 1-2, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 1, 2005).  Delta also outsources much of its ground handling and maintenance work to its affiliate DAL Global Services and to independent companies.  *See* Marilyn Adams, *Delta to outsource more jet maintenance*, USA TODAY, March 29, 2005, available at http://www.usatoday.com/money/biztravel/2005-03-29-delta-cuts_x.htm; *see also* Press Release, Airport Terminal Services, ATS Announces Delta Contract Award in RSW (Aug. 1, 2005), available at http://www.atsstl.com/news_item.asp?newsID=27.  Thus, Delta was able to accomplish pre-bankruptcy many of the cost reductions that other airlines had to achieve in the 1113 process with their fleet service and mechanics unions.

[40] Decl. of Geraldine P. Carolan in Support of Motion to Reject ALPA Collective Bargaining Agreement at 18-19 ¶¶ 26-27, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 1, 2005).

[41] *Id.* at 19 ¶ 28.

[42] *Id.* at 19-20 ¶¶ 28-29.

66.    **Further Concessions During Bankruptcy.**  Less than one year later, Delta's

pilot and other labor cost reductions proved insufficient, and on September 14, 2005, Delta

filed for bankruptcy protection.[43]  Upon filing, Delta announced that it planned to lay off

between 7,000 to 9,000 of its 52,000 employees in bankruptcy.[44]  In November 2005, Delta

filed a Section 1113 motion to reject the pilot and dispatcher collective bargaining

agreements.[45]  Delta proposed additional pilot labor cost reductions of $325 million per year.[46]

In April 2006, Delta and ALPA[47] reached an agreement that saved Delta an additional $280

million per year,[48] including:

- an additional 14 percent pay cut;[49]

- agreement that the pilots would not oppose termination of their Defined Benefit
  plan;[50]

---

[43] Voluntary Petition for Bankruptcy, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Sep. 14, 2005).

[44] Second Decl. of Edward H. Bastian in Support of Motion to Reject ALPA Collective Bargaining Agreement at 15 ¶ 30, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 1, 2005).

[45] Motion to Reject ALPA Collective Bargaining Agreement, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 1, 2005).

[46] *Id.* at 2 ¶ 6.

[47] In 2005, Delta's flight superintendents (dispatchers), represented by the Professional Airline Flight Control Association (PAFCA), agreed to concessions and a freeze of its DB plan.  *See* Delta's Reply in Support of Motion to Reject ALPA Collective Bargaining Agreement at 5, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. Nov. 14, 2005).

[48] Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Enter into Amendments to Pilot Working Agreement with Air Line Pilots Association, International at 5, 11, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. May 9, 2006).

[49] Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Enter into Amendments to Pilot Working Agreement with Air Line Pilots Association, International at 5, 12, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. May 9, 2006).

[50] Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Enter into Amendments to Pilot Working Agreement with Air Line Pilots Association, International at 6, 14, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. May 9, 2006).

- changes to the pilot scope clause to permit Delta to greatly increase its regional jet connections, up to 200 70-seat and 76-seat jets.[51]

    4.    **Northwest Airlines:  Two Rounds of Labor Cost Reduction Agreements – Once Pre-Bankruptcy and Once During Bankruptcy**

67.  **Pre-Bankruptcy Labor Cost Reductions.**  Northwest sought consensual labor cost reductions from each of its unions in 2003 and 2004.[52]  Northwest achieved the first step of its labor cost restructuring in December 2004 when ALPA agreed to consensual cost reductions of $265 million per year, primarily from a 15 percent pay cut.[53]  The parties called this agreement a "Bridge Agreement" because of their understanding that further labor cost reductions might be necessary once Northwest's other unions agreed to reductions.[54]  Subsequently, in August 2005, Northwest's AMFA-represented mechanics launched an unsuccessful strike.[55]  In response, Northwest implemented labor cost savings of $203 million a year, largely from contracting out the vast majority of its line and base maintenance.[56]  As a

---

[51] Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code for Authority to Enter into Amendments to Pilot Working Agreement with Air Line Pilots Association, International at 6, 13, *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (S.D.N.Y. May 9, 2006).

[52] Decl. of Douglas M. Steenland at 4-5 ¶ 8, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Sep. 14, 2005).

[53] *Id.* at 17 ¶ 28; Decl. of Daniel M. Kasper in Support of Northwest's Application to Reject Collective Bargaining Agreements Pursuant to Section 11 U.S.C. § 1113(c) and Northwest's Application to Modify Retiree Benefits Pursuant to Section 11 U.S.C. § 1114(f) and (g) at 7, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Dec. 20, 2005).

[54] Decl. of Douglas M. Steenland at 17 ¶ 28, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Sep. 14, 2005).

[55] *Id.* at 5 ¶ 8.

[56] Northwest's Application to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(c) at 27, n.29, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Oct. 12, 2005).

result, Northwest's mechanics workforce decreased from 4,400 in August 2005 to 880 in December 2005.[57]

68.    **Further Labor Cost Reductions During Bankruptcy.**  Northwest filed for bankruptcy on September 14, 2005 (the same day that Delta filed).[58]  In its filing, Northwest said it required labor cost reductions of $1.4 billion per year, including the $265 million in pilot concessions achieved in 2004.[59]  Northwest filed a Section 1113 Motion on October 12, 2005 to reject all of its labor contracts.[60]  Prior to a ruling on the motion:

- In March 2006, ALPA reached agreement for a second permanent restructuring agreement, providing $358 million in annual cost savings and removed restrictions that had banned (with limited exceptions) regional jets with over 55 seats, and had capped the number of 50-seat RJs at 104.[61]  These changes were in *addition* to (a) the $265 million per year achieved in a pre-petition agreement and (b) agreement to freeze the pilots' Defined Benefit pension plan.[62]

- In March 2006, IAM-represented agents and clerical workers approved a long-term restructuring agreement;[63] and in June 2006, ramp workers approved a long-

---

[57] *See* John Schmeltzer, *Deal set to end Northwest strike*, CHICAGO TRIBUNE, Oct. 10, 2006 available at http://articles.chicagotribune.com/2006-10-10/business/0610100275_1_aircraft-mechanics-fraternal-association-mechanics-at-united-airlines-layoff-status.

[58] Voluntary Petition for Bankruptcy, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Sep. 14, 2005).

[59] Northwest's Application to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(c) at 50-51, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Oct. 12, 2005).

[60] *Northwest's Application to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(c), In re Northwest Airlines Corp., No. 05-17930-alg (S.D.N.Y. Oct. 12, 2005)*.

[61] Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief Under Section 1113(c) of the Bankruptcy Code and Approval of Agreements with the Airline Pilots Association, International ("ALPA") at 8-9 ¶ 20, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. May 31, 2006).

[62] *Id.* at 6 ¶ 13.

[63] Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief under Section 1113(c) of the Bankruptcy Code and Approval of Agreements with the IAM at 6 ¶ 13, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. June 2, 2006).

term restructuring agreement.[64]  In total these IAM restructuring agreements saved a combined total of $191 million per year.[65]

- Flight attendants rejected two tentative agreements which would have saved the company an additional $195 million per year.[66]  The Bankruptcy Court then granted Northwest's Motion to Reject the flight attendant agreement and Northwest implemented cost savings of $195 million per year.[67]  Nearly a year later, flight attendants finally approved a permanent restructuring agreement saving the Company $195 million per year.[68]

In sum, during bankruptcy, pilot pay was cut by an ***additional*** 28 percent, flight attendant pay by 21 percent and, for these groups, Northwest also achieved numerous work rule changes to secure greater productivity, including increasing the maximum number of hours and reducing pay for "soft time."  At the same time, the IAM-represented office, clerical, fleet, and passenger service employees contributed with pay cuts of 11.5 percent and agreed to enhanced productivity, including increased use of part-time and subcontracting.[69]  To deal with unfunded pension

---

[64] *Id.* at 6 ¶ 15.

[65] The Labor Relations Advisor, "Northwest and IAM Ramp Workers Reach Agreement" (March 2006), available at *http://www.fhsolutionsgroup.com/files/LABOR_REL_JUNE06.pdf.*

[66] Debtors' Mem. of Points and Authorities in Opp. to the Association of Flight Attendants-CWA's Motion for Relief from the Judgment and Order Authorizing Debtors to Reject their Collective Bargaining Agreement covering Flight Attendants, at 7-8, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. March 2, 2007).

[67] *See id.*  Northwest's proposals on early out program, profit sharing, and the bankruptcy claim allotted to flight attendants were not implemented until a consensual agreement was finally reached and ratified.

[68] Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and Agreements with the Association of Flight Attendants-CWA ("AFA") at 8 ¶ 24, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. May 14, 2007); *see also* Sharon L. Levine & S. Jason Teele, "Decisions under § 1113 in the Northwest Airlines Bankruptcy Case May Have Lasting Consequences" available at www.abiworld.org/committees/newsletters/pensionsbenefits/vol2num3/Decisions.html; Bloomberg BNA Daily Labor Report, "AFA Members Ratify Agreement, Becoming Last Union to Agree to Cost Cuts", 104 DLR A-1 (May 31, 2007).

[69] Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief under Section 1113(c) of the Bankruptcy Code and Approval of

liabilities of approximately $3.8 billion ($3 billion due between 2005 and 2007), Northwest froze

its Defined Benefit Pension Plans.[70]  It effected savings in medical benefits, e.g., a 25% sharing

of cost by active employees, 50% for retired employees under 65, and eliminated retiree medical

benefits for retirees over 65.[71]

5.    **Continental Air Lines:  Even More Concessions Years After Two Bankruptcies**

69.    Continental filed bankruptcy twice, the first time in 1983 and the second in 1990.

During its first bankruptcy, Continental rejected all of its labor contracts and dramatically

reduced its labor costs.  Many years later, Continental was the last of the six major legacy

airlines to pursue labor concessions from its unions in the post-9/11 financial crisis.  In March

2003, Continental announced that it was seeking $500 million per year in labor cost reductions

---

Agreements with the IAM at 7 ¶ 17, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. June 2, 2006).

[70] *See, e.g.,* Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief Under Section 1113(c) of the Bankruptcy Code and Approval of Agreements with the Airline Pilots Association, International ("ALPA") at 6 ¶ 13, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. May 31, 2006); Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief under Section 1113(c) of the Bankruptcy Code and Approval of Agreements with the International Association of Machinists and Aerospace Workers, District 143 ("IAM") Ex. 1 at 7 ¶ 19, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. June 2, 2006); Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and for Relief under Section 1113(c) of the Bankruptcy Code and Approval of Agreements with the International Association of Machinists and Aerospace Workers, District 143, Ex. 2 at 6 ¶ 18, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. June 2, 2006); Northwest's Application to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(c) at 46, *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. Oct. 12, 2005).

[71] *See, e.g.*, Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Compromise and Agreements with the Association of Flight Attendants-CWA ("AFA") Ex. A at 29.3 § A(1)(c), 29.9 § B(2)(d), *In re Northwest Airlines Corp.*, No. 05-17930-alg (S.D.N.Y. May 14, 2007).

to avoid a third bankruptcy,[72] $331 million from union-represented employees.[73]  In March 2005, ALPA-represented pilots agreed to contribute $213 million per year,[74] through an 8.9 percent pay cut[75] and work rule changes to allow the carrier more flexibility in scheduling, such as a preferential bidding system.[76]  The pilots' defined benefit pension plan was frozen and replaced by a defined contribution plan.[77]  Mechanics agreed to a 4 percent pay cut and caps on benefits.[78]  Flight attendants represented by IAM voted down a tentative agreement in March, 2005, but reached a new agreement in December 2005 which provided for a four year pay freeze and saved Continental $72 million per year, largely through cuts in benefits and changes in work rules.[79]  The IAM agreed that Continental would contribute to the IAM Multi-employer Plan in place of a frozen Continental DB Plan.[80]

---

[72] Continental Airlines News Release, Continental Airlines Cuts Senior Management 25 Percent, Cuts 1,200 Other Jobs, Targets $500 Million Additional Cost Savings" (March 19, 2003), available at http://phx.corporate-ir.net/phoenix.zhtml?c=85779&p=irol-newsArticle&ID=553417; Bloomberg BNA Daily Labor Report, "Continental Announces Tentative Deals On Concessions With Four Unions," 39 DLR A-7 (March 1, 2005).

[73] Bloomberg BNA Daily Labor Report, "Continental Announces Tentative Deals On Concessions With Four Unions," 39 DLR A-7 (March 1, 2005).

[74] Bloomberg BNA Daily Labor Report, "Pilots, Mechanics Ratify Concessions Pact With Continental; Flight Attendants Vote 'No,'" 62 DLR AA-1 (April 1, 2005).

[75] Pilots Bullet Point Summary of 2005 Contract § 3.

[76] *Id.* at § 25.

[77] *Id.* at § 28.

[78] Agreement Between Continental Airlines, Inc. and the Airline Technicians and Related Employees in the Service of Continental Airlines, Inc. as Represented by the International Brotherhood of Teamsters 2005-2008 at 24, 32 (Tentative Agreement Feb. 28, 2005).

[79] Bloomberg BNA Daily Labor Report, "Flight Attendants at Continental Airlines Ratify Four-Year Contract Freezing Base Pay," 22 DLR A-15 (Feb. 2, 2006).

[80] Tentative Agreement: Changes to Current Contract between the IAM and Continental Airlines with Regards to the Continental Flight Attendants at 193-94 (Dec. 15, 2003).

## VI. PINNACLE'S PILOT CONTRACT PROVIDES HIGHER COSTS, LOWER PRODUCTIVITY, AND MORE RESTRICTIONS ON THE COMPANY THAN ITS COMPETITORS

70.    I have analyzed and compared the significant provisions of Pinnacle's Section 1113 proposal to the comparable provisions in the pilot labor contracts of the Comparator Group.  As noted in Section IV, above, and illustrated in more detail below, Pinnacle is at a significant disadvantage versus its main competitors in terms of labor costs as driven by its pay scales and structure, certain work rules, and its benefit plans.

### A.    Pinnacle's Pilot Compensation Is Above Market

71.    Pilots are generally paid an hourly rate based on time employed by the airline. Regional airlines typically establish their pay scales based on either seat ranges (e.g., 60 to 76 seat range) or specific type(s) of aircraft (e.g., CRJ-200) with separate scales for the two positions within the pilot craft:  Captain and First Officer.  Most often, hourly pay rate increases with pilot longevity.

