**Responding Brief Due October 12, 2012 at 12:00 p.m.**
**Trial Scheduled October 16, 2012 at __**

Thomas M. Kennedy
Susan M. Jennik
Elizabeth M. Pilecki
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place, 7th Floor
New York, New York 10003
Tel: (212) 358-1500
Attorneys for AFA-CWA

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
In re:                                              :        Chapter 11
                                                    :
Pinnacle Airlines Corp.,        *et al.*            :        Case No. 12-11343 (REG)
                                                    :
                            Debtors.                :        (Jointly Administered)
-----------------------------------------------------------------X

**MEMORANDUM OF ASSOCIATION OF FLIGHT ATTENDANTS-CWA**
**IN OPPOSITION TO DEBTORS' MOTION TO REJECT COLLECTIVE**
**BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION,**
**INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA**
**<u>PURSUANT TO 11 U.S.C. § 1113</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

SUMMARY OF RELEVANT FACTS

I.      PINNACLE WAS A PROFITABLE AIRLINE FROM 2007 THROUGH
        2010; PINNACLE'S FINANCIAL PROBLEMS IN 2011 AND ITS
        NEED FOR RE-ORGANIZATION HAVE NOTHING TO DO WITH
        ITS FLIGHT ATTENDANTS ...........................................................................4

II.     THE 2012 CAPACITY PURCHASE AGREEMENT BETWEEN DELTA
        AND PINNACLE INCLUDED A BLOCK HOUR PAYMENT
        COVERING THE EXISTING FLIGHT ATTENDANT COSTS .....................7

III.    ON MAY 8, 2012, PINNACLE DEMANDED THAT ITS FLIGHT
        ATTENDANTS ACCEPT $3.5 MILLION IN CONCESSIONS DESPITE
        THE LACK OF ANY EVIDENCE THAT THE FLIGHT ATTENDANTS
        HAD CONTRIBUTED TO PINNACLE'S BANKRUPTCY ...........................9

IV.     ON AUGUST 16, 2012, PINNACLE COMPOUNDED ITS FAILURES
        BY DRAMATICALLY RAISING THE AMOUNT OF CONCESSIONS
        SOUGHT FROM THE FLIGHT ATTENDANTS...........................................13

V.      DESPITE THE LACK OF A COMPELLING RATIONALE FOR ANY
        CONCESSIONS BY FLIGHT ATTENDANTS, AFA HAS OFFERED
        PINNACLE A PACKAGE OF CONCESSIONS THAT MEETS THE
        MAY 8, 2012 DEMANDS .............................................................................17

VI .    AFA HAS GOOD CAUSE TO REJECT PINNACLE'S REQUESTED
        INCREASE IN CONCESSIONS .................................................................18

        A.      The Delta CPA Compensates Pinnacle For Its Flight Attendant
                Costs............................................................................................18

        B.      Pinnacle Has Not Provided AFA With Available Verifiable
                Information Which Substantiates Its Demands......................................18

        C.      The Due Diligence Pinnacle Allegedly Performed Was Erroneous .....................19

        D.      Pinnacle's Experts Utilized The Wrong Pay Data................................20

        E.      Pinnacle Engaged In Double Counting.................................................20

        F.      Pinnacle Did Not Perform An Independent Diligence On The
                August 16 Ask  .............................................................................21

        G.      Pinnacle Did Not Use The Best Available Information .......................22

i

H.     Pinnacle's Analysis Is Not Plausible  ...................................................22

I.     Pinnacle Ignored The Best Information  ................................................23

J.     Pinnacle's Analysis Ignores Delta's Business Interests.........................23

K.     Misapplication Of The Data......................................................................24

L.     No Diligence On 50-Seat Aircraft ..........................................................24

M.     The Demands By Pinnacle Will Impose Unnecessary Suffering On
       The Flight Attendants  ............................................................................24

ARGUMENT

I.     PINNACLE HAS FAILED TO CARRY ITS BURDEN OF SHOWING
       IT IS NECESSARY TO REJECT THE AFA CONTRACT  ...........................................28

II.    DESPITE PINNACLE'S ARGUMENTS THAT IT IS LOSING MONEY,
       THE EVIDENCE SHOWS THAT ITS RECENT LOSSES ARE ONE-
       TIME CONTROLLABLE EVENTS THAT DO NOT REQUIRE
       CONCESSIONS FROM ITS FLIGHT ATTENDANTS ....................................31

III.   A DEBTOR SEEKING TO REJECT A LABOR AGREEMENT UNDER
       § 1113 MUST DEMONSTRATE THAT THE COMPENSATION PAID
       UNDER THAT CONTRACT IS HIGHER THAN THE RELEVANT
       MARKET COMPARISON .........................................................................33

       A.     Pinnacle's Proposed Wage Cuts Are Not Appropriate Since The
              Flight Attendants Currently Receive Below Market Pay .....................33

       B.     Section 1113 Motions Must Be Analyzed Separately For Each
              Collective Bargaining Agreement ..........................................................35

       C.     Pinnacle Has Not Demonstrated That Flight Attendant Work Rules
              Are Costly When Compared To The Relevant Market  .......................36

       D.     The Alleged Delta Claims Of Higher Costs Do Not Support The §
              1113 Motion Against The Flight Attendants ..........................................37

CONCLUSION...................................................................................................40

## TABLE OF AUTHORITIES

PAGE

### FEDERAL CASES

*In re Allied Delivery Sys. Co.,* 49 B.R. 700 (Bankr. N.D. Ohio 1985) .........................................30

*In re AMR Corp.*, 2012 WL 3422541 (Bankr. SDNY August 19, 2012) .....................................34

*In re Delta Air Lines, Inc.,* 359 B.R. 491(Bkrtcy.S.D.N.Y.) ........................................................35

*In re Delta Airlines,* 342 B.R. 685 (Bankr, SDNY, 2006)............................................................34

*In re Express Freight Lines, Inc.,* 119 B.R. 1006 (Bankr. E.D. Wis. 1990).................................30

*In re Family Snacks, Inc.,* 257 B.R. 884 (B.A.P. 8th Cir. 2001) ..................................................29

*In re GCI, Inc.,* 131 B.R. 685 (Bankr. N.D. Ind. 1991) ................................................................30

*In re Horsehead Industries, Inc.,* 300 B.R. 573 (Bankr. SDNY 2003).........................................29

*In Hostess Brands, Inc.,* No. 12-22052 (RDD) (Bankr. SDNY May 14, 2012) ..........................32

*In re Indiana Grocery Co., Inc.,* 136 B.R. 182 (Bkrtcy.S.D.Ind.,1990).......................................35

*In re Maxwell Newspapers, Inc.,* 981 F.2d 85 (2d Cir. 1992) .....................................................29

*Mile Hi Metal Sys., Inc.,* 889 F2d. 892 (10th Cir. 1990) .............................................................29

*In re Royal Composing Room, Inc.,* 848 F.2d 350 (Bankr. SDNY 1986), *aff'd* 78 B.R. 67
   (SDNY 1987), *aff'd* 846 F.2d 345 (2d Cir. 1968) ............................................................30, 34

*Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82 (2d Cir. 1987).............28, 29, 34, 36


### FEDERAL STATUTES

11 U.S.C. § 1113............................................................................................................... *passim*

11 U.S.C. § 1113(a)(1)....................................................................................................................30

11 U.S.C. §1113(b)(1) ....................................................................................................................30

11 U.S.C. §1113(b)(1)(A)...............................................................................................................28

11 U.S.C. § 1113(b)(1)(B)..............................................................................................................28

11 U.S.C. § 1113(b)(2) ...................................................................................................................28

11 U.S.C. § 1113(c) ..........................................................................................................29

11 U.S.C. § 1113(c)(1)......................................................................................................30

11 U.S.C. §1113(c)(2)...................................................................................................28, 30

11 U.S.C. § 1113(c)(3)......................................................................................................28

## OTHER AUTHORITIES

130 Cong. Rec. S8899 (daily ed. June 29, 1984).........................................................30

57 Am. Bankr. L.J. (1983) ...............................................................................................30

## INTRODUCTION

The effort of Pinnacle Airlines Corp. ("Pinnacle") to extract labor concessions from its flight attendants suffers from a fatal flaw. The proof demonstrates, and Pinnacle acknowledges, that the wages, work rules and benefits paid to its flight attendants are competitive with its peers. Pinnacle cannot impose upon its flight attendants a so-called "fair and equitable" portion of its labor cost reductions because it cannot demonstrate that the collective bargaining contract between the Association of Flight Attendants-Communication Workers of America ("AFA") and Pinnacle (the "AFA Contract") warrants rejection under § 1113 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 1113.  In spite of this evidence, Pinnacle and its affiliated debtors (the "Debtors") moved pursuant to 11 U.S.C. § 1113(c) for an Order, *inter alia* authorizing rejection of the AFA Contract; and implementing the terms of Pinnacle's § 1113 proposal (the "Motion"). (Doc. No. 647.)  AFA submits this Memorandum in opposition to the Motion.

