**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **PINNACLE AIRLINES CORP.** | ) | **Case No. 12-11343 (REG)** |
| **et al.,** | ) | **(Jointly Administered)** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF DANIEL W. AKINS**
**IN OPPOSITION TO PINNACLES' APPLICATION TO**
**REJECT AFA-CWA'S COLLECTIVE BARGAINING**
**AGREEMENT  PURSUANT  TO  11 U.S.C. § 1113(c)**

I,  Daniel W. Akins, declare that the following is true and correct:

1.      I am an Air Transport Economist with over twenty five years of airline

consulting experience.  During my career I have applied economic principles and

statistical analysis to various modes of transportation using financial and operational data

on behalf of airports, airlines, airframe manufacturers, labor unions, and other aviation

related concerns.  My clients have included, JetBlue Airways, Continental Airlines,

Lufthansa, Air Canada, Southern Air Transport, The Committee of Unsecured Creditors

of Sun Country Airlines, Tradewinds Air, Boeing, McDonnell Douglas, LSG Skychefs,

American Express, J.P. Morgan Chase, Oakland International Airport, the State of

Virginia, the U.S. Postal Service, and various labor groups. My CV is attached as

Appendix A.

2.      I was retained by the Association of Flight Attendants ("AFA") in June of

2012 to provide financial analysis and assistance to AFA in preparing for their potential

contract negotiations with Pinnacle Airlines pursuant to AFA being elected the

bargaining representative of the Flight Attendants at Pinnacle Airlines and Colgan Air.

Since my retainer I have been involved in assisting AFA in their assessments of Pinnacle's contract proposals and analysis of their business plan, labor concessions, and strategy.   This declaration is submitted in opposition to AFA's Application to Reject the existing Flight Attendant Collective Bargaining Agreement Pursuant to 11 U.S.C. § 1113(c) .  I have personal knowledge of the facts set forth herein.

3.      Over the past decade I have been a financial analyst for a number of labor groups that have negotiated concessionary agreements both inside and outside of the Section 1113 process, including labor groups at Aloha, American, Continental, Hawaiian, Mesaba, North American, United, US Airways, and World Airways.  When analyzing labor concessions, it is critical to understand the basis of the cost reductions because concessions are essentially an investment by employees in the future viability of the business.  Therefore the credibility of the business plan and the basis of the labor ask by Pinnacle are both critical to the investment.

. 4.      As shown in the following, Pinnacle's Flight Attendants have made proposals that meet the needs of the Company's business plan to successfully restructure according to what they were asked by management to concede in May of 2012. According to the Company's advisors AFA has proposed concessions that offer an annual average savings value which meets the ▮▮▮▮▮ they were asked to provide to by their Company in May.[1]  By the Company's own measure Pinnacle Flight Attendants contract provisions are at market, and thus the ▮▮▮▮▮ in annual contract savings

---

[1]Hunyor Declaration,  Exhibit 3.

offered in AFA's proposals provides the Company with Flight Attendant costs which are well below market.[2][3]

5.    The ongoing issues which separate the AFA and Pinnacle involve a recent increase in the labor concessions demanded by the Company, as well as the basis for this increase. In this Declaration I cover the key areas relevant to the reasons why the Flight Attendants at Pinnacle Airlines have good cause to reject the current 1113 petition to abrogate their current collective bargaining agreement.  These issues are broadly contained in the following summary.

A)    A brief overview of the U.S. regional airline industry and Pinnacles place in it.

B)    An exploration of the underlying causes, mostly one-time events, which lead to Pinnacle's Chapter 11 filing in on April 1, 2012.

C)    A review of the development and circumstances which produced the Company's restructuring business plan and the development of Pinnacle's initial labor concession ask on May 8, 2012.

D)    An exploration of the Company's allocation methodology and attribution of the initial labor ask to various groups of employees.

E)    An analysis of the events which lead to the Company's increased labor ask of August 16, its application to Pinnacles business plan, as well as the allocation of methodology and impact of additional concessions to the Flight Attendants and other groups.

F)        Issues which provide Pinnacle's Flight Attendants good cause to reject the company's August requested increase in concessions.

6.        My Declaration will show that the causes of Pinnacle's filing for Chapter 11 protection are not attributable to its Flight Attendants, nor are they an obstacle to the Company's plan for successful reorganization.  Pinnacle's recent financial and operational difficulties are primarily attributable to a confluence of one-time events that have largely been remedied.  Beginning in 2010, and throughout 2011, Pinnacle faced a "perfect storm" that was largely, but not entirely, of its own making.  By the Company's own admission, a continual parade of unfavorable one-time events plagued Pinnacle's operations and severely undermined its financial performance.[4]  These events abruptly halted Pinnacles long history of financial and operational success, and forced the Company into a Court surprised restructuring in the spring of 2012.

A.        <u>A Brief History of The Regional Airline Industry and Pinnacle's Place in It</u>

7.        Regional airlines such as Pinnacle represent one of four sectors in the US airline industry, which also includes mainline network carriers such as US Airways and Delta, low cost carriers such as Southwest and JetBlue, as well as smaller network or niche carriers such as Alaska and Hawaiian.  Regional airlines operations are an important component in the industry, representing nearly half of all US airline flights and a quarter of total airline industry's flight hours.[5]  Regionals fly smaller jet and prop aircraft that serve almost exclusively as a component of their mainline partner's broader operations and provide access to smaller markets or off-peak operations from mainline hubs, under the mainline carrier's brand and identity. Regional airlines operate

---

[4] PNCL 2011 SEC 10K, pages 29-33.
[5] RAA Annual Report 2011 and US DOT Form 41 data.

increasingly through contractual relationships as independent companies, although several carriers including PSA, American Eagle and Horizon are wholly owned subsidiaries of mainline carriers.

8.      Like their mainline partners, the regional airline sector has experienced considerable consolidation since deregulation, shrinking from a staggering 247 regional carriers in operating in 1980 to just 61 in 2010.[6]  Consolidation amongst regional carriers has resulted in a concentration of operations amongst a few large players, the top ten of which control 97% of regional industry capacity.[7]  Pinnacle is the third largest regional airline company with a 12% of total U.S. regional capacity, behind the largest regional, Skywest having a 33% share, and Republic with 13% of the market.[8]

9.      After deregulation in 1980 most regional airlines were independent operators, selling tickets and flying their own aircraft under their own brand on routes of their own choosing.   As the US airline industry has evolved regional airlines have almost entirely abandoned self-branded independent operations and now function as components of mainline network operations.  99% of regional capacity operating today is provided under the brand of a mainline partner.[9]

10.      Regional airlines typically enter into code share agreements with network airlines, which allow the regional airline to be authorized to use the major airline's two-letter flight designator codes and to brand itself in the mainline partners livery and colors as a partner operating seamlessly on the network of the mainline carrier. Many regional carriers provide services for more than one mainline partner.  In these relationships the mainline partner typically pays the regional airline either a fixed flight fee for operations,

---

[6] RAA Annual Report 2011
[7] *Ibid.*
[8] *Ibid.*
[9] *Ibid.*

or receives a percentage of applicable ticket revenues, termed "pro-rate" (revenue-sharing) flights. Increasingly, fixed fee contracts called capacity purchase agreements are based on paying regional partners a set fee per block hour or other metric over a number of years. Under such agreements, mainline partners typically provide for all retail functions, including marketing and ticketing, operational oversight such as scheduling, and often pay for fuel, maintenance and aircraft financing through direct payment or reimbursement of expenditures. Capacity purchase agreements also remove most variability in business planning for regional carriers, as payment in such arrangements is not based on sharing revenue, which can be highly variable. Such agreements remove most operational risk faced by regional carriers and have enabled regional carriers to largely enjoy profitable operations since 9/11, while their mainline partners lost billions.[10]

11.    As regional airlines began to substitute jet aircraft for prop equipment during the 1990's pilots at mainline carriers negotiated clauses in their contracts to limit the size of aircraft and the scope of level of flying performed by regional partners in an effort to protect mainline flying and jobs. Such pilot scope clauses were often relaxed during mainline bankruptcies after 9/11 and allowed for increased regional operations. Delta's pilot scope has traditionally allowed unlimited number of 50 seat regional jets to be operated by Delta partners operating as Delta Connection carriers, but retained limits on 50-76 seat flying, and restricted regional flying on aircraft with greater than 76 seats to mainline operations.

12.    Pinnacle Airlines, Inc. is a subsidiary of Pinnacle Airlines Corp. (PNCL), and is now the single operating airline entity of the holding company. The history of

---

[10] SEC filings and press releases.

Pinnacle Airlines, like all airlines, is punctuated by mergers, acquisitions and

consolidation.  Before Northwest Airlines was acquired by Delta Airlines in 2008,

Pinnacle Airlines had a long history of providing regional airline services to Northwest,

as both a wholly owned subsidiary of NWA, Inc. as well as an independent contract

partner, serving Northwest's hubs in Memphis, Minneapolis and Detroit.  Pinnacle

Airlines began flying in 1985 as Express Airlines 1, a regional code-share partner

operating props for the former Republic Airlines. After Republic's acquisition by

Northwest Airlines in 1986, Express One became a Northwest "Airlink" partner, a wholly

owned subsidiary of NWA, INC.   In 2002, NWA divested the regional airline, and

Express One changed its name to Pinnacle Airlines, Inc. as a subsidiary of the newly

created Pinnacle Airlines Corp.

