# EXHIBIT 8

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

| | |
|---|---|
| **OBJECTIVE** | This Term Sheet sets forth the basic terms of the Company's Section 1113 (c) Proposal which provides for necessary modifications to the parties' existing Collective Bargaining Agreement between AFA - CWA and Pinnacle Airlines (the "Basic Agreement") that are necessary to permit the reorganization of the Company. The parties will amend the Basic Agreement and related side letters of agreements, and execute such other documents as may be needed, to accomplish the following modifications.<br><br>Items marked with an asterisk (*) in this term sheet are contingent upon a consensual Collective Bargaining Agreement, i.e. they will become effective as described only upon the effective date of a new Collective Bargaining Agreement between Pinnacle Airlines and AFA - CWA. |
| **DURATION**<br>Section 20 | Amendable October 24, 2016~~December 31, 2018~~ |
| **COMPENSATION**<br>Section 18 | See Attachment A – "Compensation" |
| **PROFIT SHARING** | See Attachment B – "Profit Sharing Plan" |
| **WORK RULES**<br><br>Scheduled Minimum Work Days for Part-Time Flight Attendants<br>Sections 5.D.3 & 5.D.4 | 1. Increase part-time lines from 6 days scheduled per bid month to 8 days per bid month.<br><br>2. Eliminate benefits for all part-time flight attendants. |
| ~~Posting of Open Time~~<br>~~Section 5.G~~ | 3. ~~Eliminate the requirement to post/publish open time. The Company would be able to hold open trips for assignment.~~ |
| Co-domiciles | 4. Allow metropolitan co-domiciles system-wide (See Attachment C). |
| Vacation Accrual<br>Section 14. A.3 | 5. When a Flight Attendant has accrued two (2) weeks or more vacation to be taken in the following year one (1) week shall be unpaid. After vacations have been awarded the Company shall provide a method for the Flight Attendant to designate the awarded week he/she intends to be taken unpaid. |
| Uniform Allowance<br>Section 15.D.1 | 6. Reduce annual uniform allowance for both full-time and part-time Flight Attendants by one hundred dollars ($100.00) |
| Per Diem<br>Section 18.C | 7. Reduce per diem rates to the following:<br>   $1.40 – effective on DOS through 12/31/13 |

**CONFIDENTIAL**                                1

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

| | |
|---|---|
| | $1.50 – effective 1/1/14 through 12/31/14<br>$1.60 – effective 1/1/15 through 12/31/15<br>$1.70 – effective 1/1/16<br><br>8. The Company shall not pay per diem when scheduled on a continuous duty overnights (and one day turn around) |
| US Customs Credit<br>Section 18.I | 9. Delete Paragraph 18.I and eliminate all references to customs credit. |
| Deadhead Pay<br>Section 19.B; 19.C | 10. 50% pay and credit for deadhead. Replace all references to 75% deadhead pay with 50%. |
| 45 minute report<br>Section 6.G.1 | 11. In domicile a Flight Attendant shall be required to report, and his/her duty shall commence, **forty-five (:45) minutes** prior to his/her first scheduled departure of the day. If such departure is delayed or rescheduled, the commencement of duty shall correspondingly be delayed or rescheduled. Flight Attendants shall be notified by Crew Scheduling if their scheduled report time is delayed by more than **forty-five ( :45) minutes**. If such notification is not made, the original report time and commencement of duty will remain unchanged. |
| ~~Month Balancing~~ | ~~12. To allow the Company to adjust bidding periods for improved balancing and staffing throughout the year.~~<br><br>~~Management on Seniority List Credit~~<br>~~Maximum Pay 75 hours/month~~<br>~~No scheduled meal break section 5.D.13~~<br>~~Remove fences and combine operation~~ |
| **BENEFITS** | See Attachment D – "Benefits and Retirement" |
| **FINAL CONTRACT LANGUAGE** | While this Term Sheet sets forth binding agreements of Pinnacle Airlines and AFA - CWA, it does not necessarily represent what the parties would desire as final contract language. The parties agree that they will meet and confer to determine whether final contract language, whether in the form of a letter of agreement or amendments to the basic Pinnacle Airlines Flight Attendant Agreements, is necessary and, if so, that they will draft final contract language and execute the resulting agreements within forty-five (45) days of execution of this Term Sheet unless otherwise agreed. |

