# EXHIBIT 8

# EXHIBIT 1:

Excerpts from
*In re Hostess Brands, Inc.*,
No. 12-22052 (RDD)
(Bankr. S.D.N.Y. May 14, 2012)

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 12-22052(RDD)

4    - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    HOSTESS BRANDS, INC.

8

9          Debtors.

10    - - - - - - - - - - - - - - - - x

11

12                    U.S. Bankruptcy Court

13                    One Bowling Green

14                    New York, New York

15

16                    May 14, 2012

17                    3:07 PM

18

19    B E F O R E :

20    HON. ROBERT D. DRAIN

21    U.S. BANKRUPTCY JUDGE

22

23

24

25    ECRO:   Willie Rodriquez

Page 2

1    HEARING re:   Statement/Notice of Agenda Matters Scheduled

2    for Hearing on May 14, 2012

3

4    HEARING re: Motion of The Bakery, Confectionery, Tobacco

5    Workers and Grain Millers International Union to Dismiss

6    Case for Lack of Subject Matter Jurisdiction

7

8    HEARING re: Debtors' Motion and Debtors in Possession to (A)

9    Reject Certain Collective Bargaining Agreements and (B)

10   Modify Certain Retiree Benefit Obligations, Pursuant to

11   Sections 1113 (c) and 1114 (g) of the Bankruptcy Code.

12

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Sheila Orms

25

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    KRAMER LEVIN NAFATALIS & FRANKEL, LLP

