Hearing Date:  October 16, 2012
Objection Deadline:  October 4, 2012

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                            :

In re:                        :    Chapter 11

                            :

PINNACLE AIRLINES CORP., *et al.*,     :    Case No.: 12-11343 (REG)

                            :

               Debtors.        :    (Jointly Administered)

                            :

------------------------------------------------------------- x

## OBJECTION OF AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. §1113

Richard M. Seltzer
Thomas N. Ciantra
Bruce S. Levine
Joshua J. Ellison
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Telephone:  (212) 563-4100
Facsimile: (212) 695-5436

Attorneys for Air Line Pilots
    Association, International

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 5

    Pinnacle .......................................................................................................................... 5

    ALPA .............................................................................................................................. 6

    The JCBA ....................................................................................................................... 7

    Operational Integration and the **Bloch Award** ........................................................... 8

    Pinnacle Seeks an Out of Court Restructuring .......................................................... 10

    The Filing, the DIP Financing Agreement
    and Revised Airline Services Agreements ................................................................. 12

    Development of a Business Plan and Associated Labor Demands .............................. 13

    Court Approval of the DIP Financing and
    Assumption of the Revised Airline Services Agreements .......................................... 15

    The May Business Plan and Labor Demands ............................................................. 15

    Negotiations Through June 22 .................................................................................... 16

    June 22 Negotiating Hiatus ......................................................................................... 17

    August 16 Revised Demands ....................................................................................... 20

    Pinnacle's Justification for Its Increased Demands .................................................... 21

    Negotiations Since August 22 ..................................................................................... 24

    ALPA's Reasons for Rejecting the Company's Revised Demands .............................. 26

    ARGUMENT ............................................................................................................... 27

    PINNACLE HAS NOT MET THE STRICT
    REQUIREMENTS OF SECTION 1113 ...................................................................... 27

A.    The Proposed Modifications Are
      Not Necessary for Pinnacle's Reorganization ...................................................... 28

      1.    Pinnacle Does Not Need the Revised
            Demanded Savings From ALPA to Be Profitable ..................................... 31

      2.    The Delta Scope Agreement With ALPA Was No "Game-Changer"...... 32

      3.    The Alleged Redacted
                        Are Not Plausible ...................................................... 33

      4.    Pinnacle's "Validation" of the Alleged Redacted
                  For CRJ-900s Does Not – And Cannot –
            Show that the Proposed Labor Concessions are Necessary...................... 36

      5.    Pinnacle Has Failed to Make Itself
            Available for Negotiations with ALPA ..................................................... 38

B.    Pinnacle Has Not Conferred in Good Faith with ALPA........................................ 38

C.    Pinnacle Failed to Provide Relevant Information................................................. 39

D.    Pinnacle's Demands Are Neither Fair Nor Equitable to the Pilot Group............. 41

E.    ALPA Had Good Cause to Reject Pinnacle's Proposal........................................ 43

CONCLUSION.................................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Adventure Res., Inc. v. Holland*, 137 F.3d 786 (4th Cir. 1998) ....................................................27

*Golden Eagle Spotting Co. v. Brewery Drivers and Helpers,*
    *Local Union 133*, 93 F.3d 468 (8th Cir. 1996) .............................................................38

*In re AMR Corp.*, 2012 WL 3422541 (Bankr. S.D.N.Y. Aug. 15, 2012) ..............................29, 30

*In re Family Snacks, Inc.*, 257 B.R. 884 (B.A.P. 8th Cir. 2001) ......................................28

*In re Hostess Brands, Inc.,*
    Case No. 12-22052 (Bankr. S.D.N.Y.) (May 12, 2012) ...........................................29, 30

*In re Indiana Grocery Co.,* 136 B.R. 182 (Bankr. S.D. Ind. 1990) ................................41

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990) ...........................................27

*In re Jefley, Inc.*, 219 B.R. 88 (Bankr. E.D. Pa. 1998) ...............................................41

*In re Lady H. Coal Co.,* 193 B.R. 233 (Bankr. S.D. W. Va. 1996) .................................41

*In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992) .......................................28

*In re Mesaba Aviation, Inc.*, 341 B.R. 693 (Bankr. D. Minn. 2006) ..............................39

*In re Mile Hi Metal Sys.*, 899 F.2d 887 (10th Cir. 1990) ..............................................29

*In re Northwest Airlines Corp.*, 346 B.R. 307 (Bankr. S.D.N.Y. 2006) ..............28, 29, 43

*In re Roth Am., Inc.*, 975 F.2d 949 (3d Cir. 1992) ......................................................27

*In re Walway Co.*, 69 B.R. 967 (Bankr. E.D. Mich. 1987) ............................................41

*K-Mart Corp. v. NLRB*, 626 F.2d 704 (9th Cir. 1980) ................................................38

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ....................................................27

*NLRB v. Hardesty*, 308 F.3d 859 (8th Cir. 2002) .......................................................38

*Truck Drivers Local 807 v. Carey Transp. Inc.,*
    816 F.2d 82 (2d Cir. 1987)............................................................................28, 29, 41

*Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.,*
    791 F.2d 1074 (3d Cir. 1986)...............................................................................27

**STATUTES**

11 U.S.C. 1113(b)(1)(b) .................................................................................................39

11 U.S.C. §1113(b)(1)(A) .........................................................................................28, 41

11 U.S.C. §1113(b)(1)(A), (c)(1) ...................................................................................28

11 U.S.C. §1113(b)(1)(B) ................................................................................................28

11 U.S.C. §1113(b)(2) .....................................................................................................38

11 U.S.C. §1113(c)(2) ......................................................................................................28

**OTHER AUTHORITIES**

130 Cong. Rec. H1831 (daily ed. March 21, 1984) .......................................................27

The Air Line Pilots Association, International ("**ALPA**") objects as follows to the September 13, 2012 Motions of Pinnacle Airlines, Inc. ("**Pinnacle**") to Reject Collective Bargaining Agreements with the Air Line Pilots Association, International and the Association of Flight Attendants-CWA Pursuant to 11 U.S.C. § 1113 (the "**Motion**").

## PRELIMINARY STATEMENT

**Pinnacle's Motion** to reject its agreement with **ALPA** should be denied because **Pinnacle** has failed to satisfy the stringent requirements for obtaining such relief under Section 1113 of the Bankruptcy Code. Rather, **Pinnacle** seeks to misuse Section 1113 to obtain extraordinarily burdensome cost concessions from its **ALPA**-represented pilots that: (1) are not necessary for **Pinnacle** to emerge from bankruptcy, (2) are the product of bad faith negotiations on the part of **Pinnacle**, (3) are unsupported by relevant information, and (4) if imposed on the pilots, would be neither fair nor equitable. The motion should also be denied because **ALPA** had good cause to reject **Pinnacle's** proposal.

At the threshold, the Section 1113 proposal made by **Pinnacle** replaces a radically different proposal that **Pinnacle** made to **ALPA** three months earlier, in May of this year. **Pinnacle**, with the full support of its sole customer, Delta Airlines, Inc. ("**Delta**") represented to **ALPA**, to the Court, and to all relevant constituencies in this proceeding, that its May proposal would provide **Pinnacle** with the relief it needed to successfully emerge from bankruptcy and to compete for future business opportunities. At that time – after **Pinnacle** asked this Court at **Delta**'s bidding to assume its newly-revised airline services agreements and provided **Delta** with a business plan premised on those agreements – **Pinnacle** said it needed $33 million (rounded to the nearest million) annually from its pilots. That amount was reflected in the concessions **Pinnacle** asked for in its May proposal.

-1-

Then, only six weeks after making that proposal, **Pinnacle** unilaterally called a complete halt to negotiations. **Pinnacle** advised **ALPA** that it needed to revise its business plan. After an unprecedented eight-week complete hiatus from bargaining, **Pinnacle**, which now insists that time is of the essence, returned to the table with the same fleet plan as before under the same airline services agreements – but with an 80% increase in its demands. **Pinnacle** now says it needs $59.6 million annually from the pilot group, equating to a 33% reduction in pilot costs. Nothing, however, has occurred between May and August to justify such regressive bargaining. Nor has **Pinnacle** provided **ALPA** with the relevant information that it would need to evaluate **Pinnacle's** alleged basis for its new "ask."

On the other hand, **ALPA** has offered concessions that meet the demands **Pinnacle** said it needed in May to earn a competitive rate of return and attract new business. In short, as we demonstrate, **ALPA** has bargained in good faith and continues to do so, and its proposals for cost-savings confirm that it had good cause to reject **Pinnacle's** most recent proposal. **Pinnacle's** increased demands are not necessary to its reorganization but constitute overreaching.

**Pinnacle** attempts to explain this tectonic shift by pointing to **Delta**. It claims that ***Delta told* Pinnacle** in June that contracts this Court authorized **Pinnacle** to assume in May – at **Delta's** instigation – cost more than the average rate **Delta** pays other carriers for the same lift – REDACTED

**Pinnacle** suggests that despite **Delta's** ample bargaining leverage as its sole customer and financier, somehow it was able to take **Delta** to the cleaners *in the negotiations over the revised airline services agreements*. Based on the asserted price disparity **Delta** now asserts, **Pinnacle** substantially increased its labor demands.

- 2 -

Delta set out its pricing claims in a three-page letter dated August 1.  But Delta did not demand that Pinnacle reduce its rates under the agreements and Delta did not say that it would not support a reorganization built around those (now assumed) contracts.  Delta did not threaten Pinnacle with a loss of flying nor did it promise Pinnacle more flying if it reduces its pricing or costs.  Delta simply asserted in conclusory fashion that it is paying Pinnacle more for lift REDACTED

Not surprisingly, Pinnacle did not change its fleet plan in response to Delta's assertions, since there is nothing concrete in what Delta said.

Pinnacle nonetheless urges that it is somehow vulnerable under its contracts with Delta even though those agreements were assumed (at Delta's insistence) and extended through 2022.  Pinnacle argues that unless it reduces its costs by $34 million, the amount Delta identified as a pricing difference, it might lose Delta's work and might fail to gain new Delta business.  In this connection it perceives a threat in Delta's new pilot labor agreement which allows Delta to increase 76-seat flying if it reduces 50-seat flying provided other conditions are met.  Pinnacle's submission ignores that: (a) Delta negotiated the revised agreements with Pinnacle at the same time it was negotiating with its own pilots; (b) the revised agreements address the very possibility that Delta would want to replace 50-seat flying with 76-seat flying; and (c) salient features of Pinnacle's agreements with Delta, make it economically costly for Delta to reduce Pinnacle's 50-seat fleet.  All of this provides Pinnacle with leverage to resist overreaching by Delta and to gain new flying.

The Delta pilot agreement was no "game-changer," as Pinnacle claims.  Unlike other Delta Connection carriers which operate no 50-seat aircraft and thus cannot help Delta to shrink its 50-seat fleet, Pinnacle is a substantial 50-seat operator under contracts that make it

- 3 -

costly for **Delta** to remove the 50-seat flying.  The parties contemplated that **Delta** could reduce

50-seat lift over the term of the agreement and thus negotiated a swap-out provision.  **Pinnacle's**

complaint that it enjoys "little protection" under the agreements ignores the reality of the terms

of those agreements.

The unstated premise of **Pinnacle's** claim – that **Delta** agreed to overpay for

**Pinnacle's** lift in April and only realized this in June – beggars belief.  **Delta** had **Pinnacle** over

a barrel on the eve of bankruptcy; a salient fact that was repeated over and over during the course

of the May 16 hearing to approve assumption of the agreements and debtor-in-possession

financing.  The notion that **Delta** would have agreed to pay **Pinnacle** REDACTED

more for regional lift defies reason.

**Delta** did not provide **Pinnacle** with any data whatsoever that would verify its

pricing contentions, citing confidentiality considerations.  So, **Pinnacle** has not been able to –

and cannot – validate **Delta**'s numbers.  On their face, **Delta**'s claims do not form a legitimate

basis for **Pinnacle's** demands of **ALPA** because **Delta** explicitly excluded any consideration of

the differing margin payments it makes to its regional partners as part of pricing under these

agreements and limited its comparison to the year 2012.  Because **Pinnacle** has no risk

associated with aircraft ownership costs, **Pinnacle** likely receives smaller margin payments than

its competitors who own or directly lease their aircraft fleets.

Since it does not have access to the pricing information **Delta** used, **Pinnacle**

relies on an analysis of what it believes is a difference in the cost of its 76-seat lift as compared

with just two of its many competitors, neither of whom provide 50-seat lift to **Delta**.  The new

selective analysis concerning the costs of 76-seat lift **Pinnacle** now presents is eyewash.

Significantly, **Pinnacle** offers no analysis whatsoever with respect to the pricing differential

- 4 -

**Delta** claimed for 50-seat lift, even though the 50-seat fleet is three times as large as the 76-seat fleet and the alleged disparity in 50-seat pricing accounts for almost two-thirds of the increase in the demand.

The revised August demands are regressive and inconsistent with good faith bargaining. The eight-week hiatus from negotiations that **Pinnacle** unilaterally imposed is also inconsistent with its obligation under Section 1113 to make itself available to negotiate. **Pinnacle** now contends that any delay in granting its every wish risks liquidation.

From the outset **ALPA** has recognized that **Pinnacle** needs significant economic concessions to reorganize under the revised **Delta** agreements. **ALPA** has offered **Pinnacle** a package of pay, benefit and work rule concessions meeting the amount **Pinnacle** sought in May and which it said at that time was sufficient for it to reorganize and raise capital. As shown below, the concessions that have been offered not only make **Pinnacle** profitable, they offer **Pinnacle** terms that are competitive with pilot labor terms throughout the industry. Under these circumstances **ALPA** has ample good cause to refuse to accede to **Pinnacle's** bloated demands.

This Motion should be denied.

## STATEMENT OF FACTS

### Pinnacle

**Pinnacle** is a regional air carrier that is the product of a combination of three separate carriers. **Pinnacle** began operations in 1985 as Express Airlines I and developed into a regional jet operator for Northwest Airlines and, following Northwest's merger with **Delta**, as a **Delta** Connection carrier. In 2007, **Pinnacle's** parent, **Pinnacle** Airlines Corp. acquired Colgan Air, which operated turbo-prop aircraft and provided lift for United, Continental and US Airways. Declaration of Paul Hallin, filed herewith ("Hallin Decl.") ¶ 2.

- 5 -

In July 2010, **Pinnacle** Airlines Corp. purchased Mesaba Aviation, Inc., from **Delta**. Like **Pinnacle**, Mesaba provided regional lift to Northwest (and following the merger to **Delta**) and it operated both regional jet and turbo-prop aircraft. *Id.* In connection with the purchase of Mesaba, **Pinnacle** issued **Delta** a promissory note; at the time it filed for bankruptcy **Pinnacle** owed **Delta** $44 million on that note. DIP Motion (Docket 23) ¶ 11.

At the time it bought Mesaba, **Pinnacle** announced that it intended to merge the three carriers into two, one that would operate regional jet aircraft and the other focused solely on turbo-prop flying. *Id.* ¶ 3.

<u>ALPA</u>

**ALPA** is the largest airline pilot union in the world and represents nearly 51,000 pilots at 35 U.S. and Canadian airlines. **ALPA** represents pilots employed at regional carriers such as **Pinnacle**, mainline carriers, such as **Delta**, and cargo and charter operators. **ALPA** represented pilots at pre-merger **Pinnacle**, Colgan and Mesaba. Declaration of Marcia Eubanks ¶ 2.

**ALPA** represents pilot groups through a coordinating council known as a Master Executive Council ("**MEC**"). The **MEC** of an airline is composed of representatives elected by the **ALPA** membership at each pilot base (or domicile) of the particular carrier. The **MEC** members elect officers of the **MEC**, a Chairman, Vice Chairman and Secretary-Treasurer. Captain Thomas E. Wychor serves as the Chairman of the **Pinnacle** Master Executive Council. He has formerly served as Executive Vice President of **ALPA** and a member of **ALPA's** Executive Council. In addition to contact through **MEC** officers and members, **ALPA** interacts with management through the activities of various **MEC** committees. These include not only a Negotiating Committee responsible for the conduct of collective bargaining with the Company, but also committees whose activities encompass the universe of pilot working conditions and

- 6 -

mirror the structure of the agreement.  Captain Paul Hallin serves as the Chairman of the

**Pinnacle MEC'S** Negotiating Committee.  Declaration of Thomas E. Wychor ¶ 3; Hallin Decl. ¶

1.

