Hearing Date: October 16, 2012

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 607-7984
Marshall S. Huebner
Benjamin S. Kaminetzky
Damian S. Schaible
Paul S. Mishkin

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PINNACLE AIRLINES CORP.,** *et al.,* | Case No. 12-11343 (REG) |
| | (Jointly Administered) |
| **Debtors.** | |

**REPLY MEMORANDUM IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 4

ARGUMENT ................................................................................................................... 6

    I.  PINNACLE'S PROPOSAL IS NECESSARY TO ITS RESTRUCTURING ............ 6

       A.  Pinnacle's Current Contracts Provide Zero Assurance of Future Viability ............... 7

       B.  Pinnacle Must Eliminate the Price Gaps Identified by Delta .................................. 10

          1.  Factual Overview .................................................................................. 10

          2.  Plausibility of Price Gap ...................................................................... 12

          3.  Selection of Compass and GoJet "Comps" ......................................... 14

          4.  Inability to Corroborate ▮▮▮▮ Price Gap ........................................... 17

          5.  Other Criticisms of Delta Calculations ............................................... 17

          6.  Business Plan Based on Existing Contracts .......................................... 19

    II.  PINNACLE HAS SUPPLIED THE REQUIRED INFORMATION AND BARGAINED IN GOOD FAITH ................................................................................................... 20

    III.  PINNACLE'S PROPOSAL COMPLIES WITH SECTION 1113'S EQUITABLE FACTORS ................................................................................................................ 23

       A.  ALPA ......................................................................................................... 23

       B.  AFA ........................................................................................................... 24

CONCLUSION ............................................................................................................... 25

i

## TABLE OF AUTHORITIES

### CASES

PAGE

*In re AMR Corp.*, No. 11-15463 (SHL), 2012 Bankr. LEXIS 3756
(Bankr. S.D.N.Y. Aug. 15, 2012) ................................................................15, 24

*In re Century Brass Products, Inc.*, 55 B.R. 712 (D. Conn. 1985),
    *rev'd on other grounds*, 795 F.2d 265 (2d Cir. 1986)................................22

*Chicago Local No. 458-3M, Graphic Communications International Union, AFL-CIO v.*
    *N.L.R.B.*, 206 F.3d 22 (D.C. Cir. 2000) .........................................22-23

*In re Delta Air Lines, Inc.*, 342 B.R. 685 (Bankr. S.D.N.Y. 2006) ............................24

*In re Delta Air Lines, Inc.*, 359 B.R. 468 (Bankr. S.D.N.Y. 2006) ...............................7

*Hyatt Regency Memphis*, 296 N.L.R.B. 289 (1989), *overruled on other grounds*,
    *McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386 (1996) ........................22

*New York Typographical Union No. 6 v. Maxwell Newspapers, Inc.*
*(In re Maxwell Newspapers, Inc.)*, 981 F.2d 85 (2d Cir. 1992)......................22

*New York Typographical Union No. 6 v. Royal Composing Room, Inc.*
    *(In re Royal Composing Room, Inc.)*, 848 F.2d 345 (2d Cir. 1988),
    *cert. denied*, 489 U.S. 1078 (1989)..............................................7

*In re Northwest Airlines Corp.*, 346 B.R. 307 (Bankr. S.D.N.Y. 2006) ........................22

*Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2d Cir. 1987) ...................7

### STATUTES

11 U.S.C. § 1113...................................................................................20-21

Pinnacle Airlines Corp. ("**Pinnacle**" or the "**Company**") and its affiliated debtors (the "**Debtors**") respectfully submit this reply memorandum in further support of their Motion to Reject Collective Bargaining Agreements with the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**") pursuant to 11 U.S.C. § 1113.

## PRELIMINARY STATEMENT

The ALPA and AFA Objections suffer from numerous flaws, some specific to each, and others common to both, many of which fundamentally misconstrue or ignore the facts or law relevant to this motion.

First, neither ALPA nor AFA appears to appreciate the severity of Pinnacle's financial condition. As dire as Pinnacle's outlook was when it filed this motion on September 13, 2012, that outlook has only worsened:

- By mid-*November* 2012, Pinnacle's cash balance is still projected to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This could have devastating results. As previously explained to the Court, management's judgment is that▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- By the end of *December* 2012, Pinnacle's cash balance is now forecasted to be ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pinnacle's debtor in possession ("**DIP**") agreement with Delta Air Lines, Inc. ("**Delta**"), and its spare part credit agreement with CIT Bank ("**CIT**"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- By the end of *January* 2013, Pinnacle's cash balance is now forecasted to be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- Implementation of Pinnacle's collective bargaining agreement modifications by December 1, 2012 could ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

████████████  However, if the modifications are not in place until January 1, 2013, the ███████████████████████████

(Reply Declaration of Virginia L. Hughes, dated October 12, 2012 ("**Hughes Rep. Decl.**") ¶¶ 4-8.) The ██████████████████████████ for ███████████████ are largely related to a further "utilization" decrease by Delta in Pinnacle's flying – precisely the type of risk that Pinnacle has repeatedly cited as contributing to the Company's current vulnerability, but which has continually fallen on deaf ears in the negotiating room. ALPA pays lip service to Pinnacle's conceded need for "significant economic concessions" (ALPA Obj. at 5), but otherwise ignores the severity of the situation. Bizarrely, AFA denies there is any financial problem at all, claiming that past issues leading to Pinnacle's bankruptcy were one-time events now in the Company's past. (AFA Obj. at 7 ("The operating issues causing the one time losses in 2011 have been cured.").) This failure to appreciate the severity of Pinnacle's crisis – or, in the case of AFA, outright denial that it exists – permeates the unions' Objections.

