UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

**REPLY DECLARATION OF JOHN SPANJERS IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

John Spanjers declares and says:

1. I am the President and Chief Executive Officer of Pinnacle Airlines Corp. ("**Pinnacle**" or the "**Company**"). I previously submitted a declaration in this matter dated September 13, 2012 (the "**September 13 Declaration**").

2. This reply declaration responds to various arguments raised by the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**") relating to my September 13 Declaration, specifically with respect to the developments in May and June impacting Pinnacle's Section 1113 process, including the steps Pinnacle took to corroborate the price gap information communicated to it by Delta Air Lines, Inc. ("**Delta**").[1]

---

[1] This reply declaration addresses what I view to be the principal arguments of ALPA and AFA related to my initial declaration. It is not intended to cover exhaustively every point made by ALPA and AFA in their Objection papers with which I disagree.

1

I. **Industry "Game-Changer"**

3. ALPA and AFA argue that nothing happened in May or June of this year that warranted a hiatus in the negotiations or a reformulation of Pinnacle's initial labor ask. I could not disagree more strongly with that argument.

4. As I outlined in my September 13 Declaration, Delta announced in May 2012 that it had reached a tentative agreement with its pilots union that effectively mandated a rapid reduction in its 50-seat jet capacity. Specifically, the tentative agreement conditioned Delta's ability to expand its fleet of dual-class regional aircraft on the reduction of its 50-seat fleet from 343 to at most 125 aircraft, a 60% decline. Delta subsequently said that it intended to achieve the full reduction in 50-seat aircraft over a two- to three-year period.

5. From Pinnacle's perspective, this was critical, game-changing news. Pinnacle had certainly long been aware that Delta and other mainline carriers were looking to reduce their 50-seat aircraft over time. But now Pinnacle's only customer, for which Pinnacle predominantly supplies 50-seat flying, had contractually committed itself to a specific and extremely accelerated time table for reducing 50-seat flying. Based on the distribution of 50-seat aircraft among Delta Connection carriers, Delta's plan inevitably meant some – and perhaps significant – reduction of Pinnacle's 50-seat fleet, before the expiration of Pinnacle's commercial agreements.

II. **June 15 Meeting and Follow-Up Diligence**

6. As described in my September 13 Declaration, I attended a meeting with other Pinnacle representatives and Delta Connection representatives on June 15, 2012. At that meeting, Pinnacle received an extremely disappointing message from its DIP lender and only customer, Delta: Pinnacle would not be competitive for future 50-seat or 76-seat flying unless it could reduce its rates by at least ████████████ per year per aircraft, respectively.

2

7.      I was personally stunned by this news and considered it to be a huge setback in our restructuring efforts. It meant that Pinnacle's May ask was no longer viable; that Pinnacle would have to go back to the drawing board to develop proposals sufficient to obtain substantially more savings; and that Pinnacle would now have to impose significant additional hardship on its employees to keep the Company in business.

8.      In the face of this information, I directed my team of advisors – to be led by Virginia Hughes of Seabury – to obtain every detail they possibly could regarding how Delta's calculations were derived and the data upon which they were based.

9.      Over the course of several conversations with Delta representatives following the initial June 15 meeting, my team and I learned additional information about the cost gap calculations. We understood from Delta ███████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

10.     Based on the information we learned regarding the calculation, I discussed with my advisor team the most effective and appropriate way to attempt to corroborate Delta's calculations. Together with Ms. Hughes, we believed it was the most appropriate to compare Pinnacle's costs to those of Compass and GoJet. We selected these carriers because: (i) we were able to make reasonable assumptions about the seniority distributions of these carriers given their modest number of years of operation; (ii) we believed Compass and GoJet would be representative of the carriers contributing to the 76-seat average given that the overall rate spread was narrow; and (iii) Delta had specifically identified Compass and GoJet as among the lower-cost carriers against which Pinnacle needed to be equipped to compete. Separately, we directed

our outside advisor Compass Lexecon to evaluate independently the cost gap calculations as well.

11. Given that we could not obtain the backup rate information underlying Delta's calculations, we could not directly prove or replicate the calculations performed by Delta. However, based on the work of Seabury and Compass Lexecon, and given the information we had obtained ███████████████████████████████████████, I was satisfied that we had tested the price gap numbers both fairly and reasonably and that the testing provided corroboration of Delta's calculations.

12. With respect to the ███████ cost gap for 50-seat aircraft, we were not able to obtain any compelling data allowing us to corroborate that figure directly. However, any significant cost gap with respect to 76-seat aircraft would logically imply a substantial cost gap with respect to 50-seat aircraft, given that items such as wages, work rules, and benefits that account for all or substantial portions of the 76-seat aircraft cost gap also apply to 50-seat aircraft. Thus, we viewed the corroboration work we did for the 76-seat cost gap as highly supportive of the 50-seat cost gap as well.

### III. Revised August Ask

13. I viewed, and continue to view, the revised August labor proposal as an extremely unfortunate, but absolutely necessary step to the successful restructuring of Pinnacle. I was disappointed that we could not obtain the direct backup information from Delta that would have allowed us to replicate Delta's precise calculations. Ultimately, as the chief executive officer, the best interests of our stakeholders required that I weigh my own personal disappointment against the stark reality of what we were being told by our DIP lender and only customer, Delta – i.e., that Delta viewed Pinnacle as uncompetitive without the requested cuts. Under those circumstances, I did not believe that I could responsibly ignore the information I had received,

4

nor did I see any conceivably advisable step other than to seek the cost cuts needed to preserve Pinnacle's viability.

14.   As I have often repeated over the last few very difficult months for our Company, I believe that the painful sacrifices we have asked and continue to ask of Pinnacle's employees will permit our survival and allow the Company to emerge stronger than before and poised for the future.

I, John Spanjers, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee
Dated: October 12, 2012

                                                      John Spanjers
                                                      President and Chief Executive
                                                      Officer – Pinnacle Airlines Corp.