UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

**REPLY DECLARATION OF VIRGINIA L. HUGHES IN SUPPORT OF DEBTORS'
MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION
OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

Virginia L. Hughes declares and says:

1.  I am an Executive Director and Co-Head of the Airline Corporate Advisory Group of Seabury Advisors LLC ("**Seabury**"), and I have been serving as the *de facto* CFO of Pinnacle Airlines Corp. ("**Pinnacle**" or the "**Company**"). I previously submitted a declaration in this matter dated September 13, 2012 (the "**September 13 Declaration**").

2.  This reply declaration responds to various arguments raised by the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**") relating to my September 13 Declaration, specifically: (i) AFA's denials of Pinnacle's financial troubles; (ii) ALPA's and AFA's criticisms of the diligence I performed on the price gaps for Pinnacle's 76-seat and 50-seat flying identified by Delta Air Lines, Inc. ("**Delta**"); and (iii) certain other miscellaneous arguments related to Pinnacle's financial condition and other topics.[1]

---

[1] This reply declaration addresses what I view to be the principal arguments of ALPA and AFA related to my initial declaration. It is not intended to cover exhaustively every point made by ALPA and AFA in their Objection papers with which I disagree.

1

3. As I explain below, I find the ALPA and AFA arguments to be unpersuasive, and they do not materially change any of the information or opinions I presented in my September 13 Declaration.

## I. Pinnacle's Financial Crisis

4. AFA claims that Pinnacle's bankruptcy was "primarily attributable to a confluence of one-time events that have largely been remedied." (Akins Decl. ¶ 6.) I do not understand how AFA can genuinely hold this view. According to any measure of financial health, Pinnacle's financial troubles are far from "remedied." To the contrary, Pinnacle is in the midst of a severe liquidity crisis and stands at the brink of liquidation.

5. As I explained in my September 13 Declaration, Pinnacle loses money on its existing contracts, which has contributed to a mounting liquidity crisis. Recently, this crisis has been compounded by a decision by Delta to reduce further the utilization of Pinnacle aircraft, a right that Delta can exercise at will given the lack of any "minimum utilization" requirement under Pinnacle's service agreements. Reduced aircraft utilization results in reduced revenue for Pinnacle. And, although Pinnacle may be able to mitigate expenses over time, it cannot do so in the short-run, and the losses will further impact cash adversely. As a result of the recent utilization reduction, Pinnacle is now projecting even lower month-end cash balances than were projected at the time of my September 13 Declaration. The latest projections of Pinnacle's cash levels are illustrated in the following chart:

[chart redacted]

6.  The thick horizontal line in the above chart represents the $25 million cash minimum covenant contained in both Pinnacle's DIP agreement with Delta and loan agreement with CIT Bank. Under both agreements, an event of default occurs if Pinnacle's month-end cash balance drops below $25 million, resulting in certain acceleration, likely foreclosure, and other severe remedies available to Delta and CIT Bank that could force Pinnacle to liquidate if exercised. One month ago, Pinnacle had been projecting a year-end cash balance of $█████. As of the date of this reply declaration, Pinnacle's projected year-end cash level is █████ █████████████████████████████. For the end of January, Pinnacle's projected cash balance has ███████████████████████. If Pinnacle's labor proposals are implemented by ████████, it may be possible to avoid ██████ ████ covenant violations. Critically, however, if the modifications are not in place by ██████████████ covenant violation appears inevitable.[2]

7.  ████████████████████ in the chart represents the "mid-month" (or "intra-month") cash low point – i.e., the lowest cash level projected to be reached each month.

---

[2] The effective date for health care savings would be 90 days after implementation of the collective bargaining agreements changes.

