UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

**REPLY DECLARATION OF JERROLD A. GLASS IN SUPPORT OF
DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS
WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND
THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA**

Jerrold A. Glass declares and says:

1. I am the President of F&H Solutions Group, a human resources and labor relations consulting firm, and serve as lead negotiator for Pinnacle Airlines Corp. ("**Pinnacle**" or the "**Company**") in the Section 1113 process. I previously submitted a declaration in this matter dated September 13, 2012 (the "**September 13 Declaration**").

2. This reply declaration responds to various arguments raised by the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**") relating to my September 13 Declaration, specifically with respect to Pinnacle's conduct during the pre-bankruptcy and Section 1113 negotiations with ALPA and AFA, the effect of GoJet's new flight attendant pay rates on Pinnacle's analysis of its competitors' costs, Pinnacle's mark-

to-market analysis of its salaried and hourly employee compensation, and the Company's consideration of work rules and benefits in its market comparisons.[1]

I.      **Pinnacle's Concessions During Section 1113 Negotiations**

3.      As the lead negotiator for the Company throughout the Section 1113 process, I have presented proposals to obtain necessary savings from ALPA and AFA for the Company to emerge from bankruptcy as a financially strong and competitive enterprise. At the same time, my negotiating team has remained flexible with both unions regarding how to achieve those savings. For example, the Company's last two proposals to ALPA – made on September 24, 2012 and October 5, 2012 – contained significant changes made at the request of ALPA, including the withdrawal or modification of thirteen provisions. Furthermore, the Company suggested to the labor unions and agreed to participate in mediation discussions with NMB Mediator Jim Mackenzie for ALPA and NMB Director of Mediation Services Larry Gibbons for AFA, and participated in such individual and joint sessions with the mediators during the weeks of October 1 and October 8, 2012, and have since exchanged further counter-proposals.

4.      On September 24, 2012, the Company withdrew proposals regarding: (1) the treatment of pilots in the event of a merger; (2) seniority integration protections in the event of a merger; (3) Company-paid, positive space travel (i.e., confirmed seat bookings) for days off during training periods; (4) sick leave and vacation days during a Family and Medical Leave Act ("**FMLA**") event; (5) the ability to refuse assignments on days off or refuse assignments that extend one's work day; (6) the pre-setting of pilot pay rates upon the purchase or lease of new aircraft; and (7) reductions in the pay credit for pilots in short-term training.

---

[1] This reply declaration addresses what I view to be the principal arguments of ALPA and AFA related to the September 13 Declaration. It is not intended to cover exhaustively every point made by ALPA and AFA in their Objection papers with which I disagree.

5. On October 5, 2012, the Company withdrew four additional proposals pertaining to (1) the payment of pilots on a "trip pairing," rather than per-segment, basis in the event of trip disruption; (2) the performance of simulator training by non-seniority list instructors; (3) the eligibility of non-probationary pilots for FMLA; and (4) the number of hours pilots can bid to fly each month. In an effort to address concerns raised by AFA, the Company also agreed to reduce the employee contribution percentage under the Health Reimbursement Act ("**HRA**") medical plan, to incorporate accident insurance in the HRA, and to reintroduce the OAP (PPO) option as an alternative to the HRA plan.

6. The Company's proposals regarding employee contributions to the medical plan are in line with the rest of the regional airline industry. *See* Glass Rep. Decl. Ex. 1, Pilot Share of Medical Premiums PPO-Type Medical Plans.

## II. The Company's Negotiations with AFA

7. Since the declaration of Terry French dated October 4, 2012 ("**French Declaration**"), negotiations between AFA and the Company have progressed productively and multiple meetings have been held with the Mediator, Mr. Gibbons.

8. Since the submission of the French Declaration and as of the date of this declaration, the Company has presented counter-proposals to AFA on October 5, October 10, and October 11. AFA has presented counter-proposals to the Company on October 10 and October 11.

9. The French Declaration references AFA's counter-proposal of September 25, 2012, stating that the annual value of the concessions contained in that proposal was $3.7 million. (French Decl. ¶ 17.) AFA submitted a revised costing of that proposal on October 5, 2012, listing the revised value of that proposal as $3.3 million.

### III. ALPA's Conduct during the Section 1113 Negotiation

10. During two negotiation sessions with the Company – on May 8, 2012 and August 20, 2012 – MEC Chairman Tom Wychor made statements that he was not open to even considering the Company's proposals, let alone working toward an agreement, irrespective of the Company's financial condition.

### IV. The Failure of Pinnacle's Pre-Petition Restructuring Effort

11. Captain Paul Hallin asserts that, on the eve of its Chapter 11 filing, the Company and the unions were close to an agreement on modifications to the Joint Collective Bargaining Agreement. (Hallin Decl. ¶ 13.) This is untrue. As the Company's chief negotiator, I can confirm that the Company and ALPA were far apart on key provisions.

