UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PINNACLE AIRLINES CORP., *et al.*,

Debtors.

Chapter 11

Case No. 12-11343 (REG)

(Jointly Administered)

**REPLY DECLARATION OF PATRICK RYAN IN SUPPORT OF DEBTORS' MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENTS WITH THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL AND THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA PURSUANT TO 11 U.S.C. § 1113**

Patrick Ryan declares and says:

1.    I am the Vice President of Manpower Planning and Staffing for Pinnacle Airlines Corp. ("**Pinnacle**" or the "**Company**"). I previously submitted a declaration in this matter dated September 13, 2012 (the "**September 13 Declaration**").

2.    I offer this reply declaration in support of Pinnacle's motion pursuant to 11 U.S.C. § 1113 to reject the collective bargaining agreements ("**CBAs**") between Pinnacle and the Air Line Pilots Association, International ("**ALPA**") and the Association of Flight Attendants-CWA ("**AFA**").

3.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, experience, and review of relevant business records and information. I have relied on Stephen Hunyor, an Associate at Seabury Consulting LLC, and his team to prepare costing analyses of the amount of savings to the Company resulting from CBA modifications proposed by the Company and its unions. These costings were prepared in close collaboration with certain Pinnacle subject matter experts, who provided input data and shared

their professional expertise and experience.  If called upon to testify, I would testify competently to the facts set forth in this declaration.

## I.    The Value of ALPA's October 11, 2012 Proposal Is [Overstated]

4.      ALPA has claimed its October 11 proposal is worth approximately $33 million in annual savings, averaged across 2013–2014.  While the Company's valuation of this proposal is ongoing at the time of this writing, the Company thus far has identified over $10 million in total annual costing differences, some of which carry over from our valuation of ALPA's October 1 proposal.  The Company's assessment, therefore, is that the value of ALPA's proposal falls well short of that claimed by the union, and is approximately $37 million shy of the $59.6 million savings the Company requires from its pilot.[1]

### A.    Proposed Work Rule Modifications and Associated Valuation

5.      As explained in my declaration of September 13, Pinnacle and ALPA have exchanged a series of proposals to modify the Joint Collective Bargaining Agreement ("JCBA") between Pinnacle and its pilots.  Pinnacle has considered and discussed at length with ALPA all of the union's counter-proposals for savings.  Pinnacle has also provided ALPA with the tools and information necessary to evaluate the Company's costing analysis, including access to computer crew scheduling systems.

6.      Exhibit 1 to the October 12, 2012 declaration of Stephen Hunyor presents a detailed side-by-side costing comparison of individual work rules.

7.      The Company has met with ALPA on multiple occasions to review our respective costing calculations and methodologies.  A "costing subcommittee" created at the request of

---

[1] Among other shortcomings discussed below, ALPA's counter-proposal includes only a 2% initial pay cut that is followed by automatic 3% wage *increases* each year, beginning one year after the proposed agreement's amendable date, if no new agreement has been reached before the scheduled increase.

ALPA has met eight times since August 31.[2]  While the Company and ALPA have calculated similar savings for a number of items in ALPA's counter-proposals, substantial discrepancies exist with respect to others.  For certain rules, the Company's valuation is *higher* than ALPA's, accounting collectively for over $120,000 of additional savings in ALPA's favor.  Pinnacle has communicated the substantive flaws that it has identified in ALPA's methodology to union representatives in meetings on September 21, October 4, October 5, and October 10, 2012.

8.      Disagreements with respect to the costing of "one-time items" drive most of the aggregate difference between the Company's and ALPA's calculations.  First, ALPA contends that the elimination of Pinnacle's retiree medical plan will produce ▉▉▉▉▉▉▉ in one-time savings.  The ▉▉▉▉▉▉ value ascribed by ALPA represents the estimated value of the Company's Accumulated Postretirement Benefit Obligation ("**APBO**") as of December 31, 2012.  As discussed in the October 12, 2012 declaration of Virginia Hughes, the elimination of the Company's retiree medical plan will simply remove a contingent obligation, namely the APBO, from the Company's balance sheet without producing any cash savings.  (Hughes Rep. Decl. ¶ 26.)  However, the Company has offered to credit the avoidance of future liability that it would otherwise accrue under the retiree medical plan, a value of approximately ▉▉▉▉▉ annually.

9.      Second, on September 22, 2011 – more than six months before the Company's Chapter 11 filing – Pinnacle and ALPA executed a letter of agreement, LOA 21, that reduced the training impact of the displacement of the remaining Mesaba Saab 340 pilots.  The ▉▉▉▉▉▉ one-time savings associated with this contract relief was already incorporated in the Company's baseline plan and will not result in any incremental cost savings.  Therefore, ALPA's attribution

---

[2] The meetings took place on August 31, September 5, 11, 19, and 21, and October 4, 5, and 10, 2012.

3

of value to LOA 21 in its counter-proposal is improper. Additionally, three items in ALPA's proposal representing approximately ███████ in savings are contingent upon the Company crediting the union with ███████ in savings in connection with LOA 21.[3]

10.    Even were it appropriate to credit the retiree medical changes or LOA 21 as incremental savings, ALPA inflates the amount of savings by costing its proposal only over a two-year period.  ALPA asserts that retiree medical changes or LOA 21 – both one-time events – should be valued at ███████ over the duration of the contract, which results in an average annualized savings of ██████ (See Eubanks Decl. Ex. A.)  However, when spread across the six-year period proposed by the Company, the average annualized value of these one-time items is ██████ – almost ██████ less than the value ALPA ascribes.

