UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                             :

In re                                   :       Chapter 11 Case No.
                                             :

PINNACLE AIRLINES CORP., *et al.*,    :       12-11343 (REG)
                                             :

                       Debtors.       :       (Jointly Administered)
                                             :
----------------------------------------------------------------x

DECISION ON DEBTORS' MOTION, PURSUANT
TO BANKRUPTCY CODE SECTION 1113, TO
REJECT COLLECTIVE BARGAINING
AGREEMENT WITH AIR LINE PILOTS
ASSOCIATION

APPEARANCES:

DAVIS POLK & WARDWELL LLP
Attorneys for Debtors and Debtors in Possession
450 Lexington Avenue
New York, New York 10017
By:    Benjamin S. Kaminetzky, Esq. (argued)
        Lynn Earl Busath, Esq. (argued)
        Paul S. Mishkin, Esq. (argued)
        Matthew R. Maddox, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
Conflicts Counsel to the Debtors
One Bryant Park
New York, New York 10036
By:    Abid Qureshi, Esq. (argued)

COHEN, WEISS AND SIMON LLP
Attorneys for Air Line Pilots Association, Int'l
330 West 42nd Street
New York, New York 10036
By:    Thomas N. Ciantra, Esq. (argued)
        Bruce S. Levine, Esq. (argued)
        Joshua J. Ellison, Esq.

MORRISON & FOERSTER LLP
Attorneys for Official Creditors' Committee
1290 Avenue of the Americas
New York, NY 10104
By:     Brett H. Miller, Esq. (argued)
        Erica J. Richards, Esq.

## TABLE OF CONTENTS

Findings of Fact ............................................................................................................. 5
  1. Background ........................................................................................................... 5
    (a) Regional Airline Industry ............................................................................ 6
    (b) Recent Challenges Facing the Mainline Airline Industry ......................... 9
    (c) Recent Challenges Facing the Regional Airline Industry ....................... 10
    (d) Recent Challenges Specifically Facing Pinnacle ................................... 11
  2. Initial Cost Saving Measures ............................................................................ 16
  3. Chapter 11 Filing and Immediate Aftermath ................................................... 17
  4. Initial May Proposal to Unions ........................................................................ 19
    (a) Business Plan ............................................................................................ 20
    (b) Labor "Ask" ............................................................................................. 21
  5. Delta's Price Gap Calculations ........................................................................ 22
  6. Corroborating the Price Gaps ........................................................................... 23
    (a) Hughes Analysis ....................................................................................... 24
    (b) Kasper Analysis ........................................................................................ 26
  7. Revised Proposal .............................................................................................. 27
  8. Section 1113 Motion and Continued Negotiations .......................................... 29
  9. Liquidity Crisis ................................................................................................. 30
  10. Section 1113 Trial .......................................................................................... 30
  11. Ultimate Facts ................................................................................................ 31
Discussion ................................................................................................................... 32
A.  Legal Standards ..................................................................................................... 33
  1.  Necessity .......................................................................................................... 36
  2.  Fair and Equitable Treatment ........................................................................... 38
  3.  Good Cause to Reject Debtor's Proposal ......................................................... 39
  4.  Balance of Equities .......................................................................................... 41
B.  Application to Facts Here ...................................................................................... 44
  1.  Procedural Matters ........................................................................................... 44
  2.  Necessity .......................................................................................................... 46
    (a) Liquidity as Resulting in Necessity ........................................................ 46
    (b) Excessive Costs as Resulting in Necessity ............................................. 48
    (c) Necessity Requirement Conclusions ....................................................... 51
  3.  Fair and Equitable Treatment ........................................................................... 52
  4.  Balance of Equities .......................................................................................... 56
  5.  Good Cause to Reject Company's Proposal ..................................................... 58
Conclusion .................................................................................................................. 65

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Under section 1113 of the Bankruptcy Code, a chapter 11 debtor may reject an executory contract that is a collective bargaining agreement if, but only if, the Bankruptcy Court finds that rigid requirements imposed under that section have been satisfied. Section 1113 attempts to "reconcile the public policy that favors collective bargaining with the reality of bankruptcy, recognizing that Chapter 11 is not merely business as usual but an extremely serious process that can lead to liquidation and the loss of the jobs of all the debtor's employees as well as of the creditors' opportunity for any meaningful recovery."[1] In this contested matter in the chapter 11 case of debtor Pinnacle Airlines, a regional air carrier (which, together with its affiliates,[2] has been referred to variously in briefing and argument, and here, as "**Pinnacle**," the "**Debtor**" or the "**Company**"),[3] the Company moves, pursuant to section 1113, for leave to reject its collective bargaining agreement with the Air Lines Pilots Association (referred to in briefing and argument, and here, as "**ALPA**" the "**Union**," or the "**Pilots**")."

Pinnacle contends, among other things, that it is in a liquidity crisis that impairs its ability to survive. It further contends that the regional air transport industry has become commoditized (making pricing the determinant of ability to compete in the industry); that its Pilots' wages, benefits, and work rules are greatly above market; and

---

[1] `    *In re AMR Corp.*, 477 B.R. 384, 393 (Bankr. S.D.N.Y. 2012) (Lane, J.) ("*American Airlines*") (quoting *In re Northwest Airlines, Corp.*, 346 B.R. 307, 314 (Bankr. S.D.N.Y. 2006) (Gropper, J.) ("*Northwest Airlines*")).

[2]    The debtors include Pinnacle Airlines Corp.; Colgan Air, Inc.; Mesaba Aviation, Inc.; and Pinnacle East Coast Operations Inc. Though discussion of the difficulties in the integration of the operations of each sometimes requires mention of them separately, for the most part they have been referred to collectively.

[3]    The Court varies in its use of these throughout this Decision, for greater clarity or emphasis in particular contexts.

that its labor costs must be reduced dramatically—to the extent of $59.6 million in cost savings—and quickly for Pinnacle to survive.  In fact, Pinnacle argues, its labor costs must be reduced to make them the lowest in the industry—without which, Pinnacle contends, it can survive in neither the long or even the short term.  As a result, the Company argues, the Pilots unjustifiably turned down the Company's proposal—an important element of a section 1113 motion showing.

The Pilots acknowledge the liquidity crisis, and that their labor costs need to be reduced.  But they contend that the extent to which the Company needs the very major concessions the Company seeks has been overstated.  And they further contend that the Company's demands—under which the Pilots' labor costs would drop below the lowest of any of Pinnacle's competitors—would portend a "Race to the Bottom" in employee labor costs under which employees would be the continual losers.

In that connection, the Pilots note that the Company dramatically increased its demands—by 78%—in August, after the Pilots had already responded to an earlier Company section 1113 proposal (then seeking $33 million in cuts) in a way that the Pilots contend should have met the Company's legitimate needs.  The Pilots further argue that the Company's stated reason for the very large increase in its demands—that Delta Air Lines, Inc. ("**Delta Airlines**" or "**Delta**"), the Company's only present customer, told Company representatives in June that Pinnacle was not competitive with the other regional air carriers providing similar services to Delta—was insufficiently supported, when Delta did not provide copies of the contracts with others that would support that view.

The Pilots further argue that the Company showed no downward movement whatever in its aggregate demands.  And the Pilots further argue (or at least proceed on the assumption) that it does not matter that their costs are above market, as Delta is locked into contracts with Pinnacle impairing Delta's ability to give its work to other regional air carriers.

For these reasons, and others, the Pilots argue that they were fully justified in turning down the Company's latest proposal.

***

After hearing the evidence, and related argument, the Court is compelled to agree with the great bulk, but not all, of Pinnacle's contentions.  The Court finds, with great regret, that immediate reductions in Pinnacle's pilot labor costs are essential not only to Pinnacle's reorganization, but also to its survival.  The Court further finds that nearly all of Pinnacle's "Ask" was justified, even as it was increased by Pinnacle's proposal in August, after Pinnacle took measures to corroborate what Delta had said.

But Pinnacle has failed to meet burdens on this motion—including, most significantly, necessity for the proposed modifications and unjustified refusal to agree by the Pilots (as described more fully in the legal discussion that follows)—in three respects.

First, Pinnacle has failed to show that cutting costs to a level *below* that of any of the other regional airlines is justified and essential to the  Company's survival—particularly given Pinnacle's failure to take into account (at least on the record before the Court) the costs Delta would incur to switch its business to other carriers.  Pinnacle did not convince the Court that a "Race to the Bottom" was necessary.

-3-

Second, Pinnacle's proposal to protect the Pilots from windfalls others might enjoy after Pinnacle is nursed back to health fell short of that required for the Court to make necessary findings of "Necessity" and "Fair and Equitable Treatment." Pinnacle's need for cutting its Pilots' labor costs, very substantially, was overwhelmingly established. But under its proposal, the Pilots would share to only a very modest extent, through profit sharing or equity participation, in the restored profitability that would hopefully come after the Pilots' sacrifices. That failed to satisfy the requirement of Fair and Equitable Treatment, and they were fully justified in declining to agree to a proposal structured in that manner.

Third, the Court was troubled by Pinnacle's failure to make *any movement whatever* in its aggregate demands after filing its motion, and by Pinnacle's insistence on bargaining only with respect to *how* the Pilots would make the overall concessions that Pinnacle sought. While it is true, as Pinnacle argues, that a debtor seeking 1113 relief should not make demands at a high level in contemplation of reducing them thereafter, the Court is unwilling to endorse Pinnacle's position that its absolute refusal to make any concessions at all in its aggregate demand was required (or even justifiable), at least under the facts here. Though Pinnacle's misreading of the law in this area was excusable, and the Court does not, as a consequence, now find bad faith, the Court holds that Pinnacle's total lack of movement gave the Pilots additional good cause to reject Pinnacle's proposal.

Accordingly, Pinnacle's motion is denied without prejudice. If the parties cannot reach agreement with the assistance of the Court's analysis of the issues as set forth in

-4-

this Decision,[4] Pinnacle can file another motion based on a revised proposal.  If any such

motion addresses the concerns the Court has articulated here, it almost certainly will be

granted.

Findings of Fact

With the exception of one of Pinnacle's witnesses (whose testimony the Court

found in numerous respects to be unworthy of belief, but which was not particularly

important), the Court found all witnesses whose demeanor it observed to be credible and

candid.[5]  The Court's Findings of Fact as a consequence of the two sides' evidentiary

showings—by direct testimony declaration, live cross-examination, redirect, and any

subsequent examination, and exhibits—follow.

*1. Background*

Pinnacle is a regional airline that, at the time of its chapter 11 filing, operated over

1,300 flights per day to cities in the United States, Canada, and Mexico.[6]  Founded in

1985 as Express Airlines I, pre-merger Pinnacle ("**Pinnacle I**")[7] was created to provide

regional lift to Republic Airlines.[8]  Republic was acquired by Northwest Airlines

Corporation ("**Northwest**") in 1986, and in 1997, Northwest also acquired Pinnacle I.[9]

In 2003, Pinnacle I was spun off by Northwest in an initial public offering although

---

[4]     *See* Collier on Bankruptcy ¶ 1113.01 (16th Ed.) ("*Collier*") ("The language and history of section 1113 make clear that the preferred outcome under section 1113 is a negotiated solution rather than contract rejection.").

[5]     Likewise, the Court has no reason to doubt the credibility of the witnesses who testified solely by declaration, and takes their testimony as true.

[6]     Declaration of John Spanjers, Pinnacle Corp's Executive Vice President and Chief Operating Officer, Pursuant to Local Rule 1007-2 ("**Spanjers 1007-2**"), ECF # 3, April 1, 2012, at ¶ 6.

[7]     Pre-merger Pinnacle, or "Pinnacle I," refers to the original Pinnacle company prior to its acquisition of Colgan Air and Mesaba Aviation, Inc. discussed below.

[8]     Kasper Decl. ¶ 57.

[9]     *Id.*

Pinnacle I continued to provide regional flying services to Northwest under a multi-year agreement.[10]  In 2007, Pinnacle I acquired Colgan Air ("**Colgan**"), and in July 2010, it acquired Mesaba Aviation, Inc. ("**Mesaba**").[11]

Currently, Pinnacle's fleet consists of 140 50-seat Bombardier CRJ-200s and 57 76-seat Bombardier CRJ-900s.[12]  The aircraft operate as Delta Connection flights under agreements with Delta Airlines.[13]  Pinnacle provides short- and medium-haul flights to and from Delta's hub airports in Atlanta, Detroit, Memphis, New York City (John F. Kennedy Airport), and Minneapolis/St. Paul.[14]  Until recently, Colgan operated a fleet of 55 turboprops under regional lift agreements with United Airlines (or "**United**") and US Airways.[15]  Pinnacle wound down these operations as part of the restructuring, leaving Delta as Pinnacle's only remaining mainline customer, as discussed below in further detail.[16]  As of August 2012, Pinnacle had approximately 5,800 employees, including approximately 2,400 pilots, 1,500 flight attendants, and 80 flight dispatchers.[17]  More than 75% of Pinnacle's 5,800 employees are unionized.[18]

*(a) Regional Airline Industry*

Regional carriers, like Pinnacle, are airlines that provide flying services to mainline carriers on routes where (or at times of day when) passenger demand is not

---

[10]    *Id.*

[11]    Hallin Decl. ¶ 2; Kasper Decl. ¶ 57.

[12]    Kasper Decl. ¶ 58.

[13]    *Id.*

[14]    *Id.*

[15]    *Id.* at ¶ 59.

[16]    Kasper Decl. ¶ 63.

[17]    Spanjers Decl. ¶ 11.

[18]    *Id.*

sufficient to support using larger mainline aircraft.[19]  Though operated by a regional

carrier, regional aircraft and flights display the livery and adopt the brand of the mainline

partner.[20]  From the point of view of the passenger, therefore, the regional carrier flight

represents an integrated service on a single carrier.[21]

There are two types of regional carriers.  Wholly-owned regional carriers are

owned by a mainline airline and generally provide regional lift exclusively to the

mainline carrier.[22]  For example, American Eagle and Executive Airlines are wholly-

owned subsidiaries that provide regional lift to AMR Corporation ("**American Airlines**"

or "**American**").[23]  Independent regional carriers, on the other hand, are not owned by

any mainline carrier and frequently provide regional lift to multiple mainline airlines.[24]

Regional carriers are compensated by their mainline partners under one of two

types of agreements.  Under a pro-rate agreement, the fee paid by the mainline airline is

dictated by ticket sales or the number of passengers, and the regional airline pays certain

"**Pass-Through Costs**" like fuel, engine maintenance, ground handling, insurance,

aircraft ownership costs, and other enumerated costs.[25]  Thus, both the regional and the

mainline carrier share risks associated with fuel prices, passenger demand, and fares.[26]

Most pro-rate agreements today cover turboprop flying, and often for subsidized

---

[19]     Kasper Decl. ¶ 32.