### Current Pay Scales

72.    The current pilot pay scales at Pinnacle are above market and, combined with very high average seniority, are a major reason for the Company's labor cost disadvantage. Pinnacle's pilot pay scales are above market compared to both DCI and Non-DCI Comparators by significant margins.

73.    To analyze the pay rate differences, the Company developed a forecasted longevity distribution of pilots in 2013 based on a projected forecast of how many pilots would be at each longevity step of the various pay scales.  The forecasted longevity distribution was then used to calculate the cost of pay and pay-related items (e.g., 401(k), federal and state taxes) of Pinnacle's pilots in 2013.  The same forecasted longevity distribution was then applied to the pay rates of the other Delta Connection carriers.  The difference between the

forecasted weighted average Pinnacle pay rate in 2013 and the weighted average pilot pay rate at the other Delta Connection carriers was 6 percent.  *See* Ex. 17, Mark-to Market Calculations. Moreover, under the terms of the current JCBA, Pinnacle pilots are scheduled to receive a 3 percent increase on December 1, 2012, with additional increases of 2.0 percent in each subsequent year through 2015.

### CRJ-900 Captains

74.    Pinnacle's hourly rate for a first year CRJ-900 Captain ($67.29) is higher than the first year rates at all of its competitors, both DCI and Non-DCI Comparators, and is 5.3 percent higher than the DCI average ($63.92).  At every step of the CRJ-900 scale, Pinnacle pilot pay rates are higher than the DCI average.  The top of scale pilot pay rate for Pinnacle CRJ-900 Captains ($108.89) is higher than all but two of its DCI competitors and is 0.5 percent higher than the DCI average ($108.39).  *See* Ex. 18, CRJ-900 Pay Scale vs. DCI Carriers; Ex. 19, CRJ-900 Pay Scale vs. All Comparators.

### CRJ-900 First Officers

75.    The hourly rate discrepancy between First Officer rates at Pinnacle and its Comparators is even greater than the pay rate difference for Captains on the CRJ-900s. Pinnacle's wage rate for a first year CRJ-900 First Officer ($26.70) is higher than all of its competitors, both DCI and Non-DCI Comparators, and is 13.7 percent higher than the DCI average ($23.48). Pinnacle First Officers reach the top of the pay scale at 8 years and earn $46.71. This is 7.9 percent higher than the DCI average pay with 8 years seniority ($43.28). *See* Ex. 18, CRJ-900 Pay Scale vs. DCI Carriers; Ex. 19, CRJ-900 Pay Scale vs. All Comparators.

<u>CRJ-200 Captains</u>

76.    Pinnacle's current wage rate for first year CRJ-200 Captains ($62.82) is higher

than that of all of its DCI competitors and higher than that of all but one of its Non-DCI

Comparators.  *See* Ex. 20, CRJ-200 Pay Scale vs. DCI Carriers and Ex. 21, CRJ-200 Pay Scale

vs. All Comparators.  The first year rate is 9.1 percent higher than the DCI average ($57.63).

The CRJ-200 Captain rates at Pinnacle are higher then the DCI average rates at every step of

the pay scale.  CRJ-200 Captains reach the top of scale at 18 years.  Pinnacle's CRJ-200 top of

scale rate ($103.91) is higher than all of its DCI Comparators and 4.6 percent higher than the

DCI average ($99.37).  Despite being capped at 18 years, Pinnacle's wage rate for 20-year

Captains ($103.91) is still higher than all of its DCI Comparators with the exception of

SkyWest ███████ and 2.3 percent higher than the DCI average ($101.53).

<u>CRJ-200 First Officers</u>

77.    CRJ-200 First Officers pay rates are significantly higher than First Officers on the

same or comparable equipment at the other DCI Carriers.  First Officers on the first year of the

pay scale receive a higher pay rate ($26.70) than their peers at each of Pinnacle's DCI and

Non-DCI competitors.  The first  year rate is 17.1 percent higher than the DCI average

($22.80).  Pinnacle First Officers reach the top of the pay scale at 8 years and earn $44.36 or

5.4 percent more than the DCI average ($42.09).  *See* Ex. 20, CRJ-200 Pay Scale vs. DCI

Carriers; Ex. 21, CRJ-200 Pay Scale vs. All Comparators.

**<u>Section 1113 Proposed Pay Rates</u>**

78.    In order to lower its labor costs and become competitive with other DCI Carriers,

Pinnacle's 1113 proposal includes a reduction in pilot wage rates as part of the overall savings

necessary to permit a successful reorganization of the Company.  In addition to the proposed

-45-

pay scale modifications summarized below and detailed in the Company's 1113 proposal to ALPA, Pinnacle proposes to modify the scheduled increases to its pilot pay scales by replacing the current general wage increases with increases of 1.5 percent per year in 2014 and 2016, and 1.0 percent in 2015, 2017, and 2018.  *See* Exhibit 51, Pinnacle 1113 Pilot Term Sheet.

79.    The proposed rates would place Pinnacle's hourly wages near the bottom of industry pay rates, but in line with the lower pay scales at DCI Carriers like GoJet and Compass Airlines.  *See* Ex. 22, CRJ-900 Proposed vs. DCI; Ex. 23, CRJ-200 Proposed vs. DCI.  Because Pinnacle is disadvantaged by its relatively high seniority, it must achieve significant labor savings such that it can emerge at or toward the bottom of the industry in terms of pay scale.  The seniority cost disadvantage that Pinnacle faces with a senior pilot workforce is addressed in paragraphs 80 – 87.  As a result of the new longevity cap, the most senior Captains and First Officers will receive the largest pay cuts.  The Company's section 1113 proposal will reduce pilot pay rates between 7 and 25 percent, with a weighted average wage reduction of 15 percent.  *See* Ex. 19, CRJ-900 Pay Scale vs. All Comparators; Ex. 24, CRJ-900 Proposed vs. ALL Carriers; Ex. 21, CJR-200 Pay Scale vs. All Comparators; Ex. 25, CRJ-200 Proposed vs. ALL Carriers; Ex. 17, Mark-to Market Calculations; Ex. 65, Pilot Pay Comparison.

**Pinnacle's Seniority Cost Disadvantage**

80.    Comparing Pinnacle's current pilot pay rates to those at its competitors is an important analysis, but it is only the first step.  It is also crucial to analyze the interaction between pilot pay rates and the seniority of the pilot work force.

81.    While pilot seniority lists are not publicly available, a review of how long an airline has been in business provides a good indication of the relative seniority of each pilot

workforce.  Two of the six Delta Connection carriers against which Pinnacle currently

competes for business are relative newcomers in the industry.  Compass was founded in 2007

and GoJet was founded in 2004 and began operations in 2005.  Accordingly, the highest

seniority currently possible at each of those airlines is 5 years of service and 7 years of service,

respectively.  Pinnacle, in contrast, is a much older airline.  Pinnacle itself began operations in

1985, and Mesaba traces its roots back to 1944, with more active service beginning in the

1970s.  Not surprisingly, many of the pilots at Pinnacle have been with the Company for more

than 20 years.  Using the forecasted seniority in 2013,[81] approximately 30 percent of the CRJ-

900 Captains will have 20 or more years of seniority and nearly 76 percent of the CRJ-900

Captains will be at, or above, their 15th year of service in 2013.  Because Pinnacle is subject to

such high relative seniority, its actual wage-related cost disadvantage for its pilots is greater

than it might first appear if one only considered the difference in pay scales.  With its very

senior work force, Pinnacle is currently at a significant cost disadvantage to a number of its

DCI Comparators. The Company has made two proposals in its 1113 term sheet to address this

seniority cost disadvantage.

### 1113 Proposals to Address Pinnacle's Seniority Cost Disadvantage

82.    As mentioned in paragraph 34 of this declaration, the Company has proposed to

reduce the longevity of the top of scale.  The proposed top of scale for Captains is at 12 years

of service and the proposed top of scale for First Officers is at 4 years of service.[82]  While most

---

[81] *See* Ex. 17.

[82] Pilot Pay scales in the airline industry are generally structured to reflect a higher wage with year of service (number of years a pilot has been employed by the airline).  An important distinction to note is that Pinnacle's proposed Captain pay scales provide rates at various steps, not years of service.  A step does not represent a pilot's years of service, but rather represents a 12 month period of flying in that status (equipment and position).  For example, a Captain in his

of the other regional airlines cap their Captain pay scales between the fourteenth and twentieth year of service, Pinnacle must realign its pay scales to achieve the necessary savings from its pilots.  In the case of First Officer scales, Pinnacle's proposed four year scale is not outside of the industry norm.  For example, DCI Carriers GoJet and Republic cap their First Officer pay scales at 4 years.  *See* Ex. 22, CRJ-900 Proposed vs. DCI; Ex. 23, CRJ-200 Proposed vs. DCI. Pinnacle has also proposed to reduce the impact of a senior pilot work force by changing the structure of its pay progression.  It is typical in the regional airline industry for a pilot to retain his or her seniority when moving from one position to another (First Officer to Captain or vice versa).  However, Pinnacle has proposed an alternative structure under which any First Officer promoted to Captain will be placed on the first step of the applicable Captain pay scale.  A pilot who reverts from Captain to First Officer, however, would utilize his original longevity date for placement on the First Officer scale.  That is, the retention of longevity applies when a Captain is displaced to a First Officer position.  If a Captain who reverts to First Officer is later promoted back to Captain, that pilot would be placed at the first step on the Captain scale, where the pilot would remain for 12 months.

83.    While none of the Comparator Group carriers have similar pay progression systems, ALPA is familiar with the Company's proposed concept.  In 2001, ALPA and Ryan International Airlines reached an agreement in which pilots were paid based on status and longevity flying for a particular customer.[83]  The agreement provided various pay scales based on equipment type (B727, B737, DC10, A320, and B757), position (CA, FO, SO, PFE) and

---

2nd step on the Captain pay scale has held that status over 12 months but less than 24 months. The fact that he is paid the 2nd step rate is not necessarily indicative of his years of service with the Company.

[83] *See* § 3.A.2 of the Collective Bargaining Agreement between Ryan International Airlines and ALPA (2001), attached hereto as Ex. 57.

customer (Sport Hawk, Aer Lingus, USPS, etc).  Any change in equipment, position, or

customer would result in the pilot being placed at the bottom of the new applicable pay scale.

This system is similar to Pinnacle's proposal in that a move from an First Officer scale to a

Captain scale will result in the pilot being placed at the first step of the Captain scale.  In

Pinnacle's proposal, however, the reverse move from Captain to First Officer will not result in

the pilot the being placed at the first step on the First Officer scale.  Under the Company's

section 1113 proposal, a pilot will always be paid on the First Officer scale based on a pilot's

seniority with the Company.  *See* Ex. 51, Pinnacle 1113 Pilot Term Sheet.

84.     Pinnacle's proposed pay progression structure is not the only pay structure to

diverge from the traditional longevity-based structure found at most regional airlines.  In its

latest agreement with its pilots, Horizon Air implemented a different pay structure for its First

Officers.[84]  Under that plan, First Officers are placed on one of two scales – a higher pay scale

and a lower pay scale.  The most senior First Officers are placed on the higher scale and the

remaining First Officers are placed on the lower scale regardless of the equipment being flown.

The allocation of First Officers to each scale is based on the number/type of equipment being

flown by the Company at a given time.

85.     Most recently, ALPA entered into an agreement with American Eagle to modify

its pay structure as part of that Company's restructuring.  The Agreement in Principle (AIP)[85]

provides for the implementation of a four year inclusion of the E175 and CRJ-900 in the

---

[84] § 5.A of the Collective Bargaining Agreement between Horizon Air Industries, Inc. and the
International Brotherhood of Teamsters (2010), attached hereto as Ex. 58.

[85] AIP between American Eagle and ALPA information from document developed by ALPA
titled, "1113 Term Sheet vs. Agreement in Principal (AIP)."

Turbojet 60-76 seat scale provided that the aircraft are configured at 79 seats or less.[86]  This

provision will allow American Eagle to fly these larger aircrafts without paying pilots a higher

rate.

86.    Due to Pinnacle's above market pay rates and very high average seniority, the

proposed pay rates and new pay system are required for the Company to achieve it labor costs

savings.

**B.**    **Pinnacle's Pilot Work Rules Are Among The Most Costly And Least
Productive In The Industry**

87.    Pinnacle's competitive disadvantage is owed in large part to its pilot work rules,

which are among the most costly and least productive in the industry.  Work rules substantially

impact pilot productivity and cost because they determine, among other things, the number of

days of work, time off, and how and when pilots may be scheduled to work, which, in turn,

determines the number of pilots needed to staff a particular flight schedule.  Airlines generally

seek work rules that maximize a pilot's time in the cockpit piloting the aircraft (known as

"block hours" or "hard time"), while minimizing the time a pilot is paid while the pilot is not in

the cockpit (called "credit time" or "soft time").  By modifying its work rules, Pinnacle can

reduce costs and increase productivity.

88.    Below is a description of the significant pilot work rule modifications that

Pinnacle has proposed and how these modifications achieve critical improvements to

Pinnacle's competitive position.  The relevant rules relate to three broad categories:  (1) pilot

scheduling; (2) pilot training; and (3) other miscellaneous work rules.

---

[86] The E175 is certificated by the FAA to operate with up to 88 passenger seats; the CRJ-900 is
certificated by the FAA to operate with up to 90 passenger seats.

1.   **Pilot Scheduling and Compensation-Related Work Rules**

89.    Several of the work rules described below relate to certain basic pilot scheduling

and compensation concepts, which are introduced briefly here for background purposes.

90.    There are two classes of pilots: Lineholders and Reserve pilots. A Lineholder's

work schedule for a given month is known as a "Line" and consists of a series of "Trips." A

"Trip" is a sequence of flights beginning and ending at the pilot's home airport (known as the

pilot's "Domicile"). Depending on the number and length of the assigned flights, a Trip may

be concluded within a single day or may involve overnight stays away from the pilot's

Domicile and last up to four days before the pilot returns to his or her Domicile. A Line is

composed of several Trips of varying lengths scheduled throughout the month, interspersed

with designated "off" days between Trips.

91.    Lineholders bid for Lines each month using Pinnacle's Preferential Bidding

System ("PBS"), which collects pilots' preferences for various Line characteristics (e.g.,

desired days off, timing and location of Trips) and attempts to accommodate those preferences

based on Pinnacle's needs for the month, with priority given to more senior pilots. The

overarching goal of PBS is to maximize pilot productivity and satisfaction.