When Pinnacle first proposed painful concessions to the flight attendants in May, 2012, it accompanied the proposed concessions with a table that demonstrated that the existing flight attendant compensation package was well within industry norms:

| Step 1. Pinnacle contract provision mark-to-market | Pilots | Flight[1] Attendants |
|---|---|---|
| **Wages** | | |
| Pinnacle base wage-related costs per year | █████ | █████ |
| % wage-related costs are above (below) DCI average (in 2013) | | |
| Value of cost disadvantage (advantage) vs. DCI average | ██ | |
| **Work Rules** | | |
| Value of work rule disadvantage (advantage) vs. DCI carriers | █████ | █ ███ |
| **Component of total 'ask' from mark-to-market** | █████ | █ ███ |

---

[1] The Declaration of Jerrald Glass, dated September 13, 2012, ("Glass Decl.") Exhibit 17.

1

This chart is clear:  while the pilots are allegedly above market rates by ███ million dollars, the

flight attendants are below market in wages and barely above market with regard to work rules –

but, as we show below, this chart significantly <u>understates</u> the extent to which Pinnacle flight

attendants are actually below market in their wages, benefits and work rules.

      Pinnacle's analysis of the Delta Connection, Inc. ("DCI") market average is distorted by

using outdated pay scale information for GoJet's flight attendant pay and by not including an

offset for work rules that favor Pinnacle as compared to other DCI regional carriers. The pay

scale for GoJet flight attendants compensation currently tops out at ███ an hour, compared to the

███ an hour asserted by Pinnacle.[2] The impact of Pinnacle using the wrong pay data for GoJet is

very substantial. Using the actual GoJet salary rates in the overall average DCI rate comparison

shows the Pinnacle flight attendant wages are ██████ or █████ below the DCI regional carrier

market average and the overall analysis combining work rules and wages puts the Pinnacle flight

attendants at least ██████ below the market average and not $85,000 above market as Pinnacle

alleged. See Akins Table 3:

### **Flight Attendant Mark-to-Market using Corrected GoJet Pay Rates**

| | |
|---|---|
| Pinnacle F.A. Base Wages | ██████ |
| % Wage-Related FA below market | ████ |
| $ Value of wage-related FA (disadvantage) | █████ |
| FA Work Rules(using the erroneous Pinnacle assumption) | █████ |
| **Total FA mark-to-market** | █████ |

---

[2] See Akins Declaration dated October 4, 2012, paragraph 63, hereinafter "Akins Decl. c"; Balzer Declaration paragraphs 5 – 8 dated October 4, 2012, hereinafter "Balzer Decl. ¶ __."  Charts or Tables from the Akins Declaration will be referred to as "Akin's Chart ___ or Table ____".

[3] The Pinnacle work rule analysis failed to credit its flight attendants for the 18 instances in which Pinnacle admits its flight attendant work rules are more favorable than other DCI carriers.

Discovery in this matter has demonstrated that as Pinnacle and Delta Air Lines ("Delta") worked hand in glove to find a basis for driving down Pinnacle's employee compensation, their review of the realities of flight attendant compensation actually ████████████████████ ████████████████████ (Declaration of Elizabeth Pilecki, dated October 4, 2012 ("Pilecki Decl.") Ex. 1.)  When Pinnacle worked through the key components of the AFA Contract, it was forced to concede that ████████████████████████ ████████████████████ (Pilecki Decl., Ex. 2.)  The declarations submitted by Pinnacle in support of its § 1113 motion concede that ████████████████ ████████████████████████████ ████████████ (Glass Decl., ¶ 170.)

Despite this conclusion, Pinnacle has demanded ████████ in annual labor concessions from its flight attendants. (Declaration of Terry French, dated October 4, 2012 ("French Decl."), Ex. 2.)  AFA respectfully submits that in the Second Circuit, as argued below, the case law endorsing labor cost reductions under § 1113 depends on a demonstration that it was those labor costs that generated an employer's adverse economic conditions.  Pinnacle may need a reorganization but that does not in and of itself permit it to reject a particular union's labor agreement if it cannot demonstrate that that particular agreement was a contributing cause of its financial difficulties.

Where a company has multiple labor agreements, each labor agreement must be separately evaluated.  Only where it is necessary for that particular labor agreement to be rejected can an employer prevail in a § 1113 proceeding.  Nonetheless, AFA has spent many hours considering and bargaining over Pinnacle's demand for labor concessions and has proposed concessions valued by Pinnacle in excess of the May, 2012 demand for ████ million in

3

concessions.  More than that they cannot and should not be asked to do.  The § 1113 motion to reject the AFA Contract should be denied.

<u>**SUMMARY OF RELEVANT FACTS**</u>

**I.    PINNACLE WAS A PROFITABLE AIRLINE FROM 2007 THROUGH 2010; PINNACLE'S FINANCIAL PROBLEMS IN 2011 AND ITS NEED FOR RE-ORGANIZATION HAVE NOTHING TO DO WITH ITS FLIGHT ATTENDANTS**

As a regional carrier, Pinnacle is subject to the pressures facing all of the competitors in that market.  But the facts particular to this case demonstrate that Pinnacle Airlines was a profitable airline from at least 2007 to 2010.   The annual net income reported by Pinnacle over the past ten years mounts to a total profit of $323.6 million on a consolidated basis. (Akins Chart 1.)  The consistent profit production of Pinnacle Airlines since 2007 is remarkable for any U.S. airline weathering the continual barrage of external events since 9/11 which include: two wars; a quadrupling in fuel prices; a global economic meltdown; and many other negative exogenous factors.  The loss in 2011, as we show below, is a function of a series of one time events that have nothing to do with flight attendants:



4

(Akins. Decl., ¶ 16.)

Pinnacle's story in 2011 is a simple one: its pre-tax, one-time expenses ballooned from $2 million in 2009 to $10.9 million in 2010 to $28.5 million in 2011. Pinnacle has identified the reasons for its adverse financial performance in 2011 and subsequent chapter 11 filing in its brief in support of the § 1113 motion: Pinnacle's bankruptcy was caused by a confluence of factors, including delayed integration of its subsidiaries, difficulties arising from its collective bargaining agreement with its pilots, increased operational expenses, and increasingly unprofitable flying contracts, all of which contributed to an acute liquidity crisis. (Pinnacle Memorandum in Support of the Motion ("Pinnacle Brief") at 1- 2.) , Pinnacle's 2011 SEC 10k filing contains an enlightening section and perspective under the title "Events Leading to Chapter 11 Cases". Listed below are the five critical factors Pinnale has highlighted in its annual SEC filing that it states "<u>have combined to jeopardize the Company's viability</u>".[4]

1. Delays in integrating the operating certificates of our subsidiaries;
2. Developments arising out of a new joint collective bargaining agreement with our pilots;
3. Increasingly unprofitable contracts with airline customers;
4. Poor operational performance; and
5. Increased operational expenses.

(Akins Decl., ¶ 22.) (Emphasis added.)

There is no reference to the AFA Contract as a contributing factor leading to Pinnacle's bankruptcy.

The Pinnacle SEC 10k filings make clear that it was the impact of the delayed integration of Mesaba and Colgan, the extensive costs involving the training and cross training of its pilots and the unprofitable Capacity Purchase Agreements with United and US Airways that caused its

---

[4] 2011 Pinnacle SEC 10k at 30.

financial problems. Operational integration of Mesaba was far more difficult, time consuming and costly than the prior Pinnacle management team had anticipated. When considering the impact of the delayed integration of Mesaba Pinnacle claimed, "we estimate that we have unanticipated costs and lost revenue in the tens of millions of dollars as a result of delayed integration and lost synergies." (Akins Decl., ¶ 24.) (Emphasis added.)

All of these expenses and operational issues added up to a one-time expense level of $28.5 million in 2011. Shown below in Akins Chart 4, is the impact of one-time expenses reported by PNCL in 2011 compared to previous years. The nearly 15-fold increase in Pinnacle's one-time pre-tax costs between 2009 and 2011 is the financial impact of many of the items Pinnacle listed as causing its chapter 11 filing discussed above.



As shown in Akins Chart 5 below, Pinnacle reported a net loss of $31 million in 2011 after reporting $12 million in net income in 2010, and $41.8 million in 2009. The impact of the

one-time expenses, coupled with all of the other expenses which occurred during the perfect

storm of 2011 pushed Pinnacle into the red and is the reason why Pinnacle had to restructure.



But today, Pinnacle has already completed the Mesaba integration process and Colgan

has been terminated.  The pilot training necessary to fly the existing fleet is completed.  The

unprofitable contracts for flying with United and US Airways have been rejected.  The operating

issues causing the one time losses in 2011 have been cured. At a minimum, it is clear that none

of the financial losses in 2011 or 2012 have ever been attributed to the flight attendants.