      13.     Like the rest of the regional industry, Pinnacle realized explosive growth

after the terrorist attacks on 9/11, as mainline carriers shrank domestic capacity and

substituted regional lift for mainline operations.   Pinnacle's operating revenues doubled

between 2001 and 2003, as its fleet changed and increased in size from 24 turboprops and

30 jets in 2001, to an all jet fleet of 76 aircraft by end of 2003.   By 2006 the regional

industry had more than doubled in size, and Pinnacle operated fleet of 124 jet aircraft and

became one of the largest regional airlines in the U.S., despite the bankruptcy of its sole

mainline partner Northwest.

      14.     In 2007 PNCL Corp. purchased Colgan Airways, an operator of turboprop

smaller turboprop aircraft, which operated as a partner for Continental, United and US

Airways.  In July 2010, Pinnacle bought Mesaba Airlines, a wholly owned subsidiary of

Delta acquired through the acquisition of Northwest.   Prior to and after its acquisition by

PNCL, Mesaba operated a fleet a compatible fleet of 41 CRJ-900s, 19 CRJ-200s and 26

Saab A340 turbo-prop aircraft.[11]  In the fall of 2010 PNCL Corp. began merging and integrating the operations of Mesaba's jet and turbo-prop operations into its Pinnacle and Colgan subsidiaries. A proposition which proved more challenging and expensive than anyone at PNCL anticipated.[12]

15.    Today PNCL Corp has closed down its turbo-prop operations at Colgan Airways, and as shall be demonstrated, consequently ceased the money losing operations as a partner of United and US Airways.[13]   PNCL currently has 5,800 active employees, flying under contract as Pinnacle Airlines, Inc. a Delta Connection carrier.  In this capacity Pinnacle Airlines, Inc. currently operates 197 regional jets, including 140 CRJ -200 aircraft which have 50 seats, plus 57 CRJ-900 aircraft with 76 seats, on 1,000 daily flights to 131 cities in the United States and Canada. [14]

**B.    An Exploration of the Underlying Causes, Mostly one-time events, Which Lead to Pinnacles' Chapter 11 Filing on April 1, 2012                          **

16.    Chart 1 below shows the annual net income reported by Pinnacle Airlines over the past ten years, which when consolidated amount to a total of $323.6 million. The consistent profit production of Pinnacle Airlines since 2002 is remarkable for any US Airline weathering the continual barrage of external events since 9/11, which include; 2 wars, a quadrupling in fuel prices, a global economic meltdown, and many other negative exogenous factors.  Pinnacle's past good fortunes ceased in 2011, as indicated by their first reported loss since 9/11, which ultimately snowballed into a Chapter 11 filing.

---

[11] US DOT Data show Mesaba posted positive annual operating profits from 2008 through 2011 totaling $40 million.
[12] Intralinks document 1.1 and  PNCL 2011 SEC 10K
[13] Intralinks document 1.1, page 6.
[14] PNCL Corp. The 197 aircraft includes 16 original Pinnacle Airlines Inc., CRJ-900s that are being transferred to Skywest

**Chart 1**



## Pinnacle Airlines, Inc.
## Annual Net Income

Source: US DOT Form 41 Data and SEC filings
Note: 2002 include Express One earnings

17.     In this section I explore the reasons that Pinnacle has explicitly stated were too blame for its Chapter 11 filing and examine what has been done to cure the problems. After enduring the extreme headwinds of the post 9/11 era it would appear curious that, at a time of relative prosperity in the larger airline industry, Pinnacle Airlines would experience its first loss in a decade in 2011. Within the broader operations at PNCL, it's two other airlines were reporting losses in 2011 as well.  As shown below in Chart 2, Colgan was at best a breakeven operation, losing over $25 million from 2008 – 2011, posting only $1.6 million in income in 2009.  Meanwhile, in the first three of the past four years, Mesaba reported positive financial results totaling nearly $30 million in net income.  But in 2011 Mesaba also posted a loss, adding to the losses posted by PNCL's two other airline subsidiaries. In 2011 PNCL reported a net loss of $31.5 million.  The question is why?

**Chart 2**



18.     The turmoil at PNCL in 2011 took down four of the five top executives on PNCL's team, including long time CEO and President Phil Trenary (in March 2011), COO Douglas Shockey (October 2011) , CFO Peter Hunt (June 2011),  and Robert Muhs ( Jan 20112) SV of Pinnacle Airlines operations.  As the core group that facilitated the events eventually leading to PNCL's demise and bankruptcy filing, it added more turmoil that these top 5 executives garnered a combined $4.4 million in compensation in 2010. Mr. Trenary alone took more than $3.0 million upon leaving the Company in 2011.[15] Thus, those responsible for creating the fallout from their decisions were paid handsomely while employed and as they left, yet they were not around to clean up the mess they had created.

19.     Since 2011 the executive suites at PNCL appeared to become a turnstile as replacements for departing executives also quit the company in rapid succession. The

---

[15] PNCL 1Q 2011 SEC 10Q at page 7.

curiously short tenures of replacement CEO Sean Menke, a qualified and experienced former Frontier Airlines' chief executive, as well as his former colleague, replacement CFO Ted Christie, are disturbing, as both stayed less than a year at PNCL.

20.    Most of the events leading to the operational and financial calamity of 2011 were created earlier by the PNCL leadership who appear to have had every intention to expand operations and continue their solid relationship with Delta Airlines through the purchase of Mesaba Airlines on July 1, 2010.   Their original plan was to take the existing business stream that Mesaba had maintained with Delta and to absorb those profitable operations by merging them into the operations of PNCL's two existing subsidiaries, Pinnacle Airlines and Colgan Airways.

21.    Other financial issues related to the operation of Colgan's fleet of turboprop aircraft at United and US Airways which exacerbated PNCL's losses.  Air service contracts with those carriers to operate turbo-prop equipment were fundamentally financially unsound, producing revenues through pro rate agreements that were below Colgan's operating costs.[16]  Adding to the problems was Colgan's operation of highly unreliable, but relatively new Bombardier Q400 aircraft for United Airlines.[17] Surprisingly, 16 of the 30 Q400 aircraft in Colgan's fleet in 2011 were brand new NextGen models that appeared to have been plagued with engine and other maintenance problems, according to PNCL executives.[18] Such maintenance issues caused PNCL to cancel a multitude of flights and pay millions in penalties to its partner airlines by missing performance targets.

---

[16] PNCL 2011 SEC 10K at page 31.
[17] Aviation Week and Space Technology, July 7, 2011
[18] Ibid

22.    In its public statements and SEC filings PNCL's (mostly new) executives have provided much insight from their perspective on events from inside the Company. For example, PNCL's 2011 SEC 10K filing contains an enlightening section and perspective under the title "Events Leading to Chapter 11 Case".  Listed below are the five critical factors PNCL has highlighted in its annual SEC filing which "*have combined to jeopardize the Company's viability*".[19]

1. Delays in integrating the operating certificates of our subsidiaries;
2. Developments arising out of a new joint collective bargaining agreement with our pilots;
3. Increasingly unprofitable contracts with airline customers;
4. Poor operational performance; and
5. Increased operational expenses

23.    All of the issues above have largely been addressed prior to and during the Court supervised restructuring process. As discussed below, Pinnacle essentially ran out of time before all of the issues listed above could be cured, but had undertaken measures with the new management team to fix the troubling problems that upended the Company in 2011.

**B1**.    <u>**Unanticipated Merger and Integration Impacts**</u>

24.    Several unanticipated issues and complications stemming directly from PNCL's July 2010 acquisition and integration of Mesaba appear to be the key to the Company's difficulties in 2011.  Operational and functional integration of Mesaba was far more difficult and costly than the prior PNCL management team had anticipated. When considering the impact of the delayed integration of Mesaba into Pinnacle and Colgan operations the Company claimed, "*we estimate that we have unanticipated costs*

---

[19] 2011 PNCL SEC 10K at page 30

*and lost revenue in the tens of millions of dollars as a result of delayed integration and lost synergies*."[20] In the past year (2011) when PNCL reported a net loss of $31.5 million, the impact of this one issue alone could represent the largest single factor, if not the entire reason, attributable to the loss.

25.    It is clear that much of the additional expense in integrating Mesaba operations relate to the unanticipated delays in the FAA approval process that were "*more difficult and time-consuming than anticipated*".[21]  A change in PNCL integration plans also had severe implications.[22]  Originally PNCL executives intended to move Colgan's operations onto Mesaba's prop operating certificate, but by mid-2011 PNCL had changed its plans and decided to move Mesaba's operations onto the existing certificate of Colgan and terminate Mesaba's certificate, while simultaneously changing the name of the merged entity to "Mesaba".[23]  This process undoubtedly caused additional delay, to the point where Mesaba had already effectively completed its planned wind-down of its Saab A340 prop flying before it could operate on the Colgan certificate. Subsequently Colgan ceased operations altogether in September 2012.