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

## ATTACHMENT A

## "Compensation"

1. Pay Rates
   See rate tables included below.

   a. ~~Increase rates as follows:~~

   ~~1/1/2016    +4%*~~
   ~~1/1/2017    +2%*~~
   ~~1/1/2018    +2%*~~



3. Premium Pay
   b. Replace all references in the CBA to premium pay at 200% with 150%.

      1. ~~Extension — Section 5.G.6.d~~
         ~~Delete paragraph 5.G.6.d in its entirety re: ability to decline extensions and receive 200% premium.~~

      2. ~~Junior Manning — Section 5.G.7.d & 5.G.7.e~~
         ~~Reduce premium from 200% to 150%, and delete 5.G.7.e re: ability to decline a Junior Manning Assignment.~~

      3. ~~Reserve Extension into Scheduled Day off Section 5.M.5.d~~
      4. ~~Reduce premium from 200% to 150%. Reserve Extension into Scheduled Day off — Section 5.M.5.d~~
         ~~Reduce premium from 200% to 150%.~~

      5. ~~Working into a Day off Section 18.G.3~~
      6. ~~Reduce premium from 200% to 150%. Working into a Day off — Section 18.G.3~~
         ~~Reduce premium from 200% to 150%.~~

4. Holiday Pay
   c. Eliminate Holiday Pay

5. Section 12.A.6
   a. Pay, no credit for recurrent training. Recurrent training will be scheduled on a Flight Attendant's day(s) off **except for a Reserve Flight Attendant.**

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

| Flight Attendants | | | | | | |
|---|---|---|---|---|---|---|
| YOS | DOS | 1/1/2014 | 1/1/2015 | 1/1/2016 | 1/1/2017 | 1/1/2018 |
| ~~1st 6 Mos~~ | ~~16.91~~ | ~~16.91~~ | ~~16.91~~ | ~~17.59~~ | ~~17.94~~ | ~~18.30~~ |
| ~~2nd 6 Mos~~ | ~~18.09~~ | ~~18.09~~ | ~~18.09~~ | ~~18.81~~ | ~~19.19~~ | ~~19.57~~ |
| ~~1-2~~ | ~~20.20~~ | ~~20.20~~ | ~~20.20~~ | ~~21.01~~ | ~~21.43~~ | ~~21.86~~ |
| ~~2-3~~ | ~~21.56~~ | ~~21.56~~ | ~~21.56~~ | ~~22.42~~ | ~~22.87~~ | ~~23.33~~ |
| ~~3-4~~ | ~~23.03~~ | ~~23.03~~ | ~~23.03~~ | ~~23.95~~ | ~~24.43~~ | ~~24.92~~ |
| ~~4-5~~ | ~~24.05~~ | ~~24.05~~ | ~~24.05~~ | ~~25.01~~ | ~~25.51~~ | ~~26.02~~ |
| ~~5-6~~ | ~~24.99~~ | ~~24.99~~ | ~~24.99~~ | ~~25.99~~ | ~~26.51~~ | ~~27.04~~ |
| ~~6-7~~ | ~~25.90~~ | ~~25.90~~ | ~~25.90~~ | ~~26.94~~ | ~~27.47~~ | ~~28.02~~ |
| ~~7-8~~ | ~~26.66~~ | ~~26.66~~ | ~~26.66~~ | ~~27.73~~ | ~~28.28~~ | ~~28.85~~ |
| ~~8-9~~ | ~~27.60~~ | ~~27.60~~ | ~~27.60~~ | ~~28.70~~ | ~~29.28~~ | ~~29.86~~ |
| ~~9-10~~ | ~~28.42~~ | ~~28.42~~ | ~~28.42~~ | ~~29.56~~ | ~~30.15~~ | ~~30.75~~ |
| ~~10-11~~ | ~~29.21~~ | ~~29.21~~ | ~~29.21~~ | ~~30.38~~ | ~~30.99~~ | ~~31.61~~ |
| ~~11-12~~ | ~~29.94~~ | ~~29.94~~ | ~~29.94~~ | ~~31.14~~ | ~~31.76~~ | ~~32.40~~ |

**RETAIN LONGEVITY STEPS 12-15 YOS**

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

**ATTACHMENT B**

## "Profit Sharing Plan"*

If consensual agreements are reached, Pinnacle Airlines Corp. will provide a profit sharing plan as outlined below:

1. Payout Threshold
   a. Pre-tax margin excluding non-cash deferred revenue and special items ("Adjusted Margin" and "Adjusted Earnings")
   b. Year end unrestricted cash must exceed $40 million, net of anticipated profit sharing payout. If the last day of the year falls on a weekend, then the year end cash will be measured on the first business day of the following month.