 4         Attorneys for the Creditors' Committee

 5         1177 Avenue of the Americas

 6         New York, NY  10038

 7

 8    BY:  JOSHUA K. BRODY, ESQ.

 9

10    PAUL, WEISS, RIFLIND, WHARTON & GARRISON, LLP

11         Attorneys for Silver Point Finance

12         1285 Avenue of the Americas

13         New York, NY  10019

14

15    BY:  BRIAN S. HERMANN, ESQ.

16         KELLIE CAIRNS, ESQ.

17         KYLE KIMPLER, ESQ. (TELEPHONICALLY)

18         NORMAN PENTELOVITCH, ESQ. (TELEPHONICALLY)

19         MICHAEL S. RUDNICK, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

Page 4

1    BREDHOFF & KAISER, PLLC

2         Attorneys for Bakery, Confectionery, Tobacco and

3              Grain Millers Union

4         805 Fifteenth Street, NW

5         Washington, DC  20005

6

7    BY:  JEFFREY R. FREUND, ESQ.

8         ZOE L. PALITZ, ESQ. (TELEPHONICALLY)

9

10   PARAVATI, KARL, GREEN & DEBELLA, LLP

11        Attorneys for New York State Teamsters Conference

12             Pension and Retirement Fund and New York State

13             Teamsters Council Health & Hospital Fund

14        12 Steuben Park

15        Utica, NY  13501-2991

16

17   BY:  VINCENT M. DEBELLA, ESQ.

18

19   FEINBERG, CAMPBELL & ZACK, P.C.

20        Attorneys for New England Teamsters and

21             Trucking Industry Pension Fund

22        177 Milk Street

23        Boston, MA  02109

24

25   BY:  CATHERINE M. CAMPBELL, ESQ.

**Page 5**

1    JONES DAY

2         Attorneys for Debtors

3         222 East 41st Street

4         New York, NY  10017

5

6    BY:  ROBERT HAMILTON, ESQ.

7         JESSICA KATIN, ESQ.

8         HEATHER LENNOX, ESQ.

9

10   SPIVAK LIPTON LLP

11        Attorneys for Bakery Drivers Local 550 and

12             Industry Pension Fund

13        1700 Broadway

14        New York, NY  10019

15

16   BY:  JAMES M. MURPHY, ESQ.

17

18   COHEN, WEISS & SIMON, LLP

19        Attorneys for Interstate Brands Corporation

20        First National Negotiating Committee

21        330 West 42nd Street

22        25th Floor

23        New York, NY  10036

24

25   BY:  RICHARD M. SELTZER, ESQ.

Page 6

1    OFFICE OF GENERAL COUNSEL

2         Attorney for Southeast and Southwest Areas

3         Health and Welfare and Pension Funds

4         9377 W. Higgins Road

5         Rosemont, IL  60018

6

7    BY:  BRAD R. BERLINER, ESQ.

8

9    OFFICE OF THE UNITED STATES TRUSTEE

10        Attorney for the U.S. Trustee

11        33 Whitehall Street

12        21st Floor

13        New York, NY  10004

14

15   BY:  PAUL SCHWARTZBERG, ESQ.

16

17   LOCKE, LORD, BISSELL & LIDDELL, LLP

18        Attorneys for Bloomer Chocolate Company

19        111 South Wacker Drive

20        Chicago, IL  60606

21

22   BY:  COURTNEY BARR, ESQ.

23

24

25

Page 7

1   BAILEY & EHRENBERG, ESQ.

2        Attorneys for International Brotherhood of Teamsters

3        1015 18th Street NW

4        Suite 204

5        Washington, DC 20036

6

7   BY:  JEFFREY B. COHEN, ESQ.

8

9   WHITE & CASE LLP

10        Attorneys for Frank L. Eaton

11        200 South Biscayne Boulevard

12        Suite 4900

13        Miami, FL  33131

14

15   BY:  FRANK L. EATON, ESQ.

16

17   FAULKER HOFFMAN & PHILLIPS, LLC

18        Attorneys for Teamsters Local 52 Pension Fund et al.

19        One International Place

20        20445 Emerald Parkway Drive

21        Suite 210

22        Cleveland, OH  44235

23

24   BY:  GEORGE FAULKNER, ESQ.

25

Page 8

 1    DEBEVOISE & PLIMPTON LLP

 2         Attorneys for Investors I, LLC et al.

 3         919 Third Avenue

 4         New York, NY   10022

 5

 6    BY:  STEVE R. GROSS, ESQ.

 7

 8    MORGAN LEWIS & BOCKIUS LLP

 9         Attorneys for BBU, Inc.

10         1701 Market Street

11         Philadelphia, PA   19103

12

13    BY:  RACHEL MAUCERI, ESQ.

14

15    FULBRIGHT & JAWORSKI LLP

16         Attorneys for Bakery & Confectionery Union et al.

17         666 Fifth Avenue

18         New York, NY   10103

19

20    BY:  ANCELA NASTASKI, ESQ.

21

22

23

24

25

Page 9

1    KILPATRICK TOWNSEND & STOCKTON LLP

2         Attorneys for Flowers Foods, Inc. and Affiliates

3         1100 Peachtree Street

4         Atlanta, GA  30309

5

6    BY:  PAUL M. ROSENBLATT, ESQ.

7

8    WICK STREIFF MEYER O'BOYLE & SZELIGO

9         Attorneys for Western Pennsylvania Teamsters

10        And Employers Pension

11        1450 Two Chatham Center

12        Pittsburgh, PA  15219

13

14   BY:  VINCENT SZELIGO, ESQ.

15

16   APPEARING TELEPHONICALLY:

17

18   BRIAN J. CONROY, CREDIT VALUE PARTNERS

19   CHAIM FORTGANG, SILVER POINT CAPITAL

20   DREW HILL, UBS SECURITIES LLC

21   MICHAEL J. KELLY, MONARCH ALTERNATIVE CAPITAL LP

22   TIM LAVELLE, SIVER POINT CAPITAL

23   DAVID J. LIEBMAN, BIMBO BAKERIES USA

24   KYLE G. MAPES, TALAMOD ASSET MANAGEMENT LLC

25   JOHN RAPAPORT, CYRUS CAPITAL PARTNERS LP

Page 10

1    DAVID REGNANATO, SILVER POINT CAPITAL

2    LUIS RINALDINI, LUIS RIALDINI-GROTON PARTNERS

3    JOHN SEBREE, HOSTESS BRANDS, INC.

4    MATTHEW SPIEGELMAN, IN PRO PER

5    WINSTON & STRAWN, LLP, ZOLTON DONOVAN

6    KIMBERLY B. GIANIS, CONTRARIAN CAPITAL MANAGEMENT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 99

1        So it's the same scenario.  You're just looking at

2   a future contribution obligation that we have made the

3   determination, you know -- well, the idea behind the future

4   contribution obligation is it postpones insolvency.  And

5   it's a better scenario for the fund overall and for the

6   participants and beneficiaries of the fund.

7        THE COURT:  Okay.

8        MR. BERLINER:  Thank you.

9        THE COURT:  Anything else?

10       MR. HAMILTON:  We'll stand on our brief, Your

11  Honor.

12       THE COURT:  Okay.  All right.  I have before me a

13  motion by the debtors in this case to reject their

14  collective bargaining agreements with the IBT or the

15  Teamsters pursuant to Section 1113 of the Bankruptcy Code

16  and as well to reject the benefit plan obligations provided

17  for in the CBAs under Section 1114 of the Bankruptcy Code.

18  Pursuant to prior orders of the Court, the IBT was delegated

19  as the bargaining representative for both of those matters.

20       Section 1113 of the Bankruptcy Code governs a

21  debtor's rejection of collective bargaining agreements.  It

22  requires the bankruptcy court to approve the rejection only

23  if the Court makes the following three findings:  First, the

24  trustee or, in this case, the debtor-in-possession has prior

25  to the hearing made a proposal that fulfills the

Page 100

1    requirements of Subsection (b)(1) of Section 1113; two, the

2    authorized representative of the employees has refused to

3    accept such proposal without good cause; and three, the

4    balance of the equities clearly favors rejection of the CBA,

5    11 U.S.C., Section 113(c).

6         Because Section 113(c)(1) incorporates Subsection

7    (b)(1) by reference, the bankruptcy court must also look to

8    Subsection (b)(1), which provides as follows:

9         "Subsequent to filing a petition and prior to

10   filing an application seeking rejection of a collective

11   bargaining agreement, the debtor-in-possession or trustee --

12   hereinafter in this section, trustee shall include a debtor-

13   in-possession -- shall (A) make a proposal to the authorized

14   representative of the employees covered by such an agreement

15   based on the most complete and reliable information

16   available at the time of such proposal, which provides for

17   those necessary modifications in the employees' benefits and

18   protections that are necessary to permit the reorganization

19   of the debtor and assures that all creditors, the debtor and

20   all of the affected parties are treated fairly and

21   equitably; and (B) provides, subject to subsection (d)(3),

22   which is the confidentiality section, the representative of

23   the employees with such relevant information as is necessary

24   to evaluate the proposal."

25        Thus, as Collier notes, Section 113(c)

Page 101

1    incorporates both procedural and substantive requirements.

2    See 7 Collier on Bankruptcy, paragraph 113 -- 1113, excuse

3    me, point 04.

4             The debtors and the IBT agreed upon the specific

5    proposal by the debtors that would be the proposal to be

6    evaluated by the Court in this context as well as the IBT's

7    responsive proposal.  They have both been provided to the

8    Court.  They are both changed from the initial post-petition

9    pre-1113 motion proposal by the debtor as well as the

10   initial responsive proposal by the Teamsters.

11            After a period as contemplated by the Court and

12   the code for bargaining off of the original post-petition

13   pre-motion proposal, this Court held a two-day evidentiary

14   hearing, as contemplated by Section 1113(c), on April 18th

15   and 19th.  The statutory period within which the Court is

16   supposed to rule on such a motion has not run.  There is

17   still a fair amount of time as far as these types of motions

18   are concerned for the parties to continue to negotiate.

19            In addition, the covenant in the debtors' DIP

20   agreement requiring a resolution of the 1113/1114 motion

21   acceptable to the DIP lenders also has not run, although its

22   expiree is at the end of this week.  Nevertheless, the

23   parties have informed the Court that all things considered,

24   they are either neutral about the Court's ruling today or

25   believe, in the debtors' case, that a ruling would assist

12-11343-reg   Doc 702-8   Filed 10/05/12   Entered 10/05/12 18:48:25   Exhibit 8
Pg 16 of 49
11-15463-shl   Doc 2895-1   Filed 05/24/12   Entered 05/24/12 12:06:08   Exhibit 1
Pg 15 of 48

Page 102

1    the parties in attempting to negotiate a resolution of their

2    disputes.

3            That is clearly the desired goal of Section 1113

4    of the Bankruptcy Code, as stated repeatedly by the Second

5    Circuit, most recently by Chief Judge Jacobs in his

6    concurring opinion in In re Northwest Airlines Corp, 483

7    F.3d 160 at page 179 through 180.  Section 113 sets in

8    motion an expedited form of collective bargaining with

9    several safeguards designed to ensure that employers do not

10   use Chapter 11 as medicine to rid themselves of corporate

11   indigestion, citing Century Brass Products, Inc. v. United

12   Auto, Aero and Agricultural Implement Workers of America,

13   795 F2d 265, 272, Second Circuit, 1986.

14           The process ensures that well informed and good

15   faith negotiations occur in the marketplace not as part of

16   the judicial process.  Reorganization procedures are

17   designed to encourage such a negotiated voluntary

18   modification.