The JCBA

      Following the Mesaba acquisition, **ALPA** entered into negotiations with the

company in the fall of 2010 for the purpose of negotiating a single collective bargaining

agreement covering all three carriers.  The parties engaged in expedited bargaining and reached a

tentative agreement in December of that year (the joint collective bargaining agreement or the

"**JCBA**").[1]  The **JCBA** became effective February 18, 2011, and becomes amendable, pursuant

to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq*., as of February 18, 2016.  Hallin Decl. ¶ 4.

      Following the negotiation of the **JCBA**, the pilot groups began the process of

integrating the separate seniority lists of the three carriers into a single integrated list.  As a

general matter, relative seniority governs in the assignment of work under the **JCBA**: vacancies

are awarded in order of seniority and reductions are awarded in inverse order of seniority.  When

it negotiated the **JCBA**, management did not demand "fences," *i.e.*, limits on the ability of pilots

to bid to or be awarded positions across the combined airline system until the companies were

operationally merged.  Rather under the **JCBA** once an integrated seniority list was either agreed

to or determined in arbitration, pilots would be free to move to positions across the entire

combined airline system subject only to whatever limits might be imposed with the integrated

list.  All things being equal, fence provisions would reduce the excess training that would be

expected with an integration of pilot groups under a single contract and single seniority list.  *Id.* ¶

5.

---

[1] The **JCBA** is Exhibit 54 to the Declaration of Jerrold A. Glass.

When the pilot groups could not agree on an integration methodology, the seniority issue was arbitrated before Richard Bloch. On May 19, 2011, before Arbitrator Bloch issued an award, the **MEC** Chairmen of the three carriers wrote to the airline's chief operating officer proposing a meeting once the award issued to discuss questions that would arise concerning the scheduling and filling of vacancies provisions of the agreement. The **MEC** chairmen proposed a meeting in early June after the award was issued. **Pinnacle** management demurred. *Id.* ¶ 6.

<u>Operational Integration and the **Bloch Award**</u>

Arbitrator Bloch issued an award establishing the integrated seniority list on June 16, 2011 (the "**Bloch Award**"). The **Bloch Award** contained only a few conditions and restrictions.[2] Upon the implementation of the **Bloch Award,** the work assignment provisions of the **JCBA** became applicable to **Pinnacle's** operations and pilots became able to freely transfer to positions across the combined system consistent with the arbitrator's decision. This caused a significant increase in pilot training costs, because **Pinnacle** had not implemented common operating standards or procedures for the common fleet types it operated. *Id.* ¶ 7.

While the pre-merger carriers operated common aircraft types (the CRJ-200, CRJ-900 and Saab 340s) management had not (and still has not) implemented a common set of operating standards or procedures for those aircraft. That is management's sole responsibility, not **ALPA's**. One part of the process of merging airlines is combining their operations on a

---

[2] Of relevance here, the arbitrator imposed limits on the ability of pilots to be displaced to captains' positions on the CRJ-200 and CRJ-900 aircraft. For example, no pre-merger **Pinnacle** or Colgan pilot may be awarded or displaced to a CRJ-900 captain position unless Mesaba pilots maintain a set number of CRJ-900 captain positions, and no pre-merger Mesaba or Colgan pilot may be awarded or displaced to a CRJ-900 captain position unless **Pinnacle** pilots maintain a set number of CRJ-900 captain positions.

single operating certificate issued by the Federal Aviation Administration ("**FAA**").[3]  Until there

is a single set of **FAA**-approved operating procedures and pilots have been trained on those

common procedures, pilots who move between the operations of the pre-merger carriers even on

the same aircraft must be trained as though they had never operated that aircraft before.  For

example, a legacy Mesaba CRJ-900 Captain who was awarded a voluntary bid to fly the CRJ-

900 as a Captain in Atlanta, where that aircraft is operated under legacy **Pinnacle** procedures,

would be required to undergo a full initial transition training event (or approximately eight weeks

of training) in order to operate the CRJ-900 there.  If there were a single operating certificate, no

training would be required for the pilot in the example to change domiciles.  Because there were

no limits on pilot position awards (other than those imposed in the **Bloch Award** with respect to

the minimum number of Captain positions to which each legacy pilot group was entitled based

on the equipment operated at the time of the merger), and because the combined operation was

shrinking due to the elimination of turbo-prop flying beginning in 2011, **Pinnacle's** pilot training

costs ballooned.  *Id.* ¶¶ 8-9.

Holding all else equal, increased pilot training requirements dramatically increase

the relative unit costs (also known as block hour costs) of pilot labor.  That is because pilots are

paid while they train and do not perform revenue flying and because the airline must carry

additional pilots on the payroll to cover for those pilots who are being trained.  As a result,

**Pinnacle's** pilot labor costs – measured either by the cost of each block hour of pilot time or by

the number of block hours flown per pilot per month – rose in 2011.  As CEO John Spanjers

---

[3] While airlines may operate the same types of aircraft, the particular procedures and
operating philosophy it instructs its pilots to follow on those aircraft may be quite different.
These differences can be found in all segments of the flight process, from ground operations
prior to flight, to take-off and flight at cruising altitude, through descent and landing to taxiing to
flight termination at the gate.

noted at the outset of this case: "The lack of meaningful [integrated seniority list] fences, integration delays and flying downsizing have resulted in substantial additional training costs and decreased productivity." Declaration of John Spanjers Decl. (Docket 3) ¶ 25.

In 2011 after Arbitrator Bloch issued his award, **ALPA** and **Pinnacle** entered into negotiations to address the pilot training bubble. In particular, **Pinnacle** posted a notice (11-09) that contemplated substantial retraining of pilots occasioned by reduction of Saab 340 flying for **Delta**. This flying had been performed by pre-merger Mesaba pilots and many of the Saab captains who would be displaced were relatively senior on the combined list and would be expected to bump into higher paying positions creating a cascade of training events as more junior pilots were reassigned. Hallin Decl. ¶ 10.

**ALPA** volunteered to negotiate relief from certain provisions of Section 24 of the **JCBA** entitled "Filling of Vacancies" to lessen the expected training demands by eliminating intermediate training steps for pilots facing displacement. **Pinnacle** and **ALPA** reached agreement on a letter of agreement ("LOA 21") that provided **Pinnacle** with substantial relief. **Pinnacle** noted that absent LOA 21 it faced in excess of 900 training events associated with 11-09 between November 2011 and May 2012; with the relief training was limited to 583 events and **Pinnacle** reported that it saved $6.2 million. Hallin Decl. ¶ 11.

Pinnacle Seeks an Out of Court Restructuring

In the summer of 2011, **Pinnacle** retained new senior management and began to reevaluate its existing contractual relationships. As Spanjers related, management determined that none of **Pinnacle's** Saab flying for US Airways was profitable and neither was its Q400 flying for United-Continental. The existing CRJ-200 and CRJ-900 agreements with **Delta** "were deemed potentially viable, but not without the benefit of contractual rate increases, scheduled to be introduced over the course of 2012-13[.]" Spanjers Decl. ¶ 27.

- 10 -

In November 2011, **Pinnacle** announced that it intended to restructure its business outside of bankruptcy. Following a presentation by **Pinnacle** management to the **MEC** in December, the parties entered concessionary bargaining, a process that ended in February 2012, as reviewed herein, without an agreement. Hallin Decl. ¶ 12.

In late December 2011 and early January 2012, the parties made substantial progress toward an agreement. The provisions that governed the filling of vacancies and thus training costs were tentatively amended to provide substantial cost savings. In addition, the parties were able to agree to a 5% wage reduction, that would gradually be recovered over the term of the **JCBA**.  REDACTED

Attempts to reach agreement on language **ALPA** felt was necessary to retain value for any concessions made in advance of bankruptcy were not successful, further corroborating **ALPA's** belief that bankruptcy was a foregone conclusion. *Id.* ¶ 14.

After **Delta** put **Pinnacle** on notice that it would not support an out-of-court restructuring and that any restructuring would have to take place under Chapter 11, **Pinnacle** and **Delta** reached agreement on revised and extended airline services agreements for CRJ-200 and CRJ-900 flying through 2022, an early termination of the separate agreement for CRJ-900 flying that pre-merger **Pinnacle** had performed, and a super-priority debtor-in-possession financing agreement with **Delta** that would finance the bankruptcy and convert to an exit facility.

- 11 -

**Pinnacle** also reached agreements to terminate its turbo-prop flying for United-Continental and US Airways. *Id.* ¶ 15.

Specifically, the revised airline services agreements with **Delta** included [REDACTED]

The Filing, the DIP Financing Agreement
and Revised Airline Services Agreements

On April 1, 2012, **Pinnacle** filed for bankruptcy protection in this Court.  The next day, **Pinnacle** filed a motion to approve its various agreements reached with **Delta**: the DIP financing, the revised airline services agreements and an accompanying set-off and mutual release agreement concerning claims of **Pinnacle** and **Delta** under the predecessor agreements.

---

[4] **Delta** CFO Edward Bastian told investors in the third quarter of 2007 that "[t]he only capacity growth we've got going on in domestic is the up-gauging of regionals from 50-seat to 76-seaters, as we're getting rid of those 50-seaters."  In the first quarter of 2008, he told investors that "[s]maller regional aircraft are not efficient to operate in current fuel levels and so we are now targeting to remove the equivalent of 100 regional aircraft from the system by the end of the year through a combination of lease returns, decreased utilization and changes in contractual arrangements."  *See also* "Airlines Cut Small Jets as Fuel Prices Soar," *USA Today*, November 28, 2011 ("Delta is moving away from small jets more aggressively than other airlines.  It will eliminate 121 50-seat jets from October 2008 through the end of next year [2012].  That will leave it with 324.") (cited in Kasper Decl. ¶ 49 fn. 69).

- 12 -

(Subsequently **Pinnacle** filed a motion to reject its agreement with United-Continental). **Delta** conditioned the financing upon the *immediate* assumption of the revised airline services agreements and the set-off and mutual release agreement. DIP Motion at ¶¶ 1, 34, 66. Under the DIP financing agreement **Delta** made a total of approximately $74 million available to **Pinnacle** of which $44 million was used to pay off the Mesaba acquisition note.

The DIP Facility also included specified "Milestones" which set dates tied to certain case developments. DIP Facility, Section 5.10, Appx. F ("Milestones"). The Milestones include deadlines for **Pinnacle** to deliver a business plan to **Delta** and to file a Plan of Reorganization and Disclosure Statement "that are reasonably acceptable" to **Delta**. They also include dates for **Pinnacle** to initiate and prosecute proceedings under Section 1113 of the Code, 11 U.S.C. §1113. Any settlement of such a motion shall also be "reasonably acceptable to [**Delta**]." *Id.* Appx. F §II.6.

Development of a Business Plan and Associated Labor Demands

**Pinnacle** represented that the applicable Milestones were achievable and that **Pinnacle** had "prepared a preliminary 6-year business plan with guidance from [**Delta**]" and had "conducted the necessary analyses and begun preparing proposals" to present to **ALPA** and the other unions. DIP Motion ¶ 39. It also contended that absent the DIP financing it would run out of cash in June 2012 and that there were no alternative sources of funding. DIP Motion ¶¶ 16, 26-27.

With respect to the amended airline services agreements, **Pinnacle** stated that they were central to its reorganization. As **Pinnacle** explained:

> the Debtors' entire business plan and reorganization depend on the Amended DCAs. The Amended DCAs have the potential to be profitable for the Debtors provided the Debtors can achieve certain targeted cost reductions. If the Amended DCAs are assumed, the Debtors will have access to the DIP Facility financing that they

- 13 -

need to operate their business and the Exit Note to fund emergence
from chapter 11, assuming other conditions are satisfied.

DIP Motion ¶ 67.

The amended agreements thus presupposed that **Pinnacle** would obtain labor

contract concessions from **ALPA** and its other labor groups.  As **Pinnacle's** CEO testified, the

level of concessions had already been analyzed by the Company in conjunction with **Delta** in

light of the overall market for regional flying:

> Q.      And in fact, the contracts – the now amended contracts that
> you have with **Delta**, you can correlate from those contracts how
> much cost savings you have to achieve in order for you to be
> profitable under those contracts, right?
>
> A.      Yes, we do, and that is based on the negotiation that we had
> with **Delta** and what was outlined earlier relative to the company
> doing *a significant amount of analysis* relative to our contracts
> and what market contracts are relative to compete in the regional
> business.
>
> Q.      Well, do you have an expectation as to how much the
> debtors have to get, by way of concessions from labor, in order to
> meet the requirement under the DIP, the cost-saving requirement?
>
> A.      Relative to what we need to do, there was a number relative
> to the global cost that we needed to get, which was approximately
> seventy million dollars.  Of that, labor makes up about forty-two
> million dollars.  And there is components in the – when I go back
> to the seventy million dollars, is that as we shrink the airline there
> will be overhead structure, meaning management professionals,
> that will shrink, but that is not concessionary in nature.
>
> *Q.      Mr. Menke, what you need to do with labor in this case is
> already baked, isn't it? You know what you have to get out of
> them, don't you?*
>
> *A. We're aware of the concession level we are seeking relative to
> the marketplace, yes, sir.*

DIP Hearing Tr. at 137-38 (emphasis added).

- 14 -

Court Approval of the DIP Financing and
Assumption of the Revised Airline Services Agreements

      The Unsecured Creditors Committee, of which **ALPA** is a member, supported the

DIP Motion. Docket No. 308. After a hearing, the Court approved the Motion. The Court

found that absent the financing **Pinnacle** would run out of money and that there was no

alternative to **Delta's** proposal. DIP Hearing Tr. at 177. With respect to the assumed airline

services agreements the Court found that there was "*an imbalance* in bargaining power" but that

"under the circumstances, the debtors did pretty well." DIP Hearing Tr. at 179 (emphasis

added).

The May Business Plan and Labor Demands

      On May 8, **Pinnacle** management gave **ALPA** and the other labor groups a

business plan presentation and a set of demands for contract concessions. This six-year business

plan assumed the fleet covered by the two airline services agreements with **Delta**: 140 CRJ-200

aircraft and 41 CRJ-900 aircraft. **Pinnacle's** plan called for $71.4 million in expense reductions

on an annual basis of which $42.6 million was sought from labor. **Pinnacle** described its labor

demands as "grounded in market realities," pointing to wide-spread restructuring in the industry.

In particular, **Pinnacle** pointed to three goals of its plan: the ability to retain **Delta** flying, to

attract an equity investor and to "grow the business beyond the existing contracts," all of which

would be served by the $42.6 million labor ask. Hallin Decl. ¶ 17.

      The remaining $28.7 million of the $71.4 million target was taken from the

following sources:

- $13.5 million is corporate headcount reduction including pre-bankruptcy reductions;
- $6.4 million in foregone pay increase for management and salaried employees;
- $4.1 million in savings in materials costs;

- $1.9 million in real estate savings; and
- $2.9 million in miscellaneous savings. *Id.* ¶ 18.

Management presented no benchmarking analysis of its executive or managerial compensation structure or any other benchmark analysis to substantiate the disparate ask of the pilots in particular. *Id.* ¶ 19.

The May business plan projected an operating margin of REDACTED

Of the $42.6 million total labor ask, **Pinnacle** sought approximately $32.2 million from the pilots in revisions to pay, work rules and benefits, a reduction in total annual pilot costs of 18.3%. Hallin Decl. ¶ 21.

Negotiations Through June 22

After receiving **Pinnacle's** demands, **ALPA** began the preliminary work of reviewing how the airline valued each of its proposals. The costing of bargaining proposals is complicated. Depending on the issue being costed, consideration must be given to the fact that numerous factors are interrelated, including the number of pilots required, their seniority, their compensation, their pay hours, the number retiring or attriting from the airline, the potential

movement of pilots between aircraft and seats (*i.e.*, from first officer or co-pilot to captain or

vice versa), staffing and costs related to training, sick time and vacation time, the level of flying

and fleet projections from the Company, taxes, benefits and pensions, and the duration of the

contract. Eubanks Decl. ¶ 13.