Second. ALPA and AFA share a flawed view of Section 1113. As they see it, concessions sufficient to achieve minimal profitability under Pinnacle's *current* contracts are all that Section 1113 contemplates, even though those contracts are now known to be off-market. Pinnacle faces various short-term risks under its agreements (including lack of any minimum utilization requirement), and Pinnacle is unlikely to emerge from bankruptcy absent exit financing from a financier convinced of Pinnacle's long-term competitive prospects (a fact the unions do not dispute in their Objection papers). Given these short-term risks, and longer-term impossibility of obtaining new contracts on similar terms, the unions' asserted willingness to offer concessions sufficient to obtain minimal profitability under the existing agreements is legally irrelevant. (The claim is also factually false in the case of ALPA.) Section 1113 is

2

concerned with a debtor's prospects for *long-term* viability, not whether it can merely live to see another day based on current revenue. Pinnacle is trying to avoid the all-too-familiar pattern of airlines emerging from restructuring efforts with insufficiently reduced costs, only to have to restructure again when a stop-gap response to mounting financial pressure proved insufficient in a relentlessly competitive industry. (*See* Debtors' Mem. at 41.)

Third, ALPA and AFA dismiss out of hand the blunt and game-changing assessment that Pinnacle received from Delta in mid-June – i.e., that Delta had analyzed whether Pinnacle was cost competitive and determined that the answer was a resounding *no*, unless Pinnacle could reduce its costs by at least ██████ and ██████ per 76-seat and 50-seat aircraft, respectively. Without any analysis whatsoever undercutting Delta's assessment, ALPA and AFA simply accuse Delta of lying and suggest that the prudent approach would have been for Pinnacle to ignore Delta and seek to emerge from bankruptcy with rates that its DIP lender and only customer deemed to be uncompetitive. The unions make this argument even though Pinnacle's independent analysis shows that there are regional airlines whose costs are sufficiently lower than Pinnacle's such that they can profitably fly dual-class aircraft at rates approximately ██████ lower than Pinnacle's current rates – a conclusion that the unions do not seriously contest in their papers. For all their rhetoric and accusations of bad faith, ALPA and AFA never explain how, within a nearly commoditized industry, Pinnacle could hope to compete against regional carriers with substantially lower costs, or how Pinnacle could have prudently ignored Delta's assessment that it was not equipped to do so.

Fourth, the unions ignore or misstate the extent to which Pinnacle's labor costs are off-market. ALPA does not deny that Pinnacle's pilot compensation is substantially above market with respect to wages, work rules, and benefits, or that this discrepancy is severely exacerbated

3

by the seniority of Pinnacle's pilots. AFA insists that Pinnacle's flight attendants contribute no
cost disadvantage relative to the market, because the flight attendant collective bargaining
agreement is relatively standard when compared on a provision-by-provision or wage scale basis.
But this assertion fails to account for Pinnacle's seniority disadvantage. For example, even if
Pinnacle's most senior flight attendants are compensated at or below the market average,
Pinnacle faces a cost disadvantage due to the fact that its flight attendants are disproportionately
more senior, because compensation increases with seniority. AFA goes so far as to argue that
compensation parity on a wage scale basis *precludes* Section 1113 relief as a matter of law, even
though AFA does not and cannot cite any legal authority for that proposition.

   For all these reasons and the additional reasons discussed below, the ALPA and AFA
Objections should be overruled, and Pinnacle's motion should be granted.

## BACKGROUND

   The factual background relevant to this motion is set forth in the Debtors' opening
memorandum. (Debtors' Mem. at 6-34.) This section briefly supplements that background
based on developments over the last several weeks.[1]

   Since filing its Section 1113 motion on September 13, 2012, Pinnacle has continued to
negotiate with ALPA and AFA in good faith in an attempt to agree on required collective
bargaining agreement modifications. In addition to continued negotiations and information
sharing, Pinnacle agreed with both ALPA and AFA to use the services of the National Mediation
Board ("**NMB**") to facilitate discussions, specifically NMB Mediator Jim Mackenzie for ALPA,

---

[1] The ALPA and AFA Objections purport to discuss – with varying degrees of accuracy – numerous pre-filing events, many of which are irrelevant or of only marginal relevance to the present motion. By focusing on more recent events of greatest relevance to this motion, Debtors do not accept as true the unions' descriptions and characterizations of past events. For example, ALPA asserts that it agreed with Pinnacle pre-filing to certain concessions, including a 5% wage cut. (ALPA Obj. at 5; Hallin Decl. ¶ 13.) In fact, ALPA never made any such concession. (Glass Rep. Decl. ¶¶ 11-13.)

and NMB Director of Mediation Services Larry Gibbons for AFA. (Reply Declaration of Jerrold A. Glass, dated October 12, 2012 ("**Glass Rep. Decl.**") ¶ 3.) The parties participated in individual and joint sessions with the mediators during the weeks of October 1 and October 8, and have exchanged further counter-proposals since. (*Id.*) To date, no agreement has been reached with ALPA or AFA.

As the parties have continued to negotiate, Pinnacle's financial situation has gone from bleak to bleaker still. As shown in the September 13, 2012 declaration of Virginia Hughes, Pinnacle's *de facto* CFO, the Company at that time was projecting month-end cash balances of ███████ and ███████ for December 2012 and January 2013, respectively. Now, as a result of decreased utilization by Delta, Pinnacle is projecting that those figures will be ███ ███ and ███████, even if Pinnacle's requested collective bargaining modifications are implemented in full by ███████. (Hughes Rep. Decl. ¶ 6.) At these levels, Pinnacle would be in violation of its minimum cash covenants under its Delta DIP and CIT agreements ███ ███, which would give Delta and CIT severe remedies against Pinnacle sufficient to guarantee its liquidation if they so desired. (*Id.*) Pinnacle also continues to project a severe risk of dropping below its $20 million operational minimum cash cushion as ███████████, which means that an unexpected emergency at that time could shut down or restrict severely Pinnacle's operations. (*Id.* ¶ 7.) In short, Pinnacle needs substantial, immediate cost savings to survive.