3

As explained in my September 13 Declaration, and as previously presented to the Court,



8.      Given these projections, Pinnacle faces real likelihood of liquidation absent substantial and immediate labor cost savings. Based on this fact, and coupled with Pinnacle's current inability to compete for future flying, I conclude that Pinnacle is facing a severe financial crisis that is far from "remedied" as claimed by AFA.[3]

## II.    Labor Benchmarking Before Initial May Proposal

9.      ALPA and AFA argue that, because Pinnacle undertook labor benchmarking efforts before making its initial labor proposals in May, those proposals must reflect the correct amount of savings actually needed by Pinnacle for its restructuring. (ALPA Obj. at 31, AFA Obj. at 8.) This argument fails to appreciate the nature of the benchmarking exercise undertaken and the information limitations that existed at that time.

10.     Pinnacle's labor benchmarking before its initial May proposals consisted of a provision by provision comparison of its collective bargaining agreements to analogous provisions in the agreements of other carriers. Specifically, Pinnacle compared itself to other carriers with respect to wages, work rules, and benefits for various work groups, performing a "mark to market" analysis to determine the amount of savings that could be realized by taking out-of-market provisions and modifying them to be more standard with respect to the market as a

---

[3] In addition to ignoring Pinnacle's liquidity crisis and current inability to win future business, AFA's assessment of "remedied" cost issues overlooks the continuation of high training costs. (Ryan Rep. Decl. ¶¶ 13–15.)

4

whole. There were two key limitations to this exercise. First, a mark-to market effort of this kind does not account for seniority, which in the case of Pinnacle, tends to understate its labor cost disadvantage compared to the market because of the relatively high seniority of its work force. Consider, for example, an industry-standard "rate card" paying average amounts for employees at different levels of the pay scale. Even though the rate card is "at market," it will inevitably generate more costs for a carriers like Pinnacle that have disproportionately more senior employees at higher steps of the pay scale. Notably, comparative seniority information across carriers is generally not publicly available, and at the time Pinnacle was first performing mark-to-market labor analyses in connection with its restructuring, Pinnacle did not appreciate the full extent of its seniority disadvantage.

11.     Second, a mark-to-market exercise does not account for the fact that, particularly in a largely commoditized and intensely competitive industry, rates are set by low-cost providers, not providers with average costs. For this independent reason, achieving "industry-standard" labor provisions may not permit a regional airline to compete. Ultimately, however, a regional carrier's understanding of competitive rate levels is largely based on the rates it is offered in actual transactions, because rates charged by other carriers are closely guarded and commercially sensitive.

12.     Consistent with this information limitation, Pinnacle used the rates under its amended commercial agreements with Delta as a benchmark of competitiveness. To achieve profitability under those rates, Pinnacle was required to reduce its labor costs beyond the level obtained through the mark-to-market exercise. What it did not learn until later was that achieving truly competitive rate levels would require significantly greater cuts beyond the market-to-market level.

## III. Price Gaps Identified By Delta

13. ALPA and AFA fault Pinnacle for basing its revised August labor ask on the price gaps identified by Delta for 50-seat and 76-seat aircraft. The unions criticize both Pinnacle's diligence of the identified cost gaps and the methodology that Delta used in its calculations. For the reasons discussed below, I believe these criticisms are unfounded.

### A. Initial Diligence by Pinnacle

14. As described in my September 13 Declaration, I first learned of the ▓▓▓▓ price gaps associated with Pinnacle's 76-seat and 50-seat aircraft when I attended a meeting with other Pinnacle representatives and Delta Connection representatives on June 15, 2012. At that meeting, Delta informed Pinnacle that it was not cost competitive for future flying if it could not eliminate the identified cost gaps.

15. During and following the initial June 15 meeting, I had numerous conversations with Delta Connection representatives in which I sought to understand how Delta had performed the price gap calculations. I asked questions about the calculations, requested backup documentation, sought the underlying contracts reflecting the rates against which Pinnacle's rates were being measured, probed the methodology used, and otherwise did everything I reasonably could to understand the basis for the price gap figures Delta had calculated.