12. One substantial disagreement involved profit sharing. While the Company's proposal resembled profit sharing plans customary in the regional airline industry, ALPA insisted on an industry-leading plan that would have required the profit sharing pool to equal the percentage of the Company's annual profit margins. The difference between the two proposals amounted to $9.3 million. The Company also could not accept ALPA's proposal for a temporary pay cut that would have lasted only nine months and then been reversed. On each anniversary of the amendable date of the contemplated agreement, pilots would receive automatic 2 percent pay *increases* until the parties reached a new agreement. On modifications relating to pilot wages, scheduling flexibility, bankruptcy protection language, among other issues, significant disagreements also remained.

13. ALPA's February 25, 2012 hotline message to its members (attached hereto as Glass Rep. Decl. Ex. 2 and reproduced below) accurately describes the parties' positions and belies Captain Hallin's testimony that Pinnacle and ALPA were close to an agreement:

> From: pclmec-fastread@ames.alpa.org
> Date: Thu, 23 Feb 2012 02:22:04 +0000
> To: pclmec-fastread<pclmec-fastread@ames.alpa.org>
> ReplyTo: "pclmec-fastread" <pclmec-fastread@ames.alpa.org>
> Subject: Special Hotline: Negotiations Update
>
> ALPA: The Pilots Union
>
> Negotiating Update
>
> The Negotiating Committee met with the Company on February 21 – 22. We have been able to reach agreement on the changes we feel are necessary to Section 24 (Filling of Vacancies) on both a temporary and permanent basis. The only remaining issue in that area is the valuation of the savings.
>
> As we have previously reported, the Company is also seeking a permanent 5% wage reduction. ALPA does not believe there is a need for a permanent wage reduction, and we are apart on that issue. We believe that a case can be made for a targeted wage cut with snapbacks to our current pay scales. In addition, there are potential contract amendments that could save the Company money and also benefit the pilots, and we are willing to entertain those changes in lieu of a greater wage cut.
>
> The other key pieces of a potential restructuring agreement are: 1) "upside" (profit sharing and post-amendable increases), and 2) bankruptcy protection language to guard against the "double dip" and to seek equitable contribution from all other labor groups. Although we have had some discussions on profit sharing, we remain apart on the potential yield. The Company is not currently proposing a post-amendable increase, but did so earlier in these negotiations. On the bankruptcy protection front, we have not yet received any meaningful proposals from the Company.
>
> At this time, it is not clear whether we will be able to reach an agreement with the Company, but we remain committed to trying to do so.

V.     **The Effect of GoJet's New Wage Rates on Pinnacle's Analysis of Competitors' Costs**

      14.    In performing market comparisons, the Company inadvertently used outdated pay rates for more senior GoJet flight attendants. After learning of this issue from Daniel Akins' October 5, 2012 declaration, I performed an analysis using corrected GoJet pay rates, which shows that the "*Additional Ask as % of cost base*" listed for the flight attendants group increases from 9.1% to 10%. *See* Glass Rep. Decl. Ex. 3, Determination of Ask by Employee Group

(Revised Glass Decl. Ex. 17). This figure remains, in my view, a fair and equitable apportionment to the flight attendants of the total additional ask. Accordingly, the wage error had no material impact on my original conclusions.[2] *See* Glass Rep. Decl. Ex. 3; *see also* Glass Rep. Decl. Exs. 4-7, Flight Attendant Pay Comparisons (Revised Glass Decl. Exs. 34-37).

### VI.  Benchmarking Pinnacle's Salaried, Management, and Hourly Employee Compensation

15.  When the Company conducted its mark-to-market analysis to apportion the total labor ask, it did not include a mark-to-market analysis for management, salaried, and hourly employees. However, Pinnacle regularly surveys salaries to determine market pay for its employees using a comparison by the Seabury Group of salaries for 37 positions at 13 airlines, including eight regional carriers.[3] As illustrated in the comparison attached hereto as Exhibit 8, Pinnacle reviewed the results of the 2010 Seabury survey and applied a 3.6 percent adjustment to account for comparable 2012 salaries.[4] *See* Glass Rep. Decl. Ex. 8, Seabury Compensation Comparison. We compared the adjusted 2012 data to actual average 2012 salaries at Pinnacle. For 31 of the 37 positions surveyed, the analysis shows that Pinnacle's salaries are below the market average.

16.  Following its Chapter 11 filing, the Company also engaged Mercer Global ("**Mercer**"), a consulting firm, to conduct an analysis benchmarking its target executive compensation levels against the market. Mercer's analysis concluded that Pinnacle's executive

---

[2] The negligible nature of the impact is attributable, first, to the fact that current GoJet rates are the same or similar to the older rates for early years of service and become substantially higher only at later years. GoJet has only been in business for seven years; thus, the more significant pay rate increases occur in years of service where there are now no employees.