11.    Pinnacle and ALPA also disagree about the value of other work rule modifications included in ALPA's October 11 counter-proposal.  Exhibit 1 to the October 12, 2012 declaration of Stephen Hunyor presents a detailed side-by-side costing comparison of individual work rules.

## II.    Negotiations Since Filing for 1113 Relief

12.    My team has met with ALPA on numerous occasions since the Company filed its Section 1113 motion, and we have continued our efforts to reach a consensual agreement.  The meetings included four sessions of the full negotiation committees as well as more than 15 subcommittee meetings.  Altogether, our team has met with ALPA for more than twenty-five hours since the filing of the Company's 1113 motion, and we continue to make ourselves available to meet.  Since the filing of the 1113 motion on September 13, 2012, our meetings with ALPA have included the following:

---

[3] These items include (1) reimbursement of flight pay loss by ALPA, (2) pilot reimbursement of FAA-mandated medical exams, and (3) short-term training modification in the pilot bidding system.

- On September 14, 2012, my team met with ALPA for approximately one hour and discussed the Flight Operations Training Manual as it applies to required pilot training.

- On September 18, 2012, my team met with ALPA for approximately three hours over two separate meetings and discussed the costing associated with training relief.

- On September 19, 2012, my team met with ALPA for approximately two-and-one-half hours and discussed ALPA's valuation of its proposal.

- On September 20, 2012, my team met with ALPA for approximately one-and-one-half hours and discussed the costing associated with training relief. We also conducted a separate teleconference for approximately 30 minutes.

- On September 21, 2012, my team met with ALPA for approximately 30 minutes and discussed the costing associated with training relief. We also met with ALPA for approximately one-and-one-half hours with the Costing Subcommittee to review the costing of work rule proposals.

- On September 24, 2012, my team met with ALPA for approximately two hours and discussed the costing associated with training relief. We also met with the full negotiating committees, and the Company provided a comprehensive counter-proposal.

- On September 25, 2012, my team met with ALPA for approximately two hours and discussed the costing associated with training relief. We also met for approximately one-and-one-half hours in a Scheduling Subcommittee and discussed ALPA's bid period smoothing proposal.

- On September 26, 2012, my team met with ALPA for approximately one-and-one-half hours and discussed the Company's staffing and bidding processes as they related to work rule proposals related to open time. In a separate meeting, we met for one-and-one-half hours and discussed several work rule proposals, including co-domiciles and Captain equipment freezes.

- On October 1, 2012, my team met with ALPA for approximately 45 minutes and ALPA presented the Company with a counter-proposal.

- On October 4, 2012, my team met with ALPA on three separate occasions. This included a Costing Subcommittee meeting for approximately one hour during which we discussed ███████████████████████ Next, we met with ALPA for approximately 15 minutes during which they ███████████████████████████ ███████ Finally, we met for approximately 15 minutes during which the Company ████████████████████████████ These meetings were conducted under the supervision of mediator James Mackenzie.

- On October 5, 2012, my team met with ALPA for approximately one hour and provided a comprehensive counter-proposal. Additionally, my team met with the Costing Subcommittee for approximately one hour and ███████████████████ ████████ These meetings were conducted under the supervision of mediator James Mackenzie.

- On October 10, 2012, my team met with ALPA for approximately three hours and discussed the ███████████████████ This meeting was conducted under the supervision of mediator James Mackenzie.

- On October 11, 2012, my team met with ALPA for approximately for 45 minutes, and ALPA presented the Company with a comprehensive counter-proposal. This meeting was conducted under the supervision of mediator James Mackenzie.

III.    **Training Costs**

13.    Throughout negotiations with ALPA, training costs and the processes associated with pilot movement to alternate positions have been a frequent and significant topic of discussion. Since 2011, the Company has been in a prolonged cycle of significant training volume. For the following reasons, I expect that we will see a similar volume for at least the next 12 months.

14.    First, the Company continues to displace and retrain pilots associated with fleets that have been or will be eliminated. Second, the business plan assumes attrition levels that are higher than historical averages, which will increase the number of training events. The Company's business plan assumes annual attrition of approximately 300 pilots for the remaining jet fleet, more than the 2011 attrition of 210 pilots across the larger, combined turboprop and jet fleets in place at that time. This increase in attrition will drive significant training volume on an ongoing basis.

15.    Third, the Bloch Award, which governs the integration of seniority lists and the associated training, provides limited protection for the Company against pilot movement across positions, with no limitations or "fences" for first officer positions. Open issues with respect to interpretation of the Bloch Award present additional risks to the Company. The Company has sought guidance from the ALPA Dispute Resolution Committee ("DRC") – the applicable governing body – but to date, some issues remain unresolved.

I, Patrick Ryan, declare under penalty of perjury that the foregoing is true and correct.

Memphis, Shelby County, Tennessee

Dated:  October 12, 2012

_____

Patrick Ryan
Vice President, Manpower
Planning and Staffing
Pinnacle Airlines Corp.