[20]     *Id.*

[21]     *Id.*

[22]     *Id.* at ¶ 37.

[23]     *Id.*

[24]     *Id.* at ¶ 38.

[25]     Kasper Decl. ¶ 42; Spanjers 1007-2 ¶ 7.

[26]     Kasper Decl. ¶ 40.

"Essential Air Services" routes (routes between small communities and larger hubs that receive a subsidy from the U.S. Department of Transportation).[27]

By contrast, under a "**Capacity Purchase Agreement**," the mainline airline pays the regional airline a fixed dollar rate per block hour, day, or departure to operate regional aircraft (either turboprops or regional jets).[28] Pass-Through Costs are also often covered by the mainline airline under such agreements, under which the regional carrier receives fixed fees, and the mainline carrier assumes all risk associated with passenger demand and fuel prices.[29] In addition, the mainline carrier is solely responsible for determining the regional carrier's schedule (both routes and flight times) and for the sale and marketing of tickets.[30] Profit under a Capacity Purchase Agreement is driven by a regional carrier's ability to control costs, since the regional carrier receives the fixed fees irrespective of ticket sales or fares charged.[31] And because so many of the other costs (the Pass-Through Costs) are covered by the mainline airline, labor (which is not a Pass-Through Cost) is generally the largest controllable cost for regional airlines.[32] By shifting most of the risks to the mainline airlines, Capacity Purchase Agreements (which now make up the bulk of agreements between regional and mainline airlines) have essentially made the regional airline industry a commoditized business, with major

---

[27]     *Id.*; *id.* at 28 n.54.

[28]     *Id.* at ¶ 41.

[29]     Kasper Decl. ¶ 42.

[30]     *Id.*

[31]     *Id.* at ¶ 43.

[32]     *Id.*

airlines generally relying on a number of different regional carriers to provide regional lift.[33]

### (b)  Recent Challenges Facing the Mainline Airline Industry

In recent years, mainline carriers like American, Delta, United, and US Airways have faced increased pressure to control their costs as a result of several factors.[34]  "**Low Cost Carriers**," like JetBlue, Spirit, Virgin America, and Allegiant, have expanded rapidly both in terms of size and geographic coverage.[35]  Low Cost Carriers benefit from a lower cost structure as a result of simplified fleets of one or two types of aircraft only; more flexible work rules; quick turn-around times; and employee populations of lesser seniority than large network carriers because of their relatively recent entries to the market.[36]  This dramatic growth of Low Cost Carriers as well as widespread passenger acceptance of Low Cost Carriers has placed downward pressure on mainline carriers to provide cost-competitive lift.[37]  Internet-based airline search and booking tools have increased price transparency, resulting in further downward pressure on airfares.[38] Higher fuel costs have forced mainline carriers to reduce services that cannot be operated economically.[39]  Carriers are unable to cover the higher fuel costs without raising fares to help offset the increased costs.  But passenger demand decreases when fares are raised, forcing mainline carriers to reduce capacity, which results in decreased revenues.[40]  And

---

[33]     *Id.* at ¶ 44.

[34]     *Id.* at ¶ 7.

[35]     *Id.*

[36]     *Id.* at 3 n.3.

[37]     *Id.* at ¶ 8.

[38]     *Id.* at ¶ 11.

[39]     *Id.* at ¶ 13.

[40]     *Id.*

more stringent and time-consuming passenger screening procedures following the
September 11th terrorist attacks—what has become known as the "hassle factor"—have
also resulted in decreased passenger demand.[41]

These factors, among others, have contributed to over $30 billion in operating
losses for large mainline carriers since 2001, and are at least in part what has forced all of
the surviving mainline carriers (American, United, Delta, and US Airways) to file for
chapter 11 protection and seek reduction of controllable costs, including their costs for
regional lift.[42]

*(c) Recent Challenges Facing the Regional Airline Industry*

Although regional airlines initially were largely immune from the factors
affecting mainline carriers (due in large part to the protection regional carriers received
under Capacity Purchase Agreements from both demand risk and increased fuel costs),
regional carriers are now feeling the effects.[43] The "hassle factor" has had a particularly
harsh impact on short-haul flying (less than 500 miles), where regional aircraft are most
commonly used, thus reducing demand by mainline carriers for regional carrier
services.[44] Although fuel is generally covered by the mainline carrier under a Capacity
Purchase Agreement, increased fuel prices make regional aircraft—especially 50-seat
regional jets—less cost effective.[45] For example, 50-seat regional jets consume 55% to
126% more fuel per seat hour than small mainline jets like the Boeing 737 or Airbus A-

---

[41]     *Id.* at ¶ 14.

[42]     *Id.* at ¶ 15.

[43]     *Id.* at ¶ 16.

[44]     *Id.* at ¶¶ 14, 48.

[45]     *Id.* at ¶ 19.

320.[46]  Mainline airlines therefore have reduced the number of 50-seat regional jet block

hours flown by regional partners by 24% since 2005, and further reductions are

expected.[47]  During their chapter 11 restructurings, many mainline carriers reduced the

number of less efficient regional aircraft, including those operated by independent

regional carriers, and rejected or renegotiated unfavorable contracts with regional

carriers.[48]  In addition, the large number of mergers between mainline carriers over the

past several years has left independent regional carriers with fewer mainline airline

customers for whom they can provide regional lift services.[49]  In 2011, these factors,

among others, resulted in profit margins for regional carriers dropping to their lowest

levels in a decade.[50]

### (d)  Recent Challenges Specifically Facing Pinnacle

Pinnacle began experiencing financial difficulties in recent years as a result of a

confluence of issues.  In 2011, Pinnacle operated at a net loss of $31 million, and

Pinnacle's profit margin (-2.6%) reached its lowest level since 1998.[51]  Pinnacle replaced

its former Chief Executive Officer and Chief Operating Officer that year with Sean

Menke and John Spanjers respectively.[52]  In July 2011, the new management conducted

an assessment of Pinnacle's business and identified several factors that contributed to

Pinnacle's questionable viability, including: (1) delays in integrating the flying of

Pinnacle I and Mesaba; (2) unanticipated developments arising out of a new "**Joint**

---

[46]     *Id.* at ¶¶ 34, 49.

[47]     *Id.* at ¶ 19.

[48]     *Id.* at ¶ 17.

[49]     *Id.* at ¶ 18.

[50]     *Id.* at ¶ 21.

[51]     *Id.* at ¶¶ 22, 23.

[52]     Spanjers 1007-2 ¶ 16.

**Collective Bargaining Agreement**" with the Debtors' pilots; and (3) increasingly unprofitable contracts with mainline airline customers.[53]

*(i) Integration Delays*

At the time it acquired Mesaba, Pinnacle announced its intention to merge the three carriers (Pinnacle I, Mesaba, and Colgan) into two, with one operating regional jet aircraft and the other operating turboprop aircraft.[54] Although the pre-merger carriers operated some common aircraft types, the carriers had independent operating standards and procedures for those aircraft.[55] To effectively merge the carriers, the operations needed to be combined on a single operating certificate issued by the Federal Aviation Administration ("**FAA**").[56] At the time, Pinnacle had three separate operating certificates for each of its three airlines.[57] Moving Mesaba under the Pinnacle operating certificate was originally scheduled for May 2011, but Pinnacle was not able to obtain FAA approval in time, and the move was delayed until January 2012.[58] The delays resulted in deferral of cost savings, and also required Pinnacle to hire additional employees and consultants to accomplish the consolidation.[59] Full integration of maintenance and flight operations of the Pinnacle I and Mesaba jets is not expected to be completed until early 2013, even though the Mesaba jets have now been moved under the Pinnacle operating certificate.[60]

---

[53]    *Id.*

[54]    Hallin Decl. ¶ 3.

[55]    *Id.* at ¶ 8.

[56]    *Id.*

[57]    Spanjers 1007-2 ¶ 17.

[58]    *Id.* at ¶ 18.

[59]    Hallin Decl. Exh. B (Presentation to the Labor Leadership, May 8, 2012), at 8.

[60]    Spanjers 1007-2 ¶ 19.

*(ii) Joint Collective Bargaining Agreement*

Following the Mesaba acquisition, the Company and the Pilots entered into negotiations in the fall of 2010 in an effort to create a single collective bargaining agreement that would cover all three carriers.[61]  By February 2011, the Company reached an agreement with the joint representative of the pilots for all three subsidiaries—the Joint Collective Bargaining Agreement.[62]  But there were two problems that arose as a consequence of the Joint Collective Bargaining Agreement:  (1) recent analysis showed the compensation of the pilots to be above market average with respect to wages, benefits, and work rules; and (2) under the Joint Collective Bargaining Agreement, an "integrated seniority list" had to be created that would merge the pilot seniority lists of all three subsidiaries.[63]

With respect to the first of the problems (pilot costs), Pinnacle's pilots' compensation, in terms of wages, benefits, and work rules, is above market average. Pinnacle's pilot pay scale is among the highest in the regional airline industry, and this disadvantage is exacerbated by Pinnacle's "seniority disadvantage"—i.e., the relatively high seniority of its pilots compared to those of competitors—which leads to significantly higher costs.[64]  These higher costs, compared to younger airlines such as GoJet Airlines ("**GoJet**") and Compass Airlines ("**Compass**"), put Pinnacle at a disadvantage. Pinnacle's pilot work rules limit pilot productivity[65] by a series of provisions, including

---

[61]     Hallin Decl. ¶ 4.

[62]     Spanjers 1007-2 ¶ 20.

[63]     *Id.* at ¶¶ 20, 21.

[64]     Glass Decl. ¶ 72.

[65]     Pilot cost per block hour is a common metric used to measure pilot productivity.  It compares the number of block hours paid to the number of block hours flown.  Block hours paid will always be higher than block hours flown because pilots are paid block hour time for vacation, training, sick

work rules related to minimum day rigs, open time posting, and duty days.[66]  Pinnacle is

also uncompetitive with respect to rules governing pilots' ability to take time off (*e.g.*,

vacation accruals, vacation credit, extended sick leave, and use of Family Medical Leave

Act).[67]  Under these terms, Pinnacle pilots are less productive, requiring Pinnacle to

utilize more pilots and more payable hours than competitors to fly comparable routes and

aircraft.  Under Pinnacle's current active medical plan, Pinnacle's employee contribution

level is lower than that of employees at other carriers.[68]  Pinnacle is also one of only a

handful of airlines to still offer medical plans to its retirees.[69]  In addition, Pinnacle's

current 401(k) plan is one of the most generous in the regional industry.[70]  For Pinnacle's

most senior employees, for example, Pinnacle matches employee contributions up to

12.5%.[71]

    With respect to the second of the problems (integration of the seniority lists),

difficulties arose in connection with the development of one unified seniority list.  Pilots

bid on vacancies to obtain a new domicile, new aircraft, or new category, and bids are

honored based on seniority.[72]  The integration of the three seniority lists into one resulted

---

leave, and similar things.  The closer the ratio is to 1, the more efficient the company. Trial Tr.
151:5-22, October 17, 2012 (Kasper).   After the Joint Collective Bargaining Agreement was
entered into, Pinnacle's pilot cost per block hour rose dramatically. Trial Tr. 240:2-8, October 17,
2012 (Ryan).

[66]    *Id.* at ¶ 35.

[67]    *Id.*

[68]    *Id.* at ¶ 41.

[69]    *Id.* at ¶ 42.

[70]    *Id.* at ¶ 43.

[71]    *Id.*

[72]    Spanjers 1007-2 ¶ 22.

in new seniority relationships among thousands of pilots.[73]  Pilots undergo training each

time they move to a new aircraft or category, and under the Joint Collective Bargaining

Agreement, the pilots receive full salary during training.[74]  In addition, when a pilot

moves to fill a vacancy, his or her position must also be filled through the bidding

system.[75]  Prior to the integration, pilots at each airline were only permitted to bid on

vacancies at their airline specifically.[76]  Following the integration, pilots were permitted

to bid on vacancies at any of the three airlines, which opened up many new routes and

different aircraft possibilities for the pilots, all of which necessitated additional training.[77]

The Joint Collective Bargaining Agreement did not contain safeguards (or "**fences**") that

would keep training costs for this type of movement of pilots in check by essentially

preventing pilots from bidding or being awarded positions at the other airlines before the

companies were operationally merged.[78]

    The delayed integration (discussed previously) further added to the training costs

associated with the Joint Collective Bargaining Agreement because pilots not only

needed to be trained on transfers to different aircraft; they also needed to be trained for

transfers even to the same aircraft type if the aircraft was under a different operating

certificate.[79]

---

[73]     *Id.*  Because the different pilot groups could not agree on an integration methodology, arbitrator Richard Bloch was called upon to decide the seniority issue. Hallin Decl. ¶ 6.  Bloch issued an award establishing the integrated seniority list on June 16, 2011 (the "**Bloch Award**"). *Id.*

[74]     Spanjers 1007-2 ¶ 22.

[75]     *Id.*

[76]     *Id.*

[77]     *Id.*

[78]     Hallin Decl. ¶ 5; Spanjers 1007-2 ¶ 22.

[79]     Spanjers 1007-2 ¶ 23.

The Joint Collective Bargaining Agreement does not become "amendable," within the meaning of the Railway Labor Act, until February 18, 2016.[80]

### (iii) Unprofitable Contracts

An analysis of Pinnacle's contracts in 2011 showed that non-compensable costs incurred by Pinnacle under their existing contracts with mainline carriers, including increased labor costs under the Joint Collective Bargaining Agreement and costs associated with maintaining an aging fleet, were in excess (or soon would be in excess) of fees received by Pinnacle under its contracts.[81]  Neither the pro-rate agreement under which Pinnacle was providing Saab 340 turboprop flying to US Airways nor the Capacity Purchase Agreement under which Pinnacle was providing Q400 turboprop flying to United were profitable.[82]  Also, the profitability of Pinnacle's three existing contracts with Delta to provide CRJ-200 and CRJ-900 flying was also in question.[83]

### 2.  Initial Cost Saving Measures

Prior to the filing, Pinnacle engaged in a number of cost saving measures in an effort to avoid bankruptcy.[84]  Pinnacle reduced the number of officers from 29 to 18, and 26 "director"-level positions were eliminated—a 40% reduction.[85]  The number of support staff and other employees was also reduced.[86]  Merit increases and discretionary

---

[80]    Hallin Decl. ¶ 4.