92.    Reserve pilots do not receive Lines with pre-determined Trips, but rather are

simply assigned on- and off-days for a given month. Reserve pilots report for duty on their on-

days and may be assigned to any flight or series of flights for which they are qualified,

returning to their Domicile in time for their next scheduled off-day. Reserve pilots increase an

airline's scheduling flexibility in the face of last-minute required changes.

93.    Lineholders and Reserve pilots are compensated on an hourly basis according to

the number of "Credit Hours" they earn in a given month. Examples of credit time include

vacation, sick leave, training, and rigs (*see* below at paragraph 94). Credit Hours are always at

least equal to a pilot's actual block hours (i.e., time spent piloting aircraft), but often exceed block hours based on various potential increases provided for by the governing CBA.

(a)     <strong>Minimum Day Credit</strong>

94.    Rigs (Ratios to Guarantee) are complex provisions in some pilot and flight attendant contracts that provide minimum pay and credit towards the various flight and duty limitations, vacation, sick and other accruals (collectively called "pay and credit" in the industry) according to various formulas. One such type of rig is the Minimum Day Credit (sometime referred to as "Minimum Duty Period Credit" or "MDPC)". The Minimum Day Credit provides that a pilot will receive the greater of the pay and credit for the scheduled time of the trip, the time actually flown during the trip, or the Minimum Day Credit value for each day of the trip pairing.

95.    **Current Pinnacle Terms**: Pinnacle's CBA provides for a Minimum Day Credit of 4 hours whenever a pilot is assigned to duty or required to remain away from the pilot's Domicile (Ex. 54 §3.H).

96.    **Comparator Group**: Pinnacle's Minimum Day Credit of 4 hours is more generous than those of any of the airlines in its primary Comparator Group.[87] Only two DCI

---

[87] Minimum Day Credit Sources (DCI Carriers): CBA between Atlantic Southeast Airlines, Inc. and ALPA ("ExpressJet-CRJ ALPA CBA"), attached hereto as Exhibit 66, at §3.F, as amended by Letter of Agreement between Atlantic Southeast Airlines, Inc. and ALPA ("ExpressJet-CRJ ALPA LOA"), attached hereto as Exhibit 67; CBA between Comair, Inc. and ALPA (2007) ("Comair ALPA CBA"), attached hereto as Exhibit 68, at §3.C.4; CBA between Compass Airlines and ALPA (2007) ("Compass ALPA CBA"), attached hereto as Exhibit 69, at §4.B; CBA between GoJet Airlines, LLC and International Brotherhood of Teamsters (2007) ("GoJet IBT CBA"), attached hereto as Exhibit 70, at §5.J; CBA between Chautauqua Airlines Inc. and Teamsters Airline Division Local 747 (2003) ("Republic Teamsters CBA"), attached hereto as Exhibit 71, contains no provision; ███████████████████████████
████████████████

Carriers, GoJet and Comair, provide Minimum Day Credit values at or above Pinnacle's 4 hour

credit, and those carriers limit the extent of the rule's application.  GoJet's Minimum Day

Credit is only applicable to situations where a pilot is on layover away from base without a

duty assignment and Comair's Minimum Day Credit is calculated on a bid period basis.

Calculating credit on a bid period (or monthly) basis is significantly less costly than calculating

it on a daily or per-trip basis because over the course of an entire bid period, trips and duty

periods that exceed the guaranteed value are balanced out with trips and duty periods that fall

below the guaranteed value.  Calculating credit daily or on a per-trip basis does not allow for

this balancing.

97.    Pinnacle's 4 hour credit exceeds that of all Non-DCI Comparators.[88]  Trans

State's 4 hours is similar to GoJet, above, in that it is only applicable on layovers without a

duty assignment, and ExpressJet-ERJ's 3 hour credit is only applicable to layovers.

98.    **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to eliminate Minimum

Day Credit.  Under this proposal, pilots will receive Credit Hours for all hours that they work

each day.  This puts Pinnacle in line with Republic among DCI Carriers, and in line with Mesa

among Non-DCI Comparators.

---

[88] Minimum Day Credit Sources (Non-DCI Comparators):  CBA between Air Wisconsin
Airlines Corporation and ALPA (2001) ("Air Wisconsin ALPA CBA"), attached hereto as
Exhibit 72, at §3.C; CBA between American Eagle Airlines, Inc. and ALPA (2009) ("American
Eagle ALPA CBA"), attached hereto at Exhibit 73, at §3.D; CBA between ExpressJet Airlines,
Inc. and ALPA (2004) ("ExpressJet-ERJ ALPA CBA"), attached hereto as Exhibit 74, at §3.D;
CBA between Mesa Airlines, Inc. and ALPA (2008) ("Mesa ALPA CBA"), attached hereto as
Exhibit 75, at §13.G; CBA between Trans States Airlines and ALPA (2011) ("Trans States
ALPA CBA"), attached hereto as Exhibit 76, at §3.I.

(b)    **Vacation Accrual**

99.    **Current Pinnacle Terms**:  Pinnacle new-hire pilots accrue 7 vacation days per

year (Ex. 54 §7.A).  The maximum vacation accrual, for pilots with 14 or more years of

service, is 28 days (*Id.*).

100.    **Comparator Group**:  In terms of maximum vacation accrual, Pinnacle is near the

top of the industry when compared to the DCI Carriers,[89] matching ExpressJet-CRJ and GoJet

and trailing only Comair.  While Republic provides 35 days per year, its pilots accrue Paid

Days Off ("PDOs"), which are to be used for *all* unscheduled absences including vacation, sick

leave, and personal time.  Compared to Non-DCI Comparators,[90] Pinnacle is in line with

ExpressJet-ERJ, Mesa, and Trans States.

101.    **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to decrease the vacation

accrual for pilots by 7 days at each level of accrual, except for those pilots who currently

receive 7 days per year, whose vacation accrual would remain the same.  Under this proposal,

pilots would receive between 1 and 3 vacation weeks per year.  This places Pinnacle at the

bottom end of both Comparator Groups.

(c)    **Vacation Credit**

102.    **Current Pinnacle Terms**:  Pinnacle pilots are compensated 21 Credit Hours for

each vacation week (Ex. 54 §7.B.1).  However, for purposes of calculating a pilot's total

monthly credit hours and ensuring compliance with the monthly maximum hour limits, the

---

[89] Vacation Accrual Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §7 as
amended by Ex. 67, ExpressJet-CRJ ALPA LOA; Ex. 68, Comair ALPA CBA, at §7; Ex. 69,
Compass ALPA CBA, at §7; Ex. 70, GoJet IBT CBA, at §13; Ex. 71, Republic Teamsters CBA,
at §8.A; ██████████████████

[90] Vacation Accrual Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at
§7; Ex. 73, American Eagle ALPA CBA, at §8.A; Ex. 74, ExpressJet-ERJ ALPA CBA, at §8.A;
Ex. 75, Mesa ALPA CBA, at §7.A; Ex. 76, Trans States ALPA CBA, at §8.A.

PBS system credits pilots with 24.5 hours for each vacation week (*Id.*).  Based on a 94 hour scheduled monthly maximum, under the current system, a pilot who takes a one-week vacation has only 69.5 remaining hours of potential work time (i.e., 94 minus 24.5), versus the 73 potential credit hours that would be available if the PBS system credited the pilot for 21 hours.  This additional 3.5 hours of credit time (the "Virtual Vacation Credit") restricts the number of hours a pilot may be assigned to fly, thereby reducing pilot productivity and increasing costs.

103.  **Comparator Group**:  Among DCI Carriers,[91] Pinnacle's 24.5 hours of Virtual Vacation Credit per week is greater – and thus *less* favorable to the Company, for the reasons stated above – than Comair, GoJet, Republic, ▮▮▮▮, and Compass (which does not have virtual credits but which credit pilots with 3 hours per vacation day, or 21 hours per vacation week).  Ex. 26, Pilot Vacation Credit – Pinnacle vs. DCI Carriers (reproduced below).  For Non-DCI Comparators,[92] Mesa is the only carrier with Virtual Vacation Credits and its 21 hours per week allows its pilots to be available for more hours of flying per month than Pinnacle.  Among the other Non-DCI Carriers, only ExpressJet-ERJ credits pilots with more than Pinnacle's 24.5 hours per week.  Ex. 27, Pilot Vacation Credit – Pinnacle vs. Non-DCI Comparators (reproduced below).

---

[91] Vacation Credit Sources (DCI Carriers):  Ex. 67, ExpressJet-CRJ ALPA LOA, at §13.C.3.b(2)(e); Ex. 68, Comair ALPA CBA, at §24.E; Ex. 69, Compass ALPA CBA at §3.I; Ex. 70, GoJet IBT CBA, at §13.B; Ex. 71, Republic Teamsters CBA, at §6.F.1.b(xvii); ▮▮▮▮▮

[92] Vacation Credit Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §3.S, §7.C; Ex. 73, American Eagle ALPA CBA, at §8.B; Ex. 74, ExpressJet-ERJ ALPA CBA, at §8.B; Ex. 75, Mesa ALPA CBA, at §21.B.9.c; Ex. 76, Trans States ALPA CBA, at §8.B.



Ex. 26, Pilot Vacation Credit – Pinnacle vs. DCI Carriers



Ex. 27, Pilot Vacation Credit – Pinnacle vs. Non-DCI Comparators

104.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to eliminate the Virtual Vacation Credit and to credit pilots with 21 hours for each vacation week – the actual amount of time paid – when constructing Line assignments and measuring total block hours against the 94 hour maximum.  This puts Pinnacle well within market for DCI as well as Non-DCI Comparators.

(d)    **Long Call Reserve**

105.  **Current Pinnacle Terms**:  Pinnacle currently employs two types of Reserve pilots:  Short Call Reserves and Long Call Reserves (Ex. 54 §§2.NN, 25.E.2.k).  Short Call Reserves must be available to fly without notice on a given assignment day.  Long Call Reserves must check their schedules at some point between 10:00 a.m. and 1:00 p.m. on the day before their potential assignment.  If there is no assignment for them at the time they call in, they are released from duty the next day and paid the Minimum Day Credit.  Under the current pilot contract, if a Long Call Reserve pilot has not been assigned to a Trip at the time the pilot calls in, which tends to be at the beginning of this window, the pilot is released from duty for the following day.  Due to weather delays, pilot absences, and other unpredictable circumstances, Pinnacle is unable to determine the number of pilots it will need for the following day before the call-in window.  Thus, the current rule results in the premature release of Long Call Reserve pilots may, in fact, be needed for duty the next day.  Currently, Pinnacle is required to designate at least 15 percent of its Reserve assignments as "Long Call Reserve."

106. **Comparator Group**:  Among DCI Carriers,[93] only ExpressJet-CRJ and ███████ employ Long Call Reserves and they each require 20 percent of Reserve lines to be Long Call.

---

[93] Long Call Reserve provisions (DCI Carriers):  Ex. 67, ExpressJet-CRJ ALPA LOA 11, §13.C.3.f; Comair has no Long Call Reserves; Compass has no Long Call Reserves; GoJet has no Long Call Reserves; Republic has no Long Call Reserves; ████████████████

Comair, Compass, GoJet, and Republic do not utilize Long Call Reserves at all.  The only Non-DCI comparator that utilizes Long Call Reserves is ExpressJet-ERJ and their pilot CBA only requires that 10 percent of Reserve lines will be Long Call lines.[94]

107.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes eliminating the Long Call Reserve system and filling vacancies using Short Call Reserves only, putting them in line with most of the Comparators.

(e)      **Long Call Available**

108.  **Current Pinnacle Terms**:  In lieu of assigning a Lineholder to a specific Trip, Pinnacle may assign Lineholders to a status of "Long Call Available" ("LCA") which requires the pilot to check in for a potential assignment at any point between 10:00 am and 1:00 pm Central Time on the day preceding the LCA scheduled work day (Ex. 54 §25.H.6.b).  This system results in the same problematic lack of flexibility discussed above for Long Call Reserve assignments (*see* Section VIVII.B.2 above).

109.  **Comparator Group**:  The majority of Pinnacle's Comparators do not employ Long Call status.  Of the DCI Carriers[95] that use Long Call status, ExpressJet-CRJ and ▮▮▮▮▮▮ pilot contracts are silent on the matter of when pilots check in for assignments, and Comair's check-in window is between 2:00 pm and 4:00 pm on the day prior to an assignment.

---

[94] Long Call Reserve Sources (Non-DCI Comparators):  Air Wisconsin has no Long Call Reserves; American Eagle has no Long Call Reserves; Ex. 74, ExpressJet-ERJ ALPA CBA, at §21.D.3; Mesa has no Long Call Reserves; Trans States has no Long Call Reserves.

[95] Long Call Available Sources (DCI Carriers):  ExpressJet-CRJ has no provision for check-in; Ex. 68, Comair ALPA CBA, at §12.G.1.d-e; Compass has no LCA; GoJet has no LCA; Republic has no LCA; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Two of the five Non-DCI Comparators[96] do not employ Long Call status while two others are silent on the timing of check-in for assignment.

110.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to change the Long Call Available call-in window to 6:00 pm to 8:00 pm Central Time.  This change would allow Pinnacle to more accurately fill unexpected vacancies and reduce the need to junior assign pilots.

(f)      **Open Time Posting**

111.  **Current Pinnacle Terms**:  "Open Time" is flying that either was not assigned during the bid process or flying which has become available during the month.  Under Pinnacle's current JCBA, the Company is required to post all Open Time "as soon as practicable" and make Open Time available for pickup by any pilot based on seniority (Ex. 54 §25.G.2).  Although Open Time can theoretically be claimed by both Lineholders and Reserves, in practice, Open Time is typically picked up by Lineholders who want to increase their pay hours in a month and who have a seniority advantage over Reserves.  However, it is more efficient and economical for Reserve pilots to pick up Open Time – or for the Company to assign such time to Reserves – because Reserves are generally underutilized compared to Lineholders and more likely to fall below the Minimum Monthly Guarantee of 75 credit hours.  However, under the current system, requiring all Open Time to be published often results in such time being picked up by Lineholders who already exceed the Minimum Monthly Guarantee, at added cost to Pinnacle, as opposed to Reserves who are often paid for a

---

[96] Long Call Available Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §25.E.11; American Eagle has no LCA; ExpressJet-ERJ has no provision for check-in; Mesa has no provision for check-in; Trans States has no LCA.

minimum number of hours they are not actually achieving and could often cover the Open

Time at *no* added cost to Pinnacle.