## II.    THE 2012 CAPACITY PURCHASE AGREEMENT BETWEEN DELTA AND PINNACLE INCLUDED A BLOCK HOUR PAYMENT COVERING THE EXISTING FLIGHT ATTENDANT COSTS

Pinnacle made the business judgment to enter into a new Capacity Purchase Agreement

with Delta on April 1, 2012 ("Delta CPA"), essentially at the same time it commenced this case.

The terms of the Delta CPA require that Pinnacle be paid ████ by Delta for each Block Hour

flown.  (Exhibit A, Payment Terms, Section 1.02 to the April 1, 2012 CPA, Data Room 4.1.1 p.

A-3.)  The payment is subject to an adjustment each year based on an economic measure

intended to reflect the impact of inflation.  Attachment D to the Delta CPA shows that the Block

Hour Rate covers, *inter alia*, ███████████████████████████████

The Delta CPA does not call for any reductions in flight attendant wages or benefits. Reached only six months ago, the Delta CPA included an amount sufficient to cover the existing flight attendant compensation.

There is no doubt that Delta and Pinnacle exhaustingly reviewed the AFA Contract before entering into the Delta CPA. In January, 2012, F&H Solutions Group prepared a confidential Pinnacle Flight Attendant Pay Comparison. (Pilecki Decl., Ex 3.)  Delta and Pinnacle representatives repeatedly discussed flight attendant costs prior to April 1, 2012.  For example, on March 19, 2012, Patrick Ryan ("Ryan") of Pinnacle emailed to Jason Cude ("Cude") of Delta a chart which compared Pinnacle flight attendants to the Delta Connection average flight attendant pay, showing that Pinnacle flight attendants ██████████████

████████████████████████████████████████████████████

█████████████████████████    *Ibid*.  Ryan also advised Cude in this email that with respect to work rules, Pinnacle flight attendants ████████████████████████ (Pilecki Decl., Ex. 4.)  On March 20, 2012, Ryan followed up with another email to Cude in which he stated that ██████████████████████████████████████████

████████████████████████████████████████    Since the Pinnacle flight attendant wages, benefits and work rules were already known to Delta and Pinnacle when they agreed to the April 1, 2012 Block Hour reimbursement rule which covers those costs, they were already baked into Pinnacle's profit forecasts.

III.   **ON MAY 8, 2012, PINNACLE DEMANDED THAT ITS FLIGHT ATTENDANTS ACCEPT $3.5 MILLION IN CONCESSIONS DESPITE THE LACK OF ANY EVIDENCE THAT THE FLIGHT ATTENDANTS HAD CONTRIBUTED TO PINNACLE'S BANKRUPTCY**

On May 8, 2012, Pinnacle made a presentation to the United Steelworkers of America ("Steelworkers"), the labor organization then representing the Pinnacle flight attendants.  The presentation admitted that the Pinnacle base wage related costs for its flight attendants per year was ███████ (.5%) below the DCI average on a mark to market basis.  The accompanying chart – parts of which are presented at page 1 of this brief – also alleged that the value of the work rule disadvantage versus other DCI carriers was ███████. This statement was apparently based on a segment of the ██ work rules analyzed by Pinnacle and is not true based on an analysis of the overall work rules at DCI carriers.  Pinnacle compared Pinnacle flight attendant work rules with work rules at the other DCI regional carriers. (Glass Decl., Ex. 5a.)  This chart compares ██ work rules from 6 DCI carriers, and shows that Pinnacle has <u>more</u> favorable work rules than other DCI carriers in ██ instances, <u>comparable</u> work rules in ██ instances, and <u>less</u> favorable work rules in ██ instances.  (Glass Decl. Ex. 5b.)  The Pinnacle demands for concessions based on flight attendant work rules do not give any credit whatsoever for the ██ instances in which the Pinnacle flight attendant work rule actually is less costly than the rules for flight attendants at other DCI regional carriers.  A fair mark to market comparison that included the 18 work rules where Pinnacle has a more favorable work rule than other DCI carriers would undoubtedly show that Pinnacle's flight attendant work rules are less costly than flight attendants at those other carriers.

The May 8, 2012, demand for Flight Attendant concessions represented a reduction of 9.1% in flight attendant "all in" cost base, including wages, benefits and work rules.  The demanded ██ million reduction in overall compensation represented ██ of the total labor

ask, with ▇ of the total ask being demanded of pilots, ▇ of the total ask being demanded of salaried managers and ▇ of the total ask being demanded of non-union hourly personnel.

Pinnacle seeks to explain this allocation in the Glass Declaration. (Glass Decl., ¶¶ 17-31, at 10-14.)  Glass presents a mark to market analysis which allegedly demonstrated that Pinnacle suffers from an ▇ cost disadvantage for flight attendants *vis a vis* other DCI carriers – (which he ironically includes within a discussion of "crippling disadvantages due to uncompetitive work rules)".  (*Id.,* ¶ 32.)  Glass concludes that "through an analysis to determine an equitable basis for dividing up the remaining labor savings needed, the Company found that a savings contribution of approximately 10 percent of each work groups respective cost base would achieve the required savings" and that "after a further analysis was conducted to determine how each work group could practically contribute such savings, the target contribution of the work groups ranged from ▇ to ▇."  (*Id.,* ¶ 29.)  Glass did not state why it was equitable to take ▇ of compensation from the flight attendants who have been underpaid for years and were utterly free of any responsibility for the financial distress that resulted in the chapter 11 filing.

Glass' elastic theory of equity also ignores the fact that Pinnacle's salaried personnel are not being asked to give up between ▇ to ▇ of their compensation since they are being credited with the economic impact of pre-bankruptcy compensation reductions that allegedly occurred.  However, the pre-bankruptcy salaried cost reductions were due to a reduction in the number of salaried personnel which was inflated beyond all reason as a result of the Mesaba integration issues.  The return to a more rational level of management does not represent the same kind of direct and intense diminishment in living standards for individual managers that Pinnacle is seeking from its flight attendants.

Pinnacle has shown no compelling need to decrease its flight attendant compensation by even one penny. Its suggestion on May 8, 2012 that it is fair and equitable to diminish the compensation of these underpaid individuals by ███ million as part of a general reduction of labor costs fails because Pinnacle has not first demonstrated that the AFA Contract should be rejected under § 1113. Pinnacle has also not shown whether its management or salaried non-union costs were above or below the DCI market. If the salaried and non-union hourly costs were above market, it is hardly fair or equitable to lump in the plainly undermarket flight attendant costs into the equation leading to the total ask. Further, it is not fair and equitable to decrease the below market flight attendant costs by ███ while limiting the contribution of salaried and non-union hourly to ███ and ███ of the labor ask respectively based on alleged and unproven pre-chapter 11 reductions in bloated management without giving the flight attendants credit for the years in which they were under-compensated based on the DCI averages.

Akins Chart 6 below shows that Pinnacle's flight attendant staffing per aircraft is not out of line with other DCI Carriers.



## Pinnacle Flight Attendant Staffing Levels are Below Most DCI Carriers

**Average Flight Attendants per Aircraft 2011**

Source: US DOT Form 41 Data
Note: Pinnacle is combination of Mesaba and Pinnacle

As shown below in Akins Chart 11 the hourly pay rates by year of service of Pinnacle Flight Attendants is above only GoJet and Compass.  The dashed line for GoJet shows the erroneous old flight attendant pay data that the company used in their diligence of GoJet pay rates.

12



The compensation paid to Pinnacle flight attendants is simply not above the rates being paid to flight attendants by other DCI carriers.

## IV. ON AUGUST 16, 2012, PINNACLE COMPOUNDED ITS FAILURES BY DRAMATICALLY RAISING THE AMOUNT OF CONCESSIONS SOUGHT FROM THE FLIGHT ATTENDANTS

On August 18, 2012, when negotiations resumed after a hiatus imposed by Pinnacle, it used the same unconvincing but allegedly equitable basis to increase the demanded concessions of the AFA by ███ to ██████.  On a percentage basis, the August 16, 2012 demands asked the flight attendants to absorb the highest increase of any labor group as compared to the May 8, 2012 proposal.

Although the overall August 16, 2012 concessionary ask went up by ███, from ██████ million to ██████ million, the increased ask of the AFA went up ███, more than any other group. By Pinnacle's own measure, flight attendants are currently no more or less expensive than the average of DCI Carriers, yet they have the heaviest lift in Pinnacle's second proposal of August,

13

2012.   Akins Chart 8, below, compares the increase in concessions determined by Pinnacle to be necessary to meet their new savings targets.



The increased demand for labor concessions was allegedly based on information from Delta stating that Pinnacle's annual per airplane costs were higher than the average for DCI competitors by ▮▮▮▮ for CRJ 900 76 aircraft and by ▮▮▮▮ for CRJ 200 50 seat aircraft. (Declaration of John Spanjers, dated September 13, 2012, hereinafter referred to as "spanjers Decl.," Ex. I.)  The August 1, 2012 letter to John Spanjers from Don Bornhurst of Delta is a simple declaratory statement of alleging greater costs by Pinnacle without any statement as to where the higher costs come from or when they were discovered.