26.    On the jet side of the operation, PNCL had originally envisioned moving Mesaba's jet operations onto Pinnacle's operating certificate by May 2011, but FAA delays in the approval process to transfer the flying caused the carrier to change its target date to January 2012.  Although the FAA has approved the operation of Mesaba's jets on Pinnacles certificate PNCL now claims "*the full integration of maintenance and flight operations of Pinnacle and Mesaba jets is not expected until early 2013*".[24]    Thankfully,

---

[20] Ibid
[21] Ibid
[22] PNCL 3Q 2011 SEC 10Q.
[23] PNCL July 1 2010 Presentation to Investors
[24] PNCL 2011 SEC 10K

13

the one-time calamitous series of merger related events appear to have fully played themselves out at this point.

27.     Furthermore, PNCL now claims that the management structure that existed prior to January 2012 reorganization "*was not conducive to realizing the efficiencies of consolidation*."[25]   The integration of Mesaba into Pinnacle, plus the unanticipated delays in FAA approval and management's inefficient structure are all factors PNCL readily admits negatively impacted the Company by tens of millions of dollars in 2011.

28.     PNCL has now "streamlined" its management team and by paring it down to an efficient level to operate the Company going forward.[26]   None of the expensive integration delay or management inefficiencies were caused by PNCL's employees. Importantly, as with the costs associated with the FAA delays and operational issues cited above, the costs associated with an inefficient management structure appears to have largely been sorted out.   Thus, all of the negative impacts of the one-time and unique integration issues that crippled the Company in 2011 appear to have been solved at this point.

**B2.   Developments Relating to a New Pilot Agreement**

29.     There are two principal issues involving Pinnacle's pilots whom the company points to as impactful on its past operations.

A.     The signing of a new joint pilot collective bargaining agreement amongst all three pilot groups in February 2011.

---

[25] Ibid.
[26] PNCL 2011 SEC 10K at page 30.

B.    The results stemming from the expedient integration of the 3,000 pilots flying for all three of PNCL's airline subsidiaries on a single seniority list.

30.    In February 2011 PNCL and ALPA reached a new collective bargaining agreement across pilots groups at all three of its subsidiary airlines.  The joint contract was the necessary first step in the integration of separate pilot groups operating aircraft at as all of PNCL's three subsidiary carriers. The joint contract would eventually enable PNCL to optimize pilot deployment amongst its carriers, as is done at Republic Holdings, and other regional airlines.  The new agreement provided improvements in pilot pay, benefits and work rules; however the costs of this new contract were not to be recouped from the rates Delta pays PNCL until 2012, thus exposing the Company to nearly a full year of increased costs without offsetting revenues.[27]  The cost of the pilot's contract and the delayed recoupment of those costs, were exacerbated by the delayed implementation of integrated operations and other operational problems the carrier experienced in 2011.

31.    In their initial concessionary ask, PNCL determined that the pilot's contract costs were out of market average compared to other Delta Connection carriers by $16 million.[28]  The tens of millions of dollars PNCL lost as a result of lost synergies and increased expenses in 2011 from its delayed integration of operations obviously made the unreimbursed exposure of the pilot contract until 2012 an additional burden.   Clearly this is another of the many examples of the errors made by the past management team at PNCL, and cannot be the fault of PNCL's pilots, who negotiated in good faith to reach a beneficial agreement with their employer in February 2011.  The rate adjustment related

---

[27] PNCL 1Q 2011 SEC 10Q at page 7.
[28] Intralinks document 6.47

to the pilot's new contract that was to have occurred in February 2012 would eventually offset the additional pilot contract expenses.

32.     The joint pilot contract signed in February 2011 allowed PNCL's pilots to initiate the second phase of their integration, which was to develop a single seniority list covering the pilot's at all three subsidiaries.  Integrating pilot seniority lists is a thorny process, as each pilot's relative place on the integrated list largely determines the type of aircraft flown, status (Captain or First Officer), lines of flying, pay and domicile location, among others, that each pilot is able to garner. The integration of pilot seniority lists are often fraught with conflict and are therefore typically decided by an independent arbitrator.  The three existing individual ALPA pilot groups at Pinnacle, Mesaba and Colgan chose to utilize the services of an arbitrator, Richard Bloch, to produce an integrated seniority list.  However the integrated list produced by Mr., Bloch did not contain adequate bidding restrictions called "fences" to protect the airline's operation by preventing pilots from immediately moving to other equipment types, routes, domiciles or status based on a change in their relative seniority on the integrated list.

33.     PNCL asserts that the lack of these fence restrictions in the Bloch seniority award caused the Company "*severe, disruptive and expensive consequences on the filing of pilot vacancies and training expenses*".[29]  Once pilots of each company were combined on one large list together with the pilots of the other two PNCL subsidiary carriers they began to bid for opportunities across all three carriers.  The training of pilots choosing to transfer to another carrier, and/or new aircraft type or status, presented enormous operational difficulties, as well as an increase in pilot training costs. Additional each pilot in training is a pilot that is "offline" and unavailable to fulfill flying

---

[29] PNCL 2011 SEC 10K at page 30

needs for the carrier. Chart 3, below shows that PNCL's total pilot training expenses per

quarter went up 150% in 2011 over 2010

**Chart 3**





34.    Compounding this problem was the delayed integration of operations

(related to FAA approval), as pilots transferring to the same aircraft type at another

PNLC airline were forced to go through a complete training cycle as long as the carrier

was on a separate operating certificate.

35.    The impact of pilot training expense was further heightened as Delta

wound down the Saab A340 prop flying at Mesaba in 2011.  After implementation of the

new single seniority list the relatively more senior Saab A340 pilots at Mesaba

transferred to displace relatively more junior pilots at Pinnacle and Colgan, thus

complicating an already chaotic situation.

36.    All of the issues relating to the integrated pilot seniority and sharply

increased training cycles resulted in a lack of available pilots to perform flying which

Pinnacle was under contract to provide. This added to the chaos enveloping PNCL's

operations in 2011, and caused operational performance to suffer; resulting in millions of

dollars in fines and penalties specified in PNCL's subsidiaries contracts with mainline

partners. During the first nine months of 2011 PNCL was assessed $4.4 million in

operating performance penalties.[30]

      37.    The integration of pilot seniority and related training expenses resulting

from delayed operational integration and downsizing should not be attributed solely to

the pilots who merely exercised their bidding rights granted by the Bloch award.   The

pilot cross bidding and resulting training expense should be viewed as the unintended

consequences of a poorly thought out arbitration award.

      38.    The story of PNCL's demise becomes clearer as the one-time obstacles

that contributed to it are understood.  A perfect storm did indeed appear to be brewing at

PNCL in 2011, the damage it caused put the Company into Chapter 11, now the storm

has past.  The initial changes in the bidding practices brought about by the "unfenced"

integrated pilot seniority list have been sorted out and should be viewed as a one-time,

rectified event.   In any event the delay in reimbursement of purported increased expense

relating to PNCL's new joint pilot contract and the events resulting from the integrated

seniority list were not impacted or related to any activity of PNCL's Flight Attendants.


**B3.**     **Unprofitable Contracts with Airline Customers**

      39.    In 2011 PNCL reviewed the contract performance of each of its subsidiary

carriers and found that increased operating costs related to the pilots contract,

maintenance and other expenses relating to an aging aircraft fleet were exceeding, or

would soon exceed, the fees the Company was being paid by its mainline partners.  In

---

[30] PNCL 2011 SEC 10K at page 30.

short the compensatory rates in PNCL's contracts were not covering the Company's

operating costs.  The Company stated in its presentation to labor *"[w]ithout meaningful*

*contract changes, the Q400, Saab and Pinnacle CRJ900 business were unsustainable,*

*and the two remaining contracts required substantial and successful negotiations via rate*

*reset provisions to be profitable*."[31]

40.    The Company determined that none of the Saab A340 flying was

profitable, nor were the Q400 operations for United viable at the rates it contracted in its

pro rate agreement.   Two of the three Capacity Purchase Agreements (CPAs) covering

CRJ-200 and CRJ-900 flying for Delta were deemed "*potentially viable, but not without*

*the benefit of contractual rate increases scheduled to be introduced over the course of*

*2012-2013. In the interim these contracts were being impacted by the new pilot wage*

*rates and unforeseen expenses associated with the vacancy bidding process under the*

*ALPA JCBA, along with incremental costs associated with an aging fleet."*[32]

41.    PNCL's jet contracts with Delta were established as three separate CPA's,

one covering all of  the 50 seat CRJ operation from both Pinnacle and Mesaba, one

covering the 16 76-seat CRJ-900s owned and operated by Pinnacle, and the third covered

the 41 Mesaba CRJ-900s.  The Mesaba CRJ operation was found to be the only one of all

Pinnacles jet and prop operations that was profitable under the terms ad rates of the

CPA's established in July 2010.[33]

42.    The Saab A340 prop pro rate flying for US Airways was estimated by

PNCL's new management to have lost between ███████████████ ██.[34]  The

United Q400 prop aircraft CPA was forecast to lose ███████ in 2012 under the

---

[31] Intralinks Document 1.1 at page 6
[32] PNCL 2011 SEC 10K at page 31.
[33] Jon Spanjers statement during PNCL  labor presentation to AFA and advisors at Ford & Harrison Offices
in Washington, D.C on June 14, 2012
[34] Ibid

existing contract rates with United.[35]  Beyond operational losses, the Q400 start-up costs alone were ███████ in new debt, including spares, support, acquisition costs, and the cost of capital, that further burdened the Company with huge one-time capital expenses.[36]

43.    The good news on the horizon was that during its review, Pinnacle forecast that the contract employing the largest component of its fleet; the 140 CRJ-200s would be viable "*with the benefit of rate resets, which would adjust for increased expenses*".[37]  The CPA covering the 16 Pinnacle CRJ-900s appeared to need restructuring to recoup costs that were exceeding rates PNCL was receiving from Delta.  The flying performed by the 16 CRJ-900's for Delta is currently being transferred to SkyWest, and with them the end of the losses to PNCL associated with unfavorable contract under which Pinnacle was flying its original fleet of 16 CRJ-900's it owned.