2. Bonus Pool
   a. Ten percent (10%) of Adjusted Earnings up to four percent (4%) in pre-tax margin; fifteen percent (15%) above four percent (4%) in pre-tax margin

3. Payout
   a. Each class of employees will receive a pro rata share of the Bonus Pool based on the ratio of the class's wage and benefits concessions resulting from Pinnacle's bankruptcy to the aggregate amount of such concessions across all employee classes.
   b. The Bonus Pool amount allocated to an employee class for each fiscal year will be allocated to eligible employees within the class on a pro rata basis based on the ratio of the employee's Considered Earnings for the year to the aggregate amount of Considered Earnings for all eligible employees in such class for that year.
   c. Considered Earnings are those earnings currently defined for contribution to the Company's 401(k) for that portion of the fiscal year for which the employee was eligible to participate.

4. Eligibility
   a. All current employees (excluding officers and directors) on implementation date
   b. For those hired after implementation date, 1 year of continuous, active service
   c. Employed at end of year

*Profit Sharing Plan is based on the business plan and cash flows presented to labor as part of the Company's August 16, 2012 proposal. If the business plan and cash flows are materially changed as part of the Chapter 11 process, the Company reserves the right to modify its Profit Sharing

**ATTACHMENT "C"**

**Co-Terminal Operations**

<u>CONFIDENTIAL</u>　　　　　　　　　D - 3

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

1. "Co-terminal" means one or more airports that are within 50 miles of each other (or listed below) whereby the Company establishes one of the locations as a primary domicile (location where flight attendant is based ) and the other as a secondary domicile The following airport combinations are Co-terminal Domiciles:
    a. JFK/LGA/EWR
    b. DCA/IAD
    c. DFW/DAL
    d. LAX/BUR/LGB/ONT/SNA
    e. MIA/FLL
    f. ORD/MDW
    g. SFO/OAK
    h. IAH/HOU
2. If the Company wishes to establish Co-terminals not listed in paragraph 1, above, at any Domicile, it will meet with the Union at least thirty (30) days before commencing such Co-terminal operations at that Domicile.
3. Airports listed in paragraph 1, above, as a Co-terminal shall be considered one Domicile.
4. For each Co-terminal, the Company shall designate one (1) Co-terminal airport as the primary Co-terminal airport, and the other airport(s) listed for the Co-terminal will be considered the secondary Co-terminal airport(s). If the Company wishes to change the designation of a primary Co-terminal airport, it shall meet with the Union concerning resolution of any transition issues prior to implementing the new designation.
5. Travel time between Co-terminal airports will be that which is established by the company in pairing construction ("Travel Time"). The Company shall publish Travel Times with each Monthly Bid Package.
6. Trips will start and end at the same Co-terminal airport. A Trip may include a deadhead(s) by surface transportation between Co-terminal airports.
7. A PBS bid option shall be made available to desire/avoid pairings whose first report is at a specific airport.
8. A Flight Attendant whose Trip begins with a deadhead by surface transportation between Co-terminal airports will not be required to report at the Co-terminal airport where his/her deadhead by surface transportation begins. A Flight Attendant must call Crew Scheduling for authorization if he/she will report at the Co-terminal for his/her first departure without utilizing the deadhead by surface transportation.
9. If a Flight Attendant's deadhead by surface transportation at the completion of his/her Trip actually arrives at the Co-terminal airport where his/her Trip originated later than scheduled, he/she will notify Crew Scheduling of his/her arrival time at the Co-terminal airport of origination. A Flight Attendant will be considered to be on duty until he/she is released at the Co-terminal airport of origination
10. The Company will provide transportation between Co-terminal airports if necessary when cancellations or schedule changes cause a Flight Attendant's Trip to terminate at a different Co-terminal airport than where the Trip originated. Such time spent in transit will be considered duty until the Flight Attendant is released at the Co-terminal airport of origination. At the Flight Attendant's option, he/she will be released at the Co-terminal airport where his/her flying terminated, and he/she will notify Crew Scheduling of his/her decision to be released at the Co-terminal airport where his/her flying terminated.