19           "Knowing that it cannot turn down an employer's

20   proposal without good cause gives the union an incentive to

21   compromise on modifications of the collective bargaining

22   agreement so as to prevent its complete rejection.  Because

23   the employer has the burden of proving its proposals are

24   necessary, the union is protected from an employer whose

25   proposals may be offered in bad faith."  In re Maxwell

Page 103

1    Newspapers, Inc., 981 F2d 85, 90, Second Circuit, 1992.

2            Therefore, except with respect to the speed

3    involved, and Judge Jacobs describes it as essentially

4    collective bargaining on wheels at 179, the purpose of

5    Section 113, albeit in a Chapter 11 context with a focus on

6    the fact that Chapter 11 is indeed a serious and unique

7    context for dealing with an employer's financial problems,

8    it is designed to come as close as possible to the out of

9    bankruptcy collective bargaining process.

10            During the April 17th through 18th trial, I

11    considered the testimony of the following witnesses: Gregory

12    Rayburn, the debtors' CEO; Dr. John Johnson, an expert

13    witness retained by the debtor primarily to assess the

14    marketplace and/or competitive nature of the IBT's

15    compensation, both hard and soft; Jeffrey Parlato, the

16    employee of the debtors most responsible for negotiating

17    collective bargaining agreements, including with the IBT;

18    Mitchell Hofing, also an expert called in rebuttal in

19    respect of multi-employer pension plan issues; and Michael

20    Kramer, the debtors' investment banker at Perella Weinberg.

21            I also heard the testimony of Daniel Wrenn, a IBT

22    member and route sales representative with Hostess since

23    1983; Harry Wilson, the chairman and CEO of the Maeva Group,

24    M-A-V -- M-A-E-V-A, who can best be described as Mr.

25    Kramer's opposite number as the financial adviser for

Page 104

1    Chapter 11 purposes to the IBT; Michael Belzer, an economist

2    also called to opine as to the competitive nature of the

3    compensation, both hard and soft, for the IBT workers; Iain

4    Gold, somewhat of the opposite number to Mr. Parlato; and

5    Ken Hall, the general secretary-treasurer of the IBT and

6    ultimately responsible for the negotiations of the new

7    collective bargaining agreement and the present relationship

8    between the IBT and the debtors from the IBT's perspective.

9    I also considered as rebuttal witness Joshua Scherer,

10   another member of Perella Weinberg, the debtors' financial

11   adviser, with respect to the nature of the negotiations

12   primarily between the two sides.

13           I found all of the witness's testimony to be

14   credible, particularly so with respect to the fact witnesses

15   and Mr. Kramer and Mr. Wilson.  The debtors' expert, Mr.

16   Johnson, and his opposite number, Mr. Belzer, at times

17   seemed to be talking at cross-purposes with each other,

18   sticking to their sources for their data.  But I did not

19   find either of them within the general skepticism that the

20   Court treats each side's expert to be out of line in their

21   testimony.

22           As far as the procedural aspects of Section 113

23   are concerned, I find that the debtor has complied with each

24   of the -- of such requirements of Section 113(b)(1) and (c).

25   The debtor made a proposal to the IBT accompanied by the

Page 105

1   kind of relevant and reliable information needed to evaluate

2   it.  And further, I believe it bargained in good faith with

3   the union.  See In re Century Brass, 795 F2d at 7 -- at 273,

4   Second Circuit, 1986.

5        Frankly, there was no complaint by the union as to

6   the completeness and reliability of the information provided

7   by the debtors.  And it appeared to me that the union and

8   not only Mr. Wilson but also Mr. Hall and Mr. Gold were at

9   least as well informed about the debtor as were the debtors'

10  representatives.

11       Obviously, the aspects of information pertaining

12  to the debtors' future, including the debtors' projections

13  and the implementation of its business plan, which

14  contemplates very substantial changes to the natures -- the

15  debtors' cost structure and the nature of its business

16  cannot be predicted with any certainty.  But I have reviewed

17  the debtors' business plan and the modification of it

18  initiated by Mr. Rayburn and dated April 4th, 2012, and I

19  believe that it is a good enough picture of not only the

20  debtor today but also as projected for purposes of the

21  information requirements of Section 113(b)(1).

22       It is clear from the case law, including based on

23  the quote I earlier gave from Maxwell Newspapers at Page 90,

24  that the debtor must bargain in good faith with the union as

25  part of the procedural elements of the statute.  See also In

Page 106

1    re Century Brass, 795 F2d at 273, and Truck Drivers Local

2    807 versus Carey Transportation, 816 F2d 82, 90, Second

3    Circuit, 1987.

4         It's not entirely clear where this requirement

5    appears in the statute, although the best place for it is

6    probably 1113(b)(2), although that is not specifically

7    incorporated in Section 1113(c)(1).  Nevertheless, it is a

8    clear element as established by the case law in this circuit

9    of the debtors' burden to show that it did in fact bargain

10   in good faith after it submitted its original proposal.

11        Certain of the IBT's witnesses, including Mr.

12   Wilson, have acknowledged that the debtor has bargained in

13   good faith.  Mr. Hall took some exception to that based upon

14   his experience in normal collective bargaining, i.e. not

15   bargaining on wheels, under Section 1113 of the Bankruptcy

16   Code.  In that regard, he expressed concern about the

17   debtors having made one proposal and changed the terms in a

18   subsequent proposal in a way that appeared to him to be re-

19   trading.

20        In addition, he was clearly frustrated by the fact

21   that the debtors submitted their penultimate proposal 25

22   minutes after the deadline set by the Court and did not

23   discuss it with him or his agents before it was released to

24   the press.  I believe he was also frustrated by the fact

25   that in the middle of this extremely time-compressed

1   process, the debtors' CEO resigned and Mr. Rayburn was

2   appointed CEO in Mr. Driscoll's place.

3           However, for purposes of the good faith

4   requirement under Section 1113, I believe none of those

5   considerations would lead one to conclude that the debtor

6   has not negotiated in good faith.  Rather, I find that the

7   debtor has negotiated in good faith with the IBT.

8           As far as changing positions or putting on the

9   table proposals that had been taken off the table

10  previously, I conclude first that it is more common in an

11  1113 context for debtors-in-possession to move the pieces

12  around in a collective bargaining proposal to try to obtain

13  the result that is in monetary terms acceptable to the

14  debtor and in terms of specific emphasis still acceptable to

15  the union.  Secondly, I believe because of the midstream

16  change of CEO, some confusion as far as the specific terms

17  of the debtors' proposals is understandable, and I believe

18  that the alleged re-trading here falls into a relatively

19  minor part of the debtors' negotiating proposals.

20          Finally, it appears to me that Mr. Rayburn has

21  acted responsibly and effectively in stepping into the

22  breach left by Mr. Driscoll.  I have reviewed his April 4th

23  turnaround plan and believe that it is reasonable and an

24  improvement upon the debtors' February plan, and that he has

25  generally taken hold of the debtors' business, including

Page 108

1   effectively dealing with the prepetition salary/bonus

2   increase issue that had the potential for truly poisoning

3   the negotiations by causing, with the agreement of the

4   effective -- the affected officers of the company, the

5   reversal of that transaction.  So I conclude that the

6   debtors have satisfied the procedural elements of Section

7   1113(b) and (c).