Additionally, once all of the proposals are costed individually, the combined

effect must be analyzed to determine any overlap, or interaction, between the proposals.

Because some contract modifications, especially those involving staffing or work rules, take time

to fully implement, their costs (or savings) are not immediately experienced. Most costing is

undertaken in terms of a steady state analysis, an estimate that determines the value of a

modification assuming that the necessary time to fully implement it has passed. *Id.* ¶ 14.

Before **ALPA** could fully respond to the airline's demands, it sought to gain an

understanding and agreement as to the value of each of the proposals, so that any counter-

proposal could be evaluated as against **Pinnacle's** $32.3 million ask. In addition, **ALPA** urged

**Pinnacle** to consider a letter of agreement, parallel to LOA 21, concerning pilot training costs

that would be associated with the projected upcoming displacement of the remaining turbo-prop

pilots. **ALPA** first began these discussions with management in early June. Hallin Decl. ¶ 22.

June 22 Negotiating Hiatus

On May 21, 2012, the **Delta MEC** of **ALPA** announced that it had approved for

membership ratification a tentative agreement with **Delta** on the terms of a new collective

bargaining agreement. Included in that tentative agreement were modifications to Section 1, the

scope clause of the **Delta-ALPA** agreement. As a general matter the scope clause of the

agreement reserves to **Delta** pilots all flying by or for **Delta**, including under the **Delta** brand,

with certain specified exceptions. Included among the exceptions are flying performed by **Delta**

Connection carriers on regional jet aircraft. Among other things, the scope clause contains limits

- 17 -

on both the gauge (size) of aircraft that could be operated by such carriers for **Delta** as well as

the number of such aircraft that could be so operated.  Under the May 2012 tentative agreement,

**ALPA** agreed to permit **Delta** Connection carriers as a group to increase the number of 76-seat

regional jet aircraft they could otherwise operate; but this increase in permitted 76-seat aircraft is

in part linked to a decrease in the number 50-seat regional jet aircraft the **Delta** Connection

carriers operate and the acquisition by **Delta** of certain new smaller narrowbody mainline

aircraft.  *Id.* ¶ 23.

In particular, if **Delta** establishes a fleet of new small narrowbody aircraft

(defined as either a Boeing B-717 aircraft or Airbus A-319 aircraft not in **Delta's** fleet as of July

1, 2012), the number of 76-seat aircraft may increase (above the otherwise 153 permitted number

of such aircraft) on the basis of one 76-seat aircraft for one and one quarter new small

narrowbody aircraft added (a 1:1.25 ratio) up to a total of 223 76-seat aircraft.  In addition, if

**Delta's** regional partners are operating more than 153 76-seat aircraft, then beginning on January

1, 2014, and each succeeding January 1 thereafter, **Delta** must meet a prescribed ratio for

reducing the number of 50-seat aircraft in regional operations (below the present combined fleet

size of 348) for each 76-seat aircraft above 153 added.  In short, the required reduction of the 50-

seat fleet is linked to an increase in the number of 76-seat aircraft at **Delta** Connection carriers

(above 153 such aircraft) which is in turn contingent upon the introduction of the new small

narrow body aircraft to **Delta's** mainline fleet.  Hallin Decl. Ex. E.

**Delta's** plan and agreement to reduce 50-seat flying by its Connection partners

was no surprise to industry observers.  As **Pinnacle's** expert Kasper points out, mainline carriers

have been reducing the number of block hours flown by 50-seat lift and smaller aircraft for

several years before 2012.  Declaration of Daniel Kasper ¶ 51 ("the use of 50-seat and smaller

RJs by the large network carriers has greatly diminished and is expected to decline even further in the future"). **Delta** was ahead of this industry trend and made its intentions *known* for many years before 2012.[5]

Then on June 22, 2012, without notice and taking **ALPA** completely by surprise, **Pinnacle** announced that it was suspending negotiations. In a letter to all employees (immediately filed with the SEC), CEO John Spanjers pointed to the **Delta-ALPA** tentative agreement and its potential effect on **Pinnacle's** fleet. He stated:

> [T]here have been new developments since we presented our unions with those term sheets that require us to pause our discussions while we reformulate our business plan.
>
> As many of you know, **Delta** recently reached a tentative agreement with **ALPA** that includes a provision *that could require* a significant reduction in the number of 50-seat (CRJ-200 and ERJ-145) aircraft in **Delta**'s network ... The same agreement allows **Delta** to expand its 2-class 76-seat regional jets by 70 aircraft as it adds additional mainline aircraft to its fleet. As you can see, this agreement – if ratified by **Delta** pilots – presents both a challenge and an opportunity for this organization. ***Clearly our business plan will need to be reformulated in response.***

---

[5] **Delta** CFO Edward Bastian told investors in the third quarter of 2007 that "[t]he only capacity growth we've got going on in domestic is the up-gauging of regionals from 50-seat to 76-seaters, as we're getting rid of those 50-seaters." In the first quarter of 2008, he told investors that "[s]maller regional aircraft are not efficient to operate in current fuel levels and so we are now targeting to remove the equivalent of 100 regional aircraft from the system by the end of the year through a combination of lease returns, decreased utilization and changes in contractual arrangements." The drumbeat continued. As reported in the First Quarter 2011 edition of *Regional Horizons* (a publication of the Regional Airline Association) at page 11, "Ed Bastian, President of **Delta** Air Lines ... [said at airline conference] **Delta** will be grounding 86 regional aircraft over the next 12-18 months. They include 26 Saab 340s, acquired in the merger with Northwest Airlines, and 60 50-seat regional jets, primarily Bombardier CRJ-100s. Even though the latter have low ownership costs, he says, they are the least fuel efficient of their regional planes and are expensive to operate. Overall, **Delta**'s regional fleet will decline to 600 by year end, compared with 693 at the end of 2007." *See also* "Airlines Cut Small Jets as Fuel Prices Soar," USA Today, November 28, 2011 ("**Delta** is moving away from small jets more aggressively than other airlines. It will eliminate 121 50-seat jets from October 2008 through the end of next year [2012]. That will leave it with 324.") (cited in Kasper Decl. ¶ 49 fn. 69).

* * *

In a nutshell, ***Delta told us that the bids they've received from other regional carriers on 2-class flying were significantly below what they pay for Pinnacle's CRJ-900 flying***.  It's clear that we are competing with carriers that have significant cost and pilot seniority advantages over **Pinnacle**.

Ultimately, as we look toward the future ***we must envision a Pinnacle fleet with far fewer CRJ-200 aircraft***.  And if we hope to replace those losses with more 76-seat aircraft, we must reduce our cost structure even more than originally planned in order to be competitive.

Hallin Decl. Exh. F (emphasis supplied).

In meetings with **ALPA** on the afternoon of June 22, management stated that the **Delta-ALPA** tentative agreement required a revision of its business plan and that it would not continue discussions based on the proposals it just made, since those proposals were based on the May business plan.  Following this announcement, **Pinnacle** refused to continue discussions concerning its May proposals.  **ALPA** was not consulted and did not agree to this adjournment.  Although **ALPA** and **Pinnacle** continued to discuss certain costing issues and training relief in connection with **Pinnacle's** planned reduction in flying, progress in the negotiations was halted with management's decision to suspend them.  Initially, **Pinnacle** said that a revised business plan would be presented in three weeks.  As mid-July approached, **Pinnacle** advised that the plan would be further delayed on a weekly basis.  Bargaining finally resumed in mid-August.  Hallin Decl. ¶ 26.

August 16 Revised Demands

On August 16, 2012, **Pinnacle** sent **ALPA** what it described as a revised business plan and revised economic demands.  *Id.* ¶ 27.

**Pinnacle's** revised business plan covered the same six-year period as the May plan.  Notwithstanding its suspension of talks with **ALPA** based on the notion that **Delta** would

- 20 -

reduce 50-seat flying and increase 76-seat flying, **Pinnacle** now assumed the same fleet plan as

the May plan (*i.e.*, 140 CRJ-200 aircraft and 41 CRJ-900 aircraft) with the same revenue

assumptions until 2018.  The only difference is that **Pinnacle** revised modeling of the reset of

rates that would occur in 2018.  *Id.*

        **Pinnacle** increased the demands on labor from $42.6 million to $76.4 – an

increase of 80%.  No additional savings were sought in any other areas.

        **Pinnacle's** demands include:

- Cuts in hourly pay rates generally that would place **Pinnacle** at the bottom of the regional industry

- Wage restructuring under which upgrading pilots would be reset to the first "step" of the Captain longevity pay scale, regardless of prior service

- Reducing days off for reserve pilots to 10 days per bid period

- Elimination of the current health care plans and replacing them with a health care reimbursement (HRA) plan.  **Pinnacle** would become the first and only carrier in the industry to offer only an HRA plan to its pilots.

- Reduction of "deadhead" pay and credit

- Elimination of one week of vacation accrual for each pilot, except first-year pilots

- Reductions in cancellation pay.  *Id.* ¶ 29.

**Pinnacle's** Justification for Its Increased Demands

        **Pinnacle** explained that its incremental ask was based on **Delta's** assertion that

**Pinnacle's** pricing for 50-seat and 76-seat lift was higher REDACTED

REDACTED

           **Pinnacle** increased its economic demands to $76.4 million.  Of that total, **Pinnacle** seeks $59.6 million from the pilots.  *Id.* ¶ 30.

           In this regard, **Pinnacle** relied almost exclusively on a letter dated August 1, 2012 from Donald Bornhorst of Vice President of **Delta**'s Connection operation.  Cude Decl. Ex. A.  Bornhorst's letter states that "**Pinnacle** … has requested that **Delta** … disclose to it … **Delta's** average costs incurred for regional air transportation services provided to **Delta** by regional carriers operating as **Delta** Connection carriers under a capacity purchase agreement with **Delta**."  *Id.* at 1.  In particular, Bornhorst stated that **Delta**:

> compared the estimated 2012 base rate amounts payable by **Delta** under its agreements with **Pinnacle** for both 50-seat jet aircraft and 76-seat jet aircraft with the average estimated base rate amounts payable by **Delta** in 2012 under **Delta** Connection Agreements with all other operators of similar gauge aircraft (the "DC Average").  Applying the methodology described below, and using **Pinnacle's** forecasted 2012 utilization levels, **Delta** has determined that the estimated base rate amounts payable by **Delta** to **Pinnacle** for 50-seat lift in 2012 will be REDACTED

*Id.* at 2.  No mention was made of any bids that had been received from other regional carriers.

           **Delta** indicated that in computing the "DC Average" it excluded **Pinnacle**, Mesaba and its Comair subsidiary from the computation.  It also noted that it had *excluded margin payments* from the calculation of "base rates" because those reflected whether the contractor assumed aircraft ownership costs or not.  Thus, the comparison did not reflect the total price **Delta** paid for such lift.  Bornhorst asserted that **Pinnacle** was paid margins "equal to or greater than the average margin amount per aircraft payable by **Delta** to other **Delta** Connection

- 22 -

carriers with respect to dual class aircraft placed by **Delta** during the past three (3) years where the carrier did not assume the ownership risk for the aircraft."

Bornhorst noted that **Delta's** computation was for *2012 only* and that these comparators were subject to change "due to rate adjustments, rate resets and preferred customer provisions contemplated under the applicable **Delta** Connection Agreements." Finally, **Delta** stated that "the information contained in this letter is the entirety of the information about the costs of lift under **Delta** Connection Agreements other than **Pinnacle's** that **Delta** is comfortable providing to **Pinnacle** and/or the other parties to the Stipulated Protective Orders."

**ALPA** requested in negotiations that **Pinnacle** provide information to clarify or assess the claims in the letter. In particular, **ALPA** asked for:

- Components making up the "base rate" for each carrier included in the analysis;

- An explanation of how future years' costs differ from the 2012 "base rates" for each carrier included in the analysis;

- Whether the analysis (which included **Delta** Connection carrier Skywest) was based on the terms of the **Delta**-Skywest agreement in effect as of August 1 or whether they reflected revisions to those agreements that were announced on August 2, 2012;

  REDACTED

- The specific bids referenced in Spanjers' statement to **Pinnacle** employees on June 22.

With respect to each such request **Pinnacle** advised that the information could not be obtained because it was confidential. Hallin Decl. Exh. G.

- 23 -

Together with its revised demands, **Pinnacle** presented analyses that it claimed validated **Delta's** claims with respect to 76-seat lift only. The company provided no pricing analysis, however. **Pinnacle's** consultant Seabury analyzed what it would cost per aircraft for just two of the seven **Delta** Connection carriers, Compass and GoJets, to provide 70-seat or 76-seat lift under their labor agreements, as opposed to what the costs would be under **Pinnacle's** agreements as they would be modified under the May contract demands. **Pinnacle** consultant Compass/Lexecon presented a similar analysis for 76-seat flying based on publicly filed Form 41 data.[6] While two-thirds of the increased ask are attributable to an asserted difference in 50-seat flying, **Pinnacle** presented no analysis concerning that issue. Eubanks Decl. ¶ 37.

Negotiations Since August 22

As **Pinnacle's** planned flying has continued to be reduced with the elimination of legacy Colgan's turboprop fleet, **Pinnacle** has posted a realignment notice (12-04) which, like 11-09, will result in significant training costs. On August 23 the Negotiating Committee reached a tentative agreement with management on relief related to 12-04 contingent on an agreement on the value to be assigned to that agreement as a credit against **Pinnacle's** economic demands. On August 28, 2012, the **MEC** ratified this tentative letter of agreement contingent on an agreement on the costing. Hallin Decl. ¶¶ 32-33.

ALPA and **Pinnacle** disagreed over how much **Pinnacle** would save from the training relief **ALPA** proposed in connection with 12-04. **ALPA** insisted that any relief it offered be credited against **Pinnacle's** demands for the first year of the agreement. **ALPA** had

---

[6] The Compass/Lexecon analysis focused on **Pinnacle's** 2011 unit pilot labor costs but made no adjustment for the out of the ordinary training experience **Pinnacle** had in 2011 due to the integration of the pilot groups and the reduction in flying. In addition, Compass/Lexecon made certain assumptions concerning the return of the Atlanta-based CRJ-900 fleet and how that would affect pilot longevity, assumptions that ignore the effect of the **Bloch Award** on assignments to the CRJ-900. *See* Eubanks Decl. ¶ 38.

- 24 -

also asked that **Pinnacle** credit the $6.2 million in training savings attributable to LOA 21 to the first year of the ask as **Pinnacle** credited reductions in management head count in 2011 towards its overall savings target. Notwithstanding **Pinnacle's** refusal to credit any of the LOA 21 savings, **ALPA** continued to offer training relief in connection with 12-04 if **Pinnacle** agreed to value that concession at $5 million. **Pinnacle** refused, offering only $3.5 million in credit. *Id.* ¶ 34.

Since **Pinnacle** returned to bargaining in late August, **ALPA** has made three comprehensive counter-proposals, on August 30, September 12 and (after **Pinnacle** filed this Motion) on October 1, 2012. *Id.* ¶ 35. **ALPA's** costing analysis demonstrates that **ALPA** has met the amount of annualized savings **Pinnacle** was seeking in its May 2012 proposal, *i.e.*, approximately $33,000,000. Eubanks Decl., Exh. A. As set forth above, **Pinnacle's** May proposal was made by **Pinnacle** in accordance with what its business plan and with what it represented to **ALPA** was what was needed in order for the airline to emerge from bankruptcy in a competitive position.

**ALPA** has proposed average annual pay rate savings in the amount of $6,050,500, recurrent schedule credits in the average annual amount of $2,862,908, reduced instructor costs in the average annual amount of $1,250,784, and block-based bid period changes in the average annual amount of $5,401,100. Declarations of Jeff Sorensen and Marcia Eubanks.