ALPA concedes in passing that Pinnacle needs significant cost savings to survive (ALPA Obj. 5), but otherwise barely acknowledges Pinnacle's crisis. AFA and its expert, Dan Akins, outright deny that Pinnacle has any significant financial problems at all, arguing that its recent precipitous decline to the point of near liquidation is a temporary, anomalous setback resulting

from factors that have largely been corrected. (AFA Obj. at 4-7.) AFA's main purported
support for this contention is that 2011 presented specific and significant challenges relating to
integration of Pinnacle's subsidiaries, including high training costs and operational challenges.
(*Id.* at 5.) In making this argument, AFA overlooks the substantial continuing impact of these
issues (Hughes Rep. Decl. ¶ 8 n.3; Reply Declaration of Patrick Ryan, dated October 12, 2012
("**Ryan Rep. Decl.**") ¶¶ 13-15.), but more fundamentally, never confronts the undisputed facts
that Pinnacle's cash balance is perilously low, its current contracts are *money-losing*, and its sole
customer and DIP lender has said that Pinnacle is not cost competitive unless it can charge rates
substantially below the already money-losing rates under its existing contracts. (Debtors' Mem.
at 2.) Any one of these factors alone, and certainly all three in combination, preclude any
credible positive assessment of Pinnacle's financial condition.

## ARGUMENT

## I.    PINNACLE'S PROPOSAL IS NECESSARY TO ITS RESTRUCTURING

ALPA concedes and AFA does not dispute that necessity is the "most fundamental
requirement" of Section 1113, and that analysis of necessity properly focuses on the debtor's
ability to "compete in the marketplace upon emergence from Chapter 11." (ALPA Obj. at 28.)
As shown in Pinnacle's opening memorandum and accompanying declarations, Pinnacle needs
approximately $76 million in annual labor cost savings to achieve the rate levels identified by its
only customer, Delta, as required to be cost competitive. Moreover, Pinnacle faces substantial
challenges even in exiting from bankruptcy if it does not achieve those cost savings. (Debtors'
Mem. at 42-43.)

ALPA and AFA assert two basic arguments in response. First, they contend that
Pinnacle's existing contracts with Delta are sufficient to guarantee Pinnacle's viability, and that

any labor cost savings should thus be aimed solely at securing minimal profitability under those contracts. Second, the unions dismiss Delta's assessment of Pinnacle's competitiveness, suggesting that Pinnacle should have ignored the information it received from Delta in mid-June and attempted to emerge from bankruptcy with a cost structure that its exit lender and only customer viewed as uncompetitive. As discussed below, neither argument has merit.

### A.    Pinnacle's Current Contracts Provide *Zero* Assurance of Future Viability

To the extent that ALPA and AFA are arguing that "necessary" cuts are only those required to achieve minimal profitability under a debtor's *existing* contracts, regardless of the debtor's ability to secure new contracts in the future, that argument fails as a matter of law. *See Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 89 (2d Cir. 1987) (Section 1113 looks to debtor's "ultimate future"); *In re Delta Air Lines, Inc.*, 359 B.R. 468, 477 (Bankr. S.D.N.Y. 2006) (Section 1113 looks to debtor's "*long-term* economic viability") (emphasis added). The Section 1113 inquiry is inherently long-term, and the debtor's proposal "need not be limited to the bare bones relief that will keep it going." *New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 350 (2d Cir. 1988), *cert. denied*, 489 U.S. 1078 (1989). ALPA and AFA ignore this rule of law when they argue that Pinnacle should be content with labor savings allegedly matching its May 8, 2012 proposal, which was designed only to achieve minimal profitability under Pinnacle's existing Delta agreements, now known to be off-market. (*See* ALPA Obj. at 43; AFA Obj. at 31.)

As an initial factual matter, ALPA has *not* offered savings approaching the May 8 ask level. ALPA has made a counter-proposal that, among other shortcomings: (i) includes only a 2% initial pay cut; (ii) includes automatic 3% wage *increases* each year, beginning one year after the proposed agreement's amendable date if no new agreement has been reached before the

7

scheduled increase; (iii) provides a duration of only two years, after which all of the amended

contract terms would become amendable; (iv) is driven in large part by purported one-time

savings items, rather than recurring savings items needed to permanently decrease Pinnacle's

cost structure; and (v) includes savings amounts realized before any Section 1113 proposal was

made, and which were already part of the baseline cost structure upon which Pinnacle's

proposals were made. (Ryan Rep. Decl. ¶¶ 4 n.1, 8-11; Reply Declaration of Stephen Hunyor,

dated October 12, 2012 ("**Hunyor Rep. Decl.**") ¶ 5 & Ex. 1.)  Properly valued, ALPA's counter-

proposal would contribute  only approximately $23 million in annual savings, as compared to the

approximately $33 million per year Pinnacle requested from its pilots under the initial May ask,

and approximately $37 million under the revised August 2012 ask.  (Ryan Rep. Decl. at ¶ 4.)

      But more fundamentally, cost concessions aimed only at achieving minimal profitability

under Pinnacle's current agreements – even if actually offered – would be insufficient because

the current agreements provide no foundation for long-term viability.  Those agreements are

above-market, as discussed in Debtors' opening brief and further below, and thus more

significant cuts are needed to allow the company to achieve future business.  Moreover,

Pinnacle's immediate *short-term* viability is severely threatened without rates sufficient to secure

future business, for various reasons catalogued in the Debtors' opening papers and generally

unaddressed by the unions.  For example, neither ALPA nor AFA contests that:

- Pinnacle is unlikely to attract necessary financing to exit bankruptcy if it cannot achieve long-term competitive rates through Section 1113. (Debtors' Mem. at 42.)

- Delta must inevitably decrease Pinnacle's 50-seat flying within the next two years, based on Delta's publicly stated commitment to overall reduction of its 50-seat fleet (in the wake of its agreement with its pilots),[2] and given the large number of 50-seat

---

[2] Contrary to the unions' contentions, the agreement Delta reached with its pilots regarding reduction of 50-seat flying was most certainly a fundamental "game-changer," not because it affirmed Delta's desire to reduce 50-

8

aircraft flown by Pinnacle. Pinnacle cannot hope to replace such flying with 76-seat aircraft unless it achieves competitive rates. (*Id.* at 20-21, 38.)

- Pinnacle's existing agreements contain no minimum utilization requirement, so Delta could simply not fly aircraft as a means of reducing Pinnacle's flying, thereby eliminating large numbers of pilot and flight attendant jobs. (*Id.* at 26, 43.)[3]

- Pinnacle may imminently be facing a covenant breach under the Delta DIP agreement, which would require renewed negotiations with Delta, jeopardizing the terms of Pinnacle's current agreements. (*Id.* at 25, 42-43.)