16. One area I focused on in my questions was the extent of the ▓▓▓▓ of the rates comprising the averages that Delta had calculated. While Delta could not provide any carrier-specific rate or agreement information, I understood ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17. Another area on which I focused was the extent to which the calculated cost gaps, which were based on 2012 data, might change in subsequent years. While again Delta could not

6

provide any carrier-specific rate or agreement information █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

19.　　In August 2012, Delta and SkyWest entered into a commercial transaction under which SkyWest agreed to reduce the number of 50-seat aircraft SkyWest operated for Delta.[4]  In exchange, SkyWest was awarded a contract for a smaller number of 76-seat aircraft previously flown by other Delta Connection carriers.  Subsequent to the announcement thereof, I inquired of Delta as to whether the rates for the 76-seat aircraft contract were included in the price gap calculations.  At that time, Delta said it was not able to answer my questions given confidentiality concerns, ████████████████████████████████████████████

████████████████████████████████████████[5]

██████████████████████████████████████████

### B.　Overview of Compass/GoJet Calculation

20.　　In addition to the diligence described above, I discussed with Pinnacle management how the Pinnacle/Seabury team could test the reasonableness of the price gap figures reported by Delta.  We decided that the best approach was to compare Pinnacle's cost

---

[4] The 76-seat aircraft that SkyWest was awarded consisted of aircraft previously flown by Comair and Pinnacle's 16 76-seat aircraft that are due to come out of service in 2013.

[5] As noted in my September 13 Declaration, a carrier such as SkyWest is fundamentally different from Pinnacle on account of, for example, its huge relative size and capitalization, including its ability to "cross-subsidize" across contracts and therefore submit bids for certain flying that would not otherwise be compatible with its cost structure.  For these reasons, I do not believe that Pinnacle could win future business simply by targeting labor costs similar to those of SkyWest.  Moreover, with respect to the August 2012 Delta/SkyWest transaction referred to above, it should appropriately be characterized as an aircraft exchange transaction, not an award of new flying pursuant to a typical competitive bid process. ████████████████████████████████████

████████████████████████████████████████████████████████████

7

structure to Compass and GoJet, two of the industry's lowest-cost providers. We made this decision because: (i) we were able to reasonably estimate the seniority distributions of Compass and GoJet based on publicly available information; (ii) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compass and GoJet as carriers with which Pinnacle needed to be prepared to compete.[6]

21.     As set forth in my September 13 Declaration, my team and I performed a cost comparison analysis of Pinnacle to Compass and GoJet, which corroborated the existence of a ▮▮▮▮▮ cost gap between Pinnacle and Compass and GoJet.

22.     I had no similar data with which to corroborate directly the ▮▮▮ price gap identified by Delta related to 50-seat aircraft, because there is no publicly available data with which to reliably estimate the seniority distribution of 50-seat carriers. However, the existence of a significant cost gap related to 76-seat aircraft would necessarily imply a significant cost gap related to 50-seat aircraft, since any cost disadvantages related to wages, work rules, and benefits would impact both aircraft types. Thus, our analysis of the ▮▮▮ price gap for 76-seat aircraft was corroborative of a substantial price gap for 50-seat aircraft as well.

C.     **Correction of GoJet Rates**

23.     AFA correctly notes that the GoJet cost comparison analysis set forth in my initial declaration used out-of-date GoJet flight attendant pay rates. (Akins Decl. ¶¶ 62, 100D.) In my original analysis, I calculated that GoJet's hourly rates per flight attendant were $19.44 and that GoJet's annual flight attendant wage-related costs were $198,246 per aircraft, implying an annual flight attendant cost disadvantage for Pinnacle of $36,688 per aircraft. I have re-run the

---

[6] Because Compass and GoJet each fly only one aircraft type (Compass flies 76-seat aircraft and GoJet flies comparable 70-seat aircraft), they also had the advantage of being "pure comps" for the dual-class cost comparison, avoiding the need to attempt to separate out 50-seat aircraft costs.