[3] Airlines surveyed include Air Canada, Air Wisconsin, Alaska Airlines, Comair, Compass, ExpressJet, Horizon, JetBlue, Mesaba, Pinnacle, Republic, United, and USAirways.

[4] The 2012 Seabury salary survey has not yet been completed. The 3.6% adjustment over 2010 data is equal to the social security adjustment/COLA between 2010 and 2012.

management members will receive take-home pay that is ███ below the market median for 2012 and ███ below the market median for 2013. *See* Glass Rep. Decl. Ex. 9, Mercer 2012 Incentive Compensation Overview dated May 2, 2012.

## VII. The Company's Proposal on Pilot Compensation

17. Captain Hallin asserts erroneously that Pinnacle's proposed pay rates "would place Pinnacle at the bottom of the regional industry." (Hallin Decl. ¶ 29.) In fact, the Company's proposed pay rates are higher than those at Mesa. *See* Glass Decl. Exs. 24 and 25. Captain Hallin's conclusion ignores the fact that current Captains will remain at their current step under the Company's proposal.

## VIII. Consideration of Work Rules

18. Long before Pinnacle considered filing for bankruptcy protection, the Company requested that F&H Solutions Group survey its work rules for both pilots and flight attendants and compare them to the rest of the regional airline industry. In the course of this analysis, we surveyed a wide array of work rules, including more than 63 pilot work rules and 17 flight attendant work rules. *See, e.g.*, Glass Decl Exs. 1a, 2a, 5a, 6a; Glass Rep. Decl. Exs. 10-13, Additional Pilot and Flight Attendant Work Rules Surveyed. Pursuant to our review, we determined that many of the flight attendant rules were in line with other regional airlines. *See* Glass Decl. Exs. 5a, 6a; Glass Rep. Decl. Exs. 10-11. We also identified disadvantageous work rules where cost savings might be achieved through modification. *See, e.g.*, Glass Decl. Exs. 5a, 6a. The Company's May proposal included modifications of some, but not all, disadvantageous flight attendant and pilot work rules.

19. In the course of surveying the work rules, we found no work rule or series of work rules that would have provided a significant competitive advantage for the Company as

compared to the Delta Connection market. I concluded the rules excluded from the Company's May Proposal provided small advantages or small disadvantages to the Company as compared to other carriers and, on balance, were not material to a mark-to-market analysis.

20. My analysis also showed the flight attendant work rules and benefits under the Company's May Proposal were no more favorable to the Company than Compass' and GoJet's work rules. Glass Decl. Exs. 7a, 7b. This fact belies Mr. Akins' assertion that it was improper for the Company to exclude flight attendant work rules when comparing the costs per-76 seat aircraft between Pinnacle and Compass or GoJet. (Akins Decl. ¶ 100E.)

### IX. Consideration of Benefits

21. In seeking to identify sources of savings for the May Proposal, I evaluated various flight attendant benefits pertaining to sick leave, disability coverage, medical coverage, retirement, and profit sharing. My analysis showed that Pinnacle's existing flight attendant benefits were generally less favorable for the Company as compared to its competitors'. Glass Decl. Exs. 5b, 6b. Under the terms of the May Proposal, flight attendant benefits at Pinnacle remained, on net, no more favorable to the Company than Compass and GoJet's benefits. Glass Decl. Ex. 7b. Accordingly, exclusion of flight attendant benefits from the comparison of Pinnacle to Compass and GoJet does not "overstate[]" the cost gap, as Mr. Akins erroneously asserts. (Akins Decl. ¶ 100E.)

### X. Conclusion

22. I strongly disagree with the unions' suggestion that the Company is trying to use Section 1113 to gain an unfair competitive advantage in the regional airline industry. As I described in my September 13 declaration (Glass Decl. ¶¶ 47-69), a major mistake of other airlines' management has been the failure to seek sufficient savings from labor groups when their

companies were forced to restructure. While there is no doubt about the hardships these proposals entail, they do not approach the devastation that would come with the Company going out of business and more than 5,000 workers losing their jobs, with no income or medical insurance, in an economy still struggling to regain its footing. There are numerous examples of airline employees ratifying concessions on par with or even greater than what is being asked of Pinnacle employees. Those airlines survived and are now robust competitors in the airline industry. Two of them – Hawaiian Airlines and US Airways – are profitable, growing airlines where employees now enjoy the kind of job security that was merely a faint hope as recently as ten years ago.

I declare under penalty of perjury that the foregoing is true and correct on the basis of my personal knowledge and upon information from documents I have reviewed, including those in my custody and control.

Executed this 12th day of October, 2012.

*[signature]*
JERROLD A. GLASS
President
F&H Solutions Group