[81]    Spanjers 1007-2 ¶ 26.

[82]    *Id.*

[83]    *Id.*

[84]    *Id.* at ¶ 29.

[85]    *Id.* at ¶ 30.

[86]    *Id.*

bonuses scheduled for 2012 were eliminated, producing an estimated savings of approximately $3 million.[87]

Pinnacle sought concessions from its lenders and other creditor concessions.[88] Pinnacle was able to obtain some short-term liquidity in early 2012 as a result of an agreement reached with Export Development Canada, Pinnacle's lender in connection with mortgages for purchased Q400 and CRJ-900 aircraft, to defer payments until April 2012.[89]

Pinnacle also reached out to its unions pre-filing to negotiate potential pay cuts and work-rule concessions, and to secure limitations on pilot transfers that would help mitigate the issues related to integration of the seniority lists.[90]  The parties ultimately were not able to come to an agreement.[91]

### 3.  Chapter 11 Filing and Immediate Aftermath

The cost saving measures were not sufficient to stave off bankruptcy, however, and on April 1, 2012, Pinnacle Airlines Corp. and its affiliates[92] filed voluntary chapter 11 petitions.  The following day, Pinnacle filed a motion requesting that the Court authorize assumption of Pinnacle's revised "Airline Service Agreements" (sometimes referred to in testimony or briefing as "**ASAs**") with Delta.  Pinnacle also sought

---

[87]    *Id.*

[88]    *Id.* at ¶ 38.

[89]    *Id.*

[90]    *Id.* at ¶ 32.

[91]    Spanjers Decl. ¶ 14.

[92]    *See* note 2 above.

-17-

approval of an agreement with Delta, as lender, under which Pinnacle would receive debtor-in-possession ("**DIP**") financing from Delta (the "**DIP Financing Agreement**").[93]

Under the DIP Financing Agreement, Delta provided a $74.285 million DIP facility, which, subject to various conditions, could be convertible to exit financing.[94] The DIP Financing Agreement contained various milestones, financial covenants, and additional requirements with which Pinnacle would have to comply to avoid an event of default.[95]  The DIP Financing Agreement contained (among other financial covenants) a minimum unrestricted liquidity covenant that dictated that Pinnacle's unrestricted cash and cash equivalents could not fall below $25 million as of the last day of any calendar month, or the first day of the next month if the last day were to fall on a weekend.[96]

In addition, the DIP Financing Agreement contained various milestones with which Pinnacle would have to comply relating to its collective bargaining agreements. Pinnacle was required under the DIP Financing Agreement to file a motion under section 1113 "reasonably acceptable" to Delta in both form and substance if Pinnacle could not reach a consensual agreement with its unions.  The DIP Financing Agreement further dictated a time frame in which this was to occur, which was extended through amendments to the DIP Financing Agreement to a final deadline of September 13, 2012.[97]

---

[93]    Debtors' Motion for Approval of DIP Financing ("**DIP Financing Motion**"), April 2, 2012, ECF # 23.

[94]    Shapiro Decl. ¶ 7.

[95]    *Id.*

[96]    Shapiro Decl. Exh. 1 ($74,285,000 Senior Secured Super-Priority Debtor in Possession Credit Agreement ("**DIP Financing Agreement**")), May 18, 2012, Annex G/Section 6.10(a).

[97]    DIP Financing Agreement, Annex F/Section 5.10(II).

Additionally, any final order of the Court granting a section 1113 motion or approving consensual collective bargaining agreement modifications also needed to be "reasonably acceptable" to Delta.[98]  Violation of any of the financial covenants, milestones, or other requirements contained in the DIP Financing Agreement would trigger an automatic event of default, entitling Delta to accelerate all amounts due to it under the DIP Financing Agreement on five days' notice.[99]

Although Pinnacle and its advisors had sought financing from a number of potential sources, in the end, Delta was the only option.[100]  The onerous milestones, financial covenants and other provisions in the DIP Financing Agreement and the associated DIP Financing Order had to be approved for lack of viable alternatives.  They remain in the DIP Financing Agreement and DIP Financing Order to this day.

*4.  Initial May Proposal to Unions*

On May 8, 2012, Pinnacle made an initial section 1113 proposal to its unions.[101] More than 75% of Pinnacle's workforce is unionized, with the pilots represented by the Air Line Pilots Association ("**ALPA**"),[102] the flight attendants represented by the Association of Flight Attendants ("**AFA**"), and the flight dispatchers represented by the Transport Workers Union ("**TWU**").[103]

---

[98]     *Id.* at 5.10(II)(6).

[99]     *Id.* at Section 1.14; Order Approving DIP Financing ("**DIP Financing Order**"), ECF # 316, ¶ 9(a).

[100]    Spanjers 1007-2 ¶ 40.

[101]    Spanjers Decl. ¶ 15.

[102]    ALPA is the largest airline pilot union in the world, representing over 51,000 pilots at both regional and mainline carriers. Wychor Decl. ¶ 2.  ALPA represents pilot groups through a "**Master Executive Council**" at each airline, the representatives of which are elected by the ALPA membership at the airline. *Id.* at ¶ 3.

[103]    Spanjers Decl. ¶ 11.

*(a)  Business Plan*

At the May 8, 2012 meeting with Pinnacle's unions, Pinnacle presented the

unions with a six-year business plan.  Pinnacle's remaining contracts,[104] upon which the

business plan was based, involve two separate Capacity Purchase Agreements covering

50-seat CRJ-200 flying and 76-seat CRJ-900 flying for Delta.[105]  Pinnacle flies 140 CRJ-

200s and 41 CRJ-900s for Delta pursuant to those agreements.[106]  The agreements extend

through 2022, with termination of 78 of the CRJ-200s scheduled to begin in 2019, with

rate resets in 2018.[107]

In developing its business plan and calculating the initial labor "Ask," Pinnacle

had three primary goals:

> (1) attaining a cost structure that would avoid losing money on its only
> existing contracts; (2) achieving a sufficient profit margin to attract an
> investor to allow Pinnacle to emerge from bankruptcy and to generate
> excess cash for future growth and protection against unforeseen
> fluctuations; and (3) achieving an overall competitive cost structure
> allowing the company to win future new business.[108]

---

[104]    As mentioned previously, Pinnacle terminated the turboprop flying being done by Colgan on
behalf of United Airlines and US Airways because the agreements were unprofitable.  Kasper
Decl. ¶ 59; Spanjers Decl. ¶ 9; Spanjers 1007-2 ¶ 35.  Pinnacle will also wind down 16 CRJ-900s
covered by a separate Capacity Purchase Agreement with Delta beginning in the first half of 2013.
Spanjers Decl. ¶ 9.  Pinnacle also terminated its ground operations division, which offered ground
handling services like loading and unloading checked bags, for its mainline partners as well as
other airlines. Kasper Decl. ¶ 60. As a result, Pinnacle's sole remaining flying is for Delta.
Spanjers Decl. ¶ 9.

As mentioned previously, Although Delta is Pinnacle's sole mainline customer, Delta uses a number of other regional
carriers ("**Delta Connection carriers**") to provide regional lift including SkyWest (and its
subsidiary ExpressJet), Republic (through its subsidiaries Chautauqua and Shuttle America), and
Trans State Holdings (through its subsidiaries GoJet and Compass Airlines). Kasper Decl. ¶ 63.

[105]    Spanjers Decl. at ¶9.

[106]    *Id.*

[107]    *Id.*

[108]    Spanjers Decl. ¶ 15; *see also* Trial Tr. 36:10-37:25, October 17, 2012 (Hughes).

*(b) Labor "Ask"*

Based on these considerations, initially Pinnacle proposed a package of wage, benefit, and work rule concessions (from all of its unions) that would produce total savings of approximately $43 million annually.[109]  In developing the business plan and determining the amount of the initial "Ask," Pinnacle relied upon the rates agreed to in its recent amendments to its contracts with Delta so as to ensure that labor cost reductions would enable it to continue bidding for additional contracts at those rates.[110]  At the time, Pinnacle believed these rates to be industry-competitive given Delta's recent agreement to them.[111]  Because pricing terms of regional airline contracts are generally not publicly available, Pinnacle was not able to rely on competitors' rates in determining its initial $43 million "Ask."[112]

Pinnacle first presented a general overview of the proposal to all of the unions, and then met with each union individually.[113]  Pinnacle provided the unions with an electronic "Data Room" and access to a "live" version of the model underlying Pinnacle's business plan, which the unions were free to manipulate.[114]

Of the approximately $43 million initial ask of labor, Pinnacle sought approximately $33 million from pilots in revisions to wages, work rules, and benefits.[115]

---

[109]    Spanjers Decl. ¶ 15.

[110]    *Id.* at ¶ 16.

[111]    Trial Tr. 29:10-31:7, October 17, 2012 (Hughes).

[112]    Spanjers Decl. ¶ 16.

[113]    *Id.* at ¶ 17.

[114]    *Id.*

[115]    Hallin Decl. Exh. D.

### 5. Delta's Price Gap Calculations

In May 2012, as a result of an agreement Delta reached with its pilot union on May 21, 2012, Delta announced that it would be adding 70 "dual class" regional aircraft (70- or 76-seat aircraft that provide first class seating, as well as coach) and substantially decreasing the number of 50-seat aircraft (single class) flown by its regional carriers.[116] Delta plans to reduce its total number of 50-seat aircraft by at least 200 to 125 or fewer over the next two to three years.[117] Pinnacle's fleet consists of 140 50-seat aircraft; therefore, at least some of the reduction will need to come from Pinnacle's fleet.[118]

On June 15, following Delta's announcement of the new agreement with its pilot union, Pinnacle advisor Virginia Hughes, of Seabury Advisors LLC ("**Seabury**"); Pinnacle Chief Restructuring Officer Steven Rossum; and Pinnacle President and Chief Executive Officer ("**CEO**") John Spanjers met with Delta representatives in Minneapolis.[119] The Delta representatives then informed Pinnacle that Pinnacle's rates for 76-seat flying per aircraft exceeded the average rates charged by Delta's other regional carriers for similar-gauge aircraft.[120] The Delta representatives noted that the price spread amongst carriers providing 76-seat lift was narrow—ruling out the possibility that the price gap was driven by one or two outliers.[121] They further reported that Pinnacle's rates for 50-seat flying also exceeded average rates charged by other Delta

---

[116]     *Id.* at ¶ 23; Hughes Decl. ¶ 36.

[117]     Hughes Decl. ¶ 36

[118]     *Id.*

[119]     Spanjers Decl. ¶¶ 7, 19.

[120]     *Id.* Specifics as to the exact amount of the Delta price gap calculation (the "**Delta price gap**" or "**price gap calculation**"), Pinnacle's liquidity situation, and other confidential mattes, appear in a supplement to this Decision filed under seal (the "**Confidential Supplement**"), setting forth findings and analysis which are inappropriate for disclosure in the public domain.

[121]     Trial Tr. 52:7-13, October 17, 2012 (Hughes).

Connection carriers.[122]  The Delta representatives did not reveal the details of their

analysis, however, citing confidentiality obligations to other Delta Connection

providers.[123]

Instead, Delta provided a letter to Mr. Spanjers, dated August 1, 2012, from

Senior Vice President of Delta Connection Donald Bornhorst,  that memorialized the

conclusions and methodology Delta had employed in reaching the price gap

calculation.[124]  Delta compared the estimated 2012 base rate amounts payable by Delta

under its agreements with Pinnacle with the average estimated base rate amounts payable

by Delta under its agreements with other Delta Connection carriers.[125]

If the price gaps identified by Delta were in fact accurate, Pinnacle's management

understood that Pinnacle would be hard pressed to win new flying from Delta or any

other major carrier if Pinnacle could not achieve cost savings sufficient to bring its rates

more in line with other regional carriers.[126]  The Court finds this not to be merely

Pinnacle management's understanding; it is a fact.  On June 22, 2012, Pinnacle

suspended negotiations with its unions to reassess its business plan, and set out to

corroborate the price gaps identified by Delta through Pinnacle independent analysis.[127]

6.  *Corroborating the Price Gaps*

Without access to information on rates other regional carriers charge mainline

carriers, Pinnacle instead focused on validating Delta's price gap calculation through a

---

[122]    Cude Decl. Exh. A. (Bornhorst Letter), at 2.  Again, the exact amount of this differential can be
found in the Confidential Supplement.

[123]    Spanjers Decl. ¶ 19.

[124]    *Id.*

[125]    Cude Decl. Exh. A. (Bornhorst Letter), at 2.

[126]    Spanjers Decl. ¶ 19.

[127]    *Id.* at ¶¶ 7, 21.

-23-

comparison of Pinnacle's costs to those of competitors.[128]  Since Delta had announced its

intention to dramatically scale back its 50-seat flying with 70- and 76-seat flying,

Pinnacle chose to focus on the 76-seat flying price differential.[129]  To analyze the price

gap, Pinnacle employed the services of Seabury's Virginia Hughes (which provides

advisory services to financially troubled companies),[130]  and Daniel Kasper, an airline

industry expert employed by consulting group Compass Lexecon.[131]

    *(a)  Hughes Analysis*

    Ms. Hughes sought to corroborate Delta's price gap calculation by comparing

Pinnacle's labor costs to those of its competitors.[132]  Labor costs were singled out

because labor costs are the largest controllable (*i.e.*, non pass-through) costs for regional

airlines—in Pinnacle's case accounting for 70% of forecasted controllable costs.[133]

Pinnacle competitors Compass and GoJet were chosen as the most appropriate

comparisons because, as Ms. Hughes reasoned, the regional airline industry is

increasingly commoditized, and Pinnacle lacks any meaningful ability to compete for

additional business if it cannot offer rates that are among the industry's lowest.[134]

---

[128]    *Id.* at ¶ 21.

[129]    *Id.* at ¶ 20.

[130]    Hughes Decl. ¶ 1.  Ms. Hughes was initially retained by Pinnacle in November 2011, and effectively functioned as Pinnacle's de facto Chief Financial Officer ("**CFO**"), especially following Ted Christie's resignation as CFO in March 2012. *Id.*; Trial Tr. 9:18-10:1, October 17, 2012 (Hughes).

[131]    Spanjers Decl. ¶ 24.

[132]    Hughes Decl. ¶ 23.

[133]    Kasper Decl. ¶ 66.

[134]    Trial Tr. 53:19-23, October 17, 2012 (Hughes); Hughes Decl. ¶ 24.