112.  **Comparator Group**:  Among the DCI Carriers,[97] Compass is permitted to

withhold certain unassigned flying from Open Time and Republic may assign open flying to

in-domicile Reserves at *any* time.  Among Non-DCI Comparators,[98] Air Wisconsin and

American Eagle may withhold some unassigned flying from Open Time and Mesa's contract

provides that the Company "may" post uncovered flying.

113.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to have the discretion to

withhold Open Time, including, but not limited to, for the purpose of assignment to Reserve

pilots.  Pinnacle's ability to withhold certain trips from Open Time will allow it to make more

effective use of its pilots and will align itself with Compass and Republic, among DCI Carriers,

and three of the five Non-DCI Comparators.

(g)    **Post-Line Award Open Time Requirements**

114.  **Current Pinnacle Terms**:  At the close of the line construction process, Pinnacle

must leave at least 2 percent of the available time in each Domicile unassigned (Ex.

§25.E.2.a.ii), if doing so is preferable to the pilots in that Domicile (i.e., if they would prefer to

decrease their desired flying time as opposed to meeting their desired amount through inclusion

of flying not matching their Trip preferences).  This requirement results in Pinnacle's leaving

close to 2 percent of available time unassigned.  Somewhat similar to the Open Time Posting

---

[97] Open Time Posting Sources (DCI Carriers):  Ex. 67, ExpressJet-CRJ ALPA LOA, at §13.I.1;
Comair has no provision; Ex. 69, Compass ALPA CBA, at §25.N; Ex. 70, GoJet IBT CBA, at
§6.F.1; Ex. 71, Republic Teamsters CBA, at §6.H.1████████████

[98] Open Time Posting Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at
§25.H.2; Ex. 73, American Eagle ALPA CBA, at §11.F.4; Ex. 74, ExpressJet-ERJ ALPA CBA,
at §21.H.1; Ex. 75, Mesa ALPA CBA, at §3.H.3; Ex. 76, Trans States ALPA CBA, at §25.G.1.

discussion, above, this work rule decreases overall efficiency because it adds to the time that

Pinnacle must assign through means other than the bidding process, such as through Open

Time or junior assignment, which is more costly and less efficient for the Company.

115. **Comparator Group**: Among DCI Carriers,[99] only Comair is required to

withhold more than the 2 percent required by the Pinnacle JCBA. However, the time withheld

at Comair is only in order for pilots to accomplish initial operating experience ("OE") and

while the amount withheld at Comair can be up to 4 percent, it is also limited to the amount

required to construct required OE lines, which could effectively limit the amount withheld to

less than Pinnacle's 2 percent. The pilot contracts at Compass and Republic only provide that

the carriers **_may_** withhold time from lines, while GoJet's pilot contract only limits withheld

time to 5 percent of all scheduled block hours, with no stated requirement to withhold such

time. ███████████████████████ At ExpressJet-CRJ, while the contract

states that the Company **_may_** withhold up to 2%, it also provides that the union can withhold

up to 2 percent.

116. None of the Non-DCI Comparators are required to withhold time, though the

majority of them **_may_** withhold varying amounts of flying.[100]

---

[99] Post-Award Open Time Sources (DCI Carriers): Ex. 67, ExpressJet-CRJ ALPA LOA, at
§11.C.2; Ex. 68, Comair ALPA LOA, at §24.B; Ex. 69, Compass ALPA CBA, at §25.I; Ex. 70,
GoJet IBT CBA, at §8.C.1.a; Ex. 71, Republic Teamsters CBA, at §6.E.1: ████████████
███

[100] Post-Award Open Time Sources (Non-DCI Comparators): Ex. 72, Air Wisconsin ALPA
CBA, at §25.H.2; Ex. 73, American Eagle ALPA CBA, at §11.B.4; Ex. 74, ExpressJet-ERJ
ALPA CBA, at §21.D.1.h; Ex. 75, Mesa ALPA CBA, at §13.I.1; Ex. 76, Trans States ALPA
CBA, at §25.B.3.a.

117.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to reduce the maximum required post-award open time to 1 percent, which places Pinnacle well within both Comparator Groups and is still more restrictive than the majority of the Comparators.

(h)     **Voluntary Open Time Pay**

118.  **Current Pinnacle Terms**:  Under its current pilot contract, Pinnacle must compensate a pilot who voluntarily picks up an Open Time Trip at 150 percent of base pay (Ex. 54 §3.M.2).

119.  **Comparator Group**:  The majority of Pinnacle's competitors compensate pilots who voluntarily pick up Open Time trips at 100 percent of base pay, while only paying a premium for certain "Red Flag" or "Critical Coverage" trips which are chosen by the airline, trips that remain uncovered a certain number of hours prior to report time, or trips picked up on a pilot's day off.  Among DCI Carriers, only Comair pays pilots at 150 percent for voluntarily picking up trips on a duty day.  *See* Ex 28, Pilot Open Time Pay – Pinnacle vs. DCI Carriers[101] (reproduced below) and Ex. 29, Pilot Open Time Pay – Pinnacle vs. Non-DCI Comparators[102] (reproduced below).

---

[101] Voluntary Open Time Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §13.M.8; Ex. 68, Comair ALPA CBA, at §3.K; Ex. 69, Compass ALPA CBA, at §3.G; Ex. 70, GoJet IBT CBA, at §5.F; Ex. 71, Republic Teamsters CBA, at §3.C.1; ███████████

[102] Voluntary Open Time Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §3.B; Ex. 73, American Eagle ALPA CBA, at §3.H; Ex. 74, ExpressJet-ERJ ALPA CBA, at §3.E.8; Ex. 75, Mesa ALPA CBA, at §13.E.10-11; Ex. 76, Trans States ALPA CBA, at §3.E.2.

| Pilot Premium for Voluntary Open Time Flying - Pinnacle vs. DCI Carriers | | | | | | | |
|---|---|---|---|---|---|---|---|
| PNCL Current | PNCL Proposed | Xjet-CRJ | Comair | Compass | GoJet | Republic | SkyWest |
| 150% | 150% Red Flag trips only | 150% Premium trips only | 150% | 150% Critical trips only | 150% Only for trip flown on day scheduled off when final bid award was published | No premium | |

Ex 28, Pilot Open Time Pay – Pinnacle vs. DCI Carriers

| Pilot Pay for Voluntary Open Time Flying - Pinnacle vs. Non-DCI Comparators | | | | | | |
|---|---|---|---|---|---|---|
| PNCL Current | PNCL Proposed | Air Wis | Amer Eagle | Xjet-ERJ | Mesa | TSA |
| 150% | 150% Red Flag trips only | 150% | 120% Regular open time<br><br>150% Critical Coverage trips | 150% Red Flag trips only | 150% to 200%<br><br>Critical flying on originally scheduled day off | 150% |

Ex. 29, Pilot Open Time Pay – Pinnacle vs. Non-DCI Comparators

120. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to compensate pilots for any voluntarily added Open Time trips at 100 percent of base pay, with certain Red Flag Trips identified by Pinnacle in its discretion and compensated at 150 percent of base pay, bringing it within the industry norm.

-63-

(i)    **Reserve Days Off Per Month**

121.  **Current Pinnacle Terms**:  Currently, Pinnacle's Reserve pilots receive a

minimum of 11 days off duty per month (Ex. 54 §12.E).

122.  **Comparator Group**:  Among DCI Carriers,[103] GoJet provides Reserves with

10 guaranteed days off per month in all months, ███████████████████████

█████████████████████████.  The Non-DCI Comparators generally provide

between 11 and 12 days off per month for Reserves.[104]

123.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to reduce Reserve

guaranteed minimum days off to 10 days, which would keep Pinnacle in line with GoJet and

partially in line with ███████

(j)    **Single Duty Day**

124.  **Current Pinnacle Terms**:  As a general matter, Pinnacle prefers to avoid

assigning its pilots to a "Single Duty Day," i.e., a day of work surrounded by at least one day

off on either side of work.  The default rule under PBS is that pilots will not be assigned to a

Single Duty Day, but pilots may "waive" this requirement by affirmatively selecting a Single

Duty Day as a preference when bidding a Line (Ex. 54 §25.E.2.d).  When a pilot selects a

Single Duty Day, Pinnacle is often unable to actually assign the pilot to a Trip on the Single

Duty Day because of limited numbers of Trips that conclude within a single day.  For

Reserves, this can be particularly problematic.  For example, a Reserve pilot may waive the

---

[103] Reserve Days Off Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §12.D.2;
Ex. 68, Comair ALPA CBA, at §12.B; Ex. 69, Compass ALPA CBA, at §12.E; Ex. 70, GoJet
IBT CBA, at §7.A.2; Ex. 71, Republic Teamsters CBA, at §23.D; ██████████████████
██████

[104] Reserve Days Off Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at
§12.F; Ex. 73, American Eagle ALPA CBA, at §10.B; Ex. 74, ExpressJet-ERJ ALPA CBA, at
§21.D.3; Ex. 75, Mesa ALPA CBA, at §12.B; Ex. 76, Trans States ALPA CBA, at §12.C.3.

prohibition on Single Duty Days and be given a single day assignment for the evening time slot.  Because almost any flight that would become available during that duty period would continue into the next day (i.e. the Reserve pilot's day off), Pinnacle is unable to utilize that Reserve pilot at all, creating a staffing issue for the Company.

125.  **Comparator Group**:  Only Compass, among all of Pinnacle's Comparators.[105] [106] provides the option for pilots to waive the Single Duty Day prohibition.  The pilot contracts of the remaining Comparators are silent on the Single Duty Day issue.

126.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes no change to the Single Duty Day policy for Lineholders, but proposes, at its discretion, to prohibit Reserve pilots from waiving the restriction preventing selection of assignments for a Single Duty Day.  This change will prevent the inefficiency of an assignment to a day on which the Reserve pilot cannot actually perform flying during his or her assigned time slot.

(k)    **Per Diem Compensation**

127.  **Current Pinnacle Terms**:  Pilots generally receive a "Per Diem" payment for every hour they are away from their home domicile on duty.  Per Diem is designed to compensate pilots for meals and other ancillary expenses incurred while away from their Domiciles.  A pilot's "Time Away From Base" begins when the pilot reports for the first flight of a Trip and ends when the pilot is released back at the pilot's Domicile.  Currently,

---

[105] Single Duty Day Sources (DCI Carriers):  ExpressJet-CRJ has no provision; Comair has no provision; Ex. 69, Compass ALPA CBA, at §25.E.4; GoJet has no provision; Republic has no provision▮▮▮▮▮▮▮▮

[106] Single Duty Day Sources (Non-DCI Comparators):  Air Wisconsin has no provision; American Eagle has no provision; ExpressJet-ERJ has no provision; Mesa has no provision; Trans States has no provision.

Pinnacle's pilots are compensated at a Per Diem rate of $1.70 per hour for domestic flights, with scheduled increases of $0.05 in February of each year through 2015 (Ex. 54 §5.D).

128. **Comparator Group**: Pinnacle's current rate is greater than four of the six DCI Carriers.[107] Ex. 30, Pilot Per Diem – Pinnacle vs. DCI Carriers (reproduced below). Among Non-DCI Comparators,[108] Pinnacle pays a higher per diem rate than three of the five carriers. Ex. 31, Pilot Per Diem – Pinnacle vs. Non-DCI Comparators (reproduced below).



Ex. 30, Pilot Per Diem – Pinnacle vs. DCI Carriers

---

[107] Per Diem Sources (DCI Carriers): Ex. 66, ExpressJet-CRJ ALPA CBA at §5.A.1; Ex. 68, Comair ALPA CBA, at §5.B; Ex. 69, Compass ALPA CBA, at §5.B; Ex. 70, GoJet IBT CBA, at §5.O; Ex. 71, Republic Teamsters CBA, at §4.B▮▮▮▮▮▮▮▮▮▮▮▮

[108] Per Diem Sources (Non-DCI Comparators): Ex. 72, Air Wisconsin ALPA CBA, at §5.D; Ex. 73, American Eagle ALPA CBA, at §5.B; Ex. 74, ExpressJet-ERJ ALPA CBA, at §4.C as amended by LOA 8; Ex. 75, Mesa ALPA CBA, at §5.A.2; Ex. 76, Trans States ALPA CBA, at §5.C.



Ex. 31, Pilot Per Diem – Pinnacle vs. Non-DCI Comparators

129. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to reduce its Per Diem rate to $1.60 per hour, with $0.05 increases in 2016 and 2017.  This would still leave Pinnacle paying a higher Per Diem rate than two of the six DCI Carriers and one of the five Non-DCI Comparators, and would match Air Wisconsin and Trans States among Non-DCI Comparators.

130.  Pinnacle also proposes to eliminate Per Diem pay for trips that start and end in the pilot's domicile on the same day.  While this provision does not currently exist at other DCI or OAL regional airlines, it has existed in CBAs in the past and is a way to reduce costs without impacting safety.  Pilots eat before their report and after their release, so this means, a pilot only needs food for perhaps a lunch meal.  That would be the only out of pocket cost for a pilot in this situation.

(l)      **Customs Credit**

131.  **Current Pinnacle Terms**:  In addition to normal Credit Hours earned for an international flight, Pinnacle's pilot contract currently also provides for 18 minutes of credit each time the pilot passes through customs (Ex. 54 §3.K), referred to as a "Customs Credit."

132.  **Comparator Group**:  Two of the other DCI Carriers[109] also provide 18 minutes of Customs Credit, while the other four provide no pay credit at all.  Two of the Non-DCI Comparators[110] provide customs credit in a lower amount than Pinnacle – 15 minutes at Air Wisconsin and 10 minutes at ExpressJet-ERJ – while the other three provide no pay credit.

133.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to eliminate the Customs Credit bringing the Company in line with the majority of its Comparators.

(m)      **Deadhead Credit**

134.  **Current Pinnacle Terms**:  There are occasions when pilots need to travel to a different location to report for their next scheduled flight, because Trip segments may start from a different airport than the pilot's domicile.  Such travel, where the pilot is not operating the aircraft but is being positioned to do so, is known as "deadheading."  Pinnacle provides deadhead travel via ground or air and compensates pilots for deadheading time at the rate of 75 percent of actual or scheduled travel time, whichever is greater (the "Deadhead Credit") (Ex. 54 §8.A).

---

[109] Customs Pay Sources (DCI Carriers):  ExpressJet-CRJ has no provision; Comair has no provision; Ex. 69, Compass ALPA CBA, at §3.N; GoJet has no provision; Ex. 71, Republic Teamsters CBA, at §3.G▪

[110] Customs Pay Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §3.G; American Eagle has no provision; Ex. 74, ExpressJet-ERJ ALPA CBA, at §3.F; Mesa has no provision; Trans States has no provision.