The record demonstrates that Pinnacle used the information in this letter to pass on to its labor groups ▮▮ million in required additional concessions to meet this alleged cost gap.  There is no suggestion that the additional cost gap has any relationship to the flight attendants. Pinnacle is careful to state that it did not take the Delta allegation of over market costs "at face

14

value;" Pinnacle allegedly conducted its own analysis. Pinnacle explains: "█████████████

███████████████████████████████████████████████████████

████████████████████████████████████" And again: "████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████"

(Pinnacle Brief at 49.)  Pinnacle does not even suggest that the alleged cost gap is attributable to

flight attendant costs.

        In addition, Pinnacle has not established the bona fides of this alleged additional cost gap.

First, Delta did not state that the per plane cost gaps that aggregate to $33 million were a

function of labor cost. Delta was quite clear to Pinnacle that its cost calculations for determining

the CRJ 900 and CRJ 200 costs █████████████████████████████

███████████████████████████████████████████

████████████████████████ (Pilecki Decl. Ex. 4.) ████████████

███████████████████████████████████████████

███  All of Pinnacles' costs were included in the Delta claim but Pinnacle has responded by

slashing only its labor costs.

        In fact, a review of the business plans that allegedly support the May 8 and August 16

demands for labor concessions reveal that ████████████████████████████

████████████████████████ The ███ million in proposed labor savings

are used solely to push operating margins well above the ███ that was deemed by Pinnacle and

Barclay's sufficient to enable Pinnacle to successfully reorganize.

        As shown below in Akins Chart 7, Pinnacle is now demanding a rate-based margin in

excess of ███ for its Delta operations:



It is also clear that well before the August 1 Bornhorst letter to Pinnacle, Delta and Pinnacle were working together to find a basis for increasing the demanded concessions. In discovery, AFA learned of communications between Delta and Pinnacle which make it quite clear that Pinnacle management worked hand in glove with Delta to use this bankruptcy proceeding to drive down labor costs for their mutual benefit. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████"

(Pilecki Decl. Ex. 5.)

It is important to note that there is no evidentiary support for Delta's allegations that Pinnacle has per plane costs in excess of the DCI average. Delta says that Pinnacle is over cost as compared to the universe of DCI carriers. Spanjers testified that he took that information and directed Seabury to make a comparison of flight attendant labor costs solely at two of the lowest cost airlines. (Spanjers Decl. ¶ 23.) He does not describe how a comparison to a broad average

16

could be authenticated by a comparison to a different subset of that group.  Finally, how

creditable is it that Delta woke up in June, 2012, less than three months after negotiating a

Capacity Purchase Agreement effective April 1, 2012 in which it had full access to Pinnacle's

costs, and discovered a significant cost gap?  It is far more likely that Delta decided to take

advantage of the chapter 11 case to help Pinnacle get even more concessions than were originally

needed or demanded.

## V.      DESPITE THE LACK OF A COMPELLING RATIONALE FOR ANY CONCESSIONS BY FLIGHT ATTENDANTS, AFA HAS OFFERED PINNACLE A PACKAGE OF CONCESSIONS THAT MEETS THE MAY 8, 2012 DEMANDS

In the rounds of bargaining through October 4, 2012, AFA presented counteroffers to the

Pinnacle proposals on September 7, September 12 and September 25, 2012.  The annual savings

from these proposals exceed the concessions demanded in May, 2012.   There can be no claim

that AFA is not taking Pinnacle's current financial difficulties seriously.  Since the AFA was

certified as the representative for the Pinnacle flight attendants, AFA has met repeatedly with

Pinnacle and retained experts to review the material presented by Pinnacle.

AFA has rejected the Pinnacle demand that it concede to the full ███ million in annual

concessions. First, AFA has more than met the concessions demanded in May, 2012. Second, the

difference in the Operating Margin for Pinnacle between what Pinnacle is proposing and AFA

has accepted is miniscule when compared to the revenues and costs of Pinnacle. Third, while

Pinnacle has conceded that the flight attendant under-market costs did not cause its financial

difficulties, it has not credited the flight attendants with the work rules that are more favorable to

Pinnacle or the cumulative impact of prior years in which their compensation was admittedly

under market.  Fourth, there is no reason to believe that the collusive August 1 allegation from

Delta that Pinnacle is over cost per airplane is based on labor costs and, in any event, the alleged

cost gap has not been substantiated by Pinnacle.

**VI .   AFA HAS GOOD CAUSE TO REJECT PINNACLE'S REQUESTED INCREASE IN CONCESSIONS**

AFA has good cause to reject the August 16, 2012 demand for $6.4 million in

concessions.

**A.    The Delta CPA Compensates Pinnacle For Its Flight Attendant Costs**

When Delta signed the Delta CPA on April 1, 2012, establishing a new Block Hour Rate

that compensated Pinnacle for, *inter alia*, its flight attendant costs, Delta held a position of

extreme leverage over Pinnacle, as its sole customer and DIP lender.  It is unfathomable that the

second largest carrier in the world with contracts governing 550 aircraft at seven DCI carriers

would sign a multi-year deal in April, 2012 that it discovered a few months later would cost it

much more than its payments to other DCI carriers.  Pinnacle has provided no reasonable

substantiation of the claim that its flight attendant costs are above the average DCI flight

attendant costs.

**B.    Pinnacle Has Not Provided AFA With Available Verifiable Information Which Substantiates Its Demands**

Pinnacle asserts that it has provided AFA with "relevant information as necessary to

evaluate the proposal."  (Pinnacle Brief at 34.) This is clearly not the case for the August 16,

2012 proposal for ▮ million in additional concessions from labor. As opposed to Pinnacle's

claims that its labor ask is based on information that is has loaded through more than 7,000 pages

of documents in the data room (*e.g.,* Intralinks), the entire ▮ million in additional concessions

is based entirely on the claims made by Delta in one paragraph of  its August 1 response letter to

Spanjers.  Not one cent of Delta's rate analysis on which this concessionary ask is based is

18

verifiable by the AFA, or Pinnacle, or by anyone with the ability to directly review the assumptions and methodology upon which Delta makes it claim. The information regarding the source of Pinnacle's $33 million concessionary request is completely shrouded in confidentiality. This is convenient for Delta, which may have other commercial interests in mind when it developed its figures

### C.    The Due Diligence Pinnacle Allegedly Performed Was Erroneous

In its acceptance of Delta's out of market rate claims Pinnacle stated, "<u>Pinnacle did not, of course, simply take this information from Delta at face value,</u>" asserting that the Delta rate analysis was vetted though two separate independent analyses from two of its advisors, Seabury Consulting and Compass Lexicon. (Pinnacle Brief at 38.)

Virginia Hughes ("Hughes") of Seabury Consulting distorted her diligence efforts by directing the analysis away from verification of the DCI carrier <u>average</u> that Delta used, instead focusing on a subset of DCI carriers; two much smaller and newer low cost competitors, Compass and GoJet, neither of which operate CRJ-900 aircraft. She bases this selection on the following logic, █████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████ (Emphasis added.) Spanjers testified that it was he who directed Hughes to focus on GoJet and Compass. (Spanjers Decl. ¶ 23.)

Hughes excluded from her diligence efforts the two DCI carriers that actually operate the CRJ-900 aircraft in addition to Pinnacle: Skywest and ExpressJet. Additionally, if Hughes' "professional judgment" were correct then it would be Compass and/or GoJet that should be receiving both the 16 CRJ-900's (non-Mesaba) that are being currently transferred out of

---

[5] Declaration of Virginia Hughes, dated September 13, 2012 ("Hughes Decl., ¶ 24.)

Pinnacle and the 13 CRJ-900's that Comair is exiting.  Yet it is Skywest that will be taking over the operation of these 29 CRJ-900 aircraft.  The bottom line is that the diligence never addressed the claims made by Delta as it was the <u>average</u> DCI carrier rates and not those of the lowest cost competitors that Delta used and which should have been evaluated.

### D.    Pinnacle's Experts Utilized The Wrong Pay Data

Hughes' analysis of GoJet's flight attendant pay was based on outdated pay scale information. The pay scale under which GoJet flight attendants are currently being compensated tops out at ███ an hour, compared to the ███ an hour used by Hughes.  The impact of using the wrong pay data for GoJet is very substantial. Using the actual GoJet salary rates in the overall average DCI rate comparison shows the Pinnacle flight attendants wages are ███ below the DCI regional carrier market average (not merely ███) and an overall analysis combining work rules and wages puts the Pinnacle flight attendants well below the market average and not ███ above market as Pinnacle alleged. The impact of using the wrong GoJet pay scale also results in overestimating by ███ the annual flight attendant costs per aircraft.