44.    In  2012 PNCL has ceased flying both of its money losing operations associated with Saab A340 and Q400 flying at US Airways and United, respectively, has wound down all Saab flying at Delta, has shuttered operations at Colgan, and is shedding the unprofitable Pinnacle CRJ 900 flying to Skywest.  PNCL has retained the profitable operation of the 41 original Mesaba CRJ-900  aircraft and  the forecast rate resets on the CRJ-200's in 2012 would cure the loses on the largest fleet of aircraft operated by Pinnacle.  Thus, in addition to successfully addressing (or playing out) the unfavorable mix of operational issues, pilot contract and seniority issues, PNCL has addressed the ongoing operational issues which caused the financial bleeding in 2011.

---

[35] Op cit. Spanjers June 14.
[36] Intralinks Document 1.1 at page 6.
[37] Intralinks Document 1.1 at page 6.

**B4.** **Operational Performance**

45.    As discussed above, all of the issues relating to PNCL's poor operational

performance stem from three primary factors:

1)    The acute 2011 pilot staffing shortage due to a spike in pilot

training.

2)    FAA certification approval delays.

3)    The reliability of Colgan's Q400 NextGen aircraft.

As a result of these issues PNCL experienced a decline in its operating performance

beginning in the fall of 2010.  Operational impacts stemming from new seniority list and

related pilot staffing shortages, combined with the additional training expenses caused by

delay FAA authorization, added to the operational impact of the maintenance issues on

the Q400 aircraft flying for United.  As stated earlier, over the first nine months of 2011

PNCL incurred contract penalties totaling approximately $4.4 million associated with

poor performance at Pinnacle and Colgan.[38]

46.    By 2012, all of the operational issues relating to these factors have been

cured and will not be repeated.  The Q400 reliability issue has been solved as PNCL no

longer operates Colgan or any prop aircraft.   The one-time spike in training and pilot

shortages related to the new pilot seniority list has ceased with the passage of time. The

FAA has approved the operation of all jet aircraft from Mesaba on Pinnacle's operating

certificate, a move which will allow Pinnacle to complete its full operational integration

of Mesaba within the next several months. And finally the cessation of operations of

Colgan effectively terminated the Q400 problems.  Therefore, all of the issues relating to

---

[38] PNCL 2011 10K at page 30.

this expensive set of circumstances in 2011 have been rectified and no longer affect the operational performance of the Company

### B5.    Increased Operating Expenses

47.    All of the first four of the five factors cited by the Company as the cause of its Chapter 11 filing resulted in increased operating costs throughout the operation.  As shown above, the primary factors that caused increased operating problems and costs have been resolved in one fashion, or another, and no longer burden the Company. PNCL management has been pared down, flying unreliable prop aircraft has been eliminated, the FAA has granted its certification approval, the spike in pilot training events and staffing shortages have ceased, and unprofitable flying has been terminated or transferred.

48.    PNCL reported that its consolidated operating expenses in 2011 went up by $272 million over 2010, which the Company claimed were related to the following issues:

> A.    A $28.5 million one-time integration, restructuring and impairment expense.
>
> B.    An unspecified amount related to seniority list driven pilot training and new collective bargaining agreement.[39]
>
> C.    A $21 million impact resulting from crew-related expenses due to hiring, training, and overnight accommodations relating to the repositioning of crews due to changes in partner network and schedule changes.
>
> D.    Increased maintenance expense due to aging fleet.
>
> E.    A $4.9 million increase in fuel costs from the exposure to fuel prices on Colgan's pro rate contracts.

---

[39] US DOT Data shows pilot training expenses at Pinnacle doubled from between 2010 and 2011, adding $8 million in additional expense

49.     The one-time expenses claimed by the company directly resulting from the integration of Mesaba totaled $11.9 million in 2011.[40]  These expenses accrued from training, relocation and displacement of management and frontline employees, information technology costs, as well as severance payments of $2.6 million.  The additional severance payment of $3 million in March 2011 upon the resignation of PNCL CEO Phil Trenary, indicates the degree to which the company had lost its bearings in 2011.[41]

50.     Additionally, PNCL incurred more one-time expenses related to the impairment and retirement of the Saab fleet.[42]  The expenses totaled $14.7 million as of the 4th quarter of 2011 alone.[43]  Also PNCL's efforts at pre-bankruptcy restructuring resulted in an additional $1.9 million in expenses in 2011 from the hiring of consultants, investment bankers, and outside counsel.

51.     All of these expenses and operational issues added up to a one-time expense  of $28.5 million in 2011.  Shown below in Chart 4, is the impact of one-time expenses reported by PNCL in the years 2009, 2010 and 2011.  The nearly 15-fold increase in PNCL's one-time pre-tax costs between 2009 and 2011 is the financial impact of many of the items the Company listed as causing its Chapter 11 filing and discussed above.

---

[40] PNCL 2011 SEC 10K at page 32.
[41] Ibid.
[42] Ibid
[43] Ibid

**Chart 4**



52.    As Shown in Chart 5 below, PNCL reported a net loss of $31 million in 2011, after reporting $12 million in net income in 2010, and $41.8 million in 2009.  The impact of one-time expenses, coupled with all of the other operational difficulties which occurred during the perfect storm of 2011, pushed the company into the red.  Ultimately they are the reasons why PNCL had to restructure.

**Chart 5**



## PNCL Net Income

**PNCL Consolidated Income Millions**

Source: PNCL SEC 2011 10K

**C.      The development and circumstances which produced the Company's restructuring business plan and the development of Pinnacle's initial labor concession ask on May 8, 2012.**

53.      The circumstances and issues stated by the Company as contributing factors towards PNCL's Chapter 11 filing and restructuring did not include its Flight Attendants.  Nonetheless,   Pinnacle's Flight Attendants were in asked in May 2012 to give up ██ million in annual concessions including ██ million in wages cuts, ████ in the elimination or modification of work rules, ████ in 401K cuts, and ████ in absorbing increased medical plan costs and lower benefits.[44]  Flight Attendants annual ask of ██ million was part of a larger ask of ██ million, which was pared back to $42.6 million by accounting for a claimed $3.3 million in prior contribution of PNCL"s salaried and hourly employees.

---

[44] Intralinks Document 2.5

54.    The total concession amount was fundamentally based on PNCL's business plan as prepared by PNCL and its advisor Barclays (presented on May 8), and was designed to make the Company viable and enable it to successfully reorganize.[45] The business plan required ███████ in annual average cost reductions, including ████ million in labor savings that would allow PNCL to become viable and capture a rate based margin of ████ during the forecast years 2013-2018.[46]    The business plan's revenues were based on a projection of the rates and conditions as set forth in the Amended and Restated CPAs that were negotiated with Delta commensurate with PNCL's Chapter 11 filing on April 1, 2012.

55.    The Amended and Restated CPAs signed between PNCL and Delta affected the rates and terms set in the previous CPAs signed in July 2010.  The Amended and Restated CPAs signed in April with Delta cover Pinnacle's 140 CRJ-200 and 41 CRJ-900 flying through 2020, with a rate reset in 2018.

56.    PNCL determined the allocation of the ████ million of concessions to each five groups of employee groups  including; Pilots, Flight Attendants, Dispatchers, Salaried, and Hourly workers, through a two-step process.  Step 1 of the allocation was an analysis conducted by the Company's and its advisor Seabury that compared Pinnacle's labor cost with the average costs of their counterparts at other DCI Carriers in a mark-to-market assessment.[47]

57.    The first step of the mark-to-market assessment was described in the Declaration of Jerry Glass, who stated, ███████████████████████████
███████████████████████████████████████████

---

[45] PNCL 1113 Brief at page 14
[46] Intralinks Document 2.1
[47] DCI Carriers chosen by the Company as comparators are: ExpressJet-CRJ (formerly ASA), Comair, Compass, GoJet, Republic and SkyWest.

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ██

58.    As shown in Table 1, below, is the tabulation of the Company's initial

concession analysis titled "Methodology To Apportionment of  Required Savings

Between Work Groups – May 18th Ask". As shown in Step 1, titled  "*Pinnacle contract

provision mark-to-market*",  the results of  Company's mark-to-market labor cost analysis

are identified for all labor groups..  Through this exercise the Company found that

Pinnacle's Flight Attendant's total annual wage cost of ████ million was ████ below the

"wage-related costs" of the average of Flight Attendants at other DCI carriers.  But as

described below, this was an erroneous calculation resulting from the use of out of date

pay data.