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

11. All transportation between Co-terminal airports will be scheduled and paid by the Company.
12. A Flight Attendant who designates a Domicile with Co-terminals as the location for Company-paid parking specified in Section 17 E. shall, upon request, be provided with Company-paid parking at one Co-terminal airport location.
13. The Reserve call-out time for a primary Co-terminal airport is 120 minutes, and the callout time for a secondary Co-terminal airport is 180 minutes.
14. A Flight Attendant subject to rescheduling and recovery under Section 5 may be assigned to commence a Trip that originates at a Co-terminal airport other than the airport to which he/she was scheduled to report. A rescheduled Trip may include deadhead by surface transportation to another Co-terminal airport or deadhead to another Domicile.
15. At a secondary Co-terminal airport, the Company will provide a reporting location and checking in capabilities including a mechanism to update the Flight Attendant Manual.
16. The Company recognizes the difficulty of travel in major metropolitan areas and will consider such in evaluating late reports or missed assignments.
17. Modify Section 2 to read as follows:
    a. "**BASE**" means a geographical location where a Flight Attendant is based and from which a Flight Attendant's Trips will originate and terminate. A Flight Attendant shall be assigned to one Domicile.

CONFIDENTIAL

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

ATTACHMENT "D"

~~Benefits and Retirement~~

1. ~~Section 16.A: Medical, Dental, and Vision~~
   a. ~~Increase employee contribution at all levels to 35. "All levels" mean: employee only, employee + spouse, employee + children, and Family.~~
   b. ~~Delete paragraph 3, which requires the Company to meet and review the following year's benefit contribution, as redundant to paragraph 5.~~
   c. ~~Revise paragraph 5 to read as follows:~~
      ~~The Company and the Association will meet no later than September 15 of each year to address any anticipated changes to the cost of the plans.~~
   d. ~~Delete paragraphs 16.A.5.a and 16.A.5.b.~~
      ~~Removes the data requirements and eliminates the refund based on actual expenses.~~

2. ~~Section 16.C.3~~
   ~~Delete paragraph as information is now available on www.mypinnaclebenefits.com~~

3. ~~Section 10.c.8: Benefits Continuation~~
   ~~Revise Section 10.c.8 to read:~~
   ~~A Flight Attendant's health benefits shall continue in compliance with applicable state and/or federal law provided appropriate premiums are paid~~

4. ~~Section 22: Retirement and 401k~~
   a. ~~No change to contractual language. The following table will be posted to the Company's website as referenced in paragraph 22.C.3~~

| ~~Years of Service~~ | ~~Company Match %~~ | ~~Match Salary Reduction Contributions Each Plan Year Up To~~ |
|---|---|---|
| ~~1 but less than 6~~ | ~~25%~~ | ~~6% of eligible earnings~~ |
| ~~6 but less than 11~~ | ~~50%~~ | ~~8% of eligible earnings~~ |
| ~~11 or more~~ | ~~50%~~ | ~~10% of eligible earnings~~ |

   b. ~~New hires will be automatically enrolled in the Plan the first day of the month following 6 months of employment.~~

**NON-CONTRACTUAL ITEMS**

1. Extended Sick leave will be eliminated pursuant to Company Policy.

2. Employees will be offered a voluntary 100% employee paid short term disability plan.

3. Employee will be required to pay 25% of the long term disability premium. Employee may opt out. LTD plan will contain a 120 day elimination period.

| ~~Proposed HRA Medical Plan~~ ||
|---|---|
| ~~Benefit~~ | ~~2013 Single HRA Plan Design~~ |