8           In order to comply with the substantive

9   requirements of Section 1113(b)(1), the debtor, again, must

10  demonstrate that the modifications and benefits and

11  protections are necessary to permit the reorganization of

12  the debtor, and all creditors, the debtor and all affected

13  parties are treated fairly and reasonably.  The most

14  fundamental requirement for rejection of the collective

15  bargaining agreement is that the rejection must be

16  necessary.

17          This is obviously a change from the standard set

18  forth in Section 365 of the Bankruptcy Code.  The debtor

19  must show not only that the agreement is burdensome but that

20  the rejection is necessary to permit the reorganization of

21  the debtor.  See Carey Transport, 816 F.2nd at 90.

22          As developed in the Second Circuit, the court

23  specifically rejected the Third Circuit's narrower

24  construction of Section 1113 in Wheeling-Pittsburgh Steel

25  versus United Steelworkers, 791 F2d 1074, 1088 through 89,

Page 109

1    Third Circuit, 1986, where that court construed the term

2    necessary to encompass only those modifications essential to

3    the debtors' short-term survival or necessary to prevent

4    liquidation.  As stated by the Second Circuit in Carey

5    Transport, the Second Circuit reads the term to mean that

6    the proposal contained necessary but not absolutely minimal

7    changes that will enable the debtor to complete the

8    reorganization successfully.

9             As that court explained, the term necessary could

10   not be synonymous with essential or bare minimum because if

11   a debtor were constrained to propose only the minimal

12   changes to a collective bargaining agreement, it would have

13   no room to engage in the good faith negotiations required by

14   Section 113.  Rather, a debtor's proposed modifications are

15   considered necessary if they have a significant impact on

16   the debtor's operations and are required for the debtor to

17   reorganize successfully and compete in the marketplace upon

18   emergence from Chapter 11, 816 F2d at 89 through 90.  See

19   also Royal Composing Room, Inc. -- In re Royal Composing

20   Room, Inc., 848 F2d 345, 348, Second Circuit, 1988, and In

21   re Northwest Airlines Corporation, 346 B.R. 307, 321,

22   Bankruptcy S.D.N.Y 2006.

23            The focus is on, again, therefore necessary for a

24   successful reorganization to enable the debtor to compete in

25   the marketplace upon emergence from Chapter 11.  This does

Page 110

1    not mean, though, that the debtor is required to demonstrate

2    how each element of modification is necessary.  Rather, when

3    determining the necessity of the debtor's proposal it must

4    be viewed as a whole as achieving those elements that are

5    necessary to enable the debtor to reorganize effectively.

6    Royal Composing Room, 848 F2d at 348.

7            The debtor must also demonstrate that all

8    creditors, the debtor and all affected parties are treated

9    fairly and equitably under 1113(b)(1).  The purpose of this

10   requirement is to spread the burdens of saving the company

11   to every constituency while ensuring that all sacrifice to a

12   similar degree.  In re Century Brass, 795 F2d at 273, Carey

13   Transportation, 816 F2d at 90.  In other words, the debtor

14   must spread the hurt.  In re Horsehead Industries, Inc., 300

15   B.R. 573, 584, Bankruptcy S.D.N.Y. 2003.

16           It is clear, though, that under the standard the

17   various constituencies need not share an identical burden.

18   The key phrase as set forth by Century Brass and Carey

19   Transportation is, quote, to a similar degree.  Therefore,

20   the debtor has the burden to demonstrate why one particular

21   constituency must bear more than its proportionate share of

22   the financial burden.  In doing so, courts apply a flexible

23   approach in determining what constitutes fair and equitable

24   treatment.  See for example in re Indiana Grocery Company,

25   136 B.R. 182, 194, Bankruptcy SD Indiana, 1990, quote,

Page 111

1    "Equity under Section 1113 means fairness under the

2    circumstances."

3              As noted by Judge Gropper in the Northwest

4    Airlines case, a debtor can meet the fair and equitable

5    requirement of Section 1113 by showing that its proposal

6    treats the union fairly when compared with the burden

7    imposed on other parties by the debtor's additional cost-

8    cutting measures and the Chapter 11 process generally.

9    Thus, for example, the Court needs to take into account the

10   rights and leverage in terms of both legal rights and rights

11   in the marketplace or leverage in the marketplace of the

12   other constituents in determining what is fair and equitable

13   for purposes of this subsection of the statute.

14             The statute in Section 1113(c)(3) also requires

15   the Court to balance the equities so that it finds or to

16   find that the equities clearly favor rejection of the

17   agreement.  It's recognized that this requirement codifies

18   the aspect or that aspect of NLRB v. Bildisco and Bildisco,

19   465 U.S. 513, 1984.  See In re Century Brass, 795 F2d at

20   273.

21             It also is a flexible standard applied on a case-

22   by-case basis, but the Second Circuit has directed courts to

23   look at the following factors to determine whether the

24   balance of the equities clearly favors rejection, in Carey

25   Transportation, 816 F2d at 93:

Page 112

1           "One, the likelihood and consequences of

2    liquidation if rejection is not permitted; two, the likely

3    reduction in the value of creditors' claims if the

4    bargaining agreement remains in force; three, the likelihood

5    and consequences of a strike if the bargaining agreement is

6    voided; four, the possibility and likely effect of any

7    employee claims for breach of contract if rejection is

8    approved; five, the cost-spreading abilities of the various

9    parties, taking into account the number of employees covered

10   by the bargaining agreement and how various employees' wages

11   and benefits compare to those of others in the industry; and

12   six, the good or bad faith of the parties in dealing with

13   the debtor's financial dilemma."

14           In short, in striking the balance, the Court must

15   consider the degree as well as any qualitative difference

16   between the hardships each party may face upon rejection of

17   the collective bargaining agreement, 7 Collier on

18   Bankruptcy, paragraph 1113.057.  Certain of those factors

19   would in light of subsequent decisions both by the lower

20   courts and by the Second Circuit in the Northwest Airlines

21   decision require a further gloss.  For example, in Northwest

22   Airlines, 483 F2d 160, the Second Circuit held that unless

23   offered by the debtor as part of the resolution of a -- the

24   consensual resolution of a Section 1113 motion or a court-

25   imposed resolution, the union would not have a rejection

Page 113

1    claim.

2            But I believe the factor still needs to be

3    considered as has been acknowledged by subsequent courts in

4    light of, again, sharing the cost.  That is, it is

5    appropriate for a debtor to consider offering such a claim,

6    even though it is not required to do so upon rejection.