The costing analysis reflects that **ALPA's** most recent proposal generates savings in 2013 in the amount of approximately $25,537,353 plus additional one-time savings in the amount of $14,583,579, and additional unknown one-time savings for pilot attrition credit. **ALPA's** proposal would generate savings in 2014 in the amount of $28,301,604. Excluding the one-time savings that have or will be recouped by **Pinnacle**, the average annual savings during

- 25 -

the proposed two-year agreement would be $26,919,479. Inclusion of the one-time savings results as first-year savings results in average annualized savings under **ALPA's** proposal in the amount of more than $34,000,000. *Id.*

Notably, after the expiration of the two- year period during which **ALPA's** proposal would remain in effect, virtually all of the same concessions would continue to apply to the pilots until such time as **ALPA** and **Pinnacle** agreed to the terms and conditions of a new collective bargaining agreement. The few exceptions would be the one-time savings, the uniform allowance forfeiture of $498,927,which is only proposed for the first year, and the possibility of a proposed 3% pay rate increase one year after the amendable date if no new agreement has been reached prior to that time. In short, virtually all of the savings proposed by **ALPA** will be built into years subsequent to 2014 unless and until the parties agree to new terms and conditions. Eubanks. Decl. ¶ 19

**ALPA** continues to negotiate in good faith with the goal of reaching a consensual resolution. The parties have agreed to participate in mediation, and both sides have met and conferred with the mediator. Given continued negotiations, there may be further developments prior to the first day of hearing scheduled for October 16, 2012.

ALPA's Reasons for Rejecting the Company's Revised Demands

As noted above, recognizing that labor costs need to be reduced, **ALPA** has proposed economic concessions in its October 1 Proposal that equate to over $34,000,000 on a steady state annualized basis over the two years of the proposed agreement.

**ALPA** has refused to accede to the Company's regressive demands for two principal reasons: they have not been justified as necessary for **Pinnacle** to reorganize and they would cause substantial hardship to many pilots. *See* Wychor Decl. ¶¶ 17-33.

- 26 -

## ARGUMENT

### PINNACLE HAS NOT MET
### THE STRICT REQUIREMENTS OF SECTION 1113

Congress enacted Section 1113 after the Supreme Court decided in *NLRB v.

Bildisco & Bildisco,*[7] that a debtor could reject a collective bargaining agreement by showing no

more than that it burdened the estate and that the balance of the equities favored rejection.  The

permissive *Bildisco* standard allowed debtors to employ Chapter 11 opportunistically to breach

their obligations to their employees and created concern that employers were "using bankruptcy

law as an offensive weapon in labor relations." *Adventure Res., Inc. v. Holland,* 137 F.3d 786,

797-98 (4th Cir. 1998); *accord In re Roth Am., Inc.,* 975 F.2d 949, 956 (3d Cir. 1992); *see

generally Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.,* 791 F.2d 1074, 1089

(3d Cir. 1986).

Congress found that *Bildisco* created a "new and dangerous imbalance in the

collective bargaining process," 130 Cong. Rec. H1831 (daily ed. March 21, 1984), and enacted a

stricter set of requirements for rejection of collective bargaining agreements in Section 1113,

which requires that a debtor satisfy several onerous conditions before a bankruptcy court will

grant it leave to abandon its bargained-for obligations to its employees. *In re Ionosphere Clubs,

Inc.,* 922 F.2d 984, 989 (2d Cir. 1990).  The intent of Section 1113's safeguards was to restore

the balance of bargaining power in bankruptcy and to ensure that employers did not use Chapter

11 proceedings as a "judicial hammer to break the union." *In re Maxwell Newspapers, Inc.,* 981

F.2d 85, 89 (2d Cir. 1992).

Thus, to obtain an order authorizing it to reject a collective bargaining agreement

under Section 1113, a debtor must establish that its demands include only those modifications to

---

[7] 465 U.S. 513, 526 (1984).

the agreement that are "necessary to permit the reorganization of the debtor" and also ensure "all

creditors, the debtor and all of the affected parties are treated fairly and equitably" under its

proposed contractual modifications 11 U.S.C. §1113(b)(1)(A).  The debtor must also show that it

bargained "in good faith" over its proposal with the union, *id.* §1113(b)(2), and that the balance

of equities "clearly" favors rejection of the collective bargaining agreement, *id.* § 1113(c)(3).  In

addition, the debtor must have provided the relevant information that is necessary to evaluate the

debtor's proposal, 11 U.S.C. §1113(b)(1)(B), and record show that the union's rejection of the

debtor's proposal was "without good cause," 11 U.S.C. §1113(c)(2).  *See generally Truck*

*Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 88 (2d Cir. 1987).  The debtor bears the

burden of showing that every element of Section 1113 have been satisfied.  *See, e.g., In re*

*Northwest Airlines Corp.*, 346 B.R. 307, 320-21 (Bankr. S.D.N.Y. 2006); *In re Family Snacks,*

*Inc.*, 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001).

> A.    The Proposed Modifications Are
>        Not Necessary for **Pinnacle's** Reorganization

This Court has stated that proving that the proposed CBA modifications are

necessary for reorganization is the "most fundamental requirement" under Section 1113.

*Northwest Airlines*, 346 B.R. at 321.  To meet this standard, a debtor must show that to

reorganize successfully it needs as much relief from the collective bargaining agreement as it

seeks.  *See* 11 U.S.C. §1113(b)(1)(A), (c)(1).  While a debtor need not propose "absolutely

minimal" changes, it must prove that the changes that it seeks "are required for the debtor to

successfully reorganize and compete in the marketplace upon emergence from Chapter 11."

*Northwest Airlines*, 346 B.R. at 321; *see also Carey Transp., Inc.*, 816 F.2d at 88-90.

Particularly salient here, Section 1113 mandates that a "debtor may not overreach

under the guise of proposing necessary modifications."  *In re Mile Hi Metal Sys.*, 899 F.2d 887,

893 (10th Cir. 1990). Indeed, in its two most recent decisions concerning Section 1113

applications, this Court denied Section 1113 motions based on precisely the type of overreaching

reflected in **Pinnacle's** proposal in this case. In *In re Hostess Brands, Inc.*, Case No. 12-22052

(Bankr. S.D.N.Y.) (May 12, 2012) (attached to this Objection as Exhibit A), the debtor claimed

that its proposal was necessary because the requested concessions would enable Hostess to

achieve an EBITDA margin of approximately 10%, which Hostess claimed it needed to permit it

to attract capital and reorganize. Judge Drain denied the motion and found that Hostess sought

more than what was necessary. In doing so Judge Drain credited evidence presented by the

union that its counter-proposal would produce an EBITDA margin of about 9% and found that

"the one percent difference in margin has not [been] shown to me to be material for purposes of

Section 1113."

      Similarly, in *In re AMR Corp.*, 2012 WL 3422541 (Bankr. S.D.N.Y. Aug. 15,

2012), the court denied American Airlines' Section 1113 motion because of the failure of the

carrier to establish the necessity of the requested relief. There, Judge Lane concluded that

American's Section 1113 proposal overreached in seeking to eliminate restrictions in the pilots'

agreement regarding certain "codesharing," which allows one airline to expand the reach of its

operations by putting its scheduling code on the flights of a partner airline. Judge Lane found

that "American has not shown by a preponderance of the evidence ... that essentially unlimited

codesharing is necessary to achieve a successful reorganization" because it had not proposed an

expansion of codesharing in its business plan and because "American's unlimited request for

codesharing is greater even than the comparative group that American urges is an appropriate

benchmark." 2012 WL 3422541, at *35.[8]  The court acknowledged the airline's need for

flexibility but concluded that "flexibility cannot be unlimited or it would render the necessity

requirement a nullity." *Id.* at *36.  *Hostess* and *AMR* confirm that a debtor cannot establish

necessity simply by showing that its demands would be helpful in some abstract way

unconnected to its own reorganization plans.

Here, **Pinnacle's** claim that its August proposal is necessary flatly contradicts

what it represented it needed in May.  As described above, on May 8, 2012, **Pinnacle's** "ask" in

labor savings was $43 million per year, with approximately $33 million to come from **ALPA**-

represented pilots.  **Pinnacle** Br. at 19; Glass Decl. ¶ 31.  Shortly after negotiations began,

**Pinnacle** took an eight-week hiatus and then returned with an 80% increase in its demands under

a business plan with the same basic premises as before.[9]

Since revenues through 2018 are constant in the new plan as compared to the old,

arithmetic dictates that **Pinnacle** will be more profitable if it achieves 80% more in cost savings

from **ALPA**.  But try as it might, **Pinnacle** cannot justify with reference to its business plan that

*anything material changed* that could justify its making new demands.  As shown below, neither

the revisions to the **Delta** scope clause nor **Delta**'s opaque claims with respect to prices its pays

for regional lift Nor **Pinnacle's** futile attempts to "validate" that analysis without access to the

underlying documents, can justify **Pinnacle's** new demands.

---

[8] The court subsequently granted the motion, but only after the Debtor modified its proposal
to remove unnecessary demands, or "defects" as the court called them. *In re AMR Corp.*, 2012
WL 3834798 (Bankr. S.D.N.Y., Sept. 5, 2012).

[9] REDACTED

1.    **Pinnacle** Does Not Need the Revised
      Demanded Savings From **ALPA** to Be Profitable

It is undisputed that **Pinnacle** does not require the Revised **ALPA** Ask to be

profitable.  In May 2012, **Pinnacle** represented to **ALPA**, other relevant constituencies, and this

Court that "[t]he Amended DCAs have the potential to be profitable for the Debtors provided the

Debtors can achieve certain targeted cost reductions."  DIP Motion ¶ 67.  **Pinnacle's** CEO

further reassured the Court that it had worked with **Delta** to analyze the extent of labor cost

savings that would be required to be competitive in the market and that they were "based on the

negotiation that we had with **Delta** and what was outlined earlier relative to the company doing a

significant amount of analysis relative to our contracts and what market contracts are relative to

compete in the regional business…. We're aware of the concession level we are seeking relative

to the marketplace."  DIP Hearing Tr. at 137-38.  This was the basis of the May Labor Ask of

$42.6 million, which **Pinnacle** concedes was based on "calculating the amount of savings needed

to achieve REDACTED

The targeted profitability, according to **Pinnacle's** advisors, "required to generate

minimal cash flows to attract third-party investment needed for emergence from Chapter 11,

assuming that such a cost structure would enable it to successfully compete for additional

profitable business."  *Id.*  **Delta** was, of course, aware of this analysis, as **Pinnacle's** May

Business Plan was devised based on **Pinnacle's** renegotiated agreements with **Delta** and in close

consultation with **Delta**.  DIP Motion ¶ 39.  As of May 2012, both **Pinnacle** and **Delta** believed

that **Pinnacle** could successfully reorganize with $33 million in savings from **Pinnacle'** pilots.

Notably, the operating margin under the May business plan would place **Pinnacle**

above the average in the regional airline industry.  REDACTED

- 31 -

REDACTED

**ALPA's** October 1 proposal exceeds the $32 million in annual concessions that **Pinnacle** initially proposed in May. Assuming for the sake of argument that the $32 million ask is necessary for Pinnacle's reorganization (something Pinnacle has not shown) based on **Pinnacle's** own representations, to **ALPA**, to other constituencies, and to the Court, **ALPA** has offered **Pinnacle** the relief that is necessary for **Pinnacle** to emerge from bankruptcy.

    2.    <u>The **Delta** Scope Agreement With **ALPA** Was No "Game-Changer"</u>

**Pinnacle** contends that subsequent to its May proposal circumstances changed because of an agreement that **Delta** reached with **ALPA** for a new tentative agreement. Under the agreement **Delta** can increase the number of 76-seat aircraft operated by its regional partners if it decreases the number of 50-seat aircraft they operate and if **Delta** introduces new mainline aircraft. **Pinnacle** claims that the agreement was a "game changer" because it was likely to cause a reduction in **Pinnacle's** 50-seat fleet. Spanjers Decl. ¶ 6. Of course, **Pinnacle** did not actually revise its business plan by reducing its 50-seat fleet or by increasing its 76-seat fleet. In addition, the "game changer" argument also fails as a justification for **Pinnacle's** new proposal because **Delta** was fully aware of what it was seeking in negotiations with its own pilots. As shown above, **Delta** had been reducing 50-seat flying for some time when it renegotiated the contracts with **Pinnacle** and it had publicly stated its desire to do so for years. Nonetheless, having reviewed the **Pinnacle** May Business Plan, **Delta** insisted that **Pinnacle** immediately assume the revised agreements. Dip Motion ¶ 39.

REDACTED

REDACTED

**Delta**'s desire to decrease 50-seat flying and increase 76-seat flying, and its May agreement with its pilots, could be logically related to the question of the appropriate fleet plan for **Pinnacle** or whether the underlying airline services agreements should be revised. However, since **Pinnacle** has not stated that the agreements with **Delta** should (or must) be renegotiated and since **Pinnacle** has not changed its fleet plan, **Delta**'s new pilot agreement provides no basis for **Pinnacle** to increase its ask between May and August – and to do so by 80 percent.

3.    The Alleged REDACTED
<u>Are Not Plausible</u>

**Pinnacle** also seeks to justify the 80% increase in its demand on an alleged pricing gap asserted by **Delta**. **Pinnacle** argues that this gap must be closed or **Pinnacle** will not

be competitive in the long-term.  First, it is simply incredible to assert that **Delta** would insist

that **Pinnacle** assume contracts under which it was over-paying for regional lift REDACTED

annually.  It is equally implausible that **Delta** and **Pinnacle** only discovered this pricing gap in

June, well after **Pinnacle** had petitioned for Chapter 11 protection, **Delta** and **Pinnacle** had

negotiated, agreed to, and obtained the Court's approval of the Restated ASAs, and **Pinnacle** had

formulated with **Delta**'s help a business plan and set of labor demands and begun negotiations

over them.

Second, **Pinnacle's** "validation" of the REDACTED                is based

on clearly flawed assumptions, and **Pinnacle** did not even attempt to analyze the REDACTED

– even though **Delta**'s plans for CRJ-200 flying were supposedly the "game

changer" that led **Pinnacle** to upset the apple cart, suspend negotiations, and come back to the

table with an increase in its demands.

As described above, **Pinnacle's** May Labor Ask and Business Plan were created

in close consultation with **Delta**.  The Restated ASAs were, as the court acknowledged,

negotiated under conditions where there was a clear imbalance of bargaining power in **Delta**'s

favor.  DIP Hearing Tr. at 179.  Under such circumstances it strains credulity to suggest that,

**Delta** would have agreed to enter into contracts requiring the payment of rates that are tens of

millions of dollars above what it needed to pay – and in that context provide additional debtor in

possession financing to boot.  If **Pinnacle** could not provide lift at reasonable prices, there is no

reason why **Delta** would not have wound down **Pinnacle's** operations (like its Comair

subsidiary) and reached an agreement to place the aircraft with lower cost providers.

According to Bornhorst's letter, after **Delta** entered into the revised agreements, it

undertook an analysis "to determine whether **Pinnacle** would be a candidate for future lift

awards from **Delta**."  Cude Decl. ¶ 6.  One would expect that such an analysis would have been

performed before, not after, **Delta** restructured its *current* lift agreements immediately prior to

the bankruptcy filing.

In any event, **Pinnacle** has no direct information about whether the rates it

charges **Delta** are in fact above-market, because **Delta** would not "disclose pricing information"

for other **Delta** Connection carriers.  In response to **ALPA's** requests for the relevant

information, **Pinnacle** simply said that **Delta** would not provide it because of confidentiality

concerns.

**Delta**'s analysis is also flawed because it omits from the analysis the difference in

margin payments it makes to regional carriers.  As Bornhorst's letter states, **Delta**'s comparison

is based on its calculation of the "base rates" **Delta** pays to **Delta** Connection Carriers.  **Delta**

excluded Margin Payments in the base-rate analysis, REDACTED

Instead of including margin costs in the "cost gap," **Delta** simply stated that "**Pinnacle's** margin

amounts per aircraft payable under its agreements with **Delta** are equal to or greater than the

average margin amount per aircraft payable to other **Delta** Connection carriers."  *Id.* REDACTED

- 35 -

Second, certain "pass-through costs" – operating costs that are borne by **Delta** under its agreements with the regional carriers – were included as a component of the base rates, but it appears that those pass-through costs are not treated as base-rate costs under all of the **Delta** Connection carriers.  REDACTED

The pricing gap claimed in Bornhorst's letter are thus based on dubious assumptions — that pass-through costs should be included and that margin payments should be ignored — and cannot, without further information and explanation, provide a basis for **Pinnacle's** stunning 80% increase in the labor concessions it demands.  Nor can **Pinnacle's** flawed "validation" of the cost gaps buttress the Bornhorst Letter so as to make it a proper basis for **Pinnacle's** sudden drastic increase in concessionary demands, particularly given the crude manner in which **Pinnacle** calculated its revised ask, by simply multiplying **Delta**'s asserted cost gaps by the number of planes in **Pinnacle's** fleet.