- Delta enjoys change-of-control veto rights under its commercial agreements with Pinnacle, and thus could condition approval of any substantial investment in Pinnacle by a third party, or even distribution to creditors, on changes to the agreements, such as changes in rate, duration, numbers of aircraft to be operated, substitution rights, and payment terms. (*Id.* at 26-27.)

- Even if Pinnacle could somehow continue operating under its existing agreements through the end of 2017, the rates are subject to reset in 2018  (*Id.* at 26, 43.)

Failure to achieve rates needed to compete for future business is obviously a death sentence. To the extent ALPA and AFA are banking on a stay of execution because Pinnacle temporarily enjoys above-market contracts, the risk factors above show that any such stay will be brief or nonexistent.

---

seat aircraft, which had long been known, but because it provided a specific contractual arrangement for doing so at an extremely accelerated pace not previously anticipated. (Spanjers Rep. Decl. ¶¶ 3-5; Kasper Rep. Decl. ¶ 30.)

[3] ALPA contends that Delta has an economic incentive to keep Pinnacle's fleet of 50-seat aircraft flying and generating revenue under the current agreements, because it is obligated to pay certain fixed margin and aircraft lease payments regardless of utilization level. (ALPA Obj. at 33.) This argument overlooks not only various substantial costs incurred by Delta to keep flying Pinnacle's 50-seat aircraft but, more fundamentally, the implausibility that Delta would hesitate for a moment to incur what would at most be extremely modest expenses to ensure accomplishment of its business-critical 50-seat aircraft reduction goals. (Hughes Rep. Decl. ¶ 29.)

**B.**    **Pinnacle Must Eliminate the Price Gaps Identified by Delta**

**1.**    **Factual Overview**

The ALPA and AFA Objections contain pervasive insinuations and allegations of abuse and bad faith that distort beyond recognition what actually happened in mid-June. A return to reality is warranted.

Pinnacle received a blunt and alarming message from Delta, its only customer, on June 15: you are not cost-competitive for 50-seat or 76-seat flying unless you reduce your rates (which are already money-losing) by ▮▮▮▮ and ▮▮▮▮ per year per aircraft, respectively. (Reply Declaration of Jason Cude, dated October 12, 2012 ("**Cude Rep. Decl.**") ¶ 3.) This was not an orchestrated, collusive communication, as ALPA and AFA repeatedly allege without basis. This was an unexpected message about as unwelcome as any Pinnacle could have received. (Reply Declaration of John Spanjers, dated October 12, 2012 ("**Spanjers Rep. Decl.**") ¶ 7.) It meant that Pinnacle's May ask was no longer viable; that Pinnacle would have to go back to the drawing board to develop proposals sufficient to obtain substantially more savings; and that Pinnacle would now have to impose significant additional hardship on its employees to keep the Company in business. (*Id.*)

In the face of this information, Pinnacle sought to obtain every detail it possibly could regarding how the calculations were derived and the data upon which they were based. Pinnacle asked questions, requested backup documentation, sought the underlying contracts reflecting the rates against which Pinnacle's rates were being measured, probed the methodology used, and otherwise did everything it reasonably could to understand the basis for the price gap figures Delta had calculated. (*Id.* ¶ 8; Hughes Rep. Decl. ¶ 15.) Pinnacle was successful in obtaining various details about the parameters of the calculation and the approach Delta had taken.

(Hughes Rep. Decl. ¶¶ 16-18.) But it could not access the specific rate information upon which Delta had performed its analysis because such information is among the most commercially sensitive in the regional airline industry, and Delta's contractual obligations to DCI carriers flatly prohibited its disclosure. (Spanjers Rep. Decl. ¶ 11; Cude Decl., Ex. A.)

Unable to test Delta's calculations directly, Pinnacle sought to corroborate the calculations by examining, to the extent it could, the comparative cost structures of its competitors. This approach obviously had a fundamental limitation: a regional airline's *costs* are not the same thing as the *rates* it charges its mainline partner for regional flying. There are myriad reasons why a carrier's costs may serve as a poor predictor of the rates it is willing to charge, including varying strategies and varying financial positions allowing for different rate structures, margin payments, etc. (Reply Declaration of Mark Shapiro, dated October 12, 2012 ("**Shapiro Rep. Decl.**") ¶¶ 6-12.) But if Pinnacle could identify other regional carriers whose costs were lower than Pinnacle's by approximately the amount of the identified rate gaps, that would corroborate Delta's calculation by demonstrating that such competitors were capable of profitably charging rates lower than Pinnacle's by approximately the amount of the identified gap, and thereby setting the market at that level. Pinnacle successfully performed such corroboration for 76-seat aircraft using two separate methodologies. (Spanjers Rep. Decl. ¶¶ 10-12.)

Pinnacle had no choice but to redo its Section 1113 proposal to attain the cost cuts that its DIP lender and only customer said were necessary to achieve competitiveness, and which Pinnacle's independent analysis had corroborated. For all their allegations of bad faith, neither ALPA nor AFA attempts to explain how Pinnacle's management could have chosen any other alternative consistent with its fiduciary obligations and basic common sense.

11

The ALPA and AFA criticisms of Pinnacle's revised August 16, 2012 labor ask are all belied by that basic flaw alone, as well as the other reasons explained in the subsections that follow.

## 2.    Plausibility of Price Gap

Without any supporting analysis, ALPA and AFA simply dismiss the Delta-calculated price gaps as "implausible." (ALPA Obj. at 33-36; AFA Obj. at 39.) They argue that Delta must be lying to Pinnacle, the Court, and the unions about the price gaps it calculated in June, because otherwise: (i) Delta overpaid for Pinnacle's flying when it signed the amended agreements on April 1; (ii) Pinnacle asked for the wrong amount from its labor groups on May 8, despite its prior review of comparative labor costs; and (iii) the asserted price gaps are simply too large to be believed. These arguments are all unavailing.