8

calculation with GoJet's current hourly rates of $19.99 per flight attendant. (Ex. 1, Revised Build-up of Pinnacle Cost Disadvantage Versus GoJet Average Per Year).) My revised calculation shows that GoJet's annual flight attendant wage-related costs per aircraft are $203,886, implying a flight attendant cost disadvantage of $31,048 per aircraft. This results in a minimal impact on the overall analysis. Instead of a $332,343 total cost disadvantage, I estimate that Pinnacle's total cost disadvantage compared to GoJet is $326,703, reflecting a 1.7% change from my original analysis. Critically, Pinnacle's total cost disadvantage of $326,703 with respect to GoJet remains significantly more than the ▮▮▮▮ differential.

D.  **Alleged "Double Counting" of Flight Attendant Non-Wage Concessions**

24.  AFA contends that the cost comparisons to Compass and GoJet "double count" the flight attendant non-wage concessions reflected in the initial May 8 labor ask. (Akins Decl. ¶¶ 100E, 111.) AFA does not explain what precisely it means by this criticism, but it appears to be based on an assumption that implementation of the May 8 ask would have resulted in significantly more favorable flight attendant work rules and benefits than those of Compass and GoJet (such that any further comparison to Compass and GoJet measured from that same baseline should have "credited back" those improvements as part of assessing any remaining cost disadvantage against those carriers). If this is indeed the assumption upon which AFA's criticism relies, the assumption is false and the criticism fails. (*See* Glass Rep. Decl. ¶ 20 (explaining that flight attendant non-wage concessions included in May 8 ask would not have placed Pinnacle at an advantage compared to Compass and GoJet with respect to those items).) If AFA's criticism is not tied to such an assumption, it is not clear what point it is trying to make or why the point would undermine any aspect of my analysis.

9

## IV.  Other Miscellaneous Responses

### A.  Business Plan Fleet Assumptions

25.  AFA notes that Pinnacle's revised business plan does not include assumptions to account for Delta's plans to reduce its 50-seat aircraft fleet. (Akins Decl. ¶ 100G.) The lack of specific information regarding future rates and fleet composition prevented the Company from arriving at the type of assumptions that can be reliably incorporated within a business plan. Notably, however, a revised business plan with a fleet composition weighted more heavily to 76-seat aircraft than the current plan would most likely require an *increased* labor ask, given that Pinnacle's cost differential for 76-seat aircraft is larger than its cost differential for 50-seat aircraft. For illustrative purposes, I have conducted a basic analysis showing that Pinnacle's labor ask would have to be *increased* by $4.8 million if the Company assumed that Delta would replace 40 of Pinnacle's 50-seat aircraft with 76-seat aircraft. (Ex. 2, Business Plan Assuming Trades of 40 50-seat Aircraft for 76-seat Aircraft.) Similarly, if the Company were to assume that its fleet size would shrink and become more heavily weighted to 76-seaters, the per-aircraft labor ask would also increase, given that Pinnacle suffers a larger cost disadvantage with respect to the 76-seat aircraft than 50-seat aircraft. (*Id.*) Moreover, a shrinking fleet would lead to higher unit costs resulting from the spreading of fixed costs over fewer aircraft and further exacerbation of seniority, each of which would additionally tend to place upward pressure on the labor ask.

### B.  Search For Non-Labor Savings in Connection with Revised Proposals

26.  ALPA alleges that Pinnacle failed to seek additional non-labor savings after learning from Delta that its cost structure was substantially too high, even after factoring in savings requested initially in May. (Wychor Decl. ¶ 17.) That is not true. Although my team and I had previously undertaken an exhaustive review of the business plan to identify all

potential non-labor savings (e.g., real estate, maintenance, spare parts, executory contracts, etc.), management instructed me to take another hard look. We undertook that review again in late June and July to see if we had missed anything and concluded we had not. Notably, neither ALPA nor AFA has identified any specific non-labor savings that it claims Pinnacle can achieve but has not yet factored into its business plan.