Cost comparisons were conducted based largely on two categories of information: pay scales and seniority distributions.[135] For a comparison of pay scales, Ms. Hughes tracked the differences between the hourly rate paid to Captains, First Officers, and flight attendants at each level of the seniority scale.[136] She also tracked the differences in seniority distributions at the different airlines by analyzing the number of Captains, First Officers, and flight attendants at each level of the seniority scale.[137] Pinnacle has a substantial seniority disadvantage due to the airline's longevity, which is exacerbated by the Joint Collective Bargaining Agreement.[138]

Ms. Hughes applied the estimated seniority disadvantage in comparing Pinnacle's proposed pay rates under its May 2012 labor ask to its competitors' pay rates.[139] The effect of Pinnacle's 401(k) disadvantage was also calculated by applying the seniority comparison and pay rates to each airline's 401(k) match rates.[140] Last, pilot work rule advantages and disadvantages were assessed by comparing Pinnacle's pilot work rules under the May 2012 labor "Ask" to the work rules of Compass and GoJet.[141]

Based upon these categories, Ms. Hughes computed Pinnacle's total estimated cost disadvantage, as compared to Compass and GoJet, to be near Delta's price gap.[142]

---

[135]    Hughes Decl. ¶ 25.

[136]    *Id.*

[137]    *Id.*

[138]    *Id.* at ¶ 26.

[139]    Hughes Decl. ¶ 27.

[140]    *Id.*

[141]    *Id.* at ¶ 28.

[142]    *Id.* at ¶¶ 29, 30. Ms. Hughes was not able to conduct a similar analysis to corroborate the price gap identified by Delta related to 50-seat aircraft because there is no publicly available data with which to reliably estimate the seniority distribution of 50-seat carriers. Hughes Reply Decl. ¶ 22.

Ms. Hughes calculated that Pinnacle would need to obtain an additional $33.9 million in savings above that requested in Pinnacle's May labor "Ask" in order to bridge the price gaps—increasing the total annual required savings to $76.5 million.[143]

*(b)  Kasper Analysis*

Mr. Kasper relied on publicly available U.S. Department of Transportation ("**U.S. DOT**") Form 41 data ("**Form 41 data**") to replicate the Delta price gap.[144]  The U.S. DOT Form 41 database compiles the financial and traffic data required by federal regulations to be submitted to the U.S. government on a periodic basis by individual airlines.[145]  Because labor would account for the largest portion of controllable costs, Mr. Kasper sought (as Ms. Hughes did) to corroborate the price gap by showing that the labor costs alone approached this gap.[146]

According to 2011 Form 41 data, Pinnacle's pilot costs per block hour for 76-seat flying were higher than all other Delta Connection carriers operating 76-seat regional jets (other than Comair, which was in the process of being wound down by Delta, and now has ceased operations).[147]  Pinnacle's costs per pilot block hour for 76-seat flying still exceeded the other Delta Connection carriers, with the exception of SkyWest, even after applying the labor cost savings under the May 18 ask (-18.3%) and adding in the increased costs (2.9%) resulting from 16 CRJ-900s leaving the fleet (largely due to increased pilot seniority).[148]  Mr. Kasper used this cost per block hour to determine

---

[143]    Hughes Decl. ¶ 33.

[144]    Trial Tr. 154:2-6, October 17, 2012 (Kasper).

[145]    Kasper Decl. ¶ 5.

[146]    *Id.* at ¶ 66.

[147]    *Id.* at ¶ 81; Trial Tr. 124:3-4, October 16, 2012 (Glass).

[148]    *Id.*; Kasper Reply Decl. ¶ 10.

Pinnacle's cost disadvantage vis-à-vis the other Delta Connection carriers,[149] and

determined that, based on pilot costs alone, Pinnacle had a cost disadvantage per 76-seat

aircraft that exceeded the Delta price gap compared to Compass' annual E-175 pilot

costs, and compared to the other carriers (Shuttle America, SkyWest, ExpressJet/ASA),

constituted a substantial portion of the Delta price gap.[150]

For smaller regional jets with 50 seats or fewer, Mr. Kasper computed Pinnacle's

cost per pilot block hour to be just below the average for other Delta Connection carriers

(excluding Comair).[151]   But Mr. Kasper believed that the methods used to assess

Pinnacle's 76-seat cost disadvantage using publicly available Form 41 data were not a

reliable basis for assessing Pinnacle's 50-seat cost disadvantage "due to the chaotic status

of the current market for 50-seat flying" (*i.e.*, the large reductions in 50-seat regional jet

block hours over the last several years by mainline carriers).[152]

### 7. Revised Proposal

Pinnacle delivered a revised section 1113 proposal to the unions on August 16,

2012, along with a revised business plan.[153]   The proposal consisted of wage, benefit, and

work rule modifications totaling $76.5 million (the amount Pinnacle and its advisors

determined would be required in aggregate labor savings per year to eliminate the Delta

price gap[154] (and, the Court infers, to get "a little more")).[155]   The August proposal

---

[149]      Annual pilot costs were calculated assuming two pilots per aircraft and 9.5 hours of aircraft utilization 365 days a year. Kasper Decl. ¶ 82, 60 n.128.

[150]      Kasper Reply Decl. ¶ 10; *id.* at 6 n.18.

[151]      Corrections to Kasper Decl., ECF # 660, Exh. 24.

[152]      Kasper Reply Decl. ¶ 16.

[153]      Spanjers Decl. ¶ 7.

[154]      *Id.* at ¶¶ 25, 31.

[155]      *See* note 268 below.

contained all of the work rule and benefit modifications included in the May proposal, and in addition, various new items.[156] Of the $76.5 million, $59.6 million was sought from the pilots; $6.5 million from the flight attendants; and a little less than $200,000 from flight dispatchers.[157] An additional $10.1 million in annual savings was expected from salary cuts, benefit reductions, and work rule modifications for non-unionized employees.[158]

Pinnacle reasoned that the Pilots were asked to contribute the greatest portion of the overall savings because (1) pilot costs constituted the largest component of Pinnacle's labor costs, and (2) Pinnacle's pilot costs were also furthest from the industry norm in comparison to the other labor groups—especially when factoring in seniority disadvantage.[159] To specifically address the seniority disadvantage, the proposal included several changes to pay rates, generally reducing the premium in pay that would result from seniority.[160] For example, longevity steps would be capped at twelve years for Captains, and four years for First Officers.[161]

Although the new plan incorporated the higher labor "Ask," Pinnacle did not adjust the revenue projections on the long-range outlook.[162] A profit sharing plan, however, was added to the plan.[163]

---

[156]    Trial Tr. 55:9-56:9, October 16, 2012 (Glass).

[157]    Hallin Decl. ¶ 30; Hunyor Decl. Exh. 1.

[158]    Hunyor Decl. Exh. 1.

[159]    Spanjers Decl. ¶ 31.

[160]    Glass Decl. Exh. 51 (Pinnacle Airlines 1113(c) Restructuring Proposal to the Air Line Pilots Association, August 16, 2012 Term Sheet), Attachment A.

[161]    *Id.*

[162]    Trial Tr. 44:20-23, October 17, 2012 (Hughes).

*8. Section 1113 Motion and Continued Negotiations*

On August 30, 2012, Pinnacle reached a tentative agreement with the TWU on behalf of Pinnacle's flight dispatchers, and the agreement was ratified on September 11, 2012.[164]

Unable to reach similar agreement with ALPA and the AFA on behalf of the flight attendants, Pinnacle filed its motion, under section 1113, for leave to reject its collective bargaining agreements with each union on September 13, 2012.

Negotiations continued following the filing of the motion, and Pinnacle and the AFA came to a tentative agreement late on Friday, October 12, four days before the scheduled trial.[165] The agreement, which was later ratified by the AFA's membership, would achieve $6.4 million in savings.[166]

The negotiations between Pinnacle and the Pilots continued, with both parties meeting with a mediator. But the two sides were unable to come to a resolution.[167] The Pilots presented various counter-proposals to the Company's revised August proposal, both before and after the section 1113 motion filing.[168] The Company responded with revised proposals, the last of which (prior to conclusion of the hearing) was presented to the Pilots on October 15, 2012.[169] Although the Company informed the Pilots that it was willing to consider different *means* of attaining the $59.6 million total dollar ask, it was

---

[163]    Trial Tr. 45:5-6, October 17, 2012 (Hughes); Glass Decl. Exh. 51 (Pinnacle Airlines 1113(c) Restructuring Proposal to the Air Line Pilots Association, August 16, 2012 Term Sheet), Attachment B.

[164]    Spanjers Decl. ¶ 33.

[165]    Trial Tr. 21:5-8, October 16, 2012 (Glass).

[166]    *Id.*

[167]    Trial Tr. 12:16-18, October 16, 2012 (Company Counsel).

[168]    Hallin Decl. Exh. H-J.

[169]    ALPA Exh. 14.

unwilling to reduce the dollar amount of the "Ask,"[170] and showed no movement with
respect to the total "Ask" whatever.

### 9. Liquidity Crisis

The possibility of a liquidity shortfall was raised by Pinnacle as early as May 8,
2012, during its presentation to the unions.[171]  However, as the trial on this motion drew
closer, Pinnacle grew more concerned about its cash levels and its ability to avoid events
of default under various agreements.  In her reply declaration submitted on October 12,
2012, Ms. Hughes explained that because Pinnacle does not have a "minimum
utilization" requirement in any of its Delta agreements, Delta is free to reduce its use of
Pinnacle services, and in fact Delta has reduced its use of Pinnacle aircraft, resulting in
reduced revenues for Pinnacle and lower projected cash levels.[172]  As noted previously,
specifics as to Pinnacle's liquidity situation appear in the Confidential Supplement.

### 10. Section 1113 Trial

The Court held a four-day trial beginning on October 16, 2012.  Consistent with
the Court's Case Management Order and its need to receive quantitative and technical
information in writing, direct testimony was taken by declaration, and cross-examination,
redirect, and any subsequent examination proceeded live.  Also, certain witnesses
supplemented their written declarations by providing oral direct testimony in Court as to
events that occurred since they submitted their declarations.  The Court heard from
Pinnacle's witnesses Jerrold Glass (Pinnacle's lead labor negotiator), John Spanjers

---

[170]    Trial Tr. 64:5-7, October 16, 2012 (Glass).

[171]    Hallin Decl. Exh. B. (Presentation to The Labor Leadership of Pinnacle Airlines, May 8, 2012), at
14.  Mr. Glass noted in his testimony that he directly raised the possible liquidity problem at the
negotiating table two or three months before the trial. Trial Tr. 29:10-21, October 16, 2012
(Glass).

[172]    Hughes Reply Decl. ¶ 5

(Pinnacle's President and CEO), Virginia Hughes (Seabury), Jason Cude (General

Manager of Delta Connection Finance), Daniel Kasper (Compass Lexecon), Mark

Shapiro (Barclays Capital), and Patrick Ryan (Vice President of Pinnacle's Manpower

Planning and Staffing).  The Court likewise heard from the Pilots' witnesses Captain Paul

Hallin (Chairman of the Negotiating Committee of the Pinnacle Master Executive

Council), Marcia Eubanks (lead financial analyst for ALPA), and Captain Thomas

Wychor (Chairman of the Master Executive Council).

*11.  Ultimate Facts*

    The Court additionally makes the following findings of ultimate facts:

        1. Pinnacle has made a proposal to the authorized representative of

the employees (*i.e.*, the Pilots) covered by the collective bargaining

agreement.

        2. The proposal was based on the most complete and reliable

information available at the time of the proposal.

        3. Pinnacle provided the Pilots, to the extent Pinnacle could, with

such relevant information as was necessary to evaluate the proposal.

        4. Pinnacle met, at reasonable times, with the Union to attempt to

reach mutually satisfactory modifications of the collective agreement.

Pinnacle did so in good faith.

        5. In nearly all respects, though not in every respect, Pinnacle's

proposal was necessary to permit the reorganization of the Debtor.

        6. In nearly all respects, though not in every respect, Pinnacle's

proposal assured that all creditors, the debtor, and all affected parties were

-31-

treated fairly and equitably.  To the extent it was not, it was by reason of its unfairness to the Pilots.

      7. The Pilots were justified in refusing to accept Pinnacle's proposal as the proposal was tendered to it—or, putting it in the terms of section 1113(c)(2), the Pilots did not refuse to accept Pinnacle's proposal "without good cause."

Discussion

Section 1113 of the Bankruptcy Code imposes special requirements for the rejection of a collective bargaining agreement, to reconcile the reorganization imperatives of a chapter 11 debtor with the collective bargaining interests of organized employees.[173] It was enacted in 1984 in response to the Supreme Court's decision in *N.L.R.B. v. Bildisco & Bildisco,*[174] in which the Supreme Court held that a debtor could reject a collective bargaining agreement as an executory contract by showing that the agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract."[175]

In the wake of the *Bildisco* decision, congressional concerns intensified that certain companies were misusing the bankruptcy system as an end-run around collective bargaining.[176]  Consequently, Congress, overruling *Bildisco* in part, provided that collective bargaining agreements would not be subject to the general provisions of

---

[173]    *Northwest Airlines,* 346 B.R. at 320.

[174]    465 U.S. 513, 526, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("***Bildisco***").

[175]    *Northwest Airlines,* 346 B.R. at 320.

[176]    *See Wheeling-Pittsburgh Steel Corp v. United Steelworkers*, 791 F.2d 1074, 1082 (3d Cir. 1986) (citing Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances*, 58 Am. Bankr. L.J. 293, 312 (1984)).

-32-

section 365, and laid down procedural and substantive prerequisites to a debtor's rejection of a collective bargaining agreement.

These requirements are imposed on the debtor "to prevent it from using bankruptcy as a judicial hammer to break the union."[177]  The prerequisites, set forth in section 1113, are aimed at facilitating consensual modifications to collective bargaining agreements but include finite time periods in recognition of the fact that indefinite delay can doom a chapter 11 reorganization.[178]  If the efforts to negotiate a consensual resolution fail, the court can approve rejection when the statutory requirements have been met.

A.

Legal Standards

Section 1113 has three subsections relevant to this motion.  Its subsection (a) provides that a collective bargaining agreement can be rejected only after compliance with the requirements of section 1113.  Then its subsection (b) lays out steps with which a debtor or trustee must comply before a motion for approval of rejection can be filed, and (after any such motion has been filed) before the hearing on it.  Then its subsection (c) lays out requirements for approval of any such motion.

Subsection (c) provides:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> > (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

---

[177]    *In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir. 1972) ("**Maxwell Newspapers**").

[178]    *See Northwest Airlines*, 346 B.R. at 320.