135. **Comparator Group**: The Deadhead Credit of Pinnacle's competitors[111] [112] ranges from 50 percent to 100 percent of the greater of actual or scheduled deadheading time, with two of Pinnacle's competitors compensating all deadheading at 50 percent (GoJet and Mesa). *See* Ex. 32, Pilot Deadhead Credit – Pinnacle vs. DCI Carriers (reproduced below); Ex. 33, Pilot Deadhead Credit – Pinnacle vs. Non-DCI Comparators (reproduced below).

| | PNCL Current | PNCL Proposed | Xjet-CRJ | Comair | Compass | GoJet | Republic | SkyWest |
|---|---|---|---|---|---|---|---|---|
| **Pilot Deadhead Pay and Credit - Pinnacle vs. DCI Carriers** | | | | | | | | |
| Air | 75% | 50% | 100% | 75% | 75% | 50% | 75% | |
| Ground | 75% | 50% | 50% | 100% | 75% | No provision | 50% | |

Ex. 32, Pilot Deadhead Credit – Pinnacle vs. DCI Carriers

| | PNCL Current | PNCL Proposed | Air Wis | Amer Eagle | Xjet-ERJ | Mesa | TSA |
|---|---|---|---|---|---|---|---|
| **Pilot Deadhead Pay and Credit - Pinnacle vs. Non-DCI Comparators** | | | | | | | |
| Air | 75% | 50% | 100% | 75% | 100% | 50% | 75% 100% effective the earlier of 8/1/14 or |
| Ground | 75% | 50% | 100% | 75% | 100% | 50% | 50% |

Ex. 33, Pilot Deadhead Credit – Pinnacle vs. Non-DCI Comparators

---

[111] Deadhead Sources (DCI Carriers): Ex. 66, ExpressJet-CRJ ALPA CBA, at §3.G.5; Ex. 68, Comair ALPA CBA, at §3.D-E; Ex. 69, Compass ALPA CBA, at §3.N; Ex. 70, GoJet IBT CBA, at §5.H; Ex. 71, Republic Teamsters CBA, at §3.E;

[112] Deadhead Sources (Non-DCI Comparators): Ex. 72, Air Wisconsin ALPA CBA, at §3.E; Ex. 73, American Eagle ALPA CBA, at §3.J; Ex. 74, ExpressJet-ERJ ALPA CBA, at §6.A-B; Ex. 75, Mesa ALPA CBA, at §6.A; Ex. 76, Trans States ALPA CBA, at §3.H.

136. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to reduce the Deadhead Credit to 50 percent of the greater of actual or scheduled travel time for all deadheading. This would match the deadhead rates at GoJet and Mesa for all deadhead time and would match ExpressJet-CRJ, Republic, ███████, and Trans States for ground or surface deadhead.

### 2.    Pilot Training-Related Work Rules

### (a)    Pay and Credit for Recurrent Training

137. **Current Pinnacle Terms**: Under Pinnacle's current contract, pilots receive pay and credit for all training events, including recurrent training (Ex. 54 §3.O). Therefore, value of the training event is both paid to the pilot and is also credited to the pilot, resulting in the pilot being available for fewer hours of flying in the month of training. For example, if a pilot is scheduled and completes ground training with a value of 4 hours, the pilot will be paid 4 hours and the pilot's availability for flying for the remainder of the month will be reduced by 4 hours. By paying pilots for their training event, but not crediting them for the hours, each pilot will be available for more flying during the month, thus significantly increasing pilot productivity.

138. **Comparator Group**: All of the DCI[113] and Non-DCI[114] Comparators provide pay and credit for recurrent training. This proposal, however, has been utilized in a number of other restructurings in the past decade and will go a long way toward improving the productivity of pilots.

---

[113] Recurrent Training Sources (DCI Carriers): Ex. 66, ExpressJet-CRJ ALPA CBA, at §11.D; Ex. 68, Comair ALPA CBA, at §3.F; Ex. 69, Compass ALPA CBA, at §3.H; Ex. 70, GoJet IBT CBA, at §5.G; Ex. 71, Republic Teamsters CBA, at §3.M; ███████████████████

[114] Recurrent Training Sources (Non-DCI Comparators): Ex. 72, Air Wisconsin ALPA CBA, at §11.I; Ex. 73, American Eagle ALPA CBA, at §3.L; Ex. 74, ExpressJet-ERJ ALPA CBA, at §14.H; Ex. 75, Mesa ALPA CBA, at §11.C; Ex. 76, Trans States ALPA CBA, at §3.G.

139. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposed to significantly increase pilot productivity – and thus lower costs – by providing pay/no credit for recurrent training.

(b)  **Assignment and Compensation of Training Instructors**

140. **Current Pinnacle Terms**:  The FAA mandates that pilots periodically receive training, with each session requiring an instructor pilot.  Currently, Pinnacle and Mesaba utilize different selection and compensation systems for their instructors.  Under the Pinnacle system, Part-Time Instructors are not contractually required to train pilots during a month and they can still bid on a monthly schedule.  Instruction days are built in to a pilot's line as a planned activity or added to the line after the bidding process and are assigned by the Company.  Lineholders bid on and are assigned Instructor Lines and are compensated in accordance with general line compensation provisions.  Under the Mesaba system, on the other hand, pilots are selected to serve as an instructor for a period of time (e.g., six months) and are fully committed to training pilots.  For this work, the instructors receive an override and a higher monthly guarantee than line pilots.  As such, the Mesaba system provides the Company with greater predictability in its operations.

141. **Comparator Group**:  All of Pinnacle's competitors have a single pilot instructor assignment/compensation system, and most use a system similar to the more favorable system at Mesaba.

142. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to adopt the current Mesaba assignment and compensation system for all instructors.  This change would eliminate the administrative burden of maintaining two separate systems, and would align Pinnacle's system with the industry norm.

(c)    **Training Freeze**

143.  **Current Pinnacle Terms**:  After specified time periods, pilots may bid to fly a different aircraft type in the same seat or to be upgraded from First Officer to Captain.  Before either type of assignment, the FAA requires pilots to undergo extensive training, with sessions lasting up to six weeks.  In addition to FAA requirements, airlines generally implement their own restrictions to limit the movement of pilots from aircraft to aircraft because the cost of training a pilot – both in terms of actual training costs such as instructors, facilities, etc., as well as having the pilot out of service for the period of instruction – is very expensive and reduces pilot productivity.  Under Pinnacle's current work rules, Captains may seek to fly in a different aircraft after one year of employment and are subject to additional restrictions after that time.  This one-year restriction is referred to as a "freeze" because the pilot is essentially frozen at that position for 1 year.  When a Captain seeks to move to a lower-paying aircraft (e.g., from the CRJ-900 to the CRJ-200), however, the freeze at the lower-paying category is 24 months.

144.  Currently, Pinnacle's First Officers may be awarded a change in status and/or equipment (a) 1 year after the pilot's date of hire when attaining another First Officer position, or (b) at the time the pilot upgrades to Captain.  Following an award to a different aircraft as a First Officer, the Pilot may be upgraded to Captain after 12 months or a new First Officer position after 24 months.  (§24.G.3.)

145.  **Comparator Group**:  All of Pinnacle's competitors prohibit aircraft type reassignments by Captains at some level.[115] [116] The duration of the Captain freezes range from

---

[115] Training Freeze Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §24.G.6; Ex. 68, Comair ALPA CBA, at §11.H; Ex. 69, Compass ALPA CBA, at §24.C; Ex. 70, GoJet

1 to 3 years, and can be different based on the equipment type.  First Officer freezes are also

common at the competitor airlines and rang from 6 months to 3 years.  At DCI Carrier

Republic, a new hire First Officer is frozen from the time the pilot completes training until the

pilot is eligible for upgrade to Captain.

146.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to increase the initial

Captain freeze from 12 months to 24 months.  Additionally, Pinnacle proposes to extend the

restrictions for Captains seeking to move to a lower-paying category from 24 months to 36

months.  Regarding First Officers, Pinnacle proposes to prohibit First Officers from changing

status or equipment until the pilot is awarded an upgrade to Captain.  A review of the

Comparator Group shows that Pinnacle's proposals are in line with the industry.  These

changes will reduce the frequency of providing training, thereby saving the Company money.

Because training also removes a pilot from revenue-producing operations, this change would

increase the productivity of Pinnacle's pilots.

(d)    **Home Study Pay**

147.  **Current Pinnacle Terms**:  Certain types of FAA mandated training can be

conducted outside of a classroom.  This is referred to as "Home Study" or "Distance Learning"

and may include reviewing manuals or practicing with computer-based simulations.  Pinnacle

currently compensates its pilots for Home Study at a rate of 50 percent of base pay for every

hour up to 16 hours, and 100 percent of base pay for each hour thereafter (Ex. 54 §11.K.2).

The hours spent on Home Study are "paid above" a pilot's Guarantee of 75 Credit Hours – i.e.,

---

IBT CBA, at §16.E; Ex. 71, Republic Teamsters CBA, at §7.C.9;  ████████████
████

[116] Training Freeze Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at
§24.K; Ex. 73, American Eagle ALPA CBA, at §15.I; Ex. 74, ExpressJet-ERJ ALPA CBA; Ex.
75, Mesa ALPA CBA, at §23.F; Ex. 76, Trans States ALPA CBA, at §24.D.

each pilot's monthly compensation always includes payment for at least 75 Guaranteed Credit

Hours *plus* any credited Home Study time.

148. **Comparator Group**:  All but one of Pinnacle's competitors,[117] [118] Comair,

compensate pilot Home Study at 50 percent or less of the base rate, regardless of the total

hours spent, with one airline also limiting the compensable pilot Home Study time to two hours

per session.

149. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to compensate pilot Home

Study at 50 percent of base rate, regardless of total time spent.  This proposal essentially brings

Pinnacle's Home Study provision in line with the industry. Pinnacle would continue to

compensate pilots for any hours spent on Home Study above that pilot's Minimum Monthly

Guarantee.

(e)     **Positive Space During Training**

150. **Current Pinnacle Terms**:  Pinnacle provides a pilot with the option of positive

space travel – which includes a reserved seat on a flight – to and from the pilot's domicile if

the pilot is scheduled for 2 or more consecutive Days Off during Long Term Training.  If the

pilot chooses not to travel to his or her domicile during the pilot's two days off, the pilot may

remain at the training location hotel the Company's expense (Ex. 54 §11.A.3.H).  Providing

positive space on flights reduces the seats available for sale to the public when it is not

---

[117] Home Study Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §11.D.6; Ex. 68, Comair ALPA CBA, at §3.F.a-b; Ex. 69, Compass ALPA CBA, at §11.B; GoJet has no provision; Republic has no provision; ███████████████

[118] Home Study Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §11.H; Ex. 73, American Eagle ALPA CBA, at §3.L3; Ex. 74, ExpressJet-ERJ ALPA CBA, at §14.H.5; Mesa has no provision; Ex. 76, Trans States ALPA CBA, at §3.G.7.

absolutely necessary for a pilot to return home.  As long term training often occurs away from a pilot's base, assuring each pilot's positive space on flights can be costly.

151.  **Comparator Group**:  Pinnacle's competitors[119] [120] do not specify the requirement for positive space per se, although 3 of the competitors specifically allow travel back to a pilot's domicile on days off during training.  ExpressJet-CRJ only allows return to domicile if the training period is greater than 14 days.  At ExpressJet-ERJ Pilots who chose to remain at the training location when given more than 2 consecutive days off will not be provided lodging or per diem during those days off.

152.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to eliminate its requirement to provide Pilot's with positive space during training should the pilot choose to travel to or from his or her domicile during 2 or more consecutive days off.  This removal would match 7 of Pinnacle's 11 competitors who have no provision regarding positive space during training.

      3.      **Other Work Rules**

      (a)      **Uniform Maintenance Allowance**

153.  **Current Pinnacle Terms**:  Pinnacle currently provides a "Uniform Maintenance Allowance" of $20 per month to each pilot (Ex. 54 §18.H).  The allowance is designed to assist pilots with the purchase, replacement, and cleaning of uniforms.

---

[119] Position Space Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §11.C.2.e; Ex. 68, Comair ALPA CBA, at §12.B.4; Compass has no provision; GoJet has no provision; Republic has no provision; ██████████

[120] Position Space Sources (Non-DCI Comparators):  Air Wisconsin has no provision; Ex. 73, American Eagle ALPA CBA, at §5.B.4; Ex. 74, ExpressJet-ERJ ALPA CBA, at §14.G; Mesa has no provision; Trans States has no provision.

154. **Comparator Group**: Only one of the six other DCI Carriers[121] provides a uniform maintenance allowance to its pilots – Compass, which provides the same $20 per month as Pinnacle. Among Non-DCI Comparators,[122] three of the five carriers provide no uniform maintenance allowance while Trans States is $25 per month and Air Wisconsin's is $250 per year; however, Air Wisconsin pilots must pay 100% of their initial uniform expense while Pinnacle pilots pay 50%.

155. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to eliminate the Uniform Maintenance Allowance, putting them in line with the majority of DCI and Non-DCI Comparators.

(b)      **Flight Pay Loss**

156. **Current Pinnacle Terms**: Pilots receive pay and credit for duty time lost due to time spent serving on ALPA-related committees (e.g., APLA's global management committee, Hotel Committee, Negotiating Committee, etc.). Under its current pilot contract, Pinnacle absorbs the first $350,000 of such "Flight Pay Loss" annually (§13.F.7.d as amended by LOA 21.A.10). The union only reimburses Pinnacle for amounts over $350,000 per year.

157. **Comparator Group**: Notwithstanding a limited exception at Compass, all of the other DCI Carriers[123] are fully reimbursed by their respective pilot unions for Flight Pay Loss.

---

[121] Uniform Maintenance Sources (DCI Carriers): ExpressJet-CRJ has no provision; Comair has no provision; Ex. 69, Compass ALPA CBA, at §26.A; GoJet has no provision; Republic has no provision; ██████████████

[122] Uniform Maintenance Sources (Non-DCI Comparators): Air Wisconsin at §18.C; American Eagle has no provision; ExpressJet-ERJ has no provision; Mesa has no provision; Trans States at §5.F.