### E.    Pinnacle Engaged In Double Counting

Pinnacle claims that the additional ███ million concession generated by Delta's rate analysis is wholly incremental to the original ask and that the diligence performed by its advisors fully accounted for this fact.  In order for a true accounting of the original ask any diligence on the second ask would have to first discount Pinnacle's actual labor cost by the amounts that were contemplated in original ask.  Pinnacle and its advisors appear to have attempted to do so regarding pilot costs, as both pay and work rules appear to have been adjusted to account for the initial ask, however this is not the case with flight attendants.  In fact, in both the Seabury and Compass Lexicon diligence of Delta's rate claim, flight attendant costs are given short shrift.

The analysis of Daniel Kasper ("Kasper") entitled, "76-seat Pilot Cost Analysis" does not even mention the fact that it has only a single page devoted to flight attendants, as discussed below.

Of the ███ million in the May, 2012 ask, approximately half was related to wage expenses. In its diligence, the company and its advisors have only attempted to back out the wage-related expense and have not adjusted flight attendant costs by the remaining work rule and benefits concessions. Therefore any diligence that Pinnacle performed to estimate the gap between its flight attendants and those at other carriers has not backed out these concessions and thus overstates the actual gap by approximately ███.

### F.    Pinnacle Did Not Perform An Independent Diligence On The August 16 Ask

Pinnacle claims it vetted Delta's rate claims that its costs were higher than the DCI average through separate analysis of costs performed by two of its advisors, Seabury and Compass Lexicon. Seabury presented its evaluation results for both GoJet and Compass Airlines, while Kasper of Compass Lexicon looked at only Compass Airlines. Both analyses were primarily focused on pilot costs.[6] Compass Lexicon used U.S. Department of Transportation ("US DOT") data as the basis of both its pilot and flight attendant diligence. However, there does not appear to be any application of US DOT Form 41 data or source numbers derived from independent sources that Kasper claims as the basis of its flight attendant diligence.[7] Instead, the real and only basis for Kasper's analysis of flight attendant costs is the application of the pay data provided to him by Seabury. Kasper has no other source for his average seniority adjusted wage for Pinnacle and Compass, other those generated from the Seabury analysis, which he lists as a source.[8]

---

[6] Interlinks Documents 6.44, 6.48 and 4.33.
[7] Interlinks Document 4.33 at page 5.
**[8]** Ibid.

Even then, in addition to the use of erroneous GoJet salary information, the importation of one of the pay figures Kasper uses seems to be in error.  Seabury diligence on average seniority weighted hourly pay at Compass for flight attendants was ██, whereas Kasper's analysis uses ██.[9]  Besides the fact that this error artificially increases the gap in Kasper's analysis, his analysis simply repeats the Seabury analysis and should not be considered a second independent diligence on flight attendant costs as implied by Pinnacle.

### G.    Pinnacle Did Not Use The Best Available Information

Pinnacle alleges that the "game changer" is the new pilots contract which could potentially limit Delta's operation of 50-seat aircraft operation to a maximum of 125 aircraft. This event is not tied in any obvious or logical way to the rate analysis Spanjers had requested from Delta.  Therefore, Pinnacle's new business plan with 140 50-seat aircraft through 2018, does not account for this "game changing" fact, and is not a reliable projection of future operations upon which the concessions are based.

Furthermore, no amount of flight attendant or labor concessions can change the fleet allocation decisions Delta will be soon making regarding who it chooses to operate the maximum of combined DCI fleet of 125 50-seat aircraft.  The CRJ-200 rates paid by Delta to Pinnacle are set through 2017 and will not be changed regardless of labor concessions at Pinnacle.  Delta, like most mainline carriers, has recently been attempting to shift away from older 50-seat aircraft. The basis for this change stems from the basic operational economics of the aircraft as well as passenger preference and not flight attendant costs.

### H.    Pinnacle's Analysis Is Not Plausible

Pinnacle's ██ million additional concession ask takes the total labor concession requested add up to ██ million annually.  According to Pinnacle, based on a fleet of 181

---

[9] Interlinks Documents 6.44 and 4.33 at page 5.

22

aircraft, Pinnacle's labor costs were not ███████ or ███████ above market as Delta claims, but an astounding ███████ per aircraft per year above the level at which Pinnacle would be viable. This is difficult, if not impossible, to believe.

### I.    Pinnacle Ignored The Best Information

Pinnacle's new business plan does not reflect any change to revenues or fleet assumptions resulting from the so-called Delta game changer and does not reflect the best available information.  Pinnacle operates fifteen more CRJ-200 aircraft than Delta's game changer deal allows.  Yet Pinnacle does not include this assumption in its latest business plan, keeping the full fleet of 140 CRJ-200 aircraft.  After negotiations were suspended for nearly two months due to the game changing events limiting total DCI carrier operation to 125 50-seat aircraft, Pinnacle's new business plan still contained 15 more CRJ-200 aircraft than Delta would be operating, contrary to Pinnacle's claim that it's "proposals are based on the most complete and reliable information available." (Pinnacle Brief at 34.)

### J.    Pinnacle's Analysis Ignores Delta's Business Interests

As an airline business seeking profits and competitive advantage Delta has in interest in reducing the rates it pays at Pinnacle as much as possible   It could reduce the amount it pays Pinnacle for any new flying after 2018, and the lower rates it seeks from Pinnacle can be used as leverage for Delta against other DCI carriers in future negotiations.  Also, there is an important clause in the Amended and Restated CPA's which could result in Delta receiving a payment from Pinnacle if profitability margins exceed certain thresholds.[10] The Annual Adjustment to Margin Payment section of the CRJ-200 CPA provides a formula which would not yield any payments by Pinnacle to Delta under the old business plan, but would yield as much as $20 million in payments to Delta under the new business plan as projected operating margins would

---

[10] Interlinks Document 7.13 at page 41.

exceed thresholds.  This could be useful in offsetting some of Delta's cost in parking 50-seat aircraft from DCI carriers.

### K.    Misapplication Of The Data

Regarding the findings of its diligence Pinnacle stated, "



" (Pinnacle Brief at 38.)  All other issues aside, if this flawed diligence was relied upon by Pinnacle in its assessment of the second ask, why did it increase flight attendant concessions more than any other group? As Chart 8 above shows, the concessions demanded of the flight attendants went up 82%, from the May ask, the most of any group.

### L.    No Diligence On 50-Seat Aircraft

Two-thirds of the $33 million in additional concessions is derived from the claimed ▮▮▮▮▮ above average rate for each of Pinnacle's fleet of 140 CRJ-200 50-seat aircraft.   This amounts to $22 million of the $33 million in additional concessions, yet there has been no diligence from Pinnacle or any of its advisors on this number.  One complication stems from the fact that a repeat of their CRJ-900 diligence using Compass and GoJet as the comparators is not possible, as neither of these carriers flies 50-seat regional jets.

### M.    The Demands By Pinnacle Will Impose Unnecessary Suffering On The Flight Attendants

The reality is that Pinnacle flight attendants are not only paid poorly in comparison to the average DCI carrier, they are paid poorly in absolute terms as well. The current starting rate for flight attendants at Pinnacle is only ▮▮▮▮ per hour.  But that figure can be misunderstood. flight attendants throughout the airline industry are paid an hourly rate for only a portion of the hours ("Block Hours") that they actually devote to their job.  The average Pinnacle flight

attendant gets paid for flying 82 Block Hours a month but works far more than that number of hours per month when including their Time Away From Base ("TAFB"), which represents the hours that a flight attendant is actually away from his or her base serving as a flight attendant. The TAFB for a Pinnacle flight attendant is as much as 402 hours per month, only 82 hours of which are hourly paid time.  The TAFB non-hourly paid time is paid only a per diem of $1.65 per hour, which usually goes for buying airport meals while away from home.  On a common overnight trip, for instance, from Minneapolis/St. Paul to JFK (which Pinnacle flies 20 or 25 times a week) the hourly paid time would be 3 Block Hours each way or 6 paid Block Hours and 12 to 16 hours of TAFB, unpaid except for the small hourly per diem.

The average Pinnacle flight attendant is paid ███ per hour, which represents ███ per month at the average of ██ paid hours.  The minimum monthly guaranteed number of flight attendant hours is ██ Block Hours and that yields a monthly income of ███ or a yearly wage of ████.  AFA MEC Chair Terry French testified that many of the Pinnacle flight attendants are single parents who must live on this income.  Pinnacle flight attendants are on food stamps, live in low-income assisted housing and receive other social assistance benefits despite working a full time job. They have enough trouble meeting rent, food and transportation obligations now without accepting any reductions in that income.  (French Decl. ¶ 5.)  These low wages are the reason why any wage cut or reduction in per diem would be very difficult for Pinnacle's flight attendants to accept.

This low level of wages also means that the Pinnacle proposal for transferring additional cost of health insurance on to the flight attendant will be very difficult for them to accept. Pinnacle's callous effort to design a single consumer health plan for all employees may work fine for the higher paid managers, but it will devastate flight attendants who rely on this job to

provide them health insurance.  In the Pinnacle proposal on health care, a newly hired flight attendant could be required to pay up to one-third of her/his income, or up to ▮▮▮ from an income of less than ▮▮▮.