59.     Table 1 also shows the results of the 2nd portion of the mark-to-market

analysis, based on an assessment of work rules at Pinnacle versus those in place at other

DCI Carriers.   As Mr. Glass describes in his Declaration,

60.     The Company's mark-to-market evaluation of Pinnacle's Flight Attendant

work rules was different from the wage-related analysis which evaluated Pinnacle's

wage-related expenses against the average DCI wage-related expense.  For work rules the

company evaluated against what was in place at the <u>majority</u> of other carriers.  In doing

so the Company only looked at the subset of Pinnacle work rules that were less favorable

than the majority of DCI Carriers, and did not apparently investigate the degree to which

Pinnacles Flight Attendant work rules were more favorable than the competition.  It

would seem that a fair evaluation of work rules would look at the complete weight of all

work rules and not just the less favorable ones.

---

[49] Declaration of Jerrold A. Glass, at page 12, paragraph 24.

61.     The results of the "less favorable" work rule analysis showed that the
Company believed Pinnacle's Flight Attendants to have work rules that █████████
██████████████████████████████████████████  When combined with the
savings from wage-related costs which were deemed ██████████████, the
Company found that its annual Flight Attendants costs overall were ████████
market. This represents ████████ on a base of ████████ in total annual
Flight Attendant costs. ████████████████████████████████
████████████  Essentially, the Company's assessment showed that
Pinnacles Flight Attendant costs were "at market".[50]

62.     The Company has however inadvertently used obsolete GoJet Flight
Attendant hourly pay rates which are as much as 14.2 % below those in GoJet pay rates
since January 2012.  This error has substantial impacts on both the Company's May
mark-to-market analysis, shown in Table 1 above, as well as their subsequent diligence of
the Delta rates in the August 1 letter, discussed below.   The GoJet Flight Attendant pay
scale shown in Table 2 contains the old and new rates paid as of January 1, 2012.



63.    Application of the correct rates to the mark-to-market analysis above would change Pinnacle Flight Attendant wage-related costs to ███████ DCI average, and places the their wage-related costs nearly half a million below the average of their competitors.  Shown below in Table 3 is an updated Flight Attendant mark-to-market assessment using correct GoJet pay rates shown in Table 2.  Using correct GoJet pay rates tips in the total mark-to-market analysis of Pinnacle Flight Attendant costs from ███████ above average as shown  in Table 1, ████████████████, as shown below in Table 3.



64.    Each labor group, with the exception of the salaried employees, went through the mark-to-market analysis performed by the company.  Salaried employees skipped Step 1 in the allocation analysis.  As shown on Table 1 above,  pilots were found to be above market by a total of ███████████, dispatchers below market by ██████, and hourly employees at nearly ███████████.

65.    The results of the Company's mark-to-market the analysis showed that its labor groups combined "all-in labor base" cost was approximately ███████ above their competitors (driven entirely by the pilots), and well short of the ██████ needed to make the business plan target.

66.    In his Declaration, Mr. Glass begins his discussion of the allocation methodology employed by the company to distribute the remaining ██████ as he makes the bold and false assertion that ███████████████████████ ████████████████████████████████████████████ ■ However, the Company's analysis estimated that the pilot's contract alone was out of market.

67.    The next step required a methodology to allocate the needed $27 million, that by the Company's own measure, would place Pinnacle employee groups well below the average costs of their contemporaries at other DCI Carriers.  The Company's assessment of the total ask required from each group is shown in Step 2, of  Table 1 above, titled *"Equitable distribution of additional savings according to relative size of cost base."*

68.    The allocation vehicle the Company developed was a methodology that began by assuming a subjective target of a savings of ███ from each work group's respective costs to achieve the additional annual target cost savings of ████████, excluding the findings of the mark-to-market analysis.   Further analysis determined how each group could practically contribute such savings. Those subjective findings

---

51

determined that the target contribution of each work group ██████████████

percent, in addition to the mark-to-market savings. [52]

69.    Through this process the Company determined the Flight Attendants

annual concessionary ask to be ████ million, representing ████ cut in combined wages,

work rules, and benefits.  The entire $3.6 million concession represents below market

sacrifices deemed necessary to address the needs of the Company as determined by the

May 8 business plan.  The company subjectively determined that the Flight Attendants

should cut pay rates by ████████████████████████████████████████

████████████████████████████████, and placing all of the

most senior Flight Attendants at the pay rates that exist in the current ████ year.

70.    The effect of the Company's May 18 allocation of wage-related

concessions to Pinnacle's Flight Attendants has been to substantially decrease their

already below-market wages by ████████████████ the average pay rates of

other DCI Carriers' Flight Attendants.  Table 4, below shows the Company's allocation

of the May 18th  ask to each labor group as well as the apportionment of each groups

concessions to four expense categories, including,  medical benefits, 401K, wages and

work rules.

---

[52] Declaration of Jerrold A. Glass, at page 14, paragraph 29.



71.    Pinnacle's Flight Attendant work rules were originally estimated to be ███ above market in Step 1 of Company's mark-to-market analysis. The Company's "fair and equitable" apportioning of concessions drives the Flight Attendant work rule concessions to ███. The work rule ask was based upon Mr. Glass's assessment that current work rule disadvantages that exist in Pinnacle's Flight Attendant contract is in fact much larger than the mark-to-market analysis would indicate. There appears to be an inherent conflict between the methodology employed the Company in determining competitive Flight Attendant work rules over various iterations of the Cmpany's analysis.   No standard rule or definition is ever established  for what makes a work rulebe deemed out of market or more costly than other carriers.  The definition of "out-of-market" appears to change to meet the needs of the changing labor asks.

72.    To support their choice of modifying or eliminating seven Flight Attendant work rules Mr. Glass claims that ███████████████

████████████████████████████████████████████

████████████████████████████ ■ An obvious question could be, "more"

than what?  Could this mean more than Pinnacle currently has, or more than its DCI

competitors?  His assertion of higher staffing at Pinnacle is wholly unsubstantiated in the

record or in fact.


**E.**    **An analysis of the events which lead to the Company's subsequent labor ask, its application to Pinnacles business plan, as well as the allocation of additional concessions to the Flight Attendants and other groups.**

73.    The concessionary request made by Pinnacle of its Flight Attendants that

was established in May totaling ████ million was met by the latest AFA proposal

according to the Company's valuation of the Flight Attendant's proposal on September

12 . However, by that date the Company had increased the Flight Attendant ask by 82%

based on an event they called a "game changer" at Delta.[54]

74.    As a result of the "game changer" and largely unproven claims made by

Delta the Flight Attendants ask was increased to annual concession value of $6.4 million.

The Flight Attendants at Pinnacle, as well as all other labor groups, have good cause to

reject this new level of concession as it is not warranted by  the Company's new (and old)

business plan, which are almost identical.

75.    I will now review the causes and implications of the increased ask and

why increasing the Flight Attendants or any other group's concessions to meet the

Company's new ████ higher concession ask is not required for the viability of the

company as determined by the new business plan as a basis of operation  through 2018.

---

[53] Declaration of Jerrold A Glass
[54] PNCL Brief at page 20.

76.    As opposed to claims by the Company that its new increased ask is crucial for survival, the ▮ million in additional concessions serves to increase the projected profits of Pinnacle and does nothing to change the rates paid by Delta to Pinnacle, which are essentially locked in until 2018 as stated in the Amended and Restated CPAs signed April 1st.[55]   Table 5 below displays the new level of concessions for all labor groups which now total ▮▮▮▮▮, which is approximately $33 million more than the May 18th ask ▮▮▮▮▮ concessions



77.    The impact of the additional concessions in the business plan is clear, it doubles the profitability of Pinnacle and pushes rate based margins well above the ▮ that were deemed by the Company and Barclay's to be enough to provide viability and enable Pinnacle to successfully reorganize.

---

[55] Intralinks Document 2.10,

78.    Shown below in Chart 6 are the rate based margins Pinnacle is projected
to achieve with the original ask of ████████ in May compared with the margins from
the August 18 ask of ██████. Average margins to Pinnacle from 2013-2017 are
███████████, from an average of ████ with the May concessionary ask to ████
with the August increase. These margins accrue from the rates Delta is contractually
obligated to pay Pinnacle through 2017. Therefore, not one cent of the proposed ████
million annual labor concessions would affect the rates Delta pays Pinnacle, and
therefore cannot be impactful on the fleet and assumptions currently contained in the
Company's business plans.



79.    Furthermore, although the overall concessionary ask went up by a total of
████, (from ████ million to ████ million), the increase for Flight Attendants went up
████, more than any other group. By the Company's own measure, Flight Attendants are
currently no more or less expensive than the average of DCI Carriers, yet they have the

heaviest lift in the Company's 2nd concessionary ask in August.   Chart 7, below,
compares the increase in concessions determined by the Company as necessary to meet
their new savings targets.