AFA RESPONSE TO PINNACLE AIRLINES RESPONSE 1113(c) RESTRUCTURING PROPOSAL
SEPTEMBER 25, 2012

| | ~~Propose July, 2012~~ |
|---|---|
| ~~Annual Deductible In-Network~~ | ~~$1,500 Single~~ ~~$3,000 Family~~ |
| ~~Annual Deductible Out of Network~~ | ~~$2,000 Single~~ ~~$4,000 Family~~ |
| ~~Company HRA Contributions~~ | ~~$500 Single~~ ~~$1,000 Family~~ |
| ~~Out of Pocket Maximums In-Network~~ | ~~$3,000 Single~~ ~~$6,000 Family~~ ~~Includes Deductible~~ |
| ~~Out of Pocket Maximums Out of Network~~ | ~~$5,000 Single~~ ~~$10,000 Family~~ ~~Includes Deductible~~ |
| ~~In-Network Co-Insurance~~ | ~~20% Coinsurance~~ |
| ~~Out of Network Co-Insurance~~ | ~~50% Coinsurance~~ |
| ~~Office Visits~~ | ~~Coinsurance and Deductible~~ |
| ~~Office Visits – Specialist~~ | ~~Coinsurance and Deductible~~ |
| ~~Urgent Care Co-Pay~~ | ~~Coinsurance and Deductible~~ |
| ~~Emergency Room Co-Pay~~ | ~~$250 Co-Pay then~~ ~~20% After Deductible~~ |
| ~~High Cost Radiology (CT, MRI, PET)~~ | ~~$250 Co-Pay then~~ ~~20% After Deductible~~ |
| ~~Inpatient Surgery (1)~~ | ~~$250 Co-Pay then~~ ~~20% After Deductible~~ |
| ~~Mental Health Inpatient~~ | ~~$250 Co-Pay then~~ ~~20% After Deductible~~ |
| ~~Gastric By-pass~~ | ~~Do Not Cover For Anyone~~ |
| ~~Prescription Deductible~~ | ~~$500 Deductible~~ |
| ~~Prescription 30 day supply~~ | ~~20% After Deductible~~ |
| ~~Mail Order Rx 90 day supply~~ | ~~20% After Deductible~~ |

~~NOTE: The plan design above is for 2013 only. Plan designs for 2014 and beyond are subject to change by the Company.~~

CONFIDENTIAL                                       E - 2

AFA 9.25.2012

~~Pinnacle Response 9-13-12~~

~~PROFIT SHARING~~

~~Flight Attendants will participate in the Profit Sharing Plan as outlined in Attachment B of the Company's Term Sheet Proposal dated May 31, 2012. If any other labor group is afforded more favorable terms of participation, such terms shall be provided to the Flight Attendants.~~ [COVERED IN MAIN DOCUMENT]

EXPENSES

1. The Company shall reimburse AFA for trips/reserve days paid/paid days in missed and/or paid in connection with the review, design negotiation, ratification and implementation of any agreement arising from the Pinnacle Airline bankruptcy, including outside any associated "override."

2. The Company will reimburse AFA for the expenses, including but not limited to hotels, meals and travel costs and fees incurred by the Union in connection the review, design negotiation, ratification and implementation of any agreement arising from the Pinnacle Airline bankruptcy, including outside legal counsel and other advisors.

3. Upon presentation of receipts, the Company will reimburse AFA within 15 business days.

~~EXPEDITED~~ ARBITRATION

1. At either the Company's or Union's request, any dispute arising over the meaning of the negotiated amendments to the Pinnacle Flight Attendant Agreement may be submitted for ~~expedited~~ arbitration.

2. If the parties are unable to agree upon a neutral arbitrator, the parties will alternately strike names on the revised list of the current panel of arbitrators, with the Union striking first, until only one name remains.

3. The matter shall be heard by the Board within thirty (30) days of the selection of the arbitrator.

4. In the event the selected neutral does not agree to comply with the time limits stated above, the last stricken arbitrator will be used. This process will continue until an arbitrator agrees to comply with the time lines in paragraph 3 above.

5. The availability of these ~~Expedited Dispute Resolution~~Arbitration procedures will not prevent the parties from mutually agreeing to an alternate process to settle any dispute arising under this Agreement.