7    Similarly, the issue of the likelihood of a strike may not

8    carry much weight if, as was the case in the Horsehead

9    decision that I cited earlier by former Chief Judge

10   Bernstein, the Court concludes that the debtor  would

11   liquidate either upon a strike or, importantly, if the

12   debtors' motion were not granted.

13           Nevertheless, it is a relatively flexible set of

14   factors, again, focusing primarily on the rights and

15   leverage both legal and business of the parties in the

16   context of the debtors' reorganization.  In large measure,

17   it focuses on treatment of non-union employees in comparison

18   to union employees as well as to the treatment of other

19   unions and the union specifically at issue in the motion,

20   although it also should consider other constituencies'

21   rights and leverage in the Chapter 11 context.

22           Finally, the Court must find that the authorized

23   representative of the employees has refused to accept such

24   proposal without good cause, 11 U.S.C., Section 1113(c)(2).

25   The Second Circuit has held that the purpose of the good

Page 114

1    cause requirement serves to prohibit any bad faith conduct

2    by an employer while at the same time protecting the

3    employer from a union's rejection of the proposal without

4    good cause, which is largely a tautology, 795 F2d and 273.

5          It is clear, though, that this requirement forces

6    the union to the negotiating table.  See In re Maxwell

7    Newspapers, 981 F2d at 90.  As stated by that court, this

8    requirement fosters the goals of good faith negotiations and

9    voluntary modification and induces the debtor to propose

10   only those modifications necessary to a successful

11   reorganization while protecting the debtor against the

12   union's refusal to accept the proposal without a good

13   reason.

14         Where the union rejects a proposal that is

15   necessary, fair and equitable, it must explain the reasons

16   for its opposition.  On the other hand, if the union makes

17   counterproposals that meet its needs while preserving the

18   savings required by the debtor, its rejection of the

19   debtor's proposal will be with good cause.  See In re

20   Horsehead Industries, 300 B.R. at 584, citing, among other

21   cases, In re Maxwell Newspapers, 981 F2d at 90, and Royal

22   Composing Room, 848 F2d at 349.

23         The debtors in their proposals have focused on

24   both quantifiable cost savings and largely unquantifiable

25   but nevertheless significant business risks that they

Page 115

1    believe must be curtailed or eliminated in order for the

2    debtors to successfully merge -- emerge from Chapter 11.

3    The business risks that I'm referring to have to do almost

4    entirely with the fact that under the collective bargaining

5    agreements the debtors participate in a number of multi-

6    employer pension plans set up under the Taft-Hartley Act,

7    and certain of those plans are in serious financial distress

8    or so-called red plans.

9            For example, the debtors have over 3,000 employees

10   currently employed by the IBT, I mean, represented by the

11   IBT in the Central States Pension Plan, which has a current

12   liability in respect of vested benefits far in excess of the

13   amount of plan assets so that its funded status is at

14   approximately 48-and-a-half percent.  The debtors also have

15   a substantial number of IBT represented employees in the New

16   England Teamsters and Trucking Industry Pension -- Multi-

17   Employer Pension Plan, which also has a substantial excess

18   of current liability versus plan assets such that its

19   funding status is at approximately 40 percent.

20           The fact that these plans are substantially

21   underfunded has been noted not only by the debtors but also

22   in the financial world generally.  The debtors had offered

23   -- have offered up, for example, as Exhibit D-71 an analysis

24   in the form of a special comment by Moody's on the fact that

25   growing multi-employer pension funding shortfall is an

Page 116

1    increasing credit concern.  It's dated from September 2009.

2    However, I believe that the trial record, including Mr.

3    Hofing's testimony, confirms that there's been little to no

4    improvement since then in terms of the risks involved.

5           They've also introduced testimony from May 27th,

6    2010 by Thomas C. Nyhan, executive director and general

7    counsel of the Central States Southeast and Southwest Areas

8    Pension Fund, in which he states that that fund faces an

9    unprecedented financial crisis.  If no action is taken, the

10   fund is projected to be insolvent in the next 10 to 15

11   years.

12          The debtors therefore originally proposed that the

13   collective bargaining agreements be amended so that they

14   would withdraw from the MEPPs and crystallize their

15   withdrawal liability, which would then be discharged upon

16   the confirmation of their Chapter 11 plan.  They have

17   revised that proposal in light of the union's strong

18   opposition to it and in essence have provided that in

19   addition to providing for specific savings for contributions

20   to ongoing pension obligations it will or the debtor will

21   attempt to re-enter two so-called green MEPPs that are

22   currently ones in which IBT employees of the debtors are

23   beneficiaries before January 1, 2003, subject to certain

24   conditions, including with respect to the health of -- the

25   financial health of those replacement MEPPs and the

Page 117

1    migration of all new hires away from the MEPPs and into a

2    separate 401(k) plan.  The debtors' proposal also

3    contemplates having specific representation and control, in

4    effect, of the green MEPPs board of trustees, although the

5    debtors' witnesses recognized that those trustees would be

6    fiduciaries to the plan or to the fund and not to the

7    debtors.

8            It was clear from all of the parties -- all of the

9    witness's testimony that the MEP issue, that is, the future,

10   if at all, of the debtors' participation as an employer in

11   the MEPs was the primary sticking point and the primary

12   initial issue as well between the debtor and the union.  The

13   union was strongly opposed to the debtors' termination of

14   all of the participation in all of the MEPPs.  And yet, as

15   the parties progressed in their discussion, the union did

16   recognize, as testified to in particular by Mr. Wilson, that

17   the existence of the serious problems with certain of the

18   MEPPs, at least three of them being substantially in the

19   red, creates potentially insurmountable obstacles without

20   change to the debtors' emergence from Chapter 11.

21           This is because both the debtor and the union

22   agree that to emerge from Chapter 11 in a way that will

23   enable a successful reorganization, the debtor has to obtain

24   not only substantial and meaningful concessions from its

25   secured creditors but also in all likelihood a substantial

Page 118

1   new money investment from third parties.  And it is unlikely

2   that either of those things would occur with the risks posed

3   by the existing MEPP situation continuing without change.

4          Consequently, the union in its final proposal of

5   April 15th, 2012, proposed a changed relationship between

6   the debtor and the MEPPs.  First, it proposed a somewhat

7   reduced monetary concession with respect to the contribution

8   rate by the debtor to the pension obligations that it would

9   have to its employees.  Hostess contemplated a 22 percent

10  reduction with subsequent increases in contributions for

11  benefits up to 5 percent per year for the period of the

12  agreement, whereas the IBT proposed a 10 percent reduction

13  in the contribution rate with the company continuing to

14  contribute 10 percent less than the established rate in --

15  for the remainder of the agreement.