4.      **Pinnacle's** "Validation" of the REDACTED
Does Not – And Cannot –
Show that the Proposed Labor Concessions are Necessary

Virginia Hughes of Seabury Advisors LLC claims to have "validated" **Delta**'s asserted REDACTED                Hughes Decl. ¶ 23.  But Hughes then ignores the REDACTED                which amounts to REDACTED                For this

- 36 -

reason alone, **Pinnacle** has no basis for opining that it "would need to obtain additional savings of approximately $33.9 million above and beyond the savings initially requested on May 8, 2012, bringing the total annual required savings to approximately $76.5 million." Hughes Decl. ¶ 33.

With respect to the supposed REDACTED                    Hughes herself candidly admits that the information provided by **Delta** was "significantly limited." *Id.* Instead, **Pinnacle** simply analyzed what it believes it would cost just two of **Delta**'s other regional carriers, Compass Airlines ("Compass") and GoJet Airlines ("GoJet"), as compared to **Pinnacle's** costs under the May demands. Compass and GoJet are relatively new carriers whose pilots lack the longevity of the **Pinnacle** group. **Pinnacle** admits, however that there are three other regional airlines that provide 76-seat flying to **Delta** that "may have seniority distributions more similar to **Pinnacle's**." Hughes Decl. ¶ 31. Still, **Pinnacle** simply ignored these other regional carriers because **Pinnacle's** pilots "likely have a higher seniority due to **Pinnacle's** ISL and additional increases to overall seniority resulting from [a] significant reduction in flying." **Pinnacle** said in May that it had performed just such a benchmarking and that its original demands made it competitive. Now, when it looks to increase its demands by 80%, **Pinnacle** cherry picks the comparators to "validate" **Delta**'s assertions.

Similarly, the Compass/Lexecon analysis of comparable 76-seat costs is flawed. *See* Eubanks Decl. ¶¶ 38-39. Compass/Lexecon used pilot block hour costs for 2011 when **Pinnacle's** productivity was negatively affected by the extraordinary training demands related to the integration of the three pilot groups and the overall reduction in flying. The effect of this error is to overstate the difference Compass/Lexecon computed in pilot unit labor costs. Second, the seniority penalty of 3.1% of costs Compass/Lexecon assigned on amount of the return of the

- 37 -

Atlanta-based CRJ-900 fleet ignores the effect of the fences in the **Bloch Award** that protect

those pilots.  Rather, **ALPA's** October 1 proposal if accepted by **Pinnacle**, would place its unit

pilot labor costs below its competitors Shuttle America, Skywest and Express Jet.  Eubanks Decl.

¶¶ 20-21.

5.    **Pinnacle** Has Failed to Make Itself
Available for Negotiations with **ALPA**

Under Section 1113(b)(2), **Pinnacle** was required to "meet, at reasonable times,

with [**ALPA**] to confer in good faith in attempting to reach mutually satisfactory modifications

[.]"  As set forth above, **Pinnacle** initially presented **ALPA** with an ask of $33.1 million in

annual savings in May.  Then, based on the **Delta** tentative agreement of a month before,

**Pinnacle** unilaterally declared an 8-week hiatus in negotiations to revise its business plan, only

to come back with the same business plan but with a demand for concessions that was 80%

higher than the concessions it demanded in May.  **Pinnacle** nowhere explains why this delay was

necessary and, instead, points to the delay and a deteriorating cash position as a reason for

granting its outsized demands.  **Pinnacle's** failure to negotiate or even consult with **ALPA** while

it put together a regressive proposal violated its obligation to meet at reasonable times with

**ALPA**.

B.    <u>**Pinnacle** Has Not Conferred in Good Faith with **ALPA**</u>

Section 1113 requires that a debtor "confer in good faith in attempting to reach

mutually satisfactory modifications."  11 U.S.C. §1113(b)(2).  Regressive bargaining – moving

farther away from the other party than prior proposals – is a primary indicator that an employer

has failed to bargain in good faith.  *See NLRB v. Hardesty,* 308 F.3d 859, 866 (8th Cir. 2002)

(regressive bargaining and other conduct supported violation of NLRA); *Golden Eagle Spotting*

*Co. v. Brewery Drivers and Helpers, Local Union 133*, 93 F.3d 468, 471 (8th Cir. 1996)

- 38 -

("Golden Eagle refused to bargain in good faith by engaging in regressive bargaining"); *K-Mart Corp. v. NLRB*, 626 F.2d 704 (9th Cir. 1980) (bad faith established by regressive proposals, delay in making proposals, and refusal to supply requested information).

Here, **Pinnacle** began negotiating based on the May Labor Ask which it developed in consultation with **Delta** and represented would be sufficient for reorganization, and then almost doubled that ask based on nothing more than an apparent suggestion from **Delta** that **Pinnacle** should further reduce its labor costs. For a debtor to begin negotiations, then suspend them and increase its demand by 80% and do so on the basis of a suggestion from a third party and absent some material change in circumstances, is not good faith, and the Court should not place its imprimatur on such conduct.

C.    Pinnacle Failed to Provide Relevant Information

Congress required that a debtor provide a union with the information necessary to review its proposals. 11 U.S.C. 1113(b)(1)(b). In looking to check off this element of the statutory requirements, **Pinnacle** points to the numerical quantify of documents it placed in its virtual data room and made available to **ALPA**. But quantity does not carry the day. Rather, the question is whether **Pinnacle** provided the information **ALPA** needed to assess **Pinnacle's** demands. Thus, in *In re Mesaba Aviation, Inc.*, 341 B.R. 693, 715 (Bankr. D. Minn. 2006), the court explained that the purpose of this Section 1113 requirement is to "enable a union's representatives and members to subjectively attach some bedrock legitimacy to a debtor's proposal-to convince them that the process of formulating the proposal was not arbitrary, not 'loaded' toward a particular result, not manipulated to produce an unfair allocation of burdens among the constituencies to the bankruptcy case." Thus, the question of relevance is not determined "merely by its objective, empirical character alone." *Id.* at 714-15. The court denied

- 39 -

the debtor's Section 1113 motion because it had failed to provide the financial model it used to validate its concessionary demands. *Id.* at 717.

Here, while **Pinnacle** provided its financial model, it has not provided the most relevant information—the basis for **Delta**'s assertion that there is a cost-gap between **Pinnacle** and other DCI carriers. That, and that alone, is the basis for the 80% increase in **Pinnacle's** ask, and **ALPA** obviously needs to be able to "attach some bedrock legitimacy" to that dramatic increase. **Pinnacle** says it could not provide the back-up for **Delta**'s assertions (because **Delta** refused to give it the information), but it validated **Delta**'s assertions and provided **ALPA** with that analysis. But **Pinnacle** did not base its revised 'ask' on any analysis it performed, it based its "ask" on what **Delta** claimed, even though its analyses came up with different numbers altogether and even though it provided no analysis at all with respect to the alleged 50-seat aircraft gap which REDACTED                Under these circumstances the failure to provide information sufficient to assess **Delta**'s representations means that **Pinnacle** failed to provide the basis information **ALPA** needs to assess **Pinnacle's** proposals.

The declaration of Jason Cude, a **Delta** financial analyst, submitted by **Pinnacle** in support of the Motion, adds nothing in this regard because it includes none of the *underlying documentation* supporting **Delta**'s assertions. Instead, Cude simply states that Bornhorst's letter is accurate. Cude describes an analysis that **Delta** did of **Pinnacle's** costs compared to its competitors, which is purportedly based on "**Delta**'s commercial contracts with other **Delta** connection carriers," but neither have been submitted. Thus, neither **ALPA**, nor creditors, nor the Court can make any determination as to the veracity of Cude's statements, and accordingly his declaration should bear no weight. While Cude asserts that **Delta**'s agreements with other DCI carriers prohibit **Delta** from disclosing the analysis or the contracts that purportedly support

- 40 -

the Bornhorst Letter and Cude declaration, the consequences of that refusal are that the Cude

declaration is utterly unsubstantiated and should therefore be disregarded.

**Pinnacle** (and **Delta**) cannot have it both ways, arguing that the **JCBA** must be

rejected based on **Delta**'s analysis but then arguing that **Delta**'s analysis must be kept behind the

curtain. As in Oz, there often is nothing credible behind the curtain.

D.    **Pinnacle's** Demands Are Neither Fair Nor Equitable to the Pilot Group

A proposal that satisfies Section 1113(b)(1)(A) must "assure[ ] that all creditors,

the debtor and *all of the affected parties* are treated fairly and equitably." 11 U.S.C.

§1113(b)(1)(A) (emphasis added). The purpose of this provision is to "spread the burdens of

saving the company *to every constituency* while ensuring that all sacrifice to a similar degree."

*Century Brass*, 795 F.2d at 273 (emphasis added). Pinnacle must show that other interested

parties are shouldering a proportionate share of the burden of its restructuring. *See Carey*

*Transp.*, 816 F.2d at 90.

The failure to meet this requirement is fatal to a Section 1113 motion, regardless

of whether it meets all other standards. *See In re Lady H. Coal Co.,* 193 B.R. 233, 242 (Bankr.

S.D. W. Va. 1996) (denying Section 1113 motion because of inequities between officers'

compensation and treatment of employees, even in face of possible shut down of facility ); *In re*

*Jefley, Inc.*, 219 B.R. 88, 93-94 (Bankr. E.D. Pa. 1998) (continued receipt by debtor's principals

of high salaries prevented court from concluding that proposal was fair and equitable to union

employees); *In re Indiana Grocery Co.,* 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990) (denying

rejection motion because top management took no reduction in salaries and received bonuses

while at the same time sought to reject CBA); *see also In re Walway Co.*, 69 B.R. 967, 973 n.15

(Bankr. E.D. Mich. 1987) ("In most cases, a financially troubled company should consider

rejection of a labor contract a last resort to help the company survive. The history of the

- 41 -

collective bargaining agreement and its special treatment and protection lends support to this conclusion").

In short, the requirement for a debtor to show that its proposed modifications to a labor contract are both fair and equitable is not some insignificant rote and technical component of the statute. It is a critical element that **Pinnacle** must satisfy with actual evidence, and not with bald and unsubstantiated conclusory assertions of fairness. Congress has determined that fairness and equity must necessarily be considered before authorizing the rejection of a labor contract.

**Pinnacle's** August demands are neither fair nor equitable to the **Pinnacle** pilots. First, the concessions demanded come disproportionately from the pilot group. Pilot compensation is 58% of payroll, yet pilots are asked by management to take on 78% of the total concessions. *See* Eubanks Decl. ¶ 23. Indeed, the increase in the August demand is targeted exclusively on labor cuts, no part of the 80% increase comes from any other source. Eubanks Decl. ¶ 30. Management has yet to provide a benchmarking analysis of its own compensation and targeted no additional savings from itself after the supposed **Delta** "game-changer." *Id.* In addition, the airline operations are substantially reduced in size since the bankruptcy filing. Additional reductions in personnel and/or compensation in the wake of a narrowed scope of responsibilities would be both expected and appropriate. Moreover, while management refuses to credit **ALPA** with any part of the pre-bankruptcy savings admittedly realized from LOA 21, it credits the value of management head count reduction before the filing. This selective accounting cannot camouflage the fact that management's excessive demands[10] fall disproportionately on the **Pinnacle** pilots. This alone is reason to deny the motion.

---

[10] See Declaration of Kristopher M. Pierson, ¶¶ 7-13.

E.    <u>ALPA Had Good Cause to Reject **Pinnacle's** Proposal</u>

Section 1113 requires that the Court find that **ALPA's** rejection of **Pinnacle's** proposals must be without "good cause" in order to enter an order allowing **Pinnacle** to reject **JCBA**. Here, **ALPA** has made compromise proposals that will provide **Pinnacle** with the savings it demanded in the May **ALPA** ask and, as shown above, there is no showing that **Pinnacle** needs the additional concessions it demanded in August. "If the union seeks to negotiate compromises that meet its needs while preserving the debtor's required savings, it would be unlikely that its rejection of the proposal could be found to be lacking good cause. If, on the other hand, the union refuses to compromise, it is as unlikely it could be found to have acted with good cause." *Northwest Airlines Corp.*, 346 B.R. at 327. **Pinnacle** has, however, insisted on almost double those savings, based on scant information from **Delta** and a cursory "validation" of that information. Those regressive tactics are inconsistent with bargaining in good faith. **ALPA's** rejection of **Pinnacle's** proposal was therefore for good cause. This Court should deny the motion and permit the parties to negotiate a consensual resolution, which is in the interests of all constituencies. *See* Wychor Decl. ¶ 23.[11]

---

[11] For these reasons, the balance of the equities favor denial of the motion.

- 43 -

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated: New York, New York
October 4, 2012

Respectfully submitted,

/s/ Thomas N. Ciantra

By  _____
Richard M. Seltzer
Thomas N. Ciantra
Bruce S. Levine
Joshua J. Ellison
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
F: 212-695-5436

Attorneys for Air Line Pilots
   Association, International

- 44 -

# Exhibit A

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 12-22052(RDD)

4  - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  HOSTESS BRANDS, INC.

8

9          Debtors.

10  - - - - - - - - - - - - - - - - x

11

12                 U.S. Bankruptcy Court

13                 One Bowling Green

14                 New York, New York

15

16                 May 14, 2012

17                 3:07 PM

18

19  B E F O R E :

20  HON. ROBERT D. DRAIN

21  U.S. BANKRUPTCY JUDGE

22

23

24

25  ECRO:  Willie Rodriquez

Page 2

1    HEARING re:  Statement/Notice of Agenda Matters Scheduled

2    for Hearing on May 14, 2012

3

4    HEARING re: Motion of The Bakery, Confectionery, Tobacco

5    Workers and Grain Millers International Union to Dismiss

6    Case for Lack of Subject Matter Jurisdiction

7

8    HEARING re: Debtors' Motion and Debtors in Possession to (A)

9    Reject Certain Collective Bargaining Agreements and (B)

10    Modify Certain Retiree Benefit Obligations, Pursuant to

11    Sections 1113 (c) and 1114 (g) of the Bankruptcy Code.

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Sheila Orms

25

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KRAMER LEVIN NAFATALIS & FRANKEL, LLP