First, Delta has explained that it approached the negotiations with Pinnacle in March 2012 entirely differently from how it would approach negotiations for new regional lift in the marketplace. It did not perform any analysis of whether the rates were at "market" levels, and never concluded that they were. Instead, Delta has explained that it looked at Pinnacle's business plan to determine whether it would be sufficient to service the Delta contracts. Under the circumstances, which included a desire on the part of Delta to ensure that Pinnacle would stay afloat for a period of time so as to avoid any sudden disruptions to Delta's network, Delta was comfortable with the rates set under the agreements. (Cude Rep. Decl. ¶ 2.)

Second, Pinnacle's initial assessment of required labor cuts was based on the limited information it had before June regarding the overall competitiveness of its cost structure. Pinnacle did indeed perform extensive labor benchmarking efforts before the initial May 8 ask to compare its collective bargaining agreements to the industry. (Hughes Rep. Decl. ¶¶ 9-10.)

12

However, this analysis was necessarily limited to a provision-by-provision comparison of its

collective bargaining agreements, including comparisons of Pinnacle's individual work rules,

pay scale, and benefits to those of its competitors. (*Id.* ¶ 10.) The initial goal of this work was to

"mark to market" all of these various provisions – i.e., to identify all of the changes necessary to

match industry average labor compensation terms and to determine how much cost savings such

changes would obtain. (*Id.*) But that exercise is insufficient to ensure cost competitiveness for at

least two key reasons: (i) seniority distribution differences across carriers – which are largely

unknown based on public information – can result in extremely substantial cost differences

between carriers even if they have similar labor compensation provisions; and (ii) lower-cost

providers may be setting the market, meaning that industry average collective bargaining terms

may be insufficient to compete. (*Id.* ¶¶ 10-11.) Because competitor rate information is not

publicly available, regional carriers will not generally know how precisely their rates compare to

those of their competitors, and must gauge their competitiveness based on their ability to actually

win business. That is exactly what Pinnacle did here. Specifically, it sought labor cuts in its

May 8 proposal sufficiently beyond the "mark-to-market" level so as to attain the cost structure

needed to support the rates offered by Delta, on the assumption that those rates were competitive.

When it later learned that those rates were off from the market average, Pinnacle had no choice

but to seek significant additional cuts. (Spanjers Rep. Decl. ¶ 13.)

Third, there is nothing inherently implausible in the magnitude of the price gaps

identified by Delta, particularly given Pinnacle's corroboration. ALPA and AFA argue that

Pinnacle should not be comparing itself to the lowest-cost providers in the industry (as discussed

below), but they do not contend that such a comparison shows anything other than what Pinnacle

and its advisors have concluded – i.e., that Pinnacle has a cost disadvantage compared to the

13

lowest-cost carriers of approximately ██████ or higher per year per 76-seat aircraft.[4]  If low-cost providers are that much cheaper than Pinnacle, it is more than "plausible" that Pinnacle's rates are off from the industry norm by that much, given that the regional airline industry is largely commoditized and relentlessly cost competitive.  (Reply Declaration of Daniel Kasper, dated October 12, 2012 ("**Kasper Rep. Decl.**") ¶¶ 25, 29.)  Critically, ALPA and AFA do not explain how Pinnacle could hope to compete against carriers that provide the same service it does at a significantly lower price.

### 3.    Selection of Compass and GoJet "Comps"

ALPA and AFA accuse Pinnacle of cherry-picking the comparator airlines (or "comps") used in the corroboration of the Delta calculation, by focusing specifically on low-cost providers Compass and GoJet.  The unions argue that this selection undermines the corroboration effort, because Delta's calculations are based on the average, rather than the lowest, rates charged by DCI carriers; Compass and GoJet do not have 50-seat aircraft; and SkyWest – a higher cost regional airline – has recently won 76-seat flying from Delta.  (ALPA Obj. at 36-38; AFA Obj. at 19-20.)  Once again, the unions' arguments are unavailing.

As an initial matter, the notion that Pinnacle "cherry-picked" the comps by selecting the lowest-cost providers (which, in any event, were the only competitors for which seniority distribution could be estimated) is undermined by the same basic point made above:  Pinnacle cannot compete with carriers that offer the same services for less.  (Kasper Rep. Decl. ¶ 27.)  Indeed, the industry's lowest-cost providers, Compass and GoJet, have been consistently

---

[4] ALPA and AFA have set forth certain minor criticisms of Pinnacle's calculation of this cost gap figure, which – as shown in the rebuttal declarations of Virginia Hughes and Dan Kasper – do not have any material impact on the calculation.  (Hughes Rep. Decl. ¶¶ 20-23; Kasper Rep. Decl. ¶ 35.)  ALPA and AFA submit no alternate calculation of the cost gap, nor do they offer any other reason to think that the calculations submitted by Pinnacle's advisors are materially wrong.

winning new business and are by far the fastest-growing regional carriers. (*Id.*) If Pinnacle cannot compete with them, it cannot survive. The simple logic of this point is consistent with Judge Lane's observation in the American Airlines bankruptcy, uncontested by ALPA and AFA, that the pattern in airline bankruptcies has been for the airline to "enter[] bankruptcy with labor costs that are at or near the top of the industry and then emerge[] with costs *at or near the low end of the group.*" *In re AMR Corp.*, No. 11-15463 (SHL), 2012 Bankr. LEXIS 3756, at *82 (Bankr. S.D.N.Y. Aug. 15, 2012) (emphasis added). There is nothing suspicious or improper about benchmarking costs against the industry's lowest-cost competitors. It is the logical, appropriate thing to do.

Regarding Delta's calculation of the *average* price gap, Pinnacle understood from Delta that ███████████████████████████████████████████████ (Hughes Rep. Decl. ¶¶ 16, 20.) Thus, an analysis focused on the lowest-cost providers, as Pinnacle performed here, is appropriately considered in connection with a corroboration of the average rate. (Hughes Rep. Decl. ¶ 20.)