    C.    **Shared Operating Margin Payments to Delta**

27.    AFA asserts that increased operating margins under Pinnacle's revised August labor proposal could "yield as much as ▉▉▉▉ in payments to Delta under the new business plan" based on a provision in the CRJ-200 contract requiring a certain degree of "margin sharing" with Delta. (Akins Decl. ¶ 100I.) AFA does not explain how it derives this estimate. I have performed my own calculation of anticipated excess margin payment to Delta from 2013-2018 and reached a substantially lower figure – approximately ▉▉▉▉, with approximately half attributable to profits in 2013, which remains highly vulnerable to further utilization reductions. My calculation is as follows:



Although not clear given the absence of any explanation accompanying AFA's calculation, it appears AFA's calculation – unlike mine – may fail to account for the Company's proposed profit sharing plan, as well as the fact that Pinnacle retains a portion of the excess margin, and may also incorrectly assume that the CRJ-900 contract contains a margin sharing provision, when in fact such a provision is only contained in the CRJ-200 contract.

11

D.  **Alleged Improper Credit for Management Head Count Reduction**

28.  ALPA asserts that Pinnacle "credits the value of management head count reduction before the filing" in connection with its labor ask. (ALPA Obj. at 42; Hallin Decl. ¶ 34.) That is not true. The ███████ n savings associated with Pinnacle's pre-filing headcount reduction had long been priced into the baseline upon which the aggregate labor ask was developed. Otherwise stated, the original approximately $43 million ask in May, revised to $76.5 million in August, was built starting from a baseline cost structure that already included the headcount reduction savings. There is no improper credit of this savings toward the labor ask figures, which are wholly incremental to the baseline.

E.  **Alleged Delta Financial Disincentive to Ground Aircraft**

29.  ALPA argues that Delta has an economic incentive to keep Pinnacle's fleet of 50-seat aircraft flying and generating revenue, because Delta is obligated to pay certain fixed margin and aircraft lease payments regardless of utilization level, and thus would not ground any of Pinnacle's 50-seat aircraft. (ALPA Obj. at 33.) This conclusion is over-simplified and likely wrong. Delta incurs various substantial variable costs when it flies (or contracts with Pinnacle to fly) 50-seat aircraft – including fuel charges, block hour payments to Pinnacle, significant insurance costs, and anticipated massive engine overhaul expenses – which it would avoid by simply grounding or causing the grounding of the aircraft. Even if ALPA had shown, which it has not, that Delta would be foregoing some amount of net revenue by grounding the aircraft, the notion that Delta would hesitate to do so in furtherance of its critical business plan of reducing 50-seat aircraft is highly implausible. Indeed, airlines ground aircraft, notwithstanding ongoing financing or other charges, if doing so is overall more efficient for the airline. (See, e.g., Ex. 3, RJET – Q3 2011 Republic Airways Holdings Inc. Earnings Conference Call, November 8, 2011, p. 7 ("[W]e've determined we are much better of[f] in times of low demand and high fuel prices

to simply park small regional jets rather than operative [sic] them at a significant loss in the Frontier network.").)

      F.    **Alleged Retiree Medical Savings**

30.    Finally, ALPA erroneously asserts that it has offered a counter-proposal that would deliver the same amount of aggregate savings initially sought by Pinnacle under its May proposal. (Eubanks. Decl. ¶ 16.) As explained in the Reply Declarations of Patrick Ryan and Stephen Hunyor, ALPA's analysis is premised on unsupportable costing of numerous portions of the proposal, including asserted savings associated with "Retiree Medical" plan modifications to which ALPA attributes ▋. In fact, the proposal's treatment of Retiree Medical would simply remove a contingent obligation from the Company's balance sheet without producing recurring, cash-generating cost savings.

13

I, Virginia L. Hughes, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Tennessee
Dated: October 12, 2012

_____
Virginia L. Hughes
Financial Advisor to the Debtors