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

Subsection (b)(1),[179] referenced in subsection (c) as establishing the requirements for any satisfactory modification proposal, imposes both procedural and substantive requirements. As procedural matters, subsection (b)(1) requires that prior to rejecting a collective bargaining agreement, a debtor provide the union with a proposal for proposed modifications;[180] that the proposed modifications be based on the most complete and reliable information available at the time of the proposal;[181] that the debtor provide the union with all relevant information that is necessary to assist the union in evaluating the proposal;[182] and that the debtor bargain in good faith with the union in attempting to

---

[179]     Subsection (b) provides, in full:

> (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

>> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

>> (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

[180]     Bankruptcy Code section 1113(b)(1)(A).

[181]     *Id.*

[182]     Bankruptcy Code section 1113(b)(1)(B). Also, subsection (b)(2) requires that during the period between the making of the proposal and the date of the hearing on the motion, the trustee meet, at

reach mutually satisfactory modifications during the period from the date of the initial proposal to the date of the hearing before the Court.[183]

As substantive matters, subsection (b)(1) requires that the proposal be "necessary to permit the reorganization of the debtor,"[184] and that it "assure that all creditors, the debtor and all of the affected parties [be] treated fairly and equitably."[185]

Effectively then, by reason of the amalgam of the requirements of section 1113's subsections (b) and (c), a debtor must show, in addition to compliance with the procedural requirements, that:

>  (1) the modifications it seeks are necessary to permit the reorganization of the debtor;"

>  (2) the proposal assures that all affected parties are treated "fairly and equitably;"

>  (3) the authorized representative of the employees has refused to accept the proposal without good cause; and

>  (4) the balance of the equities clearly favors rejection of such agreement.

The debtor bears the burden of proof, by preponderance of the evidence, on all elements of section 1113.[186]

---

reasonable times, with the authorized representative (*i.e.* the union) to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement. This effectively imposes procedural requirements (the duty to meet) and substantive ones (to do so in good faith).

[183]  Bankruptcy Code section 1113(b)(2).

[184]  Bankruptcy Code section 1113(b)(1)(A).

[185]  *Id.*

[186]  *See Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir. 1987) ("***Carey Transportation***"); *American Airlines*, 477 B.R. at 406.

1.  *Necessity*

"A debtor must show that its proposed modifications to the collective bargaining agreement are necessary for reorganization."[187]  Indeed, as Judge Gropper observed in *Northwest Airlines*, "[t]he *most fundamental* requirement for rejection of a collective bargaining agreement is that the rejection must be 'necessary.'"[188]

In that connection, the Court agrees with Pinnacle's point,[189] quoting Second Circuit authority, that a section 1113 proposal must contain "necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."[190]  In the Second Circuit, it is true, as Pinnacle argues,[191] that the debtor's proposal "need not be limited to the bare bones relief that will keep it going."[192]

On the other hand, the Court does not understand that to mean, and in any event the Court is unwilling to hold, that a necessity that exists as a general matter supports a proposal that goes beyond the demonstrated necessity.  That is the teaching of Judge Lane's decision in *American Airlines*,[193] and Judge Drain's decision in *Hostess Brands*[194]—in each of which the court found that necessity for most of the proposed

---

[187]    *American Airlines*, 477 B.R. at 407.

[188]    *Northwest Airlines*, 346 B.R. at 321 (emphasis added).

[189]    Pinnacle Br. at 35.

[190]    *Carey Transportation,* 816 F.2d at 89-90.

[191]    Pinnacle Br. at 35.

[192]    *New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.),* 848 F.2d 345, 350 (2d Cir. 1988) ("***Royal Composing Room***").

[193]    *See* 477 B.R. at 454 (denying section 1113 motion without prejudice, where necessity in most, but not all, respects was shown).  Judge Lane later granted section 1113 relief after the debtor modified its proposal to cure the defects Judge Lane had identified.  *See In re AMR Corp,* 2012 Bankr. LEXIS 4168, 2012 WL 3834798 (Bankr. S.D.N.Y. Sept. 5, 2012).  As discussed below, see page 67 below, this Court would be amenable to a similar scenario here.

[194]    *In re Hostess Brands, Inc.,* Case No. 12-22052, Tr. of Hrg. of May 12, 2012 (Bankr. S.D.N.Y. May 12, 2012) (denying section 1113 motion where debtor sought more than what was necessary).

modifications had been shown, but that it did not support demands that went further.
Though stated in another section 1113 context, an observation by the Tenth Circuit has
broader application, and is equally applicable here:  "[a] debtor may not overreach under
the guise of proposing necessary modifications."[195]  Thus, necessity that has been
established cannot be used as a Trojan Horse to support proposals that go beyond the
necessity that has actually been shown.

But the necessity that may be shown includes necessity in the long term, as well
as the short term.  To determine whether changes are necessary for a successful
reorganization, the court must "look[ ] into the debtor's *ultimate future* and estimate[e]
what the debtor needs to attain financial health."[196]  And as Judge Lane observed in
*American Airlines*, quoting earlier analysis by Judge Hardin in *Delta Airlines*:[197]

> [A] court should focus "on the long-term economic
> viability of the reorganized debtor, as opposed to
> the debtor's short-term economics as they may have
> evolved during the course of the bankruptcy...."[198]

---

[195]    *In re Mile Hi Metal Sys.*, 899 F.2d 887, 893 (10th Cir. 1990).

[196]    *Carey Transportation*, 816 F.2d at 89 (emphasis added).

[197]    *In re Delta Air Lines, Inc.,* 359 B.R. 468 (Bankr. S.D.N.Y. 2006) (Hardin, J.) ("*Delta Airlines*").

[198]    *American Airlines*, 477 B.R. at 407 (quoting *Delta Airlines*, 359 B.R. at 477).  Judge Hardin also
made another critical point.  He stated that "[b]ecause a plan of reorganization may not be
confirmed if it is likely to be followed by liquidation or the 'need for further financial
reorganization,' the modifications are proposed with a view to the long-run success of the debtor's
business."  *Delta Airlines*, 359 B.R. at 477.  That is so because section 1129 of the Bankruptcy
Code requires, if a debtor is to confirm a reorganization plan—the ultimate goal of any
reorganization—that the bankruptcy court find, among other things, that:

> Confirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of
> the debtor or any successor to the debtor under the plan, unless
> such liquidation or reorganization is proposed in the plan.

Bankruptcy Code section 1129(a)(11).  Thus, even if a debtor's failure to get its house in order
isn't critical in the short term, if liquidation in the longer-term is still likely, the debtor cannot
confirm a reorganization plan.

Caselaw in this area also requires the Court to consider not just the costs inherent in a debtor's ability to survive, but also in its ability to compete—at least in cases (like this one) where the debtor lacks the ability to charge its customers or its contract counterparties whatever the debtor's costs require, and the debtor's ability to survive depends on its ability to compete. As Judge Lane stated in *American Airlines*:

> It is self-evident that a debtor's long-term ability to compete in the marketplace for its product is essential for the viability of any reorganization....[199]

And like Judge Hardin ahead of him in *Delta Airlines*, Judge Lane noted the Second Circuit's recognition, in *Royal Composing Room,*[200] of the necessity of rejection when a debtor's labor costs are higher than those of its competitors and where the debtor faces "enormous competitive pressure."[201]

### 2. Fair and Equitable Treatment

Section 1113(c)—by reason of its incorporation, in section 1113(c)(1), of requirements of section 1113(b)(1)—also requires that the debtor's proposal "assure[] that all creditors, the debtor and all of the affected parties are treated fairly and equitably." This requirement "spread[s] the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."[202]

---

[199]    *American Airlines*, 477 B.R. at 407 (quoting *Delta Airlines*, 359 B.R. at 478).

[200]    *Royal Composing Room,* 848 F.2d at 345.

[201]    *American Airlines*, 477 B.R. at 407; *Delta Airlines*, 359 B.R. at 478, in each case quoting *Royal Composing Room*, 848 F.2d at 350; *see also Northwest Airlines*, 346 B.R. at 321 ("[A] debtor's proposed modifications are considered necessary if they … are required for the debtor to … compete in the marketplace upon emergence from Chapter 11.").

[202]    *Carey Transportation*, 816 F.2d at 90 (quoting *In re Century Brass Prods., Inc*., 795 F.2d 265, 273 (2d Cir. 1986)); *American Airlines*, 477 B.R. at 408 (quoting *Carey Transportation*).

As Pinnacle correctly states,[203] there are no bright-line rules indicating whether a proposal is fair and equitable. Instead, courts "apply a general, flexible standard" that cost-cutting burdens be shared among affected parties—and that to the extent some groups are asked to contribute more than others, the different contribution levels be justified under the circumstances. As Judge Lane put it in *American Airlines*:

> Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest. . . . . A debtor can meet the requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally."[204]

In that connection, "[t]he affected parties need not receive identical modifications, and the concessions asked of the unions can reflect the differences in the individual unions' wage and benefit levels."[205]

### 3. *Good Cause to Reject Debtor's Proposal*

To grant section 1113 relief, the Court must also find, consistent with the requirements of section 1113(c)(2), that "the authorized representative of the employees has refused to accept such proposal without good cause…." The requisite "good cause" in this context is not statutorily defined, nor are standards for finding it articulated in the Code. But "good cause" has been fleshed out in the caselaw. Findings that a proposed modification is necessary, fair and equitable do not by themselves compel an additional finding that a union's refusal to agree to a proposal is without "good cause." The

---

[203]    *See* Pinnacle Br. at 47.

[204]    *American Airlines*, 477 B.R. at 408 (quoting *Northwest Airlines*, 346 B.R. at 326) (internal citations omitted).

[205]    *See American Airlines*, 477 B.R. at 408.

requirement of section 1113(c)(2) is an additional one, and cannot be read to be surplusage.[206]

As the Second Circuit observed in *Maxwell Newspapers*:

> What "good cause" means is difficult to answer in the abstract apart from the moorings of a given case. A more constructive and perhaps more answerable inquiry is why this term is in the statute. We think good cause serves as an incentive to the debtor trying to have its labor contract modified to propose in good faith only those changes necessary to its successful reorganization, while protecting it from the union's refusal to accept the changes without a good reason.[207]

The *Maxwell Newspapers* court explained that:

> the entire thrust of section 1113 is to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process, and that reorganization procedures are designed to encourage such a negotiated voluntary modification. Knowing that it cannot turn down an employer's proposal without good cause gives the union an incentive to compromise on modifications of the collective bargaining agreement, so as to prevent its complete rejection. Because the employer has the burden of proving its proposals are necessary, the union is protected from an employer whose proposals may be offered in bad faith.[208]

"Though the debtor retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modification, the union must come forward with evidence of its reasons for declining to accept the debtor's proposal in

---

[206]    *See Carey Transportation*, 816 F.2d at 91-92 (subtly questioning the propriety of a bankruptcy court conclusion that because the bankruptcy court had held a modification proposal to be necessary, fair and equitable, the union therefore lacked good cause to reject it—but holding that such an analysis would be proper where, as there, the union had neither participated meaningfully in post-petition negotiations nor offered any reason for rejecting the proposal other than its view that the proposed modifications were excessive).

[207]    981 F.2d at 90.

[208]    *Id.*

whole or in part."[209] But those duties are more theoretical than real in practical terms. Well represented debtors and unions will typically do much more than meet their burdens of coming forward, and will flesh out in detail, in an evidentiary hearing, their respective needs and concerns. They will do so to give the Court the raw materials it needs to make a decision as to the union's good cause in rejecting a debtor proposal as a classic mixed question of fact and law.

Ultimately when making a "Good Cause" determination, a court will consider the parties' respective positions and conduct; the proposal that was rejected; and the context in which it was rejected—all, as *Maxwell Newspapers* put it, as part of the "moorings of a given case"[210]—to determine, for example, whether the union's decision to reject the debtor's proposal was out of intransigence or unwillingness to recognize economic realties, on the one hand, or by reason of statutory or economic deficiencies in the debtor's proposal (or inappropriate debtor negotiating conduct), on the other.

### 4. Balance of Equities

Then, to grant section 1113 relief, the Court must additionally find, consistent with the requirements of section 1113(c)(3), that "the balance of the equities clearly favors rejection of such agreement." In applying that subsection, it is important to note the word "clearly" that appears as part of that clause; textual analysis tells us that considerably more than a minimal tipping in the balancing is required.

This requirement is a codification of the standard set out in *Bildisco*.[211] In *Carey Transportation*, the Second Circuit identified "at least" six "permissible equitable

---

[209]    *Carey Transportation*, 816 F.2d at 92 (internal quotation marks deleted).

[210]    981 F.2d at 90.

[211]    *See Carey Transportation*, 816 F.2d at 92; *American Airlines*, 477 B.R. at 410.

considerations" (many of which also factor into the other substantive requirements imposed by section 1113) for use in determining if the equities favor rejection of a collective bargaining agreement:

> (1) the likelihood and consequences of liquidation if rejection is not permitted;

> (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

> (3) the likelihood and consequences of a strike if the bargaining agreement is voided;

> (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

> (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

> (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.[212]

The equities must be examined in relation to the debtor's attempts to reorganize  "[T]he Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities.  The Bankruptcy Code does not authorize freewheeling consideration of every

---

[212]    *Carey Transportation*, 816 F.2d at 93; *see also American Airlines*, 477 B.R. at 410 (listing the *Carey Transportation* factors).

conceivable equity, but rather only how the equities relate to the success of the reorganization." [213]

But in this Court's view, even recognizing that equitable considerations must be limited to those that relate to the success of the reorganization, there is an additional important matter to consider as well. In the past, when the Second Circuit has articulated factors for the courts in the Circuit to consider, it has not infrequently done so by use of expressly or impliedly nonexclusive lists. [214] And in the past, as it did in *General Motors*, [215] this Court, recognizing that the Circuit's list was not exclusive, has suggested additional factors to consider as well. [216] That is appropriate here too, since the Circuit, in *Carey Transportation*, articulated "*at least* six permissible equitable considerations." [217]

Another key equitable consideration—perhaps implied, but not expressly stated, in the considerations listed by the Circuit in *Carey Transportation*—is whether imposing the requested pay cuts or other concessions would still be preferable to the loss of everyone's jobs, those of union members and non-union members alike. That consideration is so important, in this Court's view, that it deserves separate mention and analysis.

---

[213]    *American Airlines*, 477 B.R. at 410 (quoting *Bildisco*, 465 U.S. at 527).