[123] Flight Pay Loss Sources (DCI Carriers): Ex. 66, ExpressJet-CRJ ALPA CBA, at §9.D.1; Ex. 68, Comair ALPA CBA, at §25.M.7; Ex. 69, Compass ALPA CBA, at §13.G, §11.R.4, §13.G.17.g; Ex. 70, GoJet IBT CBA, at §15.G.3-4; Ex. 71, Republic Teamsters CBA, at §12.G.3-4; ██████████████

Compass absorbs the cost of Flight Pay Loss only for pilots taking part in activities related to its the Training Review Board, Flight Operations Quality Assurance ("FOQA"), and Aviation Safety Action Program ("ASAP") programs.  All of the Non-DCI Comparators[124] are fully reimbursed for Flight Pay Loss.

158.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes that ALPA fully reimburse the Company for Flight Pay Loss, aligning it with nearly all of its Comparators.

(c)        **Medical Reimbursement**

159.  **Current Pinnacle Terms**:  The FAA requires Pilots to undergo one or two medical exams per year.  The Company may also require additional medical exams at its discretion.  Under its current pilot contract, Pinnacle reimburses pilots for all Company-required medical exams *and* one FAA-required medical exam annually, up to $100 (LOA 21.A.9).

160.  **Comparator Group**:  Only one of the eleven DCI[125] and Non-DCI[126] Comparator airlines are required to reimburse pilots for FAA-required medical exams.

161.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes no change to the reimbursement of Company-mandated medical exams, but seeks to eliminate reimbursement for FAA-mandated exams, bringing it in line with its Comparators.

---

[124] Flight Pay Loss Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §13.H.4; Ex. 73, American Eagle ALPA CBA, at §18.F.2.e; Ex. 74, ExpressJet-ERJ ALPA CBA, at §12.J.5; Ex. 75, Mesa ALPA CBA, at §9.E.6; Ex. 76, Trans States ALPA CBA, at §13.G.4-5.

[125] Medical Reimbursement Sources (DCI Carriers):  ExpressJet-CRJ has no provision; Comair has no provision; Compass has no provision; GoJet has no provision; Republic has no provision;

[126] Medical Reimbursement Sources (Non-DCI Comparators):  Air Wisconsin at §15; American Eagle has no provision; ExpressJet-ERJ has no provision; Mesa has no provision; Trans States has no provision.

(d)        **Moving Benefits for Voluntary Changes in Domicile**

162.  **Current Pinnacle Terms**:  In addition to reimbursing moving expenses for pilots who are involuntarily assigned to new Domiciles, Pinnacle provides various moving-related benefits to pilots who change Domiciles ***voluntarily***, including per diem, hotel accommodations, and additional time off (Ex. 54 §§6.E, 6.F).  Under the current ALPA JCBA, such benefits for voluntary Domicile changes are payable even if the pilot is not changing his or her place of residence.

163.  **Comparator Group**:  Only two DCI Carriers[127] provide such benefits for pilots who voluntarily change domiciles.  ExpressJet-CRJ provides per diem, but not lodging, until the pilot receives 4 consecutive days off following the last scheduled trip at the former domicile.  ██████████████████████████████████████████████████

██████████████████████████████████████████████  It is important to note that pilots at those two carriers only receive the stated benefits in the case of an actual move.  None of the Non-DCI Comparators[128] receive similar benefits upon voluntary changes in domicile.

164.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes no change to the provisions governing moving benefits for pilots required by the Company to change Domiciles, but proposes to eliminate pilot moving benefits, as described above, for voluntary Domicile changes.

---

[127] Voluntary Moving Expenses Sources (DCI Carriers):  Ex. 67, ExpressJet-CRJ ALPA CBA, at §5.A.5; Comair has no provision; Compass has no provision; GoJet has no provision; Republic has no provision; ████████████████████████

[128] Voluntary Moving Expenses Sources (Non-DCI Comparators):  Air Wisconsin has no provision; American Eagle has no provision; ExpressJet-ERJ has no provision; Mesa has no provision; Trans States has no provision.

(e)   **Family Medical Leave Act (FMLA) – Dependent Care**

165. **Current Pinnacle Terms**: Pinnacle's pilots accrue 2.5 hours of sick leave each month, and can accrue this sick leave without limit. Under the current pilot contract, if a pilot needs to take time off under FMLA for any qualifying event that pilot may use his or her sick leave credit hours to be paid for such time off (LOA 21.A.4-5).

166. **Comparator Group**: Most regional airlines have non-contractual policies regarding FMLA that can be changed unilaterally by the carrier.

167. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to grant FMLA leave in accordance with applicable law and proposes to remove an employee's option to be paid using sick leave credit hours for FMLA unless it is for the pilots' own qualifying serious illness. Under the proposed terms, employees would only be eligible to use sick leave credit hours when leave is taken based on that employees' own health condition.

## VII.   PINNACLE'S FLIGHT ATTENDANT CONTRACT CONTAINS A NUMBER OF PROVISIONS THAT ARE MORE COSTLY AND PROVIDE LESS PRODUCTIVITY THAN ITS COMPETITORS

168. I have analyzed and compared the provisions of Pinnacle's Section 1113 proposal to the comparable provisions in the flight attendant labor contracts of the Comparator Group. As with Pinnacle's pilots, and as noted in Section IV, above, and illustrated in more detail below, Pinnacle is at a disadvantage versus its main competitors in terms of flight attendant labor costs as driven by certain work rules and benefits.

### A.   Pinnacle's Flight Attendant Compensation Is At Market Rates

169. Flight attendants are paid an hourly rate based on length of service with the Company. The longer a flight attendant is with a Company, the higher the hourly rate. In addition to their current hourly rates, Pinnacle flight attendants are scheduled to receive 1.5

percent general wage increase on October 24, 2012, with additional increases of 1.0 percent in

October 2013 and 2014 and another 1.5 percent increase in October 2015.

### Current Flight Attendant Pay Scales

170.  The mark-to-market analysis shows that Pinnacle's current flight attendant pay

scale is in line with both its DCI and Non-DCI competitors.  *See* Ex. 17, Mark-to-Market.  At

some seniority steps, Pinnacle's rates are slightly higher than the industry average, and at

others, Pinnacle's rates are slightly lower than the industry average.  *See* Ex. 34, Current Flight

Attendant Pay vs. All Carriers.

171.  Pinnacle's current wage rate for first year flight attendants is 0.6 percent lower

than the DCI average, but is higher than 3 of its DCI competitors.  *See* Ex. 35, Current Flight

Attendant Pay vs. DCI Carriers. Pinnacle's pay rate for 10-year flight attendants is about 1.1

percent higher than the DCI average and is higher than three of its DCI competitors.  Pinnacle

currently caps its flight attendant pay scale at 16 years.  Pinnacle's current wage rate for 16-

year flight attendants is higher than that of 2 of its DCI competitors and is 1.6 percent above

the DCI average.

172.  As noted above, Compass and GoJet are the two youngest carriers among the DCI

group. As a result, the average seniority of a Pinnacle flight attendant is higher than flight

attendant seniority at Compass and GoJet, resulting in an added cost disadvantage to Pinnacle.

173.  Pinnacle's flight attendant pay rate ranges from ███████████████████

than the pay rates at Compass and ██████████████████████████ than the pay rates at

GoJet.  *See* Ex. 36, Current Flight Attendant Pay vs. GoJet and Compass.

**Proposed Wage Reduction and General Wage Increases**

174.  In addition to the proposed pay scale reductions, *see* Ex. 37, Proposed Flight Attendant Pay vs. DCI Carriers; Ex. 38, Proposed Flight Attendant Pay vs. Non-DCI Comparators, Pinnacle proposes to modify the current scheduled pay increases to flight attendants to increases of 1.5 percent each year, starting in January 2014.

175.  Pinnacle's proposed wage rate for first year Flight Attendants would be higher than one of its DCI competitors, but sill 5.6 below the DCI average.  Pinnacle's wage rate for 10-year Flight Attendants would also be higher than one of its DCI competitors, but 4.0 percent below the DCI average.

176.  To help solve the seniority disadvantage, Pinnacle has proposed to cap the flight attendant pay scale at 12 years instead of 16 years.  At 12 years of seniority, Pinnacle's proposed rates would be higher than two of its DCI competitors at 12 years of seniority, but 3.1 percent below the DCI average.

**B.**   **Pinnacle's Flight Attendant Work Rules Are Costly**

177.  Pinnacle's competitive disadvantage is also owed, in part, to its flight attendant work rules.  Like those governing its pilots, the work rules governing flight attendants substantially impact productivity and cost because they determine, among other things, number of days of work, how and when flight attendants may be scheduled to work, which, in turn, governs the number of flight attendants needed to staff a particular flight schedule.

178.  Below is a description of the flight attendant rule modifications that Pinnacle has proposed and how these modifications achieve critical improvements to Pinnacle's competitive position.

1.    **Holiday Pay**

179. **Current Pinnacle Terms**: Currently, Pinnacle's full-time flight attendants

accrue 8 hours of holiday pay per full quarter, and its part-time active flight attendants accrue 4

hours of holiday pay per quarter (Ex. 55 §18.K.1). Flight attendants must have at least 12

months seniority to be eligible for holiday pay. This current provision does not provide any

kind of incentive for flight attendants to work on a holiday, it simply allows flight attendants to

accrue holiday pay throughout the year and receive the pay out in a separate check during

December of each year.

180. **Comparator Group**: Pinnacle's competitors[129] [130] provide between 0 and 7

holidays, with at least five competitors providing two holidays or less including three of the

DCI Carriers, Comair ███████ ███████. Every DCI Carrier that provides designated

holidays include some sort of incentive pay for working on an actual holiday. *See* Ex. 39,

---

[129] Holiday Pay Sources (DCI Carriers): CBA between Atlantic Southeast Airlines, Inc. and
AFA-CWA, AFL-CIO (2008) ("ExpressJet-CRJ AFA CBA"), attached hereto as Exhibit 77, at
§5.O; CBA between Comair, Inc. and International Brotherhood of Teamsters (2002) ("Comair
IBT CBA"), attached hereto as Exhibit 78, contains no provision; ████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████; CBA between Chautauqua Airlines Inc. and International Brotherhood of Teamsters,
AFL-CIO (2005) ("Republic IBT CBA"), attached hereto as Exhibit 79 at §3.N; ████████████
████████████████████████████████████

[130] Holiday Pay Sources (Non-DCI Comparators): CBA between Air Wisconsin Airlines
Corporation and AFA (2003) ("Air Wisconsin AFA CBA"), attached hereto as Exhibit 80, at
§6.N; CBA between American Eagle Airlines, Inc. and AFA-CWA (2005) ("American Eagle
AFA CBA"), attached hereto at Exhibit 81, at §4.M; CBA between ExpressJet Airlines, Inc. and
International Association of Machinists and Aerospace Workers ("ExpressJet-ERJ IAM CBA"),
attached hereto as Exhibit 82, at §4Q; CBA between Mesa Airlines, Inc. and AFA-CWA (2010)
("Mesa AFA CBA"), attached hereto as Exhibit 83, at §3I; CBA between Trans States Airlines
and International Brotherhood of Teamsters, Local 618 (2009) ("Trans States IBT CBA"),
attached hereto as Exhibit 84, at §9.

Flight Attendant Holiday Pay – Pinnacle vs. DCI Carriers (reproduced below); Ex. 40, Flight

Attendant Holiday Pay - Pinnacle vs. Non-DCI Comparators (reproduced below).

| Flight Attendant Holiday Pay - Pinnacle vs. DCI Carriers | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | PNCL Current | PNCL Proposed | Xjet-CRJ | Comair | Compass | GoJet | Republic | SkyWest |
| Number of Holidays | | 4 | 5 | None | | | 7 | |
| Pay for Working on Holiday | All full time F/As are paid 32 hours per year for holiday pay. | 150% | 150% | N/A | | | Straight-time pay plus 4 hours | |

Ex. 39, Flight Attendant Holiday Pay – Pinnacle vs. DCI Carriers

| Flight Attendant Holiday Pay - Pinnacle vs. Non-DCI Comparators | | | | | | | |
|---|---|---|---|---|---|---|---|
| | PNCL Current | PNCL Proposed | Air Wis | Amer Eagle | Xjet-ERJ | Mesa | TSA |
| Number of Holidays | | 4 | 4 | 2 | 2 | 6 | 6 |
| Pay for Working on Holiday | All full time F/As are paid 32 hours per year for holiday pay. | 150% | 150% | 150% | Straight-time pay plus 5 hours | 150% | 150% |

Ex. 40, Flight Attendant Holiday Pay - Pinnacle vs. Non-DCI Comparators

181. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to designate 4 paid

holidays each year. Any flight attendant scheduled to work on one of those holidays would be

paid 150 percent of base pay for that day. This provision is a more reasonable and efficient

system because it rewards flight attendants who actually work on a holiday with 150 percent

pay. It also aligns Pinnacle with the norm among DCI Carriers. In fact, with 4 paid holidays,

the proposed provision is more favorable, from the perspective of a flight attendant, than the provisions at three of the DCI Carriers: Comair, ████████████.

### 2.    Per Diem Compensation

182.    **Current Pinnacle Terms**: Currently, Pinnacle pays flight attendants a Per Diem rate of $1.65 per hour, with scheduled increases of $0.05 per year from October 24, 2012, until October 24, 2015 (Ex. 55 §18.C).

183.    **Comparator Group**: Pinnacle's competitors pay flight attendant Per Diem rates ranging from $1.39 to $1.80 per hour. Pinnacle's current rate is greater than, or the same as, that of three of the six DCI Carriers.[131] Ex. 41, Flight Attendant Per Diem – Pinnacle vs. DCI Carriers (reproduced below). With Pinnacle's current $0.05 annual increases, however, Pinnacle's per diem will surpass all but one of its competitor's rates by October 24, 2013. Among Non-DCI Comparators,[132] Pinnacle pays a higher per diem rate than two of the five carriers. Ex. 42, Flight Attendant Per Diem – Pinnacle vs. Non-DCI Comparators (reproduced below).

---

[131] Per Diem Sources (DCI Carriers): Ex. 77, ExpressJet-CRJ AFA CBA, at §6.C; Ex. 78, Comair IBT CBA, at 2006 Extension LOA.D, §14.B.2; ████████████████████████; Ex. 79, Republic IBT CBA, at §4.B; ████████████████████

[132] Per Diem Sources (Non-DCI Comparators): Ex. 80, Air Wisconsin AFA CBA, at §7.E; Ex. 81, American Eagle AFA CBA, at §5.B; Ex. 82, ExpressJet-ERJ IAM CBA, at §7.D; Ex. 83, Mesa AFA CBA, at §6.A; Ex. 84, Trans States IBT CBA, at §4.B.1.