Robin Hugdahl ("Hugdahl") testified that she is a Pinnacle flight attendant with over 14 years seniority. She usually flies more than the average flight attendant, and usually works 100 flight hours per month.  Her hourly rate of pay is ▮▮▮ per flight hour, but for any other time spent for layovers or flight delays, she is paid at the per diem rate of ▮▮▮ per hour to cover her meal and other basic expenses. In order to work ▮▮▮ hours of flight time, her actual hours away from home – commuting to work, time spent at the airport where she is based in Minneapolis, and layovers in other cities – are approximately ▮▮▮ hours per month.  After deductions are taken from her paycheck for taxes, 401k contributions, health care contributions and a 401k loan repayment she takes home around $603 in each of two checks per month.  (Hugdahl Declaration, dated October 4, 2012, hereinafter "Hugdahl Decl.," ¶¶ 1-3.)

Hugdahl was out of work on disability and seriously ill from June 26, 2011 until August 7, 2012.  During that time she had six surgeries.  In 2011, she had $3,500 in unreimbursed medical costs under the current Pinnacle health plan.  Had she suffered the same illness under the plan Pinnacle is now proposing, she would have had to pay significantly more out-of-pocket than she could afford.  During her illness, while out of the hospital, she had several prescriptions that cost $500, $350 and $212.00 that were necessary to support her recovery.  She also had many CAT scans for which Pinnacle is proposing to increase the employee contribution.  Diagnostic testing is crucial in a health plan, and forgoing such tests, because of costs, would not be in the best interests for patients.  (Hugdahl Decl. ¶¶ 16-17.)

26

The health benefit proposals that Pinnacle has given to AFA would have a devastating effect on Hughdahl and other flight attendants. Pinnacle's health care proposal significantly increases a flight attendant's out-of-pocket costs to the point where flight attendants would be unable to pay the additional costs and would forego medical care that they may need. The deductible for in-network single coverage is now ▆▆▆ and would increase to ▆▆▆ per year. For family coverage, the current ▆▆▆ deductible would increase to ▆▆▆ . That is substantially more than Hugdahl and other flight attendants could pay. Pinnacle is proposing to eliminate employee co-pays for doctor visits which are now ▆▆▆ per visit. Instead flight attendants would have to pay for ▆▆▆ for all office visits and ▆▆▆ of the cost before the ▆▆▆ deductible is met. (Hugdahl Decl. ¶¶ 7-9.)

Pinnacle is proposing to increase the prescription deductible to ▆▆▆ per year and any prescription costs after the deductible would be paid by the employee at ▆▆▆ of the prescription cost. For flight attendants who have prescriptions to fill monthly, or who have more expensive prescriptions, this would be a huge increase in their out-of-pocket expenses. Indeed, if Hugdahl had to pay ▆▆▆ of the cost of a prescription, she would consider not filling a prescription notwithstanding the obvious risks to her health. (Hugdahl Decl. ¶ 9.)

Pinnacle also proposes changing the out-of-pocket maximum for a single employee from ▆▆▆ per year to ▆▆▆ per year. Before the plan pays anything, an employee with single coverage would have to pay ▆▆▆ for their medical bills, plus another ▆▆▆ for prescriptions. Flight attendants would have to make some very hard choices. Like many others, Hugdahl has a mortgage, car payments, and must pay for food and gas. (Hugdahl Decl. ¶ 12.) In addition to all of these increased costs, Pinnacle wants to increase the employee contribution to ▆▆▆ from the current ▆▆▆ for the payment of premiums. Hugdahl now pays ▆▆▆ per pay period as a health

27

insurance premium.  (Hugdahl Decl. ¶ 13.)  If this number is increased, she will have that much

less to pay for the other costs imposed on her by the Plan.

Pinnacle is proposing that the same health plan cover flight attendants making $30,000

per year, and senior management making $150,000 per year.  Flight attendants are Pinnacle's

front line employees with constant direct contact with passengers.  They are exposed to more and

more varied illnesses than other employees and passengers, yet they are less able to bear the

proposed increased health care costs because they earn lower wages than most other workers.


## ARGUMENT

### I. PINNACLE HAS FAILED TO CARRY ITS BURDEN OF SHOWING IT IS NECESSARY TO REJECT THE AFA CONTRACT

In *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir. 1987), the

Second Circuit described §1113 as requiring three substantive requirements:

> 1.    The proposal is "limit[ed]" to "those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor" and that insures that "all creditors, the debtor and affected parties are treated fairly and equitably," § 1113(b)(1)(A);

> 2.    The union has rejected the proposal "without good cause," § 1113(c)(2); and

> 3.    The balance of equities clearly favors rejection. § 1113(c)(3).

In addition, a debtor must demonstrate that it has made a proposal based on the "most

complete and reliable information available at the time of such proposal" § 1113 (b)(1)(A),

provided the union with "such relevant information as is necessary to evaluate the proposal" §

1113(b)(1)(B), and met "at reasonable times, with the authorized representative to confer in good

faith in attempting to reach mutually satisfactory modifications of such agreement." §

1113(b)(2).

Courts have uniformly held that on each of these elements the debtor bears the burden of proof by a preponderance of the evidence. *See, e.g., In re Family Snacks, Inc.*, 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001). The Second Circuit has held that "the entire thrust of § 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process." *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90-91 (2d Cir. 1992). In § 1113 negotiations, where the union does not accept a proposal that is necessary, fair and equitable, it must explain the reasons for its opposition. *Mile Hi Metal Sys., Inc.*, 899 F.2d at 892 (10th Cir. 1990); *Carey Transp. Inc.*, 816 F.2d at 92. The AFA had good cause to not accept the August 16, 2012 Pinnacle proposal because Pinnacle cannot demonstrate that its flight attendant costs are above the relevant market. *In re Horsehead Industries, Inc.*, 300 B.R. 573, 588 (Bankr. SDNY 2003) recognized that the price of a debtor's bargaining strategy to effectively ignore a particular bargaining unit is a denial of the motion to reject that collective bargaining agreement. A debtor must meet the statute's requirements as to each collective bargaining agreement and bargaining unit, and a failure to meet with a union with regard to one of many collective bargaining agreements precludes rejection of it.

Sections 1113(c) and 1114(g)(2) require Pinnacle to prove that the AFA refused to accept its proposal without "good cause:" "The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that . . . (2) the authorized representative of the employees has refused to accept such proposal without good cause." The legislative history of the "good cause" requirement indicates that a bankruptcy court should give serious consideration and considerable weight to a union's reasons for rejecting the debtor's proposals. Representatives Hughes and Morrison stated that the good cause language was intended to embody the same standard suggested in Douglas Bordewick & Vern Countryman, "The

29

Rejection of Collective Bargaining Agreements by Chapter 11 Debtors," 57 Am. Bankr. L.J. at 319 (1983), that accords a union a presumption of reasonableness to its grounds for rejecting the debtor's proposal. *See* 130 Cong. Rec. S8899 (daily ed. June 29, 1984) (statement of Senator Kennedy citing statement of Representatives Morrison and Hughes).

The plain language of § 1113 mandates that the existence of a union's "good cause" provides a separate and independent statutory reason for denial of the debtor's application. In particular, § 1113(c)(1) provides that the court shall approve an application for rejection only if the trustee has "made a proposal that fulfills the requirements of subsection (b)(1)." Section 1113(c)(2) then provides that the court can approve the application to reject only if the union has rejected the proposal without good cause. Section 1113(c)(2) provides an additional requirement for the debtor. Thus, even though a proposal might satisfy the requirements of § 1113(a)(1), the debtor still must prove to the court's satisfaction that the union does not have good cause for not accepting the debtor's proposal. *See also Royal Composing Room*, 62 B.R. at 406 (Bankr. SDNY 1986), *aff'd* 78 B.R. 67 (SDNY 1987), *aff'd* 846 F.2d 345 (2d Cir. 1968) (the good cause requirement was "intended to ensure that a continuing process of good faith negotiations will take place before court involvement") (internal citation omitted). If the "debtor's proposal is not necessary to its reorganization and is not fair to all concerned, it follows that the union rejected the proposal with good cause." *In re Express Freight Lines, Inc.*, 119 B.R. 1006, 1017 (Bankr. E.D. Wis. 1990); *cf. In re Allied Delivery Sys. Co.*, 49 B.R. 700, 704 (Bankr. N.D. Ohio 1985); *In re GCI, Inc.*, 131 B.R. 685, 696 (Bankr. N.D. Ind. 1991) (same).