80.    As shown in Chart 8, the Dispatchers had the lowest increase in
concessions, ▮▮▮, and not surprisingly are the sole organized group to reach a consensual
concessionary agreement.  The AFA's proposal on September 12 provides annual
average savings to Pinnacle of ▮▮▮ million according to the Company's own valuation,
which enough to meet the original ask in May. This begs the obvious question, if the
Flight Attendants had their ask increased by the amount of the Dispatchers ▮▮▮ would
the Company have already achieved a consensual agreement with AFA ? There is no
legitimate reason that the Flight Attendants ask should go up more than any other group,
indeed at all. The amount of concessions proposed from the Flight Attendants is based on

a wholly subjective choice and has nothing to do with the proposition that Pinnacle's Flight Attendant costs are above market.

81.    The most important and troubling aspect of the Company's increased concessionary target are the circumstances upon which it is based.  In its 1113 Brief and many Declarations submitted to the Court, Pinnacle has focused on the necessity of achieving the additional ██████████ in concessions to enable the Company to compete for additional, or replacement flying.  However this potential additional flying is not contained in any document and remains undefined, speculative, and importantly, outside the assumptions in the current (new) business plan that should drive the labor target.

82.    The so called "game changer", which is offered by Pinnacle as the basis for the concessionary ask, has its roots in a change in the projected future the mix of aircraft types which Delta Connection carriers will be flying.  This change in regional aircraft comes into play by virtue of a scope clause restrictions contained in the new Delta mainline pilot contract signed in June, and is not in any way related to the relative cost of Pinnacle's labor.



This makes sense as one would reason that

---

[56] August 1, 2012 letter from Delta SVP Delta Connection, Donald Bornhurst to Mr. Spanjers, at point #4.

the previous mark-to-market labor cost analysis performed by the Company would ostensibly indicate such a gap, especially among essentially the same comparator base, which would be reflected in the rates Delta pays to them.

84.     The evolution of events puts Pinnacle in a difficult position with regards to its already established labor ask and business plan.  The Company now has to argue that the original ████████ concessions from the May 18th ask, that went beyond the original mark-to-market needs, did not get Pinnacle to the labor cost level it needs to be competitive with the same carriers that were the basis of its May 18  mark-to-market analyses. For Pinnacles Flight Attendants, who have already met  original May 18th target, the additional ask is unnecessary and perhaps designed for other purposes than those claimed by Delta and Pinnacle.

85.     It is important to get a sense of the trail of events that have created the current state of affairs and linkage between issues.  In this regard, I have created a recounting of recent history of dates and events from 2012 which are impactful on the Company's concessions and restructuring plans.  The events in the time-line shown below, lead to the many reasons why Pinnacle's Flight Attendants have good cause to reject the huge increase in their concessions currently being requested by their Company.

**April 1**

86.     Pinnacle and Delta reach terms on new Amended and Restated Capacity Purchase Agreements which locked in rates and conditions of Pinnacle's fleet of 140 CRJ-200 50- seat aircraft and 41 CRJ-900 76 seat aircraft until 2020. ████████



87.    After new terms and rates were in place the Amended and Restated CPAs Pinnacle filed for Chapter 11 protection with Delta providing DIP financing. Milestones were established regarding the filing of a plan of reorganization require the delivery of an acceptable business plan and Section 1113 process. ████████████████████ ████████████████████████████████ ██

**May 8**

██ ████████████████████████████

██████ complete and present a business plan which would determine the tasks and savings deemed necessary to produce a viable operation and successful restructuring. The May 8 business plan identified an average annual restructuring savings need of ████ ██████, of which a total ████████ was left as a target to be covered through employee concessions.

**May 18**

89.    The Company presents the allocation of the ask and valuation methodology to the various labor constituents.  At the time Pinnacle's Flight Attendants were represented by the United Steelworkers, until a representation election later in July when AFA was elected and certified by the NMB as the bargaining agent for Pinnacle's Flight Attendants.

---

[57] Intralinks Document 7.13 and 4.15.
[58] Intralinks Document 1.1 at page 18.

**May 15**

90.     The future game changer is set in motion, as Delta's mainline pilots agree

to terms for a new collective bargaining agreement containing an 18.5% pay scale

increase and changes in their scope which directly impacts the operations at Delta

Connection Carriers.  Under the deal with its pilots, Delta agreed to cut the amount of 50

seat regional jets operated at DCI Carriers to a maximum of 125 under certain conditions,

and to increase the number of 71 to 76 seat regional jets operated by DCI Carriers from

120 to 153.  This number is permitted to increase by seventy (70) additional 76 seat

aircraft contingent upon the delivery of "small narrowbody aircraft", at a rate of four RJs

for every five "small narrowbody aircraft  (ratio of 1.0 to 1.25).   The Tentative

Agreement (TA) reached with Delta's mainline pilots occurred an unprecedented seven

months prior to contract amendable date.  The TA was approved by the ALPA Master

Executive Council (MEC) at Delta on May 21 and sent out to the rank and file for a vote

due by June 29.

**May 22**

91.     The day after the Delta pilot's MEC approved the TA, Delta Airlines

finalized a deal with Southwest to purchase all 88 of Airtran's B-717 aircraft.  Delta and

ALPA had have already agreed to add B-717 rates to the Delta pilot contract as "small

narrowbody aircraft" to be operated at the mainline.  The B717 deal meets the

contingency in the ALPA contract scope section and allows Delta to add up to a total of

up to 103 new 76 seat aircraft to the operations at DCI carriers.

**June 14/15**

92.    AFA representative meet with Pinnacle managers and advisors and are provided background information of Pinnacle's recent history and the developments which lead to the filing.  The company also provided to AFA the total labor concessionary target of ███████, but did not specify the ███████ portion of this amount allocated to the Flight Attendants. ████████████████████

████████████████████████████████████████

██████████████████████████████ ██ █████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████

**June 22**

93.    Pinnacle suspends labor negotiations as a result of the Delta pilots TA in order to reformulate business plans.

**June 29**

94.    Mainline Delta pilots approve the new contract with 18.5% pay increases over 5 years and in effect approve of Delta's ability to add a new narrow body fleet, etc.

**August 1**

95.    ████████████████████████████████████

████████████████████████████████████

---

[59] Intralinks Document 1.1



96. ████████ █ ████████████████

97. ████████████████████

98. ████████████████████

---

[60] Delta Highly Confidential Letter to Mr. Spanjers  August 1, 2012

███████

99.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

**F.    Issues Which Provide Pinnacle's Flight Attendants Good Cause to Reject the Company's Requested Increase in Concessions**

100.    The basis for the Company's additional ask of ██████████ has a number

of illogical and speculative assumptions which are not contained in the business plan

upon which the 1113 concessions are based.  As stated above, Pinnacle's Flight

Attendants have met the amount requested of them by Pinnacle in May.  Shown below

are several issues tied to the time-series of events described above which clarify why

Pinnacle's Flight Attendants have cause to reject this huge additional increase in

concessions now being requested by their company.

**A.    Delta's Inadvertent Rate Oversight in April**:  When Delta

signed the Amended and Restated rates in April the carrier held a position of extreme

leverage over Pinnacle, as its sole customer and DIP lender.  ████████████████████

████████████████████████████████████████████



**B.     No Available Verifiable Information**:  In its 1113 Brief, the

Company asserts that it has provided the AFA with all "*relevant information as*

*necessary to evaluate the proposal.*"[61]

concessions is based entirely on the claims made by Delta in one paragraph of  its August

1 response letter to Mr. Spanjers.  Not one cent of Delta's rate analysis on which this

concessionary ask is based is verifiable by the AFA or the Company, nor by anyone

without the ability to directly review the assumptions and methodology upon which Delta

makes it claim.  The information regarding the source and methodology of Pinnacle's

concessionary request is completely shrouded in confidentiality.  This is

convenient for Delta, which may have other obvious commercial interests in mind when

it developed its figures.

**C.     Erroneous Due Diligence:**  Pinnacle asserts that it verified the

via proxy through a new series of labor market analyses performed

independently by its advisors.[62]  However, on closer inspection, the diligence undertaken

by its advisors is fraught with errors, duplication and omissions which render it nearly

useless.  The second-hand calculus of advisors is not adequate to explain or substitute as

---

[61] PNCL 1113 Brief at page 34
[62] Hughes Declaration

a basis for an additional labor ask of ▮▮▮▮▮▮▮, which is on its face inexplicable,

especially given the previous mark-to-market diligence efforts.



Carriers she has excluded from the diligence include the two DCI

carriers actually operating the CRJ-900 aircraft besides Pinnacle, Skywest and

---

[63] PNCL 1113 Brief at page 38
[64] PNCL 1113 Brief at page 38
[65] Virginia Hughes Declaration at page 9, paragraph 24

ExpressJet. Additionally, ███████████████████████████████████ then it would be Compass and/or GoJet that would be receiving the 16 CRJ-900's (non-Mesaba) that are being currently transferred out of Pinnacle, as well as the 13 CRJ-900's being shed from operations at Comair. Yet it is older, higher cost, SkyWest that will be taking over the operation of these 29 CRJ-900 aircraft.[66] The bottom line is that the diligence never attempted to address the claims made by Delta as it was the <u>average</u> DCI carrier rates and not those of the lowest cost competitors that Delta used and which should have been evaluated.