GENERAL UNSECURED CLAIM

~~The~~Subject to the effectiveness of modifications to the AFA collective bargaining agreement as set forth herein, the parties recognize that the AFA and its members have made significant concession in their contractual and prevailing conditions of employment including wages and work rule modifications for the purpose of enabling Pinnacle Airlines, Inc. to successfully reorganize in the pending Chapter 11 proceedings. AFA and the Company have agreed that AFA shall have an allowed prepetition general unsecured non-priority claim in the amount of $_____(the "AFA Claim")~~.~~; provided that if the concessions made by AFA under this agreement are reduced, then the AFA Claim shall be reduced by the amount of any such reduction as determined in good faith by the Company. None of AFA or any of AFA's represented employees shall have any other claim or cause of action on account of this agreement or the concessions made by AFA hereunder or in the modified AFA collective bargaining agreement. Any transfer of all or any part of the AFA Claim may be made only in compliance with the Final Trading Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Interests in the Debtors' Estates entered by the Bankruptcy Court on April 23, 2012. The Company agrees they will support ~~this~~the AFA Claim and ~~that they will urge~~use reasonable efforts to obtain the support of the Unsecured Creditors Committee to also support the ~~claim. If the Claim is not allowed in full, the parties agree to renegotiations to reduce the concessions set forth in this agreement by an amount equal to the proceeds that would have been generated by the Claim.~~AFA Claim.

AFA will have the sole authority and responsibility to determine the manner of allocation among its represented employees on account of the AFA Claim; provided that the allocation schedule or formula will be delivered to the Company no later than

30 days prior to any applicable distribution date. To the extent reasonably practicable, the Company will distribution such proceeds to the employees identified by AFA net of applicable withholding taxes.

**PROTECTIONS**

~~If ratified, these terms and conditions will not go in to effect until all other labor groups-union/non-union and management/non-management at Pinnacle Airlines, Inc. have either agreed to, or had concessions imposed.~~

~~AFA will be provided a "Me-Too" if any other labor group (union/non-union) has their dollar target reduced at any point in this process.~~

If ratified and approved by the Bankruptcy Court, these terms and conditions will not go in to effect until the Company implemented, through binding agreement or legal unilateral authority, revisions to (A) the labor contracts of the Company's other non-AFA unionized employees and (B) the wages, benefits and working conditions of the Company's non-union hourly employees and (C) the wages, benefits and working conditions of the non-union salaried and management employees so that the aggregate revisions in (A), (B) and (C) for each individual non-AFA union and non-union employee group are reasonably projected by the Company to produce the targets for labor cost savings specified by the Company in its [Term Sheet Proposal dated May 31, 2012] as those targets may be modified by mutual agreement; *provided* that if the Company fails to implement the changes described in this paragraph for any other non-AFA union or non-union employee group, without implementing other changes that are reasonably projected by the Company to achieve equivalent labor cost savings, the Company and AFA will meet to discuss and agree upon a proportionate reduction in projected labor cost savings under the modified AFA collective bargaining agreement, and any such agreement will satisfy the condition to effectiveness in this paragraph.

AFA will be provided "Me-Too" for any equity position in the Company provided to any other labor group.

The Company will propose as part of its Plan and in the appropriate governance documents that the Board of Directors of the reorganized Company will for the term of the modified Collective Bargaining Agreement, include one member designated by AFA.

~~The Company agrees to indemnify and hold harmless AFA, the Pinnacle Airlines AFA Master Executive Council (MEC), the AFA International, and each of their current or former members, officers, committee members, employees, advisors, attorneys and consultants form any and all losses, damages, fines, penalties, taxes, expenses, claims, lawsuits, or administrative charges of any sort whatsoever (including attorney fees~~

~~and costs arising in connection with the investigation and defense of any such matter)
relating to or connected with the negotiation or implementation of the modification
to the Pinnacle Flight Attendant CBA.~~

1. **Indemnification** - The Company will indemnify and hold harmless AFA and its current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, investment bankers, consultants, agents, actuaries, financial advisors, professionals, agents and other representatives each indemnitee from any liability, loss, damage, fines, penalties, taxes, expenses, and costs (not including an income or excise taxes or similar amounts imposed by any governmental agency) relating to, concerning or resulting from any and all third party claims, lawsuits, or administrative charges of any sort whatsoever arising in connection with matters relating to, concerning or connected to the negotiation or establishment of the Term Agreement and related Letters of Agreement and any other document or agreement forming part of the Term Agreement and related Letters of Agreement.