16          As importantly, the union proposed that the debtor

17  would exit the MEPPs but provide at the same time for its

18  re-entry into the MEPPs, including the troubled ones, under

19  the following terms.  Each MEPP would be required to adopt a

20  new employer pool or amend its existing new employer pool

21  consistent with the following: the PBGC would approve the

22  new employer amendments within six months of the date of the

23  agreement, and each MEPP would provide an agreement stating

24  that the debtors' discharge of withdrawal liability in

25  bankruptcy constitutes full satisfaction of that liability

12-11343-reg   Doc 702-8   Filed 10/05/12   Entered 10/05/12 18:48:25   Exhibit 8
Pg 33 of 49
11-15463-shl   Doc 2895-1   Filed 05/24/12   Entered 05/24/12 12:06:08   Exhibit 1
Pg 32 of 48

Page 119

1    for purposes of entry into the new employer pool.  Further,

2    in the event that the debtor is included in a mass

3    withdrawal, that is, a withdrawal of either 100 percent or

4    roughly 85 percent by agreement or a forced withdrawal of

5    the employers in the funds, the MEP will allocate mass

6    withdrawal liability proportionate to each employer's

7    initial withdrawal liability, i.e. the withdrawal liability

8    through the new employer pool amount based on that unfunded

9    liability as opposed to the discharged unfunded liability.

10              In the event that any of the following withdrawal

11   events as defined below occur, however, Hostess shall be

12   deemed to have withdrawn from the effective MEP on the last

13   date of the plan year prior to the withdrawal event's

14   occurrence.  Those events include Hostess being subject to

15   an increase of 15 percent or more in the rate of its

16   required annual contribution to the MEP, the IRS assessing

17   an excise tax under 26 U.S.C., Section 4971 with respect to

18   the MEP.

19              If the MEP fails for two consecutive years to

20   satisfy its rehabilitation plan, the MEP becomes insolvent

21   within the meaning of Section 4245 of ERISA.  If for any two

22   consecutive years the allocable new employer pool of

23   unfunded vested benefits attributable to Hostess exceeds

24   three times Hostess's annual contributions to the MEP for

25   such years, UVBs from the MEP's old employer pool are

Page 120

1   allocated to the new employer pool.  If funding levels

2   calculated in the same manner as for the MEP's annual

3   funding notice fall below 80 percent in the new employer

4   pool or below 20 percent in the old employer pool where

5   there is a final non-appealable order of a court of

6   competent jurisdiction holding that a MEP's new employer

7   amendments are substantively illegal in a material respect

8   and such illegality cannot be corrected through reasonable

9   measures.

10          Under those circumstances, as I noted in the

11   union's proposal, Hostess shall be deemed to have withdrawn

12   and then shall go to a fallback MEP, which is specified in

13   paragraph three on page six of the union proposal, although

14   there is some uncertainty as to the triggers for that or the

15   nature of the fallback MEP.  And finally, if they fail -- if

16   no MEPs qualify as a fallback MEP and/or the PBGC does not

17   approve the amendments, the company will contribute the

18   appropriate contributions into a third-party escrow account,

19   and the parties will mutually agree on an acceptable

20   alternative.

21          The debtor offered significant testimony as well

22   as subsequent briefing to the effect that while it viewed

23   that the union had acted creatively and in good faith in

24   proposing the foregoing, it has not in so doing provided an

25   acceptable alternative to the debtors' proposal or to the

Page 121

1    simple termination of the MEPs and the creation of a new

2    single-employer pension plan or 401(k) plan for the existing

3    Teamster employees and new hires.

4         The debtors' concern is best put in the context of

5    Mr. Kramer's testimony, who noted that in addition to

6    changing its business plan and thereby substantially

7    reducing costs and projecting additional earnings based on

8    that business plan, all of which has a substantial execution

9    risk, the debtor also carries two additional substantial

10   execution risks for its emergence from bankruptcy.  First,

11   this is a Chapter 22 case.  The debtor has previously been

12   through a bankruptcy case and emerged, nevertheless, with

13   significant levels of debt and its underlying business

14   issues not having been materially improved upon.

15        And second, the debtor faces substantial

16   uncertainty in obtaining new financing based upon the risks

17   posed by the potential for increasing contributions to the

18   MEPs and in addition the potential for substantial

19   withdrawal liability from the MEPs in the future on a mass

20   withdrawal scenario.  The IBT as well as the Central States

21   Pension Fund has tried to persuade the Court that this risk

22   is actually relatively minimal, but I believe it is

23   nevertheless substantial.

24        I will note that it is uncontroverted that UPS

25   Corporation paid approximately $6 billion in order to be

Page 122

1   relieved of its ongoing obligations to one of the MEPs, and

2   I believe it's perfectly appropriate to infer that it had

3   good reasons to do so based upon its assessment of the risks

4   of being a continuing participant in the MEPs.  I will note

5   also that the proposals by prospective exit investors both

6   -- all contemplate both the reduction of MEP exposure and a

7   structure quite close to the debtors' final proposal.

8           I recognize that those proposals may be

9   potentially self-serving and that I could, to some extent,

10  play a game of chicken with the potential plan funders.  But

11  it appears to me based upon the testimony that I've heard as

12  well as the additional briefing that has been given to me at

13  my request on the legal risks posed by the IBT's proposed

14  MEP solution that there is both a substantial legal and

15  underlying economic risk of the debtors remaining in the IBT

16  collectively bargained for MEPs even under the new employer

17  pool proposed by the union.

18          It appears to me that while the debtor would have

19  arguments as to the timing of the other employers in those

20  funds ability to contest the proposal that the union is

21  proposing, there is a substantial risk that the debtors

22  providing for no withdrawal liability payments and relying

23  simply on its discharge would give rise to a right and a

24  potential objection that would be sustainable by the other

25  employers in the MEP, some of whom are the debtors' direct

Page 123

1    and primary competitors.  That the PBGC's approval of the

2    union-proposed structure is not or was not proper and that

3    instead, the withdrawal liability that would be discharged

4    by the debtor would be over allocated to the other employer

5    sponsors of the plan.

6            I agree with the debtor -- I'm sorry.  I agree

7    with the IBT that the likelihood of a total or partial

8    deemed withdrawal -- mass withdrawal from any of the MEPs is

9    relatively unlikely.  However, the consequences of there

10   being such a mass withdrawal are potentially drastic.  It is

11   not clear to me that they would be limited as far as the

12   other employers in the pool -- in the fund to the right to

13   get refunds from the fund as opposed to the imposition of

14   additional withdrawal liability above the new pool

15   withdrawal liability on the debtor.