 4        Attorneys for the Creditors' Committee

 5        1177 Avenue of the Americans

 6        New York, NY  10038

 7

 8   BY:  JOSHUA K. BRODY, ESQ.

 9

10   PAUL, WEISS, RIFLIND, WHARTON & GARRISON, LLP

11        Attorneys for Silver Point Finance

12        1285 Avenue of the Americas

13        New York, NY  10019

14

15   BY:  BRIAN S. HERMANN, ESQ.

16        KELLIE CAIRNS, ESQ.

17        KYLE KIMPLER, ESQ. (TELEPHONICALLY)

18        NORMAN PENTELOVITCH, ESQ. (TELEPHONICALLY)

19        MICHAEL S. RUDNICK, ESQ. (TELEPHONICALLY)

20

21

22

23

24

25
```

Page 4

```
 1   BREDHOFF & KAISER, PLLC

 2        Attorneys for Bakery, Confectionery, Tobacco and

 3             Grain Millers Union

 4        805 Fifteenth Street, NW

 5        Washington, DC  20005

 6

 7   BY:  JEFFREY R. FREUND, ESQ.

 8        ZOE L. PALITZ, ESQ. (TELEPHONICALLY)

 9

10   PARAVATI, KARL, GREEN & DEBELLA, LLP

11        Attorneys for New York State Teamsters Conference

12             Pension and Retirement Fund and New York State

13             Teamsters Council Health & Hospital Fund

14        12 Steuben Park

15        Utica, NY  13501-2991

16

17   BY:  VINCENT M. DEBELLA, ESQ.

18

19   FEINBERG, CAMPBELL & ZACK, P.C.

20        Attorneys for New England Teamsters and

21             Trucking Industry Pension Fund

22        177 Milk Street

23        Boston, MA  02109

24

25   BY:  CATHERINE M. CAMPBELL, ESQ.
```

Page 5

```
 1   JONES DAY
 2        Attorneys for Debtors
 3        222 East 41st Street
 4        New York, NY  10017
 5
 6   BY:  ROBERT HAMILTON, ESQ.
 7        JESSICA KATIN, ESQ.
 8        HEATHER LENNOX, ESQ.
 9
10   SPIVAK LIPTON LLP
11        Attorneys for Bakery Drivers Local 550 and
12             Industry Pension Fund
13        1700 Broadway
14        New York, NY  10019
15
16   BY:  JAMES M. MURPHY, ESQ.
17
18   COHEN, WEISS & SIMON, LLP
19        Attorneys for Interstate Brands Corporation
20        First National Negotiating Committee
21        330 West 42nd Street
22        25th Floor
23        New York, NY  10036
24
25   BY:  RICHARD M. SELTZER, ESQ.
```

Page 6

1  OFFICE OF GENERAL COUNSEL

2        Attorney for Southeast and Southwest Areas

3        Health and Welfare and Pension Funds

4        9377 W. Higgins Road

5        Rosemont, IL  60018

6

7  BY:  BRAD R. BERLINER, ESQ.

8

9  OFFICE OF THE UNITED STATES TRUSTEE

10        Attorney for the U.S. Trustee

11        33 Whitehall Street

12        21st Floor

13        New York, NY  10004

14

15  BY:  PAUL SCHWARTZBERG, ESQ.

16

17  LOCKE, LORD, BISSELL & LIDDELL, LLP

18        Attorneys for Bloomer Chocolate Company

19        111 South Wacker Drive

20        Chicago, IL  60606

21

22  BY:  COURTNEY BARR, ESQ.

23

24

25

Page 7

1    BAILEY & EHRENBERG, ESQ.

2         Attorneys for International Brotherhood of Teamsters

3         1015 18th Street NW

4         Suite 204

5         Washington, DC 20036

6

7    BY:  JEFFREY B. COHEN, ESQ.

8

9    WHITE & CASE LLP

10        Attorneys for Frank L. Eaton

11        200 South Biscayne Boulevard

12        Suite 4900

13        Miami, FL  33131

14

15   BY:  FRANK L. EATON, ESQ.

16

17   FAULKER HOFFMAN & PHILLIPS, LLC

18        Attorneys for Teamsters Local 52 Pension Fund et al.

19        One International Place

20        20445 Emerald Parkway Drive

21        Suite 210

22        Cleveland, OH  44235

23

24   BY:  GEORGE FAULKNER, ESQ.

25

Page 8

1    DEBEVOISE & PLIMPTON LLP

2          Attorneys for Investors I, LLC et al.

3          919 Third Avenue

4          New York, NY  10022

5

6    BY:  STEVE R. GROSS, ESQ.

7

8    MORGAN LEWIS & BOCKIUS LLP

9          Attorneys for BBU, Inc.

10         1701 Market Street

11         Philadelphia, PA  19103

12

13   BY:  RACHEL MAUCERI, ESQ.

14

15   FULBRIGHT & JAWORSKI LLP

16         Attorneys for Bakery & Confectionery Union et al.

17         666 Fifth Avenue

18         New York, NY  10103

19

20   BY:  ANCELA NASTASKI, ESQ.

21

22

23

24

25

Page 9

1   KILPATRICK TOWNSEND & STOCKTON LLP

2        Attorneys for Flowers Foods, Inc. and Affiliates

3        1100 Peachtree Street

4        Atlanta, GA   30309

5

6   BY:  PAUL M. ROSENBLATT, ESQ.

7

8   WICK STREIFF MEYER O'BOYLE & SZELIGO

9        Attorneys for Western Pennsylvania Teamsters

10       And Employers Pension

11       1450 Two Chatham Center

12       Pittsburgh, PA   15219

13

14  BY:  VINCENT SZELIGO, ESQ.

15

16  APPEARING TELEPHONICALLY:

17

18  BRIAN J. CONROY, CREDIT VALUE PARTNERS

19  CHAIM FORTGANG, SILVER POINT CAPITAL

20  DREW HILL, UBS SECURITIES LLC

21  MICHAEL J. KELLY, MONARCH ALTERNATIVE CAPITAL LP

22  TIM LAVELLE, SIVER POINT CAPITAL

23  DAVID J. LIEBMAN, BIMBO BAKERIES USA

24  KYLE G. MAPES, TALAMOD ASSET MANAGEMENT LLC

25  JOHN RAPAPORT, CYRUS CAPITAL PARTNERS LP

Page 10

1   DAVID REGNANATO, SILVER POINT CAPITAL

2   LUIS RINALDINI, LUIS RIALDINI-GROTON PARTNERS

3   JOHN SEBREE, HOSTESS BRANDS, INC.

4   MATTHEW SPIEGELMAN, IN PRO PER

5   WINSTON & STRAWN, LLP, ZOLTON DONOVAN

6   KIMBERLY B. GIANIS, CONTRARIAN CAPITAL MANAGEMENT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          So it's the same scenario.  You're just looking at

2     a future contribution obligation that we have made the

3     determination, you know -- well, the idea behind the future

4     contribution obligation is it postpones insolvency.  And

5     it's a better scenario for the fund overall and for the

6     participants and beneficiaries of the fund.

7               THE COURT:  Okay.

8               MR. BERLINER:  Thank you.

9               THE COURT:  Anything else?

10              MR. HAMILTON:  We'll stand on our brief, Your

11    Honor.

12              THE COURT:  Okay.  All right.  I have before me a

13    motion by the debtors in this case to reject their

14    collective bargaining agreements with the IBT or the

15    Teamsters pursuant to Section 1113 of the Bankruptcy Code

16    and as well to reject the benefit plan obligations provided

17    for in the CBAs under Section 1114 of the Bankruptcy Code.

18    Pursuant to prior orders of the Court, the IBT was delegated

19    as the bargaining representative for both of those matters.

20              Section 1113 of the Bankruptcy Code governs a

21    debtor's rejection of collective bargaining agreements.  It

22    requires the bankruptcy court to approve the rejection only

23    if the Court makes the following three findings:  First, the

24    trustee or, in this case, the debtor-in-possession has prior

25    to the hearing made a proposal that fulfills the

Page 100

1    requirements of Subsection (b)(1) of Section 1113; two, the

2    authorized representative of the employees has refused to

3    accept such proposal without good cause; and three, the

4    balance of the equities clearly favors rejection of the CBA,

5    11 U.S.C., Section 113(c).

6            Because Section 113(c)(1) incorporates Subsection

7    (b)(1) by reference, the bankruptcy court must also look to

8    Subsection (b)(1), which provides as follows:

9            "Subsequent to filing a petition and prior to

10   filing an application seeking rejection of a collective

11   bargaining agreement, the debtor-in-possession or trustee --

12   hereinafter in this section, trustee shall include a debtor-

13   in-possession -- shall (A) make a proposal to the authorized

14   representative of the employees covered by such an agreement

15   based on the most complete and reliable information

16   available at the time of such proposal, which provides for

17   those necessary modifications in the employees' benefits and

18   protections that are necessary to permit the reorganization

19   of the debtor and assures that all creditors, the debtor and

20   all of the affected parties are treated fairly and

21   equitably; and (B) provides, subject to subsection (d)(3),

22   which is the confidentiality section, the representative of

23   the employees with such relevant information as is necessary

24   to evaluate the proposal."

25           Thus, as Collier notes, Section 113(c)

1    incorporates both procedural and substantive requirements.

2    See 7 Collier on Bankruptcy, paragraph 113 -- 1113, excuse

3    me, point 04.

4           The debtors and the IBT agreed upon the specific

5    proposal by the debtors that would be the proposal to be

6    evaluated by the Court in this context as well as the IBT's

7    responsive proposal.  They have both been provided to the

8    Court.  They are both changed from the initial post-petition

9    pre-1113 motion proposal by the debtor as well as the

10   initial responsive proposal by the Teamsters.

11          After a period as contemplated by the Court and

12   the code for bargaining off of the original post-petition

13   pre-motion proposal, this Court held a two-day evidentiary

14   hearing, as contemplated by Section 1113(c), on April 18th

15   and 19th.  The statutory period within which the Court is

16   supposed to rule on such a motion has not run.  There is

17   still a fair amount of time as far as these types of motions

18   are concerned for the parties to continue to negotiate.

19          In addition, the covenant in the debtors' DIP

20   agreement requiring a resolution of the 1113/1114 motion

21   acceptable to the DIP lenders also has not run, although its

22   expiree is at the end of this week.  Nevertheless, the

23   parties have informed the Court that all things considered,

24   they are either neutral about the Court's ruling today or

25   believe, in the debtors' case, that a ruling would assist

1    the parties in attempting to negotiate a resolution of their

2    disputes.

3           That is clearly the desired goal of Section 1113

4    of the Bankruptcy Code, as stated repeatedly by the Second

5    Circuit, most recently by Chief Judge Jacobs in his

6    concurring opinion in In re Northwest Airlines Corp, 483

7    F.3d 160 at page 179 through 180.  Section 113 sets in

8    motion an expedited form of collective bargaining with

9    several safeguards designed to ensure that employers do not

10   use Chapter 11 as medicine to rid themselves of corporate

11   indigestion, citing Century Brass Products, Inc. v. United

12   Auto, Aero and Agricultural Implement Workers of America,

13   795 F2d 265, 272, Second Circuit, 1986.

14          The process ensures that well informed and good

15   faith negotiations occur in the marketplace not as part of

16   the judicial process.  Reorganization procedures are

17   designed to encourage such a negotiated voluntary

18   modification.

19          "Knowing that it cannot turn down an employer's

20   proposal without good cause gives the union an incentive to

21   compromise on modifications of the collective bargaining

22   agreement so as to prevent its complete rejection.  Because

23   the employer has the burden of proving its proposals are

24   necessary, the union is protected from an employer whose

25   proposals may be offered in bad faith."  In re Maxwell

Page 103

1    Newspapers, Inc., 981 F2d 85, 90, Second Circuit, 1992.

2            Therefore, except with respect to the speed

3    involved, and Judge Jacobs describes it as essentially

4    collective bargaining on wheels at 179, the purpose of

5    Section 113, albeit in a Chapter 11 context with a focus on

6    the fact that Chapter 11 is indeed a serious and unique

7    context for dealing with an employer's financial problems,

8    it is designed to come as close as possible to the out of

9    bankruptcy collective bargaining process.

10           During the April 17th through 18th trial, I

11   considered the testimony of the following witnesses: Gregory

12   Rayburn, the debtors' CEO; Dr. John Johnson, an expert

13   witness retained by the debtor primarily to assess the

14   marketplace and/or competitive nature of the IBT's

15   compensation, both hard and soft; Jeffrey Parlato, the

16   employee of the debtors most responsible for negotiating

17   collective bargaining agreements, including with the IBT;

18   Mitchell Hofing, also an expert called in rebuttal in

19   respect of multi-employer pension plan issues; and Michael

20   Kramer, the debtors' investment banker at Perella Weinberg.

21           I also heard the testimony of Daniel Wrenn, a IBT

22   member and route sales representative with Hostess since

23   1983; Harry Wilson, the chairman and CEO of the Maeva Group,

24   M-A-V -- M-A-E-V-A, who can best be described as Mr.

25   Kramer's opposite number as the financial adviser for

Page 104

1    Chapter 11 purposes to the IBT; Michael Belzer, an economist

2    also called to opine as to the competitive nature of the

3    compensation, both hard and soft, for the IBT workers; Iain

4    Gold, somewhat of the opposite number to Mr. Parlato; and

5    Ken Hall, the general secretary-treasurer of the IBT and

6    ultimately responsible for the negotiations of the new

7    collective bargaining agreement and the present relationship

8    between the IBT and the debtors from the IBT's perspective.

9    I also considered as rebuttal witness Joshua Scherer,

10   another member of Perella Weinberg, the debtors' financial

11   adviser, with respect to the nature of the negotiations

12   primarily between the two sides.

13          I found all of the witness's testimony to be

14   credible, particularly so with respect to the fact witnesses

15   and Mr. Kramer and Mr. Wilson.  The debtors' expert, Mr.

16   Johnson, and his opposite number, Mr. Belzer, at times

17   seemed to be talking at cross-purposes with each other,

18   sticking to their sources for their data.  But I did not

19   find either of them within the general skepticism that the

20   Court treats each side's expert to be out of line in their

21   testimony.

22          As far as the procedural aspects of Section 113

23   are concerned, I find that the debtor has complied with each

24   of the -- of such requirements of Section 113(b)(1) and (c).

25   The debtor made a proposal to the IBT accompanied by the

Page 105

1    kind of relevant and reliable information needed to evaluate

2    it.  And further, I believe it bargained in good faith with

3    the union.  See In re Century Brass, 795 F2d at 7 -- at 273,

4    Second Circuit, 1986.

5            Frankly, there was no complaint by the union as to

6    the completeness and reliability of the information provided

7    by the debtors.  And it appeared to me that the union and

8    not only Mr. Wilson but also Mr. Hall and Mr. Gold were at

9    least as well informed about the debtor as were the debtors'

10   representatives.

11           Obviously, the aspects of information pertaining

12   to the debtors' future, including the debtors' projections

13   and the implementation of its business plan, which

14   contemplates very substantial changes to the natures -- the

15   debtors' cost structure and the nature of its business

16   cannot be predicted with any certainty.  But I have reviewed

17   the debtors' business plan and the modification of it

18   initiated by Mr. Rayburn and dated April 4th, 2012, and I

19   believe that it is a good enough picture of not only the

20   debtor today but also as projected for purposes of the

21   information requirements of Section 113(b)(1).

22           It is clear from the case law, including based on

23   the quote I earlier gave from Maxwell Newspapers at Page 90,

24   that the debtor must bargain in good faith with the union as

25   part of the procedural elements of the statute.  See also In

Page 106

1    re Century Brass, 795 F2d at 273, and Truck Drivers Local

2    807 versus Carey Transportation, 816 F2d 82, 90, Second

3    Circuit, 1987.

4         It's not entirely clear where this requirement

5    appears in the statute, although the best place for it is

6    probably 1113(b)(2), although that is not specifically

7    incorporated in Section 1113(c)(1).  Nevertheless, it is a

8    clear element as established by the case law in this circuit

9    of the debtors' burden to show that it did in fact bargain

10   in good faith after it submitted its original proposal.

11        Certain of the IBT's witnesses, including Mr.

12   Wilson, have acknowledged that the debtor has bargained in

13   good faith.  Mr. Hall took some exception to that based upon

14   his experience in normal collective bargaining, i.e. not

15   bargaining on wheels, under Section 1113 of the Bankruptcy

16   Code.  In that regard, he expressed concern about the

17   debtors having made one proposal and changed the terms in a

18   subsequent proposal in a way that appeared to him to be re-

19   trading.

20        In addition, he was clearly frustrated by the fact

21   that the debtors submitted their penultimate proposal 25

22   minutes after the deadline set by the Court and did not

23   discuss it with him or his agents before it was released to

24   the press.  I believe he was also frustrated by the fact

25   that in the middle of this extremely time-compressed

Page 107

1   process, the debtors' CEO resigned and Mr. Rayburn was

2   appointed CEO in Mr. Driscoll's place.

3          However, for purposes of the good faith

4   requirement under Section 1113, I believe none of those

5   considerations would lead one to conclude that the debtor

6   has not negotiated in good faith.  Rather, I find that the

7   debtor has negotiated in good faith with the IBT.

8          As far as changing positions or putting on the

9   table proposals that had been taken off the table

10  previously, I conclude first that it is more common in an

11  1113 context for debtors-in-possession to move the pieces

12  around in a collective bargaining proposal to try to obtain

13  the result that is in monetary terms acceptable to the

14  debtor and in terms of specific emphasis still acceptable to

15  the union.  Secondly, I believe because of the midstream

16  change of CEO, some confusion as far as the specific terms

17  of the debtors' proposals is understandable, and I believe

18  that the alleged re-trading here falls into a relatively

19  minor part of the debtors' negotiating proposals.

20         Finally, it appears to me that Mr. Rayburn has

21  acted responsibly and effectively in stepping into the

22  breach left by Mr. Driscoll.  I have reviewed his April 4th

23  turnaround plan and believe that it is reasonable and an

24  improvement upon the debtors' February plan, and that he has

25  generally taken hold of the debtors' business, including

Page 108

1   effectively dealing with the prepetition salary/bonus

2   increase issue that had the potential for truly poisoning

3   the negotiations by causing, with the agreement of the

4   effective -- the affected officers of the company, the

5   reversal of that transaction.  So I conclude that the

6   debtors have satisfied the procedural elements of Section

7   1113(b) and (c).

8           In order to comply with the substantive

9   requirements of Section 1113(b)(1), the debtor, again, must

10  demonstrate that the modifications and benefits and

11  protections are necessary to permit the reorganization of

12  the debtor, and all creditors, the debtor and all affected

13  parties are treated fairly and reasonably.  The most

14  fundamental requirement for rejection of the collective

15  bargaining agreement is that the rejection must be