Moreover, the fact that Compass and GoJet do not fly 50-seat aircraft does not undermine the validity of the comparison. Contrary to the unions' suggestions, Pinnacle does not enjoy a competitive advantage over Compass and GoJet based on its disproportionate share of increasingly obsolete 50-seat aircraft. The opposite is true: Pinnacle is highly vulnerable in the face of Delta's publicly stated commitment to reduce 50-seat aircraft. (*See supra* Section I.A.) Once Pinnacle's 50-seat aircraft are inevitably reduced or removed entirely, the only relevant

15

question will be whether Pinnacle can offer competitive rates for replacement flying, and that answer will be *no* if Compass, GoJet, or any other airline can offer the flying more cheaply.[5]

Finally, the recent award of 76-seat flying to SkyWest does not indicate that Pinnacle can achieve viability by matching SkyWest's cost structure. This award was not the result of a competitive bid process for new 76-seat flying that Delta plans to add to its network, but rather a "two for one" swap of existing 76-seat aircraft for 50-seat aircraft (i.e., SkyWest gave up approximately two 50-seat aircraft for each 76-seat aircraft it obtained).[6] The rates for that transaction are not publicly disclosed, but would not in any event indicate the market rate for the new 76-seat flying that Pinnacle is trying to position itself to obtain. (Hughes Rep. Decl. ¶ 19 n.5.) Delta extracted a benefit from the SkyWest transaction – i.e., elimination of a significant number of 50-seat aircraft in furtherance of its publicly stated reduction goal. (*Id.*) Pinnacle enjoys no such trading leverage based on its own 50-seat aircraft, given the various routes open to Delta to eliminate or significantly reduce Pinnacle's flying, without offering any concessions to Pinnacle.[7] Again, Pinnacle can only be competitive for replacement flying if it achieves competitive rates.[8]

---

[5] The fact that Compass and GoJet do not fly 50-seat aircraft did, however, facilitate the calculation, because it rendered the companies "pure" comps for dual-craft aircraft, obviating the need to attempt to separate out 50-seat aircraft costs. (Hughes Rep. Decl. ¶ 20 n.6.) Comparison to Compass and GoJet was also facilitated by the youth of these companies, which allowed Pinnacle to make reasonable assumptions about their seniority distribution, as required to meaningfully gauge the cost difference under the methodology employed. (Hughes Decl. ¶ 26.) This type of information did not exist for 50-seat carriers, precluding the same type of corroboration of the identified ████ price gap. (Hughes Rep. Decl. ¶ 22.)

[6] The 76-seat aircraft that SkyWest was awarded consisted of aircraft previously flown by Comair and Pinnacle's 16 76-seat aircraft that are due to come out of service in 2013. (Hughes Rep. Decl. ¶ 19 n.4.)

[7] More generally, Pinnacle cannot hope to compete in the industry by matching the cost structure of SkyWest. SkyWest is the largest, best-capitalized regional airline in the country, with numerous advantages over Pinnacle, including the ability to finance its own aircraft. Pinnacle cannot compete without labor costs significantly lower than those of SkyWest. (Hughes Rep. Decl. ¶ 19 n.5; Shapiro Rep. Decl. ¶¶ 6-12.)

[8] There is no merit to the suggestion that Pinnacle enjoys meaningful protection and leverage based on the aircraft "swap" provisions of Pinnacle's current agreements, which allow Delta to remove 50-seat aircraft from

4.    **Inability to Corroborate** ████ **Price Gap**

ALPA and AFA appear to argue that Pinnacle should have ignored the ████ price gap on 50-seat aircraft because it was not able to corroborate it directly, even though it corroborated the ████ price gap for 76-seat aircraft. As explained by the Company's advisors, it was not possible to obtain reliable comparative cost information for 50-seat aircraft. (Hughes Rep. Decl. ¶ 22; Kasper Rep. Decl. ¶ 16.) However, the existence of a significant cost gap related to 76-seat aircraft necessarily implies a significant cost gap related to 50-seat aircraft, since cost disadvantages related to wages, work rules, and benefits would impact both aircraft types. (Hughes Rep. Decl. ¶ 22.) Thus, the analysis of the ████ price gap for 76-seat aircraft is corroborative of a substantial price gap for 50-seat aircraft as well. (*Id.*)

5.    **Other Criticisms of Delta Calculations**

The unions advance other miscellaneous criticisms regarding the calculation methodology employed by Delta. For example, ALPA argues that a price gap measured in 2012 is not necessarily representative of price gaps in future years; that Delta has treated "pass-through" costs inconsistently in its calculations ████████████████████ undermines the calculation's reliability. (ALPA Obj. at 35-36.) These fail as well.

████████████████████████████████

---

Pinnacle's fleet provided it replaces such aircraft with 76-seat aircraft on a one-for-one basis. (ALPA Obj. at 32-33.) Delta's agreement with its pilots requires it to remove a significantly larger number of 50-seat aircraft than it is permitted to replace with 76-seat aircraft, and thus it is not interested in one-for-one swaps. (Debtors' Mem. at 8-10, 20.) Moreover, for any 76-seat aircraft that Delta is seeking to place, the going rate for such flying is significantly below what Pinnacle can currently offer. (Debtors' Mem. at 20-21.) Given that Delta has other options for reducing Pinnacle's 50-seat flying, as enumerated above, there is thus no conceivable reason why Delta would seek to utilize the one-for-one swap provisions in Pinnacle's agreements.

17



Second, there is nothing inconsistent about the way Delta's calculation treated "pass-through" costs.  The whole purpose of the comparison was to gauge the relative expense to Delta of regional services provided by Pinnacle and its competitors.

---

[9] AFA's Objection brief (and notably, *not* the declaration of its expert) asserts that seniority-related cost differences may diminish over time.  (AFA Obj. at 40.)  This contention is unsupported and, in any event, is refuted by Pinnacle's expert Dan Kasper.  (Kasper Rep. Decl. ¶ 24.)

[10] Indeed, Marcia Eubanks, ALPA's financial advisor, agrees that certain "regional carriers – unlike Pinnacle . . . assume aircraft ownership risks and . . . historically enjoy higher margins under their contracts with mainline carriers."  (Eubanks Decl. ¶ 25.)