[214]    *See, e.g., Comm. of Equity Sec. Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (listing factors to consider in determining whether the bulk of a debtor's assets may be sold under section 363, rather than under a plan); *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990) (listing factors to consider in determining whether to grant relief from the automatic stay to permit litigation in another forum).

[215]    *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) ("**General Motors**"), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10–4882-bk (2d Cir. Jul. 28, 2011).

[216]    *See General Motors*, 407 B.R. at 490.

[217]    *See* 816 F.2d at 93 (emphasis added).

-43-

<u>B.</u>

<u>Application to Facts Here</u>

The Court then turns to its application of those legal principles to the facts it found in the evidentiary hearing on this motion, rearranging them slightly for ease of discussion.

*1. Procedural Matters*

The Court turns initially to the procedural requirements for section 1113 relief, though they need only modest mention.

First, the Court has found as a fact, and now determines as a mixed question of fact and law, that Pinnacle satisfied the necessary procedural requirements to make a proposal; to provide any and all information that it could to enable the Pilots to evaluate the proposal; and to negotiate with the Union.[218]  As a matter of law on an issue that the Court believes to be one of first impression, the Court rules that to meet the procedural requirements of section 1113(b)(1), a debtor can only be required to provide information that is within the debtor's power to provide.

While section 1113(b)(1)(B) requires the debtor to provide "such relevant information as is necessary to evaluate the proposal" (and while information unavailable to the debtor could often be helpful, or even "necessary," at least in the sense of being the information that would be most helpful), section 1113(b)(1)(A) requires the proposal to be "based on the most complete and reliable information *available* at the time of such

---

[218]    In this connection, the Court cannot agree with the Pilots' contention, *see* Pilots Br. at 38, that "Pinnacle's failure to negotiate or even consult with ALPA while it put together a regressive proposal violated its obligation to meet at reasonable times with ALPA."  Deferring negotiations pending validation of Delta's assertions and considering how they might affect Pinnacle's arrangements with its various unions was at least appropriate, if not also essential.

-44-

proposal."[219]  In the Court's view, all of the provisions of section 1113(b)(1) must be

read together.  And together they evidence, along with the remainder of section 1113 and

section 1113 caselaw, Congress' intention that the parties try as hard as they can to reach

a negotiated, and nonjudicial, resolution.  But the parties can only do what is possible,

and the statutory language, and common sense, require that the Court impose

requirements consistent with reality.

    The Court has little doubt that information available only to Delta—what its

contracts with other regional carriers provide, and, perhaps, what Delta has to support its

statements as to what other regional carriers' costs are—would be the best indication of

what Pinnacle would need to do to compete and survive.  But the Court is persuaded,

after hearing all of the evidence, that Pinnacle does not have that information except in

the form that Delta shared it, and in the form of the results of Pinnacle's own efforts to

corroborate Delta assertions, which Pinnacle shared with the Pilots.  Thus Pinnacle's

inability to provide information that only Delta could provide is not fatal to Pinnacle's

motion.

    Second, as noted above and below, the Court was and still is troubled by

Pinnacle's unwillingness to show any movement whatever in its aggregate demand.  In

some cases, refusal to move in any way could reasonably be argued to evidence a failure

to negotiate in good faith, and might be found to be such in the future.  But the Court

recognizes some subtlety in the caselaw as to this issue.[220]  As a consequence, the Court

is disinclined to rule that Pinnacle's refusal to move in negotiations based on advice that

counsel may have given to Pinnacle with which this Court now disagrees rose to the level

---

[219]    Emphasis added.

[220]    *See* page 59 et seq. below.

-45-

of either bad faith or a failure to satisfy statutory requirements for negotiation in good faith.[221]  Thus the Court assumes, for the purpose of the analysis that follows, that Pinnacle complied with the requirement under section 1113(b)(2) that Pinnacle meet to confer in good faith with the Union after making its proposal.[222]

## 2.  Necessity

As noted above,[223] the most fundamental requirement for rejection of a collective bargaining agreement is that the rejection must be "necessary."  The Court is compelled to find that in nearly every respect, Pinnacle has made the required showing.

Though the Court regards it as unnecessary and inappropriate to here set forth in detail evidence it heard in closed proceedings at trial, and findings it has set forth in the Confidential Supplement, the bottom line is clear—and the question is not in any way close.  Pinnacle's liquidity crisis is acute, and its pilot labor costs are considerably over market.  These are critical issues in the short run and the long run, and without correcting both, Pinnacle cannot reorganize.  Indeed, without correcting the former, Pinnacle would quickly come to an end.

### (a)  Liquidity as Resulting in Necessity

The Court has addressed Pinnacle's liquidity situation in the Confidential Supplement.  It is sufficient for purposes of this public discussion to state that Pinnacle's

---

[221]    It did, however, give the Pilots good cause—and, under the facts here, additional good cause—for their refusal to agree to Pinnacle's proposal.  *See* page 65 below.

[222]    The Court similarly declines to hold that the absolute size of the change in Pinnacle's "Ask"— even an attention-catching increase by 78%—was, as the Pilots argue, *see* Pilots Br. at 39, indicative of bad faith negotiation.  While an increase of that magnitude might be indicative of bad faith when combined with more (or in the absence of any sound explanation), the absence here of any more, and circumstances explaining the size of the increase (or at least most of it), cause the Court to conclude that the mere size of the increase is insufficient to warrant a bad faith conclusion here.

[223]    *See* page 36 above.

liquidity situation is serious.  The issue is not that the liquidity situation is disputed in any

way.  To their credit, the Pilots acknowledge it.[224]  But they say that the liquidity

problems are not their fault; that the liquidity problems were exacerbated, if not also

caused, by one-time transitional costs in 2011 and 2012; and that the cost-cutting

measures Pinnacle seeks would take so long as to be ineffectual in solving the liquidity

problem that there is no point to asking the Pilots to make the requested sacrifices.

The Pilots are right with respect to the underlying facts, but not with respect to the

conclusion or what needs to be done.  Section 1113 determinations are not an exercise in

finding fault; they are an exercise in problem solving—determining what measures are

necessary to enable a debtor to reorganize, and, in extreme cases, what measures are

necessary to enable a debtor to survive.  It is not the Pilots' fault that the Debtor has

serious liquidity issues,[225] but it is only through sacrifices the Pilots will have to make

that the liquidity problem may be resolved.

The Pilots are also correct that even if they make concessions—particularly

concessions with respect to work rules—those concessions would not, by themselves,

---

[224]    *See* Closing Args. Tr. at 29:24-30:3 ("[PILOTS' COUNSEL]: Your Honor, we don't dispute the
liquidity crisis.  I think what's in dispute is what flows from it and whether the company's
demands are connected in any way to solving the crisis that they've put on evidence about.").

[225]    The Pilots pointed out at trial, in both evidence and argument, that difficulties Pinnacle was
undergoing were not of the Pilots' making, and that major components of the Pinnacle's extra
costs appeared in the past and would not recur to the same extent in the future.  In many respects,
the Pilots were right.  It is true, by way of example, that Pinnacle suffered mightily from very high
costs associated with merging the Mesaba, Colgan, and Pinnacle I operations and work forces—
including, especially, the additional costs of training and certification for pilots to fly different
aircraft, or even the same aircraft under different operating procedures or under FAA certification
for different corporate entities.  These matters cannot in any way be regarded as the Pilots' fault.
And it is also true that costs of the type just mentioned would not recur, or would recur to a
considerably lesser degree.  But Pinnacle is right that a determination under section 1113 does not
turn on fault; it turns on what is necessary to ensure a company's ability to survive.  And in that
connection, Pinnacle showed that even putting aside the very high costs incurred in the past,
Pinnacle's *present* cost structure makes it impossible for Pinnacle to survive unless the Pilots
make wage, benefit, and/or work rules concessions representing the great bulk of the "Ask" that
Pinnacle sought.

have a quick enough economic effect to respond to Pinnacle's liquidity crisis. All parties

recognize that reality. The most likely source of a solution to that would be short term

relief from Delta—which undoubtedly has an incentive to keep Pinnacle alive (as Delta

has done through the duration of Pinnacle's chapter 11 cases through DIP financing) to

keep Pinnacle's planes flying to meet Delta's own operational needs. But Delta has

stated that it is not interested in talking to Pinnacle about help with Pinnacle's short term

liquidity problems if Pinnacle doesn't first get its labor costs house in order. The Court

takes Delta at its word.

The Court well understands, of course, that there is no guarantee that if Pinnacle

*does* gets its labor house in order, Delta will assist. But the Court can and must make an

informed judgment as to the likelihood of assistance if Pinnacle *does not* get its labor

house in order. The most serious risk (if not also likelihood) is that Delta would keep

Pinnacle alive until Delta could put in place satisfactory substitutes for Pinnacle's

services, and that Delta will then switch to cheaper alternatives, leaving Pinnacle then to

fail—with insufficient liquidity, no other customers, and no choice then but to liquidate.

That would be a tragic consequence for the Pilots and, of course, all of Pinnacle's other

employees, and makes an overwhelming showing of what the Necessity provision of

section 1113 requires.

### (b) Excessive Costs as Resulting in Necessity

The Court is also compelled to find that Pinnacle has shown the necessity for

dramatically reducing its Pilots' labor costs even apart from its liquidity situation. The

Court has no doubt, based on its earlier Findings of Fact, that Pinnacle's Pilot labor costs

are dramatically over market. A significant part of that overage results from the Pilots'

high average level of seniority, but it is no less a problem.  Other regional airlines have
dramatically lower costs.

The backup to Delta's calculation as to the extent to which Pinnacle's costs are
way over market was not made available—not to the Pilots and not to Pinnacle.  So
appropriately, Pinnacle took steps to try to corroborate the Delta calculation.  Pinnacle
did so through the Seabury analysis, explained by Ms. Hughes, and the Compass Lexecon
analysis, explained by Mr. Kasper—each of which the Court finds to have been
performed competently and in good faith.  The corresponding analysis of the Union's
own financial expert, Ms. Eubanks, was consistent with Pinnacle's expert's analysis, after
adjustment for a computational error which resulted in most of the discrepancy.

The dramatic extent to which Pinnacle's costs are higher than market affects both
Pinnacle's ability to get future work from other carriers and even from Delta itself, at
least in 2018 and thereafter.  The evidence the Court heard as to the extent to which the
regional air transport industry is commoditized was effectively undisputed, and in any
event was unrefuted and highly persuasive.  So was the evidence of Delta's ability to
invoke the reset provisions of the Delta Connection Agreements.[226]  Pinnacle can offer no
bases for choosing its services over those of its competitors except on the basis of price.
It will need to be among the lowest-cost providers in the industry.

Additionally, the requirement that the Court look also to the long term[227] prevents
the Court from being satisfied with band-aid solutions.  The Pilots cannot proceed on the
assumption that Delta is now stuck with Pinnacle, and that it doesn't now matter that the
Pilots' wages make Pinnacle grossly uncompetitive.  The Court cannot find Pinnacle's

---

[226]    *See* text accompanying note 107 above.

[227]    *See* page 37 above.

proposal for wage cuts to be unnecessary simply because they will become most critical only at a later time. When that later time comes, unless Pinnacle is then competitive, it will almost certainly lose its Delta business—the business from its only present customer.

And there will be no reasonable basis for concluding that Pinnacle will secure business from anyone else, unless its costs (and thus the rates it will be able to charge and still make a profit) are at least near, if not also at the same level as, the rates of its competitors. Then, without the dramatic reduction in costs that is necessary to make Pinnacle competitive, the Court will find it impossible to find, as confirmation of a reorganization plan requires,[228] that confirmation is not likely to be followed by liquidation. A future liquidation will be a certainty, or a likelihood very close to one.

Thus the Court has found the requisite necessity for nearly all of the cost savings that Pinnacle seeks. The Court cannot, however, find the requisite necessity for the entirety of Pinnacle's "Ask." That is so because Pinnacle's proposal at least seemingly sought to place the Pilots' aggregate labor costs *below* those of Pinnacle's lowest cost competitors.[229] That was aptly characterized by the Pilots as a "Race to the Bottom," and was unsupported by the evidence presented to the Court. It was particularly unsupported with respect to the ongoing relationship with Delta, since there would undoubtedly be costs—very possibly more than minimal ones—that Delta would have to incur upon shifting from one regional carrier to another, which would at least seemingly have to be trumped by any difference in pricing to warrant a shift away from Pinnacle, at least until 2018. And there was similarly no evidence that being *below* competitors' cost levels—as

---

[228]    *See* note 198 above.

[229]    *See* note 268 below.

contrasted to being at approximately the same level—would be necessary to compete.[230] Pinnacle has met its burden to show the requisite necessity for the great bulk of the cost savings it seeks. But for this reason, it has not shown the need for all of them.

The Pilots should not read too much, however, from the Court's view that the necessity for a "Race to the Bottom" has not been shown. Even with Pinnacle's somewhat excessive demands, the requisite necessity was shown for nearly all of Pinnacle's request. While Pinnacle asked for cost savings of $59.6 million, the Pilots offered only $33 million, and the Court is not even confident that the Pilots' valuation of the savings under their offer could fairly be regarded as that much, or would continue for the requisite time. The savings for which necessity has been shown are very near to the Pinnacle figure, and not at all close to the Pilots'.

### (c)  Necessity Requirement Conclusions

Because the proposal as put forward by Pinnacle was to a certain extent overreaching, the Court cannot find that the Necessity requirement of section 1113(b)(1) was satisfied.[231] But Pinnacle's proposal was not overreaching by very much. The failure to meet the Necessity requirement with respect to the proposal as put forward

---

[230]    Pinnacle has called the Court's attention to Judge Lane's observation in *American Airlines* that:

> In each prior airline bankruptcy then, the pattern appears the same: the airline enters bankruptcy with labor costs that are at or near the top of the industry and then emerges with costs at or near the low end of the group.

477 B.R. at 419. The Court assumes that to be true, and applicable here as well, though it would appear that Judge Lane got more direct evidence of that in *American Airlines* than this Court got here. But assuming that it fully applies here as well, Judge Lane's observation cannot be extended beyond what he actually said. He found that the airlines would emerge with costs "*at or near* the low end of the group," not below them. He expressed no view as to the need for leapfrogging to achieve lower and lower costs.

[231]    As the proposal was overreaching, the Court must also find that the Pilots rejected it with good cause, causing the Company additionally to have failed to satisfy the requirements of section 1113(c)(2). *See* page 58 below.

requires denial of the motion without prejudice.  If negotiations do not otherwise lead to agreement, a somewhat modified proposal may be put forward, and if necessary a new motion may be filed.[232]

### 3.  Fair and Equitable Treatment

With one exception (but only one), the Court determines that the modifications Pinnacle seeks meet all of the requirements, discussed above,[233] for Fair and Equitable Treatment.