Ex. 41, Flight Attendant Per Diem – Pinnacle vs. DCI Carriers



Ex. 42, Flight Attendant Per Diem – Pinnacle vs. Non-DCI Comparators

184.  **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to reduce the current per diem rate to $1.60 with scheduled $0.05 increase on January 1, 2016, January 1, 2017.  The Company made an identical 1113 proposal to the pilots.  This would still leave Pinnacle paying a higher Per Diem rate than two of the six DCI Carriers and two of the five Non-DCI Comparators.

185.  Pinnacle also proposes to eliminate Per Diem pay for trips that start and end in the flight attendant's domicile on the same day.  While this provision does not currently exist at other DCI or OAL regional airlines, it has existed in CBAs in the past and is a way to reduce costs without impacting safety.  Flight attendants eat before their report and after their release, so this means, a flight attendant only needs food for perhaps a lunch meal.  That would be the only out of pocket cost for a flight attendant in this situation.

### 3.    Vacation Accrual

186.  **Current Pinnacle Terms**: Pinnacle's new hire flight attendants accrue 1.75 vacation hours per month.  The maximum accrual for flight attendants with 13 or more years of service is 7.00 vacation hours per month, or 84 hours per year (Ex. 55 §14.A.3).

187.  **Comparator Group**:  In terms of maximum vacation accrual, Pinnacle is at the top of the industry when compared to the DCI Carriers,[133] matching Comair and only trailing

---

[133] Vacation Accrual Sources (DCI Carriers):  Ex. 77, ExpressJet-CRJ FA CBA, at §12; Ex. 78 Comair IBT CBA, at §22; ███████████████████ ; Ex. 79, Republic IBT CBA, at §28; ███████████████████████████

Comair.  Compared to Non-DCI Comparators,[134] Pinnacle's vacation accrual is consistent with the other carriers.

188.  **Pinnacle's Section 1113 Proposal**:  Like the pilot 1113 proposal, Pinnacle proposed a decrease in vacation accrual for flight attendants by 1 week (or 1.75 hour per month) at each level of accrual, except for those flight attendants who currently receive 1 week per month.  Under this proposal, flight attendants would receive between 14 and 21 days of vacation accrual per year.

### 4.    Pay and Credit for Recurrent Training

189.  **Current Pinnacle Terms**:  Under Pinnacle's current contract, flight attendants receive pay and credit for annual recurrent training (Ex. 55 §12.A.6).  Because the training value is credited in addition to being paid, this results in the flight attendant being available for fewer hours of flying in the month.  By paying flight attendants for their annual recurrent training but not crediting them for the hours, each flight attendant with recurrent training can be scheduled for more flying during the month. This increase in flying hours directly increases the productivity of each flight attendant.

190.  **Comparator Group**:  All of the DCI[135] and Non-DCI[136] Comparators provide pay and credit for recurrent training.  However, this proposal has been utilized in a number of

---

[134] Vacation Accrual Sources (Non-DCI Comparators):  Ex. 80, Air Wisconsin AFA CBA, at §8.A; Ex. 81, American Eagle AFA CBA, at §10; Ex. 82, ExpressJet-ERJ IAM CBA, at §8.B; Ex. 83, Mesa AFA CBA, at §5.A; Ex. 84, Trans States IBT CBA, at §8.

[135] Recurrent Training Sources (DCI Carriers):  Ex. 77, ExpressJet-CRJ AFA CBA, at §5.E.1; Ex. 78, Comair IBT CBA, at §5.E; ███████████████ Ex. 79, Republic IBT CBA, at §3.J; ████████████████████████████ .

[136] Recurrent Training Sources (Non-DCI Comparators):  Ex. 80, Air Wisconsin AFA CBA, at §6.G; Ex. 81, American Eagle AFA CBA, at §19.B.4; Ex. 82, ExpressJet-ERJ IAM CBA, at §6.D.1; Ex. 83, Mesa AFA CBA, at §3.E; Ex. 84, Trans States IBT CBA, at §3.

other restructurings in the past decade and will go a long way towards improving the productivity of flight attendants.

191. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposed to significantly increase flight attendant productivity – and thus lower costs – by provided pay/no credit for recurrent training.

### 5.    Open Time Posting

192. **Current Pinnacle Terms**:  Similar to the open time discussion in the pilots section, "Open Time" is flying that either was not assigned during the monthly bid process for flying or which becomes available during the month.  Currently, flying which becomes available greater than 48 hours prior to report time must be placed in open time and made available for voluntary pick prior to being assigned to a Reserve (Ex. 55 §5.G.2).  As was discussed in the pilot section, while this "Open Time" can be picked up by Lineholders or Reserves, it is typically picked up by Lineholders with seniority advantage over Reserves. This results in various Lineholders reaching and even exceeding the Minimum Monthly Guarantee.  Because Reserves are typically underutilized and less likely to reach the Minimum Monthly Guarantee, it would save the Company money if Reserves picked up that open time or if the Company were able to assign that open time to Reserves. Under the current provision, however, the Company must first make all Open Time available for voluntary pick up before assigning it to a Reserve.  The Lineholders who typically pick up this open time are then often paid over their Minimum Monthly Guarantee, at added cost to Pinnacle.

193.   **Comparator Group**: Among the DCI Carriers,[137] ExpressJet-CRJ is permitted to either place unassigned time into daily open time for voluntary pick up or assign the flying to a Reserve. ██████████████████████████████████████████████████████████████████████, and thus it can be assumed that they also are permitted to assign open time to Reserves instead of first making it available for voluntary pick up.  Among the Non-DCI Comparators,[138] Air Wisconsin may assign open time which results from additional flights or requests to drop to a time available and/or Long Call flight attendant without first being posted.

194.   **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to remove the provision which prohibits the Company from assigning open time to a Reserve without first posting the flying in open time.  This ability to withhold Open Time from being posted and instead being allowed to assign the flying to Reserves will prove to be a more efficient and economical use of Reserves.  This proposal will better align Pinnacle with its DCI competitors.

6.   **Customs Credit**

195.   **Current Pinnacle Terms**: In addition to normal Credit Hours earned for an international flight, Pinnacle's flight attendant contract currently provides for 18 minutes of credit each time they pass through customs, referred to as a "Customs Credit" (Ex. 55 §18.I).

---

[137] Open Time Posting Sources (DCI Carriers):  Ex. 77, ExpressJet-CRJ AFA CBA, at §7.K; Ex. 78, Comair IBT CBA, at §23.L; ████████████████████████████████████; Ex. 79, Republic IBT CBA, at §6.G; ██████████████████████

[138] Open Time Posting Sources (Non-DCI Comparators):  Ex. 80, Air Wisconsin AFA CBA, at §11.E; Ex. 81, American Eagle AFA CBA, at §8.E; Ex. 82, ExpressJet-ERJ IAM CBA, at §5.H; Ex. 83, Mesa AFA CBA, at §7.B.1; Ex. 84, Trans States AFA CBA, at §6.G.

196.  **Comparator Group**: Currently, only one of the six DCI Carriers[139] besides Pinnacle provides flight attendants with a customs credit. None of the Non-DCI Comparators provide a customs credit.

197.  **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to eliminate the Customs Credit bringing the Company in line with all of its DCI competitors and the majority of its Non-DCI competitors.

### 7.  Minimum Day for Part-Time Flight Attendants

198.  **Current Pinnacle Terms**: Pinnacle currently employs part-time flight attendants, in addition to full-time flight attendants. Like Lineholders, part-time flight attendants must be scheduled to work a certain number of days per bid period. Currently, Pinnacle builds both regular and Reserve part-time lines to contain at least 6 scheduled working days per bid month (Ex. 55 §5.D).

199.  **Comparator Group**: Among the DCI Carriers,[140] only three of the six carriers employ part-time flight attendants. Of the Non-DCI Comparators,[141] only two airlines employ part-time flight attendants. None of these carriers provide provisions regarding the number of working days for which a part-time flight attendant must be scheduled. Instead, they provide a minimum number of hours part-time flight attendants must work per month. Assuming that,

---

[139] Customs Pay Sources (DCI Carriers): ExpressJet-CRJ has no provision; Comair has no provision; ███████████████████; Republic at §3.F; ███████████
███████

[140] Part Time F/A Sources (DCI Carriers): Ex. 77, ExpressJet-CRJ AFA CBA, at §27; Comair has no provision; ███████████████████; Ex. 79, Republic IBT CBA, at §6.E.3.b:███████████████

[141] Part Time F/A Sources (Non-DCI Comparators): Air Wisconsin has no provision; Ex. 81, American Eagle AFA CBA, at §8.B.10.a; Ex. 82, ExpressJet-ERJ IAM CBA, at §5.G.3, §20.E; Mesa has no provision; Trans States has no provision.

on average, a Pinnacle flight attendant is credited with 5 hours per day, a relative comparison can be made with the other carriers. At 5 credit hours per day, the current provision of 6 days per month would result in part-time flight attendants working 30 hours per month. This is well below the minimum at each of the DCI Carriers where the minimums range from 31.25 credit hours to 40 credit hours, as well as the Non-DCI Carrier, ExpressJet-ERJ. While Non-DCI comparator American Eagle does provide reduced lines of flying, these lines are not held to a minimum number of hours.

200. **Pinnacle's Section 1113 Proposal**: Pinnacle proposes to increase the part-time lines from 6 scheduled work days to 8 scheduled work days per month. Applying the average of 5 credit hours per day, this would increase a part-time flight attendant from being scheduled 30 hours per month to 40 hours per month. This proposal would allow for a more effective use of part-time flight attendants, increase productivity, and place Pinnacle align with the other carriers.

        8.     **Deadhead**

201. **Current Pinnacle Terms**: As explained above in the pilots section, flight attendants also are often required to "deadhead" (traveling to a location other than a flight attendant's domicile to report for a scheduled flight). A flight attendant can deadhead by air travel or ground travel. Currently, Pinnacle compensates flight attendants for "deadheading" either by air or ground at the rate of 75 percent of actual or scheduled travel time, whichever is greater (the "Deadhead Credit") (Ex. 55 §19.B, §19.C).

202. **Comparator Group**: Pinnacle's DCI and Non-DCI Comparators compensate flight attendants for deadheading at rates between 50 percent and 100 percent of the deadhead

time.  Among the DCI Comparators,[142] Pinnacle's deadhead rate of 75 percent is lower

ExpressJet-CRJ, Comair, and ████████ rates for deadheading by air.  By ground, however,

Pinnacle's rate is higher than all of the DCI Carriers with the exception of Comair.  *See* Ex. 43,

Flight Attendant Per Diem – Pinnacle vs. DCI Carriers (reproduced below).  Among the Non-

DCI Comparators[143] only Pinnacle and American Eagle compensate at rates above 50 percent.

*See* Ex. 44, Flight Attendant Per Diem – Pinnacle vs. Non-DCI Comparators (reproduced

below).

| Flight Attendant Deadhead Pay and Credit - Pinnacle vs. DCI Carriers | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | PNCL Current | PNCL Proposed | Xjet-CRJ | Comair | Compass | GoJet | Republic | SkyWest |
| Air | 75% | 50% | 100% | 100% | ███ | ███ | 75% | ███ |
| Ground | 75% | 50% | 50% | 100% | ███ | ███ | 50% | ███ |

Ex. 43, Flight Attendant Per Diem – Pinnacle vs. Non-DCI Comparators

| Flight Attendant Deadhead Pay and Credit - Pinnacle vs. Non-DCI Comparators | | | | | | | |
|---|---|---|---|---|---|---|---|
| | PNCL Current | PNCL Proposed | Air Wis | Amer Eagle | Xjet-ERJ | Mesa | TSA |
| Air | 75% | 50% | 50% | 75% | 50% | 50% | 50% |
| Ground | 75% | 50% | 50% | 75% | 50% | 50% | No provision |

Ex. 44, Flight Attendant Per Diem – Pinnacle vs. DCI Carriers

---

[142] Deadhead Sources (DCI Carriers):  Ex. 77, ExpressJet-CRJ AFA CBA, at §5.D; Ex. 78, Comair IBT CBA, at §3.J; ███████████████████████████████; Ex. 79, Republic IBT CBA, at §3.E; ██████████████████████████████████████████.

[143] Deadhead Sources (Non-DCI Comparators):  Ex. 80, Air Wisconsin, AFA CBA, at §6.E; Ex. 81, American Eagle AFA CBA, at §4.E; Ex. 82, ExpressJet-ERJ IAM CBA, at 2008 Restructuring LOA.3, §3.P, §7.B; Ex. 83, Mesa AFA CBA, at §3.G; Ex. 84, Trans States IBT CBA, at §3.13.

203. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to reduce the Deadhead Credit to 50 percent of the greater of actual or scheduled travel time for all deadheading.  This rate would match all of the non DCI Carriers.  The proposal would align Pinnacle's rate for ground deadheading with four of the DCI Carriers, and the proposal for deadheading by air would match Compass' rate and place Pinnacle at a competitive advantage with respect to the other DCI competitors.

## VIII.   PINNACLE'S EMPLOYEE BENEFITS ARE AMONG THE MOST COSTLY IN THE INDUSTRY

204.  Health care costs continue to skyrocket across American industry.  Pinnacle has not been immune to this national problem.  The Company-sponsored medical benefits that Pinnacle provides to its employees are very costly to the Company and continue to rise each year.  Curbing these rising costs is necessary to keep Pinnacle competitive and allow Pinnacle to manage its future costs.  Pinnacle has proposed company-wide modifications to its employee benefits plans as follows:

### A.   Medical Plans

#### 1.   Medical Plan Design

205. **Current Pinnacle Terms**:  Pinnacle currently offers two types of health plans: an Open Access Plan ("OAP") and Health Reimbursement Act Plan ("HRA").  In general, the OAP provides In-Network and Out-of-Network coverage with defined benefits for medical services.  The HRA also provides benefits for In-Network and Out-of-Network coverage, but has lower premiums and a higher deductible than the OAP Plan.

206. **Comparator Group**:  Pinnacle's Comparators offer employees the option between OAP or other point-of-service/preferred-provide plans, and/or HRAs or consumer-

driven healthcare plans ("CDHP").  The trend in American industry has been towards the type

of CDHP that Pinnacle has proposed.[144]

207.  **Pinnacle's Section 1113 Proposal**:  Given the rapidly-changing nature of the

health care industry and rising health care costs, as well as the recent trend in American

industry toward CDHPs, Pinnacle must adopt a medical plan that is in line with the trend in

order to be competitive.  A summary of the benefits under the proposed consumer-driven HRA

plan is attached as Ex. 51, Pilot 1113 Term Sheet and Ex. 52, Flight Attendant 1113 Term

Sheet.  The proposed plan would save Pinnacle an estimated $4.6 million per year.  (*See*

Declaration of Stephen Hunyor, dated September 13, 2012, at ¶ 5.)  Moreover, Pinnacle will

save costs by matching coverage to employee needs and by eliminating the administrative costs

and burdens associated with maintaining two types of healthcare plans.