## II. DESPITE PINNACLE'S ARGUMENTS THAT IT IS LOSING MONEY, THE EVIDENCE SHOWS THAT ITS RECENT LOSSES ARE ONE-TIME CONTROLLABLE EVENTS THAT DO NOT REQUIRE CONCESSIONS FROM ITS FLIGHT ATTENDANTS

Pinnacle showed strong operating profits every year from 2007 through 2010. The $28 million in operating losses that Pinnacle sustained in 2011 were the result of a number of one-time Mesaba integration related expenses or otherwise curable conditions that Pinnacle has already addressed.  In its SEC 10k filings for 2011, Pinnacle asserted that its poor performance in 2011 was the result of the Mesaba integration issues and pilot-related issues including the costly pilot contract, the need for pilot cross-training and other cross-bid related expenses.

Flight attendants, of course, do not need to be cross-trained to serve on other types of jets. Pinnacle has also made clear that it has completed the Mesaba integration.  The costly Colgan prop flying has been eliminated.  Other problems such as the money-losing Capacity Purchase Agreements with United and U S Airways have been terminated in this bankruptcy proceeding. Pinnacle is in negotiations with its pilots for a new labor agreement.  A new and profitable CPA was negotiated with Delta on April 1, 2012.  The business model does not need extensive changes in flight attendant labor costs to allow Pinnacle to successfully reorganize.

In an effort to reach an agreement with Pinnacle, the AFA has accepted concessions that Pinnacle values in excess of the May 8, 2012 demand, thus meeting and exceeding 100% of the concessions proposed by Pinnacle in May, 2012.  The additional concessions demanded in August 16 would barely impact Pinnacle's proposed Operating Margin and Rate Based Margin.

Minor differences between a proposed plan and a plan accepted by a union are not sufficient to permit employers to impose the additional concessions rejected by the union.

In *In re Hostess Brands, Inc*, No 12-22052 (RDD) (Bankr. SDNY May 14, 2012), Judge

Drain denied a § 1113 motion because the union had agreed to concessions that brought the

EBIDTA within 1% of the company's proposal:

> Initially, the debtors' view was that that margin needed to be in the 11 percent range.
> That was subsequently reduced to the 10 percent range. Interestingly, there was no real
> costing of the individual elements of the proposal that showed how that margin would be
> achieved in the debtors' proposal or in how the union's proposal was short of that margin.
> On the other hand, and this was really the only testimony as to the margin that would be
> achieved by the IBT proposal, Mr. Wilson testified without being shaken or even
> challenged on cross-examination that if the union's proposal were implemented across the
> board, that is, not only for the IBT but similar changes were made for the other debtors'
> unions, the debtors would have an approximate 9 percent margin in respect of EBIDTA.
> The union proposal when compared to the debtors' proposal on specific cost savings
> appears to the Court to be consistent with that analysis. In that regard, what I mean is that
> the differences in terms of specific cost savings do not appear to be dramatic between the
> debtors' last proposal and the union's last proposal, although obviously, the union's last
> proposal has fewer or less dramatic cost reductions than the debtors. In the absence of
> any evidence to the contrary, it appears to me that Mr. Wilson's testimony should be
> accepted and that the EBIDTA margin difference here when one normalizes the union's –
> the IBT's proposal across all the debtors' unions and cost structure is that there is a one
> percent margin difference between the debtor and the union.
>
> I conclude based upon that analysis that in respect of the specific financial concessions
> that the debtors have asked of the union and the union has responded to the debtors on,
> first, that the union has turned down the company's proposal with regard to these
> concessions for good cause and secondly, that the company's proposal is not necessary
> for a reorganization, *i.e.* the one percent difference in margin has not shown to me to be
> material for purposes of Section1113.

Transcript page 41-41 Pilecki Decl. Ex. 8.

The Pinnacle flight attendants similarly have good cause to reject Pinnacle's proposals

because the proposed sacrifices in excess of the May, 2012 concessions are not necessary for a

re-organization.  The additional ███ million in concessions Pinnacle demanded in August,

2012 from the flight attendants will, like the additional concessions sought in Hostess, have an

annual impact on Operating Margin of less than one ███ percent.  A ███ million shortfall in

cost savings for Pinnacle would cause the forecast operating margin in 2013 to fall from ███ to

███, and the rate-based margin to fall from ███ to ███. See Akins Dec. ¶¶ 112 and 113.

## III.    A DEBTOR SEEKING TO REJECT A LABOR AGREEMENT UNDER § 1113 MUST DEMONSTRATE THAT THE COMPENSATION PAID UNDER THAT CONTRACT IS HIGHER THAN THE RELEVANT MARKET COMPARISON

### A.    Pinnacle's Proposed Wage Cuts Are Not Appropriate Since The Flight Attendants Currently Receive Below Market Pay

Pinnacle's motion seeks authority to force its flight attendants to undergo reductions in

wages, benefits and work rules valued at an average of ███ million per year, which represents an

overall reduction in annual compensation of ███. On September 13, 2012, Pinnacle presented a

proposal which demanded wage reductions of ███████ from its flight attendants as part of the

$6.4 million in reductions.  As described above, in fact, the Pinnacle flight attendants already

receive wages that are well below the DCI average.

Pinnacle's expert witness, Glass, testified that Pinnacle's flight attendant compensation is

at market rates of the Comparator Group he utilized to measure Pinnacle's labor costs.  (Glass

Decl., ¶ 169.)  Glass states: "████████████████████████████

████████████████████████████████████████" (*Id.*, ¶ 170.)  He

also admits that some flight attendant seniority rates are slightly lower than average.  (*Id.*)

Pinnacle originally offered proposals that would have driven flight attendant

compensation well below market levels.  Glass admits that on compensation alone, the Pinnacle

proposals to the AFA would make the compensation for first-year flight attendants ███ below

the DCI average and for ten-year flight attendants ██ below the DCI average.  (*Id.*, ¶ 175.)

Pinnacle then proposed to reduce the maximum seniority step to twelve years from the current

sixteen years and to cut that rate to ███ below the industry average.  These draconian cuts in

wages are not warranted by prevailing market compensation for flight attendants.

While Pinnacle has admitted that its flight attendant costs are within the competitive industry standards, it is nonetheless seeking a reduction in flight attendant compensation based upon an alleged operating cost gap determined by Delta for Pinnacle's 76-seat and 50-seat aircraft. Pinnacle made it quite clear that any gap in its costs from other DCI carriers is wholly a result of pilot costs. Pinnacle alleges that its costs for operating each Delta Connection 76-seat aircraft are $280,000 higher than the average of DCI regional carriers. Pinnacle explains that it did not take the Delta allegation of over market costs "at face value;" Pinnacle conducted its own analysis**.** The brief explains: "What Pinnacle found is that all or significantly all of the ▮▮▮▮ cost gap can be explained by the differential between its pilot costs and those of the lowest cost regional airlines." (Pinnacle Brief at 38.) And again: As discussed above, comparative cost analyses shows that the Company's ▮▮▮▮ cost disadvantage per 76-seat aircraft identified by Delta is largely, if not completely explainable, by pilot costs alone. (Pinnacle Brief at 49.) Pinnacle continues: "This is the unavoidable result of above-market pilot wages on a per-seniority year basis, above-market benefits and work rules, and – most fundamentally – a substantial seniority disadvantage, all impacting Pinnacle's largest cost item within its largest category of controllable costs." (Pinnacle Brief at 49.) It is perfectly plain from this exchange that flight attendant costs are not uncompetitive or they would have been cited as an element of the alleged cost gap.

The Second Circuit requires that in order to prevail on a § 1113 motion, a debtor must demonstrate that the affected workers under a challenged labor contract are receiving above market compensation. In *In re AMR Corp.*, 2012 WL 3422541 (Bankr. SDNY August 19, 2012)**,** Judge Lane observed that the Second Circuit has recognized the necessity of rejection "when a debtor's labor costs are higher than those of its competitors". The *AMR* court held that the

34

"airline industry is labor intensive" and found that the Debtors have "higher labor-related costs" than their competitors.  *In re Delta Air Lines, Inc.*, 359 B.R. 491(Bankr. S.D.N.Y. 2007) (rejecting a pilot contract because there was no dispute that Comair's pilot costs are materially higher than the rest of the regional airline industry and this competitive disadvantage has cost the airline dearly).

*In re Carey Transportation, Inc.* 816 F.2d 82, 93 (2d Cir. 1987), held that pay scales which materially exceed competitive industry standards were among the factors that justified rejection of the collective bargaining agreement (record evidence indicated that Carey was losing large sums of money, that its Local 807 labor costs in contrast to other employees' salaries and benefits were well above industry averages). *Royal Composing Room, Inc.,* 848 F.2d 350, rested on the finding of *In re Royal Composing Room Inc.*, 62 B.R. 403 (Bankr. S.D.N.Y. 1986) "that in order to survive Royal must end up with a labor cost that is competitive with a non-union shop's labor cost."  *See also In re Indiana Grocery Co., Inc.,* 136 B.R. 182, 193-94 (Bankr. S.D. Ind. 1990) (a factor in determining whether it was equitable to reject a union's agreement is whether "some workers' compensation is barely competitive while wages under the CBA sought to be rejected are above industry standards.")