      **D.**      **Wrong Pay Data**: Seabury's analysis of GoJet's Flight Attendant pay was based on outdated pay scale information. The pay scale which GoJet Flight Attendants are currently being compensated tops out at ███ an hour, compared to the ███ an hour which is used in Seabury's diligence. The impact of using the wrong pay data for GoJet is a ███ overestimation of annual Flight Attendant costs per aircraft in Seabury's analysis, and importantly, increases the Pinnacle's May mark-to-mark wage-related costs to ███ below the average DCI carrier from the ███ below as originally calculated.

      **E.**      **Double Counting**: Pinnacle claims that the additional ███████ concession generated by Delta's rate analysis is wholly incremental to the original ask and that the diligence performed by its advisors has fully accounted for this fact. In order for a true accounting of the original ask any diligence on the second ask would have to first discount Pinnacle's actual labor cost by the amounts that were contemplated in original ask. The Company and its advisors appear to have attempted to do so regarding pilot costs, as both pay and work rules appear to have been adjusted to account for the

---

[66] Hughes Declaration, Exhibit 11.

initial ask, however this is not the case with Flight Attendants.  In fact, in both the

Seabury and Compass Lexicon diligence of Delta's rate claim, the Flight Attendants

seem to be given short shrift.  Mr. Kasper's analysis entitled" *76-seat Pilot Cost*

*Analysis*" does not even mention that fact that he includes any diligence on Flight

Attendants.

Of the ███ in the original Fight Attendant ask, (shown in Table 2

above) approximately half were wage-related expenses.  In its diligence, the company

and its advisors have only attempted to back out the wage-related expense and have not

adjusted F/A costs in their diligence by adjusting for the remaining work-rule and

benefits concessions in the first ask.  Therefore any diligence that they have performed to

estimate the gap between Flight Attendants at Pinnacle and other carriers has not backed

out these concessions and thus overstates the actual gap by approximately 50%.

**F.    No Truly Independent Second Diligence:**  Pinnacle claims it

vetted Delta's rate claims through the separate analysis of costs performed by two of its

advisors, Seabury and Compass Lexicon.[67]  Seabury presented its evaluation results for

both GoJet and Compass Airlines, while Mr. Kasper of Compass Lexicon looked at only

Compass Airlines.  Both analyses were primarily focused on pilot costs.[68]  In the

Declaration Mr. Spanjers, he writes,, *"Pinnacle also asked Daniel Kasper, a noted*

*airline industry expert of the consulting group Compass Lexicon, to analyze Pinnacle's*

*cost disadvantage. Based on publicly available "Form 41" cost data reported by airlines*

*for 2011, Mr. Kasper estimated a cost differential between Pinnacle and Compass*

*Airlines of over* ████████████████████████████████

---

[67] Hughes Declaration, Kasper Declaration, Hunyor Declaration, PNCL 1113 Brief
[68] Intralinks Documents 6.44, 6.48 and 4.33.
[69] Spanjers Declaration at page 9.

In accordance with Mr. Spanjers statements Mr. Kasper sources US DOT data as the basis of both his pilot and Flight Attendant diligence.[70]  However, there does not appear to be any application of US DOT Form 41 data or source numbers derived from US DOT Form 41 or that Mr. Kasper claims as part of the basis of his Flight Attendant diligence.[71]  Instead, the real and only basis for Mr. Kasper's analysis of Flight Attendant costs is the application of the pay data provided to them by Seabury from their own diligence analysis.  Mr. Kasper has no other source for its average seniority adjusted wage for Pinnacle and Compass, other than the ones generated from the Seabury analysis, which he lists as a source.[72]

Even then the average pay figure Mr. Kasper uses for Compass Flight Attendants seems to be in error.  Seabury diligence on average seniority weighted hourly pay at Compass for Flight Attendants produced an hourly pay rate of ███, whereas Mr. Kasper's analysis uses ███████  Besides the fact that error artificially increases the gap in Mr. Kasper's analysis, his analysis is simply a repeat evaluation of the Seabury analysis and should not be considered a second independent diligence on Flight Attendant costs as implied by the Company.

**G.**    **Did Not Use Best Available Information**:  The "game changer" in the new ALPA contract which could potentially limit Delta's operation of 50 seat aircraft operation to a maximum of 125 aircraft is not tied in any obvious or logical way to the rate analysis Mr. Spanjers had requested from Delta.  Therefore, Pinnacle's new business plan with 140-50 seat aircraft and 41 76-seat aircraft through 2018, does not

---

[70]US DOT Form 41 data is shown as a source of Mr. Kasper's flight attendant analysis.
[71] Intralinks Document 4.33 at page 5.
[72] Ibid.
[73] Intralinks Documents 6.44 and 4.33 at page 5

account for this "game changing" fact, and is not a reliable projection of future operations upon which the concessions are based.



Furthermore, no amount of Flight Attendant or labor concessions can change the fleet allocation decisions Delta will be soon making regarding who it chooses to operate the maximum combined DCI fleet of 125 50-seat aircraft. ███████

███████████████████████████████████████████

███████████████████ Delta, like most mainline carriers, has recently been attempting to shift away from older 50 seat aircraft.  The basis for this change stems from the basic operational economics of the aircraft as well as passenger preference and not Flight Attendant costs.

**H.    Implausible Results:** Pinnacle's ██████ additional concession ask takes the total labor concession requested add up to ██████ annually.  Based on a fleet of 181 aircraft, Pinnacles labor costs were not ████████████████████

---

[74] PNCL 1113 Brief at page 34.

████ and Pinnacle claim, but an astounding ████████████████████ ████ which Pinnacle would be viable.  This means that the current compensation and work rules of Pinnacle employees are somehow found to be above market rates by ████ .  This is difficult, if not impossible, to believe.

I.    **Delta's Prurient Business Interests**: As an airline business seeking profits and competitive advantage, Delta has in interest in reducing the rates it pays to Pinnacle as much as possible   According to the Amended and Restated CPAs Delta could reduce the amount it pays Pinnacle for any new flying after 2018 to the average rates paid to other DCI carriers. The lower rates it seeks from Pinnacle could be used as leverage for Delta against other DCI Carriers in future negotiations.  Also, there is an important clause in the Amended and Restated CPA's which could result in Delta receiving a payment from Pinnacle if profitability margins exceed certain thresholds.[75]

"The Annual Adjustment to Margin Payment" section of the CRJ-200 CPA provides a formula which would not yield any payments by Pinnacle to Delta under the old business plan, but would yield as much as ████ in payments to Delta under the new business plan as projected operating margins would exceed thresholds.[76] This could be useful in offsetting some of Delta's cost in parking 50 seat aircraft from DCI carriers.

J.    **Misapplication of the Data**:  Regarding the findings of its diligence Pinnacle stated, "*What Pinnacle found is that all, or significantly all, of the* ████████████ *can be explained solely by the differential between its pilot costs and those of the lowest-cost regional airlines with which it competes.*"[77]  All other issues

---

[75] Intralinks Document 7.13 at page 41.
[76] *Ibid*
[77] PNCL 1113 Brief at page 38

aside, if this flawed diligence was relied upon by the Company in its assessment of the

second ask, why did it increase Flight Attendant concessions more than any other group?

As Chart 7 above shows the Flight Attendants concessions went up ███, from the May

ask, the most of any group.

> K.      **Mark-to-market Labor Cost Illogic**:  In its initial diligence

regarding mark-to-market labor cost assessments presented in May, Pinnacle used the

same set of comparator carriers, the average of DCI carriers, for its analysis as Delta

claimed in its rate analysis.  Yet Pinnacle found its total labor costs in May to be only

approximately ███████ above the average of DCI carriers (the rest of the ████

million annual ask of course was made up from "fair and equitable" allocations to each

labor group).  Delta's August 1 rate analysis are being viewed as an additional mark-to-

market assessment of the Pinnacles labor costs, but this time derived from and requested

to affect Delta's CPA rates.   Delta's rate analysis has been assumed by Pinnacle to

translate into an additional ████████ of out of market labor costs, which accrue not just

on the original ████████ out of market assessment, but on top of the entire ████

million original ask.

> In the end, how is it possible that Pinnacle's original mark-to-

market labor cost analysis, which showed Pinnacle's total labor annual labor costs were

███████ above market, captured only one-third of the implied out of market annual

labor cost of ███████████   It is simply an implausible outcome which is shrouded in the

secrecy of Delta's confidential rate analysis and not in any way verified by the flawed

diligence performed by Pinnacle and its advisors.

---

[78] Math: ███████ original above market assessment (from Intralinks Document 6.51), plus the additional ██ million in the Delta's rates analysis equates to ████████ above market.

L.      **No Diligence on 50 Seat Aircraft:** Two-thirds of the ██ million in additional concessions is derived from the claimed ████ above average rate for each of Pinnacles fleet of 140 CRJ-200 50-seat aircraft.   This amounts to ██ million of the ██ million in additional concessions, yet there has been no diligence from the Company or any of its advisors on this number.  One complication stems from the fact that a repeat of their CRJ-900 diligence using Compass and GoJet as the comparators is not possible, as neither of these carriers flies 50 seat regional jets.