Such indemnification and hold harmless obligation will not apply to: 1) any claim, lawsuit or administrative charge resulting from the willful or intentional conduct if any indemnitee, 2) any claim, lawsuit or administrative charge asserting that AFA violated its By-Laws or other organizational requirements by entering into the Term Agreement, 3) any claim, lawsuit or administrative charge resulting from any statement made by any indemnitee that incorrectly describes the Term Agreement or Letters of Agreement or the modifications made thereby; 4) any claim, lawsuit or administrative charge related to allocation among Pinnacle employees represented by AFA of any proceeds or distribution received in connection with the AFA Pinnacle Claim or 5) any claim, lawsuit or administrative charge related to any disposition by AFA or employees represented by AFA to third parties of the AFA Pinnacle Claim or any proceed or distribution received in connection therewith or on account thereof.

Any indemnitee seeking to be indemnified and held harmless pursuant to this paragraph must provide to the Company written notice within seven business days of the indemnitee learning of the claim, lawsuit or administrative charge as to which the indemnitee seeks to be indemnified and held harmless. The Company will have the right to conduct the defense of such matter with counsel of the Company's choosing and enter into a settlement of such matter. The Company will give reasonable consideration to the wishes of the

indemnitee in connection with the matters described in the foregoing sentence.

2.  Exculpation -The Company agrees that it will not propose or support any Plan of Reorganization that does not contain an exculpation or release provision for AFA and each of their current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives at least as favorable as any exculpation or release provisions provided for the Company's officers, directors, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives.

3.  Bankruptcy Protection-From the date of this Agreement until a date three years from the date of this Agreement, the Debtors will not file or support any motion (Motion) pursuant to 11 U.S.C. Sections 1113, 1113(e), or any other relevant provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the Agreement(s) or this Agreement.The Debtors will actively oppose any such Motion if filed by another party.

Notwithstanding the foregoing, the Debtors reserve the right to file or support any Motion if there is a material deterioration in the Company's financial condition or financial prospects, whether because of general economic conditions or otherwise. All requirement and provisions of Section 1113 will also remain applicable to any such Motion. AFA reserves the right to object to such a Motion and nothing in the Agreement shall be construed as an agreement by the AFA to such modifications or relief.

**Seniority List Integration**

The Company shall accept and apply without change; the merged seniority list arrived at through mutual agreement between representatives of the Colgan, Pre-Merger Pinnacle Flight Attendants and the Pre-Merger Mesaba Flight Attendants, or failing mutual agreement, through mediation or binding arbitration.

(See Protocol Agreement and Seniority Integration Process Agreement)

**Fenced Operations**

Until full integration of the Mesaba and Pinnacle systems, and route structures, and until an integrated seniority list, that includes the Flight Attendants from Colgan Airlines, is provided by the Union to the Company, the Flight Attendants of the above operations shall remain separate on their aircraft unless expressly agreed otherwise.

## RECOGNITION

~~REPLACING CURRENT A.C.G.~~

A. In accordance with Certification Number R-7324 made by the National Mediation Board, the Company recognizes the Association of Flight Attendants-Communications Workers of America, AFL-CIO, as the bargaining representative of the Flight Attendants employed by the Company for the purposes of the Railway Labor Act, as amended.

B. The provisions of the Agreement shall be binding on any successors or assigns of the Company, unless and until changed in accordance with the provisions of the Railway Labor Act, as amended.

C. Labor Protective Provisions

1. In the event of a merger of the Company with another airline, which affects the seniority rights of Flight Attendants on the Company's Flight Attendant System Seniority List, provisions will be made for the integration of seniority lists in a fair and equitable manner. The integration of the seniority lists of the respective Flight Attendant groups shall be governed by the Association merger policy if both pre-transaction Flight Attendant groups are represented by the Association. If the other pre-transaction Flight Attendant group is not represented by the Association, then Sections 3 and 13 of the Allegheny-Mohawk LPPs shall apply. The Surviving Entity shall accept the integrated seniority list established through the Association merger policy or LPP proceedings.

    2.    In the event of a merger or acquisition involving the Company, the Company will meet and confer with the Association concerning any matters that affect the Flight Attendants covered by this Agreement.

    3.    The Company agrees that it will not accept or implement an integrated Flight Attendant System Seniority List unless it has been established pursuant to this Section.