16           It appears to me that that risk, although fairly

17   remote given the number of employers in the red plans, is

18   nevertheless the type of risk that would cause a reasonable

19   investor to question a long-term commitment to the debtor.

20   It is clear from the testimony of all of the IBT's witnesses

21   that it is that type of long-term commitment, one that

22   focuses on the need to focus the debtor on necessary capital

23   expenditures, advertising expenditures and R&D that is

24   necessary to enable this debtor to reorganize.

25           Consequently, I conclude that with one exception,

Page 124

1   the debtors' proposal or counterproposal of establishing two

2   substitute green MEPs to migrate the IBT employees is

3   necessary and in good faith for purposes of Section 1113 of

4   the code.  The one area that I have a grave concern about

5   with regard to that proposal is the notion in that proposal

6   that it would include only existing employees and not future

7   hires.  It appears to me that that would create substantial

8   risk going forward for the replacement MEPPs since it is

9   ongoing employees that help sustain the life of any pension

10  plan, and that continuing obligation I believe is critical

11  for the debtors' proposal to work.

12          I conclude that although the union has negotiated

13  in good faith and tried to be creative with respect to the

14  MEP issue, it has not accepted the debtors' proposal with

15  the one caveat, however, that I mentioned with good cause.

16  However, that caveat does mean that the union has turned

17  down the proposal with good cause.  Again, the caveat being

18  that the debtors proposed the substitute MEPPs to contain

19  only existing employees and not new hires.

20          The remaining areas of disagreement between the

21  debtors' final proposal and the union's final proposal fall

22  into two categories.  First are economic differences between

23  the proposals, both in terms of hard costs and soft costs.

24  The second are in my view procedurally focused aspects of

25  the agreements.  Let me deal with the procedural aspects

Page 125

1   first.

2          The union, as is to be expected, has a provision

3   of its proposal calling for a grievance procedure to ensure

4   that there has been equal sacrifice as among all of the

5   debtors' employees, not just IBT employees but other union

6   employees and non-union employees.  It refers to requiring

7   the, quote, same percentage reduction in total compensation

8   as is being applied to the IBT bargaining unit employees in

9   addition to the rescission or continued rescission of the

10  late 2011 management team bonus and salary transaction.  It

11  also provides that the company shall not increase wages,

12  including benefits, and benefits of current non-bargaining

13  unit employees, including management, as an overall

14  percentage beyond the effective overall total compensation

15  percentage increases to be received by the bargaining unit

16  employees.

17         As I noted, however, the fair and equitable and

18  balance of the equities elements of Section 1113 do not

19  require identical treatment nor even pro rata treatment

20  among the debtors' employees, union and non-union.  On

21  cross-examination -- actually, on questioning from the

22  Court, it was recognized that different types of employees

23  have different leverage.

24         To be more specific, Mr. Hall recognized that one

25  of the needs of this debtor is to get appropriately

12-11343-reg   Doc 702-8   Filed 10/05/12   Entered 10/05/12 18:48:25   Exhibit 8
Pg 40 of 49
11-15463-shl   Doc 2895-1   Filed 05/24/12   Entered 05/24/12 12:06:08   Exhibit 1
Pg 39 of 48

Page 126

1   experienced management.  In his words, if he could get Jack

2   Welch he would certainly pay for Jack Welch or his

3   equivalent.  So it appears to me that although it would be

4   reasonable for a union to put some constraints tied to a

5   business plan or to market conditions on the treatment of

6   non-union employees and management, this aspect of the

7   union's proposal goes beyond what is reasonable and goes

8   beyond good cause.

9       The union's proposal also contemplates a specific

10   Chapter 11 plan structure and process to get to confirmation

11   of that plan as well as specific capital structure for the

12   reorganized debtor.  In addition, it contemplates not only

13   board representation by the union but also a veto by the

14   IBT-designated director with respect to certain transactions

15   going beyond the normal conduct of business.

16       It is quite reasonable for the union to want to

17   ensure that the debtor will have an appropriate

18   capitalization coming out of bankruptcy.  The union has in

19   my view astutely identified the debtors' operational and

20   business issues.  There was substantial agreement between

21   Mr. Kramer and the union's witnesses on this point, that the

22   debtor has gone for too long without necessary capital

23   expenditures for plant and its fleet of vehicles, that it

24   has gone for too long without an appropriate SG&A budget,

25   and that it has gone too long without appropriate R&D

1    budget.

2          It appears to me, however, that not only

3    Mr. Kramer but also Mr. Rayburn and his turnaround plan of

4    April 4th take those concerns well into account.  Therefore,

5    it would appear to me to be excessive for the union to

6    require the -- as a condition of the collective bargaining

7    agreement's amendment that the debtor go beyond what is

8    reasonably necessary to execute that business plan and to

9    propose a feasible, that is feasible under Section 1129(a)

10   of the Bankruptcy Code, Chapter 11 plan.

11         I would not be saying this if I did not believe

12   that the April 4th plan is in substantial agreement with the

13   union in respect of what needs to be done as far as the

14   debtors' capital structure and cost structure.  So it

15   appears to me that the provisions that I have discussed as

16   well as the accountability provision, which deals with

17   milestones going forward, are under the circumstances -- and

18   it is important to note that it is only under the

19   circumstances and relying upon the business plan --

20   overreaching by the union.

21         On the other hand, it appears to me to be

22   reasonable and an exercise of good cause for the union to

23   insist upon provisions implementing modified CBAs and, if

24   achievable within a reasonable capital structure, a claim

25   for the concessions -- the monetary concessions made by the

Page 128

1    union, a prepetition claim, that is.  It also seems to me to

2    be reasonable that the union have representation on the

3    debtors' board and that there be general level of

4    information sharing so that the union can be reasonably

5    assured that the business plan is being carried out.

6          Let me turn finally to the monetary provisions of

7    the two proposals, the company's and the debtors'.

8    Mr. Seltzer on behalf of the union accurately noted that

9    unlike most Section 1113 motions, the debtors' Section 1113

10   motion did not put emphasis on a target dollar concession in

11   the aggregate that it believed the union needed to meet for

12   the debtors to successfully reorganize.  Instead,

13   Mr. Rayburn and Mr. Kramer focused on an EBIDTA margin that

14   would enable the debtors to compete with their major

15   competitors.

16          Initially, the debtors' view was that that margin

17   needed to be in the 11 percent range.  That was subsequently

18   reduced to the 10 percent range.  Interestingly, there was

19   no real costing of the individual elements of the proposal

20   that showed how that margin would be achieved in the

21   debtors' proposal or in how the union's proposal was short

22   of that margin.  On the other hand, and this was really the

23   only testimony as to the margin that would be achieved by

24   the IBT proposal, Mr. Wilson testified without being shaken

25   or even challenged on cross-examination that if the union's

Page 129

1    proposal were implemented across the board, that is, not

2    only for the IBT but similar changes were made for the other

3    debtors' unions, the debtors would have an approximate 9

4    percent margin in respect of EBIDTA.