16  necessary.

17          This is obviously a change from the standard set

18  forth in Section 365 of the Bankruptcy Code.  The debtor

19  must show not only that the agreement is burdensome but that

20  the rejection is necessary to permit the reorganization of

21  the debtor.  See Carey Transport, 816 F.2nd at 90.

22          As developed in the Second Circuit, the court

23  specifically rejected the Third Circuit's narrower

24  construction of Section 1113 in Wheeling-Pittsburgh Steel

25  versus United Steelworkers, 791 F2d 1074, 1088 through 89,

Page 109

1    Third Circuit, 1986, where that court construed the term

2    necessary to encompass only those modifications essential to

3    the debtors' short-term survival or necessary to prevent

4    liquidation.  As stated by the Second Circuit in Carey

5    Transport, the Second Circuit reads the term to mean that

6    the proposal contained necessary but not absolutely minimal

7    changes that will enable the debtor to complete the

8    reorganization successfully.

9            As that court explained, the term necessary could

10   not be synonymous with essential or bare minimum because if

11   a debtor were constrained to propose only the minimal

12   changes to a collective bargaining agreement, it would have

13   no room to engage in the good faith negotiations required by

14   Section 113.  Rather, a debtor's proposed modifications are

15   considered necessary if they have a significant impact on

16   the debtor's operations and are required for the debtor to

17   reorganize successfully and compete in the marketplace upon

18   emergence from Chapter 11, 816 F2d at 89 through 90.  See

19   also Royal Composing Room, Inc. -- In re Royal Composing

20   Room, Inc., 848 F2d 345, 348, Second Circuit, 1988, and In

21   re Northwest Airlines Corporation, 346 B.R. 307, 321,

22   Bankruptcy S.D.N.Y 2006.

23           The focus is on, again, therefore necessary for a

24   successful reorganization to enable the debtor to compete in

25   the marketplace upon emergence from Chapter 11.  This does

Page 110

1    not mean, though, that the debtor is required to demonstrate

2    how each element of modification is necessary.  Rather, when

3    determining the necessity of the debtor's proposal it must

4    be viewed as a whole as achieving those elements that are

5    necessary to enable the debtor to reorganize effectively.

6    Royal Composing Room, 848 F2d at 348.

7            The debtor must also demonstrate that all

8    creditors, the debtor and all affected parties are treated

9    fairly and equitably under 1113(b)(1).  The purpose of this

10   requirement is to spread the burdens of saving the company

11   to every constituency while ensuring that all sacrifice to a

12   similar degree.  In re Century Brass, 795 F2d at 273, Carey

13   Transportation, 816 F2d at 90.  In other words, the debtor

14   must spread the hurt.  In re Horsehead Industries, Inc., 300

15   B.R. 573, 584, Bankruptcy S.D.N.Y. 2003.

16           It is clear, though, that under the standard the

17   various constituencies need not share an identical burden.

18   The key phrase as set forth by Century Brass and Carey

19   Transportation is, quote, to a similar degree.  Therefore,

20   the debtor has the burden to demonstrate why one particular

21   constituency must bear more than its proportionate share of

22   the financial burden.  In doing so, courts apply a flexible

23   approach in determining what constitutes fair and equitable

24   treatment.  See for example in re Indiana Grocery Company,

25   136 B.R. 182, 194, Bankruptcy SD Indiana, 1990, quote,

1   "Equity under Section 1113 means fairness under the

2   circumstances."

3          As noted by Judge Gropper in the Northwest

4   Airlines case, a debtor can meet the fair and equitable

5   requirement of Section 1113 by showing that its proposal

6   treats the union fairly when compared with the burden

7   imposed on other parties by the debtor's additional cost-

8   cutting measures and the Chapter 11 process generally.

9   Thus, for example, the Court needs to take into account the

10  rights and leverage in terms of both legal rights and rights

11  in the marketplace or leverage in the marketplace of the

12  other constituents in determining what is fair and equitable

13  for purposes of this subsection of the statute.

14          The statute in Section 1113(c)(3) also requires

15  the Court to balance the equities so that it finds or to

16  find that the equities clearly favor rejection of the

17  agreement.  It's recognized that this requirement codifies

18  the aspect or that aspect of NLRB v. Bildisco and Bildisco,

19  465 U.S. 513, 1984.  See In re Century Brass, 795 F2d at

20  273.

21          It also is a flexible standard applied on a case-

22  by-case basis, but the Second Circuit has directed courts to

23  look at the following factors to determine whether the

24  balance of the equities clearly favors rejection, in Carey

25  Transportation, 816 F2d at 93:

Page 112

1          "One, the likelihood and consequences of

2     liquidation if rejection is not permitted; two, the likely

3     reduction in the value of creditors' claims if the

4     bargaining agreement remains in force; three, the likelihood

5     and consequences of a strike if the bargaining agreement is

6     voided; four, the possibility and likely effect of any

7     employee claims for breach of contract if rejection is

8     approved; five, the cost-spreading abilities of the various

9     parties, taking into account the number of employees covered

10    by the bargaining agreement and how various employees' wages

11    and benefits compare to those of others in the industry; and

12    six, the good or bad faith of the parties in dealing with

13    the debtor's financial dilemma."

14          In short, in striking the balance, the Court must

15    consider the degree as well as any qualitative difference

16    between the hardships each party may face upon rejection of

17    the collective bargaining agreement, 7 Collier on

18    Bankruptcy, paragraph 1113.057.  Certain of those factors

19    would in light of subsequent decisions both by the lower

20    courts and by the Second Circuit in the Northwest Airlines

21    decision require a further gloss.  For example, in Northwest

22    Airlines, 483 F2d 160, the Second Circuit held that unless

23    offered by the debtor as part of the resolution of a -- the

24    consensual resolution of a Section 1113 motion or a court-

25    imposed resolution, the union would not have a rejection

Page 113

1    claim.

2            But I believe the factor still needs to be

3    considered as has been acknowledged by subsequent courts in

4    light of, again, sharing the cost.  That is, it is

5    appropriate for a debtor to consider offering such a claim,

6    even though it is not required to do so upon rejection.

7    Similarly, the issue of the likelihood of a strike may not

8    carry much weight if, as was the case in the Horsehead

9    decision that I cited earlier by former Chief Judge

10   Bernstein, the Court concludes that the debtor  would

11   liquidate either upon a strike or, importantly, if the

12   debtors' motion were not granted.

13           Nevertheless, it is a relatively flexible set of

14   factors, again, focusing primarily on the rights and

15   leverage both legal and business of the parties in the

16   context of the debtors' reorganization.  In large measure,

17   it focuses on treatment of non-union employees in comparison

18   to union employees as well as to the treatment of other

19   unions and the union specifically at issue in the motion,

20   although it also should consider other constituencies'

21   rights and leverage in the Chapter 11 context.

22           Finally, the Court must find that the authorized

23   representative of the employees has refused to accept such

24   proposal without good cause, 11 U.S.C., Section 1113(c)(2).

25   The Second Circuit has held that the purpose of the good

Page 114

1    cause requirement serves to prohibit any bad faith conduct

2    by an employer while at the same time protecting the

3    employer from a union's rejection of the proposal without

4    good cause, which is largely a tautology, 795 F2d and 273.

5            It is clear, though, that this requirement forces

6    the union to the negotiating table.  See In re Maxwell

7    Newspapers, 981 F2d at 90.  As stated by that court, this

8    requirement fosters the goals of good faith negotiations and

9    voluntary modification and induces the debtor to propose

10   only those modifications necessary to a successful

11   reorganization while protecting the debtor against the

12   union's refusal to accept the proposal without a good

13   reason.

14           Where the union rejects a proposal that is

15   necessary, fair and equitable, it must explain the reasons

16   for its opposition.  On the other hand, if the union makes

17   counterproposals that meet its needs while preserving the

18   savings required by the debtor, its rejection of the

19   debtor's proposal will be with good cause.  See In re

20   Horsehead Industries, 300 B.R. at 584, citing, among other

21   cases, In re Maxwell Newspapers, 981 F2d at 90, and Royal

22   Composing Room, 848 F2d at 349.

23           The debtors in their proposals have focused on

24   both quantifiable cost savings and largely unquantifiable

25   but nevertheless significant business risks that they

Page 115

1    believe must be curtailed or eliminated in order for the

2    debtors to successfully merge -- emerge from Chapter 11.

3    The business risks that I'm referring to have to do almost

4    entirely with the fact that under the collective bargaining

5    agreements the debtors participate in a number of multi-

6    employer pension plans set up under the Taft-Hartley Act,

7    and certain of those plans are in serious financial distress

8    or so-called red plans.

9           For example, the debtors have over 3,000 employees

10   currently employed by the IBT, I mean, represented by the

11   IBT in the Central States Pension Plan, which has a current

12   liability in respect of vested benefits far in excess of the

13   amount of plan assets so that its funded status is at

14   approximately 48-and-a-half percent.  The debtors also have

15   a substantial number of IBT represented employees in the New

16   England Teamsters and Trucking Industry Pension -- Multi-

17   Employer Pension Plan, which also has a substantial excess

18   of current liability versus plan assets such that its

19   funding status is at approximately 40 percent.

20          The fact that these plans are substantially

21   underfunded has been noted not only by the debtors but also

22   in the financial world generally.  The debtors had offered

23   -- have offered up, for example, as Exhibit D-71 an analysis

24   in the form of a special comment by Moody's on the fact that

25   growing multi-employer pension funding shortfall is an

Page 116

1    increasing credit concern.  It's dated from September 2009.

2    However, I believe that the trial record, including Mr.

3    Hofing's testimony, confirms that there's been little to no

4    improvement since then in terms of the risks involved.

5            They've also introduced testimony from May 27th,

6    2010 by Thomas C. Nyhan, executive director and general

7    counsel of the Central States Southeast and Southwest Areas

8    Pension Fund, in which he states that that fund faces an

9    unprecedented financial crisis.  If no action is taken, the

10   fund is projected to be insolvent in the next 10 to 15

11   years.

12           The debtors therefore originally proposed that the

13   collective bargaining agreements be amended so that they

14   would withdraw from the MEPPs and crystallize their

15   withdrawal liability, which would then be discharged upon

16   the confirmation of their Chapter 11 plan.  They have

17   revised that proposal in light of the union's strong

18   opposition to it and in essence have provided that in

19   addition to providing for specific savings for contributions

20   to ongoing pension obligations it will or the debtor will

21   attempt to re-enter two so-called green MEPPs that are

22   currently ones in which IBT employees of the debtors are

23   beneficiaries before January 1, 2003, subject to certain

24   conditions, including with respect to the health of -- the

25   financial health of those replacement MEPPs and the

1    migration of all new hires away from the MEPPs and into a

2    separate 401(k) plan.  The debtors' proposal also

3    contemplates having specific representation and control, in

4    effect, of the green MEPPs board of trustees, although the

5    debtors' witnesses recognized that those trustees would be

6    fiduciaries to the plan or to the fund and not to the

7    debtors.

8            It was clear from all of the parties -- all of the

9    witness's testimony that the MEP issue, that is, the future,

10   if at all, of the debtors' participation as an employer in

11   the MEPs was the primary sticking point and the primary

12   initial issue as well between the debtor and the union.  The

13   union was strongly opposed to the debtors' termination of

14   all of the participation in all of the MEPPs.  And yet, as

15   the parties progressed in their discussion, the union did

16   recognize, as testified to in particular by Mr. Wilson, that

17   the existence of the serious problems with certain of the

18   MEPPs, at least three of them being substantially in the

19   red, creates potentially insurmountable obstacles without

20   change to the debtors' emergence from Chapter 11.

21           This is because both the debtor and the union

22   agree that to emerge from Chapter 11 in a way that will

23   enable a successful reorganization, the debtor has to obtain

24   not only substantial and meaningful concessions from its

25   secured creditors but also in all likelihood a substantial

Page 118

1    new money investment from third parties.  And it is unlikely

2    that either of those things would occur with the risks posed

3    by the existing MEPP situation continuing without change.

4            Consequently, the union in its final proposal of

5    April 15th, 2012, proposed a changed relationship between

6    the debtor and the MEPPs.  First, it proposed a somewhat

7    reduced monetary concession with respect to the contribution

8    rate by the debtor to the pension obligations that it would

9    have to its employees.  Hostess contemplated a 22 percent

10   reduction with subsequent increases in contributions for

11   benefits up to 5 percent per year for the period of the

12   agreement, whereas the IBT proposed a 10 percent reduction

13   in the contribution rate with the company continuing to

14   contribute 10 percent less than the established rate in --

15   for the remainder of the agreement.

16           As importantly, the union proposed that the debtor

17   would exit the MEPPs but provide at the same time for its

18   re-entry into the MEPPs, including the troubled ones, under

19   the following terms.  Each MEPP would be required to adopt a

20   new employer pool or amend its existing new employer pool

21   consistent with the following: the PBGC would approve the

22   new employer amendments within six months of the date of the

23   agreement, and each MEPP would provide an agreement stating

24   that the debtors' discharge of withdrawal liability in

25   bankruptcy constitutes full satisfaction of that liability

Page 119

1    for purposes of entry into the new employer pool.  Further,

2    in the event that the debtor is included in a mass

3    withdrawal, that is, a withdrawal of either 100 percent or

4    roughly 85 percent by agreement or a forced withdrawal of

5    the employers in the funds, the MEP will allocate mass

6    withdrawal liability proportionate to each employer's

7    initial withdrawal liability, i.e. the withdrawal liability

8    through the new employer pool amount based on that unfunded

9    liability as opposed to the discharged unfunded liability.

10            In the event that any of the following withdrawal

11    events as defined below occur, however, Hostess shall be

12    deemed to have withdrawn from the effective MEP on the last

13    date of the plan year prior to the withdrawal event's

14    occurrence.  Those events include Hostess being subject to

15    an increase of 15 percent or more in the rate of its

16    required annual contribution to the MEP, the IRS assessing

17    an excise tax under 26 U.S.C., Section 4971 with respect to

18    the MEP.

19            If the MEP fails for two consecutive years to

20    satisfy its rehabilitation plan, the MEP becomes insolvent

21    within the meaning of Section 4245 of ERISA.  If for any two

22    consecutive years the allocable new employer pool of

23    unfunded vested benefits attributable to Hostess exceeds

24    three times Hostess's annual contributions to the MEP for

25    such years, UVBs from the MEP's old employer pool are

Page 120

1    allocated to the new employer pool.  If funding levels

2    calculated in the same manner as for the MEP's annual

3    funding notice fall below 80 percent in the new employer

4    pool or below 20 percent in the old employer pool where

5    there is a final non-appealable order of a court of

6    competent jurisdiction holding that a MEP's new employer

7    amendments are substantively illegal in a material respect

8    and such illegality cannot be corrected through reasonable

9    measures.

10           Under those circumstances, as I noted in the

11   union's proposal, Hostess shall be deemed to have withdrawn

12   and then shall go to a fallback MEP, which is specified in

13   paragraph three on page six of the union proposal, although

14   there is some uncertainty as to the triggers for that or the

15   nature of the fallback MEP.  And finally, if they fail -- if

16   no MEPs qualify as a fallback MEP and/or the PBGC does not

17   approve the amendments, the company will contribute the

18   appropriate contributions into a third-party escrow account,

19   and the parties will mutually agree on an acceptable

20   alternative.

21           The debtor offered significant testimony as well

22   as subsequent briefing to the effect that while it viewed

23   that the union had acted creatively and in good faith in

24   proposing the foregoing, it has not in so doing provided an

25   acceptable alternative to the debtors' proposal or to the

Page 121

1    simple termination of the MEPs and the creation of a new

2    single-employer pension plan or 401(k) plan for the existing

3    Teamster employees and new hires.

4           The debtors' concern is best put in the context of

5    Mr. Kramer's testimony, who noted that in addition to

6    changing its business plan and thereby substantially

7    reducing costs and projecting additional earnings based on

8    that business plan, all of which has a substantial execution

9    risk, the debtor also carries two additional substantial

10   execution risks for its emergence from bankruptcy.  First,

11   this is a Chapter 22 case.  The debtor has previously been