6. **Business Plan Based on Existing Contracts**

ALPA and AFA criticize Pinnacle's business plan, specifically: (i) the profit levels resulting after implementation of the requested labor savings; and (ii) the assumed fleet plan and associated revenue, which are based on Pinnacle's existing flying agreements, notwithstanding the significant risks to those agreements and the likelihood of reduced 50-seat flying in the near-term. (ALPA Obj. at 31-33; AFA Obj. at 22, 38.)

Regarding profit levels, the unions misstate the extent to which those levels are outside industry norms, particularly for a company emerging from bankruptcy and looking to establish a platform for growth. (Kasper Rep. Decl. ¶ 32.) More fundamentally, the unions simply ignore that Pinnacle has agreed to a substantial profit-sharing program, which would be among the industry's most generous. (Glass Decl. ¶¶ 21, 103-04.) To whatever extent Pinnacle profits from the labor cuts it has requested, the proposed plan ensures that employees substantially enjoy those profits as well.

Regarding the fleet and revenue assumptions in Pinnacle's business plan, Pinnacle has simply used the data it has in front of it. It is not currently possible to build a revised business plan with meaningful specificity and certainty because Pinnacle does not know how its fleet composition may change in the coming years, or at what precise rates, and according to what terms, Pinnacle may be able to provide such flying. (Hughes Rep. Decl. ¶ 25.) What it does know is that, absent closing the identified price gaps, there is no future fleet composition, revenue potential, or any foreseeable contingency under which Pinnacle can hope to survive. (Debtors' Mem. at 2-3.)

19

To the extent the unions are suggesting that the absence of a revised business plan tends to overstate the amount of labor savings Pinnacle actually needs to restructure, they have the point precisely backwards. As shown by Ms. Hughes, any revised assumptions regarding expected reductions in 50-seat flying would only tend, if anything, to *increase* the amount of the required labor ask on a per-aircraft basis. (Hughes Rep. Decl. ¶ 25; Ex. 2.) The current business plan thus does not undermine Pinnacle's Section 1113 proposals in any way.

## II.   PINNACLE HAS SUPPLIED THE REQUIRED INFORMATION AND BARGAINED IN GOOD FAITH

ALPA and AFA advance a single argument regarding information sharing: Pinnacle never shared the rate information it could not obtain from Delta, and thus supposedly cannot prevail under Section 1113. (ALPA Obj. at 40-41; AFA Obj. at 18-19.) Under this view, it makes no difference that Pinnacle's only customer has told Pinnacle that it will never win any new business absent the cost savings sought; that Pinnacle requested the rate information from Delta, but Delta was precluded from providing the information; that Pinnacle has conducted all feasible independent analysis to corroborate the identified rate gap, and has found the gap for 76-seat aircraft explainable based on Pinnacle's cost disadvantage compared to its competitors; that Pinnacle likely cannot emerge from bankruptcy without the requested savings; or that the failure to obtain such savings subjects Pinnacle to myriad short-term risk factors. All of that may be true, but because Pinnacle's sole customer cannot disclose the information it used to reach its view that Pinnacle is ineligible for future flying without the requested cuts, Pinnacle supposedly has no option other than to liquidate.

This is not, and cannot be, the law. Section 1113 does not require the debtor to disclose "all" information relevant to its proposals, and it certainly contains no requirement to disclose information that a debtor does not possess. Instead, the debtor must supply the unions with

20

"such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(1)(B). For all of the reasons enumerated above and in the Debtors' opening papers, it is abundantly clear that Pinnacle will liquidate without the cost savings it requests – either because it will never emerge from bankruptcy, or because its fate upon emergence is dependent upon its ability to compete with low-cost providers, as to which Pinnacle currently suffers a substantial competitive disadvantage. There is no additional information that ALPA and AFA need to appreciate this harsh reality. Moreover, there is no concern regarding information asymmetry or unfair advantage as between Pinnacle and the unions. The unions know exactly what Pinnacle knows about the identified price gaps, and are thus equally equipped to see why Pinnacle plainly has no future viability without the requested cuts.

Regarding good faith bargaining, AFA does not assert any violation of this requirement. ALPA does, but only in the most half-hearted way. ALPA argues that Pinnacle "unilaterally" declared a halt to negotiations after the June 15, 2012 meeting with Delta, failed to meet with ALPA during the negotiations hiatus, and engaged in bad faith "regressive" bargaining by increasing the labor ask. (ALPA Obj. at 38.) These arguments are contrary to law and logic.

First, it could not conceivably have been bad faith for Pinnacle to halt negotiations after learning from Delta that its initial ask was untenable and needed to be entirely reformulated. To the contrary, it would arguably have been bad faith for Pinnacle to *continue* bargaining over a proposal that had been rendered obsolete.

Second, the length of the hiatus was justified by the efforts Pinnacle undertook to better understand Delta's calculations and perform its own corroboration analyses, the negotiations it had with Delta over the most favored nation ("**MFN**") clause, and the extensive work it did to

21

reformulate its labor proposals. (Spanjers Decl. ¶¶ 19-21, 30.)[11] Legally, however, all of that is irrelevant to Section 1113's good faith requirement, which is focused on the extent of bargaining in which a debtor engages *after* putting forth its proposal. Even relatively brief bargaining periods between issuance of a Section 1113 proposal and filing of a motion are routinely deemed sufficient to satisfy a debtor's obligation to bargain in good faith.[12] Here, the bargaining period was approximately one month from the time of the revised ask through the filing of the motion, and then another month before scheduled commencement of the hearing – during which time Pinnacle's representatives made themselves available to the unions on virtually a 24/7 basis to answer questions, supplied substantial additional information, held information sessions, exchanged counter-proposals, and engaged in mediation. (Debtors' Mem. at 4-5, 31-34; Glass Rep. Dec. ¶¶ 3-5.) These efforts over these time periods constitute vastly more than the minimum required under the law to demonstrate good faith bargaining.