The principal potential unfairness addressed in briefing was the extent to which the Pilots were asked to take pay cuts and make other concessions relative to other unionized employees—especially flight attendants—and non unionized personnel.  But after review of the evidence, the Court is satisfied with the reason for the greater sacrifice asked from the Pilots.  A greater market disparity exists for the Pilots as compared to other labor groups, both union and non-union.

Pinnacle presented unrebutted testimony that its two other unionized work groups, the flight attendants and the dispatchers, were at or below market before any labor concessions.  That is a critical distinction, and it satisfactorily explains why the Pilots needed to sacrifice more.

---

[232]    In closing arguments, the Pilots asked the Court to require, as a prerequisite for any section 1113 relief, three-way discussions amongst the Company, the Pilots, and Delta.  This would probably be very useful, but the Court cannot require it.  The Pilots' request goes beyond any of the requirements that are imposed under the Code and related caselaw, which focus on the relationship between the debtor and the union, without reference to third-party entities that might have influence over a debtor's fate.  The Pilots' request underscores the reality that parties have much greater flexibility to address their needs and concerns in negotiations, as contrasted to judicial determinations, where judges are bound to issue rulings within the four corners of the issues that are before them for determination.

[233]    *See* page 38 above.

Likewise, the Court regarded it as important to query whether Pinnacle's non-unionized personnel—and its senior management in particular—were likewise sharing in the sacrifices asked of the Pilots. The testimony was unrebutted that Pinnacle's management receives below-market compensation. And while the evidence of sacrifices management made did not come in as clearly as the Court would have hoped (and the Pilots were not given the information as to this as early as the Court would have hoped), the showing ultimately was made that management sacrificed too, with reductions in pay of from 8% to 10%. That is not as much as the Pilots were asked to bear, but was in the context of below-market compensation for management.

There was a fair and reasonable basis for the sacrifices the Pilots were asked to make. In that respect, the "Fair and Equitable Treatment" requirement was satisfied.

There is, however, another consideration relevant to "Fair and Equitable Treatment"—fairness with respect to other stakeholders—and in this respect the Court finds deficiencies. Pinnacle is asking the Court for leave to abrogate numerous contractual obligations. That would result in great pain to the Pilots. The need to dramatically reduce the costs associated with the contractual obligations has been shown to exist—but Fair and Equitable Treatment requires ameliorating the pain to the Pilots (insofar as possible) by giving them, by means of appropriate profit sharing, or issuance of equity, a share in the fruits of any profits that their sacrifice might entail, and avoiding windfalls to others.

The Court is not satisfied that such has been offered here. Any such profit sharing—not being a cost Pinnacle would have to bear, but kicking in only after Pinnacle would be showing a profit—would have no impact on Pinnacle's liquidity or ability to

compete.  The Court was not impressed by Pinnacle's less than wholly direct response to

the Court's concerns with respect to "the windfall that might perhaps happen if we

implement these cost savings,"[234] or its vague assertion that we have a "very serious"

profit sharing proposal to Pinnacle's unions.[235]  To the extent that Pinnacle contends that

its proposal for profit sharing is in any way significant, the Court is surprised by that

contention.  The Court considers it very modest given the sacrifices the Pilots will have to

bear.  This case contrasts with *Northwest Airlines*, in which substantial profit sharing was

offered to flight attendants under the proposal that ultimately warranted section 1113

relief.[236]

    The words "fair and equitable" have, or may have, different meanings in at least

three different contexts in bankruptcy law.[237]  But the combination of making the Pilots

---

[234]    Closing Args. Tr. at 58:10-11.

[235]    *Id.* at 58:17-22.

[236]    *See in re Northwest Airlines Corp.*, 366 B.R. 270, 274 (Bankr. S.D.N.Y. 2007) (Gropper, J.)
("**Northwest-Claims**") ("The Debtor's proposal, which it was authorized to effectuate in
accordance with the § 1113 procedures, *provides for substantial profit sharing* by AFA and its
members.  They will share in this manner in whatever better performance the Debtor may
achieve.") (emphasis added).

[237]    Some of the different ways "fair and equitable" has appeared in bankruptcy caselaw were
discussed in this Court's decision in *In re Chemtura Corp.*, 439 B.R. 561, 593-95 (Bankr.
S.D.N.Y. 2010).  Those words have one meaning in the context of settlements, where bankruptcy
courts want comfort that the debtor isn't "giving away the store," under standards articulated in
*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414
(1968).  They have a different meaning in the context of confirmation of reorganization plans, as
incorporating the "absolute priority rule"—though in *In re Iridium Operating LLC*, 478 F.3d 452,
463 (2d Cir. 2007) ("*Iridium*") the Second Circuit held that unless deviation from the general rule
was shown to be justified, a settlement outside of confirmation of a plan would also have to be
"fair and equitable" in the absolute priority rule sense.  The words "fair and equitable" in section
1113 are probably best thought of as applying in a third sense, consistent with their plain
meaning, including all aspects of fairness—including, but not limited to, requirements of caselaw
that has identified particular aspects that need to be focused upon, such as fairness as between
employee groups.  And if *Iridium* doctrine were also deemed to apply here, it would suggest a
need to avoid benefits to more junior classes (like equity) at the expense of parties (like unions)
with contractual rights.  The Court does not believe that the "Fair and Equitable" inquiry properly
should be limited to consideration of the treatment of one employee group as contrasted to others.
At the least, it should be construed to cover fairness vis-à-vis other stakeholders, if not also
covering fairness whenever fairness may be questioned.

take such a large haircut with minimal sharing in the benefits would subject the Pilots to

the risk, if not certainty, of others (such as Equity) securing a windfall at the expense of

the Pilots—who have, at least until this motion is granted, contractual rights. That is

neither "fair" nor "equitable," by any measure under which those words might be

construed. The Pilots must receive, in the form of equity or profit sharing, a greater share

of any benefits that result from the abrogation of their contractual rights before the Court

can find that they have received "Fair and Equitable Treatment."[238]

---

[238]    If the Court were writing on a clean slate, it would construe "rejection" in section 1113 and "rejection" under section 365 consistently and as a unified whole—to the end that the rejection of a collective bargaining agreement after compliance with section 1113 results in the same consequences as the rejection of any other executory contract, and that section 1113 merely imposes additional requirements that must be satisfied before rejection can be invoked. Traditional executory contract doctrine has developed to provide a means to relieve a debtor of burdensome postpetition obligations (of which collective bargaining agreements may be the paradigm), while still providing at least some recompense to the injured counterparty by means of allowance of a prepetition claim. Allowing relief from those burdensome *post-petition* obligations (and those alone), if the negotiation required under section 1113 fails, is at least seemingly also consistent with the Congressional intent, to balance a company's need to survive against the rights of employees understandably wishing respect for their contractual rights.

However, in *Northwest Airlines Corp. v. Association of Flight Attendants (In re Northwest Airlines Corp.)*, 483 F.3d 160, 170-73 (2d Cir. 2007) ("*Northwest-Circuit*"), a case dealing with the propriety of an anti-strike injunction after an 1113 motion was granted (and not the allowance of a union's claim), the panel's two judge majority stated that the rejection of the collective bargaining agreement under section 1113 would result not in the breach and resulting prepetition claim that results from the rejection of executory contracts generally, but rather a court authorized "abrogation," *id.* at 170, 174; *accord id.* at 169, which would not result in an allowable claim for the disclaimer of the debtor's obligations. The *Northwest-Circuit* majority also made several statements effectively compelling the conclusion that union claims for rejection damages could not lie after a decision approving rejection under section 1113. *See* 483 F.3d at 174 ("[W]e thus conclude that a bankruptcy court acting pursuant to § 1113 may authorize a debtor to abrogate its [collective bargaining agreement], effectively shielding it from a charge of breach."); *id.* at 172 ("If a carrier that rejected a [collective bargaining agreement] simultaneously breached that agreement and violated the [Railway Labor Act], the union would be correspondingly free to seek damages or strike, results inconsistent with Congress's intent in passing § 1113."). The *Northwest-Circuit* majority also twice mentioned, though without substantive discussion, a Tennessee bankruptcy court decision, affirmed at the district court level, that had held there is no claim for breach of a collective bargaining agreement in light of section 1113. *Id.* at 169, 172 (citing *In re Blue Diamond Coal Co.*, 147 B.R. 720 (Bankr. E.D. Tenn. 1992), *aff'd*, 160 B.R. 574 (E.D. Tenn. 1993).

After the decision in *Northwest-Circuit*, Judge Gropper of this Court, with extensive consideration of what the Circuit panel's majority had said, understandably ruled that *Northwest-Circuit* required union claims for rejection damages to be expunged. *See Northwest-Claims*, note 236 above, 366 B.R. at 275-76. If Pinnacle can abrogate the Pilots' contractual rights and deny them even a prepetition claim, it is all the more important that the Court take appropriate measures to

-55-

*4. Balance of Equities*

As discussed above, in *Carey Transportation*, the Second Circuit identified "at least" six "permissible equitable considerations" for use in determining if the equities favor rejection of a collective bargaining agreement.[239]  Though as is common when courts articulate multi-factor tests, all are not equally applicable or significant,[240] four of the named factors weigh in favor of rejection:

> #1:  liquidation is effectively a certainty if rejection is not permitted;
>
> #2:  there will be a dramatic reduction in the value of creditors' claims if the bargaining agreement remains in force;
>
> #5:  the Pilots wages are above market with respect to those of others in the industry;
>
> #6:  the Company dealt with the Union in good faith in dealing with the Company's financial dilemma.[241]

Factors #1 and #5 favor rejection particularly strongly.

Factors #3 and #4 are effectively addressed in law that has come down since *Carey Transportation*—in *Northwest-Circuit* (holding, in the Railway Labor Act context, that a union's strike after an adverse section 1113 determination was granted could be

---

ensure that the Pilots are fairly and equitably treated in the section 1113 process, especially by means that do not impair Pinnacle's ability to survive.

[239]  *See* page 42 above.

[240]  *See, e.g.*, *In re Motors Liquidation Co.*, 457 B.R. 276, 291 (Bankr. S.D.N.Y. 2011) (Gerber, J.) ("The remaining enumerated factors, as is so often the case when we judges exercise our discretion using a list of factors we're directed to consider, have no material relevance to the controversy here.").

[241]  The Court finds that the Pilots dealt with Pinnacle in good faith too, but it is *Pinnacle* that is seeking the section 1113 relief.  If Pinnacle had not shown the requisite good faith, the Court would deny relief in a heartbeat.

enjoined),[242] and in *Northwest-Circuit* and *Northwest Claims* (effectively stating, and

holding, respectively, that union members' rejection claims should be expunged).[243]

Factors #3 and #4 tend to cut against granting section 1113 relief here, because they cut

off mechanisms that Pilots might otherwise employ to ameliorate the harm to them

resulting from an adverse 1113 decision but they are insufficient to trump the other

factors, especially #1, which in this Court's view is by far the most important of the

*Carey Transportation* enumerated considerations.

The Court noted above that it was free to consider other factors as well.[244]  A

critical equitable consideration, in the Court's view, is the consequences of inaction, and

the consequences to the other employees.  As harsh as the consequences of relief here

would be to the Pilots, they pale in comparison to the loss of 5,800 jobs (including those

of the Pilots themselves)—which the Court finds to be a certainty if Pinnacle's labor

costs are not dramatically reduced.  As Judge Gropper put it in *Northwest Airlines* (also

in the context of the Balance of Equities analysis that section 1113(c)(3), and *Carey*

*Transportation*, require):

> The Court would do the flight attendants and the
> Debtors' thousands of other employees no favor if it
> refused to grant the Debtors' § 1113 relief, and the
> Debtors joined the ranks of the many other airlines
> that have liquidated as a consequence of a Chapter
> 11 filing.[245]

Three deficiencies that the Court has addressed above and below prohibit, at this

time, section 1113 relief.  But they do not go to the Balance of Equities.  This

---

[242]    *See Northwest-Circuit,* 483 F.3d at 170-74.

[243]    *See Northwest-Circuit,* 483 F.3d at 170-74, and *Northwest Claims*, 366 B.R. 275-76, respectively.

[244]    *See* page 42 above.

[245]    346 B.R. at 330.

requirement has been satisfied.  If the deficiencies the Court has noted above and below
are satisfactorily addressed, and Pinnacle and the Union still cannot reach agreement, the
Balance of Equities will not in any way be an impediment to section 1113 relief.

*5.  Good Cause to Reject Company's Proposal*

The final requirement to be addressed, as also discussed above,[246] is that of
section 1113(c)(2) that "the authorized representative of the employees has refused to
accept such proposal without good cause…."  In this case, the Court finds that the Pilots
had good cause for declining to accept Pinnacle's proposal as it was then put forward—
though they would no longer have such good cause if Pinnacle revised and negotiated its
proposal in the three respects the Court identifies here.

Two of those respects have already been addressed.  As noted above, Pinnacle
showed an overwhelming necessity for very major reductions in its Pilot labor costs—
having shown, among many other things, that its Pilot labor costs are substantially over
market, and are effectively going to kill Pinnacle.  But Pinnacle overreached.  Without
showing that the necessity it had otherwise shown required the Pilots' labor costs to be
*below* market, Pinnacle at least seemingly asked the Pilots to agree to a proposal
premised on that.[247]  Pinnacle sought what the Pilots aptly called a "Race to the Bottom,"
which was unjustified by Pinnacle's showing of necessity.  The Court does not need to
decide, and does not now decide, whether a "Race to the Bottom" would be appropriate
upon an appropriate evidentiary showing that a continuing leapfrog toward lower and

---

[246]      *See* page 39 above.

[247]      *See* note 268 below.

-58-

lower labor costs is necessary to compete or survive; it was not made here. The Pilots had good cause to reject Pinnacle's proposal for this reason.[248]

The Court has also addressed Pinnacle's very modest proposal to assuage the pain the Pilots would suffer by means of profit sharing mechanisms. To the extent necessity could be shown (and as it *was* shown, with respect to the great bulk of Pinnacle's "Ask"), the Pilots would lack good cause to reject proposals for reduced compensation and benefits, as each would directly impact cash flow and Pinnacle's liquidity. But profit sharing would not impact Pinnacle's cash flow. It would come into play only if Pinnacle were already making a profit. Pinnacle could have, and should have, offered more to the Pilots to make up for their sacrifices in a way that would not have affected Pinnacle's ability to be profitable and survive. The Pilots had good reason to reject Pinnacle's proposal for this reason as well.