2. **Employee Contributions to Medical Premium**

208.  **Current Pinnacle Terms**:  Currently, Pinnacle employees opting for the OAP

plan pay 27 percent of the premium, which ranges from about $101 per month for single

coverage up to $323 per month for family coverage.  Pinnacle's employees that opt for the

HRA plan pay approximately 25 percent of the premium, which ranges from about $67 per

month for single coverage up to $214 per month for family coverage.

209.  **Comparator Group**:  Among DCI Carriers, only Comair pilots contribute a

lower percentage towards their health care costs than Pinnacle, while Air Wisconsin is the only

---

[144] According to a publication by the Bureau of Labor Statistics, 22 percent of respondents to a Mercer survey of private employees "plan to institute a CDHP to curb the increase in [healthcare] cost."  *See* Consumer-Driven Health Care: What Is It, And What Does It Mean for Employees and Employers, available at http://www.bls.gov/opub/cwc/cm20101019ar01p1.htm.

Non-DCI comparator with a lower pilot contribution share.[145]  *See* Ex. 45, Pilot Share of Premium for Medical Plans – Pinnacle vs. DCI Carriers (reproduced below); Ex. 46, Pilot Share of Premium for Medical Plans – Pinnacle vs. Non-DCI Comparators (reproduced below).

| Pilot Share of Premiums for Medical Insurance Plans - Pinnacle vs. DCI Carriers | | | | | | | |
|---|---|---|---|---|---|---|---|
| PNCL Current | PNCL Proposed | Xjet-CRJ | Comair | Compass | GoJet | Republic | SkyWest |
| OAP - 27%<br><br>HRA - 25% | HRA - 35% | Definity Health Plan - 30%<br><br>PPO - 30% | Primary PPO - 12%<br><br>Plus PPO - 16%<br><br>High Deductible Plan - 7% - 9% | 25% | 35% - 39% | After 1 Year of Service*:<br>No Deductible - 31% to 51%<br><br>$500 Deductible - 33% to 45%<br><br>High Deductible - 25% to 36%<br><br>*Pilot pays higher share during 1st year. | |

Ex. 45, Pilot Share of Premium for Medical Plans – Pinnacle vs. DCI Carriers

---

[145] Because medical plan contribution share data was only available for pilots, the analysis herein only refers to DCI and OAL pilot data and does not include flight attendants.  However, employee contribution percentages are generally the same across work groups for any individual airline.

| Pilot Share of Premiums for Medical Insurance Plans - Pinnacle vs. Non-DCI Comparators | | | | | | |
|---|---|---|---|---|---|---|
| PNCL Current | PNCL Proposed | Air Wis | Amer Eagle | Xjet-ERJ | Mesa | TSA |
| OAP - 27%  HRA - 25% | HRA - 35% | PPO - 25%  Indemnity - 21% | PPOs - 30%  Minimum Coverage Plan - 30% | EPOs - 25%  PPOs - 25%  BCBS Consumer Advantage - 25% | EPOs and PPOs - 36% to 48% for employee hired after 12/31/06  Those hired earlier may choose higher coverage with cost share more than 60% | Plans A and B - 38% to 50% |

Ex. 46, Pilot Share of Premium for Medical Plans – Pinnacle vs. Non-DCI

Comparators

210. **Pinnacle's Section 1113 Proposal**:  Under its proposed consumer-driven HRA

plan, employees would contribute 35 percent of the plan cost.  This would place Pinnacle well

within the range for the industry – GoJet and Republic pilots would still contribute a higher

share than Pinnacle among DCI Carriers, while ████████████████████

████  Mesa and Trans States would remain higher among Non-DCI Comparators.

3.    **Future Changes to the Medical Plan Design**

211. **Current Pinnacle Terms**:  Currently, Pinnacle is not contractually permitted to

make any changes to the medical plan designs offered to pilots, including the applicable

coverage, deductibles, and co-payments, without the consent of ALPA (Ex. 55 §27,

Appendices E, F, G).

212. **Comparator Group**:  Among DCI Carriers,[146] ███████████████████ ████████████ ExpressJet-CRJ must offer benefits at least equal to other employee groups and, if it negotiates benefit changes with the insurer, it must only notify the union and provide it with an opportunity to discuss such changes.  Four of the five Non-DCI Comparators[147] may make changes to their medical benefits after non-binding consultation with their unions.

213. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to have the ability to modify the health care plan at its discretion, which will provide the flexibility necessary to adapt to the rapidly-changing healthcare industry and which will be competitive with the rules in place at the majority of its DCI and Non-DCI Comparators.

4. **Medical Plan Coverage for Retired Pilots**

214. **Current Pinnacle Terms**:  Pinnacle provides health care coverage to pilots who retire at age 60 and their spouses at a reduced cost compared to COBRA (Ex. 54 §27.C).  Retired pilots are eligible to receive this coverage until the time that they are eligible for Medicare.  Very few of Pinnacle's pilots actually choose to use this plan, but Pinnacle is required to reflect the costs of future retirees on its books for accounting purposes, negatively impacting its profit and loss statements.

---

[146] Plan Changes Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §28.A.1; Ex. 68, Comair ALPA CBA, at §26.B; Ex. 69, Compass ALPA CBA, at §27; Ex. 70, GoJet IBT CBA, at §27; Ex. 71, Republic Teamsters CBA, at §14.B, §14.H ██████████████████

[147] Plan Changes Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at §27.D; Ex. 73, American Eagle ALPA CBA, at §28.A; Ex. 74, ExpressJet-ERJ ALPA CBA, at §22.E; Ex. 75, Mesa ALPA CBA, at §24.A; Ex. 76, Trans States ALPA CBA, at §27.

215.  **Comparator Group**: Four of the six DCI Carriers[148] do not offer any retiree

medical coverage to their pilots, and a fifth carrier, Compass, requires pilots to pay 100 percent

of the cost of retiree medical coverage.  Two of the five Non-DCI Comparators[149] do not offer

retiree medical and ExpressJet-ERJ pilots pay 100 percent of the cost.

216.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to eliminate health care

coverage for retired employees on a going-forward basis.  Pinnacle will offer retirees access to

its medical plans to the extent that they wish to enroll, but they would be responsible for 100

percent of the premium.  This places Pinnacle well within the industry standard compared to

both its DCI and Non-DCI Comparators.  Most importantly, since pilots now do not have to

retire until age 65, all employees, including pilots, will have the safety net of Medicare should

they decide to retire at age 65.

B.     Sick Leave and Disability

1.     **Extended Sick Leave / Short Term Disability**

217.  **Current Pinnacle Terms**:  Pinnacle pilots accrue 30 hours of regular sick leave

per year (Ex. 54 §14) and its flight attendants accrue 36 hours of regular sick leave per year

(Ex. 55 §13).  Regular sick leave is paid at 100 percent of base pay and is designed to cover

short term absences due to illness or off the job injuries.  In addition, pilots and flight

attendants (and other Company employees) participate in an Extended Sick Leave ("ESL")

plan, which is fully funded by Pinnacle and which begins on the 4th day of a disabling

---

[148] Retiree Medical Sources (DCI Carriers):  Ex. 66, ExpressJet-CRJ ALPA CBA, at §28.G; Ex.
68, Comair ALPA CBA, at §26.F; Ex. 69, Compass ALPA CBA, at §27.A; GoJet has no
provision; Republic has no provision; ██████████████████.

[149] Retiree Medical Sources (Non-DCI Comparators):  Ex. 72, Air Wisconsin ALPA CBA, at
§27.B; Ex. 73, American Eagle ALPA CBA, at §28.C; Ex. 74, ExpressJet-ERJ ALPA CBA, at
§22.B; Mesa has no provision; Trans States has no provision.

condition (15th day for flight attendants), may continue for up to 90 days, and is paid at 60

percent of base pay.  Once on ESL, employees only have to contribute 40 percent from their

sick leave bank (rather than 100 percent).  ESL is designed to cover longer-term absences due

to more serious illness or injury.  Pinnacle does not currently offer a standard Short Term

Disability ("STD") plan.

218.  **Comparator Group**:  None of the DCI Carriers offers an ESL or similar plan to

its pilots or flight attendants.  Two of the six DCI Carriers do not offer an STD plan either

█████████████, while the other four offer STD plans that are 100% paid by the employee

(ExpressJet-CRJ, Comair, Republic, SkyWest).  Of the Non-DCI Comparators, American

Eagle, and ExpressJet-ERJ offer a form of extended sick leave to pilots, while ExpressJet-ERJ

and Mesa offer it to flight attendants.  Air Wisconsin, American Eagle and Mesa offer STD

plans to pilots and flight attendants.  Trans States offers neither extended leave nor a STD plan

to either group.

219.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to replace Company-paid

ESL plan with an employee-paid short-term disability plan.  As discussed above, this aligns

Pinnacle with its Comparators and allows it to be more competitive.  These changes would

align Pinnacle with the industry average and are estimated to save the Company approximately

$939,000 per year.

### 2.  Long-Term Disability

220.  **Current Pinnacle Terms**:  Pinnacle currently offers Company-paid Long-Term

Disability ("LTD") benefits to its pilots (Ex. 54 §27.G).  Pinnacle's flight attendant LTD

benefits are covered by company policy.  Each plan is 100% paid by the Company.

221.  **Comparator Group**:  Comair requires that pilots contribute towards their LTD

coverage, while Republic's pilot and flight attendant CBAs make no mention of an LTD plan

at all.  Among Non-DCI Comparators, Air Wisconsin, and ExpressJet-ERJ require their pilots to contribute around half of the cost.

222.  **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to modify its LTD provision to require that employees contribute 25 percent towards the cost of the benefit, bringing it closer in line with a number of its Comparators.

### C.    401(k) Retirement Benefits

223.  **Current Pinnacle Terms**:  Pinnacle currently matches its employee's 401(k) contributions at varying rates depending on seniority.  For example, Pinnacle matches 25% of the first 6% of the employee's contributed salary for employees with 1 to 6 years of service, up to 125% of the first 10% of contributed salary is matched for employees with over 20 years of service (Ex. 54 §28 of pilot JCBA; Ex. 55 §22 of flight attendant CBA).

224.  **Comparator Group**:  As shown in Ex. 47, Pilot DC Plan Contribution – Pinnacle vs. DCI Carriers (reproduced below), Ex. 48, Pilot DC Plan Contribution – Pinnacle vs. Non-DCI Comparators (reproduced below), Ex. 49, Flight Attendant DC Plan Contribution – Pinnacle vs. DCI Carriers (reproduced below), Ex. 50, Flight Attendant DC Plan Contribution – Pinnacle vs. Non-DCI Comparators (reproduced below), Pinnacle's current contribution level – as measured by the maximum possible Company contribution – exceeds that of every other DCI and Non-DCI comparator, most by a significant margin.



Ex. 47, Pilot DC Plan Contribution – Pinnacle vs. DCI Carriers



Ex. 48, Pilot DC Plan Contribution – Pinnacle vs. Non-DCI Comparators



Ex. 49, Flight Attendant DC Plan Contribution – Pinnacle vs. DCI Carriers



Ex. 50, Flight Attendant DC Plan Contribution – Pinnacle vs. Non-DCI Comparators

225. **Pinnacle's Section 1113 Proposal**:  Pinnacle proposes to reduce the rate of Pinnacle's matching 401(k) contributions to bring it more in line with the industry norm. Under the proposed modifications, Pinnacle would continue to match 25% of the first 6% of the pilot's contributed salary for pilots with 1-5 years of service, and would match 50% of the first 8% of the pilot's contributed salary for pilots with 6-10 years, and 50% of the first 10% of the pilot's contributed salary for pilots with over 10 years of service, which equates to a maximum match of 5% of salary.  As illustrated above, this still leaves Pinnacle within the range of its Comparators.

### D.    Profit Sharing

226.  Variable compensation such as profit sharing is a great tool for an industry that is as cyclical in nature as the airline industry.  During the restructuring period of the past decade, many airlines have instituted profit sharing plans that have resulted in real compensation for employees.  It is a fair and equitable way to share the upside with employees who have sacrificed in other areas.

227. **Current Pinnacle Terms**:  Pinnacle does not currently offer a profit-sharing plan.

228. **Comparator Group**:  Because most profit sharing plans in the regional airline industry are offered by companies on a discretionary basis, and not negotiated with the union, the provisions of those plans often do not appear in the CBAs, making it difficult to obtain details of the plans.  In addition, these discretionary, non-negotiated, profit sharing plans may be changed at any time by the Company.  Only ExpressJet-CRJ and Comair, among the six DCI Carriers, have CBAs which contain details of the profit sharing plans.  Republic's CBA only states that any plan offered to other employees will be offered to pilots or flight attendants. ███████████████████████████████████████████████

███████████████.  I do not have information on any plans that may be in place at Compass or

GoJet, but since there is no mention of any such plan in their respective CBAs, if there is any profit sharing plan offered at all, the provisions of the plans are discretionary and may be revised by the airlines at any time.  Among the Non-DCI Comparators, only ExpressJet-ERJ pilot and flight attendant CBAs speak to a profit sharing plan at all.

229.  **Pinnacle's Section 1113 Proposal**:  If consensual agreements are reached, Pinnacle proposes to provide a profit-sharing plan, detailed in full in Ex. 51, Pinnacle Pilot 1113 Term Sheet and Ex. 52, Pinnacle Flight Attendant 1113 Term Sheet.  Under the profit-sharing proposal, in the event that the Company meets certain benchmarks, a bonus pool based on 10% of the Company's Adjusted Earnings up to 4% pre-tax margin, and 15% above the 4% pre-tax margin would be created.  Each class of employees, other than officers and directors, would receive a pro rata share of the Bonus Pool based on the class's wage and benefits concessions during bankruptcy.  This proposal is projected to result in approximately $7 million in annual payments to employees.  This plan provides guaranteed sharing starting with the first dollar of profits earned.  This would be among the best plans in the industry and, unlike the discretionary plans at most of Pinnacle's competitors, it would guarantee employees a share in the future profits of the Company.

I, Jerrold A. Glass, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee
Dated:  September 13, 2012

_____
Jerrold A. Glass
President
F&H Solutions Group