Pinnacle cannot demonstrate that its flight attendant costs are above industry standards even when the relevant industry is comprised of the other regional airlines that fly for Delta.  Its § 1113 motion to reject the AFA contract must be rejected for that reason alone.

### B.    Section 1113 Motions Must Be Analyzed Separately For Each Collective Bargaining Agreement

The court in *In re Delta Airlines,* 342 B.R. 685, 696-97 (Bankr. S.D.N.Y. 2006), denied Delta's § 1113 motion to reject a flight attendant contract in part because each union was entitled to a separate evaluation of its contract under § 1113:

<u>Under the statute and the case law the flight attendants must bear their fair and proportionate share of the cost of Comair's reorganization, but the flight attendants are entitled to their own day in court under Section 1113.</u>  It is not acceptable to say that Comair, by reaching agreement with the pilots and the machinists, can preempt for the flight attendants the Section 1113 process of proposal, good faith negotiations, and determinations by the Bankruptcy Court of all issues relating to necessity, fairness, good faith negotiations, good cause and balance of the equities.  The quantum of flight attendant cost reductions is certainly at the heart of the requirement that 'all of the affected parties are treated fairly and equitably.' But that statutory issue is to be judged by the Bankruptcy Court, and the issue may not be predetermined and foreclosed by Comair's negotiations with the pilot and machinist unions.  ALPA and IAM represent their own members, not the flight attendants, and they may not dictate what is fair and equitable for the flight attendants by signing contingency clauses purporting to bind Comair and the Court.

Where multiple groups in an enterprise in chapter 11 have different economic circumstances, the Second Circuit has recognized that it is not necessary to extend pay or benefit reductions to employees who are not receiving pay and benefits above industry standards. In re *Carey Transportation, Inc.*, 816 F.2d 82, 90-91 (2d Cir.1987), held that it was not unfair or inequitable to exempt management and non-union employees from pay and benefit reductions where "the court finds that only employees covered by the pertinent bargaining agreements are receiving pay and benefits above industry standards."  816 F.2d at 90–91.  It is equally clear that here, where the flight attendants are not receiving compensation above industry standards, they should be exempt from the proposed cuts and they have good cause to reject the proposal to reduce their compensation even further below the market.

### C.    Pinnacle Has Not Demonstrated That Flight Attendant Work Rules Are Costly When Compared To The Relevant Market

Glass argues that certain of the flight attendant work rules place Pinnacle at a disadvantage against its main competitors.  (Glass Decl., ¶¶ 168, 177-203.)  Pinnacle has selected certain work rules that it alleges are disadvantageous to Pinnacle when compared to other comparable carriers.  But Pinnacle does not offer an analysis of the net offsetting impact of the

36

flight attendant work rules that are favorable to Pinnacle.  Pinnacle admits that 44 of the flight

attendant work rules are more favorable to Pinnacle than similar flight attendant work rules at the

DCI competitor airlines.  (Glass Decl., Ex. 7b.)  Glass does not separately evaluate the

significance of each of these work rules but the Pinnacle presentation to the flight attendants on

August 16, 2012, that was apparently prepared to support Pinnacle's May 8, 2012 concessionary

demand, identified the entire value of the so-called out of market work rules as ██████.  Since

the report admits that on average, the flight attendant annual wages were under market by

██████ ( which ignores the additional under-market impact of the actual GoJet rates) , the net

market comparison of wages, benefits and work rules estimated that the annual cumulative

above-market impact of the entire flight attendant compensation and benefits was approximately

██████ – a startlingly low two one thousandths of a percent (.002%) of the existing flight

attendant payroll and far below the $4.7 million in cost reductions that AFA has offered.  Even

that small disparity disappears if the flight attendants are given the advantage of the 44 instances

in which their work rules at Pinnacle are less costly than the work rules at other DCI regional

carriers.

### D.   The Alleged Delta Claims Of Higher Costs Do Not Support The § 1113 Motion Against The Flight Attendants

On August 16, 2012, Pinnacle virtually doubled the concessionary demands that it was

making on AFA by increasing its proposed annual compensation reduction from ██ million to

██ million.  This is an extraordinary act in any labor negotiation and plainly requires the utmost

transparency on how the concessionary demand was calculated and on what it is based.  The

facts show that Delta entered into a renewed Capacity Purchase Agreement with Pinnacle on

April 1, 2012 that specifically set forth a Block Hour compensation amount that would pay

Pinnacle for its labor costs for at least the next six years through 2018, including but not limited

37

to flight attendant wages, benefits and any costs arising as a result of work rules under the AFA

Contract.  Pinnacle now argues that in June, 2012, Delta decided that Pinnacle's costs that Delta

had just included within the Block Hour compensation amount two months before were now

████████ higher than average DCI competitors for 76-seat aircraft and ████████ higher than

average DCI competitors for 50-seat aircraft.  Pinnacle alleges that this disparity was first

conveyed at a meeting in June, 2012 and that Delta waited until August 1, 2012 to confirm in a

letter.[11]

It is clear that the inflated August 16, 2012 demands were a product of a decision by

Delta and Pinnacle to manipulate this proceeding to inflate the rate of return achieved by

Pinnacle.  A comparison between the Business Plans that were presented to AFA in support of

both the May 8, 2012 and August 16, 2012 proposals, shows that a major reason the August 16,

2012 proposal required higher concessions was a decision by Pinnacle to boost its Operating

Margin and Rate Based Margin under the August Plan as follows:



The entirety of the improved operating margin from the May to the August Business Plans is

achieved by lowering salaries, wages and benefits by ████████ in 2013.  (*Id.*)  The two

---

[11]    Delta, of course, has every incentive to wildly exaggerate the relative labor costs of its DCI regional carriers.
First when the Block Hour rates are reset to market in 2018, Delta will profit handsomely if it can manipulate the
market in this proceeding to drive labor costs lower and lower.  Second, the CPA allows Delta to recapture operating
margins on its contracts that exceed 8% – since the proposed labor concessions would result in a margin of 15%,
Delta would have an immediate payout as well.

Business Plans do not show a single dollar being saved from any source other than salaries,

wages and benefits during the entire period from 2013 through 2018.

That is particularly troublesome since it is clear that the allegations by Delta of excess

costs for the CRJ 900 and the CRJ 200 is not limited in any sense to labor costs.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

The Delta letter opining that on a per aircraft basis the Pinnacle costs are higher than the

DCI average is entirely *soi-disant*.  There is simply no evidence in this record that: 1) the Delta

assertions about a Pinnacle cost gap are true; or 2) that if there is such a gap, it has anything to do

with labor costs.  The mysteriously delayed letter states nothing apart from its conclusion and

expressly refuses to provide any factual back up.  Pinnacle, of course, pretends that like Captain

Renault in *Casablanca*, it was shocked, shocked, to discover that its corporate partner was

strongly suggesting it demand even more from its employees than it had first requested in the

May, 2012 proposal.

Pinnacle admits that it did not undertake an analysis of its costs compared to its DCI

competitors, which is the comparator group identified in the Delta August 1, 2012

correspondence.  (Spanjers Decl., ¶ 19)  Instead, Spanjers testified that he instructed Hughes of

Seabury to conduct a comparison between Pinnacle labor costs and the labor costs of only two of

the six other DCI regional carriers.  (Spanjers Decl., ¶ 25)  Spanjers got the results he wanted by

forcing a comparison with two companies that were known to have net lower labor costs because

they are more recent entrants into the industry and their relative employee seniority is lower.

AFA analyzed the arithmetic utilized by Hughes and it is obviously based on an outdated salary scale for GoJet.  (Akins Decl., ¶ 63.)  The comparison with Compass utilizes a salary scale set four years ago that is now under re-negotiations.  (Balzer Decl. ¶¶ 5-7.)

Further, any seniority-based comparison to a new airline is inevitably a temporary and transitory comparison because the relative seniority of GoJet and Compass flight attendants will inevitably increase to a level comparable to Pinnacle as the GoJet and Compass work forces age and mature.  There is no estimation of what the relative seniority of the GoJet and Compass flight attendants will be in 2018 when the Block Hour rates are subject to being reset but it is apparent from simple logic that it will be substantially higher than it is today, leading to equal flight attendant labor costs without the brutal concessions being demanded by Pinnacle.

.                                      **CONCLUSION**

For the foregoing reasons, the Pinnacle motion pursuant to § 1113 to reject the AFA Contract should be denied.

Dated:  New York, New York
        October 4, 2012

                        KENNEDY, JENNIK & MURRAY, P.C.
                        Counsel for AFA-CWA


                        By:_____/s/____Thomas M. Kennedy
                            Thomas M. Kennedy *(tkennedy@kjmlabor.com )*
                            Susan M. Jennik      *(sjennik@kjmlabor.com)*
                            Elizabeth M. Pilecki  *(epilecki@kjmlabor.com)*
                            113 University Place
                            New York, NY  10003
                            (212) 358-1500