M.      **No Impact on Current CPA's**:  The additional ask will not affect the rates Delta is obligated to pay Pinnacle until 2018 for either the 76 seat CRJ-900 fleet or the 50 seat CRJ-200 fleet.   All of the additional concessions would go to Pinnacles bottom line which is fattened at a rate which is twice what Pinnacle initially claimed was necessary to be viable in May.   Any additional 76 seat flying that would enter Pinnacle fleet is not contemplated in the business plan and therefore there is no evaluation the AFA or any advisor can do to evaluate the impact of the concession on an alternative business plan containing the new 76 seat aircraft.  Since the rates Delta pays to Pinnacle are locked into the existing CPA's for several years, in order to benefit from the additional August labor concessions Pinnacle would have to sign a new CPA for any new flying of 76 seat aircraft.  Delta has no new 76 seat aircraft on order and Pinnacle does not include any in its business plan.  The Flight Attendants are being asked by their Company to provide an ████████ in their concessions based on highly questionable assumptions for the chance to fly aircraft which are not on order and are not included in their Company's new business plans.

101.     Thus for all of the reasons stated above,  Pinnacles "at market" Flight Attendants, who have in the Company's own valuation already met the initial

concessions requested,  have good cause to reject the remaining ████████ in annual

concessions being asked of them now.[79]

102.    There are also inherent reasons why the structure of the August concession

is not reasonable.  Through the August 1 letter to Mr. Spanjers regarding Delta's rate

analysis Pinnacles Flight Attendants are being asked to provide an additional ████████

in annual concessions.  The allocation of those savings by the Company has been

predominantly based on a wholesale disposal of work rules that appears to be based on

little more than Mr. Glass's one-way analysis of comparable work rules.  No sense of

balance is appears to be afforded, as only work rules that are deemed less favorable to

Pinnacle are considered.   Of the ████████ in additional concessions being asked from

the Flight Attendants approximately ████████ is harvested from work rules alone, as the

value of concessions from work rules increased from ████████ in the May ask, to ████

million in the August ask.

103.    As shown below in Table 6 below are the seven Flight Attendant work

rules that were proposed to be changed to enable the company to obtain over ████████ in

average annual savings.   The list includes those selected work rules deemed to be less

favorable to Pinnacle than those existing at a majority of competitors.

---

[79] Original $3.6 million concessionary request was increased to $6.4 million in August.  .



104.    Table 7 below highlights the Company's greatly expanded list of Flight Attendant work rule changes from the August 16th ask which includes twice as many items as were identified in the May 18 tabulation shown in Table 6 above. The list includes the cost savings of selected work rules deemed to be less favorable than "any" DCI or non-DCI comparator. The average annual concessions associated with these work rule changes of approximately ████████. This is a savings value that is more than 10 times the amount by which Pinnacle's Flight Attendant work rules were deemed above market in May.



105.    The allocation of concessions to Flight Attendant work rules in the August concession package is effectively the Company's third bite at the same apple. In the mark-to-market analysis done in May certain work rules were dubbed "unfavorable" compared to the majority of DCI carriers. [80]   In the May allocation of "fair and equitable" concessions the Flight Attendants were assessed ███████ based on work rules judged to be more expensive than that "of a competitor".[81]   In this the third assessment of Flight Attendant work rules another ███████ is needed in order to bring the Flight Attendants to market costs.  In effect, the same  Flight Attendant work rules that were judged to be ███████ above market in May are now required to be reduced by ██ million more in the August ask to make the Flight Attendants compensation to be at market based on Delta's rate analysis.  None of this makes sense, even according to the company's evolving logic and market valuations.

106.    In Mr. Glass's Declaration he claims that their proposed changes to Pinnacle's Flight Attendant work rules leave the carrier "generally in line with those of the Comparator group".[82]  Yet the changes in Flight Attendant work rules leaves Pinnacle Flight Attendants with a set of work rules of which Mr. Glass deems ███████ are worse than others, ███████ better than others, and ███████ are approximately the same as others.[83]  It does not seem possible that Pinnacle's Flight Attendant work rules can be generally in line with the comparator group after the concessions the company seeks leave them with ███████ worse off work rules and less than half that share, ███, better off than their counterparts.

---

[80] Intralinks 6.51 and Glass Declaration
[81] Glass Declaration at page 15.
[82]Glass Declaration at page 19.
[83] Mr. Glass uses the obverse of "favorable and unfavorable" when looking at it from the Company's perspective.

.      107.      Finally, it is quite possible that the Company chose to only compare itself against GoJet and Compass in the wage-related assessments of the 2nd ask, and no other DCI comparators, due to their low wage scale alone.   Shown below in Chart 8 are the hourly pay rates by year of service of Pinnacle Flight Attendants (and those at all other DCI Carries), which are substantially above GoJet and Compass.  The dashed line for GoJet shows the erroneous old Flight Attendant pay data that the company used in their diligence of GoJet pay rates.

**Chart 8**



108.      The relevance of the August rate based concessionary ask is not to gain market based costs, and  it  appears to  be an overreach into Flight Attendant wages and work rules to perhaps set the standard for other DCI carriers in the future.  The pattern bargaining that Mr. Glass highlights in his Declaration, works two ways.  As he claims, for labor, increases at one carrier can lead to leverage for an increase at another carrier.

For carriers, concessions at one carrier provide leverage for concessions at other carriers. From both Delta's and Pinnacles perspective, the 1113 filing may present a convenient opportunity to overreach on the  concessions needed for addressing the business needs of the Company in order to focus on longer term leverage against other DCI carriers in the future.

109.    It seems much more realistic that after the "game changer' Delta mainline pilot agreement in in June which limited 50 seat flying for the first time at Delta Connection Carriers that a new equation was evaluated,  one that contemplated the costs of parking 50 seat aircraft at Delta.  The first of Pinnacle's CRJ-200s comes off lease in 2019, meaning that Delta, who owns Pinnacles fleet, would have to continue making payments of approximately of ███████ a year per aircraft as well as pay fixed monthly payments to Pinnacle of ██████████, or ████ per year to Pinnacle for each of Pinnacles 140 CRJ-200 in their fleet.  Delta also has huge engine maintenance costs of as much as $1 billion in the next three years, which adds to the incentives Delta has to park the aircraft.

110.    The additional labor concessions could be viewed as being directly linked to the Delta's mainline pilot deal and not to the claims made by Delta in the August 1 letter to John Spanjers.  The August increase in concessions may be a partial offset to the loss of flying of 50 seat aircraft at Pinnacle and to compensate Delta through above margin returns.

111.    As I have demonstrated, the Flight Attendants have been assessed by Pinnacle and their advisors to be "at market" costs of their DCI competitors. If the Company had used the correct pay rates for GoJet they would have found that Pinnacle's Flight Attendant costs are actually below market.  The AFA's last proposal (September

12) has been valued by the Company to meet their original May ask.  The increase in the

Flight Attendants ask in the August concessions is the highest amongst all groups and is

based on confidential information and methodology that Delta alone controls.  Diligence

on the August concession increase is fraught with errors, omissions, double-counting,

duplication, and assumptions that cannot be relied upon for true measure of Delta's

average DCI rate claims.  The fact that SkyWest is receiving the 16 Pinnacle and 13

Comair CRJ-900s and not GoJet and Compass, undermines their theory that low cost

carriers alone will get access of the 76 seat aircraft fleet.

112.    The potential impact on Pinnacle's business plan of the Flight Attendants

not reaching the second ask, and instead meeting the original May ask can be readily

assessed.  A key indicator of business plan viability is the share of each revenue dollar

earned that is retained as profit.  This ratio of profit to revenue is known as an operating

margin.  In the Company's May business plan Pinnacle's operations were forecast to

produce an average annual operating margin ████████████████████████████████

████, assuming that labor concessions match the ████ million May ask.  If the Flight

Attendants provided the annual relief of ██████████, the operating profit margins in the

business plan would drop from an average margin of ██████████ in 2013.  This result

is more than twice the ████████████████ in the May business plan judged be provide

a viable basis for a successful restructuring.  For years 2014-2018 the operating margin in

the new business plan averages ████.  Without the Flight Attendant portion of the August

ask the average annual profit margin drops to ██████████████████ ■

113.    Similar small impacts result from the Flight Attendants meeting the May

ask and not the August ask  on another component of the Company's business plan, the

---

[84] Intralinks Documents 2.2 and 2.10.

rate based margin..   The rate based margin in 2013 is forecast to be ▮▮▮, which would

drop to ▮▮▮.   Longer term 2014-2018 rate based margins average ▮▮▮, which drops

to ▮▮▮ over the 2014-2018 period.   Both of which are well above the ▮ rate base

margin calculated in the Company's May business plan. [85]

114.    Pinnacles Flight Attendants have met their fair allocation of cost

concessions under any reasonable analysis. For all of the above reasons, Pinnacle's Flight

Attendants appear to have just cause to reject the additional concessions that have been

request above what they have already agreed to provide.


I declare under penalty of perjury that the foregoing is true and correct to the best

of my knowledge.


Executed this 5th  day of October,  2012.


_____

Daniel W. Akins

[85] *Ibid*