D.    Scope

    1. No Flight Attendant will be furloughed or subject to involuntary domicile transfer as a direct and immediate result of any flying performed by management personnel.

    2. Except as otherwise provided in this Agreement, all revenue flying on the Company's aircraft (whether leased to or owned by the Company) or under the Company's operational control, including wet leases (aircraft and crew), and contracting for other carriers or entities (government, military or commercial to other carriers or entities, shall be performed by Flight Attendants on the Company's Seniority List

    3. The Company shall not create or acquire an "alter ego" to avoid the terms and conditions of the Agreement.

E.    New Equipment Type

Whenever a new equipment type which will be operated by the Company is placed into revenue service, the Company will notify the Union of the new equipment type and will meet and discuss negotiate the implementation and training for the new equipment, and whether any changes to the Agreement are necessary.

[Margin annotations: Formatted Strikethrough; Formatted]

F. Mergers and Acquisitions

1. Upon announcement of any transaction which is intended to result in the consolidation of the Company with another airline, that affects the seniority rights of Flight Attendants on the Seniority List, the parties will meet in a timely manner to discuss the appropriate steps to be taken consistent with this Agreement.

2. Upon announcement of a sale of the Company in a bona fide "arms length" transaction to an unrelated third party, the Company will use its best efforts to arrange for the Union to meet and confer with any such unrelated third party to discuss the appropriate steps to be taken consistent with this Agreement

G. Remedies

Any and all disputes concerning alleged violation of this Section shall be resolved by final and binding arbitration. The Company specifically agrees to arbitrate any grievance filed by the Association alleging violation of this Section on an expedited basis directly before the System Board of Adjustment sitting with a neutral member, as the arbitration forum. The dispute shall be heard expeditiously no later than sixty (60) days following the submission to the System Board, and the Company agrees to request that a decision be issued within sixty (60) days after the close of the hearing.

**AFA Summary of Proposed Work Rule Changes**

| | First Year | Four Year | Avg Annual | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Eliminate ESL - ASO cost | $53,909 | $210,800 | $52,700 | $53,909 | $52,297 | $52,297 | $52,297 |
| Eliminate Holiday Pay | $893,896 | $3,095,299 | $773,825 | $893,896 | $755,972 | $728,456 | $716,975 |
| 1 week of vacation unpaid | $743,718 | $2,648,135 | $662,034 | $743,718 | $649,042 | $630,911 | $624,464 |
| Reduce Per Diem | $838,569 | $2,465,551 | $616,388 | $838,569 | $682,283 | $551,074 | $393,625 |
| Eliminate 1 day trip per diem & CDOs | $342,503 | $1,516,800 | $379,200 | $342,503 | $366,968 | $391,432 | $415,897 |
| Recurrent training - pay but no credit | $319,566 | $1,221,205 | $305,301 | $319,566 | $297,684 | $300,384 | $303,571 |
| No health insurance for grandfathered PT Fas | $269,505 | $1,078,020 | $269,505 | $269,505 | $269,505 | $269,505 | $269,505 |
| Eliminate ESL - Premium Cost | $186,440 | $745,760 | $186,440 | $186,440 | $186,440 | $186,440 | $186,440 |
| Decrease uniform allowance | $112,300 | $439,300 | $109,825 | $112,300 | $109,000 | $109,000 | $109,000 |
| Reduce Deadhead Pay | $91,250 | $357,289 | $89,390 | $91,250 | $88,691 | $88,588 | $88,760 |
| Eliminate US customs pay | $109,835 | $438,913 | $109,728 | $109,835 | $109,707 | $109,579 | $109,792 |
| Increase min days for PT Fas (6->8) | $71,241 | $322,568 | $80,642 | $71,241 | $77,032 | $83,583 | $90,712 |
| 45 minute report time | $61,367 | $272,340 | $68,085 | $61,367 | $64,878 | $70,656 | $75,439 |
| Co-domicile | $27,084 | $231,714 | $57,929 | $27,084 | $68,210 | $68,210 | $68,210 |
| Junior assignment | $10,000 | $40,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Reduce premium pay to 150% | $10,000 | $40,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Total | $4,141,183 | $15,123,694 | $3,780,991 | $4,141,183 | $3,797,709 | $3,660,115 | $3,524,687 |