5          The union proposal when compared to the debtors'

6    proposal on specific cost savings appears to the Court to be

7    consistent with that analysis.  In that regard, what I mean

8    is that the differences in terms of specific cost savings do

9    not appear to be dramatic between the debtors' last proposal

10   and the union's last proposal, although obviously, the

11   union's last proposal has fewer or less dramatic cost

12   reductions than the debtors.

13         In the absence of any evidence to the contrary, it

14   appears to me that Mr. Wilson's testimony should be accepted

15   and that the EBIDTA margin difference here when one

16   normalizes the union's -- the IBT's proposal across all the

17   debtors' unions and cost structure is that there is a one

18   percent margin difference between the debtor and the union.

19   I conclude based upon that analysis that in respect of the

20   specific financial concessions that the debtors have asked

21   of the union and the union has responded to the debtors on,

22   first, that the union has turned down the company's proposal

23   with regard to these concessions for good cause and

24   secondly, that the company's proposal is not necessary for a

25   reorganization, i.e. the one percent difference in margin

Page 130

1   has not shown to me to be material for purposes of Section

2   1113.

3           This means that both in respect of the pension

4   plan proposal, for the reason -- the sole reason that I've

5   identified, and in respect of the specific financial

6   concessions aspect of the proposal I need to deny the

7   company's motion.  I believe that if the company adopted the

8   union's economic proposals and proposed that it would in

9   fact assume the IBT's collective bargaining agreements and

10  provide that it would not subsequently reject them under

11  Section 1113 in this case.  And there was some mechanism

12  that the debtors' ultimate plan would be consistent in terms

13  of capital structure with the turnaround plan that Mr.

14  Rayburn testified to from April 4th and finally that the

15  debtors included new hires in their pension proposal that

16  the debtors' proposal would in fact at that point meet the

17  criteria of Section 1113.

18          Although, of course, each one of these

19  determinations is guided by the particular facts at the

20  particular time, so I would need to consider those facts.

21  And this is a fast-moving case, as evidenced by the

22  proposals provided by potential investors.

23          So as far as this motion is concerned and viewing

24  the motion as a whole, I will deny the motion for the

25  reasons that I have stated.  I would, however, be receptive

Page 131

1    to a motion that makes a proposal along the lines that I've

2    outlined.  And in particular, although I note that it would

3    be painful for the specific MEPPs that the debtors must

4    withdraw from, it is in my view necessary for the debtors to

5    withdraw from those MEPPs, albeit that they would continue

6    on the reduced funding level set forth in the union's

7    proposal to fund pension benefits in a new and green pension

8    plan.

9            I will note finally that there was quite credible

10    testimony that if the debtors attempted to impose a

11    collective bargaining agreement along the lines that I have

12    described, the union work force has authorized their

13    representatives to determine whether there should be a

14    strike or not.  I'll say two things in respect of that.

15            First, the obvious point that Judge Bernstein made

16    in Horsehead, it appears to me, consistent with my finding,

17    that it would be necessary for the debtors to exit the

18    troubled MEPPs; that the ultimate result of a strike

19    wouldn't be materially different from staying in those MEPPs

20    for the debtors.

21            Secondly and more importantly, in this case, the

22    IBT's level of knowledge about the debtor, realism and

23    sophistication was clear and commendable.  As I noted, it

24    appears to me that the union has as good idea -- an idea

25    about what is necessary for the debtors to reorganize,

Page 132

1    except for the MEPP issue, as the debtors do.

2            I will note that Mr. Wilson testified that the

3    issue of the MEPs should not cause a strike if dealt with in

4    a way that is fair and reasonable.  It appears to me that

5    the only way to deal with that issue is to follow a plan

6    along the lines that the debtors have proposed, the cost

7    savings for that plan being, however, the savings proposed

8    by the union.

9            What I believe truly jeopardizes the debtors'

10   reorganization here, the debtors' ability to raise the money

11   necessary to make the changes that both the union and the

12   debtors agree must be made will come from investors who I

13   believe correctly would not realistically take the risk

14   imposed by the union's May 15th structural proposal for

15   dealing with the MEPs.  That proposal creates too much

16   uncertainty for any entity willing to commit substantial

17   amounts of capital and reputation and work to turn this

18   company around.

19           So I'm going to ask Mr. Seltzer to submit an order

20   consistent with my ruling.  I know that one or two courts

21   outside of the Southern District have said that you all only

22   go through this once.  I completely disagree with that.

23   This is a very fact-specific inquiry based on the specific

24   timing of the proposals.  It's one of the reasons that

25   judges get frustrated because we know that much more is

Page 133

1   going on behind the scenes, and the proposal made before the

2   start of the hearing really isn't the last proposal.

3          So I'm perfectly prepared on short notice to

4   consider an amended proposal.  I hope that's not necessary.

5   I hope that the parties of interest here will reach

6   agreement.  And it's perfectly fine with me if they reach an

7   agreement that in certain ways differs from what I've said I

8   think will work here because they know this company better

9   than I do.  But on this record, those are my conclusions.

10          ALL:  Thank you, Your Honor.

11          THE COURT:  I also want to thank you all for

12   streamlining the trial.  It saved the debtor a lot of money.

13       (Whereupon the proceedings were concluded at 7:02 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 134

1                    I N D E X

2    Witness              By                Page     Line

3    Jeffrey Parlato      by Hamilton       13       10

4                         by Freund         14       11

5

6

7                    E X H I B I T S

8    Debtor's:            Identification    Page     Line

9       1                 Parlato's declaration    17       15

10

11                   R U L I N G S

12                                          Page     Line

13   Debtors' Motion and Debtors in         59       10

14   Possession to (A) Reject Certain

15   Collective Bargaining Agreements

16       Oakland and Seattle               69       10

17       All other CBAs                    77       14

18

19   Debtors' Motion and Debtors in         99       12

20   Possession to (B) Modify Certain

21   Retiree Benefit Obligations,

22   Pursuant to Sections 1113 (c) and

23   1114 (g) of the Bankruptcy Code

24

25

Page 135

1                    C E R T I F I C A T I O N

2

        I, Sheila G. Orms, certify that the foregoing is a correct

3      transcript from the official electronic sound recording of

4      the proceedings in the above-entitled matter.

5

6      Dated:  May 16, 2012

7

8

9        Signature of Approved Transcriber

10

11

        Veritext

12

        200 Old Country Road

13

        Suite 580

14

        Mineola, NY  11501

15

16

17

18

19

20

21

22

23

24

25