12   through a bankruptcy case and emerged, nevertheless, with

13   significant levels of debt and its underlying business

14   issues not having been materially improved upon.

15          And second, the debtor faces substantial

16   uncertainty in obtaining new financing based upon the risks

17   posed by the potential for increasing contributions to the

18   MEPs and in addition the potential for substantial

19   withdrawal liability from the MEPs in the future on a mass

20   withdrawal scenario.  The IBT as well as the Central States

21   Pension Fund has tried to persuade the Court that this risk

22   is actually relatively minimal, but I believe it is

23   nevertheless substantial.

24          I will note that it is uncontroverted that UPS

25   Corporation paid approximately $6 billion in order to be

Page 122

1   relieved of its ongoing obligations to one of the MEPs, and

2   I believe it's perfectly appropriate to infer that it had

3   good reasons to do so based upon its assessment of the risks

4   of being a continuing participant in the MEPs.  I will note

5   also that the proposals by prospective exit investors both

6   -- all contemplate both the reduction of MEP exposure and a

7   structure quite close to the debtors' final proposal.

8           I recognize that those proposals may be

9   potentially self-serving and that I could, to some extent,

10  play a game of chicken with the potential plan funders.  But

11  it appears to me based upon the testimony that I've heard as

12  well as the additional briefing that has been given to me at

13  my request on the legal risks posed by the IBT's proposed

14  MEP solution that there is both a substantial legal and

15  underlying economic risk of the debtors remaining in the IBT

16  collectively bargained for MEPs even under the new employer

17  pool proposed by the union.

18          It appears to me that while the debtor would have

19  arguments as to the timing of the other employers in those

20  funds ability to contest the proposal that the union is

21  proposing, there is a substantial risk that the debtors

22  providing for no withdrawal liability payments and relying

23  simply on its discharge would give rise to a right and a

24  potential objection that would be sustainable by the other

25  employers in the MEP, some of whom are the debtors' direct

Page 123

1   and primary competitors.  That the PBGC's approval of the

2   union-proposed structure is not or was not proper and that

3   instead, the withdrawal liability that would be discharged

4   by the debtor would be over allocated to the other employer

5   sponsors of the plan.

6           I agree with the debtor -- I'm sorry.  I agree

7   with the IBT that the likelihood of a total or partial

8   deemed withdrawal -- mass withdrawal from any of the MEPs is

9   relatively unlikely.  However, the consequences of there

10  being such a mass withdrawal are potentially drastic.  It is

11  not clear to me that they would be limited as far as the

12  other employers in the pool -- in the fund to the right to

13  get refunds from the fund as opposed to the imposition of

14  additional withdrawal liability above the new pool

15  withdrawal liability on the debtor.

16          It appears to me that that risk, although fairly

17  remote given the number of employers in the red plans, is

18  nevertheless the type of risk that would cause a reasonable

19  investor to question a long-term commitment to the debtor.

20  It is clear from the testimony of all of the IBT's witnesses

21  that it is that type of long-term commitment, one that

22  focuses on the need to focus the debtor on necessary capital

23  expenditures, advertising expenditures and R&D that is

24  necessary to enable this debtor to reorganize.

25          Consequently, I conclude that with one exception,

Page 124

1    the debtors' proposal or counterproposal of establishing two

2    substitute green MEPs to migrate the IBT employees is

3    necessary and in good faith for purposes of Section 1113 of

4    the code.  The one area that I have a grave concern about

5    with regard to that proposal is the notion in that proposal

6    that it would include only existing employees and not future

7    hires.  It appears to me that that would create substantial

8    risk going forward for the replacement MEPPs since it is

9    ongoing employees that help sustain the life of any pension

10   plan, and that continuing obligation I believe is critical

11   for the debtors' proposal to work.

12           I conclude that although the union has negotiated

13   in good faith and tried to be creative with respect to the

14   MEP issue, it has not accepted the debtors' proposal with

15   the one caveat, however, that I mentioned with good cause.

16   However, that caveat does mean that the union has turned

17   down the proposal with good cause.  Again, the caveat being

18   that the debtors proposed the substitute MEPPs to contain

19   only existing employees and not new hires.

20           The remaining areas of disagreement between the

21   debtors' final proposal and the union's final proposal fall

22   into two categories.  First are economic differences between

23   the proposals, both in terms of hard costs and soft costs.

24   The second are in my view procedurally focused aspects of

25   the agreements.  Let me deal with the procedural aspects

Page 125

1    first.

2            The union, as is to be expected, has a provision

3    of its proposal calling for a grievance procedure to ensure

4    that there has been equal sacrifice as among all of the

5    debtors' employees, not just IBT employees but other union

6    employees and non-union employees.  It refers to requiring

7    the, quote, same percentage reduction in total compensation

8    as is being applied to the IBT bargaining unit employees in

9    addition to the rescission or continued rescission of the

10   late 2011 management team bonus and salary transaction.  It

11   also provides that the company shall not increase wages,

12   including benefits, and benefits of current non-bargaining

13   unit employees, including management, as an overall

14   percentage beyond the effective overall total compensation

15   percentage increases to be received by the bargaining unit

16   employees.

17           As I noted, however, the fair and equitable and

18   balance of the equities elements of Section 1113 do not

19   require identical treatment nor even pro rata treatment

20   among the debtors' employees, union and non-union.  On

21   cross-examination -- actually, on questioning from the

22   Court, it was recognized that different types of employees

23   have different leverage.

24           To be more specific, Mr. Hall recognized that one

25   of the needs of this debtor is to get appropriately

Page 126

1    experienced management.  In his words, if he could get Jack

2    Welch he would certainly pay for Jack Welch or his

3    equivalent.  So it appears to me that although it would be

4    reasonable for a union to put some constraints tied to a

5    business plan or to market conditions on the treatment of

6    non-union employees and management, this aspect of the

7    union's proposal goes beyond what is reasonable and goes

8    beyond good cause.

9          The union's proposal also contemplates a specific

10   Chapter 11 plan structure and process to get to confirmation

11   of that plan as well as specific capital structure for the

12   reorganized debtor.  In addition, it contemplates not only

13   board representation by the union but also a veto by the

14   IBT-designated director with respect to certain transactions

15   going beyond the normal conduct of business.

16         It is quite reasonable for the union to want to

17   ensure that the debtor will have an appropriate

18   capitalization coming out of bankruptcy.  The union has in

19   my view astutely identified the debtors' operational and

20   business issues.  There was substantial agreement between

21   Mr. Kramer and the union's witnesses on this point, that the

22   debtor has gone for too long without necessary capital

23   expenditures for plant and its fleet of vehicles, that it

24   has gone for too long without an appropriate SG&A budget,

25   and that it has gone too long without appropriate R&D

Page 127

1   budget.

2           It appears to me, however, that not only

3   Mr. Kramer but also Mr. Rayburn and his turnaround plan of

4   April 4th take those concerns well into account.  Therefore,

5   it would appear to me to be excessive for the union to

6   require the -- as a condition of the collective bargaining

7   agreement's amendment that the debtor go beyond what is

8   reasonably necessary to execute that business plan and to

9   propose a feasible, that is feasible under Section 1129(a)

10  of the Bankruptcy Code, Chapter 11 plan.

11          I would not be saying this if I did not believe

12  that the April 4th plan is in substantial agreement with the

13  union in respect of what needs to be done as far as the

14  debtors' capital structure and cost structure.  So it

15  appears to me that the provisions that I have discussed as

16  well as the accountability provision, which deals with

17  milestones going forward, are under the circumstances -- and

18  it is important to note that it is only under the

19  circumstances and relying upon the business plan --

20  overreaching by the union.

21          On the other hand, it appears to me to be

22  reasonable and an exercise of good cause for the union to

23  insist upon provisions implementing modified CBAs and, if

24  achievable within a reasonable capital structure, a claim

25  for the concessions -- the monetary concessions made by the

Page 128

1    union, a prepetition claim, that is.  It also seems to me to

2    be reasonable that the union have representation on the

3    debtors' board and that there be general level of

4    information sharing so that the union can be reasonably

5    assured that the business plan is being carried out.

6            Let me turn finally to the monetary provisions of

7    the two proposals, the company's and the debtors'.

8    Mr. Seltzer on behalf of the union accurately noted that

9    unlike most Section 1113 motions, the debtors' Section 1113

10   motion did not put emphasis on a target dollar concession in

11   the aggregate that it believed the union needed to meet for

12   the debtors to successfully reorganize.  Instead,

13   Mr. Rayburn and Mr. Kramer focused on an EBIDTA margin that

14   would enable the debtors to compete with their major

15   competitors.

16           Initially, the debtors' view was that that margin

17   needed to be in the 11 percent range.  That was subsequently

18   reduced to the 10 percent range.  Interestingly, there was

19   no real costing of the individual elements of the proposal

20   that showed how that margin would be achieved in the

21   debtors' proposal or in how the union's proposal was short

22   of that margin.  On the other hand, and this was really the

23   only testimony as to the margin that would be achieved by

24   the IBT proposal, Mr. Wilson testified without being shaken

25   or even challenged on cross-examination that if the union's

Page 129

1    proposal were implemented across the board, that is, not

2    only for the IBT but similar changes were made for the other

3    debtors' unions, the debtors would have an approximate 9

4    percent margin in respect of EBIDTA.

5           The union proposal when compared to the debtors'

6    proposal on specific cost savings appears to the Court to be

7    consistent with that analysis.  In that regard, what I mean

8    is that the differences in terms of specific cost savings do

9    not appear to be dramatic between the debtors' last proposal

10   and the union's last proposal, although obviously, the

11   union's last proposal has fewer or less dramatic cost

12   reductions than the debtors.

13          In the absence of any evidence to the contrary, it

14   appears to me that Mr. Wilson's testimony should be accepted

15   and that the EBIDTA margin difference here when one

16   normalizes the union's -- the IBT's proposal across all the

17   debtors' unions and cost structure is that there is a one

18   percent margin difference between the debtor and the union.

19   I conclude based upon that analysis that in respect of the

20   specific financial concessions that the debtors have asked

21   of the union and the union has responded to the debtors on,

22   first, that the union has turned down the company's proposal

23   with regard to these concessions for good cause and

24   secondly, that the company's proposal is not necessary for a

25   reorganization, i.e. the one percent difference in margin

Page 130

1   has not shown to me to be material for purposes of Section

2   1113.

3            This means that both in respect of the pension

4   plan proposal, for the reason -- the sole reason that I've

5   identified, and in respect of the specific financial

6   concessions aspect of the proposal I need to deny the

7   company's motion.  I believe that if the company adopted the

8   union's economic proposals and proposed that it would in

9   fact assume the IBT's collective bargaining agreements and

10  provide that it would not subsequently reject them under

11  Section 1113 in this case.  And there was some mechanism

12  that the debtors' ultimate plan would be consistent in terms

13  of capital structure with the turnaround plan that Mr.

14  Rayburn testified to from April 4th and finally that the

15  debtors included new hires in their pension proposal that

16  the debtors' proposal would in fact at that point meet the

17  criteria of Section 1113.

18            Although, of course, each one of these

19  determinations is guided by the particular facts at the

20  particular time, so I would need to consider those facts.

21  And this is a fast-moving case, as evidenced by the

22  proposals provided by potential investors.

23            So as far as this motion is concerned and viewing

24  the motion as a whole, I will deny the motion for the

25  reasons that I have stated.  I would, however, be receptive

Page 131

1    to a motion that makes a proposal along the lines that I've

2    outlined.  And in particular, although I note that it would

3    be painful for the specific MEPPs that the debtors must

4    withdraw from, it is in my view necessary for the debtors to

5    withdraw from those MEPPs, albeit that they would continue

6    on the reduced funding level set forth in the union's

7    proposal to fund pension benefits in a new and green pension

8    plan.

9            I will note finally that there was quite credible

10   testimony that if the debtors attempted to impose a

11   collective bargaining agreement along the lines that I have

12   described, the union work force has authorized their

13   representatives to determine whether there should be a

14   strike or not.  I'll say two things in respect of that.

15           First, the obvious point that Judge Bernstein made

16   in Horsehead, it appears to me, consistent with my finding,

17   that it would be necessary for the debtors to exit the

18   troubled MEPPs; that the ultimate result of a strike

19   wouldn't be materially different from staying in those MEPPs

20   for the debtors.

21           Secondly and more importantly, in this case, the

22   IBT's level of knowledge about the debtor, realism and

23   sophistication was clear and commendable.  As I noted, it

24   appears to me that the union has as good idea -- an idea

25   about what is necessary for the debtors to reorganize,

Page 132

1   except for the MEPP issue, as the debtors do.

2           I will note that Mr. Wilson testified that the

3   issue of the MEPs should not cause a strike if dealt with in

4   a way that is fair and reasonable.  It appears to me that

5   the only way to deal with that issue is to follow a plan

6   along the lines that the debtors have proposed, the cost

7   savings for that plan being, however, the savings proposed

8   by the union.

9           What I believe truly jeopardizes the debtors'

10  reorganization here, the debtors' ability to raise the money

11  necessary to make the changes that both the union and the

12  debtors agree must be made will come from investors who I

13  believe correctly would not realistically take the risk

14  imposed by the union's May 15th structural proposal for

15  dealing with the MEPs.  That proposal creates too much

16  uncertainty for any entity willing to commit substantial

17  amounts of capital and reputation and work to turn this

18  company around.

19          So I'm going to ask Mr. Seltzer to submit an order

20  consistent with my ruling.  I know that one or two courts

21  outside of the Southern District have said that you all only

22  go through this once.  I completely disagree with that.

23  This is a very fact-specific inquiry based on the specific

24  timing of the proposals.  It's one of the reasons that

25  judges get frustrated because we know that much more is

Page 133

1   going on behind the scenes, and the proposal made before the

2   start of the hearing really isn't the last proposal.

3          So I'm perfectly prepared on short notice to

4   consider an amended proposal.  I hope that's not necessary.

5   I hope that the parties of interest here will reach

6   agreement.  And it's perfectly fine with me if they reach an

7   agreement that in certain ways differs from what I've said I

8   think will work here because they know this company better

9   than I do.  But on this record, those are my conclusions.

10         ALL:  Thank you, Your Honor.

11         THE COURT:  I also want to thank you all for

12  streamlining the trial.  It saved the debtor a lot of money.

13     (Whereupon the proceedings were concluded at 7:02 PM)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2   Witness              By              Page      Line

3   Jeffrey Parlato      by Hamilton     13        10

4                        by Freund       14        11

5

6

7                    E X H I B I T S

8   Debtor's:        Identification     Page      Line

9     1           Parlato's declaration  17       15

10

11                   R U L I N G S

12                                       Page      Line

13  Debtors' Motion and Debtors in       59        10

14  Possession to (A) Reject Certain

15  Collective Bargaining Agreements

16     Oakland and Seattle               69        10

17     All other CBAs                    77        14

18

19  Debtors' Motion and Debtors in       99        12

20  Possession to (B) Modify Certain

21  Retiree Benefit Obligations,

22  Pursuant to Sections 1113 (c) and

23  1114 (g) of the Bankruptcy Code

24

25
```

Page 135

1                    C E R T I F I C A T I O N

2

       I, Sheila G. Orms, certify that the foregoing is a correct

3      transcript from the official electronic sound recording of

4      the proceedings in the above-entitled matter.

5

6      Dated:  May 16, 2012

7

8

9       Signature of Approved Transcriber

10

11

       Veritext

12

       200 Old Country Road

13

       Suite 580

14

       Mineola, NY  11501

15

16

17

18

19

20

21

22

23

24

25