Third, Pinnacle did not engage in "regressive" bargaining by increasing its labor ask when the initial proposal proved to be untenable. Bargaining is "regressive" when a party takes a position "so illogical or unreasonable" as to necessarily imply intentional frustration of the bargaining process in bad faith. *See, e.g., Hyatt Regency Memphis*, 296 N.L.R.B. 289, 314 (1989), *overruled on other grounds, McClatchy Newspapers, Inc.*, 321 N.L.R.B. 1386, 1392 (1996); *Chicago Local No. 458-3M, Graphic Commun. Int'l Union, AFL-CIO v. N.L.R.B.*, 206

---

[11] Pinnacle also met on at least 10 occasions with ALPA during the negotiations hiatus to discuss a variety of topics, including pilot work rules and other topics. (Ryan Decl. ¶ 8.)

[12] *See, e.g., In re Century Brass Prods., Inc.*, 55 B.R. 712, 716 (D. Conn. 1985) ("Section 1113 has no time restraint relative to when the debtor, following the submission of a proposal, may file its rejection application."), *rev'd on other grounds*, 795 F.2d 265 (2d Cir. 1986); *New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 981 F.2d 85, 91 (2d Cir. 1992) (holding that "ten hours is ample time to consider and respond to a proposal" because "parties to collective bargaining agreements routinely negotiate for many hours under imperative deadlines"); *In re Northwest Airlines Corp.*, 346 B.R. 307 (Bankr. S.D.N.Y. 2006) (good faith requirement satisfied where initial proposals were submitted September 26-28, followed by § 1113 filing on October 12).

22

F.3d 22, 33 (D.C. Cir. 2000). Where, as here, the changed bargaining position is logically

connected to new factual information, there has been no "regressive" bargaining or other

indication of bad faith.

### III.    PINNACLE'S PROPOSAL COMPLIES WITH SECTION 1113'S EQUITABLE FACTORS

#### A.    ALPA

ALPA argues that Pinnacle's proposal is unfair and inequitable because Pinnacle has

supposedly: (i) failed to benchmark management salaries against the industry; (ii) sought no

further non-labor savings after the suspension of negotiations; (iii) improperly "credit[ed] the

value of management head count reduction before the filing" as part of its savings calculations;

and (iv) requested an improperly disproportionate share of its needed savings from pilots.

(ALPA Obj. at 42.)

ALPA's first three assertions are factually false. Pinnacle *did* benchmark management

salaries against the industry and found them to be significantly below the industry average.

(Glass Rep. Decl. ¶¶ 15-16; Exs. 8-9.) Pinnacle *did* seek additional non-labor savings after

suspension of negotiations, but was unsuccessful in doing so, given that Pinnacle's controllable

costs are overwhelmingly attributable to labor, and given that Pinnacle had already searched

exhaustively for non-labor savings before its initial ask. (Notably, the unions do not identify any

significant non-labor savings that they believe Pinnacle could feasibly implement.) (Hughes

Rep. Decl. ¶ 26.) And Pinnacle *did not* improperly credit pre-filing headcount reductions in

apportioning or otherwise analyzing its requested savings. (*Id.* ¶ 28.)

ALPA's fourth argument is an unsupported subjective claim that 78% of the aggregate

labor ask is too much to assign to the pilots, given that their compensation is approximately 58%

of payroll. ALPA does not develop this argument, other than to simply compare these

23

percentages and declare the ask inequitable.  Conspicuously absent from ALPA's argument is

any response to (let alone refutation of) the fact that Pinnacle's pilot compensation is

substantially off-market, significantly more so than for any of Pinnacle's other work groups.  As

discussed in the Debtors' opening brief, this discrepancy justifies a disproportionately greater ask

from the pilots. (Debtors' Mem. at 48-49.) *See, e.g., AMR Corp.*, 2012 Bankr. LEXIS 3756, at

*49 ("The affected parties need not receive identical modifications, and the concessions asked of

the unions can reflect the differences in the individual unions' wage and benefit levels.").

**B.    AFA**

AFA argues at length that supposedly near-market flight attendant costs preclude any

Section 1113 savings from Pinnacle's flight attendants.  (AFA Obj. at 33-36.)  This argument is

premised on a faulty legal contention that is unsupported by any of the cases AFA cites or any

cases of which Debtors are aware.  (*See id.* at 33 (erroneously claiming that Section 1113

requires showing that compensation is "higher than relevant market comparison").)[13]  While it is

of course true that market discrepancies are routinely cited in connection with fair and equitable

apportionment of Section 1113 proposals, there is no rule of law that a work group *must* be off-

market before it is eligible for cost concessions under Section 1113.  And even if there were such

a rule, Pinnacle's flight attendant costs *are* greater than those of its competitors, due to

Pinnacle's seniority disadvantage. (*See, e.g.*, Hughes Repl. Decl. ¶ 23, Ex. 1.)

Ultimately, AFA's argument is simply the following:  flight attendants did not cause

Pinnacle's financial problems and will suffer significant hardship if forced to participate fully in

---

[13] There is also no merit to the argument that a union's guaranteed "own day in court," as described in *In re Delta*, means that Section 1113 savings is conditioned on a work group's compensation being below-market. The *Delta* court was evaluating whether a debtor could insist on certain concessions from one union, on the basis that those concessions were necessary to consummate conditional deals with other unions. *See In re Delta Air Lines, Inc.*, 342 B.R. 685, 696-97 (Bankr. S.D.N.Y. 2006). That issue has nothing to do with the permissibility of seeking concessions from a union whose compensation is closer to market than that of another work group.

their correction. (*See, e.g.*, AFA Obj. at 17, 24-26.) This argument misses the point. *None* of Pinnacle's employees are personally to blame for Pinnacle's predicament. The question is how, in light of its predicament, can Pinnacle emerge from bankruptcy as a healthy company poised for future success, and thereby avoid the worst possible outcome for all constituencies. As shown above and in Debtors' other supporting papers, the requested cuts are a painful, but necessary, means to achieve that goal.

## CONCLUSION

For all of these reasons, Pinnacle respectfully requests that the Court grant its Motion for an order authorizing it to reject its collective bargaining agreements with ALPA and AFA pursuant to Section 1113 of the Bankruptcy Code.

Dated: New York, New York
October 12, 2012

By: _____
Marshall S. Huebner
Benjamin S. Kaminetzky
Damian S. Schaible
Paul S. Mishkin

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 607-7984

*Counsel to the Debtors
and Debtors in Possession*

25