The Pilots also had good cause to reject Pinnacle's proposal by reason of Pinnacle's negotiating conduct. While Pinnacle was willing to secure the cost savings it wanted by flexible allocation between wages, benefits and work rules,[249] it was unwilling to show any movement whatever in its aggregate demand.[250]

---

[248] For the avoidance of doubt, the Court does *not* rule that the Pilots had good cause for rejecting Pinnacle's proposal as a consequence of the 78% increase in Pinnacle's "Ask" from $33 million to $59.6 million. As annoying, and shocking, as the change in the "Ask" likely was to the Pilots, the great bulk of the change was justified by subsequent developments and information that became known to Pinnacle only after its original proposal was put forward.

[249] *See, e.g.*, Closing Args. Tr. at 23:1-7 ("And you heard the company's position repeated again and again at the bargaining table that it is completely agnostic as to whether it achieves cost savings through work rules or pay cuts or any combination thereof. So the company, to the extent possible, has shown absolute flexibility on how to get to that number.")

[250] As the colloquy went:

> THE COURT: To what extent did the Company
> show any movement in its overall "Ask" as contrasted to
> having a willingness to shift around whether the cost savings
> would come from pay, work rules, or benefits?

Pinnacle says that it justified this approach by reason of its counsel's review of the underlying law in this area, and counsel's conclusion that the statutory framework, and earlier caselaw, did not permit movement in the overall "Ask" once Pinnacle's proposal was made—reasoning that if there was any room for negotiation, the proposal would not be "necessary."[251]  That view was incorrect.  There is *no requirement* in section 1113 law that in order to show "Necessity," a debtor show no movement in its overall demand whatever—particularly in the period between the filing of the section 1113 motion and the time of hearing on it, during which section 1113(b)(2) *requires* continuing good faith efforts to try to reach agreement.  If such stonewalling were in fact required, that would wholly frustrate the "entire thrust of section 1113"[252]—as stated by the Second Circuit in *Maxwell Newspapers*, "to ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process, and … to encourage such a negotiated voluntary modification."[253]

Pinnacle articulated the bases for its view on what it asserted was language in *American Airlines:*  a supposed statement—surrounded in quotes in the Closing Arguments transcript consistent with the way counsel described it in argument, as if it

---

[COMPANY COUNSEL]:  Well, … the answer is that we stuck to the amount of labor savings that our analysis showed we need … to become cost competitive.

THE COURT:  Is that a euphemism for saying zero?  It has not changed its overall "Ask"?

[COMPANY COUNSEL]:  As of now, I think that's fair in terms of the actual bottom line cost savings.

Closing Args. Tr. at 23:7-17 (transcription errors corrected).

[251]    *See id.* at 125:3-128:7.

[252]    *Maxwell Newspapers,* 981 F.2d at 90.

[253]    *Id.*

appeared in the *American Airlines* opinion,[254] and following counsel's statement of "what does Judge Lane say?"—that "good faith is satisfied by remaining open to alternative saving approaches while adhering to a necessary cost saving target."[255]  But that is not in fact what Judge Lane said,[256] nor was it even a fair paraphrase—especially with the failure to mention the other things Judge Lane said.  Additionally, Pinnacle failed to consider the context of the statements that *were* made by Judge Lane on the pages to which Pinnacle referred; failed to address *other* things Judge Lane said, on those pages and earlier in his decision; and failed to consider other relevant analysis, by Judges Hardin and Gropper, in *Delta Airlines* and *Northwest Airlines*, the other cases on point.

First, Pinnacle gave insufficient attention to the context in which Judge Lane made his remarks.  The time to which Judge Lane was referring was the time *before* the American motion was filed—not the time relevant here, *between motion filing and hearing*, where Pinnacle's failure to show any negotiating movement is of such concern to this Court.[257]  Second, Pinnacle ignored the fact-driven nature of Judge Lane's conclusion that the failure to move was there justified under the facts of that case,[258] and also ignored Judge Lane's careful statement that, with respect to certain aspects of the

---

[254]   It was said to appear at pages *161-*162 of the Lexis version of the opinion.  That would correspond to 477 B.R. at 444-45.

[255]   Closing Args. Tr. at 126:20-23.

[256]   The closest that came to it was Judge Lane's statement that "it is not bad faith to adhere to a necessary cost-saving target," 447 B.R. at 444, after first saying, two sentences earlier, that on the facts there, the failure to move was "*not necessarily* a failure to confer in good faith," *id.* (emphasis added), and then noting, in the following sentence, a general rule very much the opposite:  "a debtor [generally] *cannot* be said to comply with its obligation ... to 'confer in good faith in attempting to reach mutually satisfactory modifications' when it steadfastly maintains that its initial proposal ... is nonnegotiable." *Id.* (quoting *Delta Airlines*, 342 B.R. at 697) (brackets in original; emphasis added).

[257]   *See* 477 B.R. at 443 ("The [Allied Pilots Association] first complains that American did not change its labor 'ask' from its initial proposal on February 1, 2012 to the last proposal *before the filing of the Motion*.") (emphasis added).

[258]   *See id.* ("*Given the facts in this case*, the Court does not agree.") (emphasis added).

-61-

American proposal, American's unwillingness to move was "not necessarily" a failure to confer in good faith.[259]

Third, but no less important, Pinnacle failed to address rulings by other judges in this district, in *Delta Airlines* and *Northwest Airlines*, noted by Judge Lane, that as a general matter had recognized the importance (though not necessity in every case) of a debtor's willingness to show negotiating movement, at least in some respects, in the period after filing of a motion. In his earlier general discussion of the law,[260] before his later, fact-driven, discussion of the facts there before him,[261] Judge Lane analyzed Judge Gropper's and Hardin's earlier rulings in *Northwest Airlines*, and *Delta Airlines*, respectively. In significant reliance on those earlier holdings, Judge Lane observed, in *American Airlines*:

> Section 1113(b)(2) requires that after a proposal is made, but before a hearing on rejection, the debtor meet with the union at reasonable times to negotiate in good faith. To satisfy the requirement of negotiating in good faith, a debtor cannot approach negotiations with a "take it or leave it" mentality.[262]

Judge Lane noted, and endorsed, comments by Judge Hardin in *Delta Airlines*.

Judge Hardin stated:

> [A] debtor cannot be said to comply with its obligation under Section 1113(b)(2) . . . when it steadfastly maintains that its initial proposal under subsection (b)(1)(A) is non-negotiable . . . . [T]he evident purpose and objective of Section 1113(b)(2) is to compel the debtor to negotiate in good faith to

---

[259]    *Id.* at 444 ("American's unwillingness to move on the other savings requested in its initial proposal is *not necessarily* a failure to confer in good faith.") (emphasis added)

[260]    *See id.* at 409-10.

[261]    *See id.* at 443-45.

[262]    477 B.R. at 409 (quoting *Northwest Airlines,* 346 B.R. at 327, which in turn had quoted *Delta Airlines*, 342 B.R. at 697).

> reach "mutually satisfactory modifications."  With
> rare exceptions ... true negotiation necessarily
> requires compromise in each side's bargaining
> positions.  When one side presents a nonnegotiable,
> take-it-or-leave-it proposal, negotiation stalls
> because there is nothing of substance to bargain for
> when one side must bid against itself.[263]

It was only then that Judge Lane went on to state an exception to the general rule:

> This should be determined, however, on a case by
> case basis.  For "depending on the facts of the case,
> a debtor may not be obligated to reduce the total
> amount of cost savings requested in its original
> proposal to demonstrate good faith."[264]

When the totality of what Judges Hardin, Gropper and Lane said is put together, a
more accurate description of the general rule emerges.  It starts with what Judge Hardin
initially said in *Delta Airlines*, goes on to what Judge Gropper said in *Northwest Airlines*,
and then goes on to what Judge Lane actually said in *American Airlines*:  a debtor
generally cannot be said to comply with its obligation to confer in good faith in
attempting to reach mutually satisfactory modifications when it steadfastly maintains that
its initial proposal is nonnegotiable.  But parts of a debtor's section 1113 proposal *may be*
non-negotiable if they are essential to a debtor's reorganization.[265]  It is *not necessarily*
bad faith to adhere to a necessary cost-saving target, but this depends on the facts of the
case, and *depending on the facts of the case*, a debtor may not be obligated to reduce the

---

[263]    *Delta Airlines*, 342 B.R. at 697; *see also American Airlines*, 477 B.R. at 409 (quoting *Delta Airlines*).

[264]    477 B.R. at 409 (quoting *Northwest Airlines,* 346 B.R. at 327).  Judge Gropper had similarly stated, citing *Delta Airlines*, that "[t]he 'good cause' and good faith requirements have been held to preclude a debtor from simply offering a 'take it or leave it' proposal," 346 B.R. at 327, and that "depending on the facts of the case, a debtor may not be obligated to reduce the total amount of cost savings requested in its original proposal to demonstrate good faith." *Id.*

[265]    *See* 477 B.R. at 443 (quoting *Delta Airlines*, 341 B.R. at 697).

total amount of cost savings requested in its original proposal to demonstrate good faith.[266]

But most importantly, there is no legal duty imposed on a debtor to stay put in negotiations, so as to preserve the debtor's showing of necessity or for any other reason. In fact, movement, and not stonewalling, should be the norm.[267]

Ultimately, all of this depends on whether the *entirety* of the demand put forward by a debtor at the time of the filing of the motion is indeed necessary. As Judge Hardin recognized in *Delta Airlines*, the entirety generally will not be. And here the Court finds, on the facts of this case, that the entirety of Pinnacle's demand was not necessary, and that Pinnacle's insistence on no movement whatever in its aggregate demand, after it filed its motion, was error.

Given the need to synthesize several cases to get to the right result, and the false signals that apparently resulted when language was taken out of context, the Court is not of a mind to tag Pinnacle here with bad faith. But Pinnacle was wrong when it concluded that it had had an absolute right (or, worse yet, a duty) not to budge as to its aggregate demand in the negotiations following the filing of its motion. Under these circumstances,

---

[266]    The Court is unpersuaded by Pinnacle's contention that it could comply with its duties by simply demonstrating a willingness to reallocate components of its proposal while adhering to a non-negotiable total. While that could, under certain circumstances, be justified under the facts there shown, it is unjustifiable as a general matter. Calling that "negotiation," as a general matter, is a play on words.

[267]    In this connection, the Court also agrees with Judge Lane when he observed that a debtor must approach negotiations under section 1113 from a vantage point different from that usually taken during collective bargaining. *See* 447 B.R. at 443. As Judge Lane observed, while in typical labor negotiations, both sides begin with a more aggressive position than they believe can be achieved, and then negotiate toward a middle ground, parties in section 1113 negotiations do not have that luxury. It is true, as Pinnacle argues, that a debtor seeking section 1113 relief should not make demands at a high level in contemplation of reducing them thereafter. But that is very different from demonstrating an unwillingness, in the discussions that must take place after the filing of a section 1113 motion, to make any movement in the overall demand at all.

the Pilots certainly had good cause to reject Pinnacle's proposal when it evidenced no movement by Pinnacle whatever.

Conclusion

Pinnacle has come very close to making the showing it must make to reject its collective bargaining agreement with the Pilots. Pinnacle's need for significant reductions in labor costs is profound. Though Delta failed to do everything it could have done to document the extent to which Pinnacle's labor costs exceed those of other Delta regional carriers, Pinnacle's own efforts to investigate that issue satisfied the Court that Pinnacle's pilot labor costs are way over market. And Pinnacle's liquidity issues make it clear that Pinnacle cannot continue under the status quo. As unfortunate as pay cuts for the Pilots would be, the liquidation of Pinnacle, and the loss of 5,800 jobs, would be far worse.

Thus the necessity for dramatic cuts in Pilot labor costs has been shown. So have all of the other requirements for the relief Pinnacle seeks on this motion, with very limited exceptions. The only remaining issues are (1) the *full extent* of the necessary cuts in Pilot labor expense, by reason of failure to show necessity for a "Race to the Bottom" making the Pilots' costs *lower* than anyone else's;[268] (2) whether the Pilots' pain should

---

[268]    It is possible, but unlikely, that Pinnacle's proposal to the Pilots was intended to merely match the competition and not leapfrog below it. (The record is vague, but Pinnacle implied to the contrary: *see* Closing Args. Tr. at 137 (when asking for pay concessions, Pinnacle "then built in a little more…")). If Pinnacle was only trying to match (and not get below) its competition, Pinnacle did not make that point in briefing or argument, nor introduce evidence to establish the basis for that distinction.

Both sides now know the Court's views as to this. Pinnacle has shown the necessity to get its costs down to a level at which it is near or among the lowest cost carriers, but has not shown a need to leapfrog below them. If, with that knowledge, the two sides still cannot reach agreement, Pinnacle can refile its motion, putting in evidence on the distinction between what it needs to be among the lowest cost carriers and what it was asking (or is now asking) to leapfrog below that.

-65-

have been ameliorated, at least to some greater extent, by a better proposal to allow them to share, through equity or profit sharing, in fruits of concessions they were asked to make; and (3) whether Pinnacle properly could have shown no movement whatever in its overall cost savings demand.

With respect to each of these matters (but these matters alone), the Court finds Pinnacle's proposal insufficient to pass muster under sections 1113(b) and 1113(c). While necessity was shown for the great bulk of the requested pay cuts, necessity was not shown for all of them, resulting in a failure to satisfy section 1113(b)(1).

The failure to offer greater equity or profit sharing to better offset the Pilots' wage and benefits sacrifices—which, in the absence of any modification, would give others a windfall at the Pilots' expense—resulted in a failure of the section 1113(b)(1)'s requirement that Pilots be treated fairly and equitably.

And the three deficiencies just noted gave the Pilots good cause not to accept Pinnacle's proposal.

Pinnacle may be well served to present a new proposal that cures the deficiencies just noted.  If Pinnacle does so, and if that does not by itself result in consensual agreement after negotiation with the Pilots, a subsequent motion for 1113 relief will almost certainly be granted.

Dated: New York, New York          _s/Robert E. Gerber___
      November 16, 2012          United States Bankruptcy Judge

---

Of course, even if Pinnacle was only seeking to match (and not get below) its competition, its proposal was deficient in the other two respects the Court noted, and thus relief could not be granted today in any respect.  But the Court would think that all three deficiencies are relatively easy to fix, providing a basis for consensual agreement, or (though this would greatly disappoint the Court) providing a basis upon which a renewed motion could be granted.  Because so little is necessary to complete the record, the Court will hear any such renewed motion on shortened notice.